**Index of Court Filings – CH-22-1654: Chancery Court**
**Cigna Healthcare of Tennessee vs Baptist Memorial**

| No. | Date | Docket Filing |
|---|---|---|
| 001 | 12.06.2022 | Petition to Modify or Vacate, In Part, Partial Final Award in Arbitration -- Short Version |
| 002A | 12.06.2022 | Cigna v. Baptist Summon - Issued |
| 002B | 12.07.2022 | Cigna v. Baptist Summons - Returned Service |
| 003A | 12.06.2022 | Cigna's Motion for Protective Order |
| 003B | 12.06.2022 | Cigna Memorandum ISO Motion for Protective Order |
| 004A | 03.22.2023 | Joint Motion for Protective Order |
| 004B | 03.22.2023 | Signed Proposed Stipulated Protective Order |
| 005 | 05.02.2023 | Stipulated Protective Order |
| 006 | 06.06.2023 | Amended Stipulated Protective Order |
| 007A | 2023.06.13 | Petitioner's Memorandum in support of Motion to Stay |
| 007B | 06.13.2023 | Ex. 1 to Motion to Stay |
| 007C | 06.13.2023 | Ex. 2 to Motion to Stay |
| 008A | 06.13.2023 | Cigna Amended Petition to Modify or Vacate in Part Partial Final Award |
| 008B | 06.13.2023 | Ex. 1 to Cigna Amended Petition |

| No. | Date | Docket Filing |
|---|---|---|
| 008C | 06.13.2023 | Ex. 2 to Cigna Amended Petition |
| 008D | 06.13.2023 | Ex. 3 to Cigna Amended Petition |
| 008E | 06.13.2023 | Cited Authorities Petitioner's Amended Motion to Stay |
| 009A | 08.14.2023 | Petitioner's Amended Motion to Stay |
| 009B | 08.14.2023 | Petitioner's Memo ISO Amended Motion to Stay |
| 009C | 08.14.2023 | Exhibit 1 - First Amended Arbitration Agreement |
| 010A | 08.18.2023 | Baptist's Counter-Petition to Confirm Arbitration Awards and Enter Judgment |
| 010B | 08.18.2023 | Ex. A to Motion to Confirm - 1st Amd Arb Agmt |
| 010C | 08.18.2023 | Ex. B to Motion to Confirm - Order No. 13 |
| 010D | 08.18.2023 | Ex. C to Motion to Confirm - Partial Award |
| 010E | 08.18.2023 | Ex. D to Motion to Confirm Sealed |
| 010F | 08.18.2023 | Notice of Filing Exhibit under Seal |
| 011 | 08.30.2023 | Baptist's Motion to Set Dispositive Hearing |



**CH-22-1654 : CIGNA HEALTHCARE OF TN VS BAPTIST MEMORIAL CHANCERY COURT**

| | |
|---|---|
| **Case Number** | CH-22-1654 |
| **Case Type** | Arbitration |
| **Opened** | 12-06-2022 |
| **Status** | EXECUTIONS |

| | |
|---|---|
| **Plaintiff** | CIGNA HEALTHCARE OF TENNESSEE, INC. |
| **Defendant** | BAPTIST MEMORIAL HEALTHCARE CORPORATION |
| **Judge** | MELANIE TAYLOR JEFFERSON |
| **Amt. of Claim** | $.00 |
| **Jury/Non Jury** | Non Jury |

⊞ Show/Hide Participants

Click here to access documents for this case

| File Date | Case History |
|---|---|
| 08-30-2023 Court | Motion (T) - Baptist's Motion to Set Dispositive Hearing Filed by: DAVID A KING |
| 08-18-2023 Court | PAYMENT RECEIVED - A Payment of $105.57 was made on receipt CHCH135759. Filed by: Court |
| 08-18-2023 Court | Notice without service - Notice of Filing Exhibit Under Seal Filed by: DAVID A KING |
| 08-18-2023 Court | Counter complaint/petition (T) - BAPTIST MEMORIAL HEALTH CARE CORP'S COUNTER-PETITION TO CONFIRM Filed by: DAVID A KING |
| 08-18-2023 Court | Exhibits (T) - EXHIBIT A Filed by: DAVID A KING |
| 08-18-2023 Court | Exhibits (T) - EXHIBIT B Filed by: DAVID A KING |
| 08-18-2023 Court | Exhibits (T) - EXHIBIT C Filed by: DAVID A KING |
| 08-18-2023 Court | Exhibits (T) - EXHIBIT D Filed by: DAVID A KING |
| 08-14-2023 Plaintiff | Amended (T) - Petitioner's Amended Motion to Stay Filed by: ODELL HORTON |
| 08-14-2023 Plaintiff | Memorandum (T) - Petitioner's Memorandum in Support of Amended Motion to Stay Filed by: ODELL HORTON |
| 08-14-2023 Plaintiff | Exhibits (T) - Exhibit 1- First Amended Arbitration Agreement Filed by: ODELL HORTON |
| 07-27-2023 Court | Calendar strike (T) - Petitioner's Motion to Stay set for July 28, 2023 at 9:00 a.m. PLEASE STRIKE Filed by: Court |
| 06-13-2023 Plaintiff | Amended (T) - Amended Petition to Modify or Vacate, In Part, "Partial Final Award" In Arbitration Filed by: ODELL HORTON |
| 06-13-2023 Plaintiff | Exhibits (T) - Exhibit 1 to Amended Petition Filed by: ODELL HORTON |
| 06-13-2023 Plaintiff | Exhibits (T) - Exhibit 2 to Amended Petition Filed by: ODELL HORTON |
| 06-13-2023 Plaintiff | Exhibits (T) - Exhibit 3 to Amended Petition Filed by: ODELL HORTON |

| Date / Party | Description |
|---|---|
| 06-13-2023 Plaintiff | Exhibits (T) - Cited Authorities<br>Filed by: ODELL HORTON |
| 06-13-2023 Plaintiff | Motion (T) - Petitioner's Motion to Stay<br>Filed by: ODELL HORTON |
| 06-13-2023 Plaintiff | Memorandum (T) - Petitioner's Memorandum In Support of Motion to Stay<br>Filed by: ODELL HORTON |
| 06-13-2023 Plaintiff | Exhibits (T) - Exhibit 1 to Motion to Stay<br>Filed by: ODELL HORTON |
| 06-13-2023 Plaintiff | Exhibits (T) - Exhibit 2 to Motion to Stay<br>Filed by: ODELL HORTON |
| 06-06-2023 Court | Order (T) - AMENDED STIPULATED PROTECTIVE ORDER<br>Filed by: Court |
| 05-02-2023 Court | Order (T) - STIPULATED PROTECTIVE ORDER<br>Filed by: Court |
| 03-22-2023 Plaintiff | Motion (T) - Joint Motion for Protective Order<br>Filed by: ODELL HORTON |
| 12-13-2022 Plaintiff | Motion (T) - Motion for Admission Pro Hac Vice of Pamela Begaj Loutos<br>Filed by: ODELL HORTON |
| 12-13-2022 Plaintiff | Motion (T) - Motion for Admission Pro Hac Vice of John J. Hamill<br>Filed by: ODELL HORTON |
| 12-07-2022 Plaintiff | Returns other (T) - Summons return served on Baptist Memorial Healthcorp via PPS<br>Filed by: ODELL HORTON |
| 12-06-2022 Plaintiff | Motion (T) - Cigna Healthcare of Tennessee Inc Motion for Protective Order<br>Filed by: ODELL HORTON |
| 12-06-2022 Plaintiff | Memorandum (T) - Memorandum in Support of Cigna Healthcare of Tennessee Inc Motion for Protective Order<br>Filed by: ODELL HORTON |
| 12-06-2022 Court | PAYMENT RECEIVED - A Payment of $301.70 was made on receipt CHCH131446.<br>Filed by: Court |
| 12-06-2022 Court | Original complaint (T)<br>Filed by: Court |
| 12-06-2022 Plaintiff | Request (T) - Petition to Modify or Vacate, In Par, "Partial Final Award" in Arbitration<br>Filed by: ODELL HORTON |
| 12-06-2022 Plaintiff | Summons issued other - SUMMONS ISSUED TO BAPTIST MEMORIAL HOSPITAL VIA PPS<br>Filed by: ODELL HORTON |

# TAB 001

ELECTRONICALLY FILED
2022 Dec 06 10:39 AM
CLERK OF COURT - CHANCERY

## IN THE CHANCERY COURT FOR SHELBY COUNTY, TENNESSEE
## FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

| | |
|---|---|
| **CIGNA HEALTHCARE OF TENNESSEE, INC.,** ) | |
| ) | |
| **Petitioner** ) | |
| ) | **Case No.** _____ |
| **v.** ) | |
| ) | |
| **BAPTIST MEMORIAL HEALTHCARE CORPORATION,** ) | |
| ) | |
| **Respondent** ) | |

## PETITION TO MODIFY OR VACATE, IN PART,
## "PARTIAL FINAL AWARD" IN ARBITRATION

To the Chancellors of the Chancery Court for the Thirtieth Judicial District at Memphis.

### I. Introduction

1.      The parties are engaged in an ongoing and confidential arbitration on behalf of themselves and their affiliated entities (the "Arbitration").

2.      The Arbitration is being administered over the course of several phases.  Two phases occurred in 2021 and 2022, while three and potentially more will proceed in 2023.

3.      Baptist Memorial Healthcare Corporation ("Baptist") is the complaining party in the Arbitration and Cigna HealthCare of Tennessee ("Cigna") is the defending party.

4.      On September 7, 2022, a three-member arbitration panel (the "Panel") issued a decision that addressed certain, but not all, of the issues (the "September 2022 Decision"). Notwithstanding the ongoing Arbitration, the Panel designated the September 2022 Decision with terminology that may trigger the required timing to challenge it under the Federal Arbitration Act

("FAA"), 9 U.S.C. § 1 et. seq.  The particular issues relate to one cause of action in the demand Baptist made in Arbitration.

5.      As the Arbitration is confidential, Cigna requests leave to wait to submit a copy of the September 2022 Decision after a protective order is entered.  Cigna will also submit a confidential longer form of its Petition that sets forth the allegations and grounds for relief in more detail.

6.      As explained below, upon the filing of a longer form of the Petition and entry of a protective order, Cigna will be filing a motion to stay this proceeding until an actual final award is issued by the Panel because no actual relief has been granted to Baptist and there is no distinct and palpable injury.

7.      The Arbitration is pursuant to the FAA.  By agreement of the parties, the standard of review over decisions by the Panel in the Arbitration (including the September 2022 Decision) is set forth in the FAA.  Tennessee or federal law otherwise provides the substantive law governing the proceedings (depending on the issue), including whether a state law cause of action exists.

8.      Cigna submits that (i) substantial portions of the September 2022 Decision are correct under governing law, but (ii) the Panel also made certain determinations in the September 2022 Decision as to one cause of action of Baptist's arbitration demand (the "Referenced Cause of Action") that are beyond its authority and in manifest disregard of Tennessee law.  The Panel's errors include (among others identified below) permitting Baptist to proceed on the Referenced Cause of Action that is explicitly unavailable under the parties' choice of governing Tennessee law and has been rejected in this exact context by the Tennessee Court of Appeals.

9.      Cigna challenges only those portions of the September 2022 Decision that concern the Referenced Cause of Action, which it submits were beyond the Panel's authority and were issued in manifest disregard of Tennessee or federal law.

10.     The Panel was bound to apply governing Tennessee state law on Tennessee state law issues.  The parties did not agree to permit the Panel to depart from Tennessee law as to Tennessee state law causes of action.  But the Panel expressly did so, by permitting the Referenced Cause of Action to proceed even though Tennessee courts have held that no such cause of action is available under Tennessee law in the very circumstances that exist here.  Thus there is clearly established legal precedent against the Panel's determination.

11.     The Panel was bound to apply governing federal law on federal issues.  The parties did not agree to permit the Panel to depart from federal law as to federal causes of action and preemptions governed by ERISA.  But the Panel expressly did so, as will be explained in the confidential version of Cigna's Petition.  Thus there is clearly established legal precedent against the Panel's determination.

12.     Despite the Panel having exceeded its authority on certain issues, Cigna does not believe the Panel's September 7, 2022 Decision is ripe for review in this Petition.  The Panel has not issued what Cigna believes to be a final determination in the Arbitration concerning the Referenced Cause of Action that should yet be subject to any petition by Cigna like this one seeking review under the Federal Arbitration Act.  Nevertheless, because the Panel designated its September 2022 Decision as a "Partial Final Award," Cigna is compelled to file this Petition to preserve its ability to challenge that decision (at an appropriate time after the Panel renders its final decision as to the Referenced Cause of Action that it has permitted to proceed).

3

13.     In the next phase of the Arbitration, set for early 2023, the Panel has permitted the Referenced Cause of Action to go forward.  The Panel has not issued any decision on whether any actual relief is owed to Baptist on that cause of action.  It has only determined that Baptist has asserted a valid cause of action under Tennessee law.  No decision on whether any actual relief is owed is expected until a future point well into 2023.

14.     It is also entirely possible that Cigna may choose not to pursue a challenge to any actual final decision rendered by the Panel (depending on the Panel's ultimate determinations), which again will not be issued until well into 2023.

15.     As Cigna has not been ordered to provide any relief, it is doubtful that Cigna has standing under Tennessee or federal law to pursue this Petition at this time.  To date there is no distinct and palpable injury, but only conjectural and hypothetical injury.  But again, the Panel's designation of the Partial Final Award as a final award requires that this challenge be filed at this time to preserve Cigna's rights.

16.     Nor would it be efficient to proceed on a challenge to any aspect of the Panel's determinations when multiple phases remain to be pursued (after which challenges might also be levied by either party depending on the ultimate rulings).

17.     The Panel nevertheless has designated the September 2022 Decision in a way that leaves uncertain whether the time to challenge the determinations on the Referenced Cause of Action will expire on December 7, 2022.

18.     The Panel declined Cigna's request that it modify its decision that would remedy any uncertainties as to when the timing to challenge the Referenced Cause of Action is triggered, but has maintained the "Partial Final Award" designation.

19.     Out of an abundance of caution, and to ensure preservation of its rights, Cigna respectfully submits this Petition to vacate or modify certain portions of the September 2022 Decision on the basis that they are beyond the authority of the Panel and are in manifest disregard of the law.

20.     Upon entry of a protective order,  Cigna will be submitting a motion to stay this proceeding pending completion of all aspects of the Arbitration, including an actual final determination by the Panel of the ultimate question submitted to arbitration (as detailed below).

21.     The full details of the Arbitration relevant to this Petition and the motion to stay are subject to a strict confidentiality agreement governing the Arbitration.

22.     Cigna includes in the publicly-available version of this Petition only the averments necessary to state the issue and to confirm this Court's jurisdiction.

23.     A "confidential" and "amended" version of this Petition will be filed under seal upon entry of an appropriate protective order.  It will set out Cigna's complaint in considerably more detailed materials and provide the relevant accompanying materials from the Arbitration.

## II.  **Parties**

24.     Cigna HealthCare of Tennessee, Inc., is a Tennessee corporation.  It is a subsidiary of Cigna Corporation and is related to multiple Cigna affiliates.  Cigna participated in the Arbitration on behalf of itself and its affiliated entities.

25.     Baptist Memorial HealthCare Corporation is a Tennessee non-profit corporation.  Baptist participated in the Arbitration on behalf of itself and its affiliated entities.

## III.  **Jurisdiction and Venue**

26.     This matter arises under the Federal Arbitration Act.

27.     This Court has general jurisdiction under Tennessee and federal law to address the subject matter of this petition.

28.     The primary situs of the Arbitration insofar as the issues at stake in this Petition are in this venue, as this is the area in which the services at issue in the Arbitration took place.

## IV.  **Factual Background**

29.     Cigna and Baptist entered into an agreement to arbitrate a particular dispute that had arisen between them (the "Arbitration Agreement").  The first iteration of the Arbitration Agreement was entered in November 2019.  The Arbitration Agreement is a confidential document that will be made available after entry of a protective order.

30.     The Arbitration Agreement specifies the ultimate question to be addressed in the Arbitration (the "Arbitration Question").  The Arbitration Agreement will be provided in the confidential version of this Petition.

31.     There was no agreement or provision of law requiring arbitration between the parties.  The parties voluntarily chose to proceed in a private arbitration.

32.     The parties selected three arbitrators to form the Panel that would preside over the Arbitration.  The arbitrators are not based in Tennessee.

33.     The Arbitration is governed by the FAA, including its standard and scope of review. Tennessee substantive law governs in the Arbitration where causes of action (or defenses) are governed by state law, and federal substantive law governs for matters that arise under federal law.

34.     The Arbitration has proceeded in phases, with the parties and the Panel having undertaken a process to address which issues would be decided in each phase.

35.     Two phases have gone forward.   Two evidentiary hearings and associated proceedings have taken place, covering various dates in February 2021, November 2021, December 2021, and in 2022.  A third phase including an evidentiary hearing is set for January 2023, with other phases or partial phases to continue in 2023.

36.     The Arbitration Question has not been answered, including as to the Referenced Cause of Action.  At least one detailed phase—and potentially additional detailed phases—of the Arbitration remain to be conducted.

37.     The Panel issued determinations that it entitled a "Partial Final Award" on September 7, 2022.

38.     The Panel incorrectly designated the Partial Final Award, and determinations in the Award should not be considered "final" in the sense of triggering a due date for any challenges.

39.     The Panel has declined Cigna's request that it modify the Award to clarify that no challenge would be due at this time.

40.     Baptist has taken the position that a challenge (if any) would be due by December 7, 2022.

41.     Substantial portions of the September 2022 Decision were correct.  But certain portions of the September 2022 Decision concerning the Referenced Cause of Action were beyond the Panel's authority and reflect a manifest disregard of the law.  These include determinations that permit Baptist to proceed against Cigna on the Referenced Cause of Action that is unavailable under Tennessee law and determinations that certain portions of the Referenced Cause of Action are not preempted under federal law.

42.     A court may modify or vacate an arbitration award where certain statutory or judicially created grounds are present.

7

43.     Section 9 of the FAA allows a court to confirm an arbitration award upon application of a party to the arbitration.

44.     Sections 10 and 11 of the FAA set forth the statutory grounds for modifying or vacating an arbitration award, including "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. § 10(a)(4).

45.     The scope of an arbitrator's authority is determined by the terms of the agreement between the parties and applicable law.  Arbitrations may only proceed on issues consistent with the terms and scope of the parties' agreement to arbitrate.  *Frizzell Constr. Co., Inc. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 84-86 (Tenn. 1999).

46.     Vacation or modification of the award is an appropriate remedy where arbitrators exceed their contractual authority or where the arbitration award was made in manifest disregard of the law.

47.     An arbitrator acts in manifest disregard of the law where (a) the applicable legal principle is clearly defined and not subject to reasonable debate; and (b) the arbitrator refused to heed that legal principle.  *Coffee Beanery, Ltd. v. WW, L.L.C.*, 300 Fed. Appx. 415, 418 (6th Circ. 2008).  These standards are met when the arbitrator does not follow clearly established legal precedent.  *Id*. at 420.

48.     The Panel exceeded its power and acted in manifest disregard of the law by (a) permitting Baptist to proceed on a state law cause of action (in the Referenced Cause of Action) that is expressly not recognized by Tennessee law; and (b) determining that federal law did not preempt that same Referenced Cause of Action, at least in part.

8

### V.  <u>Modification or Vacatur of the Partial Final Award</u>

49.     Cigna incorporates all of the foregoing averments by reference as if fully set forth herein.

50.     For reasons that will be more fully set forth in the confidential submissions, the Panel's determinations that Baptist may proceed on a cause of action barred by Tennessee state law and that federal law did not preempt that cause of action, at least in part, were beyond the Panel's authority and in manifest disregard of the law.

### VI.  <u>Motion to Stay</u>

51.     The Panel designated its September 2022 Decision as a Partial Final Award.  Even with that caption, it is uncertain whether Cigna has standing to pursue this Petition at this time. No actual relief has been granted to Baptist.  To date there is no distinct and palpable injury, but only conjectural and hypothetical injury.

52.     In fact, depending on how the Panel ultimately answers the Arbitration Question, Cigna may be found to have no liability to Baptist, in which case it is uncertain whether Cigna would ultimately pursue any challenge to the September 2022 Decision regarding the Referenced Cause of Action.  If Cigna is ultimately found not liable to Baptist after further proceedings in the Arbitration, there would be no reason for Cigna to seek to vacate the September 2022 Decision however wrong certain determinations might be.

53.     For example, it remains entirely possible that the Panel may determine that no further relief (or minimal relief) is required when the Panel adjudicates the Referenced Cause of Action that it is permitting to proceed.  A petitioner would be hard pressed to find a sensible basis to invoke this Court's jurisdiction and resources in resolving a dispute that has no actual consequence.

54.     Upon entry of a protective order, Cigna will separately submit a motion to stay this proceeding, citing the Court's broad authority to control matters on its docket.

55.     The appropriateness of a stay will be addressed in the separate motion.

## VII.  <u>Prayer for Relief</u>

WHEREFORE PREMISES CONSIDERED, Cigna respectfully requests that this Court enter an Order granting Cigna the following remedies and relief:

1.     As shall be requested in a separate motion to stay filed in this action, stay this proceeding until (a) an actual final award is issued by the Panel in the Arbitration on the Referenced Cause of Action that the Panel has permitted to proceed; and (b) Cigna notifies the Court that it desires to proceed with this action.

2.     As shall be requested in a separate motion for a protective order filed in this action, enter a protective order governing the handling of confidential information and materials in this action, including the filing of the same.

3.     If and when this matter proceeds, modify or vacate the Partial Final Award as to the Referenced Cause of Action to determine that the Referenced Cause of Action is unavailable under Tennessee law and thus may not be pursued or the source of any relief.

4.     If and when this matter proceeds, modify or vacate the Partial Final Award as to the Referenced Cause of Action to determine that the Referenced Cause of Action is preempted, at least in part.

5.     Grant to Cigna such other and further relief as the Court deems just and proper.

Respectfully submitted,

WYATT, TARRANT & COMBS, LLP

/s/ Odell Horton, Jr.
Odell Horton, Jr. (Tenn. Bar No. 12426)
Andrew J. Pulliam (Tenn. Bar No. 16863)
6070 Poplar Avenue
Suite 300
Memphis, TN 38119
ohorton@wyattfirm.com
apulliam@wyattfirm.com
901.537.1000

DLA PIPER LLP (US)

John J. Hamill (*pro hac vice forthcoming*)
Pamela Begaj Loutos (*pro hac vice forthcoming*)
DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606
john.hamill@us.dlapiper.com
pamela.loutos@us.dlapiper.com
312-368-7036

*Counsel for Cigna HealthCare of Tennessee, Inc.*

11

# TAB 002A

ELECTRONICALLY FILED
2022 Dec 06 10:39 AM
CLERK OF COURT - CHANCERY

| STATE OF TENNESSEE 30th JUDICIAL DISTRICT CHANCERY COURT | **SUMMONS\*\*** | DOCKET NUMBER CH-_____ |
|---|---|---|

| Petitioner | Respondent |
|---|---|
| Cigna Healthcare of Tennessee, Inc. | Baptist Memorial Healthcare Corporation |

TO:     (NAME AND ADDRESS OF RESPONDENT)

Baptist Memorial Healthcare Corporation

c/o David King, Esq., Polsinelli Firm

401 Commerce Street, Suite 900

Nashville, TN  37219

Method of Service:

- ☐ Shelby County Sheriff
- ☑ Private Process Server
- ☐ Out of County Sheriff\*
- ☐ Secretary of State\*
- ☐ Comm. Of Insurance\*
- ☐ Certified Mail
- ☐ Other

*Attach Required Fees

You are summoned to defend a civil action filed against you in the Chancery Court of Shelby County, Tennessee. Your defense to this action must be made within thirty (30) days from the date this summons is served upon you. You must file your defense with the Clerk of the Court and send a copy to the Plaintiff/Plaintiff's attorney at the address listed below. If you fail to defend this action within thirty (30) days of service, judgment by default may be rendered against you for the relief sought in the complaint. Questions regarding this summons and the attached documents should be addressed to the Attorney/Plaintiff listed below.

Attorney for Petitioner or Plaintiff if filing Pro Se: (Name, address & telephone number)

Odell Horton, Jr. and Andrew Pulliam

Wyatt, Tarrant & Combs, LLP

6070 Poplar Ave., Suite 300

Memphis, TN  38119 / 901-537-1000

ISSUED_____of_____, 20_____

W. Aaron Hall, Clerk and Master

By: _____

Deputy Clerk & Master

140 Adams, Room 308    Memphis, TN 38103

TO THE SHERIFF:

_____

_____

Came to hand

_____day of_____, 20 _____

Sheriff

### CERTIFICATION (IF APPLICABLE)

| I, W. Aaron Hall, Clerk & Master of the Chancery Court in the State of Tennessee, Shelby County, do certify this to be a true and correct copy of the original summons issued in this case. | **W. Aaron Hall, Clerk & Master** By: _____ D. C. & M. |
|---|---|

\*\*Submit one original and one copy for each defendant to be served.

♿ If you need accommodations because of a **disability**, please call the ADA Coordinator at ( 901)222-2357.

**For questions regarding scheduling or filing, please contact the court.**

Notice of Personal Property Exemption:

TO THE DEFENDANT(S):

      Tennessee law provides a ten thousand dollar ($10,000.00) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state docket number on list.

## RETURN OF SERVICE OF SUMMONS

I hereby certify that I **HAVE** served the within summons:

By delivering on the_____day of_____, 20_____at_____am/pm a copy of the

summons and a copy of the Complaint to the following Defendant _____

at _____

_____    By: _____
Signature of person accepting service                    Sheriff or other authorized person to serve process

## RETURN OF NON-SERVICE OF SUMMONS

I hereby certify that I **HAVE NOT** served the within summons:

To the named defendant_____because _____

is (are) not to be found in this county after diligent search and inquiry for the following reason(s):_____.

This_____day of_____, 20 _____

By:__Sheriff or other authorized person to serve process

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the_____day of_____, 20_____, I sent, postage prepaid, by registered return receipt

mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case CH-_____to  the

defendant_____. On the_____day of_____, 20_____, I

received the return receipt, which had been signed by_____on the_____ day of _____,

20_____. The return receipt is attached to this original summons to be filed by the Chancery Court Clerk & Master.

| **Sworn to and subscribed before me on this_____day of** _____ , **20**_____ . Signature of_____Notary Public or_____ Deputy Court Clerk: _____ My Commission Expires: | Signature of Plaintiff, Plaintiff's attorney or other person authorized by statute to serve process. _____ |
|---|---|
| ATTACH RETURN RECEIPT HERE (IF APPLICABLE) | |



**The Shelby County, Tennessee Chancery Court**

**Case Style:**      CIGNA HEALTHCARE OF TN VS BAPTIST MEMORIAL

**Case Number:**     CH-22-1654

**Type:**         Summons issued other



Ms Kat Minton, DC

Electronically signed on 12/06/2022 02:12:17 PM

# TAB 002B

ELECTRONICALLY FILED
2022 Dec 08 10:39 AM
CLERK OF COURT - CHANCERY

| STATE OF TENNESSEE<br>30th JUDICIAL DISTRICT<br>CHANCERY COURT | **SUMMONS\*\*** | DOCKET NUMBER<br><br>CH-_____ |
|---|---|---|

| Petitioner<br><br>**Cigna Healthcare of Tennessee, Inc.** | Respondent<br><br>**Baptist Memorial Healthcare Corporation** |
|---|---|

**TO:     (NAME AND ADDRESS OF RESPONDENT)**

**Baptist Memorial Healthcare Corporation**

**c/o David King, Esq., Polsinelli Firm**

**401 Commerce Street, Suite 900**

**Nashville, TN 37219**

Method of Service:

- ☐ Shelby County Sheriff
- ☑ Private Process Server
- ☐ Out of County Sheriff*
- ☐ Secretary of State*
- ☐ Comm. Of Insurance*
- ☐ Certified Mail
- ☐ Other
  *Attach Required Fees

You are summoned to defend a civil action filed against you in the Chancery Court of Shelby County, Tennessee. Your defense to this action must be made within thirty (30) days from the date this summons is served upon you. You must file your defense with the Clerk of the Court and send a copy to the Plaintiff/Plaintiff's attorney at the address listed below. If you fail to defend this action within thirty (30) days of service, judgment by default may be rendered against you for the relief sought in the complaint. Questions regarding this summons and the attached documents should be addressed to the Attorney/Plaintiff listed below.

| Attorney for Petitioner or Plaintiff if filing Pro Se: (Name, address & telephone number)<br><br>**Odell Horton, Jr. and Andrew Pulliam**<br><br>**Wyatt, Tarrant & Combs, LLP**<br><br>**6070 Poplar Ave., Suite 300**<br><br>**Memphis, TN 38119 / 901-537-1000** | ISSUED_____of_____, 20_____<br><br>**W. Aaron Hall, Clerk and Master**<br><br>By: _____<br>Deputy Clerk & Master<br><br>140 Adams, Room 308   Memphis, TN 38103 |
|---|---|
| TO THE SHERIFF:<br><br>_____<br><br>_____ | Came to hand<br><br>_____day of_____, 20_____<br><br>Sheriff |

**CERTIFICATION (IF APPLICABLE)**

| I, W. Aaron Hall, Clerk & Master of the Chancery Court in the State of Tennessee, Shelby County, do certify this to be a true and correct copy of the original summons issued in this case. | **W. Aaron Hall, Clerk & Master**<br><br>By: _____<br>D. C. & M. |
|---|---|

\*\*Submit one original and one copy for each defendant to be served.

♿ If you need accommodations because of a **disability**, please call the ADA Coordinator at ( 901)222-2357.
**For questions regarding scheduling or filing, please contact the court.**

**Notice of Personal Property Exemption:**
    TO THE DEFENDANT(S):
        Tennessee law provides a ten thousand dollar ($10,000.00) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state docket number on list.

## RETURN OF SERVICE OF SUMMONS

I hereby certify that I **HAVE** served the within summons:

By delivering on the _7th_ day of _December_, 20 _22_ at _11:00_ (am/pm a copy of the

summons and a copy of the Complaint to the following Defendant _Baptist Memorial Healthcare Corporation via_ _David King (Kayla Gardner_ _(legal assistant)_

at _Polsinelli firm_

_Kayla Gardner_                                                    By: _Dion Burford_
Signature of person accepting service                    Sheriff or other authorized person to serve process

## RETURN OF NON-SERVICE OF SUMMONS

I hereby certify that I **HAVE NOT** served the within summons:

To the named defendant_____because _____

is (are) not to be found in this county after diligent search and inquiry for the following reason(s):_____.

This_____day of_____, 20 _____

By: Sheriff or other authorized person to serve process

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the_____day of_____, 20_____, I sent, postage prepaid, by registered return receipt

mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case CH-_____to the

defendant_____. On the_____day of_____, 20_____, I

received the return receipt, which had been signed by_____on the_____ day of _____,

20_____. The return receipt is attached to this original summons to be filed by the Chancery Court Clerk & Master.

| **Sworn to and subscribed before me on this_____day of** | Signature of Plaintiff, Plaintiff's attorney or other person authorized by statute to serve process. |
|---|---|
| _____, 20_____ . | |
| Signature of_____Notary Public or_____ Deputy Court Clerk: | |
| _____ | _Dion Burford (legal courier_ |
| My Commission Expires: | |

ATTACH RETURN

RECEIPT HERE

(IF APPLICABLE)



**The Shelby County, Tennessee Chancery Court**

**Case Style:**       CIGNA HEALTHCARE OF TN VS BAPTIST MEMORIAL

**Case Number:**    CH-22-1654

**Type:**               Summons issued other



Ms Kat Minton, DC

Electronically signed on 12/06/2022 02:12:17 PM

# TAB 003A

ELECTRONICALLY FILED
2022 Dec 06 3:19 PM
CLERK OF COURT - CHANCERY

**IN THE CHANCERY COURT FOR SHELBY COUNTY, TENNESSEE**
**FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS**

| | |
|---|---|
| CIGNA HEALTHCARE OF TENNESSEE, INC.,     ) | |
|     ) | |
|     ) | |
| **Petitioner**     ) | Case No. CH - 22-1654 |
|     ) | |
| v.     ) | |
|     ) | |
| BAPTIST MEMORIAL HEALTHCARE CORPORATION,     ) | |
|     ) | |
| **Respondent**     ) | |

**CIGNA HEALTHCARE OF TENNESSEE, INC.'S**
**MOTION FOR PROTECTIVE ORDER**

To the Chancellors of the Chancery Court for the Thirtieth Judicial District at Memphis.

Petitioner Cigna Healthcare of Tennessee, Inc. ("Cigna"), respectfully submits this Motion for Protective Order to govern the designation and protection from disclosure and use of confidential information during this action. The Declaration of Charles K. Utterback is attached to Cigna's Motion as <u>Exhibit A</u> in support of this request. As shown in the memorandum submitted in support of this motion, good cause exists for entry of a protective order in this matter. For the reasons set forth herein and in the memorandum supporting this motion, Cigna requests that the Court enter a protective order in this action. A proposed Protective Order will be submitted for the Court's review and consideration after consultation of the parties' counsel.

Respectfully submitted,

WYATT, TARRANT & COMBS, LLP

/s/ Odell Horton, Jr.
Odell Horton, Jr. (Tenn. Bar No. 12426)
Andrew J. Pulliam (Tenn. Bar No. 16863)
6070 Poplar Avenue
Suite 300
Memphis, TN 38119
ohorton@wyattfirm.com
apulliam@wyattfirm.com
901.537.1000

DLA PIPER LLP (US)

John J. Hamill (*pro hac vice forthcoming*)
Pamela Begaj Loutos (*pro hac vice forthcoming*)
DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606
john.hamill@us.dlapiper.com
pamela.loutos@us.dlapiper.com
312-368-7036

## <u>CERTIFICATE OF CONSULTATION</u>

This is to certify that John J. Hamill as counsel for Cigna as Petitioner communicated with counsel for Respondent, David King, on December 5, 2022 via telephone with respect to the relief sought in the present Motion for Entry of Protective Order.  Counsel for Respondent communicated that Respondent may not oppose the motion depending on the specific proposed language in the proposed Protective Order.

<div style="text-align: right;">

/s/ Odell Horton, Jr.
Odell Horton, Jr.

</div>

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing will be served on the

following counsel for Respondent by hand delivery with service of process in this case.

David King
Polsinelli
401 Commerce Street, Suite 900
Nashville, TN 37219

<u>/s/ Odell Horton, Jr.</u>
Odell Horton, Jr.

4

# EXHIBIT A

**IN THE CHANCERY COURT FOR SHELBY COUNTY, TENNESSEE
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS**

| | |
|---|---|
| **CIGNA HEALTHCARE OF TENNESSEE, INC.** ) <br> ) <br> ) <br>     **Petitioner,** ) <br> ) <br> **v.** ) <br> ) <br> **BAPTIST MEMORIAL HEALTHCARE CORPORATION** ) <br> ) <br> ) <br>     **Respondent.** ) | **Case No.  CH-22-1654** |

<u>**T.R.C.P. 72 DECLARATION OF CHARLES K. UTTERBACK, MHSA**</u>

I, Charles K. Utterback, declare as follows:

1.      I have personal knowledge of the matters stated herein.

2.      I have worked for Cigna Health and Life Insurance Company since 1989 and I became involved in negotiating the contracts and managing the provider networks between the Cigna entities (including Cigna Healthcare of Tennessee, Inc.) (collectively, "Cigna") and Tennessee healthcare providers, including hospitals, in 2000.  My current title at Cigna is Vice President, Network Management.

3.      In my capacity as Vice President, Network Management for Cigna, I am familiar with and have knowledge concerning the Arbitration Agreement between Cigna and Baptist Memorial Healthcare Corporation ("Baptist") that is the parties' agreement to arbitrate the underlying dispute.

4.      I make this Declaration of my personal knowledge and in support of Cigna's Motion for Protective Order to govern the protection from disclosure of confidential information in this action.

5.      The full details of the Arbitration between the parties that is relevant to this Petition are subject to a strict confidentiality agreement governing the Arbitration.  The Arbitration Agreement contains a strict provision requiring both the Agreement itself and virtually all aspects of the Arbitration to remain confidential—including any award.  Among other provisions to ensure confidentiality, the Arbitration Agreement expressly requires that parties must use best efforts to ensure that any award is filed under seal in a proceeding such as this one.  All arbitration communications, filings, proceedings, documents exchanged, and award(s) are to be kept strictly confidential.

6.      The Arbitration is itself governed by a multi-tier protective order entered by agreement between the parties that ensures its strict confidentiality.  The Arbitration has involved substantial volumes of internal business and proprietary information unique to Cigna and to Baptist.  It also involves substantial volumes of information protected under the Health Insurance Portability and Accountability Act ("HIPAA").

7.      Maintaining confidentiality was an important factor in the parties choosing arbitration because of a strong need to protect business sensitive information.

8.      The Arbitration is subject to a strong confidentiality protective order as well as mutual commitments to confidentiality in the Arbitration Agreement.  Maintaining confidentiality is important because disclosure of the parties' sensitive business, commercial, and financial information would be competitively damaging to reveal.   The protected information is normally protected by the parties through secure means.

9.      The sensitive information also includes HIPAA-protected Personal Health Information.

10.     The parties and the panel in the Arbitration, for these reasons, have taken significant steps throughout the Arbitration to ensure the proceedings and information exchanged are confidential and protected from disclosure.  Even the audiences from the respective parties who may observe and review material portions of the record evidence has been limited.

11.     Due to the confidential nature of the information contained in documents that will be submitted to the Court in this matter, protection from disclosure is critical for the parties to maintain the confidentiality agreed to in the Arbitration Agreement in order to protect from disclosure of the parties' internal business and proprietary information unique to Cigna and to Baptist.

12.     More specifically, these documents should be protected from disclosure because the confidential commercial information contained therein can be used to directly compete with the parties or, alternatively, might be disclosed by a competitor to decrease the competitive advantage of the information.  Simply put, the disclosure of the parties' confidential commercial information would result in very serious injury to the parties' business, or, stated differently, great competitive disadvantage and irreparable harm.

13.     I declare under penalty of perjury that the foregoing is true and correct.

Charles K. Utterback

Date:  December 5, 2022

3

# TAB 003B

ELECTRONICALLY FILED
2022 Dec 06 3:19 PM
CLERK OF COURT - CHANCERY

## IN THE CHANCERY COURT FOR SHELBY COUNTY, TENNESSEE
## FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

| | |
|---|---|
| CIGNA HEALTHCARE OF TENNESSEE, INC., ) ) ) | |
| **Petitioner** ) ) | Case No. **CH-22-1654** |
| v. ) ) | |
| BAPTIST MEMORIAL HEALTHCARE CORPORATION, ) ) ) | |
| **Respondent** ) | |

## MEMORANDUM IN SUPPORT OF CIGNA HEALTHCARE OF TENNESSEE, INC.'S MOTION FOR PROTECTIVE ORDER

To the Chancellors of the Chancery Court for the Thirtieth Judicial District at Memphis.

Petitioner Cigna Healthcare of Tennessee, Inc. ("Cigna"), respectfully submits this Memorandum in Support of its Motion for Protective Order to govern the designation and protection from disclosure and use of confidential information during this action. The Declaration of Charles K. Utterback is attached to Cigna's Motion as Exhibit A in support of this request. For the reasons set forth herein, Cigna requests that the Court enter a proposed Protective Order to be submitted for the Court's review and consideration following the parties' consultation.

## I.      FACTS AND PROCEDURAL HISTORY

The parties are engaged in an ongoing and confidential arbitration on behalf of themselves and their affiliated entities (the "Arbitration"). Cigna and Baptist Memorial Healthcare Corporation ("Baptist") entered into an agreement to arbitrate a particular dispute that had arisen between them (the "Arbitration Agreement"). Baptist is the complaining party in the Arbitration and Cigna is the defending party.

The Arbitration concerns Baptist's assertion that it is owed money as additional reimbursement (beyond what Baptist already was paid and received) on certain instances between 2013-19 where Baptist provided emergency or other services to patients whose health benefit plans were provided by a third party but administered by Cigna as a third party administrator ("Cigna members").[1]  Baptist asserts that it was obligated to provide services to Cigna members under the Emergency Medical Treatment and Active Labor Act of 1986 ("EMTALA") and its progeny, that it has not been reasonably reimbursed for its services, and that Cigna should be ordered to pay any remaining amounts.  The precise figures are in some flux, but there are between 16,000 and 19,000 individual health care reimbursement claims at stake, covering thousands of individual patients.  Baptist's assertion is that it has not been paid reasonably under its view of the law and the facts.

There was no agreement or provision of law requiring arbitration between the parties.  The parties voluntarily chose to proceed in a private arbitration and entered into an Arbitration Agreement to effect and control the Arbitration.

The Arbitration is being administered over the course of several "phases."  Two phases occurred in 2021 and 2022, while upwards of three and as many as four more are set to begin in 2023.

On September 7, 2022, a three-member arbitration panel (the "Panel") issued a decision that addressed some, but not all, of the issues (the "Partial Final Award").  Notwithstanding the ongoing Arbitration, the Panel designated the decision a "Partial Final Award."  The Panel has designated the Partial Final Award in a way that leaves open the possibility that the time to challenge any aspects of the decision will expire on December 7, 2022.  The Panel declined to

---

[1]     As noted, most of the defined "Cigna Members" were not participants in a health plan funded by Cigna, but were participants in health plans of other entities (*e.g.*, employer health plans) whose claims were administered by Cigna.  *See infra* ¶ 31 at p.7.

2

make any modifications to its decision that would remedy any uncertainties as to timing, but has maintained the designation that the decision is properly entitled a "Partial Final Award."

Because Cigna desires to maintain its right to challenge the Partial Final Award, it was left with no option except to file this action to preserve such right.  However, the full details of the Arbitration relevant to this Petition and the motion to stay are subject to a confidentiality agreement governing the Arbitration.  The Arbitration Agreement contains a provision requiring both the Agreement itself and virtually all aspects of the Arbitration to remain confidential—including any award.  Among other provisions to ensure confidentiality, the Arbitration Agreement expressly requires that parties must use best efforts to ensure that any award is filed under seal in a proceeding such as this one.  All arbitration communications, filings, proceedings, documents exchanged, and award(s) are to be kept strictly confidential.

The Arbitration is itself governed by a multi-tier protective order entered by agreement between the parties that ensures its strict confidentiality.  The Arbitration has involved substantial volumes of internal business and proprietary information unique to Cigna and to Baptist.  It also involves substantial volumes of information protected under the Health Insurance Portability and Accountability Act.  The parties and the Arbitration Panel have taken significant steps throughout the Arbitration to ensure the proceedings and information exchanged are confidential and protected from disclosure.  Even the audiences from the respective parties who may observe and review material portions of the record evidence has been limited.

Pursuant to paragraph 25 of the Arbitration Agreement, Tennessee substantive law governs in the Arbitration where causes of action, defenses, or other issues are governed by state law.

## II.     ARGUMENT AND AUTHORITIES

### A.     Protective Order Standard

This Court should enter the Protective Order to protect the September 7, 2022 Decision

3

and all filings, proceedings, documents related to, and information exchanged in the Arbitration confidential. "Protective orders are intended to offer litigants a measure of privacy, while balancing against this privacy interest the public's right to obtain information concerning judicial proceedings." *Ballard v. Herzke*, 924 S.W.2d 652, 658 (Tenn. 1996)*. "*In addition, protective orders are often used by courts as a device to aid the progression of litigation and to facilitate settlements." *Id.* "Protective orders strike a balance, therefore, between public and private concerns." *Id.* (citation omitted).

Tennessee Rule of Civil Procedure 26.03 allows a court to "make any order 'to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.'" *Ballard,* 924 S.W.2d at 658 (citing Tenn. R. Civ. P. 26.03). Specifically included within the protection afforded by Rule 26.03 are "trade secret or other confidential research, development or commercial information." Tenn. R. Civ. P. 26.03.

Generally, to establish "good cause" under Rule 26.03, "the moving party must show that disclosure will result in a clearly defined injury to the party seeking disclosure. 'Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning,' do not amount to a showing of good cause." *Id.* (quotation omitted). The burden of justifying the confidentiality of the information sought to be protected is on the party seeking the order." *Id.* (citations omitted). In determining whether good cause has been established for a protective order, trial courts balance one party's need for information against the injury that would allegedly result if disclosure is compelled. *Id.* (citation omitted). As evidenced by the declaration testimony of Charles K. Utterback (Exhibit A), the parties have good cause to protect the confidential commercial information used in the parties' Arbitration.

**B.     A Protective Order is Necessary to Protect the Highly Sensitive Commercial Information in the Arbitration.**

      **1.     *Loveall v. Am. Honda Motor Co.***

As noted above, a party seeking to obtain a protective order must show good cause.  When "confidential commercial information" is involved, as is the case here, the good cause standard requires "a showing that disclosure will result in a clearly defined and very serious injury to the company's business, or, stated differently, great competitive disadvantage and irreparable harm." *Loveall v. Am. Honda Motor Co.*, 694 S.W.2d 937, 939–40 (Tenn. 1985) (citation and internal citation omitted).

*Loveall* is illustrative in that it provides an example of what constitutes "good cause" for a protective order when confidential commercial information is involved.  That case involved a plaintiff who was injured while riding a Honda ATC-185 all-terrain cycle.  *Id.* at 938.  The plaintiff brought a products liability action against the manufacturer of the vehicle, Honda Motor Company, Ltd., and its seller and distributor, American Honda Motor Company, Ltd.  *Id.*  In the course of discovery, the plaintiff submitted two sets of interrogatories to the defendants.  *Id.*  Both requested information concerning the design, specifications, testing, developmental techniques, and component parts of the ATC-185.  *Id.* at 938–39.  The defendants did not seek to deny the plaintiff access to the requested information, but sought, instead, to have the court issue a protective order limiting the dissemination of the information by the plaintiff.  *Id.* at 939.  The motion for the protective order was based on the confidential nature of the requested information.  *Id.*  Affidavits attached to the motion stated that the requested information was highly confidential, was closely guarded, had been developed solely by Honda Research & Development (Honda R & D), and that competitors would benefit greatly from access to this information.  *Id.*

Much of the information sought by the plaintiff was contained in a series of confidential documents known as the A O Development Reports. *Id.* at 940. These reports were developed solely by employees of Honda R & D, and they contained information concerning the unique developmental procedures, specifications, and testing used by Honda R & D in the development of new products. *Id.* Included was information pertaining to the ATC-185, the all-terrain cycle upon which the plaintiff was injured. *Id.* These unique procedures, standards, and tests were alleged to be major reasons for the preeminence of defendants in the production of ATCs. *Id.* The information in these reports was obtained, and the reports themselves were developed, at great cost and over many years. *Id.*

In addition, access to these reports was strictly regulated. *Id.* All employees were required to sign a nondisclosure statement, and less than one percent of defendants' employees were privileged to see the documents. *Id.* The reports were kept in locked cabinets, prior clearance was required to enter the area where the documents were stored, and even members of the developmental team were required to obtain written authorization to view the documents. *Id.* The original reports were not allowed to be removed from the filing area, and the records were kept of all copies made. *Id.* For those reasons, said the *Loveall* Court, the defendants made a sufficient showing of good cause that irreparable harm and competitive disadvantage would result if the protective order was not issued. *Id.*

### 2. The Confidential Information in the Arbitration

The full details of the Arbitration relevant to this Petition and this matter are subject to a confidentiality agreement governing the Arbitration. The Arbitration concerns financial information, strategic information proprietary to each of the parties about their operations and business plans, HIPAA-protected patient information, and testimony and supporting documentation from both parties on commercially sensitive business and operational materials.

Accordingly, any unprotected disclosure of this highly sensitive information is a matter of the utmost concern to Cigna. *Id.* Cigna is also under an express agreement with Baptist to ensure confidential treatment of these materials.

### 3.       Good Cause Exists for Entry of the Proposed Protective Order

In determining whether good cause has been established for a protective order, trial courts must balance one party's need for information against the injury that would allegedly result if disclosure is compelled. *Ballard v. Herzke*, 924 S.W.2d 652, 658 (Tenn. 1996) (citation omitted). Factors weighing in favor of a finding of good cause include: (1) the litigation involves private litigants; (2) the litigation concerns matters of private concern or of little legitimate public interest; and (3) disclosure would result in serious embarrassment or other specific harm. *Id.* at 658–59 (citations omitted). Factors weighing against a finding of good cause include: (1) the party benefitting from the protective order is a public entity or official; (2) the information sought to be sealed relates to a matter of public concern; and (3) the information sought to be sealed is relevant to other litigation and sharing it would promote fairness and efficiency. *Id.* (citation omitted).

"No particular weight is assigned to any factor, and the balancing test allows trial courts to evaluate the competing considerations in light of the facts of each individual case." *Id.* at 659 (citation omitted). "The ultimate decision as to whether or not a protective order should issue is entrusted to the sound discretion of the trial court and it will not be reversed on appeal, absent a showing of abuse of discretion." *Id.* (citation omitted).

The present case involves specific, limited claims between private litigants. No public entity or official is a party. The information sought to be protected is confidential and proprietary commercial information, the disclosure of which would result in specific and significant harm to Cigna.

Unfettered disclosure of Cigna's proprietary confidential commercial information will result in a clearly defined and very serious injury to Cigna's business resulting in irreparable harm. *See Loveall*, 694 S.W.2d at 939–40 (Tenn. 1985).  Like Honda in the *Loveall* case, Cigna has not denied Baptist access to the requested information and documents, but instead merely seeks to have the court issue a protective order limiting the dissemination of the information.  *Loveall* at 939.

As in *Loveall*, Cigna's motion for a protective order is based on the confidential and proprietary nature of the requested information.  *Id.*  The Declaration of Charles K. Utterback clearly establishes that the requested information is highly confidential and to be closely guarded.

For the forgoing reasons, a protective order is necessary to protect the parties' sensitive and confidential commercial information from and in the Arbitration.[2]

### III.    <u>CONCLUSION</u>

WHEREFORE, good cause exists for entry of a protective order in this matter and Cigna respectfully requests that this Court enter a Protective Order that will be submitted for the Court's review and consideration after consultation of the parties' counsel.

Respectfully submitted,

WYATT, TARRANT & COMBS, LLP

/s/ Odell Horton, Jr.
Odell Horton, Jr. (Tenn. Bar No. 12426)
Andrew J. Pulliam (Tenn. Bar No. 16863)
6070 Poplar Avenue
Suite 300
Memphis, TN 38119
ohorton@wyattfirm.com

---

[2]    Cigna plans to file a more detailed form of its Petition as well as a motion to stay this action once the requested protective order is in place.

8

apulliam@wyattfirm.com
901.537.1000


DLA PIPER LLP (US)

John J. Hamill (*pro hac vice forthcoming*)
Pamela Begaj Loutos (*pro hac vice forthcoming*)
DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606
john.hamill@us.dlapiper.com
pamela.loutos@us.dlapiper.com
312-368-7036

## <u>CERTIFICATE OF CONSULTATION</u>

This is to certify that John J. Hamill as counsel for Cigna as Petitioner communicated with counsel for Respondent, David King, on December 5, 2022 via telephone with respect to the relief sought in the present Motion for Entry of Protective Order.   Counsel for Respondent communicated that Respondent may not oppose the motion depending on the specific proposed language in the proposed Protective Order.

<div align="right">

/s/ Odell Horton, Jr.
Odell Horton, Jr.

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing will be served on the following

counsel for Respondent by hand delivery with service of process in this case.

David King
Polsinelli
401 Commerce Street, Suite 900
Nashville, TN 37219

/s/ Odell Horton, Jr.
Odell Horton, Jr.

101016181.1

11

# TAB 004A

ELECTRONICALLY FILED
2023 Mar 22 4:13 PM
CLERK OF COURT - CHANCERY

## IN THE CHANCERY COURT FOR SHELBY COUNTY, TENNESSEE
## FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

| | | |
|---|---|---|
| **CIGNA HEALTHCARE OF TENNESSEE, INC.,** | ) | |
| | ) | |
| | ) | |
| **Petitioner** | ) | |
| | ) | **Case No. CH-22-1654** |
| **v.** | ) | |
| | ) | |
| **BAPTIST MEMORIAL HEALTHCARE CORPORATION,** | ) | |
| | ) | |
| | ) | |
| **Respondent** | ) | |

---

### JOINT MOTION FOR PROTECTIVE ORDER

---

Pursuant to Rule 26.03, TRCP, Petitioner Cigna Healthcare of Tennessee, Inc. ("Cigna") and Respondent Baptist Memorial Healthcare Corporation ("Baptist") (collectively, the "Parties"), respectfully submit this Joint Motion for Protective Order (the "Joint Motion") to govern the designation and protection from disclosure and use of confidential information during this action.[1] The Parties have agreed to the submission of a proposed protective order attached hereto as Exhibit A (the "Protective Order").    In support of this Motion, the Parties would show the Court as follows:

1.    The Parties have a pending dispute in arbitration which involves several causes of action.  Baptist is the complaining party in the arbitration and Cigna is the defending party.

---

[1] On December 6, 2022, Cigna filed a Motion and Memorandum in Support of its Motion for Protective Order (the "Motion").  In that Motion, Cigna set out the facts and procedural history and established that good cause exists for entry of a protective order in this case.  Cigna also included the declaration of Charles Utterback in support of its Motion clearly establishing that the requested information is highly confidential and to be closely guarded.  Baptist did not respond to that Motion as the Parties were meeting and conferring regarding the scope of a protective order. That Motion is now superseded by this Joint Motion of the Parties.

2.      The Parties' arbitration agreement (the "Arbitration Agreement") states that the arbitration shall be conducted in a confidential way and that the parties will exercise best efforts to maintain the confidentiality of the information exchanged and panel awards in the event a related court action is initiated. The Arbitration Agreement contains a provision requiring both the Agreement itself and virtually all aspects of the Arbitration to remain confidential. A substantial portion of the arbitration proceedings involved the exchange and use of information on an "attorney eyes only" basis given the commercial sensitivity of the information involving proprietary processes.

3.      The arbitration has been handled in a phased approach, including bifurcation of liability and damages on each cause of action.

4.      The arbitration panel has issued a "Partial Final Award" addressing liability for each of Baptist's causes of action.

5.      Cigna has filed a petition in this court to vacate the panel's liability award on Baptist's cause of action under state law for quantum meruit, arguing that Baptist has failed to establish the elements of this cause of action and that this state law cause of action in any event is preempted by federal law. Baptist disputes these allegations.

6.      Neither party has filed a motion to vacate the panel's award as to Baptist's other causes of action and the time for doing so has expired.

7.      The arbitration (including these other causes of action and certain parts of the quantum meruit cause of action) include consideration of Cigna's highly proprietary and confidential commercial information and internal processes, which was presented to the panel in an "attorney eyes only" format given the sensitivity of this information.

8.      Subject to the Court's consent, the Parties have agreed upon the public filing of a version of the panel's Partial Final Award that redacts certain portions of the award relating to

quantum meruit and almost all portions of the award relating to Baptist's other causes of action which are not being challenged in this court. The Parties have agreed to leave un-redacted the substantial majority of the portions of the award involving quantum meruit, which is the subject of Cigna's petition before this Court. If either party desires to file any other materials from the arbitration relevant to this court action, the parties have agreed to meet and confer about any such submission and make any redactions consistent with the provisions in this Joint Motion and the protective order.

9.    In the Parties' view, the approach set forth in this Joint Motion strikes an appropriate balance between the interests of the Parties in maintaining their agreement regarding the confidentiality of sensitive information which is not relevant to the action being brought before this Court with the need of the public to understand the basis for the Court's evaluation of and ruling on Cigna's petition.

WHEREFORE, good cause exists for entry of a protective order in this matter and the Parties respectfully request that this Court enter the Protective Order.

Respectfully submitted,                        Respectfully submitted,

Harris | Shelton                               WYATT, TARRANT & COMBS, LLP

_____               _____
Christopher S. Campbell (BPR 019061)           Odell Horton, Jr. (BPR # 12426)
Harris | Shelton                               Andrew J. Pulliam (BPR # 16863)
6060 Primacy Parkway                           6070 Poplar Avenue, Suite 300
Suite 100                                      Memphis, TN 38119
Memphis, TN 37118                              ohorton@wyattfirm.com
901.525.1455                                   apulliam@wyattfirm.com
                                               901.537.1000

POLSINELLI PC

David King (Tenn. Bar No. 01159)
Adam Dietrich (BPR # 031093)
Samantha Flener (BPR #038282
Polsinelli PC
401 Commerce Street, Suite 900
Nashville, TN 37219
615.259.1538

*Counsel for Baptist Memorial Healthcare
Corporation*

DLA PIPER LLP (US)

John J. Hamill (*pro hac vice*)
Pamela Begaj Loutos (*pro hac vice*)
DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606
john.hamill@us.dlapiper.com
pamela.loutos@us.dlapiper.com
312.368.7036

*Counsel for Cigna Healthcare of Tennessee,
Inc.*

4

# TAB 004B

IN THE CHANCERY COURT FOR SHELBY COUNTY, TENNESSEE
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

| | | |
|---|---|---|
| CIGNA HEALTHCARE OF<br>TENNESSEE, INC. | ) | |
| | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No. CH 22-1654 |
| v. | ) | |
| | ) | |
| BAPTIST MEMORIAL HEALTHCARE<br>CORPORATION | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |

## [PROPOSED] STIPULATED PROTECTIVE ORDER

Before the Court is the Joint Motion for Entry of Agreed Protective Order ("Joint Motion")

by Cigna Healthcare of Tennessee, Inc.'s ("Cigna") and Respondent Baptist Memorial Healthcare

Corporation ("Baptist") (collectively, the "Parties"). Based on the Joint Motion, the agreement of

the Parties as indicated by the signatures of counsel below, and the record as a whole, the Court

finds that the parties have shown good cause for the entry of a protective order (the "Protective

Order") based on the following representations from the Parties:

1.      The Parties have a pending dispute in arbitration which involves several causes of

action. Baptist is the complaining party in the arbitration and Cigna is the defending party.

2.      The Parties' arbitration agreement (the "Arbitration Agreement") states that the

arbitration shall be conducted in a confidential way and that the Parties will exercise best efforts

to maintain the confidentiality of the information exchanged and panel awards in the event a related

court action is initiated. The Arbitration Agreement contains a provision requiring both the

Arbitration Agreement itself and virtually all aspects of the arbitration to remain confidential. A

IN THE CHANCERY COURT FOR SHELBY COUNTY, TENNESSEE
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

| | |
|---|---|
| CIGNA HEALTHCARE OF<br>TENNESSEE, INC.<br><br>      Petitioner,<br><br>v.<br><br>BAPTIST MEMORIAL HEALTHCARE<br>CORPORATION<br><br>      Respondent. | )<br>)<br>)<br>)<br>)   **Case No. CH 22-1654**<br>)<br>)<br>)<br>)<br>)<br>) |

**[PROPOSED] STIPULATED PROTECTIVE ORDER**

Before the Court is the Joint Motion for Entry of Agreed Protective Order ("Joint Motion")

by Cigna Healthcare of Tennessee, Inc.'s ("Cigna") and Respondent Baptist Memorial Healthcare

Corporation ("Baptist") (collectively, the "Parties"). Based on the Joint Motion, the agreement of

the Parties as indicated by the signatures of counsel below, and the record as a whole, the Court

finds that the parties have shown good cause for the entry of a protective order (the "Protective

Order") based on the following representations from the Parties:

      1.      The Parties have a pending dispute in arbitration which involves several causes of

action. Baptist is the complaining party in the arbitration and Cigna is the defending party.

      2.      The Parties' arbitration agreement (the "Arbitration Agreement") states that the

arbitration shall be conducted in a confidential way and that the Parties will exercise best efforts

to maintain the confidentiality of the information exchanged and panel awards in the event a related

court action is initiated. The Arbitration Agreement contains a provision requiring both the

Arbitration Agreement itself and virtually all aspects of the arbitration to remain confidential. A

substantial portion of the arbitration proceedings involved the exchange and use of information on an "attorney eyes only" basis given the commercial sensitivity of the information involving proprietary processes.

3.      The arbitration has been handled in a phased approach, including bifurcation of liability and damages on each cause of action.

4.      The arbitration panel has issued a "Partial Final Award" addressing liability for each of Baptist's causes of action.

5.      Cigna has filed a petition in this Court to vacate the panel's liability award on Baptist's cause of action under state law for quantum meruit, arguing that Baptist has failed to establish the elements of this cause of action and that this state law cause of action in any event is preempted by federal law. Baptist disputes these allegations.

6.      Neither party has filed a motion to vacate the panel's Partial Final Award as to Baptist's other causes of action.

7.      The arbitration (including these other causes of action and certain parts of the quantum meruit cause of action) includes consideration of Cigna's highly proprietary and confidential commercial information and internal processes, which was presented to the panel in an "attorney eyes only" format given the sensitivity of this information.

8.      Subject to the Court's consent, the Parties have agreed upon the public filing of a version of the panel's Partial Final Award that redacts certain portions of the award relating quantum meruit and almost all portions of the award relating to Baptist's other causes of action which are not being challenged in this court.  The Parties have agreed to leave un-redacted the substantial majority of the portions of the award involving quantum meruit, which is the subject of Cigna's petition before this Court. If either party desires to file any other materials from the

2

arbitration relevant to this court action, the parties have agreed to meet and confer about any such submission and make any redactions consistent with the provisions in the Protective Order.

       9.      The Court finds that the approach set forth in the parties' Joint Motion strikes an appropriate balance between the interests of the Parties in maintaining their agreement regarding the confidentiality of sensitive information, which is not relevant to the action being brought before this Court, with the need of the public to understand the basis for the Court's evaluation of and ruling on Cigna's petition. Therefore, the Court finds that the Joint Motion should be granted and this Protective Order should be entered.

The Court, therefore, GRANTS the Joint Motion and ORDERS as follows:

1. **Partial Final Award**. The Parties shall be permitted to file a public version of the panel's Partial Final Award that redacts certain portions of the award relating to quantum meruit and almost all portions of the award relating to Baptist's other causes of action which are not being challenged in this court.

2. **Other Materials**. If either Party desires to file any other materials from the arbitration relevant to this action, the Parties shall meet and confer about any such submission and make any redactions consistent with the provisions in this Protective Order.

3. **Filing of Confidential Material**. With respect to any arbitration materials filed with the Court, including the Partial Final award, or any other material that is confidential and subject to this Protective Order, the filing party may file such document pursuant to the terms of this Protective Order. To the extent that any filing with the Court references any confidential document, then the filing shall refer the Court to the particular document without disclosing the contents of any confidential material. The Court

3

[requires or does not require][1] the Parties to file partially redacted materials under seal. Any material that is fully redacted shall be filed under seal pursuant to this Protective Order.

4. **Action by the Court**.  Applications to the Court for an order relating to any confidential material shall be by motion under the applicable local rule and any other procedures set forth in the presiding judge's standing orders or other relevant orders.  Nothing in this Protective Order or any action or agreement of a party under this Protective Order limits the Court's power to make any orders that may be appropriate with respect to the use and disclosure of any confidential material.

<div align="center">

**IT IS SO ORDERED.**

</div>

_____

Date:  _____

---

[1] The Parties defer to the Court on whether it requires the Parties to file the partially redacted materials under seal and have provided alternative language.

4

APPROVED FOR ENTRY:

Respectfully submitted,                           Respectfully submitted,

Harris | Shelton                                  WYATT, TARRANT & COMBS, LLP

Christopher S. Campbell (BPR 019061)              Odell Horton, Jr. (BPR # 12426)
Harris | Shelton                                  Andrew J. Pulliam (BPR # 16863)
6060 Primacy Parkway                              6070 Poplar Avenue, Suite 300
Suite 100                                         Memphis, TN 38119
Memphis, TN 37118                                 ohorton@wyattfirm.com
901.525.1455                                      apulliam@wyattfirm.com
                                                  901.537.1000

                                                  DLA PIPER LLP (US)

POLSINELLI PC                                     John J. Hamill (*pro hac vice*)
                                                  Pamela Begaj Loutos (*pro hac vice*)
David King (Tenn. Bar No. 01159)                  DLA Piper LLP (US)
Adam Dietrich (BPR # 031093)                      444 West Lake Street, Suite 900
Samantha Flener (BPR #038282)                     Chicago, IL 60606
Polsinelli PC                                     john.hamill@us.dlapiper.com
401 Commerce Street, Suite 900                    pamela.loutos@us.dlapiper.com
Nashville, TN 37219                               312.368.7036
615.259.1538
                                                  *Counsel for Cigna Healthcare of*
*Counsel for Baptist Memorial Healthcare*         *Tennessee, Inc.*
*Corporation*

5

# TAB 005

ENTERED
MAY 0 2 2023
M.B.

**IN THE CHANCERY COURT FOR SHELBY COUNTY, TENNESSEE**
**FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS**

| | |
|---|---|
| CIGNA HEALTHCARE OF )<br>TENNESSEE, INC. )<br> )<br>    Petitioner, )<br> )<br>v. )<br> )<br>BAPTIST MEMORIAL HEALTHCARE )<br>CORPORATION )<br> )<br>    Respondent. ) | Case No. CH 22-1654 ( I ) |

---

### STIPULATED PROTECTIVE ORDER

---

Before the Court is the Joint Motion for Entry of Agreed Protective Order ("Joint Motion")

by Cigna Healthcare of Tennessee, Inc.'s ("Cigna") and Respondent Baptist Memorial Healthcare

Corporation ("Baptist") (collectively, the "Parties"). Based on the Joint Motion, the agreement of

the Parties as indicated by the signatures of counsel below, and the record as a whole, the Court

finds that the parties have shown good cause for the entry of a protective order (the "Protective

Order") based on the following representations from the Parties:

1.     The Parties have a pending dispute in arbitration which involves several causes of

action. Baptist is the complaining party in the arbitration and Cigna is the defending party.

2.     The Parties' arbitration agreement (the "Arbitration Agreement") states that the

arbitration shall be conducted in a confidential way and that the Parties will exercise best efforts

to maintain the confidentiality of the information exchanged and panel awards in the event a related

court action is initiated. The Arbitration Agreement contains a provision requiring both the

Arbitration Agreement itself and virtually all aspects of the arbitration to remain confidential. A

substantial portion of the arbitration proceedings involved the exchange and use of information on an "attorney eyes only" basis given the commercial sensitivity of the information involving proprietary processes.

3.    The arbitration has been handled in a phased approach, including bifurcation of liability and damages on each cause of action.

4.    The arbitration panel has issued a "Partial Final Award" addressing liability for each of Baptist's causes of action.

5.    Cigna has filed a petition in this Court to vacate the panel's liability award on Baptist's cause of action under state law for quantum meruit, arguing that Baptist has failed to establish the elements of this cause of action and that this state law cause of action in any event is preempted by federal law. Baptist disputes these allegations.

6.    Neither party has filed a motion to vacate the panel's Partial Final Award as to Baptist's other causes of action.

7.    The arbitration (including these other causes of action and certain parts of the quantum meruit cause of action) includes consideration of Cigna's highly proprietary and confidential commercial information and internal processes, which was presented to the panel in an "attorney eyes only" format given the sensitivity of this information.

8.    Subject to the Court's consent, the Parties have agreed upon the public filing of a version of the panel's Partial Final Award that redacts certain portions of the award relating quantum meruit and almost all portions of the award relating to Baptist's other causes of action which are not being challenged in this court. The Parties have agreed to leave un-redacted the substantial majority of the portions of the award involving quantum meruit, which is the subject of Cigna's petition before this Court. If either party desires to file any other materials from the

arbitration relevant to this court action, the parties have agreed to meet and confer about any such submission and make any redactions consistent with the provisions in the Protective Order.

9.      The Court finds that the approach set forth in the parties' Joint Motion strikes an appropriate balance between the interests of the Parties in maintaining their agreement regarding the confidentiality of sensitive information, which is not relevant to the action being brought before this Court, with the need of the public to understand the basis for the Court's evaluation of and ruling on Cigna's petition.  Therefore, the Court finds that the Joint Motion should be granted and this Protective Order should be entered.

The Court, therefore, GRANTS the Joint Motion and ORDERS as follows:

1. **Partial Final Award**.  The Parties shall be permitted to file a public version of the panel's Partial Final Award that redacts certain portions of the award relating to quantum meruit and almost all portions of the award relating to Baptist's other causes of action which are not being challenged in this court.

2. **Other Materials**.  If either Party desires to file any other materials from the arbitration relevant to this action, the Parties shall meet and confer about any such submission and make any redactions consistent with the provisions in this Protective Order.

3. **Filing of Confidential Material**.  With respect to any arbitration materials filed with the Court, including the Partial Final award, or any other material that is confidential and subject to this Protective Order, the filing party may file such document pursuant to the terms of this Protective Order.  To the extent that any filing with the Court references any confidential document, then the filing shall refer the Court to the particular document without disclosing the contents of any confidential material.  The Court

3

[requires or does not require][1] the Parties to file partially redacted materials under seal. Any material that is fully redacted shall be filed under seal pursuant to this Protective Order.

4. **Action by the Court.** Applications to the Court for an order relating to any confidential material shall be by motion under the applicable local rule and any other procedures set forth in the presiding judge's standing orders or other relevant orders. Nothing in this Protective Order or any action or agreement of a party under this Protective Order limits the Court's power to make any orders that may be appropriate with respect to the use and disclosure of any confidential material.

**IT IS SO ORDERED.**

*Melanie Taylor Jefferson*

Date:   May 2, 2023

---

[1] The Parties defer to the Court on whether it requires the Parties to file the partially redacted materials under seal and have provided alternative language.

4

APPROVED FOR ENTRY:

Respectfully submitted,

Harris | Shelton

*Christopher S. Campbell* (signature)

Christopher S. Campbell (BPR 019061)
Harris | Shelton
6060 Primacy Parkway
Suite 100
Memphis, TN 37118
901.525.1455

POLSINELLI PC

David King (Tenn. Bar No. 01159)
Adam Dietrich (BPR # 031093)
Samantha Flener (BPR #038282)
Polsinelli PC
401 Commerce Street, Suite 900
Nashville, TN 37219
615.259.1538

*Counsel for Baptist Memorial Healthcare
Corporation*

Respectfully submitted,

WYATT, TARRANT & COMBS, LLP

(signature)

Odell Horton, Jr. (BPR # 12426)
Andrew J. Pulliam (BPR # 16863)
6070 Poplar Avenue, Suite 300
Memphis, TN 38119
ohorton@wyattfirm.com
apulliam@wyattfirm.com
901.537.1000

DLA PIPER LLP (US)

John J. Hamill (*pro hac vice*)
Pamela Begaj Loutos (*pro hac vice*)
DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606
john.hamill@us.dlapiper.com
pamela.loutos@us.dlapiper.com
312.368.7036

*Counsel for Cigna Healthcare of
Tennessee, Inc.*

5

101096879.1

# TAB 006

JUN 0 6 2023

## IN THE CHANCERY COURT FOR SHELBY COUNTY, TENNESSEE
## FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

| | |
|---|---|
| CIGNA HEALTHCARE OF TENNESSEE, INC. | ) |
| | ) |
| | ) |
| Petitioner, | ) |
| | ) Case No. CH 22-1654 |
| v. | ) |
| | ) |
| BAPTIST MEMORIAL HEALTHCARE | ) |
| CORPORATION | ) |
| | ) |
| Respondent. | ) |

## Amended STIPULATED PROTECTIVE ORDER

Before the Court is the Joint Motion for Entry of Agreed Protective Order ("Joint Motion") by Cigna Healthcare of Tennessee, Inc.'s ("Cigna") and Respondent Baptist Memorial Healthcare Corporation ("Baptist") (collectively, the "Parties"). Based on the Joint Motion, the agreement of the Parties as indicated by the signatures of counsel below, and the record as a whole, the Court finds that the parties have shown good cause for the entry of a protective order (the "Protective Order") based on the following representations from the Parties:

1. The Parties have a pending dispute in arbitration which involves several causes of action. Baptist is the complaining party in the arbitration and Cigna is the defending party.

2. The Parties' arbitration agreement (the "Arbitration Agreement") states that the arbitration shall be conducted in a confidential way and that the Parties will exercise best efforts to maintain the confidentiality of the information exchanged and panel awards in the event a related court action is initiated. The Arbitration Agreement contains a provision requiring both the Arbitration Agreement itself and virtually all aspects of the arbitration to remain confidential. A

substantial portion of the arbitration proceedings involved the exchange and use of information on an "attorney eyes only" basis given the commercial sensitivity of the information involving proprietary processes.

3.     The arbitration has been handled in a phased approach, including bifurcation of liability and damages on each cause of action.

4.     The arbitration panel has issued a "Partial Final Award" addressing liability for each of Baptist's causes of action.

5.     Cigna has filed a petition in this Court to vacate the panel's liability award on Baptist's cause of action under state law for quantum meruit, arguing that Baptist has failed to establish the elements of this cause of action and that this state law cause of action in any event is preempted by federal law. Baptist disputes these allegations.

6.     Neither party has filed a motion to vacate the panel's Partial Final Award as to Baptist's other causes of action.

7.     The arbitration (including these other causes of action and certain parts of the quantum meruit cause of action) includes consideration of Cigna's highly proprietary and confidential commercial information and internal processes, which was presented to the panel in an "attorney eyes only" format given the sensitivity of this information.

8.     Subject to the Court's consent, the Parties have agreed upon the public filing of a version of the panel's Partial Final Award that redacts certain portions of the award relating quantum meruit and almost all portions of the award relating to Baptist's other causes of action which are not being challenged in this court. The Parties have agreed to leave un-redacted the substantial majority of the portions of the award involving quantum meruit, which is the subject of Cigna's petition before this Court. If either party desires to file any other materials from the

arbitration relevant to this court action, the parties have agreed to meet and confer about any such submission and make any redactions consistent with the provisions in the Protective Order.

9.      The Court finds that the approach set forth in the parties' Joint Motion strikes an appropriate balance between the interests of the Parties in maintaining their agreement regarding the confidentiality of sensitive information, which is not relevant to the action being brought before this Court, with the need of the public to understand the basis for the Court's evaluation of and ruling on Cigna's petition.  Therefore, the Court finds that the Joint Motion should be granted and this Protective Order should be entered.

The Court, therefore, GRANTS the Joint Motion and ORDERS as follows:

1. **Partial Final Award**.  The Parties shall be permitted to file a public version of the panel's Partial Final Award that redacts certain portions of the award relating to quantum meruit and almost all portions of the award relating to Baptist's other causes of action which are not being challenged in this court.

2. **Other Materials**.  If either Party desires to file any other materials from the arbitration relevant to this action, the Parties shall meet and confer about any such submission and make any redactions consistent with the provisions in this Protective Order.

3. **Filing of Confidential Material**.  With respect to any arbitration materials filed with the Court, including the Partial Final award, or any other material that is confidential and subject to this Protective Order, the filing party may file such document pursuant to the terms of this Protective Order.  To the extent that any filing with the Court references any confidential document, then the filing shall refer the Court to the particular document without disclosing the contents of any confidential material.  The Court does not require the Parties to file partially redacted materials under seal.  Any material that

3

is fully redacted shall be filed under seal pursuant to this Protective Order.

4. **Action by the Court**. Applications to the Court for an order relating to any confidential material shall be by motion under the applicable local rule and any other procedures set forth in the presiding judge's standing orders or other relevant orders. Nothing in this Protective Order or any action or agreement of a party under this Protective Order limits the Court's power to make any orders that may be appropriate with respect to the use and disclosure of any confidential material.

**IT IS SO ORDERED.**

Date: _June 6, 2023_

4

APPROVED FOR ENTRY:

Respectfully submitted,                          Respectfully submitted,

Harris | Shelton                                 WYATT, TARRANT & COMBS, LLP


_Christopher S. Campbell by MRJ_                 _Odell Horton by MRJ_
Christopher S. Campbell (BPR 019061)             Odell Horton, Jr. (BPR # 12426)
Harris | Shelton                                 Andrew J. Pulliam (BPR # 16863)
6060 Primacy Parkway                             6070 Poplar Avenue, Suite 300
Suite 100                                        Memphis, TN 38119
Memphis, TN 37118                                ohorton@wyattfirm.com
901.525.1455                                     apulliam@wyattfirm.com
                                                 901.537.1000

                                                 DLA PIPER LLP (US)

POLSINELLI PC                                    John J. Hamill (*pro hac vice*)
                                                 Pamela Begaj Loutos (*pro hac vice*)
David King (Tenn. Bar No. 01159)                 DLA Piper LLP (US)
Adam Dietrich (BPR # 031093)                     444 West Lake Street, Suite 900
Samantha Flener (BPR #038282                     Chicago, IL 60606
Polsinelli PC                                    john.hamill@us.dlapiper.com
401 Commerce Street, Suite 900                   pamela.loutos@us.dlapiper.com
Nashville, TN 37219                              312.368.7036
615.259.1538

*Counsel for Baptist Memorial Healthcare*        *Counsel for Cigna Healthcare of Tennessee,*
*Corporation*                                    *Inc.*

101145823.1

# TAB 007A

ELECTRONICALLY FILED
2023 Jun 13 2:25 PM
CLERK OF COURT - CHANCERY

### IN THE CHANCERY COURT FOR SHELBY COUNTY, TENNESSEE
### FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

| | |
|---|---|
| **CIGNA HEALTHCARE OF** ) | |
| **TENNESSEE, INC.** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | **Case No. Case No. CH-22-1654** |
| **v.** ) | |
| ) | |
| **BAPTIST MEMORIAL HEALTHCARE** ) | |
| **CORPORATION** ) | |
| | |
| **Respondent.** | |

### PETITIONER'S MEMORANDUM IN SUPPORT OF MOTION TO STAY

Petitioner Cigna Healthcare of Tennessee, Inc. ("Cigna") by and through its undersigned counsel, hereby files its Memorandum of Law in Support of its Motion to Stay this proceeding.

### Introduction

Cigna moves this Court to stay this matter, in which Cigna has filed a Confidential Amended Petition to Modify or Vacate, in Part, "Partial Final Award" in Arbitration (the "Petition"). The expectation is that the stay will last at least the next several months and possibly a longer period. Cigna's Petition is in connection with an ongoing private and confidential arbitration between the parties that is not fully resolved, but likely should be resolved on any mater relevant to this petition in early 2024 (the "Arbitration"). Cigna has petitioned the Court to modify or vacate one aspect of an interim decision that the three-member arbitration panel (the "Panel") issued on September 7, 2022 (the "September 2022 Decision"). The Panel styled its decision as a "Partial Final Award," even though the question presented to the Panel for arbitration has not yet been answered. Cigna agrees with substantial portions of the September 7, 2022 Decision, but

disagrees with two specific aspects. Cigna has challenged those two aspects in this Court pursuant to the terms of the Federal Arbitration Act ("FAA").

Cigna did not wish to bring this challenge and there is a genuine question whether Cigna has standing to pursue this petition at this time. Cigna also ultimately might not seek to raise a challenge to the true final disposition of the Arbitration, depending on its outcome—but was compelled by the purported "finality" of the September 7, 2022 Decision to file the Petition to preserve its rights.

It is within this Court's discretion and authority to stay the state court proceedings pending resolution of the Arbitration. All controversies between the parties could be resolved by the final outcome, thus eliminating additional burden and expense on the parties as well as waste of judicial resources. Cigna further moves the Court only to stay, rather than dismiss, this proceeding pending resolution of Arbitration. Should the Arbitration ultimately not resolve all controversies between the parties, the stay could be lifted and this matter would proceed without delay.

## Factual Summary

The parties are engaged in an ongoing and confidential Arbitration. The Arbitration is being administered over the course of several "phases." Two phases occurred in 2021 and 2022, another phase has proceeded in 2023, while an additional phase is scheduled later in 2023 and more may come in early 2024. Baptist Memorial Healthcare Corporation ("Baptist") is the complaining party in the Arbitration and Cigna is the defending party.

On September 7, 2022, the Panel issued the September 2022 Decision. Notwithstanding the incomplete status of the ongoing Arbitration, the Panel designated the September 2022 Decision a "Partial Final Award." A partially redacted copy of the September 7, 2022 Decision is being submitted to the Court in connection with Cigna's Petition as **Exhibit 1**.

2

As detailed in the Petition, Cigna submits that the Panel's errors include (among others identified below) (i) permitting Baptist to proceed in "Count II" of its arbitration demand on a "*quantum meruit*" cause of action that is explicitly unavailable under Tennessee law and has been rejected in this exact context by the Tennessee Court of Appeals (including the Panel's determination that the measure of damages in a *quantum meruit* action would be the value of health care services Baptist provides to Cigna's mostly self-insured members); and (ii) ruling that a relatively recent Supreme Court decision stands for the proposition that the Employment Retirement Income Security Act ("ERISA") does not preempt a state law *quantum meruit* claim that relates to benefit plans. Cigna submits that substantial other portions of the September 2022 Decision are correct under governing law and has challenged only those portions that are beyond the Panel's authority and were issued in manifest disregard of the law. The grounds for its challenge are set forth in Cigna's Petition.

The Arbitration is governed by a written agreement between the parties to arbitrate the dispute that had arisen between them (the "Arbitration Agreement"). The first iteration of the Arbitration Agreement was entered in November 2019. A copy of the current First Amended Arbitration Agreement is being submitted with Cigna's Petition as **Exhibit 2**.

Baptist asserts that it is owed money as additional reimbursement on certain instances between 2013-19 where Baptist provided emergency or other medical services to patients whose health benefit plans were administered by Cigna ("Cigna members").[1] In the phase that took place in early 2023, the Panel permitted the *quantum meruit* cause of action to go forward for a portion

---

[1] Pursuant to paragraph 25 of the Arbitration Agreement, the Arbitration is governed by the FAA, including its standard and scope of review. (Ex. 2 ¶ 25.) Tennessee substantive law governs where causes of action (or defenses) are governed by state law, and federal substantive law governs for matters that arise under federal law.

of the claims.  Another phase taking place later in 2023 will also address whether the cause of action can proceed as to other claims in the case.  The Panel has not issued any decision on whether any actual relief is owed to Baptist on the *quantum meruit* cause of action.  It has only determined that Baptist has asserted a valid cause of action under Tennessee law.  No decision on whether any actual relief is owed on many of the claims is expected until well into 2023.  A decision on whether relief is owed on the remaining claims would not be issued until 2024.

Paragraph 5 of the Arbitration Agreement specifies the ultimate question to be addressed in the Arbitration: "[t]he question to be decided in this arbitration is *whether Baptist was properly reimbursed for the Arbitration Claims, and if not, what is the amount Cigna owes*."  That is the "Arbitration Question."[2]  (Ex. 2 ¶ 5.)  That question has not been answered.  It remains wholly unknown whether Baptist will receive any additional payment beyond what Cigna has already paid.

## Argument

**I.      This Court Has the Discretion and Authority to Stay this Proceeding.**

Tennessee trial courts have broad authority to manage their dockets and the manner in which matters proceed before them.  *Hodges v. Attorney General*, 43 S.W.3d 918, 921 (Tenn. Ct. App. 2000).  Within this broad discretion is the authority to stay proceedings.  *Bell v. Todd*, 206 S.W.3d 86, 93 (Tenn. Ct. App. 2005); *Federated Rural Elec. Ins. Exch. v. Hill*, 2007 WL 907717, at *14 (Tenn. Ct. App. Mar. 26, 2007).  As the Tennessee Court of Appeals has explained, "the exercise of this authority requires an exercise of judgment and a careful weighing of the competing interests."  *Bell*, 206 S.W.3d at 93 (citing *Landis v. North Am. Co.*, 299 U.S. 248, 254-255 (1936)).  Tennessee courts have thus granted stays pending final orders pending in related proceedings.  *See,*

---

[2] All emphasis in quotes and citations is added unless noted.

4

*e.g.*, *Mello v. Lamar Advertising Co., Inc.*, 2005 WL 5433563 (Tenn. Cir. Ct. Jan. 26, 2005).

The Court's analysis in examining the propriety of a stay should be tailored to the particular facts before it, and no specific set of factors is necessarily determinative. The trial court should balance the plaintiff's desire for an expeditious proceeding and the potential prejudice that may result from a delay against the potential burdens of allowing an action to proceed. *Id.*; *Federated Rural Elec. Ins. Exch.*, 2007 WL 907717, at *14 (potential for undue expense and wasted time were appropriate reasons to stay further litigation pending outcome of appeal). A decision to stay proceedings will not be disturbed on appeal absent a showing that the trial court abused its discretion. *Federated Rural Elec. Ins. Exch.*, 2007 WL 907717, at *14. Trial courts likewise have broad discretion under the Tennessee Rules of Civil Procedure to manage pre-trial proceedings and discovery. *Benton v. Snyder*, 825 S.W.2d 409, 416 (Tenn. 1992); *Federated Rural Elec. Ins. Exch.*, 2007 WL 907717, at *6-7. Trial courts thus are explicitly granted discretion to enter scheduling orders governing how matters are to proceed. *See* Tenn. R. Civ. P. 16.

Cigna respectfully submits that this is a textbook example of why such case management powers exist.

## II.    The Court Should Stay this Proceeding.

There is no added urgency in this case. The Panel designated its September 2022 Decision as a Partial Final Award. Even with that caption, it is uncertain whether Cigna has standing to pursue this Petition at this time. No actual relief has been granted to Baptist. To date there is no distinct and palpable injury, but only conjectural and hypothetical injury.

In fact, depending on how the Panel ultimately answers the Arbitration Question, Cigna may be found to have no liability to Baptist, in which case it is uncertain whether Cigna would ultimately pursue any challenge to the September 2022 Decision regarding Count II. If Cigna is

5

ultimately found not liable to Baptist after further proceedings in the Arbitration, there would be no reason for Cigna to seek to vacate the September 2022 Decision however wrong certain determinations might be.

For example, it remains entirely possible that the Panel may determine that no further relief (or minimal relief) is required when the Panel adjudicates the state law cause of action that it is permitting to proceed under Count II.  A petitioner would be hard pressed to find a sensible basis to invoke this Court's jurisdiction and resources in resolving a dispute that has no actual consequence.

### Conclusion

Based on the foregoing, Cigna respectfully requests this Court to grant its Motion to Stay Proceedings pending resolution of the Arbitration.

Respectfully submitted,

WYATT, TARRANT & COMBS, LLP

Odell Horton, Jr. (Tenn. Bar No. 12426)
Andrew J. Pulliam (Tenn. Bar No. 16863)
6070 Poplar Avenue
Suite 300
Memphis, TN 38119
ohorton@wyattfirm.com
apulliam@wyattfirm.com
901.537.1000

6

DLA PIPER LLP (US)

John J. Hamill (*pro hac vice*)
Pamela Begaj Loutos (*pro hac vice*)
DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606
john.hamill@us.dlapiper.com
pamela.loutos@us.dlapiper.com
312-368-7036


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on the 13th day of June 2023 to counsel for Respondents via e-mail and the Court's docketing system:

David King
Polsinelli
401 Commerce Street, Suite 900
Nashville, TN 37219
dking@polsinelli.com

Christopher S. Campbell (BPR 019061)
Harris | Shelton
6060 Primacy Parkway
Suite 100
Memphis, TN 37118
901.525.1455
ccampbell@harrisshelton.com


/s/ Odell Horton, Jr.
Odell Horton, Jr.

# TAB 007B

ELECTRONICALLY FILED
2023 Jun 13 2:25 PM
CLERK OF COURT - CHANCERY

# EXHIBIT 1

**PRIVATE AND CONFIDENTIAL ARBITRATION**

| | | |
|---|---|---|
| **BAPTIST MEMORIAL HEALTH CARE CORPORATION,** | ) | |
| | ) | |
| | ) | |
| Claimant, | ) | **Arbitrators** |
| | ) | **Conna A. Weiner, Esq., Panel** |
| v. | ) | **Chair** |
| | ) | **Hon. Joseph J. Farnan, Jr.** |
| **CIGNA HEALTHCARE OF** | ) | **Hon. Michael J. Schless.** |
| **TENNESSEE, INC.,** | ) | |
| | ) | |
| Respondent. | ) | |

**HIGHLY CONFIDENTIAL**

**PARTIAL FINAL AWARD**

**I. INTRODUCTION**

In this Arbitration, Baptist is claiming, on behalf of a number of its Memphis, Tennessee metro area hospitals, that Cigna has wrongfully underpaid or denied altogether certain claims for out-of-network emergency services these hospitals provided to Cigna members between 2013 and 2019 (the "Dispute Period"). This Partial Final Award sets forth the Panel's reasoning and rulings in connection with the issues addressed in Phases 1 and 2.

**II. PROCEDURAL HISTORY**

**II. A.  PHASE 1**

The Phase 1 Hearing was conducted virtually in February and March, 2021, pursuant to the Panel's Procedural Order No. 6 of September 8, 2020, Procedural Order No. 7 and other rulings. Phase 1 focused on underpaid claims from the "Top 16" Accounts and Counts I (breach of contract for non-ERISA plans) and IV (wrongful denial of benefits under ERISA). Baptist proceeds by assignment of claims by plan members in connection with these Counts (see Procedural Order No. 10).

Day 1 of the Phase I Hearing consisted of counsel tutorials pursuant to which counsel educated the Panel about the general context of this matter. On Days 2 and 3, Baptist presented its case-in-chief.  On Days 4 and 5, Cigna presented its case-in-chief. Designated pre-hearing deposition testimony was included as well, all of which the Panel reviewed in writing and some of which was presented to the Panel by video, and  viewed by each Arbitrator separately outside of the actual hearing session time. The parties submitted extensive post-hearing briefing through April. The parties presented Phase 1 closing arguments on May 14, 2021.

1

Thereafter the Panel and counsel discussed a structure for Phase 2 and its associated discovery. The Panel issued informal email orders on May 19, 2021, and May 26, 2021, outlining the agreed processes. During the summer of 2021, the parties engaged in discovery with the assistance of the Panel.

The Panel issued Procedural Order No. 12 dated June 30, 2021, making various tentative rulings which were expressly subject to re-consideration. In this Partial Final Award, we finalize and/or modify those tentative rulings as appropriate given our findings.

## II. B. PHASE 2

The foregoing discussions and discovery resulted in the Panel's Procedural Order No. 14 of November 2, 2021, which is the case management order for Phase 2. Like Procedural Order No. 6 governing the Phase 1 Hearing, Procedural Order No. 14 cited the Panel's authority pursuant to the parties' February 24, 2020 First Amended Arbitration Agreement, which grants the Panel authority to divide the Arbitration into phases. The universe of claims considered in Phase 2 was the same as the claims considered in Phase 1, namely allegedly underpaid out-of-network emergency claims focusing on the Top 16 accounts. The number of issues, however, was expanded beyond the liability issues under Counts I and IV to include additional "buckets," namely:

(2) Baptist's Count II, direct (non-derivative) state law claim under a quantum meruit/unjust enrichment theory;
(3) compliance with the greatest of three regulation;

Procedural Order No. 14 ¶ 9 required that the Panel issue final rulings on all claims and defenses that have been addressed to date except as specifically reserved for later phases in the order or as otherwise agreed by the Parties. Procedural Order No. 14 ¶10 provides that "the issue of Baptist's damages, if any, will be addressed separately from the liability rulings in Phase 2. A damages proceeding as a second part of Phase 2 will be scheduled at a later date."

███████████████████████████████████████████████████

The Phase 2 hearing proceeded for 9 days during November and December, 2021. Pre- and Post-Hearing Briefs were filed and the Panel heard oral argument on April 22, 2022.

At the Panel's request, the parties also briefed and argued the issue of whether or not Baptist's quantum meruit claim is pre-empted by ERISA in light of recent Supreme Court jurisprudence. The Panel heard oral argument on these subjects on June 23, 2022, and received post-argument supplementary briefing. We rule on these issues in this Partial Final Award.

Finally, the Panel conducted a question and answer session with counsel on July 26, 2022 and received follow up submissions relating to topics addressed during that session.

Pursuant to ¶15 of the parties' First Amended Arbitration Agreement, final awards in this matter are to be "reasoned" consistent with the Commercial Arbitration Rules of the American Arbitration Association.  In connection with its post-hearing submissions, although Cigna filed an extensive Summary of Evidence and Statement of Facts to Support its requested reasoned award, it expressly acknowledged that formal findings of fact are unnecessary in this arbitration and have not been requested. Baptist filed detailed responses to Cigna's summary. (We will refer to this document, namely the version with Baptist's responses, as "SOF" in this award.)

### III.  ARBITRATION HEARINGS - EVIDENCE

### III. A. Background

Cigna offers health coverage products to some of its employer-clients which entitle enrolled members (the employees of its clients) a level of reimbursement for out-of-network provider services, including but not limited to coverage for out-of-network emergency hospital facility services. This order concerns out-of-network emergency services only, non-emergency services to be set for later assessment. Both "emergency outpatient" and "emergency inpatient," or "emergency admit" claims are at issue. ██████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

In connection with virtually all of the claims at issue in the Top 16 accounts, Cigna is not the actual insurer. Rather, it provides administrative services only for self-insured employer plans pursuant to an Administrative Services Agreement, or ASO. ████████████████████████ ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

The evidence demonstrated that the programs and services provided, developed, and managed by Cigna and its vendors -- for whom Cigna was responsible -- were in fact substantial, extraordinarily sophisticated, and complex; and ultimately directly affected *how much* Baptist was paid for its out-of-network emergency services. These were services Baptist was to a significant extent required by law to provide, regardless of its contractual relationship with Cigna.



### III. B. In-Network vs. Out-of-Network; the "Managed Care Bargain"

When a hospital provider is "in-network," it has a contract with an insurer or claims administrator such as Cigna to provide their facility services at a specified reimbursement rate that is a discount from their "full billed charges." The contracted in-network provider is generally prohibited from balance billing a customer for amounts above and beyond the agreed, discounted, contractual reimbursement rate ████████████████████████. As was discussed in testimony and by the experts, the provider has an incentive to do this from a business perspective because they believe they will receive a greater volume of patients and the improved predictability of pricing and administrative simplicity with which in-network claims are handled. It is reasonable to infer that the converse holds true with respect to out-of-network claims, namely the provider would not expect predictability of pricing or administrative simplicity.

Cigna evaluates the adequacy of its networks to meet the needs of patients, and presented testimony that its networks consistently have met the access standards of a third party private regulator, the National Committee on Quality Assurance (NCQA), and that employer accounts had not complained about the lack of access to emergency room services ████████ ██████████████████ However, ██████████████████████████████████ ██████████ responsible for the provider network in the relevant area, had not looked at the

number of out-of-network emergency patients that had gone to Baptist during the Dispute Period, and did not believe that the NCQA standards took into account how many out-of-network emergency claims were involved in the relevant geographical area over a certain period of time ███████████████████ Although he further stated that Cigna did not depend on Baptist for out-of-network emergency services because it was a "*very, very small...percentage of overall services in the area*," he agreed with Baptist counsel that emergency services were important; stated that Cigna wanted their members to receive care when they needed it; and also agreed with Baptist counsel that the number of disputed claims in this arbitration was "*not insignificant*" ███████████████. He further indicated he had heard anecdotally that Baptist has taken patients out-of-network from a Cigna in-network hospital that had gone on "*diversion*" ███████████████

The parties and their experts have referred to the "managed care bargain" and "volume steerage" to identify the specifics of these incentives for entering into a discounted in-network arrangement. There is no credible evidence to the contrary in this arbitration. ███████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████

█████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████



In general, when entities such as Cigna, on behalf of its employer-clients, structure coverage for out-of-network benefits, a natural dilemma arises precisely because there is no contract. How much should a provider be paid for these services? The issue is particularly stark in the case of the emergency services at issue here, since various federal and state laws require that a hospital accept a patient into their emergency room and provide certain services, without questioning their insurance coverage.[5] In other words, and critically for our decision, the payor and provider are forced to deal with each other, at least to this extent. ▮▮▮▮▮▮▮▮▮▮▮▮

―――――――――――――――

[4] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[5] The Emergency Medical Treatment and Labor Act (EMTALA) requires most hospitals to provide an examination and needed stabilizing treatment, without consideration of insurance coverage or ability to pay, when a patient presents to an emergency room for attention to an emergency medical condition.



### III. C. The "Greatest of Three" Rule

The reimbursement dilemma for providers who do not have a contract for out-of-network emergency services has now twice been addressed by Congress through provisions of The Patient Protection and Affordable Care Act (Pub. L. 111-148) ("PPACA') which amended other laws, such as the Public Health Service Act, or PHS Act, and more recently the No Surprise Billing Act.[6]

The provisions of PPACA and the associated regulations which led to the creation of the "greatest of three rule," a federal rule providing a minimum payment for out-of-network emergency services ("GOT Rule"), deserve our attention.

Background on the intent and goals behind the GOT Rule is available in the Department of Health and Human Services "Clarification of Final Rules for Grandfathered Plans, Preexisting Condition Exclusions, Lifetime Annual Limits, Rescissions, Dependent Coverage, Appeals and Patient Protections Under the Affordable Care Act, " 83 Fed. Reg. 19431 (May 3, 2018), cited by both parties at various points ("Clarification Regulation"). The HHS "clarification" was necessary because of litigation filed by the American College of Emergency Physicians, which resulted in a federal district court judge remanding the case to the relevant agencies (referred to as "the Departments" in the regulation) in order to more fully respond to public comments on the interim rule generating the greatest of three calculation.  Id. at 19432.

As described in the Clarification Regulation, the section of PPACA entitled "Patient Protections" provides requirements relating to coverage of emergency services, including the parties here. The statue requires coverage of emergency services even if the provider is not a participating provider, or "in-network," and requires plans to apply the same cost-sharing requirements to members as they would have to pay if they went to an in-network facility (expressed as copayments and coinsurance). The statute did not address, however, how much the out-of-network provider of emergency services must be paid for performing such services. Id. The statute  also did not prohibit an out-of-network facility like Baptist from billing a patient for an amount it felt it was owed beyond what a plan or issuer paid, or in other words, "in

---

[6] As the No Surprise Billing Act was not in effect during the Dispute Period, it is only briefly addressed in this order to the extent the Panel found it helpful for context. The Act sets up a dispute resolution process between payors and out-of-network providers of emergency services, culminating in baseball arbitration. Unlike PPACA and the GOT Rule, it prohibits balance billing by the provider.

circumstances in which a provider's charge exceeds the allowed amount," or maximum amount on which payment is based for covered services. Id. The Clarification Regulation cites to a CMS Uniform Glossary of Health Coverage and Medical Terms for the definition of the term of art "allowed amount," an important concept in this arbitration.

The Clarification Regulation went on to discuss the 2010 interim final rule ("IFR") that initially proposed the greatest of three rule:

>  The June 2010 IFR preamble…stated, in part, that, because the statute does not require plans or issuers to cover balance billing amounts, and does not prohibit balance billing, even where the protections of the statue apply, patients may be subject to balance billing. It would defeat the purpose of the protections in the statute if a plan or issuer paid an unreasonably low amount to a provider, even while limiting the coinsurance or copayment associated with that amount to the in-network amounts. To avoid the circumvention of the protections of section 2719A of the PHS Act, it is necessary that a reasonable amount be paid before a patient becomes responsible for a balance billing amount. Thus, these interim final regulations require that a reasonable amount be paid for services by some objective standard. In establishing the reasonable amount that must be paid, the Departments had to account for wide variation in how plans and issues determine both in-network and out-of-network rates.
>  Accordingly, these interim final regulations considered three amounts: the in-network rate, the out-of-network rate, and the Medicare rate. Specifically, a plan or issuer satisfies the copayment and coinsurance limitations in the statute if it provides benefits for out-of-network emergency services in an amount equal to the greatest of three possible amounts: (1) The amount negotiated with in-network providers for the emergency service furnished; (2) The amount for the emergency service calculated using the same method the plan generally uses to determine payments for out-of-network services (such as usual, customary and reasonable charges), but substituting the in-network cost-sharing provisions; or (3) The amount that would be paid under Medicare for the emergency service.
>  This is referred to as the "Greatest of Three" or "GOT" rule because it sets a floor on the amount plans are required to pay for out-of-network emergency services under these provisions at the greatest of the three listed amounts.

The Clarification Regulation went on to recount some of the concerns cited by commentators regarding the IFR and particularly the alleged lack of transparency and potential for manipulation of the second prong of the GOT Rule, namely the "amounts a plan generally uses to determine payments for out-of-network emergency services." These commentators urged, among other things, the use of a transparent database for determining the reimbursement rate. For example, the ACEP's 2010 comment letter supported the development of an objective standard to establish "fair payment," asserting that since insurers *"know that emergency physicians will see everyone that comes to the [emergency department] due to EMTALA responsibilities…many leverage that fact to impose extremely low reimbursement rates…the plan has arbitrarily offered an in-network payment rate that fails to cover the costs of providing the service. This forces the physicians to balance bill the patients, which often results in*

*an unsatisfactory experience for everyone.*" Id. at 19433. The interim rule acknowledged that the term "'*reasonable' was in the eye of the beholder,*" and that while for many years, usual and customary rates referred to charges or a proportion of a hospital's charges, this had changed in recent years as providers had issues with the "*black box*" approach that commercial insurers have used to determine the usual and customary rates for out-of-network providers.

In response to these concerns, the Departments clarified that plans were required to disclose how they calculated the amounts under the GOT regulation, including the UCR amount. More specifically, for plans governed by ERISA, documentation and data used to calculate each of the amounts under the GOT regulations for out-of-network emergency services, including the UCR amounts, would be subject to disclosure provisions under Section 104(b) of ERISA, as well as Department of Labor claims procedure regulations.

On reconsideration of the comments and concerns as required by the federal district court, the Departments were not, however, convinced that the GOT standards are "*insufficiently transparent or otherwise unreasonable, and we conclude that the methodology for determining payment amounts under all three prongs of the GOT regulation is sufficiently transparent and reasonable.*":

> *Under the GOT regulation, the three prongs work together to establish a floor on the payment amount for out-of-network emergency services, and each state generally retains authority to set higher amounts for health insurance issued within the state. The GOT regulation requires that a…plan…must pay the highest amount determined under the three prongs, which reflect amounts that the federal government itself, or group health plans and health insurance issuers, have established as reasonable.* Id., at 19435.

The Clarification Regulation also noted the importance of the fact that a "claimant (or a claimant's authorized representative) upon appeal of an adverse benefit determination must be provided reasonable access to, and copies of, all documents, records and other information relevant to the claim for benefits, including information about the plan's determination of the UCR amount. A failure to provide or make a payment of a claim in whole or in part is considered an adverse benefit determination…patients who are to be protected by the statute have a right to transparent access to the calculations used to arrive at the allowed amount for out-of-network emergency services, and a provider can obtain this information as a patient's authorized representative. To the extent that a provider is not able to obtain these calculations, the Departments believe that the patients' ability to obtain and to potentially challenge the information through litigation or the appeals process creates adequate safeguards with respect to" concerns about…manipulation of UCR amounts. This provides sufficient protections, especially in light of the focus of section 2719A of the PHGS Act on the protection of patients, rather than physicians." Id.[7]

---

[7] The Departments also explained that creation of a database to establish payments would be problematic to monitor and that there was no indication that such a database would be a "better barometer of UCR amounts than the

### III. D.  Plan Terms; Maximum Allowable Cost

The parties agree that the amount of reimbursement received by an out-of-network provider of emergency services depends upon the terms of the plan, the GOT rule which provides a "floor" or minimum payment for such services, and various state laws.



current methodology used by ...plan...It is the Department's' view that it is appropriate to continue to reserve the determination of the relative merits of each database to the discretion of the states, insurers, and health plans."



**III. E. Baptist's Contentions**

It is useful to highlight Baptist's fundamental points, as these have developed during the course of the arbitration and were set forth in Baptist's Phase 2 post hearing briefs and during closing argument.







Quantum Meruit, on the other hand, does not depend on such findings as it is a direct claim made by Baptist without reliance on the plan terms or contract between the employer and the member.















































































51





















## IV. PARTIAL FINAL AWARD RULINGS

### IV. A. Summary of Rulings





**5. Quantum Meruit**

**a.** We find that Baptist has shown by a preponderance of the evidence that, under Tennessee law, quantum meruit is applicable to these out-of-network – in other words, out-of-contract – claims, but only to the extent that Baptist was required by law to provide the services under consideration.  (We will use the October hearing dates to address the extent to which Cigna will be so liable).

**b.** We find that the Cigna defenses applicable to a quantum meruit claim are accord and satisfaction, waiver and estoppel, laches.

**c.** We further find that Cigna has not sustained its burden of proof as to any of these defenses in this quantum meruit context.

**d.** We  find that quantum meruit claims are not pre-empted by ERISA and  thus that this relief is available for all of the claims in issue.

**e.** Finally, we find that the measure of damages for quantum meruit is the reasonable value of the services. The reasonable value of the services will be further assessed during the damages phase hearings  to be held  in October 2022.

**IV. B. Statement And Discussion Of Rulings**

Except as required by law, employers have many options when determining the extent to which they will provide coverage, if at all, for the health care expenses of their employees. [34]

Pursuant to quantum meruit principles, however, a provider of out-of-network services is entitled to recover the "reasonable value" of those services. There is no contract limiting what they can recover. Similarly, the ERISA superstructure and the discretion otherwise afforded plan administrators, as well as a plan's procedural requirements of the plans, are inapplicable.

We address Count IV before Count I because our disposition of the issues on Count IV largely addresses the issues in Count I. We then turn to quantum meruit.

**IV. B. 1. Count IV Wrongful Denial of Benefits Under ERISA 502(a)(1)(B)**



























### IV. B. 2. Count I Breach of Contract



**IV. B. 3. GOT Rule Compliance**



    We have also considered that a finding in this regard would  require us to find, in effect, that the plan choice of ███████████ was illegal **from an ERISA perspective**, something we do not believe is appropriate in light of the emphasis in ERISA on process and conduct rather than the substantive regulation and content of benefits. ███████████████████████ ███████████████████████████████████ ███████████████████████████████████ ██

### IV. B. 4. Count II Quantum Meruit

A health care provider of emergency services with an assignment of benefits from the patient has two basic causes of action available to it to pursue a denied or underpaid claim. ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ we find Baptist has proven by a preponderance of the evidence that, to the extent it was required by law to provide emergency services, it has a valid claim for relief under quantum meruit/quasi contract theories. Even Cigna agrees – as it must -- that, given the requirements of EMTALA, where there is "no choice other than the service, there has to be a remedy" and that there is a "gap" in the law that needed to be filled. Cigna argues that the federal government stepped in to fill it with the GOT Rule. ████████████████████████████████████. We find that, properly construed against the backdrop of an understanding of how the health care system works, an implied-in-law contract was created under Tennessee law for which Baptist must be compensated at a "reasonable" rate for its services rendered under that quasi-contract. We also find that, with the further clarification of the recent Supreme Court jurisprudence on pre-emption, that quantum meruit is available for all the plans in this case and is not pre-empted by ERISA.

Since this is a state law claim, we are bound by Tennessee law pursuant to the Parties' arbitration agreement. Although at present, there is no Tennessee Supreme Court case directly on point, we have the discretion to make reasoned findings, based on the evidence of record in this case, that we believe are consistent with general Tennessee law principles. In this regard, we note that other lower courts in Tennessee have reached different conclusions on this issue, but we also note we have the discretion to disagree. ███████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████ We are looking at the facts through a very different lens and, in this universe, there is no contract between Baptist and Cigna and no requirements other than the elements of the cause of action.

### (a) Quantum Meruit is Applicable Here

The Tennessee Supreme Court has noted that the actions brought under theories of unjust enrichment, quasi contract, contracts implied in law, and quantum meruit are essentially the same. "Courts frequently employ the various terminology interchangeably to describe that class of implied obligations where, on the basis of justice and equity, the law will impose a contractual relationship between the parties, regardless of their assent thereto." *Paschall's, Inc.* v. *Dozier*, 407 S.W. 2d 150 (Tenn. 1996). We note various tests propounded by the Tennessee Supreme Court and Tennessee intermediate courts to assess Baptist's claims made under these theories.

We agree with Baptist that, at least in Tennessee, the existence of member plans do not bar a cause of action on the non-ERISA claims and we do not think it bars this cause of action under a pre-emption theory either, as we discuss below. ( ███████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████ )

Cigna cites *Doe* v. *HCA Health Services of Tennessee*, 46 S.W. 3d 191 (Tenn. 2001), a case in which the plaintiff hospital expressly relied upon a quantum meruit theory in seeking the reasonable value of its out-of-network services from a patient, for the following test:

1. There is not an existing, enforceable contract between the parties covering the same subject matter;
2. The party seeking recovery proves that it provided valuable goods or services;
3. The party to be charged receives the goods or services;
4. The circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services;
5. The circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment.

Id. At 198. The Court went on to discuss how the lower court on remand should assess the "reasonable value" of the hospital's services and what elements it might want to consider.

Baptist takes issue with Cigna's reliance on *Doe* because it predates *Freeman Indus., LLC* v. *Eastman Chem. Co.*, 172 S. W. 3d 512 (Tenn. 2005) and does not involve an "indirect" benefit as it believes is at issue here. In *Freeman*, the Tennessee Supreme Court assessed whether or not an indirect purchaser from producers guilty of fixing the price of food products could bring a claim for "unjust enrichment" against those producers and found that they could. The *Freeman* court noted that the Tennessee Supreme Court had recognized two types of implied contracts, those implied in fact and those in law, that contracts implied in law are "created by law without the parties' assent and are based on reason and justice," and that courts may impose a contract implied in law where no contract exists under various quasi contractual theories, including unjust enrichment. In Freeman, the Court recited the elements of an unjust enrichment as follows:

1. A benefit has been conferred upon the defendant by the plaintiff
2. Appreciation by the defendant of such benefit
3. Acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.

Id. at 524-525.

The court noted that the most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust. The *Freeman* court did not clearly address the appropriate remedy for an unjust enrichment claim or implied-in-law contract claim, and we have

not seen persuasive authority that it should not be the reasonable value of the services, as opposed to the value of the specific benefit received by Cigna.

In *River Park Hospital, Inc.* v. *BlueCross BlueShield of Tennessee, Inc.*, 173 S.W. 3d 43 (Ct. of Appeals, Tenn. 2003), a case we find helpful, a Tennessee appellate court relied on the "implied-in-law" concept  and the idea that "theories of unjust enrichment, quasi-contract, contracts implied in law and quantum meruit are essentially the same" in assessing a claim for unjust enrichment in a health care context. There, a hospital sought its full standard rates for out-of-network emergency services it provided to Tennessee Medicaid recipients through TennCare, the state's Medicaid managed care program, managed by BlueCare, the managed care entity administering the program. The court upheld the trial court's finding that, under EMTALA and Tennessee law, River Park was required to provide services, and thus:

> …while neither of these parties may have wanted to deal with each other, both were left with no choice. Under these circumstances, we must find a contract implied in law, without the assent of either party, on the basis that it is "dictated by reason and justice."  (citation omitted)….
>
> Under these circumstances, the trial court must determine a reasonable rate of reimbursement for all of the emergency admissions at issue. River Park argues that it is entitled to its full standard rate because it repeatedly insisted on this rate with BlueCare; while River Park's standard rate for its services is pertinent to the determination of a reasonable rate, it is hardly conclusive. Likewise, BlueCare maintains that its reimbursement rate for in-network providers is clearly a reasonable rate, and relies heavily on its BlueCare provider services manual was [sic] well as on industry custom among MCOs of paying all providers, both in-network and out-of-network, the same rate. Again, evidence of BlueCare's in-network rates, as well as evidence of industry custom, is pertinent but certainly not determinative. In assessing a reasonable reimbursement rate, the trial court may take into account all of these factors, as well as others that may be pertinent, such as whether the rate for in-network providers is appropriate for out-of-network providers, given the difference in volume of BlueCare enrollees treated. Moreover, the trial court may consider factors that may increase the providers costs, such as BlueCare's repeated automatic disallowance of claims previously authorized, apparently onerous and costly appeal and approval procedures, and delays in payment.

Id. at 59-60.

Thirteen years later, this same court later distinguished *River Park* in the context of a commercial plan and found that an implied-in-law contract did not exist for out-of-network

emergency services entitling a hospital to compensation.[38]  *HCA Health Services of Tennessee, Inc. v. BlueCross BlueShield of Tennessee, Inc.,* 2016 WL 3357180  (Court of Appeals Tenn. 2016). The *HCA* Court cited the language in *Paschall's* indicating that the various theories of implied obligations were the same and cited the test relied upon in *Freeman*, above. With respect to the *River Park* decision, the HCA Court said:

> We disagree with HCA's contention that the holding in *River Park* is "squarely on point."   Unlike River Park, where BlueCare had received payment for each TennCare enrollee and was under an obligation to pay for emergency services rendered to the enrollee, the patients in this case are participants in commercial health benefit plans which include coverage provide by BCBST for emergency medical services, at a level which depends upon the specific plan and the facts and circumstances of each claim. In River Park, HCA could only seek payment from BlueCare; significantly and as distinguished from River Park, in this case HCA can seek payment directly from the patients it has treated, with the amount it may have received from BCBST operating to reduce the amount for which the patient is responsible.

Id. at 10.

Having distinguished *River Park* on this basis, the HCA court then went on to assess whether HCA had a direct cause of action against Blue Cross for unjust enrichment, focusing on the provisions of EMTALA and the equivalent Tennessee Code Section 56-7-2355. Applying the unjust enrichment elements, the Court found that:

> Applying these elements to the facts of this case, the duty imposed on HCA by EMTALA and the prohibition imposed by BCBST by Tenn.Cod Ann. Section 56-72355 do not create an implied-in-law contractual relationship upon which to sustain HCA's cause of action. HCA has not conferred a benefit on BCBST; the services were rendered to the patients, none of whom are a party to this suit, and they are the ones who received the benefits of medical care provided in HCA's emergency rooms and are obligated to pay for the services. BCBST has not denied coverage for the services covered by the plan to which the participant agreed and for which the participant paid. Without a benefit conferred on BCCST by HCA, a cause of action for implied-in-law contract cannot be sustained.

Id. at 12.

---

[38] HCA was not included in what we might refer to as a "narrow network". Blue Cross paid the full amount for what it considered a "true" medical emergency, but paid less in cases where it did not think that a true emergency existed. HCA alleged that Blue Cross only paid a small percentage of its usual and customary charges in this instance and demanded at least 80% of its full-billed charges and the removal of any "Maximum Allowable Charges."

In a footnote in the above citation (n. 15), the Court noted that "[w]e are not persuaded by HCA's argument that HCA benefitted BCBST by helping BCBST to fulfill its core obligation to "improve and sustain the physical, financial and community health of Tennessee."

We acknowledge that a number of courts have agreed that it is the patient, not the provider, that is getting a legally cognizable "benefit," not the insurer paying for or administering the services. Some of these cases rely on a non-health care case, *Travelers Indemnity of Conn*. v. *Losco Grp., Inc.*, 150 F. Supp 2d 556 (S.D.N.Y 2001) for its seductive assertion that:

> [i]t is counterintuitive to say that services provided to an insured are also provided to its insurer. The insurance company derives no benefit from those services; indeed, what the insurer gets is a ripened obligation to pay money to the insured – which hardly can be called a benefit.

Id. at 563.

As Baptist compellingly notes, however, the same Southern District of New York distinguished *Travelers* in connection with an unjust enrichment claim brought by out-of-network emergency room physicians, noting that *Travelers* did not involve healthcare services and did not involve an allegation that the plaintiff was required by law to provide the services. *Emergency Physicians of New York* v. *UnitedHealthcare Group, Inc.,* 2021 WL 4437166 (SDNY 2021). As the court further noted:

> New York courts have found, consistent with the courts of several other states, that, "where, as here, a hospital is required by law to treat patients in an emergency room, an insurance company is unjustly enriched if it fails to pay the hospital in full for the costs incurred in rendering the necessary treatment to the insurer's enrollees (N.Y.C. Health & Hosps. Corp v. Wellcare of N.Y., Inc, 937 N.Y.S2d 540, 544 (S. Ct. 2011); River Park Hosp., Inc. V. BlueCross BlueShield of Tenn., Inc., 173 S.W.3d 43, 59. As the Third Circuit recently explained, the insurer's benefit is not the provision of the healthcare services per se, but rather the discharge of the obligation the insurer owes to the insured." Plastic Surgery Ctr. P.A. v. Aetna Life Ins. Co., 967 F3d 218, 240-41 (3d Cir. 2020) (citations omitted). Other federal courts have reached the same conclusion for similar reasons. E.g., El Paso Healthcare Sys., LTD v. Molina Healthcare of N.M., Inc, 683 F. Supp. 2d 454, 461 (W.D. Tex. 2010) (While it is true that the immediate beneficiaries of the medical services were patients, and not Molina, that company did receive the benefit of having its obligations to its plan members, and to the state in the interests of its plan members, discharged (additional citations omitted).

Id. at 12.

In assessing the issues relating to an implied-in-law contract, whether a benefit was conferred and the general equities involved, we are also influenced by the Supreme Court of Tennessee's discussion of the current state of the health care system in a non-quantum meruit

81

case -- finding that the collateral source rule prohibited evidence of discounted rates accepted by medical providers from an insurer to rebut proof that the full, undiscounted charges of the hospital were reasonable medical expenses --  in *Dedmon* v. *Steelman*, 535 S.W. 3d 431 (Ten. 2017), which we quote here without citations, although we note that the Court cited River Park several times in the course of its description:

> During this same period since the adoption of the rule, the pricing, payment and reimbursement system for health care providers has become exponentially more complex. The rise of managed care organizations has distorted pricing for health care services, as deep discounts demanded by the MCO's require providers to offset those discounts by charging higher prices to other patients…Hospitals are often legally required to provide treatment for patients who either are insured by companies with whom the hospital has no contractual relationship or who have no insurances at all…In all, providers are faced with competing objectives of balancing budgets, remaining competitive, complying with health care and regulatory standards, and continuing to offer needed services to the community…In this complicated environment, charges by hospitals have come to be set within the context of hospitals' broader communities, including their competitors, payors, regulators and customers. Funding the required treatment of patients without the means to fully pay for care depends on the ability of providers to disproportionately charge various patient categories…Of significance in this appeal, one result of the increasing complexity of health care has been a widening of the gap between a medical provider's standard rate charged to uninsured patients and the amounts accepted from insurance or social legislation benefits…all of these developments have caused the issue of what constitutes a reasonable medical charge or expense to become the subject of increase litigation due to the increased involvement of government payors, the complexity of health care reimbursement provisions, financial pressures on hospitals and the significance of medial expense recovery in personal injury litigation.

Id. at 452.

Considering all that we have learned in this arbitration, our collective experience, the evidence and the law, we find that Baptist has established by a preponderance of the evidence that a cognizable benefit has been conferred on Cigna – an extension, to some extent, of the "discharge of the obligations to the insured" line of reasoning adopted by a number of courts -- and that the equities require, as was the case in *River Park*, that we find a contract implied-in-law for Cigna to pay the reasonable value of the applicable out-of-network emergency services to the extent Baptist was required by law to provide them. The HCA Court did not have the advantage of this education and evidence and that opinion was, we believe, wrongly decided.

We have reviewed the expert testimony and associated witness evidence. We do not fully agree with either ████████████. Suffice it to say that the most significant – but not the only – benefit for Cigna is created by the very "managed care bargain" with which we began this

opinion. Cigna is able to get lower rates from in-network providers by excluding Baptist. It has every right to do that, but it must bear the consequences under state law in terms of how much it pays those out-of-network providers for services they are required to provide. ███████████ ████████████████████████████████████████████████████████ A Cigna witness also admitted, as he had to, that this network relationship puts Cigna in the best possible position to get business with various self-funded employers. ████████████████████

While Cigna pressed upon the Panel its compliance with NCQA standards as proof that its network was adequate, implying that it did not need Baptist and therefore did not get a true benefit from Baptist's existence, the fact is that there are 19,000 claims in this arbitration, and Baptist evidence that over three thousand Cigna members went to Baptist hospitals on an out-of-network basis each year in the Dispute Period (Baptist Post-Hearing Brief Response at 47-48). Cigna was obviously relying on Baptist in connection with its Open Access Plus and Local Plus options.

Given this – the discounts, associated competitive advantage, capacity and marketing benefits Cigna received and relied upon -- although Tennessee law only requires an indirect benefit, and that certainly has been shown here, we believe that these facts are sufficient to establish a direct benefit to Cigna, and that it received services under *Doe*.

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

The other elements required to be shown to prove an implied in law contract have not been as controversial and in any event have been established by a preponderance of the evidence. For example, Cigna clearly "appreciated" or accepted the services and realized that Baptist expected to get paid – it marketed out-of-network, or non-contracted, coverage to its employer-clients and their employees, ███████████████████████████████████ ████████████████████████. Marketing the out-of-network coverage was of course another benefit, a subset of the competitive advantage that ████████████ identified.

As quantum meruit is an equitable remedy, additional focus on the equities is warranted. Of course, the fact that Baptist is obligated to perform the services is enough under *River Park* to create an implied in law contract and it is enough here. ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████



Cigna argued that Baptist should not get a "side payment" because they exist ███████ ██████ – but, in a way, they should, although we would recharacterize the "side payment" as compensation for the reasonable value of their services when they are forced by law to provide such services.[39]

### (b) Cigna's Applicable Defenses

We now address those of Cigna's defenses that may be relevant to a quantum meruit claim. Cigna bears the burden of proof on these issues. ████████████████████████ ██████████████████████



---

[39] We also note that the distinction made in the *HCA* case between government plans forbidding balance billing and commercial plans that permit it -- the idea being that Baptist can look to patients to collect the remainder of the reasonable value of the services if Cigna's payment falls short -- would incentivize inequitable results that are inconsistent with quantum meruit by encouraging payors to pay very little to Baptist when they were required by law to see Cigna members. If Cigna and its employer clients are going to provide out-of-network services in these (notably circumscribed) situations we think that quantum meruit principles require them to pay the reasonable value of the services in the first place.



### (c)  Implied-in-Law, Quantum Meruit Claims Are Not Pre-empted

In addition to finding that quantum meruit is applicable, we also find that it is not pre-empted by ERISA.

### (c)(i) Effect of Rutledge

In *Rutledge* v. *Pharm. Care Mgmt. Ass'n*, 592 U.S. ___, 141 S. Ct. 474 (2020), the Supreme Court found that  ERISA did not pre-empt an Arkansas statute, Act 900, that required pharmacy benefit management companies to reimburse Arkansas pharmacies at a price equal to or higher than the pharmacy's wholesale cost. The statute required that PBMs timely update their maximum allowable cost ("MAC") lists, the amount at which the PBM's reimbursed pharmacies, when drug wholesale costs – the amounts paid by pharmacies to acquire drugs – increased and set forth an administrative procedure by which pharmacies could challenge MAC rates. It also permits pharmacies to refuse to sell a drug if the reimbursement rate from a PBM is lower than its acquisition costs.

This holding, relating as it does to a clear, healthcare-related exercise of a state's legislative authority, can be distinguished in general from a general state common law cause of action such as quantum meruit, and, as the Panel pointed out during oral argument on these issues, many (although not all) of the cases upon which the Supreme Court relied dealt with state legislation. An exception was *Mackey* v. *Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 831-832 (1988), where the Court held that "state-law mechanisms of executing judgements against ERISA welfare benefit plans, even when those mechanisms prevent plan participants from receiving their benefit" was not pre-empted by ERISA (Id. at 831-832.)

Nevertheless, we are convinced by Baptist's arguments that the logic of the Court's thinking is applicable here, and several lower courts since *Rutledge* have agreed that quantum meruit claims are not pre-empted by ERISA in part in reliance on *Rutledge*, e.g., *Emergency Services of Oklahoma, P.C.* v. *Aetna Health*, Inc. 556 F. Supp. 3d 1259, 1263-64 (ERISA does not pre-empt Oklahoma state law unjust enrichment claim by out-of-network emergency services medical providers alleging that health insurer paid claims at impermissibly low rates where they

should have been paid the reasonable value of their services). While we largely agree with Baptist's thorough and tightly reasoned submissions on the relevant issues and in particular found the charts in their May 27, 2022 response submission of great assistance, we discuss some of the key issues below.

ERISA pre-empts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C. Section 1144(a). A state law relates to an ERISA plan if it has a connection with or reference to such a plan. *Rutledge,* citing *Egelhoff v. Egelhoff*, 532 U.S. 141, 147 (2001). Elaborating upon the relevant questions, the *Rutledge* court addressed the issues required of us here: In assessing whether or not ERISA pre-empts a state law quantum meruit cause of action, we must ask the following questions:

> *Does quantum meruit have an impermissible connection to an ERISA plan, in that it "governs a central matter of plan administration or interferes with a nationally uniform plan administration"? *Rutledge* at 4-6, citing *Gobeille* v. *Liberty Mut. Ins. Co.* 577 U.S. 312, 320.
> *Does it "refer to" ERISA in that it acts immediately and exclusively upon ERISA plans and the existence of ERISA plans is essential to the law's operation"? *Rutledge*, citing *Gobeille*, 577 U.S. at 319-320.

The *Rutledge* Court was able quickly to dispense with the issue of whether or not Act 900 "referred to" ERISA because it applied to PBM's whether or not they managed an ERISA plan and did not directly regulate health benefit plans at all and ERISA plans were not essential to Act 900's operation. *Rutledge* at 6-7. We think that quantum meruit can be similarly assessed as not "referring to" an ERISA plan. For example, we agree with Baptist that a quantum meruit claim does not impermissibly refer to an ERISA plan. Among other things, "[t]he 'mere fact that a claim arises against the factual backdrop of an ERISA plan does not mean it makes reference to that plan'" *Sarasota Cty. Pub. Hosp. Bd*, 511 F. Supp. 3d 1240, 1249 (quoting *Plastic Surgery Ctr. P.A.* v. *Aetna Life Ins. Co.*, 967 F. 3d 218 (Third Cir. 2020).

To address the more difficult, "impermissible connection" question,  the *Rutledge* court first analyzed the objectives of ERISA, noting that ERISA is:

> primarily concerned with pre-empting state laws that require providers to structure benefit plans in particular ways, such as by requiring payment of specific benefits…or by binding plan administrators to specific rules for determining beneficiary status…A state law may also be subject to pre-emption if "acute, albeit indirect, economic effects of the state law force an ERISA plan to adopt a certain scheme, of substantive coverage…"

> In short, ERISA does not pre-empt state rate regulations that merely increase costs or alter incentives for ERISA plans without forcing plans to adopt any particular scheme of substantive coverage.

Id at 5 (citations omitted).

86

In finding that Act 900 did not have an impermissible connection to an ERISA plan, the *Rutledge* Court relied heavily on its decision in *New York State Conference of Blue Cross & Blue Shield Plan* v. *Travelers Ins. Co.*, 514 U.S. 645 (1995), which found that a New York state statute that imposed surcharges of up to 13% on hospital billing rates for patients covered by insurers other than Blue Cross/Blue Shield was not pre-empted by ERISA:

> The logic of *Travelers* decides this case. Like the New York surcharge law in Travelers, Act 900 is merely a form of cost regulation. It requires PBM's to reimburse pharmacies for prescription drugs at a rate equal to or higher than the pharmacy's acquisition costs. PBM's may well pass those increased costs on to plans, meaning that ERISA plans may pay more for prescription drug benefits in Arkansas than in, say, Arizona, But "cost uniformity was almost certainly not an object of pre-emption….nor is the net effect of Act 900 so acute that it will effectively dictate plan choices….as a result, Act 900 does not have an impermissible connection with an ERISA plan. (citations omitted)

Of particular relevance here, the *Rutledge* Court specifically addressed the PBM's concern that Act 900 affected ERISA plan design by mandating a particular pricing methodology for the pharmacy benefits at issue by forcing PBMs to reimburse pharmacies using a MAC list constructed with an eye toward containing costs and ensuring predictability, something the plan using the PBM might prefer, and instead requiring reimbursement at acquisition cost. This was, the court said:

> …just a long way of saying that [the statute] regulates reimbursement rates. Requiring PBMs to reimburse pharmacies at or above their acquisition costs does not require plans to provide any particular benefit to any particular beneficiary in any particular way. It simply establishes a floor for the cost of the benefits that plans choose to provide. The plans in Travelers might likewise have preferred that their insurers reimburse hospital services without paying an additional surcharge, but that did not transform New York's cost regulation into central plan administration.

The Court also warned that PCMA's pre-emption argument could improperly pre-empt any state law that could affect the price or provision of plan benefits. It also noted that the "responsibility for offering the pharmacy a below-acquisition cost reimbursement lies first with the PBM" in dismissing arguments that lower rate interfered with central matters of plan administration.

We agree with Baptist that, for purposes of pre-emption, quantum meruit is nothing more than a cost regulation – representing a cost of providing an out-of-network benefit -- which does not "relate to" or create an impermissible connection with ERISA plans:

> In this case, Cigna remains free to maintain its broad and narrow networks for both ERISA and non-ERISA plans. These networks can include or exclude Baptist.

The only difference is that the out-of-network services associated with Cigna's narrow networks will be subject to payment of such claims at "reasonable" rates under quantum meruit / unjust enrichment principles. This common law protection addresses the "unappealing outcome" that could result from Cigna's position that Baptist has no recourse if Cigna refuses to reasonably compensate it, "which could conceivably incentivize insurers…to pay as little as possible while Baptist remains obligated to treat Cigna's insureds." See Emergency Physician Services of N.Y., 2021 WL 4447166.

Baptist Opening Quantum Meruit Submission, at 18.

We also think it is important not to lose sight of the over-arching principle that, as Baptist points out, quantum meruit is Baptist's "independent, non-derivative cause of action independent directly against Cigna that does not implicate traditional ERISA relationships." (May 27 Response at 2). As the Third Circuit has noted:

> ERISA governs relationships among "the employer, the plan and its fiduciaries, and the participants and beneficiaries."…As our sister circuits have recognized, ERISA struck a "bargain" between the interests of participants and beneficiaries on the one hand and insurers on the other: Section 502() created federal causes of action that allow plan participants and beneficiaries to enforce ERISA's mandates, and section 514(a) limits potential sources of plan liability, providing employers and plan administrators with some measure of security…Critically, however, out-of-network healthcare providers "were not…party to this bargain"…. Health care providers…orbit the periphery of this bargain, but their rights and remedies are not delineated in ERISA's substantive or remedial provisions.

*Plastic Surgery Center, P.S.,* v. *Aetna Life Insurance Company*, 967 Fed. 3d 218 (Third Cir. 2020). (citations omitted).[40] We appreciate Cigna's attention to the various relationships involved here, but from the perspective of ERISA and quantum meruit, Baptist is not part of the club.

### (c)(ii) GOT Rule

We also agree with Baptist about the implications of the GOT Rule. Cigna argues that the federal government has spoken on the "gap" in the law occasioned by the legal requirements of EMTALA and analogous state laws. As Baptist notes, however, the express terms of the ACA, from which the GOT Rule derives, state that it should not be construed to affect the ERISA preemption

---

[40] In this pre-*Rutledge* case, the Third Circuit found that state law contract and promissory estoppel claims were not pre-empted by ERISA, but that unjust enrichment claims were because the "benefit conferred," which it defined to be the discharge of the obligation by the insurer, arose from the existence of the plan. Id. at 240-41, We think that this holding is not consistent with *Rutledge*, but in any event disagree with this logic. See *Saratoga Cty Publ. Hosp. Bd,* supra 511 F. Supp 3d at 1249 (fact that a claim arises against the factual backdrop of an ERISA plan or that ERISA plan is an initial step in the causation chain, without more, is too remote of a relationship with the covered plan to support a finding of preemption.)

88

analysis in any way. See 42 U.S.C. Sections 300gg-123 & 10841(d). This law was addressed by the Supreme Court in *Gobeille,* which confirmed that "[t]he ACA…specifies that it shall not 'be construed to preempt any State law that does not prevent the application of the provisions of the ACA." 577 U.S. 312, 326 (2016). A quantum meruit cause of action does not prevent the application of the provisions of the ACA.  If the Panel were to find that the reasonable value of the services provided by Baptist should be higher than what it received, quantum meruit would work in tandem with the GOT Rule and simply adjust upwards the floor rate set by its three part test, which, in turn, has the effect of lowering the members' balance billing liability – the express goal of PPACA, all as we outlined earlier in this opinion in discussing in detail the Clarification Regulation.

We also emphasize that the Clarification Regulation is quite explicit that the GOT Rule is a minimum amount, like the PBM regulation analyzed by the Supreme Court in *Rutledge* – the Departments used the word "floor" and "minimum" payment to describe it. It is, as Baptist notes, a "reasonable floor rate" and does not preclude finding that other amounts are reasonable. Cigna itself in effect acknowledges the function of the GOT Rule through its conduct. It sets the GOT Rule as the absolute minimum that must be paid as a matter of law, and adjusts this rate upward in some cases █████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ We also agree with Baptist that to the extent the Clarification Regulation addressed only the ability of states to increase amounts in connection with plans regulated by state insurance, the *Rutledge* decision supersedes this limitation.

**[spaces intentionally included]**

89

## V. Conclusion

For the reasons stated above, the Panel makes this Partial Final Award as follows:

1. Baptist's request ▮ for relief based upon Count ▮▮▮▮▮▮▮▮▮▮ IV (denial of benefits under ERISA, including but not limited to any requests for relief based upon Cigna's calculations pursuant to the GOT Rule) are DENIED;
2. Baptist's request for a finding that Cigna is liable to it based upon Count II (quantum meruit) is GRANTED as limited by this Partial Final Award; and
3. The Panel will conduct further proceedings consistent with this Partial Final Award, including (a) determination of the reasonable value of the services provided pursuant to the Panel's ruling in (2) above; and (b) considering and deciding any additional issues the Panel determines are appropriate after consultation with the parties.

SO ORDERED this 7th day of September, 2022

Joseph J. Farnan, Jr.
Joseph J. Farnan, Jr.

M J Schless
Michael J. Schless

Conna A. Weiner, Panel Chair

90

# TAB 007C

ELECTRONICALLY FILED
2023 Jun 13 2:25 PM
CLERK OF COURT - CHANCERY

# EXHIBIT 2

## FIRST AMENDED ARBITRATION AGREEMENT

**THIS AGREEMENT** ("Agreement") is made as of the 24th day of February, 2020, by and between Baptist Memorial Health Care Corporation, individually and on behalf of its affiliated companies (collectively, "Baptist"), and Cigna HealthCare of Tennessee, Inc., individually and on behalf of its affiliated companies (collectively, "Cigna"). Baptist and Cigna are referred to in this Agreement in the singular as a "Party" and collectively as the "Parties."

**WHEREAS**, Baptist claims that the Parties have a dispute about the appropriate reimbursement for a specific set of certain out-of-network healthcare services provided by Baptist facilities to Cigna members (the "Dispute");

**WHEREAS**, the Parties have agreed to submit the Dispute to binding arbitration pursuant to the terms set forth below;

**WHEREAS**, the specific out-of-network reimbursement claims subject to the Dispute will not include any claims other than those set forth on the document identified on March 25, 2019, as Exhibit A to the Tolling Agreement executed on March 18, 2019, and will not include any in-network facility claims even if any in-network facility claim was identified on Exhibit A ("Arbitration Claims"); and

**WHEREAS**, Baptist has not specified the full legal or factual basis for its claims, other than Baptist asserts it has not received the full amount of reimbursement it says it is owed for out-of-network healthcare services, and Cigna therefore reserves all rights, defenses, and counterclaims related to the classification and appropriate rate of payment for the Arbitration Claims and will assert any such defenses and counterclaims pursuant to a schedule established in the arbitration.

**WHEREAS**, the Parties desire to promptly and efficiently resolve this Dispute through an arbitration process as set forth herein.

**NOW THEREFORE**, in consideration of the Parties' mutual desire to resolve this Dispute, the Parties agree as follows:

1.      <u>Agreement to Arbitrate</u>. The Parties agree to arbitrate the Arbitration Claims as provided for in this Agreement.

2.      <u>Scope of Arbitration Claims</u>.

      a.      The Arbitration shall be limited to the Arbitration Claims.  Both Parties agree that in no event do they intend the Arbitration Claims to include in-network facility claims; any inclusion of in-network facility claims on any list of disputed claims provided by Baptist is inadvertent, and any in-network facility claims are expressly excluded from this Agreement.   Both Parties agree that any applicable statutes or periods of limitation or repose and other legal or equitable defenses related to the passage of time for asserting a claim against a Party, including but not limited to laches or the loss of a claim via waiver or estoppel, as well as any evidentiary or procedural rule or presumption based on

passage of time to bring a claim against a Party (all such defenses collectively referred to as "Time-Related Defenses") for Baptist's out-of-network claims that allegedly accrue after January 1, 2019 and before January 1, 2020 and are not on Exhibit A, but that Baptist asserts in good faith that arise out of the same legal theories and subject to the same causes of action that it raises in the statement of claim to be filed in this action, shall be tolled until the later of either 60 days after the final arbitration award is received or December 31, 2020. Nothing in this agreement shall toll any procedural or exhaustion requirements. Similarly, the Parties agree that any Time-Related Defenses related to Cigna's counterclaims relating to Baptist's out-of-network claims that allegedly accrue after January 1, 2019 and before January 1, 2020 shall likewise be tolled until after the completion of the Arbitration. Nothing in this Agreement shall affect any defense available to any Party as of the Effective Date of this Agreement. This Agreement shall not be deemed to revive any claim that is or was already barred on the Effective Date of this Agreement. This Agreement shall not revive or toll any in-network claim. This Agreement shall not operate as an admission or acknowledgement by any Party that any applicable statute of limitations or other Time-Related Defense has expired or arisen as of the Effective Date of this Agreement. On or around March 18, 2019, the Parties executed a Tolling Agreement extending the time within which to file causes of action related to the Arbitration Claims on Exhibit A. Nothing in this Agreement shall supersede, rescind, or otherwise affect the provisions of the Tolling Agreement and any amendments thereto, and the terms of the Tolling Agreement and any amendments thereto are incorporated herein by reference.

b.    Within 7 days of the execution of this Agreement, Baptist shall provide a detailed statement of claim providing the factual and legal basis for its claimed right to relief on each of the reimbursement claims that are part of the Arbitration Claims. For efficiency, Baptist may group the reimbursement claims into categories of reimbursement claims that involve the same factual basis or legal theory. Baptist will have the right to amend its detailed statement of claim, including but not limited to amending its causes of action (and Cigna its corresponding counterclaims and defenses); provided that no amendment to the Arbitration Claims will be permitted that increases the number of Arbitration Claims.

c.    Within 60 days after receipt of the detailed statement of claim provided in subparagraph b above from Baptist, Cigna will identify any reimbursement claims it contends should not be included in the Arbitration Claims (for example, because they are not out-of-network claims, or were paid, or such other similar reason), except that time may be extended for reasonable cause; provided, however, that this showing shall be only to secure a list of reimbursement claims actually to be disputed in the Arbitration and shall not constitute Cigna's defense to reimbursement claims that are in dispute.

  d.  Thereafter, if any dispute remains as to what reimbursement claims are a part of this Arbitration, the Parties will make good faith efforts to resolve this dispute within 60 days.  Any such dispute remaining after 60 days will be submitted to the arbitration panel for resolution.

  e.  Nothing in this Agreement nor any position taken during this Arbitration by either Party will be construed to waive any claim or defense unrelated to this Dispute, and nothing in this Agreement impacts the rights of either Party aside from this Agreement and the issues involved in this dispute.

3.  <u>Appointment of Arbitrators</u>.

  a.  A panel of three arbitrators will decide the Dispute.

  b.  The arbitrators will each be a former judge or a well-respected dispute resolution attorney who has sophisticated commercial litigation experience and a minimum of 20 years' experience in the practice of law, and who shall not have regularly represented parties in the lines of business of Baptist or Cigna.

  c.  The Parties will select the arbitrators by agreement.  Baptist will provide a list of potential arbitrators to Cigna, and Cigna will endeavor in good faith to agree to one of the arbitrators on that list.  Likewise, Cigna will provide a list of potential arbitrators to Baptist, and Baptist will endeavor in good faith to agree to one of the arbitrators on that list.  The Parties will select the third arbitrator by agreement. If the Parties cannot reach agreement on the third arbitrator, then the Parties agree to engage the American Arbitration Association to identify a list of seven potential arbitrators that meet the criteria set out in (3)(b) above. The Parties will then strike and rank the potential arbitrator, but each Party may only strike a maximum of three of the seven potential arbitrators.

  d.  Any contact with a prospective arbitrator will be made jointly and not on a unilateral basis. As part of the selection process, the prospective arbitrator(s) will disclose to both Parties any representation, fact, or relationship that might constitute a conflict of interest in serving as a neutral in this matter.  Conflict of interest issues will be governed by the Commercial Arbitration Rules of the American Arbitration Association, amended and effective October 1, 2013, regular track, including the Procedures for Large, Complex Commercial Disputes ("AAA Commercial Rules"). If the Parties are unable to select the arbitration panel by agreement, the Parties agree to negotiate an alternative mechanism for selection of the arbitration panel.

  e.  The arbitration panel will administer the proceeding directly without the employment of the American Arbitration Association or any other dispute resolution body, unless agreed otherwise.

4.  <u>Fees and Costs for Arbitration</u>.  The Parties each agree to pay their own legal fees and expenses in connection with the arbitration and, in addition, to pay one-half the cost of the arbitration, including fees charged by the arbitrators.  Notwithstanding any contrary provision of

the AAA Commercial Rules, the arbitration panel will not have the power to reallocate fees or costs of the proceeding as part of its award.

5.   <u>Issues for Arbitration</u>. The question to be decided in this arbitration is whether Baptist was properly reimbursed for the Arbitration Claims, and if not, what is the amount Cigna owes. Baptist generally contends that it provided medically necessary out-of-network healthcare services to Cigna members that were not properly paid.  Cigna disputes Baptist's contentions, including whether they are factually or legally correct or state actionable claims or are subject to Cigna's counterclaims or other defenses.

6.   <u>Conduct of the Arbitration</u>.  The arbitration panel will apply the AAA Commercial Rules for procedural and process issues, and applicable federal and state law for substantive legal issues, except that processes and procedures regarding disclosure, use, and communications with experts will follow federal law.

7.   <u>Initial Pleadings</u>.

a.   Baptist will be deemed the claimant for purposes of the arbitration, and Cigna will be deemed the respondent.

b.   Within 7 days after execution of this Agreement, Baptist will submit to the arbitration panel and send to Cigna's counsel a detailed statement of claim specifying its causes of action and factual basis for the same, as provided in paragraph 2.b above.

c.   Within 30 days thereafter, Cigna will file an answering statement stating with specificity all affirmative defenses and counterclaims, and the grounds thereof.

d.   If either Party becomes aware during discovery of additional legal theories, causes of actions, defenses, or counterclaims relating to the appropriate reimbursement of the Arbitration Claims, it may seek leave to add them to the arbitration, which may be permitted upon a showing of good cause.

e.   The Parties agree that any applicable statutes or periods of limitation or repose and other legal or equitable defenses related to the passage of time for asserting a claim against a Party, including but not limited to laches or the loss of a claim via waiver or estoppel, as well as any evidentiary or procedural rule or presumption based on passage of time to bring a claim against a Party (all such defenses collectively referred to as "Time-Related Defenses") for Baptist's claims will continue to be tolled from the Effective Date of December 5, 2018, of the Tolling Agreement executed by the Parties on March 18, 2019, until the filing of the detailed statement in paragraph 2.b above; provided, however, that claims accruing after January 1, 2019 and before January 1, 2020 shall be tolled as provided in paragraph 2.a above.  Furthermore, the terms of the Tolling Agreement and any amendments thereto are incorporated herein by reference.

f.   Similarly, the Parties agree that any Time-Related Defenses related to Cigna's counterclaims will likewise be tolled until the filing of Cigna's answering

statement; provided again, however, that any Time-Related Defenses related to Cigna's counterclaims regarding any of Baptist's claims accruing after January 1, 2019 and before January 1, 2020 shall also be tolled as provided in paragraph 2.a above.

g.   Nothing in this Agreement will affect any defense available to any Party as of the Effective Date of the Tolling Agreement. This Agreement will not be deemed to revive any claim that is or was already barred on the Effective Date of the Tolling Agreement. This Agreement will not operate as an admission or acknowledgement by any Party that any applicable statute of limitations or other Time-Related Defense has expired or arisen as of the Effective Date of the Tolling Agreement.

8.   <u>Scope of Discovery</u>.

a.   The scope of discovery will be consistent with the AAA Commercial Rules, except as described herein.

b.   Each Party will be entitled to serve upon the other Party a total of 30 Interrogatories, including subparts, and a total of 30 Requests for Production of Documents and Tangible Things, including subparts. The Parties shall negotiate the scope of discovery in good faith and under the guidance of the arbitration panel once Baptist has supplied its detailed statement of claim as provided in paragraph 2.b above.  It is anticipated that depositions may be necessary, including corporate representatives and expert witnesses.

c.   Discovery depositions of any witness will be limited to 7 hours of questioning per deposition by the noticing Party, and up to 1 hour of follow-up by the defending Party, subject to extensions by agreement or by order of the arbitration panel for good cause shown.

d.   The Parties will select by agreement one arbitrator from the arbitration panel to resolve discovery disputes. If the Parties are unable to agree after reasonable efforts, the arbitration panel will select one arbitrator to resolve discovery disputes, according to a process determined by the arbitration panel. Discovery disputes may be taken up at any time after the Parties have made reasonable efforts to meet and confer over the dispute.

e.   Except as provided in this Agreement, discovery tools will be utilized in a manner generally consistent with the commensurate Federal Rules of Civil Procedure; provided, however, that it is anticipated and expected that the scope of document discovery (especially for electronically stored information ("ESI")) will be as narrow as reasonably feasible to the needs of this specific Dispute, as is consistent with the Parties' desire to arbitrate this Dispute and resolve it in a cost-effective and streamlined fashion.

f.   The Parties are obligated to work in good faith to ensure that discovery is streamlined and narrowly tailored to the purposes of this case. Any decisions

by the arbitrator to resolve discovery disputes regarding the scope of discovery, ESI, or any other information will take into account the Parties' desire to have a cost-effective proceeding and will not be controlled or otherwise determined by the scope of discovery provided in the Federal Rules of Civil Procedure.

9.      Pre-hearing Schedule. The Parties agree to negotiate a schedule with the goal of completing the Arbitration by the end of the summer 2020, with specific dates to be agreed to by the Parties and the arbitration panel.  This schedule may be modified by agreement or upon the motion of either Party for good cause shown, including with regard to trial schedules of counsel or the Parties that may be set by courts or arbitration panels in the interim, provided that counsel and the Parties have made best efforts to maintain this agreed-upon schedule.   Good cause includes, but is not limited to, the failure of a Party to timely produce discovery to the Party requesting modification/extension.  A material and key consideration to the Parties' agreement to the pre-hearing schedule and hearing date is their respective agreement to cooperate and timely and fully produce the documents and other information set forth herein.  Also material and key to the Parties' agreement is that, because this is a voluntary arbitration, the discovery process is streamlined, sensible, and managed to the needs of the case as provided for in paragraph 8 above.

10.      Periodic Status Conferences. The Parties and the arbitration panel will have monthly status conferences regarding the progress of discovery and the arbitration, unless otherwise agreed by the Parties.

11.      Mandatory Mediation.  No later than 90 days before the scheduled start of the final hearing, the Parties will conduct a non-binding mediation at a location to be determined by agreement of the Parties before a neutral other than the arbitration panel.  The Parties will attempt in good faith to select a mediator.  If after reasonable efforts the Parties are unable to select a mediator, the arbitration panel will appoint a mediator according to a process determined by the arbitration panel.

12.      Bifurcation.  By agreement of the Parties or by order of the arbitration panel upon motion for good cause shown, issues to be decided at the final hearing may be bifurcated in order to promote efficiencies and resolution of the Dispute.

13.      Final Hearing.  The final arbitration hearing will commence on a date to be agreed to by the Parties and the arbitration panel, with the goal of setting the hearing for summer 2020.  Proof will be closed at the conclusion of the final hearing and will not be re-opened unless extraordinary grounds are shown to the arbitration panel.

14.      Hearing Site.  The final hearing will be held at a neutral, mutually agreeable location.

15.      Decision.  The final award will be rendered by a majority of the arbitration panel. The arbitration panel will have the authority to decide all claims and defenses asserted in the arbitration, as required by law and equity.  The arbitration panel will prepare a reasoned award in writing consistent with the AAA Commercial Rules, which will specify any damages payable to any Party.

16.   <u>Binding Nature of Arbitration</u>.  The award to be made by the arbitration panel will be valid and binding upon, and will be performed by, each of the Parties and their respective parents, subsidiaries, affiliates, owners, shareholders, officers, directors, employees, representatives, successors, transferees, and assigns.  The Parties further agree that in the event either Party refuses to implement or honor the final award of the arbitration panel, then, and only then, within 90 days following such refusal to implement or honor the final award, either Party may commence a summary action in any federal court of competent jurisdiction for the confirmation of the award subject to the Federal Arbitration Act and the Federal Rules of Civil Procedure, but will abide by the confidentiality provisions of this Agreement consistent with applicable court rules.

17.   <u>Confidentiality Regarding this Agreement</u>.  No Party will disclose to third parties the terms and provisions of this Agreement without the prior written consent of the other Party except as required by law, or to enforce this Agreement, or as may be required for purposes of communicating with the Parties' auditors, regulators, attorneys, and insurers.  The Parties agree that this Agreement will be admissible in the arbitration contemplated by this Agreement but will not be admissible in any other pending or subsequent litigation or arbitration between the Parties related to any subject, except to enforce the Agreement.  The Parties agree that the breach or prospective breach of this provision will cause irreparable harm for which monetary damages may not be adequate.  The Parties therefore agree that in addition to any other remedies, the non-breaching Party will be entitled to injunctive or other equitable relief to restrain the breach hereof.  Should either Party receive a subpoena or other process requesting information pertaining to this Agreement, the subpoenaed Party shall in good faith make best efforts to provide notice of such subpoena via overnight delivery and email to counsel for the Parties, and a reasonable opportunity to oppose or quash such subpoena will be afforded to the Party seeking to oppose or quash such subpoena or process; however, this notice requirement does not apply to governmental investigations and governmental audits, for which no such notice is required of either Party.

18.   <u>Confidentiality Regarding Arbitration Proceedings and Documents Exchanged in this Arbitration</u>.  The Parties agree that the arbitration communications, filings, proceedings, and the arbitration award are and will be kept confidential and that the documents exchanged between the Parties and/or the arbitrators in relation to the arbitration may not be disclosed to any persons other than current and former employees of the Parties acting as witnesses in the arbitration, the Parties' expert witnesses and their personnel, the arbitrators and their personnel, counsel for the Parties and their personnel, or as necessary in the ordinary course of the Parties' business, absent the consent of all Parties or proper legal process.  The Parties will execute a mutually agreeable Confidentiality Agreement that will govern the documents exchanged in the arbitration.  The results and decisions of the arbitration panel will also be confidential, and will not be revealed to anyone or disclosed by the Parties for any reason other than to enforce the award, or as may be required by law, or for purposes of communicating with the Parties' auditors, regulators, attorneys, and insurers. In the event that a Party files an action to enforce the award, all Parties will use their best efforts to ensure that the award is filed under seal and remains permanently under seal.  Should either Party receive a subpoena or other process requesting information pertaining to this Agreement, the subpoenaed Party shall in good faith make best efforts to provide notice of such subpoena via overnight delivery and email to counsel for the Parties, and a reasonable opportunity to oppose or quash such subpoena will be afforded to the Party seeking to oppose or quash such

subpoena or process; however, this notice requirement does not apply to governmental investigations and governmental audits, for which no such notice is required of either Party.

19.     <u>Binding Agreement</u>.  This Agreement will be binding upon, inure to the benefit of, and be enforceable by and against each Party hereto and their respective successors and permitted assigns.

20.     <u>Entire Agreement</u>.  The Parties represent and warrant that this document constitutes the entire agreement between the Parties hereto with respect to the subject matter hereof, and all prior negotiations, correspondence, agreements, and discussions with respect thereto, are hereby merged into this Agreement.  There exists between the Parties no oral agreement, understanding, statement, promise, representation, warranty, or inducement other than as may be contained in this Agreement.   The Parties are not relying upon any promise, representation, warranty, or consideration not expressly set forth herein.

21.     <u>Assignment</u>.  No Party may assign this Agreement or its rights or obligations hereunder without the prior written consent of the other Party.

22.     <u>Amendment</u>.  This Agreement may be amended at any time by mutual agreement of the Parties, but any such amendment must be in writing, dated, and signed by the Parties.

23.     <u>Counterparts</u>.  This Agreement may be executed in multiple originals, each of which will be binding upon the Party whose signature it contains, and the combined total of which will constitute the entire document.  A facsimile or electronically scanned copy of the entire Agreement that contains the signature of an authorized representative of one or more of the Parties will be accepted as an original document for all purposes.

24.     <u>Authority</u>.  Each individual signing below on behalf of Baptist and Cigna has full and complete authorization and power to execute this Agreement.  This Agreement is a valid, binding, and enforceable obligation of each Party, and does not violate any law, rule, regulation, or contract binding upon either Party.  Cigna represents and warrants that it has full authority to execute this Agreement and to bind itself to the covenants stated herein. Baptist represents and warrants that it has full authority to execute this Agreement and to bind itself to the covenants stated herein.

25.     <u>Governing Law</u>.  It is agreed that applicable federal and state substantive law will be applied by the arbitration panel in the arbitration, except as provided under Section 6 of the Agreement with regard to the use and declaration of experts.  It is further agreed that these proceedings are governed by, construed, and enforced in accordance with the Federal Arbitration Act and the Federal Rules of Civil Procedure, except that Arkansas' Revised Uniform Arbitration Act, Ark. Code Ann. § 16-108-217(e), will be applied by the arbitration panel only for the issuance of protective orders.  The arbitration necessarily involves the production of documents containing confidential information, and protected health information and individually identifiable health information that may be protected from unauthorized disclosure by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the privacy regulations promulgated thereunder (45 C.F.R. Parts 160 and 164).  The Parties agree that the arbitration panel has the

power to issue and enforce a HIPAA qualified protective order in the arbitration under Ark. Code Ann. § 16-108-217(e).

26.     <u>Arbitrability</u>.  The arbitration panel will have the power to decide all issues of arbitrability, including whether any Arbitration Claim, cause of action, defense, or counterclaim is subject to this Agreement or may be resolved in the arbitration.

27.     <u>Construction</u>.  In the event of any question or dispute under this Agreement, Baptist and Cigna agree that the terms of this Agreement will not be construed against the drafter, but will be construed as though all Parties were the drafter.

28.     <u>Additional Documents</u>.  The Parties agree to cooperate fully and to execute any and all supplementary documents, and to take all additional actions that may be necessary or appropriate to give full force and effect to the terms and intent of this Agreement.

29.     <u>Effective Date</u>.  This Agreement will become effective on the date of the last signature below.

30.     <u>Invalid Provisions</u>.  If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, or unenforceable, the remainder of the provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated; provided, however, in lieu of such illegal, invalid, or unenforceable provision, the Parties hereto agree to add as a part hereof a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable that preserves the same benefits to the Parties.

IN WITNESS WHEREOF the Parties to this Agreement have caused it to be executed by themselves or their duly authorized representative.

Baptist Memorial Health Care Corporation ; by counsel

Signed: _____

Printed Name: DAVID A. King

Title: Polsinelli, Shareholder

Date: 2/24/20

Cigna

Signed: _____

Printed Name: John Hamill

Title: Partner, Counsel for Cigna

Date: 2/24/20

10

# TAB 008A

ELECTRONICALLY FILED
2023 Jun 13 4:13 PM
CLERK OF COURT CHANCERY
CONFIDENTIAL

**IN THE CHANCERY COURT FOR SHELBY COUNTY, TENNESSEE**
**FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS**

| | |
|---|---|
| **CIGNA HEALTHCARE OF** ) | |
| **TENNESSEE, INC.** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | **Case No. Case No. CH-22-1654** |
| **v.** ) | |
| ) | |
| **BAPTIST MEMORIAL HEALTHCARE** ) | |
| **CORPORATION** ) | |
| | |
| **Respondent.** | |

**CONFIDENTIAL AMENDED PETITION TO MODIFY**
**OR VACATE, IN PART, "PARTIAL FINAL AWARD" IN ARBITRATION**

## I. Introduction

1.      The parties are engaged in an ongoing and confidential arbitration on behalf of themselves and their affiliated entities (the "Arbitration").

2.      The Arbitration is being administered over the course of several "phases."  Two phases occurred in 2021 and 2022, another phase has proceeded in 2023, while an additional phase is scheduled later in 2023 and more may come.

3.      Baptist Memorial Healthcare Corporation ("Baptist") is the complaining party in the Arbitration and Cigna HealthCare of Tennessee ("Cigna") is the defending party.

4.      On September 7, 2022, a three-member arbitration panel (the "Panel") issued a decision that addressed certain, but not all, of the issues (the "September 2022 Decision"). Notwithstanding the ongoing Arbitration, the Panel designated the September 2022 Decision with terminology that may trigger the required timing to challenge it under the FAA.  The particular

CONFIDENTIAL

issues at stake in this Petition relate to "Count II" of the statement of its claim that Baptist made in Arbitration.  A partially redacted copy of the Confidential September 7, 2022 Decision is attached to this Petition as **Exhibit 1** pursuant to the Court's Amended Stipulated Protective Order entered on June 6, 2023.

5.      The Arbitration is pursuant to the Federal Arbitration Act ("FAA").  By agreement of the parties, which applies to the Arbitration, the standard of review over decisions by the Panel in the Arbitration (including the September 2022 Decision) is governed by the FAA.  Under the specific terms of the parties' agreement to arbitrate, Tennessee or federal law otherwise provide the substantive law governing the proceedings (depending on the issue), including whether a state law cause of action exists.

6.      Cigna submits that (i) substantial portions of the September 2022 Decision are correct under governing law, but (ii) the Panel also made certain determinations in the September 2022 Decision as to "Count II" of Baptist's arbitration demand that are flatly beyond the Panel's legal authority and in manifest disregard of Tennessee or federal law, including because they run directly afoul of clearly established legal precedent in the State of Tennessee.  By way of example, the Panel's errors as to Count II include (among others identified below) permitting Baptist to proceed in Count II on a cause of action that is _explicitly_ unavailable under governing Tennessee law (which the parties specified would apply) and has been unequivocally rejected in this _exact_ context by the Tennessee Court of Appeals.  There is clearly established legal precedent against the Panel's determinations as to Tennessee law.

7.      Cigna so far challenges only those portions of the September 2022 Decision that concern Count II, which Cigna submits were beyond the Panel's authority and were issued in manifest disregard of the law.

**CONFIDENTIAL**

8.      The Panel derives its jurisdiction from the parties' agreement to arbitrate.  The Panel therefore was bound to apply governing Tennessee state law on Tennessee state law issues. The parties did not agree to permit the Panel to depart from Tennessee law as to Tennessee state law causes of action.  But the Panel expressly did so depart, by permitting a nonexistent cause of action in Count II for *quantum meruit* to proceed that Tennessee courts have held is unavailable under Tennessee law in the very circumstances that exist here.

9.      Under the parties' arbitration agreement, the Panel was similarly bound to apply governing federal law on federal issues.  The parties again did not agree to permit the Panel to depart from federal law as to federal causes of action and preemptions governed by the Employee Retirement Income Security Act ("ERISA").  But the Panel expressly did so depart, in concluding that ERISA did not preempt the state law cause of action in Count II that relates directly to employee health benefit plans at issue in the case.

10.     To be very clear, the Panel stated in clear and unambiguous language that a decision by the Tennessee Court of Appeals was, in its view, "wrongly decided."  That holding by the Panel was in manifest disregard of the law.  There was no authority for the Panel to overturn the governing law of the State of Tennessee.  Arbitration Panels receive certain levels of deference, but are not allowed any deference to depart from clearly established legal precedent.

11.     Despite the Panel having exceeded its authority on certain issues, Cigna does not believe the Panel's September 7, 2022 Decision is ripe for review at this time (Cigna is concurrently filing a motion to stay).  There are compelling reasons to stay this matter pending the remaining phases of the Arbitration.  The Panel has not issued a final determination in the Arbitration concerning Count II that should yet be subject to any petition by Cigna like this one seeking review under the FAA.  Nevertheless, because the Panel designated its September 2022

3

CONFIDENTIAL

Decision as a "Partial Final Award," Cigna is compelled to file this Petition to preserve its ability to challenge that decision (at an appropriate time after the Panel renders its final decision as to Count II that it has permitted to proceed).

12.     More specifically, the next phase of the Arbitration is to determine whether there were in fact any damages to Baptist under the nonexistent cause of action that the Panel permitted to proceed.  This next phase is proceeding in more than one step.  One evidentiary hearing took place in early 2023.  A decision is expected in the ensuing months from now and the matter remains pending.  Another evidentiary hearing is scheduled in December 2023.  On top of that, it is conceivable that still *another* phase will be needed to determine whether and to what extent any monetary damages would ever be owed.  That phase is not yet scheduled but we anticipate it would occur in 2024.

13.     The upshot is that the Panel has not issued any decision on whether any actual relief (e.g., money damages) is owed to Baptist on that nonexistent cause of action.  It has only determined that Baptist has asserted a valid cause of action under Tennessee law (despite the clear legal precedent to the contrary).  No decision on whether any actual relief is owed is expected until a future point well into 2023 and possibly well into 2024.

14.     It is also entirely possible that Cigna may choose *not* to pursue a challenge to any actual final decision rendered by the Panel depending on the Panel's ultimate determinations as to Count II and their impact, which will not be issued until a later point in 2023 or even into 2024.  Again to be clear, there is no ruling on whether anything is actually owed, only a ruling that permitted a nonexistent cause of action to go forward (in violation of Tennessee law).

15.     As Cigna has not been ordered to provide any relief, it is doubtful that Cigna has standing under Tennessee or federal law pursue this Petition at this time.  To date there is no

CONFIDENTIAL

distinct and palpable injury, but only conjectural and hypothetical injury.  Nor would it be efficient to proceed in piecemeal fashion on a challenge to any aspect of the Panel's determinations when multiple phases remain to be pursued (after which challenges might also be levied by either party depending on the ultimate rulings).

16.     The Panel nevertheless designated the September 2022 Decision in a way that leaves uncertain whether the time to challenge Count II of the decision will expire on December 7, 2022.  The Panel's designation of the Partial Final Award as a final award necessitates that this challenge be filed at this time to preserve Cigna's rights.  The Panel declined Cigna's request to modify its decision that would remedy any uncertainties as to when the timing to challenge the determinations as to Count II is triggered, but has maintained the "Partial Final Award" designation.

17.     Out of an abundance of caution, and to ensure preservation of its rights, Cigna respectfully submits this Petition to vacate or modify certain portions of the September 2022 Decision on the basis that they are beyond the authority of the Panel and are in manifest disregard of the law (including the law of the State of Tennessee, as there is a directly-on-point decision from the Tennessee Court of Appeals that the Panel ruling was wrong).

18.     Cigna will also be submitting a motion to stay this proceeding pending completion of all aspects of the Arbitration, including an actually final determination by the Panel of the ultimate question submitted to arbitration (as detailed below).

19.     The full details of the Arbitration relevant to this Petition and the motion to stay are subject to a confidentiality agreement governing the Arbitration.

20.     Cigna included in its previously filed and publicly-available version of this Petition only the averments necessary to state the issue and to confirm this Court's jurisdiction.

CONFIDENTIAL

21.     This "confidential" and "amended" version of the Petition (filed under partial seal) sets out Cigna's complaint in considerably more detailed materials and provides the relevant accompanying materials from the Arbitration.

## II.  Parties

22.     Cigna HealthCare of Tennessee, Inc., is a Tennessee corporation.  It is a subsidiary of The Cigna Group (f/k/a Cigna Corporation) and is related to multiple Cigna affiliates.  Cigna participated in the Arbitration on behalf of itself and its affiliated entities.

23.     Baptist Memorial HealthCare Corporation is a Tennessee non-profit corporation. Baptist participated in the Arbitration on behalf of itself and its affiliated entities.

24.     This matter arises under the Federal Arbitration Act.

25.     This Court has general jurisdiction under Tennessee and federal law to address the subject matter of this petition.

26.     The primary situs of the Arbitration insofar as the issues at stake in this Petition are concerned is in this venue, as this is the area in which the services at issue in the Arbitration took place.

## III.  Factual Background

### A.     The Arbitration Agreement

27.     Cigna and Baptist entered into an agreement to arbitrate a particular dispute that had arisen between them (the "Arbitration Agreement").

28.     The first iteration of the Arbitration Agreement was entered in November 2019.  A copy of the current First Amended Arbitration Agreement is attached to this Petition as **Exhibit 2**.

29.     The Arbitration concerns Baptist's assertion that it is owed money as additional reimbursement on certain instances between 2013-2019 where Baptist provided emergency or

CONFIDENTIAL

other medical services to patients whose health benefit plans were administered by Cigna ("Cigna members"). Baptist asserts that it was obligated to provide services to Cigna members under the Emergency Medical Treatment and Active Labor Act of 1986 ("EMTALA") and its progeny, that it has not been reasonably reimbursed for its services, and that Cigna should be ordered to pay any remaining amounts. The precise figures are in flux, but there are between 16,000 and 19,000 individual health care reimbursement claims at stake, covering thousands of individual patients. Baptist's assertion is that it has not been paid reasonably under its view of the law and the facts.

30.     To be clear, Baptist already has received (substantial) payment on the vast majority of reimbursement claims at issue. It seeks *additional* reimbursement through the Arbitration. Cigna's position is that those payments were considerably more than "reasonable." As explained below, these payments came either from the employer sponsored plans governed by ERISA (for which Cigna administers claims) or directly from patients (for the portions of charges not covered by the patient's health benefit plan or for which a copayment was due).

31.     The Panel has determined that Cigna did not violate a federal law provision requiring that payments made to Baptist from coverage plans be "objectively reasonable." In particular, Baptist specifically challenged Cigna's compliance with that provision and the Panel rejected that challenge.

32.     To be clear, this means that the Panel has effectively rejected a claim by Baptist that payments to Baptist—*i.e.*, the payments Baptist challenges in the ongoing proceedings—were objectively unreasonable under federal law.

33.     The Panel nonetheless is permitting the Count II cause of action to go forward to determine whether the payments were reasonable as a matter of state law under equitable principles of *quantum meruit*.

CONFIDENTIAL

34.     Paragraph 5 of the Arbitration Agreement specifies the ultimate question to be addressed in the Arbitration: "[t]he question to be decided in this arbitration is *whether Baptist was properly reimbursed for the Arbitration Claims, and if not, what is the amount Cigna owes*." That is the "Arbitration Question."[1]  (Ex. 2 ¶ 5.)

35.     There was no agreement or provision of law requiring arbitration between the parties.  The parties voluntarily chose to proceed in a private arbitration.

36.     The parties selected three arbitrators to form the Panel that would preside over the Arbitration.  None of the arbitrators is based in Tennessee.  The arbitrators are based in Massachusetts, Delaware, and Texas.

37.     Pursuant to paragraph 25 of the Arbitration Agreement, the Arbitration is governed by the FAA, including its standard and scope of review.  (Ex. 2 ¶ 25.)  Tennessee substantive law governs in the Arbitration where causes of action (or defenses) are governed by state law, and federal substantive law governs for matters that arise under federal law.

**B.     Baptist's Causes of Action**

38.     In the vast majority of circumstances at stake in the arbitration, Cigna was not providing health benefit coverage to these patients.  Cigna instead was providing administrative services to the patients' employers in processing health care claims (which employers, in turn, were clients of Cigna).  Funding for payment of these health care claims comes from employer accounts.  These arrangements are governed by ERISA, except in relatively rare instances such as where the employer was a state government entity or a charity (in which case parallel state contract law provisions are at stake).

---

[1] All emphasis in quotes and citations is added unless noted.

CONFIDENTIAL

39.     Baptist was not in Cigna's contracted provider network for the claims at stake. Baptist was "out of network" or "non-participating" as to Cigna.  In such circumstances, payment to a health care provider like Baptist comes from the employer account as part of the member's coverage, or from the member itself for either a cost-share (e.g., a copayment) required under the benefit plan or the balance of the bill.  Cigna is not responsible for funding payment in any of those circumstances.  Cigna provides administrative services only under contracts with the employers. The payments come from the plans funded by the employers or from the members.

40.     Baptist brought four causes of action in the Arbitration.  In pertinent order:

▪     Count IV is a cause of action under federal ERISA law asserting adverse benefit determinations.  The gist of this cause of action is that Cigna should be required to pay additional amounts (beyond what Baptist already received) for situations where a claim was not paid at amounts that were allegedly required by the members' benefit plans.  This cause of action concerns situations where federal law under ERISA governs the relationship between and among Cigna, the employer, and the employee.  The vast majority of claims in the Arbitration were subject to Count IV, *including* most of those at stake in this Petition (as described below).  Federal law under ERISA supplies a rule known as the "greatest of three" ("GOT") requirement that sets the amount under federal law that plans must pay for the type of emergency services at stake in the case.  29 CFR § 2590.715-2719A(b)(3)(i); 42 U.S.C. § 300gg–19a(b).  (This is the federal standard referenced above.)  The undisputed premise of the "GOT" amount is that the amount to be paid is "objectively reasonable" and that amount is what insurers are "required" to pay.  *American College of Emergency Physicians v. Price*, 264 F. Supp. 3d 89, 92 (D.D.C. 2017); 80 Fed. Reg. at 72,213. The Panel ruled for Cigna on this cause of action.  As noted above, the Panel determined that Cigna did *not* violate the GOT rule, meaning that the Panel determined that Cigna met the test that

CONFIDENTIAL

payments were *objectively reasonable* under federal law (i.e., Baptist did not prove by a preponderance of the evidence that they were not).

▪   Count I is a cause of action for breach of contract.  Count I is a parallel cause of action to Count IV except it only applies to a minority of situations where the claims would be exempt from ERISA, where the employer is a state entity, a religious group, or a charitable organization.  The gist of this cause of action was also that Cigna should be required to pay additional amounts (beyond what Baptist already received) for situations where a claim was not paid at amounts that were allegedly required by the members' benefit plans.

▪   Count II alleges "implied contract" based on an equitable *quantum meruit* remedy. Baptist alleges in Count II that it and Cigna had an implied contract under which *Cigna* would pay a reasonable amount directly to Baptist for the health care services that Baptist provides to Cigna members (even though the vast majority of situations involve ERISA-governed coverage supplied by and funded by the member's employer).  The assertion is that the amount Baptist received to date was not reasonable (even though it met the objectively reasonable GOT test), and that Cigna (not employers and not members) should pay additional amounts under a *quantum meruit* remedy up to the point where the amount is "reasonable."  The Panel has not yet declared what it believes "reasonable" means under state law (a hearing was held on this issue in January 2023 and continued proceedings may occur in 2023 and possibly 2024).

▪   Count II (*quantum meruit*) is a cause of action that Baptist originally pleaded as an alternative to Count I (breach of contract) only.  That is because everyone understood that ERISA would preempt a *quantum meruit* cause of action as to healthcare reimbursement claims subject to

Count IV (cause of action under federal ERISA law).  With the Panel's permission, and over Cigna's objection, Baptist later amended Count II also to apply to the claims otherwise governed by ERISA.  Count II is the cause of action subject to the ruling that Cigna seeks to modify or vacate.

- ▪   Count III is a cause of action for prompt pay remedies under state law.  It has no bearing on this Petition.

41.   The Arbitration has proceeded in phases, with the parties and the Panel having undertaken a process to address which issues would be addressed in each phase.

42.   Two phases have gone forward.   Two evidentiary hearings and associated proceedings have taken place, spanning various dates in February 2021, November 2021, December 2021, and various points of 2022.  A third phase including an evidentiary hearing took place for a week in January 2023, with multiple other phases or partial phases to continue in 2023. As many as three or four more will take place in 2023.

43.   The Arbitration Question has not been answered.   At least one detailed phase remains (and maybe several) and the Panel has not issued a final decision on Count II.  Counts I and IV are not proceeding any more.  But Count II is still proceeding and no relief has been ordered on it.   The Panel therefore has not ultimately determined "*whether Baptist was properly reimbursed for the Arbitration Claims and if not, what is the amount Cigna owes,*" which again is the question presented by the parties to the Panel for Arbitration.  Substantial proceedings remain. No relief has been ordered and it is certainly possible that none will be ordered.

## C.   The September 7, 2022 Decision

44.   The Panel issued certain determinations for the first two phases of the Arbitration on September 7, 2022, in a document that it entitled a "Partial Final Award."

CONFIDENTIAL

45.     The Partial Final Award is conceptually mislabeled, though it was named by the Panel with conscious thought.  Determinations under Count II in the Award should not be considered "final" in the sense of triggering a due date for any challenges.

46.     The Panel has declined Cigna's request to modify the Award to clarify that no challenge respecting Count II would be due at this time.

47.     Baptist has taken the position that a challenge (if any) was due by December 7, 2022. Cigna agrees.  Cigna timely filed its challenge via the filing of this action on December 6.

48.     Substantial portions of the September 2022 Decision were correct, including determinations that Cigna was not liable under Counts I and IV.  These correct portions are not challenged here.  As noted, among the correct determinations were that Cigna did not violate the federal GOT rule, under which payments at stake in the case were subject to an "objectively reasonable" test under federal law.  (Ex. 1 at 76.) The Panel determined that Baptist had not proved that Cigna violated the GOT rule.

49.     In other words, for the exact same reimbursement claims that are at stake in Count II, the Panel has determined as to Counts IV and I that Baptist failed to show that the payments were not "objectively reasonable" under federal law.  The Panel reached those conclusions after exhaustive review of evidence as detailed throughout material portions of the September 7, 2022 Decision.

50.     But certain portions of the September 2022 Decision concerning Count II were beyond the Panel's authority and reflect a manifest disregard of the law.  These errors include (i) determinations that permit Baptist to proceed against Cigna on a *quantum meruit* cause of action that is unavailable under Tennessee law; and (ii) determinations that certain portions of that same

12

CONFIDENTIAL

*quantum meruit* cause of action are not preempted under federal ERISA law.  These portions of Count II in the September 2022 Decision are the subject of this Petition.

## IV.  <u>Standard of Review</u>

51.     A court may modify or vacate an arbitration award where certain statutory or judicially created grounds are present.

52.     Section 9 of the FAA allows a court to confirm an arbitration award upon application of a party to the arbitration.

53.     Sections 10 and 11 of the FAA set forth the statutory grounds for modifying or vacating an arbitration award, including "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. § 10(a)(4).

54.     The scope of an arbitrator's authority is determined by the terms of the agreement between the parties and applicable law.  Arbitrations may only proceed on issues consistent with the terms and scope of the parties' agreement to arbitrate.  *Frizzell Constr. Co., Inc. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 84-86 (Tenn. 1999).

55.     Vacation or modification of the award is an appropriate remedy where arbitrators exceed their contractual authority or where the arbitration award was made in manifest disregard of the law.

56.     An arbitrator acts in manifest disregard of the law where (i) the applicable legal principle is clearly defined and not subject to reasonable debate; and (ii) the arbitrator refused to heed that legal principle.  *Coffee Beanery, Ltd. v. WW, L.L.C.*, 300 Fed. Appx. 415, 418 (6th Cir. 2008) (quotations and citations omitted) (citing decisions); *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 330 F.3d 843, 847 (6th Cir. 2003) (quotations and citations omitted).

CONFIDENTIAL

57.     As the United States Court of Appeals for the Sixth Circuit has explained in applying these principles, an arbitrator evinces manifest disregard for the law where a decision "*fl[ies] in the face of clearly established legal precedent.*"  *Id.* (citation omitted).  That is the case here.

58.     The Panel exceeded its power and acted in manifest disregard of the law by (i) permitting Baptist to proceed on a state law cause of action that is expressly not recognized by Tennessee law under clear precedent; and (ii) determining that federal law did not preempt that same cause of action, at least in part.

59.     Those determinations "fly in the face of clearly established legal precedent."  *Id.*

## V.  <u>Modification or Vacatur of the Partial Final Award</u>

60.     Cigna incorporates all the foregoing averments by reference as if fully set forth herein.

61.     The Arbitration Agreement supplied the Panel with authority to apply Tennessee law to the state law claims.  The Panel thus was bound to apply Tennessee law on state law issues.  There is no dispute as to the governing law.  Any decision on state law matters that did not apply and follow Tennessee law is beyond the Panel's authority.

62.     The Arbitration Agreement supplied the Panel with authority to apply federal law to issues that arose under federal law.  The Panel thus was bound to apply federal law where applicable.  There is no dispute as to the governing law.  Any decision on federal law that did not apply and follow federal law is beyond the Panel's authority.

**A.     First issue:  *Quantum meruit* (or breach of implied contract under any label) is not available to a hospital seeking reimbursement for out-of-network claims under Tennessee law, and the Panel misconstrued the proper measurement of damages.**

63.     Baptist pleaded Count II in the alternative to Count I (breach of [express] contract)

14

CONFIDENTIAL

and was later also permitted to plead it in the alternative to Count IV (violation of ERISA).

64.      Baptist asserted in Count II that Cigna had an "implied" contract with Baptist to pay for the health care services that Baptist supplied to patients whose employers provided those patients with health care benefits and where Cigna administered the coverage.  Baptist asserted that it could recover from Cigna the reasonable value of the health care services Baptist provided to patients (to the extent not already reimbursed) under *quantum meruit* principles (even though for the most part Cigna was only administering claims, not funding payments).[2]

65.      The Panel ruled in Cigna's favor on Count           IV, finding that there was no violation of ERISA.

66.      The Panel determined, however, that Baptist had a "valid" cause of action in Count II for *quantum meruit*—i.e., that there was an implied contract between Baptist and Cigna and that Count II could go forward under *quantum meruit* principles.  The Panel determined that, under a *quantum meruit* cause of action, Cigna could be liable for the full reasonable value for health care services that Baptist charged to patients (as opposed to some measurement of benefit that Baptist supposedly provided to Cigna itself).  (Ex. 1 at 62, 77-84.)  To reiterate, the Panel determined that *Cigna* itself (not patients and not employers) could be so liable even though all that Cigna provides is administrative services to employer-sponsored benefit plans and Cigna was not the direct recipient of the health care services to the patients.  The Panel further determined that the measure of damages (if any) would be the reasonable value of the health care services that Baptist provided to patients.  (*Id.* at 62.)  Any amounts already covered would be credited against the *quantum meruit* value, assuming the *quantum meruit* remedy would justify any additional amounts.

---

[2] There are a few claims where Cigna is providing coverage under plans where Cigna bears the risk.  For purposes of this petition, those claims make no material difference to the dispute.

CONFIDENTIAL

67.     The Panel did not determine and has not yet determined whether Cigna actually owes anything to Baptist under this nonexistent cause of action.  In other words, so far the Panel has only determined that Baptist may proceed on the cause of action under *quantum meruit* principles.  (As noted,                        the Panel ruled against Baptist and determined that Cigna did not violate a standard that required payments on these same claims to be objectively reasonable, presenting an irreconcilable tension in the decision if the Panel were ultimately to decide payments were not objectively reasonable under a *quantum meruit* standard.)

68.     The Panel's determinations as to *quantum meruit* and in permitting Count II to proceed were in manifest disregard of the law.  Tennessee does not recognize—and the Tennessee Court of Appeals has expressly rejected—a cause of action based on *quantum meruit* in these exact circumstances.  There is no ambiguity under Tennessee law on this point.

69.     On top of that, even if Baptist could proceed with such a cause of action, the measurement of damages would not be the value of health care services Baptist provided to patients.  It would be either the value of services provided directly to Cigna (of which there was none) or the value of any benefit that Cigna itself received from Baptist (of which there was none).  Any benefit conferred on the patients was not conferred upon Cigna and therefore cannot be recovered from Cigna under a *quantum meruit* theory.  This is unequivocally the law in Tennessee.

70.     Tennessee law has clearly established legal precedent directly on point from an authoritative decision issued by the Tennessee Court of Appeals.  *HCA Health Servs. of Tenn., Inc. v. BlueCross BlueShield of Tenn., Inc.*, 2016 WL 3357180 (Tenn. Ct. App. June 9, 2016).  The decision was issued right in the midst of the claims period for this case and is patently controlling.  A copy of this decision is attached as **Exhibit 3**.

16

CONFIDENTIAL

71.     The decision in *HCA Health Services* expressly rejects the possibility of an implied contract cause of action in these exact circumstances.  In that decision, the highest court in the State of Tennessee to have addressed the matter expressly ruled that there is no breach of implied contract—i.e., no cause of action for *quantum meruit* (or the "unjust enrichment" corollary)—by a hospital seeking to recover from a direct competitor of Cigna where that company is providing administrative services.  The decision in *HCA Health Services*, in turn, invokes and cites clearly established precedent from the Supreme Court of Tennessee and the Courts of Appeal in Tennessee that lead inexorably to that outcome.

72.     These governing decisions (and other highly persuasive ones noted below) constitute "*clearly established legal precedent*" confirming that the cause of action that the Panel has permitted Baptist to pursue in Count II is flatly *unavailable* under Tennessee law.  Baptist was constrained to the breach of contract and ERISA causes it pursued in Counts I and IV, .

73.     The Panel consciously chose not to follow the *HCA Health Services* decision.  It overstepped its authority by determining that the *HCA Health Services* decision, in the Panel's own and explicit words, "was, we believe, wrongly decided."  (Ex. 1 at 82.)

74.     There is neither legal basis nor arbitral authority for the Panel to decide that a decision by the Court of Appeals was "wrongly decided."  It is the law in Tennessee and the parties agreed to be bound by that law.[3]  The legal precedent was established and the precedent is

---

[3] The *HCA Health Services* decision is available on Westlaw though it was not published in the written West Reporter.  It constitutes clearly established legal precedent.  Neither the Panel nor Baptist has challenged the authoritativeness of the *HCA Health Services* decision.  Nor could they, as the decision flows directly from pre-existing law from the Supreme Court of Tennessee that will be discussed in the ensuing paragraphs below, such as *Doe*, *Paschall's*, and *Freeman*, each of which it expressly cites.  The Panel's September 2022 Decision was that it thought the decision was wrong, which is not an arbitrator's choice to make.  The Tennessee Court of Appeals has rejected the argument that an "unpublished" opinion "is not

17

CONFIDENTIAL

clear.  It would be clearly established precedent on a state court in the State of Tennessee and it was certainly precedent for this Panel.

75.     The *HCA Health Services* decision is directly on point.  It involves virtually identical circumstances.  The direct parallels cannot be challenged.  As the Court of Appeals held:

> Applying these elements to the facts of the case, the duty imposed on HCA [like Baptist] by EMTALA and the prohibition imposed on [Blue Cross] by Tenn. Code. Ann. § 56-7-2355 do not create an implied-in-law contractual relationship upon which to sustain HCA's cause of action.  HCA has not conferred a benefit on [Blue Cross]; the services were rendered to the patients, none of whom are party to this suit, and they are the ones who received the benefits of medical care provided in HCA's emergency rooms and are obligated to pay for the services.

*HCA Health Services*, 2016 WL 3357180, at *12.

76.     The *HCA Health Services* decision is not isolated.  It follows directly from hornbook *quantum meruit* principles determined by the Supreme Court of Tennessee and other decisions by the Court of Appeals in Tennessee.  *HCA Health Services*, 2016 WL 3357180, at *11-12.

77.     Tennessee courts make clear that a *quantum meruit* cause of action must involve services that were both provided (i) *to the defendant*, and (ii) *by the plaintiff*.  As the Supreme Court of Tennessee has ruled, in a case brought against a patient by a hospital seeking payment for services, the elements of a *quantum meruit* claim are:

> (1) There is no existing, enforceable contract between the parties covering the same subject matter; (2) The party seeking recovery proves that *it*

---

controlling authority and that it has no precedential value" where, as here, such an opinion "has been relied upon in subsequent cases" and involves facts "similar to those presented" in this case (directly comparable). *Edwards v. City of Memphis*, 342 S.W.3d 12, 17-18 (Tenn. Ct. App. 2010); *see also McAllister v. Lawrence Cnty. Sch. Sys. Bd. of Educ.*, 2022 WL 776700, at *2 and *6 (Tenn. Ct. App. Mar. 15, 2022) (upholding trial court's holding that unpublished case was "controlling authority" despite being unpublished); *State v. Anderson*, 2015 WL 2374575, at *5 (Tenn. Cr. App. May 15, 2015) (rejecting argument that trial court erred by relying on unpublished Court of Appeal opinions); *Chapter 5 Counseling Center LLC v Health Net Inc.*, 2017 WL 10637433, at *9 (Ariz. Super. Apr. 20, 2017) (citing *HCA Health Services* decision for proposition that a *quantum meruit* claim brought by an OON provider is non-viable as a matter of law).

> *provided* valuable goods or services; (3) *The party to be charged received the good or services*; (4) The circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services expected to be compensated; and (5) The circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment.

*Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 198 (Tenn. 2001) (citation omitted).

78.     The point under clearly established legal precedent is that *quantum meruit* requires that the *defendant* (Cigna) be the one that *received* the goods and services for which the plaintiff (Baptist) expects payment.  Cigna is not a proper defendant to a *quantum meruit* claim, as Baptist's "services were rendered to the patients, none of whom are party to this" arbitration.  *HCA Health Services*, 2016 WL 3357180, at *12.

79.     The cause of action thus is unavailable in Tennessee.  There is no legitimate question on this point.

80.     The Panel's unsupported (and improper) notion that Tennessee courts would not follow the 2016 decision in *HCA Health Services* today is beyond its authority and manifestly contradicted by clearly established legal precedent.  Whatever discretion arbitrators may have, they do not have discretion to flout clearly established precedent.

81.     Tennessee does not stand alone on the conclusion that this type of cause of action is unavailable against Cigna to a party in Baptist's position.  Courts across the country agree that medical services provided to a member is not a benefit to the member's insurer (or claims administrator) and therefore those courts have rejected claims exactly like this one.  *See, e.g.*, *Travelers Indem. of Conn. v. Losco Grp., Inc.*, 150 F. Supp. 2d 556, 563 (S.D.N.Y. 2001); *Encompass Office Sols., Inc. v. Ingenix, Inc.*, 775 F. Supp. 2d 938, 966 (E.D. Tex. 2011); *Valley Health Sys. LLC v. Aetna Health Inc.*, 2016 WL 3536519, at *4 (D. Nev. June 28, 2016); *Broad St. Surgical Ctr., LLC v. UnitedHealth Grp., Inc.*, 2012 WL 762498, at *8 (D.N.J. Mar. 6, 2012);

CONFIDENTIAL

*Fustok v. UnitedHealth Grp., Inc.*, 2012 WL 12937486, at *5 (S.D. Tex. Sept. 6, 2012); *Hialeah Physicians Care, LLC v. Conn. Gen. Life Ins. Co.*, 2013 WL 3810617, at *4 (S.D. Fla. July 22, 2013); *GVB MD, LLC v. Aetna Health Inc.*, 2019 WL 6130825, at *7-8 (S.D. Fla. Nov. 19, 2019); *MC1 Healthcare, Inc. v. United Health Grp., Inc.*, 2019 WL 2015949, at *10-11 (D. Conn. May 7, 2019); *Joseph M. Still Burn Centers, Inc. v. Liberty Mut. Ins. Co.*, 2010 WL 55471, at *12 (S.D. Ga. Jan. 6, 2010); *Atl. Neurosurgical Specialists, P.A. v. MultiPlan, Inc.*, 2023 WL 160084, at *7-8 (S.D.N.Y. Jan. 11, 2023); *Angelina Emergency Med. Assocs. PA v. Health Care Serv. Corp.*, 506 F. Supp. 3d 425, 432 (N.D. Tex. 2020); *Texas Med. Res., LLP v. Molina Healthcare of Texas, Inc.*, 620 S.W.3d 458, 470 (Tex. App. 2021), *aff'd,* 659 S.W.3d 424, 436-37 (Tex. 2023); *Comprehensive Spine Care, P.A. v. Oxford Health Ins., Inc.*, 2018 WL 6445593, at *6 (D.N.J. Dec. 10, 2018); *Air Evac EMS Inc. v. USAble Mut. Ins. Co.*, 2018 WL 2422314, at *9-10 (E.D. Ark. May 29, 2018), *aff'd*, 931 F.3d 647 (8th Cir. 2019)).  Copies of these decisions will be made available to this Court.

82.     As the Southern District of Texas explained in dismissing this type of claim in 2021, "[i]nstead of a benefit, *the insurer gets a ripened obligation to pay money to the insured*, which is hardly a benefit."  *ACS Primary Care Physicians Sw., P.A. v. UnitedHealthcare Ins. Co.*, 514 F. Supp. 3d 927, 935 (S.D. Tex. 2021).

83.     The Panel expressly determined that Baptist could proceed under *quantum meruit*. But the Panel appears to have conflated *quantum meruit* with the corollary implied contract concept of "unjust enrichment" (though the outcome remains that such a cause of action would also be barred).  Neither doctrine applies, but some explanation may assist in showing the Panel's error.

84.     Both doctrines provide an equitable remedy where there is an implied contract.

**CONFIDENTIAL**

85.    In a *quantum meruit* situation, the plaintiff provides *a service to the defendant* and seeks the value of those services provided *to the defendant*.  The damages are the value of the services provided *to the defendant*.  The damages are not the value of services provided to someone else.

86.    In an unjust enrichment scenario, *the defendant receives a benefit* (traceable to the plaintiff) and must pay the plaintiff the value of that benefit where it would be unjust not to require the defendant to do so.  The damages are the value of the benefit *retained by the defendant*.  The damages are not the value of a benefit retained by someone else or provided to someone else.

87.    In the end, the differences between the two corollary doctrines are immaterial here. Even if the cause of action were styled as "unjust enrichment," the Tennessee Supreme Court has ruled that the "benefit" that is conferred in unjust enrichment must be "a measurable value," which of course means a measurable value *to the defendant* (i.e., to Cigna).  *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005).

88.    The Panel evidently believed that the benefit to the defendant in an unjust enrichment case need not be directly conferred on the defendant by the plaintiff (i.e., that the benefit could be indirectly supplied to the defendant).  But that misses the point.

89.    First, the Panel expressly determined that it would permit Baptist to proceed on a *quantum meruit* cause of action.  Baptist is expressly seeking the value of the *services* it provided to Cigna members, not the value of any *benefit* retained by Cigna.  Since Baptist did not provide the health care services to Cigna, the claim to recover the value of those health care services to patients is unavailable against Cigna.  It would only be available in a claim against the members/patients themselves (who received the services), as in the Tennessee Supreme Court's decision in *Doe* (which involved a claim by a hospital against a patient).

21

CONFIDENTIAL

90.     Second, the "benefit" that must be compensated in the corollary doctrine of unjust enrichment is *not* the value of the *services* provided by the plaintiff to a third party.  By clearly established legal precedent, it is a *measurable* value of whatever *benefit* the *defendant received*. That is why it violated clearly established precedent for the Panel to determine that the value of services provided to Cigna members could be collected from Cigna (including in situations where Cigna is only providing administrative services).  The Tennessee Supreme Court in *Freeman* thus went out of its way to explain that the "benefit" that is conferred in unjust enrichment is "a measurable value" that the defendant has retained.  *Freeman*, 172 S.W.3d at 525.

91.     As one federal court put it, "unjust enrichment does not seek to compensate a plaintiff for loss or damages but *seeks to disgorge a benefit that the defendant unjustly retains*." *Cleary v. Phillip Morris, Inc.*, 656 F.3d 511, 518 (7th Cir. 2011); *accord Firemen's Annuity & Benefit Fund v. Municipal Employees*, 219 Ill. App. 3d 707, 712 (1991) ("the essence of the cause of action is that one party is enriched, and it would be unjust for that party to retain the enrichment").  There is no "measurable value" that *Cigna* has retained when it comes to services provided to *members* / *patients*.

92.     The other key in an unjust enrichment scenario is that the alleged "enrichment" *to the defendant* must be "unjust."  As the Tennessee Supreme Court ruled in a case cited in *HCA Health Services*, "[t]he most significant requirement for a recovery on quasi contract *is that the enrichment to the defendant be unjust*."  *Paschall's Inc. v. Dozier*, 407 S.W.2d 150, 155 (Tenn. 1966) (cited in *HCA Health Services*, 2016 WL 3357180, at *11).  There is no finding in the present case of any "unjust" enrichment held by Cigna.

93.     The *measurement of value* in awarding any remedy thus *must* be the value of the benefit conferred upon the defendant.  *Simpson v. Bicentennial Volunteers, Inc.*, 1999 WL 430497,

at *2 (Tenn. Ct. App. June 29, 1999).  As the Tennessee Court of Appeals has held, "[t]he amount of the recovery is *the value of the benefit conferred*[.]"  *Id.* (citing *Bauman v. Smith*, 499 S.W.2d 935 (Tenn. Ct. App. 1972)).

94.    Yet the Panel here would award Baptist the value of the *health care services* that Baptist provided to the *patients*, for whom Cigna merely provides claims administration services to the patients' employers.  That decision leads to absurd results.  It means that Baptist could collect from Cigna the full value of the services that Baptist provided to the patients, so long as Baptist provided any type of entirely unrelated "benefit" at all to Cigna—for example, even if such benefits to Cigna amounted to providing a paper clip.  That is not an exaggeration.  It is the undeniable yet utterly illogical implication of the Panel's determination, for which there is no basis under Tennessee law.

95.    On top of all of that, the presence of *any* contractual relationship covering a given subject also bars the *quantum meruit* claim on that subject.  *Quantum meruit* is an equitable claim and equity does not need to support a claim where there is another straightforward and established path for relief.  Such a contract can include benefit plans that the employer provides for health coverage to a member/patient (even though a carrier like Cigna is not a direct party to those plans).  The "healthcare plans are express contracts between the [insurers] and their insureds which bear directly on [Baptist's] claims."  *ACS Primary Care*, 514 F. Supp. 3d at 935.  Or as another court put it, a provider such as Baptist "cannot avoid the express contract bar to its quantum meruit claim on the ground that [Cigna] did not designate [Baptist] as an approved network provider[.]"  *Christus Health v. Quality Infusion Care, Inc.*, 359 S.W.3d 719, 724 (Tex. App. 2011).  Nor can Baptist avoid this problem on the ground that Cigna did not "otherwise treat [Baptist] as a party to the medical plan for purposes of providing those services."  *Id.*  "Without these plans [that define

23

the method of reimbursement, Baptist] would have no basis to sue [Cigna] at all." *ASC Primary Care*, 514 F. Supp. 3d at 935.

96.      Rather than following Tennessee law as announced in decisions such *Doe* or *HCA Health Services*, the Panel decided to change the law.  It looked to reasoning in an older 2003 decision from the Court of Appeals in *River Park Hosp. v. BlueCross BlueShield of Tenn., Inc.*, 173 S.W.3d 43 (Tenn. App. 2002).  The older 2003 decision in *River Park* is inapplicable and elevating it over the directly applicable and more recent 2016 *HCA Health Services* case (issued during the claims period) and other precedent was in manifest disregard for the law.  *River Park* did not involve a *quantum meruit* issue, nor did the court find generally that *quantum meruit* or unjust enrichment could supply a cause of action.  (It was also decided years before the development of the federal greatest-of-three (GOT) test for objective reasonability.)

97.      In fact, in 2016 the Court of Appeals expressly ruled in *HCA Health Services* that *River Park* did *not* apply to this exact type of situation.  *HCA Health Services*, 2016 WL 3357180, at *10.  The *HCA Health Services* decision again amounts to clearly established legal precedent in Tennessee—as a Tennessee court has ruled without any doubt that the precedent the Panel chose to rely upon is not applicable.  The Panel also did not follow that aspect of the *HCA Health Services* decision.

98.      More specifically, *River Park* involved a particular state statutory scheme (not at stake here) with state funding supplied to health insurance companies.  Tennessee had a "TennCare" statutory scheme under which a health insurance company (BlueCross in that case) could participate and which posed obligations on health insurance companies and providers alike. If the insurance company participated in TennCare, the company would accept a certain number of patients and be paid in lump sum by the State on a "capitated" basis to provide coverage for

CONFIDENTIAL

those patients.  The carrier (BlueCross) could then sign contracts with hospitals to provide services to patients, with the carrier paying for those services out of the lump sum funds it received from the State under TennCare.  On the facts, a contract between a BlueCross subsidiary ("BlueCare") and River Park hospital had expired.  The hospital nevertheless was still obligated to provide emergency services to TennCare members covered by Blue Care under the federal "EMTALA" law.  But the hospital was barred under the TennCare statutory provisions from collecting payments from the patients (unlike here, it could not "balance bill" the patients).  The *only* source of payment was under the funds that TennCare had paid to BlueCross.  In the absence of the then-expired contract, and with the hospital having no ability to collect from members, the Court of Appeals determined that equitable implied contract principles required BlueCross to pay a reasonable rate for services to the hospital.  *See generally River Park*, 173 S.W.3d 43.

99.     The decision in *River Park* thus involves materially different circumstances.  In ruling that *River Park* does not apply to this type of situation, the Court of Appeals in *HCA Health Services* aptly summarized:

> We disagree with HCA's contention that the holding in *River Park* is "squarely on point."  Unlike *River Park*, where [the insurance company] had received payment for each TennCare enrollee and was under an obligation to pay for emergency services rendered to the enrollee, the patients in this case are participants in commercial health benefit plans which include coverage provided by BCBST for emergency medical services, at a level which depends upon the specific plan and the facts and circumstances of each claim.  In *River Park*, HCA could only seek payment from BlueCare; significantly, and as distinguished from River Park, in this case HCA can seek payment directly from the patients it has treated, with the amount it may have received from BCBST operating to reduce the amount for which the patient is responsible.

*HCA Health Services*, 2016 WL 3357180, at *10.

100.     The Panel ironically did not question that the *HCA Health Services* decision was on point.  In a sharp break from its permitted authority, the Panel instead explicitly disagreed with

the Tennessee Court of Appeals in *HCA Health Services* in the application of clear legal precedent under Tennessee law. The Panel viewed the *older* 2003 decision in *River Park*—that the Court of Appeals rejected in 2016—as a reflection of how a Tennessee Court would rule today in this circumstance, not the considerably newer and directly on-point decision in *HCA Health Services*. (Ex. 1 at 82.) And the Panel made that determination in the face of myriad other court decisions that reached the same outcome as *HCA Health Care* services.

101.    The Panel said that it was entitled to disagree with clearly established legal precedent based on "all that we have learned in this arbitration, our collective experience, the evidence and the law." (*Id.*) It said that the "HCA Court did not have the advantage of this education and evidence *and that opinion was, we believe, wrongly decided.*" (*Id.*) The Panel was incorrect that it had authority to do so.

102.    Clearly established legal precedent is clearly established legal precedent. The Court of Appeals did not issue a "wrongly decided" opinion in *HCA Health* Services. Nor was it the province of the Panel to second-guess clearly applicable precedent. The parties did not supply the Panel with jurisdiction to adopt new legal principles beyond clearly established precedent. The parties did not grant the Panel discretion to deviate from clearly established precedent. The Panel had to comply with the law.

103.    The Court of Appeals in *HCA Health Services* rejected the applicability of the *River Park* decision to this exact type of situation (a situation clearly distinguishable from *River Park*). There is no meaningful difference here of any kind.

104.    And the reason the Court of Appeals in *HCA Health Services* expressly rejected the applicability of *River Park* makes perfect sense. In this case and *HCA Health Services*, Cigna is not funding claims or paying claims—unlike BlueCross in *River Park*, which paid claims based

CONFIDENTIAL

on the capitated structure under which it received funds from the State.  Here the employer is funding claims and Cigna is only administering claims.  In this case as in *HCA Health Services,* even as to the employer, the employer that funds has not obtained those funds through a capitated state program as in *River* Park, which in *River Park* put the onus on BlueCross to make payments within the funds that it possessed from the program.  In this case, the amount the hospital could be paid is not capped by a state program as it was in *River Park.*   Unlike in *River Park*, the hospital here *does* have the right to collect unpaid amounts directly from the patients up to the full balance of the charge (unlike the hospital under the state program in *River Park*, which could not collect from patients).

105.    The Panel thus ignored a recent decision in *HCA Health Services* that is directly on point, and chose instead to apply an older decision (*River Park*) that the Tennessee courts have already determined is inapplicable

106.    The bottom line for current purposes is that the Tennessee courts have spoken:  (i) there is no *quantum meruit* cause of action under Tennessee law in this exact situation; (ii) the measurement of any damages in a *quantum meruit* action is the measurement of the value of services provided *to the defendant* (not the value of health care services provided to patients); (iii) the corollary cause of action for unjust enrichment does not apply, but even if it did the measurement of damages would be the value of the benefit retained by Cigna (which there is none) (not the value of health care services Baptist provided to someone else, i.e., patients); (iv) the *River Park* decision is inapplicable; and (v) the overwhelming majority of other jurisdictions to have addressed the question agree with Cigna and *HCA Health Services* and take positions directly contrary to what the Panel determined.

CONFIDENTIAL

107.   The Panel's decision that Baptist may proceed on a *quantum meruit* theory under Tennessee law (and may seek damages measured by the value of health services provided to the patient) thus was beyond its authority and in manifest disregard of the law.

**B.   ERISA preempts *quantum meruit*.**

108.   Courts have long held that ERISA preempts causes of action like *quantum meruit* where claims are subject to benefit plans that are administered under ERISA.

109.   The Tennessee Court of Appeals itself also addressed this exact issue in *HCA Health Services*, 2016 WL 3357180, at *7, where it determined that ERISA preempted the *quantum meruit* claims that the provider sought to bring.  No contrary decision has followed.  That decision remains clearly established legal precedent.

110.   Baptist originally submitted Count II as an alternative only to Count I, which meant that it only sought to apply the *quantum meruit* remedy where state law governed its challenge to the amounts it received on the reimbursement claims outside of ERISA.  (Count I involved claims involving members with employers whose benefit plans were not subject to ERISA.)  The panel later permitted Baptist to submit Count II as an alternative to Count IV as well.

111.   During the course of the Arbitration, the Supreme Court of the United States issued *Rutledge v. Pharm. Care Mgmt. Ass'n*, 141 S. Ct. 474 (2020).  Upon Baptist's insistence, the Panel somehow (and incorrectly) determined that *Rutledge* undid decades of precedent and permitted Baptist to extend its *quantum meruit* claims to situations where the employer was providing coverage under benefit plans governed by ERISA (i.e., all the claims at stake in Count IV).  This determination was likewise beyond the Panel's authority and in manifest disregard of the law.

112.   Some background may assist.  Most of Cigna's business consists of administering reimbursement claims under ERISA plans on behalf of employers.  The employers fund the

28

CONFIDENTIAL

payments but have no legal obligation to pay anything beyond what is called for under the terms of the ERISA plans.  It does not matter if there were state laws to the contrary.

113.    From the Supreme Court down, courts for decades have ruled that plaintiffs cannot pursue state common law claims that would require a court to rewrite the terms of an ERISA plan—i.e., to determine what must be paid—like Baptist is requesting here.

114.    A state-law claim is thus preempted if it "relate[s] to" an employee benefit plan—that is, if it "has a reference to" or "an impermissible connection with ERISA plans." *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319-20 (2016).

115.    As part of claims administration (and as the Panel was informed), Cigna must first determine whether the claims asserted involved any valid denials and then it must determine whether the covered services were properly reimbursed in accordance with the specific plan terms.

116.    For plans governed by ERISA, those determinations will require interpretation of plan terms and therefore "relate to" the plans, so those claims are preempted. *Cole v. Am. Specialty Health Network, Inc.*, 2015 WL 1734926, at *3 (M.D. Tenn. Apr. 16, 2015) (finding state law claims preempted because "[t]hrough these claims, Plaintiffs seek reimbursement for allegedly unpaid or underpaid benefits, which would require the Court to interpret the terms of Cigna's plans to determine whether additional payments were warranted").

117.    The Panel's decision would rewrite this bedrock ERISA framework through a misreading of *Rutledge*.

118.    That case concerned an Arkansas regulation that set a floor on reimbursement rates between pharmacy benefit managers ("PBMs") and pharmacies. *Rutledge*, 141 S. Ct. at 482.

119.    PBMs are intermediaries that negotiate rates with pharmacies and reimburse them on behalf of benefit plans.  Plans then reimburse PBMs at higher rates to compensate the PBMs

CONFIDENTIAL

for their negotiation services.  The Supreme Court ruled that ERISA did not preempt the state regulation because the regulation merely increased the costs that ultimately accrue to plans through an intermediary, which is an insufficiently close "connection with" ERISA plans to trigger ERISA preemption.  *Id.* at 480.

120.    The Court distinguished the Arkansas regulation from laws "requiring payment of specific benefits" under an ERISA plan, which the Court expressly stated remain preempted.  *Id.*

121.    ERISA has never allowed hospitals or other health care providers to pursue a state common law remedy as an *alternate* enforcement mechanism, and the ten-page opinion in *Rutledge* did not somehow implicitly overrule decades of precedent.

122.    *Rutledge* simply built upon the well-established framework that ERISA does not preempt laws that only indirectly affect plan costs. The Supreme Court in *Rutledge* reiterated that the only impact on the plans is that the PBMs "may" pass along the higher costs from Arkansas's rate regulations to the plans.  *See Rutledge*, 141 S. Ct. at 480-482.

123.    That is very different from the *quantum meruit* claim here, which would act directly on the plans themselves.  Courts have long recognized that for self-funded plans, Cigna is not financially responsible for funding self-funded benefits.  It merely administers the claims seeking plan benefits and pays providers from the plans' bank accounts.  *Gobeille*, 577 U.S. at 317 ("[t]he Plan is self-insured and self-funded, which means that Plan benefits are paid by [the Plan]"); *Henretta v. Chrysler Motors Corp.*, 977 F.2d 595, at *2 (10th Cir. 1992) ("[a] 'self-funded plan' pays all benefits itself").

124.    Cigna does not pass along any additional costs—the plans themselves directly pay any increases to Baptist's reimbursement.  Unlike in *Rutledge*, where PBM intermediary costs may indirectly lead to increased costs on the ERISA plan, Baptist's claims here attempt to supplant the

CONFIDENTIAL

written ERISA plan terms for out-of-network benefits coverage and reimbursement with new terms based on Tennessee common law that Baptist contends impose some "reasonable value" for emergency services. But "payment of benefits" is a "central matter of plan administration." *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 148 (2001). Obligations undertaken with plan administration include "calculating benefit levels [and] making disbursements[.]" *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 9 (1987); *see also Rutledge*, 141 S. Ct. at 480 ("ERISA is ... primarily concerned with pre-empting laws that require providers to structure benefit plans in particular ways, such as by requiring payment of specific benefits"). The *quantum meruit* claim permitted by the Panel here would do exactly that, replacing plan terms for benefits for out-of-network emergency services and requiring different, specific benefits to be paid to providers. This directly affects the administration of ERISA plans, and thus ERISA preempts Baptist's claims just as much now as it did before *Rutledge*. *See Gobeille*, 577 U.S. at 320 (finding that state-law claims are preempted when they "govern[] ... a central matter of plan administration").

125.    No Tennessee court has addressed *Rutledge* or determined that it trumps the Tennessee Court of Appeals decision in *HCA Health Services* (which ruled that ERISA preempted the implied contract claim and which remains law in Tennessee). Other courts have rejected the notion that *Rutledge* changed existing law. *Fast Access Specialty Therapeutics v. UnitedHealth Grp.*, 532 F. Supp. 3d 956, 976 (S.D. Cal. 2021); *Gotham City Orthopedics, LLC v. Aetna Inc.*, 2021 WL 1541069, at *3 (D.N.J. Apr. 19, 2021); *Chapter 5 Counseling*, 2017 WL 10637433, at *9.[4]

---

[4] Some cases have permitted state law claims to proceed since *Rutledge*. But none of them involved the federally mandated greatest-of-three rule under ERISA, most appear not to trigger ERISA at all on the actual claims, and in most instances they appear to have involved simple introductory pleading issues. *See Fla. Emergency Physicians Kang & Assocs., M.D., Inc. v. United Healthcare of Fla., Inc.*, 526 F. Supp. 3d 1282, 1297-1300 (S.D. Fla. 2021); *Emergency Physician Servs. of New York v. UnitedHealth Grp., Inc.*,

CONFIDENTIAL

## VI. <u>Motion to Stay</u>

126.    The Panel designated its September 2022 Decision as a Partial Final Award.  Even with that caption, it is uncertain whether Cigna has standing to pursue this Petition at this time. No actual relief has been granted to Baptist.  To date, there is no distinct and palpable injury, as is required for standing, but only conjectural and hypothetical injury.

127.    In fact, depending on how the Panel ultimately answers the Arbitration Question, Cigna may be found to have no liability to Baptist.  In that case, it is all the more uncertain (if even permissible under standing law) that Cigna would ultimately pursue any challenge to the September 2022 Decision regarding the Referenced Cause of Action.  If Cigna is ultimately found not liable to Baptist after further proceedings in the arbitration, there would be no reason for Cigna to seek to vacate the September 2022 Decision however wrong certain determinations might be.

128.    For example, it remains entirely possible that the Panel may determine that no further relief is required when the Panel adjudicates the state law cause of action that it is permitting to proceed under Count II.  A petitioner would be hard pressed to find a sensible basis to invoke this Court's jurisdiction and resources in resolving a dispute that has no actual consequence.

129.    Cigna will be separately submitting a motion to stay this proceeding, citing the Court's broad authority to control matters on its docket.  The appropriateness of a stay will be further addressed in the separate motion.

---

2021 WL 4437166, at *8-10 (S.D.N.Y. Sept. 28, 2021); *Emergency Grp. of Ariz. Professional Corp. v. United HealthCare, Inc.*, 838 F. App'x 299, 300 (9th Cir. 2021); *Emergency Servs. of Oklahoma, PC v. Aetna Health, Inc.*, 556 F. Supp. 3d 1259, 1264-65 (W.D. Okla. 2021).

CONFIDENTIAL

## VII. **Prayer for Relief**

WHEREFORE PREMISES CONSIDERED, Cigna respectfully requests that this Court enter an Order granting Cigna the following remedies and relief:

1.      As shall be requested in a separate motion to stay filed in this action, stay this proceeding until (a) an actual final award on Count II specifying any relief is issued by the Panel in the Arbitration; and (b) Cigna notifies the Court that it desires to proceed with this action.

3.      If and when this matter proceeds, modify or vacate the Partial Final Award as to Count II to determine that the cause of action in Count II is unavailable under Tennessee law and thus may not be pursued or the source of any relief.

4.      If and when this matter proceeds, modify or vacate the Partial Final Award as to Count II to determine that the Count II cause of action on which the Panel permitted Baptist to proceed is preempted, at least in part.

5.      Grant to Cigna such other and further relief as the Court deems just and proper.


Respectfully submitted,

WYATT, TARRANT & COMBS, LLP


Odell Horton, Jr. (Tenn. Bar No. 12426)
Andrew J. Pulliam (Tenn. Bar No. 16863)
6070 Poplar Avenue
Suite 300
Memphis, TN 38119
ohorton@wyattfirm.com
apulliam@wyattfirm.com
901.537.1000

CONFIDENTIAL

DLA PIPER LLP (US)


  _/s/ John J. Hamill_____
John J. Hamill (*pro hac vice*)
Pamela Begaj Loutos (*pro hac vice*)
DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606
john.hamill@us.dlapiper.com
pamela.loutos@us.dlapiper.com
312-368-7036

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on the 13th day of June 2023 to counsel for Respondents via e-mail and the Court's docketing system:

David King
Polsinelli
401 Commerce Street, Suite 900
Nashville, TN 37219
dking@polsinelli.com

Christopher S. Campbell (BPR 019061)
Harris | Shelton
6060 Primacy Parkway
Suite 100
Memphis, TN 37118
901.525.1455
ccampbell@harrisshelton.com

/s/ Odell Horton, Jr.
Odell Horton, Jr.

# TAB 008B

ELECTRONICALLY FILED
2023 Jun 13 4:13 PM
CLERK OF COURT - CHANCERY

# EXHIBIT 1

**PRIVATE AND CONFIDENTIAL ARBITRATION**

| | |
|---|---|
| **BAPTIST MEMORIAL HEALTH CARE CORPORATION,** ) | |
| ) | |
| **Claimant,** ) | **Arbitrators** |
| ) | **Conna A. Weiner, Esq., Panel** |
| **v.** ) | **Chair** |
| ) | **Hon. Joseph J. Farnan, Jr.** |
| **CIGNA HEALTHCARE OF** ) | **Hon. Michael J. Schless.** |
| **TENNESSEE, INC.,** ) | |
| ) | |
| **Respondent.** ) | |

**HIGHLY CONFIDENTIAL**

**PARTIAL FINAL AWARD**

**I. INTRODUCTION**

In this Arbitration, Baptist is claiming, on behalf of a number of its Memphis, Tennessee metro area hospitals, that Cigna has wrongfully underpaid or denied altogether certain claims for out-of-network emergency services these hospitals provided to Cigna members between 2013 and 2019 (the "Dispute Period"). This Partial Final Award sets forth the Panel's reasoning and rulings in connection with the issues addressed in Phases 1 and 2.

**II. PROCEDURAL HISTORY**

**II. A.  PHASE 1**

The Phase 1 Hearing was conducted virtually in February and March, 2021, pursuant to the Panel's Procedural Order No. 6 of September 8, 2020, Procedural Order No. 7  and other rulings. Phase 1 focused on underpaid claims from the "Top 16" Accounts and Counts I (breach of contract for non-ERISA plans) and IV (wrongful denial of benefits under ERISA). Baptist proceeds by assignment of claims by plan members in connection with these Counts (see Procedural Order No. 10).

Day 1 of the Phase I Hearing consisted of counsel tutorials pursuant to which counsel educated the Panel about the general context of this matter. On Days 2 and 3, Baptist presented its case-in-chief.  On Days 4 and 5, Cigna presented its case-in-chief. Designated pre-hearing deposition testimony was included as well, all of which the Panel reviewed in writing and some of which was presented to the Panel by video, and  viewed by each Arbitrator separately outside of the actual hearing session time. The parties submitted extensive post-hearing briefing through April. The parties presented Phase 1 closing arguments on May 14, 2021.

1

Thereafter the Panel and counsel discussed a structure for Phase 2 and its associated discovery. The Panel issued informal email orders on May 19, 2021, and May 26, 2021, outlining the agreed processes. During the summer of 2021, the parties engaged in discovery with the assistance of the Panel.

The Panel issued Procedural Order No. 12 dated June 30, 2021, making various tentative rulings which were expressly subject to re-consideration. In this Partial Final Award, we finalize and/or modify those tentative rulings as appropriate given our findings.

## II. B. PHASE 2

The foregoing discussions and discovery resulted in the Panel's Procedural Order No. 14 of November 2, 2021, which is the case management order for Phase 2. Like Procedural Order No. 6 governing the Phase 1 Hearing, Procedural Order No. 14 cited the Panel's authority pursuant to the parties' February 24, 2020 First Amended Arbitration Agreement, which grants the Panel authority to divide the Arbitration into phases. The universe of claims considered in Phase 2 was the same as the claims considered in Phase 1, namely allegedly underpaid out-of-network emergency claims focusing on the Top 16 accounts. The number of issues, however, was expanded beyond the liability issues under Counts I and IV to include additional "buckets," namely:

█████████████████████████████████████████

(2) Baptist's Count II, direct (non-derivative) state law claim under a quantum meruit/unjust enrichment theory;
(3) compliance with the greatest of three regulation;

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████

Procedural Order No. 14 ¶ 9 required that the Panel issue final rulings on all claims and defenses that have been addressed to date except as specifically reserved for later phases in the order or as otherwise agreed by the Parties.  Procedural Order No. 14 ¶10 provides that "the issue of Baptist's damages, if any, will be addressed separately from the liability rulings in Phase 2. A damages proceeding as a second part of Phase 2 will be scheduled at a later date." ███████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

The Phase 2 hearing proceeded for 9 days during November and December, 2021. Pre- and Post-Hearing Briefs were filed and the Panel heard oral argument on April 22, 2022.

At the Panel's request, the parties also briefed and argued the issue of whether or not Baptist's quantum meruit claim is pre-empted by ERISA in light of recent Supreme Court jurisprudence. The Panel heard oral argument on these subjects on June 23, 2022, and received post-argument supplementary briefing. We rule on these issues in this Partial Final Award.

Finally, the Panel conducted a question and answer session with counsel on July 26, 2022 and received follow up submissions relating to topics addressed during that session.

Pursuant to ¶15 of the parties' First Amended Arbitration Agreement, final awards in this matter are to be "reasoned" consistent with the Commercial Arbitration Rules of the American Arbitration Association.  In connection with its post-hearing submissions, although Cigna filed an extensive Summary of Evidence and Statement of Facts to Support its requested reasoned award, it expressly acknowledged that formal findings of fact are unnecessary in this arbitration and have not been requested. Baptist filed detailed responses to Cigna's summary. (We will refer to this document, namely the version with Baptist's responses, as "SOF" in this award.)

### III.  ARBITRATION HEARINGS - EVIDENCE

### III. A. Background

Cigna offers health coverage products to some of its employer-clients which entitle enrolled members (the employees of its clients) a level of reimbursement for out-of-network provider services, including but not limited to coverage for out-of-network emergency hospital facility services. This order concerns out-of-network emergency services only, non-emergency services to be set for later assessment. Both "emergency outpatient" and "emergency inpatient," or "emergency admit" claims are at issue. ████████████████████████████
███████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

In connection with virtually all of the claims at issue in the Top 16 accounts, Cigna is not the actual insurer. Rather, it provides administrative services only for self-insured employer plans pursuant to an Administrative Services Agreement, or ASO. ██████████████████████████████ ███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

The evidence demonstrated that the programs and services provided, developed, and managed by Cigna and its vendors -- for whom Cigna was responsible -- were in fact substantial, extraordinarily sophisticated, and complex; and ultimately directly affected *how much* Baptist was paid for its out-of-network emergency services. These were services Baptist was to a significant extent required by law to provide, regardless of its contractual relationship with Cigna.



### III. B. In-Network vs. Out-of-Network; the "Managed Care Bargain"

When a hospital provider is "in-network," it has a contract with an insurer or claims administrator such as Cigna to provide their facility services at a specified reimbursement rate that is a discount from their "full billed charges." The contracted in-network provider is generally prohibited from balance billing a customer for amounts above and beyond the agreed, discounted, contractual reimbursement rate ████████████████████████. As was discussed in testimony and by the experts, the provider has an incentive to do this from a business perspective because they believe they will receive a greater volume of patients and the improved predictability of pricing and administrative simplicity with which in-network claims are handled. It is reasonable to infer that the converse holds true with respect to out-of-network claims, namely the provider would not expect predictability of pricing or administrative simplicity.

Cigna evaluates the adequacy of its networks to meet the needs of patients, and presented testimony that its networks consistently have met the access standards of a third party private regulator, the National Committee on Quality Assurance (NCQA), and that employer accounts had not complained about the lack of access to emergency room services ████████ ████████████████████ However, ████████████████████████████████████ ██████████████ responsible for the provider network in the relevant area, had not looked at the

number of out-of-network emergency patients that had gone to Baptist during the Dispute Period, and did not believe that the NCQA standards took into account how many out-of-network emergency claims were involved in the relevant geographical area over a certain period of time ██████████████████████ Although he further stated that Cigna did not depend on Baptist for out-of-network emergency services because it was a "*very, very small…percentage of overall services in the area*," he agreed with Baptist counsel that emergency services were important; stated that Cigna wanted their members to receive care when they needed it; and also agreed with Baptist counsel that the number of disputed claims in this arbitration was "*not insignificant*" ██████████████████████. He further indicated he had heard anecdotally that Baptist has taken patients out-of-network from a Cigna in-network hospital that had gone on "*diversion*" ████████████████

The parties and their experts have referred to the "managed care bargain" and "volume steerage" to identify the specifics of these incentives for entering into a discounted in-network arrangement. There is no credible evidence to the contrary in this arbitration. ████████████ ██████████████████████████████████████████████ ████████████████████████████████████



In general, when entities such as Cigna, on behalf of its employer-clients, structure coverage for out-of-network benefits, a natural dilemma arises precisely because there is no contract. How much should a provider be paid for these services? The issue is particularly stark in the case of the emergency services at issue here, since various federal and state laws require that a hospital accept a patient into their emergency room and provide certain services, without questioning their insurance coverage.[5] In other words, and critically for our decision, the payor and provider are forced to deal with each other, at least to this extent. ███████████

[4] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

[5] The Emergency Medical Treatment and Labor Act (EMTALA) requires most hospitals to provide an examination and needed stabilizing treatment, without consideration of insurance coverage or ability to pay, when a patient presents to an emergency room for attention to an emergency medical condition.



### III. C. The "Greatest of Three" Rule

The reimbursement dilemma for providers who do not have a contract for out-of-network emergency services has now twice been addressed by Congress through provisions of The Patient Protection and Affordable Care Act (Pub. L. 111-148) ("PPACA') which amended other laws, such as the Public Health Service Act, or PHS Act, and more recently the No Surprise Billing Act.[6]

The provisions of PPACA and the associated regulations which led to the creation of the "greatest of three rule," a federal rule providing a minimum payment for out-of-network emergency services ("GOT Rule"), deserve our attention.

Background on the intent and goals behind the GOT Rule is available in the Department of Health and Human Services "Clarification of Final Rules for Grandfathered Plans, Preexisting Condition Exclusions, Lifetime Annual Limits, Rescissions, Dependent Coverage, Appeals and Patient Protections Under the Affordable Care Act, " 83 Fed. Reg. 19431 (May 3, 2018), cited by both parties at various points ("Clarification Regulation"). The HHS "clarification" was necessary because of litigation filed by the American College of Emergency Physicians, which resulted in a federal district court judge remanding the case to the relevant agencies (referred to as "the Departments" in the regulation) in order to more fully respond to public comments on the interim rule generating the greatest of three calculation.  Id. at 19432.

As described in the Clarification Regulation, the section of PPACA entitled "Patient Protections" provides requirements relating to coverage of emergency services, including the parties here. The statue requires coverage of emergency services even if the provider is not a participating provider, or "in-network," and requires plans to apply the same cost-sharing requirements to members as they would have to pay if they went to an in-network facility (expressed as copayments and coinsurance). The statute did not address, however, how much the out-of-network provider of emergency services must be paid for performing such services. Id. The statute  also did not prohibit an out-of-network facility like Baptist from billing a patient for an amount it felt it was owed beyond what a plan or issuer paid, or in other words, "in

---

[6] As the No Surprise Billing Act was not in effect during the Dispute Period, it is only briefly addressed in this order to the extent the Panel found it helpful for context. The Act sets up a dispute resolution process between payors and out-of-network providers of emergency services, culminating in baseball arbitration. Unlike PPACA and the GOT Rule, it prohibits balance billing by the provider.

circumstances in which a provider's charge exceeds the allowed amount," or maximum amount on which payment is based for covered services. Id. The Clarification Regulation cites to a CMS Uniform Glossary of Health Coverage and Medical Terms for the definition of the term of art "allowed amount," an important concept in this arbitration.

The Clarification Regulation went on to discuss the 2010 interim final rule ("IFR") that initially proposed the greatest of three rule:

> The June 2010 IFR preamble…stated, in part, that, because the statute does not require plans or issuers to cover balance billing amounts, and does not prohibit balance billing, even where the protections of the statue apply, patients may be subject to balance billing. It would defeat the purpose of the protections in the statute if a plan or issuer paid an unreasonably low amount to a provider, even while limiting the coinsurance or copayment associated with that amount to the in-network amounts. To avoid the circumvention of the protections of section 2719A of the PHS Act, it is necessary that a reasonable amount be paid before a patient becomes responsible for a balance billing amount. Thus, these interim final regulations require that a reasonable amount be paid for services by some objective standard. In establishing the reasonable amount that must be paid, the Departments had to account for wide variation in how plans and issues determine both in-network and out-of-network rates.
>
> Accordingly, these interim final regulations considered three amounts: the in-network rate, the out-of-network rate, and the Medicare rate. Specifically, a plan or issuer satisfies the copayment and coinsurance limitations in the statute if it provides benefits for out-of-network emergency services in an amount equal to the greatest of three possible amounts: (1) The amount negotiated with in-network providers for the emergency service furnished; (2) The amount for the emergency service calculated using the same method the plan generally uses to determine payments for out-of-network services (such as usual, customary and reasonable charges), but substituting the in-network cost-sharing provisions; or (3) The amount that would be paid under Medicare for the emergency service.
>
> This is referred to as the "Greatest of Three" or "GOT" rule because it sets a floor on the amount plans are required to pay for out-of-network emergency services under these provisions at the greatest of the three listed amounts.

The Clarification Regulation went on to recount some of the concerns cited by commentators regarding the IFR and particularly the alleged lack of transparency and potential for manipulation of the second prong of the GOT Rule, namely the "amounts a plan generally uses to determine payments for out-of-network emergency services." These commentators urged, among other things, the use of a transparent database for determining the reimbursement rate. For example, the ACEP's 2010 comment letter supported the development of an objective standard to establish "fair payment," asserting that since insurers *"know that emergency physicians will see everyone that comes to the [emergency department] due to EMTALA responsibilities…many leverage that fact to impose extremely low reimbursement rates…the plan has arbitrarily offered an in-network payment rate that fails to cover the costs of providing the service. This forces the physicians to balance bill the patients, which often results in*

8

*an unsatisfactory experience for everyone.*" Id. at 19433. The interim rule acknowledged that the term *"'reasonable' was in the eye of the beholder,*" and that while for many years, usual and customary rates referred to charges or a proportion of a hospital's charges, this had changed in recent years as providers had issues with the "*black box*" approach that commercial insurers have used to determine the usual and customary rates for out-of-network providers.

In response to these concerns, the Departments clarified that plans were required to disclose how they calculated the amounts under the GOT regulation, including the UCR amount. More specifically, for plans governed by ERISA, documentation and data used to calculate each of the amounts under the GOT regulations for out-of-network emergency services, including the UCR amounts, would be subject to disclosure provisions under Section 104(b) of ERISA, as well as Department of Labor claims procedure regulations.

On reconsideration of the comments and concerns as required by the federal district court, the Departments were not, however, convinced that the GOT standards are "*insufficiently transparent or otherwise unreasonable, and we conclude that the methodology for determining payment amounts under all three prongs of the GOT regulation is sufficiently transparent and reasonable.*":

> *Under the GOT regulation, the three prongs work together to establish a floor on the payment amount for out-of-network emergency services, and each state generally retains authority to set higher amounts for health insurance issued within the state. The GOT regulation requires that a…plan…must pay the highest amount determined under the three prongs, which reflect amounts that the federal government itself, or group health plans and health insurance issuers, have established as reasonable.* Id., at 19435.

The Clarification Regulation also noted the importance of the fact that a "claimant (or a claimant's authorized representative) upon appeal of an adverse benefit determination must be provided reasonable access to, and copies of, all documents, records and other information relevant to the claim for benefits, including information about the plan's determination of the UCR amount. A failure to provide or make a payment of a claim in whole or in part is considered an adverse benefit determination…patients who are to be protected by the statute have a right to transparent access to the calculations used to arrive at the allowed amount for out-of-network emergency services, and a provider can obtain this information as a patient's authorized representative. To the extent that a provider is not able to obtain these calculations, the Departments believe that the patients' ability to obtain and to potentially challenge the information through litigation or the appeals process creates adequate safeguards with respect to" concerns about…manipulation of UCR amounts. This provides sufficient protections, especially in light of the focus of section 2719A of the PHGS Act on the protection of patients, rather than physicians." Id.[7]

---

[7] The Departments also explained that creation of a database to establish payments would be problematic to monitor and that there was no indication that such a database would be a "better barometer of UCR amounts than the

### III. D.  Plan Terms; Maximum Allowable Cost

The parties agree that the amount of reimbursement received by an out-of-network provider of emergency services depends upon the terms of the plan, the GOT rule which provides a "floor" or minimum payment for such services, and various state laws.



---

current methodology used by …plan…It is the Department's' view that it is appropriate to continue to reserve the determination of the relative merits of each database to the discretion of the states, insurers, and health plans."



### III. E. Baptist's Contentions

It is useful to highlight Baptist's fundamental points, as these have developed during the course of the arbitration and were set forth in Baptist's Phase 2 post hearing briefs and during closing argument.







Quantum Meruit, on the other hand, does not depend on such findings as it is a direct claim made by Baptist without reliance on the plan terms or contract between the employer and the member.

































































































## IV. PARTIAL FINAL AWARD RULINGS

### IV. A. Summary of Rulings





**5. Quantum Meruit**

**a.** We find that Baptist has shown by a preponderance of the evidence that, under Tennessee law, quantum meruit is applicable to these out-of-network – in other words, out-of-contract – claims, but only to the extent that Baptist was required by law to provide the services under consideration. (We will use the October hearing dates to address the extent to which Cigna will be so liable).

**b.** We find that the Cigna defenses applicable to a quantum meruit claim are accord and satisfaction, waiver and estoppel, laches.

**c.** We further find that Cigna has not sustained its burden of proof as to any of these defenses in this quantum meruit context.

**d.** We find that quantum meruit claims are not pre-empted by ERISA and thus that this relief is available for all of the claims in issue.

**e.** Finally, we find that the measure of damages for quantum meruit is the reasonable value of the services. The reasonable value of the services will be further assessed during the damages phase hearings to be held in October 2022.

**IV. B. Statement And Discussion Of Rulings**

Except as required by law, employers have many options when determining the extent to which they will provide coverage, if at all, for the health care expenses of their employees. [34]

Pursuant to quantum meruit principles, however, a provider of out-of-network services is entitled to recover the "reasonable value" of those services. There is no contract limiting what they can recover. Similarly, the ERISA superstructure and the discretion otherwise afforded plan administrators, as well as a plan's procedural requirements of the plans, are inapplicable.

We address Count IV before Count I because our disposition of the issues on Count IV largely addresses the issues in Count I. We then turn to quantum meruit.

**IV. B. 1. Count IV Wrongful Denial of Benefits Under ERISA 502(a)(1)(B)**



























### IV. B. 2. Count I Breach of Contract



**IV. B. 3. GOT Rule Compliance**



        We have also considered that a finding in this regard would  require us to find, in effect, that the plan choice of ████████████ was illegal **from an ERISA perspective**, something we do not believe is appropriate in light of the emphasis in ERISA on process and conduct rather than the substantive regulation and content of benefits. ████████████████████

### IV. B. 4. Count II Quantum Meruit

A health care provider of emergency services with an assignment of benefits from the patient has two basic causes of action available to it to pursue a denied or underpaid claim. ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ we find Baptist has proven by a preponderance of the evidence that, to the extent it was required by law to provide emergency services, it has a valid claim for relief under quantum meruit/quasi contract theories. Even Cigna agrees – as it must -- that, given the requirements of EMTALA, where there is "no choice other than the service, there has to be a remedy" and that there is a "gap" in the law that needed to be filled. Cigna  argues that the federal government stepped in to fill it with the GOT Rule. ████████████████████████████████████████. We find that, properly construed against the backdrop of an understanding of how the health care system works, an implied-in-law contract was created under Tennessee law for which Baptist must be compensated at a "reasonable" rate for its services rendered under that quasi-contract.  We also find that, with the further clarification of the recent Supreme Court jurisprudence on pre-emption, that quantum meruit is available for all the plans in this case and is not pre-empted by ERISA.

Since this is a state law claim, we are bound by Tennessee law pursuant to the Parties' arbitration agreement.  Although at present, there is no Tennessee Supreme Court case directly on point, we have the discretion to make reasoned findings, based on the evidence of record in this case, that we believe are consistent with general Tennessee law principles.  In this regard, we note that other lower courts in Tennessee have reached different conclusions on this issue, but we also note we have the discretion to disagree. ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████ We are looking at the facts through a very different lens and, in this universe, there is no contract between Baptist and Cigna and no requirements other than the elements of the cause of action.

### (a)  Quantum Meruit is Applicable Here

The Tennessee Supreme Court has noted that the actions brought under theories of unjust enrichment, quasi contract, contracts implied in law, and quantum meruit are essentially the same. "Courts frequently employ the various terminology interchangeably to describe that class of implied obligations where, on the basis of justice and equity, the law will impose a contractual relationship between the parties, regardless of their assent thereto." *Paschall's, Inc.* v. *Dozier*, 407 S.W. 2d 150 (Tenn. 1996). We note various tests propounded by the Tennessee Supreme Court and Tennessee intermediate courts to assess Baptist's claims made under these theories.

77

We agree with Baptist that, at least in Tennessee, the existence of member plans do not bar a cause of action on the non-ERISA claims and we do not think it bars this cause of action under a pre-emption theory either, as we discuss below. (███████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████)

Cigna cites *Doe* v. *HCA Health Services of Tennessee*, 46 S.W. 3d 191 (Tenn. 2001), a case in which the plaintiff hospital expressly relied upon a quantum meruit theory in seeking the reasonable value of its out-of-network services from a patient, for the following test:

1. There is not an existing, enforceable contract between the parties covering the same subject matter;
2. The party seeking recovery proves that it provided valuable goods or services;
3. The party to be charged receives the goods or services;
4. The circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services;
5. The circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment.

Id. At 198. The Court went on to discuss how the lower court on remand should assess the "reasonable value" of the hospital's services and what elements it might want to consider.

Baptist takes issue with Cigna's reliance on *Doe* because it predates *Freeman Indus., LLC* v. *Eastman Chem. Co*., 172 S. W. 3d 512 (Tenn. 2005) and does not involve an "indirect" benefit as it believes is at issue here. In *Freeman*, the Tennessee Supreme Court assessed whether or not an indirect purchaser from producers guilty of fixing the price of food products could bring a claim for "unjust enrichment" against those producers and found that they could. The *Freeman* court noted that the Tennessee Supreme Court had recognized two types of implied contracts, those implied in fact and those in law, that contracts implied in law are "created by law without the parties' assent and are based on reason and justice," and that courts may impose a contract implied in law where no contract exists under various quasi contractual theories, including unjust enrichment. In Freeman, the Court recited the elements of an unjust enrichment as follows:

1. A benefit has been conferred upon the defendant by the plaintiff
2. Appreciation by the defendant of such benefit
3. Acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.

Id. at 524-525.

The court noted that the most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust. The *Freeman* court did not clearly address the appropriate remedy for an unjust enrichment claim or implied-in-law contract claim, and we have

not seen persuasive authority that it should not be the reasonable value of the services, as opposed to the value of the specific benefit received by Cigna.

In *River Park Hospital, Inc.* v. *BlueCross BlueShield of Tennessee, Inc.*, 173 S.W. 3d 43 (Ct. of Appeals, Tenn. 2003), a case we find helpful, a Tennessee appellate court relied on the "implied-in-law" concept  and the idea that "theories of unjust enrichment, quasi-contract, contracts implied in law and quantum meruit are essentially the same" in assessing a claim for unjust enrichment in a health care context. There, a hospital sought its full standard rates for out-of-network emergency services it provided to Tennessee Medicaid recipients through TennCare, the state's Medicaid managed care program, managed by BlueCare, the managed care entity administering the program. The court upheld the trial court's finding that, under EMTALA and Tennessee law, River Park was required to provide services, and thus:

> …while neither of these parties may have wanted to deal with each other, both were left with no choice. Under these circumstances, we must find a contract implied in law, without the assent of either party, on the basis that it is "dictated by reason and justice."  (citation omitted)….
>
> Under these circumstances, the trial court must determine a reasonable rate of reimbursement for all of the emergency admissions at issue. River Park argues that it is entitled to its full standard rate because it repeatedly insisted on this rate with BlueCare; while River Park's standard rate for its services is pertinent to the determination of a reasonable rate, it is hardly conclusive. Likewise, BlueCare maintains that its reimbursement rate for in-network providers is clearly a reasonable rate, and relies heavily on its BlueCare provider services manual was [sic] well as on industry custom among MCOs of paying all providers, both in-network and out-of-network, the same rate. Again, evidence of BlueCare's in-network rates, as well as evidence of industry custom, is pertinent but certainly not determinative. In assessing a reasonable reimbursement rate, the trial court may take into account all of these factors, as well as others that may be pertinent, such as whether the rate for in-network providers is appropriate for out-of-network providers, given the difference in volume of BlueCare enrollees treated. Moreover, the trial court may consider factors that may increase the providers costs, such as BlueCare's repeated automatic disallowance of claims previously authorized, apparently onerous and costly appeal and approval procedures, and delays in payment.

Id. at 59-60.

Thirteen years later, this same court later distinguished *River Park* in the context of a commercial plan and found that an implied-in-law contract did not exist for out-of-network

emergency services entitling a hospital to compensation.[38]  *HCA Health Services of Tennessee, Inc. v. BlueCross BlueShield of Tennessee, Inc.,* 2016 WL 3357180 (Court of Appeals Tenn. 2016). The *HCA* Court cited the language in *Paschall's* indicating that the various theories of implied obligations were the same and cited the test relied upon in *Freeman*, above. With respect to the *River Park* decision, the HCA Court said:

> We disagree with HCA's contention that the holding in *River Park* is "squarely on point."  Unlike River Park, where BlueCare had received payment for each TennCare enrollee and was under an obligation to pay for emergency services rendered to the enrollee, the patients in this case are participants in commercial health benefit plans which include coverage provide by BCBST for emergency medical services, at a level which depends upon the specific plan and the facts and circumstances of each claim. In River Park, HCA could only seek payment from BlueCare; significantly and as distinguished from River Park, in this case HCA can seek payment directly from the patients it has treated, with the amount it may have received from BCBST operating to reduce the amount for which the patient is responsible.

Id. at 10.

Having distinguished *River Park* on this basis, the HCA court then went on to assess whether HCA had a direct cause of action against Blue Cross for unjust enrichment, focusing on the provisions of EMTALA and the equivalent Tennessee Code Section 56-7-2355. Applying the unjust enrichment elements, the Court found that:

> Applying these elements to the facts of this case, the duty imposed on HCA by EMTALA and the prohibition imposed by BCBST by Tenn.Cod Ann. Section 56-72355 do not create an implied-in-law contractual relationship upon which to sustain HCA's cause of action. HCA has not conferred a benefit on BCBST; the services were rendered to the patients, none of whom are a party to this suit, and they are the ones who received the benefits of medical care provided in HCA's emergency rooms and are obligated to pay for the services. BCBST has not denied coverage for the services covered by the plan to which the participant agreed and for which the participant paid. Without a benefit conferred on BCCST by HCA, a cause of action for implied-in-law contract cannot be sustained.

Id. at 12.

---

[38] HCA was not included in what we might refer to as a "narrow network". Blue Cross paid the full amount for what it considered a "true" medical emergency, but paid less in cases where it did not think that a true emergency existed. HCA alleged that Blue Cross only paid a small percentage of its usual and customary charges in this instance and demanded at least 80% of its full-billed charges and the removal of any "Maximum Allowable Charges."

In a footnote in the above citation (n. 15), the Court noted that "[w]e are not persuaded by HCA's argument that HCA benefitted BCBST by helping BCBST to fulfill its core obligation to "improve and sustain the physical, financial and community health of Tennessee."

We acknowledge that a number of courts have agreed that it is the patient, not the provider, that is getting a legally cognizable "benefit," not the insurer paying for or administering the services. Some of these cases rely on a non-health care case, *Travelers Indemnity of Conn*. v. *Losco Grp., Inc.*, 150 F. Supp 2d 556 (S.D.N.Y 2001) for its seductive assertion that:

> [i]t is counterintuitive to say that services provided to an insured are also provided to its insurer. The insurance company derives no benefit from those services; indeed, what the insurer gets is a ripened obligation to pay money to the insured – which hardly can be called a benefit.

Id. at 563.

As Baptist compellingly notes, however, the same Southern District of New York distinguished *Travelers* in connection with an unjust enrichment claim brought by out-of-network emergency room physicians, noting that *Travelers* did not involve healthcare services and did not involve an allegation that the plaintiff was required by law to provide the services. *Emergency Physicians of New York* v. *UnitedHealthcare Group, Inc.,* 2021 WL 4437166 (SDNY 2021). As the court further noted:

> New York courts have found, consistent with the courts of several other states, that, "where, as here, a hospital is required by law to treat patients in an emergency room, an insurance company is unjustly enriched if it fails to pay the hospital in full for the costs incurred in rendering the necessary treatment to the insurer's enrollees (N.Y.C. Health & Hosps. Corp v. Wellcare of N.Y., Inc, 937 N.Y.S2d 540, 544 (S. Ct. 2011); River Park Hosp., Inc. V. BlueCross BlueShield of Tenn., Inc., 173 S.W.3d 43, 59. As the Third Circuit recently explained, the insurer's benefit is not the provision of the healthcare services per se, but rather the discharge of the obligation the insurer owes to the insured." Plastic Surgery Ctr. P.A. v. Aetna Life Ins. Co., 967 F3d 218, 240-41 (3d Cir. 2020) (citations omitted). Other federal courts have reached the same conclusion for similar reasons. E.g., El Paso Healthcare Sys., LTD v. Molina Healthcare of N.M., Inc, 683 F. Supp. 2d 454, 461 (W.D. Tex. 2010) (While it is true that the immediate beneficiaries of the medical services were patients, and not Molina, that company did receive the benefit of having its obligations to its plan members, and to the state in the interests of its plan members, discharged (additional citations omitted).

Id. at 12.

In assessing the issues relating to an implied-in-law contract, whether a benefit was conferred and the general equities involved, we are also influenced by the Supreme Court of Tennessee's discussion of the current state of the health care system in a non-quantum meruit

case -- finding that the collateral source rule prohibited evidence of discounted rates accepted by medical providers from an insurer to rebut proof that the full, undiscounted charges of the hospital were reasonable medical expenses --  in *Dedmon* v. *Steelman*, 535 S.W. 3d 431 (Ten. 2017), which we quote here without citations, although we note that the Court cited River Park several times in the course of its description:

> During this same period since the adoption of the rule, the pricing, payment and reimbursement system for health care providers has become exponentially more complex. The rise of managed care organizations has distorted pricing for health care services, as deep discounts demanded by the MCO's require providers to offset those discounts by charging higher prices to other patients…Hospitals are often legally required to provide treatment for patients who either are insured by companies with whom the hospital has no contractual relationship or who have no insurances at all…In all, providers are faced with competing objectives of balancing budgets, remaining competitive, complying with health care and regulatory standards, and continuing to offer needed services to the community…In this complicated environment, charges by hospitals have come to be set within the context of hospitals' broader communities, including their competitors, payors, regulators and customers. Funding the required treatment of patients without the means to fully pay for care depends on the ability of providers to disproportionately charge various patient categories…Of significance in this appeal, one result of the increasing complexity of health care has been a widening of the gap between a medical provider's standard rate charged to uninsured patients and the amounts accepted from insurance or social legislation benefits…all of these developments have caused the issue of what constitutes a reasonable medical charge or expense to become the subject of increase litigation due to the increased involvement of government payors, the complexity of health care reimbursement provisions, financial pressures on hospitals and the significance of medial expense recovery in personal injury litigation.

Id. at 452.

Considering all that we have learned in this arbitration, our collective experience, the evidence and the law, we find that Baptist has established by a preponderance of the evidence that a cognizable benefit has been conferred on Cigna – an extension, to some extent, of the "discharge of the obligations to the insured" line of reasoning adopted by a number of courts -- and that the equities require, as was the case in *River Park*, that we find a contract implied-in-law for Cigna to pay the reasonable value of the applicable out-of-network emergency services to the extent Baptist was required by law to provide them. The HCA Court did not have the advantage of this education and evidence and that opinion was, we believe, wrongly decided.

We have reviewed the expert testimony and associated witness evidence. We do not fully agree with either ████████████████. Suffice it to say that the most significant – but not the only – benefit for Cigna is created by the very "managed care bargain" with which we began this

opinion. Cigna is able to get lower rates from in-network providers by excluding Baptist. It has every right to do that, but it must bear the consequences under state law in terms of how much it pays those out-of-network providers for services they are required to provide. ███████████ ████████████████████████████████████████████████████ A Cigna witness  also admitted, as he had to, that this network relationship puts Cigna in the best possible position to get business with various self-funded employers. ██████████████

While Cigna pressed upon the Panel its compliance with NCQA standards as proof that its network was adequate, implying that it did not need Baptist and therefore did not get a true benefit from Baptist's existence, the fact is that there are 19,000 claims in this arbitration, and Baptist evidence that over three thousand Cigna members went to Baptist hospitals on an out-of-network basis each year in the Dispute Period (Baptist Post-Hearing Brief Response at 47-48). Cigna was obviously relying on Baptist in connection with its Open Access Plus and Local Plus options.

Given this – the discounts, associated competitive advantage, capacity and marketing benefits Cigna received and relied upon -- although Tennessee law only requires an indirect benefit, and that certainly has been shown here, we believe that these facts are sufficient to establish a direct benefit to Cigna, and that it received services under *Doe*.

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

The other elements required to be shown to prove an implied in law contract have not been as controversial and in any event have been established by a preponderance of the evidence. For example, Cigna clearly "appreciated" or accepted the services and realized that Baptist expected to get paid – it marketed out-of-network, or non-contracted, coverage to its employer-clients and their employees, ████████████████████████████████ ████████████████████. Marketing the out-of-network coverage was of course another benefit, a subset of the competitive advantage that ██████████ identified.

As quantum meruit is an equitable remedy, additional focus on the equities is warranted. Of course, the fact that Baptist is obligated to perform the services is enough under *River Park* to create an implied in law contract and it is enough here. ████████████████████████ ███████████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████████



Cigna argued that Baptist should not get a "side payment" because they exist ███████ ██████ – but, in a way, they should, although we would recharacterize the "side payment" as compensation for the reasonable value of their services when they are forced by law to provide such services.[39]

### (b) Cigna's Applicable Defenses

We now address those of Cigna's defenses that may be relevant to a quantum meruit claim. Cigna bears the burden of proof on these issues. ██████████████████████████ ████████████████████████



---

[39] We also note that the distinction made in the *HCA* case between government plans forbidding balance billing and commercial plans that permit it -- the idea being that Baptist can look to patients to collect the remainder of the reasonable value of the services if Cigna's payment falls short -- would incentivize inequitable results that are inconsistent with quantum meruit by encouraging payors to pay very little to Baptist when they were required by law to see Cigna members. If Cigna and its employer clients are going to provide out-of-network services in these (notably circumscribed) situations we think that quantum meruit principles require them to pay the reasonable value of the services in the first place.



### (c)  Implied-in-Law, Quantum Meruit Claims Are Not Pre-empted

In addition to finding that quantum meruit is applicable, we also find that it is not pre-empted by ERISA.

### (c)(i) Effect of Rutledge

In *Rutledge* v. *Pharm. Care Mgmt. Ass'n*, 592 U.S. ___, 141 S. Ct. 474 (2020), the Supreme Court found that  ERISA did not pre-empt an Arkansas statute, Act 900, that required pharmacy benefit management companies to reimburse Arkansas pharmacies at a price equal to or higher than the pharmacy's wholesale cost. The statute required that PBMs timely update their maximum allowable cost ("MAC") lists, the amount at which the PBM's reimbursed pharmacies, when drug wholesale costs – the amounts paid by pharmacies to acquire drugs – increased and set forth an administrative procedure by which pharmacies could challenge MAC rates. It also permits pharmacies to refuse to sell a drug if the reimbursement rate from a PBM is lower than its acquisition costs.

This holding, relating as it does to a clear, healthcare-related exercise of a state's legislative authority, can be distinguished in general from a general state common law cause of action such as quantum meruit, and, as the Panel pointed out during oral argument on these issues, many (although not all) of the cases upon which the Supreme Court relied dealt with state legislation. An exception was *Mackey* v. *Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 831-832 (1988), where the Court held that "state-law mechanisms of executing judgements against ERISA welfare benefit plans, even when those mechanisms prevent plan participants from receiving their benefit" was not pre-empted by ERISA (Id. at 831-832.)

Nevertheless, we are convinced by Baptist's arguments that the logic of the Court's thinking is applicable here, and several lower courts since *Rutledge* have agreed that quantum meruit claims are not pre-empted by ERISA in part in reliance on *Rutledge*, e.g., *Emergency Services of Oklahoma, P.C.* v. *Aetna Health*, Inc. 556 F. Supp. 3d 1259, 1263-64 (ERISA does not pre-empt Oklahoma state law unjust enrichment claim by out-of-network emergency services medical providers alleging that health insurer paid claims at impermissibly low rates where they

should have been paid the reasonable value of their services). While we largely agree with Baptist's thorough and tightly reasoned submissions on the relevant issues and in particular found the charts in their May 27, 2022 response submission of great assistance, we discuss some of the key issues below.

ERISA pre-empts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C. Section 1144(a). A state law relates to an ERISA plan if it has a connection with or reference to such a plan. *Rutledge,* citing *Egelhoff v. Egelhoff*, 532 U.S. 141, 147 (2001). Elaborating upon the relevant questions, the *Rutledge* court addressed the issues required of us here: In assessing whether or not ERISA pre-empts a state law quantum meruit cause of action, we must ask the following questions:

> *Does quantum meruit have an impermissible connection to an ERISA plan, in that it "governs a central matter of plan administration or interferes with a nationally uniform plan administration"? *Rutledge* at 4-6, citing *Gobeille* v. *Liberty Mut. Ins. Co.* 577 U.S. 312, 320.
> *Does it "refer to" ERISA in that it acts immediately and exclusively upon ERISA plans and the existence of ERISA plans is essential to the law's operation"? *Rutledge*, citing *Gobeille*, 577 U.S. at 319-320.

The *Rutledge* Court was able quickly to dispense with the issue of whether or not Act 900 "referred to" ERISA because it applied to PBM's whether or not they managed an ERISA plan and did not directly regulate health benefit plans at all and ERISA plans were not essential to Act 900's operation. *Rutledge* at 6-7. We think that quantum meruit can be similarly assessed as not "referring to" an ERISA plan. For example, we agree with Baptist that a quantum meruit claim does not impermissibly refer to an ERISA plan. Among other things, "[t]he 'mere fact that a claim arises against the factual backdrop of an ERISA plan does not mean it makes reference to that plan'" *Sarasota Cty. Pub. Hosp. Bd*, 511 F. Supp. 3d 1240, 1249 (quoting *Plastic Surgery Ctr. P.A.* v. *Aetna Life Ins. Co.*, 967 F. 3d 218 (Third Cir. 2020).

To address the more difficult, "impermissible connection" question, the *Rutledge* court first analyzed the objectives of ERISA, noting that ERISA is:

> primarily concerned with pre-empting state laws that require providers to structure benefit plans in particular ways, such as by requiring payment of specific benefits…or by binding plan administrators to specific rules for determining beneficiary status…A state law may also be subject to pre-emption if "acute, albeit indirect, economic effects of the state law force an ERISA plan to adopt a certain scheme, of substantive coverage…"

> In short, ERISA does not pre-empt state rate regulations that merely increase costs or alter incentives for ERISA plans without forcing plans to adopt any particular scheme of substantive coverage.

Id at 5 (citations omitted).

In finding that Act 900 did not have an impermissible connection to an ERISA plan, the *Rutledge* Court relied heavily on its decision in *New York State Conference of Blue Cross & Blue Shield Plan* v. *Travelers Ins. Co.*, 514 U.S. 645 (1995), which found that a New York state statute that imposed surcharges of up to 13% on hospital billing rates for patients covered by insurers other than Blue Cross/Blue Shield was not pre-empted by ERISA:

> The logic of *Travelers* decides this case. Like the New York surcharge law in Travelers, Act 900 is merely a form of cost regulation. It requires PBM's to reimburse pharmacies for prescription drugs at a rate equal to or higher than the pharmacy's acquisition costs. PBM's may well pass those increased costs on to plans, meaning that ERISA plans may pay more for prescription drug benefits in Arkansas than in, say, Arizona, But "cost uniformity was almost certainly not an object of pre-emption….nor is the net effect of Act 900 so acute that it will effectively dictate plan choices….as a result, Act 900 does not have an impermissible connection with an ERISA plan. (citations omitted)

Of particular relevance here, the *Rutledge* Court specifically addressed the PBM's concern that Act 900 affected ERISA plan design by mandating a particular pricing methodology for the pharmacy benefits at issue by forcing PBMs to reimburse pharmacies using a MAC list constructed with an eye toward containing costs and ensuring predictability, something the plan using the PBM might prefer, and instead requiring reimbursement at acquisition cost. This was, the court said:

> …just a long way of saying that [the statute] regulates reimbursement rates. Requiring PBMs to reimburse pharmacies at or above their acquisition costs does not require plans to provide any particular benefit to any particular beneficiary in any particular way. It simply establishes a floor for the cost of the benefits that plans choose to provide. The plans in Travelers might likewise have preferred that their insurers reimburse hospital services without paying an additional surcharge, but that did not transform New York's cost regulation into central plan administration.

The Court also warned that PCMA's pre-emption argument could improperly pre-empt any state law that could affect the price or provision of plan benefits. It also noted that the "responsibility for offering the pharmacy a below-acquisition cost reimbursement lies first with the PBM" in dismissing arguments that lower rate interfered with central matters of plan administration.

We agree with Baptist that, for purposes of pre-emption, quantum meruit is nothing more than a cost regulation – representing a cost of providing an out-of-network benefit -- which does not "relate to" or create an impermissible connection with ERISA plans:

> In this case, Cigna remains free to maintain its broad and narrow networks for both ERISA and non-ERISA plans. These networks can include or exclude Baptist.

The only difference is that the out-of-network services associated with Cigna's narrow networks will be subject to payment of such claims at "reasonable" rates under quantum meruit / unjust enrichment principles. This common law protection addresses the "unappealing outcome" that could result from Cigna's position that Baptist has no recourse if Cigna refuses to reasonably compensate it, "which could conceivably incentivize insurers…to pay as little as possible while Baptist remains obligated to treat Cigna's insureds." See Emergency Physician Services of N.Y., 2021 WL 4447166.

Baptist Opening Quantum Meruit Submission, at 18.

We also think it is important not to lose sight of the over-arching principle that, as Baptist points out, quantum meruit is Baptist's "independent, non-derivative cause of action independent directly against Cigna that does not implicate traditional ERISA relationships." (May 27 Response at 2). As the Third Circuit has noted:

ERISA governs relationships among "the employer, the plan and its fiduciaries, and the participants and beneficiaries."…As our sister circuits have recognized, ERISA struck a "bargain" between the interests of participants and beneficiaries on the one hand and insurers on the other: Section 502() created federal causes of action that allow plan participants and beneficiaries to enforce ERISA's mandates, and section 514(a) limits potential sources of plan liability, providing employers and plan administrators with some measure of security…Critically, however, out-of-network healthcare providers "were not…party to this bargain"…. Health care providers…orbit the periphery of this bargain, but their rights and remedies are not delineated in ERISA's substantive or remedial provisions.

*Plastic Surgery Center, P.S.,* v. *Aetna Life Insurance Company*, 967 Fed. 3d 218 (Third Cir. 2020). (citations omitted).[40] We appreciate Cigna's attention to the various relationships involved here, but from the perspective of ERISA and quantum meruit, Baptist is not part of the club.

### (c)(ii) GOT Rule

We also agree with Baptist about the implications of the GOT Rule. Cigna argues that the federal government has spoken on the "gap" in the law occasioned by the legal requirements of EMTALA and analogous state laws. As Baptist notes, however, the express terms of the ACA, from which the GOT Rule derives, state that it should not be construed to affect the ERISA preemption

---

[40] In this pre-*Rutledge* case, the Third Circuit found that state law contract and promissory estoppel claims were not pre-empted by ERISA, but that unjust enrichment claims were because the "benefit conferred," which it defined to be the discharge of the obligation by the insurer, arose from the existence of the plan. Id. at 240-41, We think that this holding is not consistent with *Rutledge*, but in any event disagree with this logic. See *Saratoga Cty Publ. Hosp. Bd,* supra 511 F. Supp 3d at 1249 (fact that a claim arises against the factual backdrop of an ERISA plan or that ERISA plan is an initial step in the causation chain, without more, is too remote of a relationship with the covered plan to support a finding of preemption.)

analysis in any way. See 42 U.S.C. Sections 300gg-123 & 10841(d). This law was addressed by the Supreme Court in *Gobeille,* which confirmed that "[t]he ACA…specifies that it shall not 'be construed to preempt any State law that does not prevent the application of the provisions of the ACA." 577 U.S. 312, 326 (2016). A quantum meruit cause of action does not prevent the application of the provisions of the ACA.  If the Panel were to find that the reasonable value of the services provided by Baptist should be higher than what it received, quantum meruit would work in tandem with the GOT Rule and simply adjust upwards the floor rate set by its three part test, which, in turn, has the effect of lowering the members' balance billing liability – the express goal of PPACA, all as we outlined earlier in this opinion in discussing in detail the Clarification Regulation.

We also emphasize that the Clarification Regulation is quite explicit that the GOT Rule is a minimum amount, like the PBM regulation analyzed by the Supreme Court in *Rutledge* – the Departments used the word "floor" and "minimum" payment to describe it. It is, as Baptist notes, a "reasonable floor rate" and does not preclude finding that other amounts are reasonable. Cigna itself in effect acknowledges the function of the GOT Rule through its conduct. It sets the GOT Rule as the absolute minimum that must be paid as a matter of law, and adjusts this rate upward in some cases ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ We also agree with Baptist that to the extent the Clarification Regulation addressed only the ability of states to increase amounts in connection with plans regulated by state insurance, the *Rutledge* decision supersedes this limitation.

**[spaces intentionally included]**

89

## V. Conclusion

For the reasons stated above, the Panel makes this Partial Final Award as follows:

1. Baptist's request █ for relief based upon Count ██████████████ IV (denial of benefits under ERISA, including but not limited to any requests for relief based upon Cigna's calculations pursuant to the GOT Rule) are DENIED;
2. Baptist's request for a finding that Cigna is liable to it based upon Count II (quantum meruit) is GRANTED as limited by this Partial Final Award; and
3. The Panel will conduct further proceedings consistent with this Partial Final Award, including (a) determination of the reasonable value of the services provided pursuant to the Panel's ruling in (2) above; and (b) considering and deciding any additional issues the Panel determines are appropriate after consultation with the parties.

SO ORDERED this 7th day of September, 2022

Joseph J. Farnan, Jr.

Michael J. Schless

Conna A. Weiner, Panel Chair

90

# TAB 008C

ELECTRONICALLY FILED
2023 Jun 13 4:13 PM
CLERK OF COURT - CHANCERY

# EXHIBIT 2

## FIRST AMENDED ARBITRATION AGREEMENT

**THIS AGREEMENT** ("Agreement") is made as of the 24th day of February, 2020, by and between Baptist Memorial Health Care Corporation, individually and on behalf of its affiliated companies (collectively, "Baptist"), and Cigna HealthCare of Tennessee, Inc., individually and on behalf of its affiliated companies (collectively, "Cigna"). Baptist and Cigna are referred to in this Agreement in the singular as a "Party" and collectively as the "Parties."

**WHEREAS**, Baptist claims that the Parties have a dispute about the appropriate reimbursement for a specific set of certain out-of-network healthcare services provided by Baptist facilities to Cigna members (the "Dispute");

**WHEREAS**, the Parties have agreed to submit the Dispute to binding arbitration pursuant to the terms set forth below;

**WHEREAS**, the specific out-of-network reimbursement claims subject to the Dispute will not include any claims other than those set forth on the document identified on March 25, 2019, as Exhibit A to the Tolling Agreement executed on March 18, 2019, and will not include any in-network facility claims even if any in-network facility claim was identified on Exhibit A ("Arbitration Claims"); and

**WHEREAS**, Baptist has not specified the full legal or factual basis for its claims, other than Baptist asserts it has not received the full amount of reimbursement it says it is owed for out-of-network healthcare services, and Cigna therefore reserves all rights, defenses, and counterclaims related to the classification and appropriate rate of payment for the Arbitration Claims and will assert any such defenses and counterclaims pursuant to a schedule established in the arbitration.

**WHEREAS**, the Parties desire to promptly and efficiently resolve this Dispute through an arbitration process as set forth herein.

**NOW THEREFORE**, in consideration of the Parties' mutual desire to resolve this Dispute, the Parties agree as follows:

1.    <u>Agreement to Arbitrate</u>. The Parties agree to arbitrate the Arbitration Claims as provided for in this Agreement.

2.    <u>Scope of Arbitration Claims</u>.

     a.    The Arbitration shall be limited to the Arbitration Claims.  Both Parties agree that in no event do they intend the Arbitration Claims to include in-network facility claims; any inclusion of in-network facility claims on any list of disputed claims provided by Baptist is inadvertent, and any in-network facility claims are expressly excluded from this Agreement.   Both Parties agree that any applicable statutes or periods of limitation or repose and other legal or equitable defenses related to the passage of time for asserting a claim against a Party, including but not limited to laches or the loss of a claim via waiver or estoppel, as well as any evidentiary or procedural rule or presumption based on

passage of time to bring a claim against a Party (all such defenses collectively referred to as "Time-Related Defenses") for Baptist's out-of-network claims that allegedly accrue after January 1, 2019 and before January 1, 2020 and are not on Exhibit A, but that Baptist asserts in good faith that arise out of the same legal theories and subject to the same causes of action that it raises in the statement of claim to be filed in this action, shall be tolled until the later of either 60 days after the final arbitration award is received or December 31, 2020. Nothing in this agreement shall toll any procedural or exhaustion requirements. Similarly, the Parties agree that any Time-Related Defenses related to Cigna's counterclaims relating to Baptist's out-of-network claims that allegedly accrue after January 1, 2019 and before January 1, 2020 shall likewise be tolled until after the completion of the Arbitration. Nothing in this Agreement shall affect any defense available to any Party as of the Effective Date of this Agreement. This Agreement shall not be deemed to revive any claim that is or was already barred on the Effective Date of this Agreement. This Agreement shall not revive or toll any in-network claim. This Agreement shall not operate as an admission or acknowledgement by any Party that any applicable statute of limitations or other Time-Related Defense has expired or arisen as of the Effective Date of this Agreement. On or around March 18, 2019, the Parties executed a Tolling Agreement extending the time within which to file causes of action related to the Arbitration Claims on Exhibit A. Nothing in this Agreement shall supersede, rescind, or otherwise affect the provisions of the Tolling Agreement and any amendments thereto, and the terms of the Tolling Agreement and any amendments thereto are incorporated herein by reference.

b.  Within 7 days of the execution of this Agreement, Baptist shall provide a detailed statement of claim providing the factual and legal basis for its claimed right to relief on each of the reimbursement claims that are part of the Arbitration Claims. For efficiency, Baptist may group the reimbursement claims into categories of reimbursement claims that involve the same factual basis or legal theory. Baptist will have the right to amend its detailed statement of claim, including but not limited to amending its causes of action (and Cigna its corresponding counterclaims and defenses); provided that no amendment to the Arbitration Claims will be permitted that increases the number of Arbitration Claims.

c.  Within 60 days after receipt of the detailed statement of claim provided in subparagraph b above from Baptist, Cigna will identify any reimbursement claims it contends should not be included in the Arbitration Claims (for example, because they are not out-of-network claims, or were paid, or such other similar reason), except that time may be extended for reasonable cause; provided, however, that this showing shall be only to secure a list of reimbursement claims actually to be disputed in the Arbitration and shall not constitute Cigna's defense to reimbursement claims that are in dispute.

      d.      Thereafter, if any dispute remains as to what reimbursement claims are a part of this Arbitration, the Parties will make good faith efforts to resolve this dispute within 60 days.  Any such dispute remaining after 60 days will be submitted to the arbitration panel for resolution.

      e.      Nothing in this Agreement nor any position taken during this Arbitration by either Party will be construed to waive any claim or defense unrelated to this Dispute, and nothing in this Agreement impacts the rights of either Party aside from this Agreement and the issues involved in this dispute.

3.      <u>Appointment of Arbitrators</u>.

      a.      A panel of three arbitrators will decide the Dispute.

      b.      The arbitrators will each be a former judge or a well-respected dispute resolution attorney who has sophisticated commercial litigation experience and a minimum of 20 years' experience in the practice of law, and who shall not have regularly represented parties in the lines of business of Baptist or Cigna.

      c.      The Parties will select the arbitrators by agreement.  Baptist will provide a list of potential arbitrators to Cigna, and Cigna will endeavor in good faith to agree to one of the arbitrators on that list.  Likewise, Cigna will provide a list of potential arbitrators to Baptist, and Baptist will endeavor in good faith to agree to one of the arbitrators on that list.  The Parties will select the third arbitrator by agreement. If the Parties cannot reach agreement on the third arbitrator, then the Parties agree to engage the American Arbitration Association to identify a list of seven potential arbitrators that meet the criteria set out in (3)(b) above. The Parties will then strike and rank the potential arbitrator, but each Party may only strike a maximum of three of the seven potential arbitrators.

      d.      Any contact with a prospective arbitrator will be made jointly and not on a unilateral basis. As part of the selection process, the prospective arbitrator(s) will disclose to both Parties any representation, fact, or relationship that might constitute a conflict of interest in serving as a neutral in this matter.  Conflict of interest issues will be governed by the Commercial Arbitration Rules of the American Arbitration Association, amended and effective October 1, 2013, regular track, including the Procedures for Large, Complex Commercial Disputes ("AAA Commercial Rules"). If the Parties are unable to select the arbitration panel by agreement, the Parties agree to negotiate an alternative mechanism for selection of the arbitration panel.

      e.      The arbitration panel will administer the proceeding directly without the employment of the American Arbitration Association or any other dispute resolution body, unless agreed otherwise.

4.      <u>Fees and Costs for Arbitration</u>.  The Parties each agree to pay their own legal fees and expenses in connection with the arbitration and, in addition, to pay one-half the cost of the arbitration, including fees charged by the arbitrators.  Notwithstanding any contrary provision of

the AAA Commercial Rules, the arbitration panel will not have the power to reallocate fees or costs of the proceeding as part of its award.

5. <u>Issues for Arbitration</u>. The question to be decided in this arbitration is whether Baptist was properly reimbursed for the Arbitration Claims, and if not, what is the amount Cigna owes. Baptist generally contends that it provided medically necessary out-of-network healthcare services to Cigna members that were not properly paid.  Cigna disputes Baptist's contentions, including whether they are factually or legally correct or state actionable claims or are subject to Cigna's counterclaims or other defenses.

6. <u>Conduct of the Arbitration</u>.  The arbitration panel will apply the AAA Commercial Rules for procedural and process issues, and applicable federal and state law for substantive legal issues, except that processes and procedures regarding disclosure, use, and communications with experts will follow federal law.

7. <u>Initial Pleadings</u>.

a.      Baptist will be deemed the claimant for purposes of the arbitration, and Cigna will be deemed the respondent.

b.      Within 7 days after execution of this Agreement, Baptist will submit to the arbitration panel and send to Cigna's counsel a detailed statement of claim specifying its causes of action and factual basis for the same, as provided in paragraph 2.b above.

c.      Within 30 days thereafter, Cigna will file an answering statement stating with specificity all affirmative defenses and counterclaims, and the grounds thereof.

d.      If either Party becomes aware during discovery of additional legal theories, causes of actions, defenses, or counterclaims relating to the appropriate reimbursement of the Arbitration Claims, it may seek leave to add them to the arbitration, which may be permitted upon a showing of good cause.

e.      The Parties agree that any applicable statutes or periods of limitation or repose and other legal or equitable defenses related to the passage of time for asserting a claim against a Party, including but not limited to laches or the loss of a claim via waiver or estoppel, as well as any evidentiary or procedural rule or presumption based on passage of time to bring a claim against a Party (all such defenses collectively referred to as "Time-Related Defenses") for Baptist's claims will continue to be tolled from the Effective Date of December 5, 2018, of the Tolling Agreement executed by the Parties on March 18, 2019, until the filing of the detailed statement in paragraph 2.b above; provided, however, that claims accruing after January 1, 2019 and before January 1, 2020 shall be tolled as provided in paragraph 2.a above.  Furthermore, the terms of the Tolling Agreement and any amendments thereto are incorporated herein by reference.

f.      Similarly, the Parties agree that any Time-Related Defenses related to Cigna's counterclaims will likewise be tolled until the filing of Cigna's answering

statement; provided again, however, that any Time-Related Defenses related to Cigna's counterclaims regarding any of Baptist's claims accruing after January 1, 2019 and before January 1, 2020 shall also be tolled as provided in paragraph 2.a above.

g.      Nothing in this Agreement will affect any defense available to any Party as of the Effective Date of the Tolling Agreement. This Agreement will not be deemed to revive any claim that is or was already barred on the Effective Date of the Tolling Agreement. This Agreement will not operate as an admission or acknowledgement by any Party that any applicable statute of limitations or other Time-Related Defense has expired or arisen as of the Effective Date of the Tolling Agreement.

8.      <u>Scope of Discovery</u>.

a.      The scope of discovery will be consistent with the AAA Commercial Rules, except as described herein.

b.      Each Party will be entitled to serve upon the other Party a total of 30 Interrogatories, including subparts, and a total of 30 Requests for Production of Documents and Tangible Things, including subparts. The Parties shall negotiate the scope of discovery in good faith and under the guidance of the arbitration panel once Baptist has supplied its detailed statement of claim as provided in paragraph 2.b above.  It is anticipated that depositions may be necessary, including corporate representatives and expert witnesses.

c.      Discovery depositions of any witness will be limited to 7 hours of questioning per deposition by the noticing Party, and up to 1 hour of follow-up by the defending Party, subject to extensions by agreement or by order of the arbitration panel for good cause shown.

d.      The Parties will select by agreement one arbitrator from the arbitration panel to resolve discovery disputes. If the Parties are unable to agree after reasonable efforts, the arbitration panel will select one arbitrator to resolve discovery disputes, according to a process determined by the arbitration panel. Discovery disputes may be taken up at any time after the Parties have made reasonable efforts to meet and confer over the dispute.

e.      Except as provided in this Agreement, discovery tools will be utilized in a manner generally consistent with the commensurate Federal Rules of Civil Procedure; provided, however, that it is anticipated and expected that the scope of document discovery (especially for electronically stored information ("ESI")) will be as narrow as reasonably feasible to the needs of this specific Dispute, as is consistent with the Parties' desire to arbitrate this Dispute and resolve it in a cost-effective and streamlined fashion.

f.      The Parties are obligated to work in good faith to ensure that discovery is streamlined and narrowly tailored to the purposes of this case. Any decisions

by the arbitrator to resolve discovery disputes regarding the scope of discovery, ESI, or any other information will take into account the Parties' desire to have a cost-effective proceeding and will not be controlled or otherwise determined by the scope of discovery provided in the Federal Rules of Civil Procedure.

9.      Pre-hearing Schedule. The Parties agree to negotiate a schedule with the goal of completing the Arbitration by the end of the summer 2020, with specific dates to be agreed to by the Parties and the arbitration panel.  This schedule may be modified by agreement or upon the motion of either Party for good cause shown, including with regard to trial schedules of counsel or the Parties that may be set by courts or arbitration panels in the interim, provided that counsel and the Parties have made best efforts to maintain this agreed-upon schedule.   Good cause includes, but is not limited to, the failure of a Party to timely produce discovery to the Party requesting modification/extension.  A material and key consideration to the Parties' agreement to the pre-hearing schedule and hearing date is their respective agreement to cooperate and timely and fully produce the documents and other information set forth herein.  Also material and key to the Parties' agreement is that, because this is a voluntary arbitration, the discovery process is streamlined, sensible, and managed to the needs of the case as provided for in paragraph 8 above.

10.     Periodic Status Conferences. The Parties and the arbitration panel will have monthly status conferences regarding the progress of discovery and the arbitration, unless otherwise agreed by the Parties.

11.     Mandatory Mediation.  No later than 90 days before the scheduled start of the final hearing, the Parties will conduct a non-binding mediation at a location to be determined by agreement of the Parties before a neutral other than the arbitration panel.  The Parties will attempt in good faith to select a mediator.  If after reasonable efforts the Parties are unable to select a mediator, the arbitration panel will appoint a mediator according to a process determined by the arbitration panel.

12.     Bifurcation.  By agreement of the Parties or by order of the arbitration panel upon motion for good cause shown, issues to be decided at the final hearing may be bifurcated in order to promote efficiencies and resolution of the Dispute.

13.     Final Hearing.  The final arbitration hearing will commence on a date to be agreed to by the Parties and the arbitration panel, with the goal of setting the hearing for summer 2020.  Proof will be closed at the conclusion of the final hearing and will not be re-opened unless extraordinary grounds are shown to the arbitration panel.

14.     Hearing Site.  The final hearing will be held at a neutral, mutually agreeable location.

15.     Decision.  The final award will be rendered by a majority of the arbitration panel. The arbitration panel will have the authority to decide all claims and defenses asserted in the arbitration, as required by law and equity.  The arbitration panel will prepare a reasoned award in writing consistent with the AAA Commercial Rules, which will specify any damages payable to any Party.

16.    <u>Binding Nature of Arbitration</u>.  The award to be made by the arbitration panel will be valid and binding upon, and will be performed by, each of the Parties and their respective parents, subsidiaries, affiliates, owners, shareholders, officers, directors, employees, representatives, successors, transferees, and assigns.  The Parties further agree that in the event either Party refuses to implement or honor the final award of the arbitration panel, then, and only then, within 90 days following such refusal to implement or honor the final award, either Party may commence a summary action in any federal court of competent jurisdiction for the confirmation of the award subject to the Federal Arbitration Act and the Federal Rules of Civil Procedure, but will abide by the confidentiality provisions of this Agreement consistent with applicable court rules.

17.    <u>Confidentiality Regarding this Agreement</u>.  No Party will disclose to third parties the terms and provisions of this Agreement without the prior written consent of the other Party except as required by law, or to enforce this Agreement, or as may be required for purposes of communicating with the Parties' auditors, regulators, attorneys, and insurers.  The Parties agree that this Agreement will be admissible in the arbitration contemplated by this Agreement but will not be admissible in any other pending or subsequent litigation or arbitration between the Parties related to any subject, except to enforce the Agreement.  The Parties agree that the breach or prospective breach of this provision will cause irreparable harm for which monetary damages may not be adequate.  The Parties therefore agree that in addition to any other remedies, the non-breaching Party will be entitled to injunctive or other equitable relief to restrain the breach hereof.  Should either Party receive a subpoena or other process requesting information pertaining to this Agreement, the subpoenaed Party shall in good faith make best efforts to provide notice of such subpoena via overnight delivery and email to counsel for the Parties, and a reasonable opportunity to oppose or quash such subpoena will be afforded to the Party seeking to oppose or quash such subpoena or process; however, this notice requirement does not apply to governmental investigations and governmental audits, for which no such notice is required of either Party.

18.    <u>Confidentiality Regarding Arbitration Proceedings and Documents Exchanged in this Arbitration</u>.  The Parties agree that the arbitration communications, filings, proceedings, and the arbitration award are and will be kept confidential and that the documents exchanged between the Parties and/or the arbitrators in relation to the arbitration may not be disclosed to any persons other than current and former employees of the Parties acting as witnesses in the arbitration, the Parties' expert witnesses and their personnel, the arbitrators and their personnel, counsel for the Parties and their personnel, or as necessary in the ordinary course of the Parties' business, absent the consent of all Parties or proper legal process.  The Parties will execute a mutually agreeable Confidentiality Agreement that will govern the documents exchanged in the arbitration.  The results and decisions of the arbitration panel will also be confidential, and will not be revealed to anyone or disclosed by the Parties for any reason other than to enforce the award, or as may be required by law, or for purposes of communicating with the Parties' auditors, regulators, attorneys, and insurers. In the event that a Party files an action to enforce the award, all Parties will use their best efforts to ensure that the award is filed under seal and remains permanently under seal.  Should either Party receive a subpoena or other process requesting information pertaining to this Agreement, the subpoenaed Party shall in good faith make best efforts to provide notice of such subpoena via overnight delivery and email to counsel for the Parties, and a reasonable opportunity to oppose or quash such subpoena will be afforded to the Party seeking to oppose or quash such

subpoena or process; however, this notice requirement does not apply to governmental investigations and governmental audits, for which no such notice is required of either Party.

19.    <u>Binding Agreement</u>.  This Agreement will be binding upon, inure to the benefit of, and be enforceable by and against each Party hereto and their respective successors and permitted assigns.

20.    <u>Entire Agreement</u>.  The Parties represent and warrant that this document constitutes the entire agreement between the Parties hereto with respect to the subject matter hereof, and all prior negotiations, correspondence, agreements, and discussions with respect thereto, are hereby merged into this Agreement.  There exists between the Parties no oral agreement, understanding, statement, promise, representation, warranty, or inducement other than as may be contained in this Agreement.  The Parties are not relying upon any promise, representation, warranty, or consideration not expressly set forth herein.

21.    <u>Assignment</u>.  No Party may assign this Agreement or its rights or obligations hereunder without the prior written consent of the other Party.

22.    <u>Amendment</u>.  This Agreement may be amended at any time by mutual agreement of the Parties, but any such amendment must be in writing, dated, and signed by the Parties.

23.    <u>Counterparts</u>.  This Agreement may be executed in multiple originals, each of which will be binding upon the Party whose signature it contains, and the combined total of which will constitute the entire document.  A facsimile or electronically scanned copy of the entire Agreement that contains the signature of an authorized representative of one or more of the Parties will be accepted as an original document for all purposes.

24.    <u>Authority</u>.  Each individual signing below on behalf of Baptist and Cigna has full and complete authorization and power to execute this Agreement.  This Agreement is a valid, binding, and enforceable obligation of each Party, and does not violate any law, rule, regulation, or contract binding upon either Party.  Cigna represents and warrants that it has full authority to execute this Agreement and to bind itself to the covenants stated herein.  Baptist represents and warrants that it has full authority to execute this Agreement and to bind itself to the covenants stated herein.

25.    <u>Governing Law</u>.  It is agreed that applicable federal and state substantive law will be applied by the arbitration panel in the arbitration, except as provided under Section 6 of the Agreement with regard to the use and declaration of experts.  It is further agreed that these proceedings are governed by, construed, and enforced in accordance with the Federal Arbitration Act and the Federal Rules of Civil Procedure, except that Arkansas' Revised Uniform Arbitration Act, Ark. Code Ann. § 16-108-217(e), will be applied by the arbitration panel only for the issuance of protective orders.  The arbitration necessarily involves the production of documents containing confidential information, and protected health information and individually identifiable health information that may be protected from unauthorized disclosure by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the privacy regulations promulgated thereunder (45 C.F.R. Parts 160 and 164).  The Parties agree that the arbitration panel has the

power to issue and enforce a HIPAA qualified protective order in the arbitration under Ark. Code Ann. § 16-108-217(e).

26.     Arbitrability.   The arbitration panel will have the power to decide all issues of arbitrability, including whether any Arbitration Claim, cause of action, defense, or counterclaim is subject to this Agreement or may be resolved in the arbitration.

27.     Construction.   In the event of any question or dispute under this Agreement, Baptist and Cigna agree that the terms of this Agreement will not be construed against the drafter, but will be construed as though all Parties were the drafter.

28.     Additional Documents.   The Parties agree to cooperate fully and to execute any and all supplementary documents, and to take all additional actions that may be necessary or appropriate to give full force and effect to the terms and intent of this Agreement.

29.     Effective Date.   This Agreement will become effective on the date of the last signature below.

30.     Invalid Provisions.   If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, or unenforceable, the remainder of the provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated; provided, however, in lieu of such illegal, invalid, or unenforceable provision, the Parties hereto agree to add as a part hereof a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable that preserves the same benefits to the Parties.

IN WITNESS WHEREOF the Parties to this Agreement have caused it to be executed by themselves or their duly authorized representative.

Baptist Memorial Health Care Corporation *by consel*

Signed: _____

Printed Name: __DAVID A. King__

Title: __Polsinelli, Shareholder__

Date: __2 / 24 / 20__


Cigna

Signed: _____

Printed Name: __John Hamill__

Title: __Partner, Counsel for Cigna__

Date: __2/24/20__

10

# TAB 008D

ELECTRONICALLY FILED
2023 Jun 13 4:13 PM
CLERK OF COURT - CHANCERY

# EXHIBIT 3

HCA Health Services of Tennessee, Inc. v. Bluecross..., Not Reported in S.W....

2016 WL 3357180

2016 WL 3357180
Only the Westlaw citation is currently available.

SEE COURT OF APPEALS RULES 11 AND 12

Court of Appeals of Tennessee,
AT NASHVILLE.

HCA HEALTH SERVICES
OF TENNESSEE, INC., et al.
v.
BLUECROSS BLUESHIELD OF TENNESSEE, INC.

No. M2014–01869–COA–R9–CV
|
May 20, 2015 Session
|
Filed June 9, 2016

**Synopsis**
**Background:** Hospitals brought action against insurer for breach of implied-in-law contract, seeking to recover costs for emergency medical services rendered to insured patients, and hospitals sought declaratory judgment that they had exhausted all administrative remedies available. The Chancery Court, Davidson County, Carol L. McCoy, Chancellor, granted partial summary judgment to insurer and denied partial summary judgment to both insurer and hospitals. Both parties brought interlocutory appeal.

**Holdings:** The Court of Appeals, Richard H. Dinkins, J., held that:

hospital's direct cause of action against insurer for breach of implied-in-law contract was an action for an alternative enforcement mechanism and thus was conflict preempted by Employee Retirement Income Security Act (ERISA);

state court lacked subject matter jurisdiction to determine whether insurer's administrative appeals process comported with ERISA;

hospital, as assignee of insurance plan participant, was required to exhaust grievance procedure regarding non-ERISA claims against insurer before bringing suit; and

statute providing that a health insurance entity is not required to correct a payment error to a health care provider, if provider's request for correction is filed more than 18 months after date that provider received payment for claim from insurance entity, is not a statute of limitations.

Affirmed in part, reversed in part, vacated in part, and remanded.

**Procedural Posture(s):** Motion for Summary Judgment.

**Appeal from the Chancery Court for Davidson County, No. 10896II, Carol L. McCoy, Chancellor**

**Attorneys and Law Firms**

Richard C. Rose, Robert F. Parsley, James T. Williams, Chattanooga, Tennessee, for the appellant, BlueCross BlueShield of Tennessee, Inc.

David A. King and Kinika L. Young, Nashville, Tennessee, for the appellees, HCA Health Services of Tennessee, Inc., Hendersonville Hospital Corporation, Central Tennessee Hospital Corporation, and HTI Memorial Hospital Corporation.

RICHARD H. DINKINS, J., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL McBRAYER, JJ., joined.

OPINION

RICHARD H. DINKINS, J.

**\*1** Interlocutory appeal in suit brought by healthcare corporations to recover costs for emergency medical services rendered to patients participating in Defendant's insurance plans. We conclude that the Employee Retirement Income Security Act ("ERISA") preempts plaintiffs' state-law cause of action based on implied-in-law contract; that we are without subject matter jurisdiction to rule on whether Plaintiffs should be deemed to have exhausted the insurance company's appeals process and therefore decline to consider whether summary judgment should have been granted on the defense of failure to exhaust administrative remedies; that Plaintiff is not entitled to relief under an implied-in-law contract cause of action as to those plans which are not governed by ERISA based upon the duties imposed on the parties by state and federal law; that the insurance company

Case 2:23-cv-02550-JTF-tmp Document 1-2 Filed 08/31/23 Page 325 of 660 PageID 351

HCA Health Services of Tennessee, Inc. v. Bluecross..., Not Reported in S.W....

2016 WL 3357180

should have been granted summary judgment on certain coverage claims arising from plans not governed by ERISA because Plaintiffs failed to exhaust grievance procedures; that Tenn.Code Ann. § 56–7–110(b) does not bar coverage claims; and that 47 coverage claims were improperly included in this lawsuit and should have been dismissed on summary judgment. Accordingly, we affirm in part, reverse in part, and vacate in part the lower court's order and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This interlocutory appeal involves the payment of claims for healthcare services provided in Plaintiffs' hospital emergency rooms to participants in Defendant's insurance plans.

Plaintiffs (collectively, "HCA") are Tennessee corporations that own and operate eight hospitals in Middle Tennessee under the name Tristar Health System. Defendant BlueCross BlueShield of Tennessee ("BCBST") sells health insurance policies to individuals as well as to participants in employee welfare benefit plans, which are established or maintained by private employers or employee organizations and governed by the federal Employee Retirement Income Security Act ("ERISA"). [1] BCBST also provides policies to the employees of churches and state or local governments; these insurance policies are not governed by ERISA. *See* 29 U.S.C.§ 1003.

BCBST contracts with healthcare providers, such as HCA, to serve patients who are participants in BCBST's insurance plans. In Tennessee BCBST maintains two networks of healthcare providers which are available to participants: Networks S and P. Network P offers participants a wide variety of practitioners, hospitals, and other providers; in contrast, Network S costs less and has fewer providers than Network P. As a provider of healthcare, HCA has entered into an agreement with BCBST, known as a network agreement, to provide healthcare services to participants in the Network P plans; no similar agreement exists with respect to participants in Network S plans.

**\*2** HCA has treated thousands of participants of BCBST's S and P networks in its emergency rooms. Prior to being discharged, each participant signed a "Conditions of Admission Agreement" in which the participant assigned the benefits from the plan to HCA. Based on this assignment, HCA sent bills for its services directly to BCSCT, expecting BCBST to pay the charges, minus any co-payment for which

the patient was responsible. When BCBST determined that the situation was a true medical emergency, it paid HCA's bill in full for services rendered to Network S participants. However, for claims that BCBST determined were not true medical emergencies, BCBST did not pay the full amount of the bill.

Being disappointed with BCBST's reimbursement for emergency room services provided to Network S participants when BCBST determined that the situation was not an emergency, HCA filed suit against BCBST on June 1, 2010, alleging that BCBST "systematically paid substantially less than the Hospitals' usual and customary charges for Network S patients ... generally a small percentage of charges." HCA asserted causes of action for implied-in-law contract and breach of contract and sought actual damages of "at least $7.8 million" for the services rendered to Network S participants at the hospitals since January 1, 2007. The first amended complaint added a cause of action for a declaratory judgment that, under the plan documents, BCBST "must reimburse the hospitals for at least 80% of full-billed usual and customary charges" and "no longer apply a 'Maximum Allowable Charges' limitation, or any similar limitation, to reduce the amount owed on full-billed usual and customary charges" for emergency services provided to Network S patients. HCA amended the complaint a second time to add, within its breach of contract cause of action, an action to recover benefits as assignee of the participants' benefits pursuant to the civil recovery enforcement provision of ERISA, 29 U.S.C.§ 1132(a)(1)(B).

In due course, BCBST moved for partial summary judgment, on the grounds that: (1) ERISA preempted HCA's state law cause of action for unjust enrichment; (2) all but 145 of the 4,037 ERISA benefits claims were subject to dismissal because HCA failed to exhaust administrative remedies; (3) federal courts had exclusive jurisdiction of and HCA lacked standing to pursue the matters raised in the declaratory judgment action; (4) that, with respect to HCA's unjust enrichment cause of action: express contracts already governed the subject matter, HCA failed to exhaust its remedies against the network S participants, and HCA failed to confer a benefit on BCBST; (5) claims for which HCA received any payment from BCBST on or before November 30, 2008 were time-barred under Tenn.Code Ann.§ 56–7–110(b) and should be excluded from the suit; (6) Plaintiff had failed to exhaust administrative grievance procedures governing the non-ERISA plans, which should result in dismissal of 540 claims; and (7) the 112 Network P claims

Case 2:23-cv-02550-JTF-tmp   Document 1-2   Filed 08/31/23   Page 326 of 660    PageID 352
HCA Health Services of Tennessee, Inc. v. Bluecross..., Not Reported in S.W....
2016 WL 3357180

should be dismissed because the parties have agreements that govern these claims.

With respect to BCBST's contention that HCA failed to exhaust administrative remedies, HCA moved for partial summary judgment on the ground that "[t]he undisputed facts show that the notices of adverse benefit determination and denial letters for the claims at issue do not provide the information required by ERISA regulations" and that, in accordance with 29 C.F.R. § 2560.503–1(l),[2] the trial court should deem that HCA had exhausted administrative remedies.

*3   The trial court entered a Memorandum Opinion and Order on January 9, 2014, followed by a revised Memorandum and Order on April 22, 2014. In the revised order, the Chancellor held as follows:

> BlueCross/BlueShield is granted partial summary judgment dismissing the Hospitals' state law claims because ERISA is the exclusive remedy for all claims relating to an ERISA plan and neither the Hospital nor the Court may avoid the provisions of that statue by reference to a non-ERISA cause of action.

> BlueCross/BlueShield is denied partial summary judgment as to the Hospitals' claim for declaratory judgment because in the second amended complaint, the Hospitals seek a declaration of rights under the derivative claim[3] regarding the proper construction of the Network S plan documents, the assignment of benefits, BlueCross/BlueShield's internal policy documents and its appeal process and its application of undeclared and/or unwritten criteria for denying claims. To the extent that the Hospitals' request for a declaratory judgment is premised on contracts implied-in-law, ERISA provides the exclusive remedy and accordingly, that portion of the Hospitals' request for declaratory judgment is dismissed.

> BlueCross/BlueShield is denied partial summary judgment based on the Hospitals' alleged failure to exhaust mandatory administrative remedies under the ERISA plans. Any decision regarding ERISA benefit claims, assignments, appeals procedures, flawed or otherwise, is governed by ERISA and shall be resolved upon a full hearing, not by summary judgment. This Court's previous analysis that the Hospitals' implied-in-law contract claim did not require reference to BlueCross/BlueShield's procedures for administrative appeals, assignments or benefit claims and was not pre-empted by ERISA was

in error. Upon review of the pleadings, the earlier memoranda, the supplemental memoranda and arguments made by the parties at the hearing on the motions to alter or amend, this Court is persuaded that ERISA is the exclusive remedy for all claims relating to ERISA plans and therefore, BlueCross/BlueShield's motion for partial summary judgment is appropriate and granted as to the implied-in-law contract claims.

> The Court concludes that the Hospitals' action for breach of an implied-in-law contract with BlueCross/BlueShield is pre-empted by ERISA. Under common law theories and the state statute, the Hospitals would be entitled to recover from BlueCross/BlueShield the reasonable value of the emergency services rendered to BlueCross/BlueShield's patients/enrollees in Network S, but for the provisions contained in the federal law, ERISA, which is the exclusive remedy for all claims relating to ERISA plans.

> BlueCross/BlueShield is denied partial summary judgment on its assertion that all claims for which the Hospitals received any payment from them on or before November 30, 2008 are time-barred under Tenn.Code Ann. § 56–7–110(b). In analyzing the issues, the court confused the ERISA pre-emption doctrine. These claims involve material facts which, when combined with the controlling law under ERISA, preclude summary judgment.

> BlueCross/BlueShield is granted partial summary judgment regarding the Hospital's claim for quantum-meruit pursuant to the Hospitals' implied-in-law contract claim.

*4   BlueCross/BlueShield is denied partial summary judgment regarding all but 24 of the 564 "non-ERISA" claims [claims relating to employee-sponsored health plans not governed by ERISA because they are church-related or governmental] because the Hospitals claim BlueCross/BlueShield failed to comply with mandatory ERISA pre-litigation grievance processes that are required to be included in any health care plan. BlueCross/BlueShield's request for partial summary judgment necessitates resolution of material fact disputes and is denied.

> The Hospitals are denied partial summary judgment seeking a declaratory judgment that they are deemed to have exhausted all administrative remedies available and that BlueCross/BlueShield's Network S appeal process is unreasonable, arbitrary or capricious. Contrary to the Hospitals' assertion that the facts are undisputed,

Case 2:23-cv-02550-JTF-tmp    Document 1-2    Filed 08/31/23    Page 327 of 660    PageID 353
HCA Health Services of Tennessee, Inc. v. Bluecross..., Not Reported in S.W....
2016 WL 3357180

resolution of whether the appeals' procedures comport with ERISA requires proof that the notices of adverse benefit determination and denial letters for the claims at issue failed to provide the information required by the ERISA regulations.

All other matters raised by either party seeking partial summary judgment are respectfully denied. IT IS SO ORDERED.

Both parties sought interlocutory review pursuant to Tenn. R.App. P. 9. The appeal was granted, limited to the following issues:

1. Whether HCA's implied-in-law contract claim is preempted by ERISA.

2. Whether BCBST's administrative appeals procedures violate ERISA requirements, thus permitting the hospitals to seek full-billed charges.

3. For the 4,037 claims governed by ERISA, whether all but 145 should be dismissed for failure to exhaust administrative remedies.

4. For all non-ERISA claims, whether Tenn.Code Ann. § 56–7–2355 or the Emergency Medical Treatment and Active Labor Act (EMTALA), as amended, 42 U.S.C.§ 1395dd, give the hospitals an implied contractual cause of action for *quantum meruit* and, if so, what are its applicable elements and defenses.

5. For the 564 non-ERISA claims, whether all but 24 should be dismissed due to failure to comply with contractual pre-litigation grievance requirements.

6. Whether all claims for which the hospitals received payment from the insurance company on or before November 30, 2008 are time-barred under Tenn.Code. Ann.§ 56–7–110(b).

7. Whether claims related to insureds in the insurance company's Network P should be dismissed because the parties have managed-care contracts specifically governing those claims.

## II. STANDARD OF REVIEW

We review findings of fact by the trial court "de novo upon the record of the trial court, accompanied by a

presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R.App. P. 13(d). This presumption of correctness "applies only to findings of fact, not to conclusions of law[; a]ccordingly, appellate courts review a trial court's resolution of legal issues without a presumption of correctness and reach their own independent conclusions regarding these issues." *Cumberland Bank v. G & S Implement Co., Inc.,* 211 S.W.3d 223, 228 (Tenn.Ct.App.2006)

**\*5** The Chancellor's order was based upon the parties' cross motions for summary judgment. A party is entitled to summary judgment only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04. The party seeking summary judgment "bears the burden of demonstrating that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Armoneit v. Elliot Crane Service, Inc.,* 65 S.W.3d 623, 627 (Tenn.Ct.App.2001).

A succinct statement setting forth the standard for considering motions for summary judgment where the moving party does not bear the burden of proof was set forth by this court in *Hall v. Gaylord Entm't Co.*:[4]

When the moving party does not bear the burden of proof at trial, the moving party may make the required showing and shift the burden of production either "(1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye v. Women's Care Ctr. of Memphis, MPLLC,* [477] S.W.3d [235], No. W2013–00804–SC–R11–CV, at \*22 (Tenn. Oct. 26, 2015).

\* \* \*

If the moving party does satisfy its initial burden of production, "the nonmoving party 'may not rest upon the mere allegations or denials of [its] pleading,' but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, 'set forth specific facts *at the summary judgment stage* 'showing that there is a genuine issue for trial.' " *Rye,* [477] S.W.3d [235], No. W2013–00804–SC–R11–CV, at \*22 (quoting Tenn. R. Civ. P. 56.06). The nonmoving party must demonstrate the

Case 2:23-cv-02550-JTF-tmp Document 1-2 Filed 08/31/23 Page 328 of 660 PageID 354

HCA Health Services of Tennessee, Inc. v. Bluecross..., Not Reported in S.W....

2016 WL 3357180

existence of specific facts in the record that could lead a rational trier of fact to find in favor of the nonmoving party. *Id.* If adequate time for discovery has been provided and the nonmoving party's evidence at the summary judgment stage is insufficient to establish the existence of a genuine issue of material fact for trial, then the motion for summary judgment should be granted. *Id.* Thus, even where the determinative issue is ordinarily a question of fact for the jury, summary judgment is still appropriate if the evidence is uncontroverted and the facts and inferences to be drawn therefrom make it clear that reasonable persons must agree on the proper outcome or draw only one conclusion. *White v. Lawrence,* 975 S.W.2d 525, 529–30 (Tenn.1998).

*Hall,* No. M2014–02221–COA–R3–CV, 2015 WL 7281784, at *4–5 (Tenn.Ct.App. Nov. 17, 2015) (emphasis in original) (footnotes omitted). We review the trial court's ruling on a motion for summary judgment de novo with no presumption of correctness, as the resolution of the motion is a matter of law. *Godfrey v. Ruiz,* 90 S.W.3d 692, 695 (Tenn.2002); *see also Martin v. Norfolk S. Ry.,* 271 S.W.3d 76, 83 (Tenn.2008). We view the evidence in favor of the non-moving party by resolving all reasonable inferences in its favor and discarding all countervailing evidence. *Stovall v. Clarke,* 113 S.W.3d 715, 721 (Tenn.2003); *Godfrey,* 90 S.W.3d at 695.

### III. DISCUSSION

### ISSUE 1: WHETHER ERISA PREEMPTS HCA'S IMPLIED–IN–LAW CONTRACT CAUSE OF ACTION

**\*6** The trial court granted BCBST's motion for summary judgment and dismissed HCA's direct cause of action "because ERISA is the exclusive remedy for all claims relating to an ERISA plan and neither the Hospital nor the Court may avoid the provisions of that statute by reference to a non-ERISA cause of action." HCA asserts that this holding was in error because HCA's direct cause of action does not relate to ERISA benefit plans.

The United States Supreme Court explained the concept of ERISA preemption in *Aetna Health v. Davila* :

Congress enacted ERISA to "protect ... the interests of participants in employee benefit plans and their beneficiaries" by setting out substantive regulatory requirements for employee benefit plans and to "provid[e] for appropriate remedies, sanctions, and ready access to

the Federal courts." 29 U.S.C.§ 1001(b). The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans. To this end, ERISA includes expansive pre-emption provisions, see ERISA § 514, 29 U.S.C.§ 1144, which are intended to ensure that employee benefit plan regulation would be "exclusively a federal concern." *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 523, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981).

ERISA's "comprehensive legislative scheme" includes "an integrated system of procedures for enforcement." *Russell,* 473 U.S., at 147, 105 S.Ct. 3085 (internal quotation marks omitted). This integrated enforcement mechanism, ERISA § 502(a), 29 U.S.C.§ 1132(a), is a distinctive feature of ERISA, and essential to accomplish Congress' purpose of creating a comprehensive statute for the regulation of employee benefit plans.[5] As the Court said in *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987):

"[T]he detailed provisions of§ 502(a) set forth a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans. The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA. 'The six carefully integrated civil enforcement provisions found in§ 502(a) of the statute as finally enacted ... provide strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly.' " *Id.*, at 54, 107 S.Ct. 1549 (quoting *Russell, supra,* at 146, 105 S.Ct. 3085).

Therefore, any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted. *See* 481 U.S., at 54–56, 107 S.Ct. 1549; *see also Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 143–145, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990).

542 U.S. 200, 208–209 (2004) (emphasis in original).

**\*7** In the interest of clarity, at the outset we address the two categories of preemption that may apply when considering the effect of ERISA on state law causes of action—complete

Case 2:23-cv-02550-JTF-tmp Document 1-2 Filed 08/31/23 Page 329 of 660 PageID 355
HCA Health Services of Tennessee, Inc. v. Bluecross..., Not Reported in S.W....
2016 WL 3357180

preemption and conflict preemption. Complete preemption is "a description of the specific situation in which a federal law not only preempts a state law to some degree but also substitutes a federal cause of action for the state cause of action." *Schmeling v. NORDAM,* 97 F.3d 1336, 1342 (10th Cir.1996). [6] Conflict preemption, on the other hand, codified at 29 U.S.C. § 1144, "allows a defendant to defeat a plaintiff's state-law claim on the merits by asserting the supremacy of federal law as an affirmative defense." *Cmty. State Bank v. Strong,* 651 F.3d 1241, 1261 n.16 (11th Cir.2011). In their briefs on appeal, BCBST has argued, and HCA defended, that conflict preemption applies to defeat HCA's direct state law cause of action; neither party argues that complete preemption applies. Consequently, we address this issue as one of conflict preemption.

ERISA's conflict preemption provision, found at 29 U.S.C. § 1144, "preempts 'any and all State laws insofar as they may now or hereafter relate to any employee benefit plan' governed by ERISA." *Thurman v. Pfizer, Inc.,* 484 F.3d 855, 861 (6th Cir.2007) (quoting 29 U.S.C. § 1144(a)). In *Thurman* the Sixth Circuit Court of Appeals set forth three categories of state law causes of actions that ERISA preempts:

[S]tate-law claims "that (1) 'mandate employee benefit structures or their administration;' (2) provide 'alternate enforcement mechanisms;' or (3) 'bind employers or plan administrators to particular choices or preclude uniform administrative practice, thereby functioning as a regulation of an ERISA plan itself.' " *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.,* 399 F.3d 692, 698 (6th Cir.2005) ("PONI") (quoting *Coyne & Delany Co. v. Selman,* 98 F.3d 1457, 1468 (4th Cir.1996)). With respect to claims that do not fall within these three categories, we continue to follow our prior precedent that focuses on the nature of the remedy sought by a plaintiff.

484 F.3d at 861. Though the parties have mentioned all three categories in their respective briefs, we have determined that the second category is applicable to HCA's direct cause of action.

BCBST asserts that HCA's direct cause of action is a preempted "alternate enforcement mechanism" because HCA obtained benefits under an ERISA plan for the claims at issue as an assignee and is now seeking additional, extra-contractual, extra-ERISA remedies for alleged underpayments. HCA does not specifically address the applicability of the "alternate enforcement mechanism" category in its brief. However, HCA argues generally that its direct cause of action is independent, unrelated to any ERISA plan; as a separate matter, HCA argues that the implied-at-law contract action arises from a direct relationship created by the Emergency Medical Treatment and Active Labor Act ("EMTALA"), codified at 42 U.S.C. § 1395dd, and Tenn.Code Ann.§ 56–7–2355. (See discussion of these statutes in Issue 4, *infra*.). HCA asserts it is not seeking to recover benefits under the plan, but instead seeks adequate payment for services that HCA was required to provide and BCBST was required to cover.

In its complaint, after acknowledging recovery of ERISA benefits as an assignee, [7] HCA asserted a separate direct cause of action for implied-in-law contract seeking additional recovery for the same services provided to ERISA plan members. As noted in *River Park Hosp. v. BlueCross BlueShield of Tenn., Inc.,* 173 S.W.3d 43, 57–58 (Tenn.Ct.App.2002), an implied-at-law contract claim is premised on a relationship established when a plaintiff confers a benefit on a defendant without a contractual agreement and seeks payment because the circumstances would make it inequitable for the defendant to not pay. In the "IMPLIED CONTRACT/UNJUST ENRICHMENT" portion of the complaint, HCA alleges that "BCBST's contracts with these patients or their employers required payment of in-network benefits for emergency medical services, whether the services were rendered by an in-network provider or an out-of-network provider." [8] The relationship upon which HCA premises its state law cause of action is the relationship established by the insurance contract, governed by ERISA, between BCBST and the patient; HCA seeks to recover a "reasonable reimbursement for [HCA's] provision of emergency medical services" outside of the exclusive enforcement mechanism set forth in ERISA. *PONI,* 399 F.3d at 700. Inasmuch as HCA relies on the relationship between BCBST and the participants in the plans to establish the relationship that is the basis of the implied-in-law contract, we hold that HCA's direct cause of action is an alternative enforcement mechanism to ERISA and is preempted. *Id.* at 698; *Thurman,* 484 F.3d at 861. Accordingly, we affirm the trial court's grant of summary judgment to BCBST and dismissal of HCA's direct cause of action with respect to the ERISA-governed plans.

## ISSUE 2: WHETHER BCBST'S ADMINISTRATIVE APPEALS PROCEDURES COMPLY WITH ERISA REQUIREMENTS

Case 2:23-cv-02550-JTF-tmp Document 1-2 Filed 08/31/23 Page 330 of 660 PageID 356
HCA Health Services of Tennessee, Inc. v. Bluecross..., Not Reported in S.W....
2016 WL 3357180

**\*8** ERISA requires that every employee benefit plan shall "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied" and "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review." 29 U.S.C.§ 1133. Requirements for such review procedures are contained in 29 C.F.R.§ 2560.503–1. Subsection (g) of the regulation, "Manner and content of notification of benefit determination," sets forth the information required to be included in a written or electronic notification of an adverse benefit determination; subsection (h) "Appeal of adverse benefit determinations," requires that every benefit plan have a procedure through which a claimant can appeal an adverse benefit determination and receive a full and fair review; and subsection (1) provides that "a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act" when a plan fails "to establish or follow claims procedures consistent with the requirements of this section."

HCA relied upon 29 U.S.C.§ 1133 and the implementing regulation to argue before the trial court that BCBST's ERISA-governed employee benefit plans failed to comply with certain regulations, and therefore, HCA did not have to exhaust BCBST's administrative remedies process before bringing suit as assignee of the plans' benefits. HCA sought a declaratory judgment to this effect and moved for summary judgment on the same. The trial court denied HCA's motion, holding that factual disputes precluded a ruling because "whether the appeals' procedures comport with ERISA requires proof that the notices of adverse benefit determination and denial letters for the claims at issue failed to provide the information required by the ERISA regulations."

Before we can determine whether BCBST's administrative appeals process comports with ERISA, we must determine whether we have jurisdiction over this subject matter. Section 502 of ERISA, found at 29 U.S.C.§ 1132, is the "civil enforcement" provision of ERISA. It reads in pertinent part that:

**(a) Persons empowered to bring a civil action**

A civil action may be brought—

\* \* \*

**(3)** by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

\* \* \*

**(e)(1)** Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, fiduciary, or any person referred to in section 1021(f)(1) of this title. State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under paragraphs (1)(B) and (7) of subsection (a) of this section. [9]

29 U.S.C.A.§ 1132(a)(3), (e)(1). The Sixth Circuit Court of Appeals has noted that "Section 1132(a)(3) allows a party to bring a civil action for relief when the [notice and review] requirements of § 1133 are not met," *Stuhlreyer v. Armco, Inc.,* 12 F.3d 75, 78 n.2 (6th Cir.1993) (citing *Tolle v. Carroll Touch, Inc.,* 977 F.2d 1129, 1135 (7th Cir.1992)); *accord Parkridge Med. Ctr., Inc. v. CPC Logistics, Inc. Grp. Ben. Plan,* No. 1:12–CV–124, 2013 WL 3976621, at \*8 (E.D.Tenn. Aug. 2, 2013). Thus, Section 1132(a)(3), not section 1132(a)(1)(B), is the vehicle by which HCA may seek relief from BCBST's allegedly ERISA-violating appeals procedures. However, state courts are not vested with jurisdiction to hear a cause of action brought pursuant to section 1132(a)(3). We concur with our sister court, the Colorado Court of Appeals, which has held, "[T]he federal courts have exclusive jurisdiction to address violations of this ERISA provision [§ 1133]." *Matter of Estate of Damon,* 892 P.2d 350, 357 (Colo.App.1994), *aff'd,* 915 P.2d 1301 (Colo.1996).

**\*9** Because state courts have only been granted jurisdiction to hear causes of action arising under § 1132(a)(1)(B) and (7) and because, as declared in *Stuhlreyer,* 12 F.3d at 78, a cause of action for violations of § 1133 must be brought under § 1132(a)(3), only federal courts have subject matter jurisdiction to hear arguments such as that made by HCA that BCBST's administrative appeals procedures do not comply with § 1133 and its implementing regulation. We conclude that we are without subject matter jurisdiction to consider this issue; accordingly we vacate the ruling on this matter and dismiss HCA's cause of action seeking a declaratory judgment that it is deemed to have exhausted all administrative remedies available.

HCA Health Services of Tennessee, Inc. v. Bluecross..., Not Reported in S.W....

2016 WL 3357180

## ISSUE 3: HCA'S FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES WITH RESPECT TO ERISA CLAIMS

BCBST next argues that the court erred in denying summary judgment because HCA failed to exhaust administrative remedies prior to bringing suit, which should result in the dismissal of those claims from the lawsuit. Case law supports BCBST's argument that "the administrative scheme of ERISA requires a participant to exhaust his or her administrative remedies prior to commencing suit." *Cantrell v. Walker Die Casting, Inc.,* 121 S.W.3d 391, 395 (Tenn.Ct.App.2003) *(quoting Ravencraft v. UNUM Life Ins. Co. of Am.,* 212 F.3d 341, 343 (6th Cir.2000)); *see also Scott v. Regions Bank,* 702 F.Supp.2d 921, 932 (E.D.Tenn.2010) (citing *Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 986 (6th Cir.1991)).

Issues 2 and 3 are closely related.[10] As noted in our discussion of Issue 2, *supra,* HCA has asserted that BCBST's appeals process does not comply with ERISA regulations, which could possibly excuse its failure to exhaust administrative remedies, *see* 29 C.F.R. § 2560.503–1(l), and we have held that the issue must be resolved by a court of competent jurisdiction. In light of the interrelatedness of these issues, we see no reason to address the merits of the third issue certified for appeal. There must be a determination that BCBST's appeals procedure complies with ERISA regulations to resolve the issue of whether failure to exhaust the procedure is excused. Accordingly, it is appropriate that we vacate the Chancellor's ruling in this regard.

## ISSUE 4: WHETHER A CAUSE OF ACTION BASED ON AN IMPLIED–IN–LAW CONTRACT IS AVAILABLE RELATIVE TO CLAIMS NOT GOVERNED BY ERISA

The fourth issue we are called to resolve arises from the court's grant of summary judgment to BCBST on HCA's implied-in-law contract cause of action. As to the plans governed by ERISA, the court held that preemption applied; as to the plans not governed by ERISA, the court did not specify the legal basis upon which it was granting summary judgment. We restate the issue here:

For all non-ERISA claims, whether Tenn.Code Ann. § 56–7–2355 or the Emergency Medical Treatment and Active Labor Act (EMTALA), as amended, 42 U.S.C.§ 1395dd, give the hospitals an implied contractual cause of action for *quantum meruit* and, if so, what are its applicable elements and defenses.

HCA argues that BCBST has been unjustly enriched by "paying a cut-rate amount which has no basis in law and is contrary to its longstanding policy" and that BCBST "is thus taking advantage of HCA's obligations under EMTALA to provide emergency care to Network S members to unilaterally impose a draconian discount." HCA contends that the parties in this case are similarly situated to those in *River Park Hosp. v. BlueCross BlueShield of Tenn., Inc.* and that this Court should find that an implied-in-law contract exists in the instant case as we so found in *River Park.*

**\*10** The defendants in *River Park* were BCBST and its subsidiary Volunteer State Health Plan, a health maintenance organization which operated under the name "BlueCare" and participated in the State of Tennessee's Medicaid system known as TennCare as a managed care organization ("MCO"); BlueCare had been required to enter a contractor risk agreement with the State of Tennessee in order to become a Tennessee MCO. *River Park,* 173 S.W.3d at 48–49. Under the terms of the agreement, BlueCare received a monthly payment, known as a capitation payment, for each BlueCare enrollee; in exchange BlueCare was to arrange for medical services for the enrollee. *Id.* at 48. With respect to emergency care specifically, the agreement stated that "The Contractor shall be required to pay for all emergency medical services which are medically necessary until the clinical emergency is stabilized," but did not set forth the rates which BlueCare would pay for the care. *Id.* at 59. The plaintiff was River Park Hospital, which provided emergency care to BlueCare's enrollees at discounted rates pursuant to a contract with BlueCare. *Id.* at 49. The contract expired and River Park began billing BlueCare at non-discounted rates. *Id.* Instead of paying the full charges, BlueCare paid River Park at the rate that had been set in the expired contract. *Id.* River Park brought suit against BlueCare alleging unjust enrichment and other theories of recovery. *Id.* at 50.

Case 2:23-cv-02550-JTF-tmp Document 1-2 Filed 08/31/23 Page 332 of 660 PageID 358
HCA Health Services of Tennessee, Inc. v. Bluecross..., Not Reported in S.W....
2016 WL 3357180

Trial was bifurcated, and the case proceeded to a determination of whether BlueCare was unjustly enriched by having received payment from the State for enrollees in the TennCare program but paying River Park less than the amount billed for emergency room care for those enrollees. *Id.* at 50–51. Following a preliminary ruling which both parties sought to modify or amend, as well as the taking of additional proof, the trial court held in pertinent part, that:

> By federal law River Park must provide these emergency services to any patient without regard to insurance until the patient is stabilized. BlueCare is legally obligated by its contract with the State to pay for emergency medical services provided to its enrollees. There is no agreement concerning the amount of payment for these emergency services.

*Id.* at 53. The trial court thereupon held that BlueCare had been unjustly enriched under the circumstances presented. *Id.* at 52. This Court affirmed the trial court's ruling that an implied-in-law contract existed between the hospital and BlueCare and remanded the case for a determination of the reasonable rate of reimbursement for emergency medical services provided by the hospital to BlueCare enrollees. *Id.* at 61.

We disagree with HCA's contention that the holding in *River Park* is "squarely on point." Unlike *River Park,* where BlueCare had received payment for each TennCare enrollee and was under an obligation to pay for emergency services rendered to the enrollee, the patients in this case are participants in commercial health benefit plans which include coverage provided by BCBST for emergency medical services, at a level which depends upon the specific plan and the facts and circumstances of each claim. [11] In *River Park,* HCA could only seek payment from BlueCare; significantly, and as distinguished from River Park, in this case HCA can seek payment directly from the patients it has treated, with the amount it may have received from BCBST operating to reduce the amount for which the patient is responsible. Accordingly, we turn our focus to whether EMTALA [12] and

*Tenn.Code Ann.§ 56–7–2355* [13] give HCA a direct cause of action against BCBST for unjust enrichment. [14]

**\*11** Our Supreme Court examined EMTALA in *Chattanooga–Hamilton Cty. Hosp. Auth. v. UnitedHealthcare Plan of the River Valley, Inc.,* stating:

> The purpose of EMTALA was to prohibit "patient dumping," that is, "the practice of a hospital that, despite its capability to provide needed medical care, either refuses to see or transfers a patient to another institution because of the patient's inability to pay." *Baber v. Hosp. Corp. of Am.,* 977 F.2d 872, 873 n.1 (4th Cir.1992); *see also Beller v. Health and Hosp. Corp. of Marion Cnty., Ind.,* 703 F.3d 388, 390 (7th Cir.2012). To this end, when a person without the ability to pay for medical services presents to a hospital's emergency room, EMTALA requires the hospital to first provide screening to ascertain whether the person has an "emergency medical condition." If the hospital determines that the person has an emergency medical condition, the hospital must provide such treatment as is necessary to either stabilize the patient or transfer the patient to another facility. *Beller,* 703 F.3d at 390.

475 S.W.3d 746, 750 (Tenn.2015) (footnote omitted). EMTALA prevents a hospital from turning away emergency patients; it "does not extinguish an emergency patient's obligation to pay for treatment." *El Paso Healthcare Sys., LTD v. Molina Healthcare of New Mexico, Inc.,* 683 F.Supp.2d 454, 460 (W.D.Tex.2010).

*Tenn.Code Ann.§ 56–7–2355* imposes an obligation on BCBST to provide coverage for emergency services received by its participants "regardless of whether the provider furnishing the services has a contractual agreement with the health benefit plan for the provision of the services to the enrollee."

In light of the respective obligations imposed on the parties by these two statutes, we must now consider whether those obligations create an implied-in-law contract between the two. This Court set forth the elements of implied-in-law contracts in *River Park:*

> [C]ontracts implied in law "are created by law without the assent of the party bound, on the basis that they are dictated by reason and justice." *Id.* The Tennessee Supreme Court has recognized that contracts implied in law are also discussed in terms of unjust enrichment, quasi contract, and quantum meruit:

Case 2:23-cv-02550-JTF-tmp    Document 1-2    Filed 08/31/23    Page 333 of 660    PageID 359

HCA Health Services of Tennessee, Inc. v. Bluecross..., Not Reported in S.W....

2016 WL 3357180

Actions brought upon theories of unjust enrichment, quasi contract, contracts implied in law, and quantum meruit are essentially the same. Courts frequently employ the various terminology interchangeably to describe that class of implied obligations where, on the basis of justice and equity, the law will impose a contractual relationship between the parties, regardless of their assent thereto.

*Paschall's, Inc. v. Dozier,* 219 Tenn. 45, 407 S.W.2d 150, 154 (1966) [ (emphasis removed) ]; see also *Whitehaven Cmty. Baptist Church v. Holloway,* 973 S.W.2d 592, 596 (Tenn.1998) (stating that "[u]njust enrichment is a quasi-contractual theory under which a court may impose a contractual obligation on the parties where one does not otherwise exist"). In order to establish a claim based on this type of contract, the plaintiff must show that (1) a benefit has been conferred upon the defendant; (2) the defendant appreciated the benefit; and (3) acceptance of the benefit under the circumstances would make it inequitable for the defendant to retain the benefit without paying the value of the benefit. *Angus,* 968 S.W.2d at 808 (quoting *Paschall's,* 407 S.W.2d at 155).

**\*12** 173 S.W.3d at 57–58.

Applying these elements to the facts of this case, the duty imposed on HCA by EMTALA and the prohibition imposed on BCBST by Tenn.Code Ann.§ 56–7–2355 do not create an implied-in-law contractual relationship upon which to sustain HCA's cause of action. HCA has not conferred a benefit on BCBST; the services are rendered to the patients, none of whom are party to this suit, and they are the ones who received the benefits of medical care provided in HCA's emergency rooms and are obligated to pay for the services. [15] BCBST has not denied coverage for the services covered by the plan to which the participant agreed and for which the participant paid. [16] Without a benefit being conferred on BCCST by HCA, a cause of action for implied-in-law contract cannot be sustained.

Accordingly, we hold that EMTALA and Tenn.Code Ann.§ 56–7–2355 do not create a cause of action for implied-in-law contract in this case and therefore affirm the trial court's grant of summary judgment to BCBST and dismissal of HCA's implied-in-law contract cause of action.

## ISSUE 5: WHETHER HCA'S FAILURE TO COMPLY WITH NON–ERISA PLANS' GRIEVANCE PROCEDURES PRIOR TO FILING SUIT SHOULD RESULT IN DISMISSAL

The trial court denied BCBST summary judgment on its defense that HCA failed to comply with grievance procedures prior to filing suit, as required by the terms of the non-ERISA plans. The court held:

> BlueCross/BlueShield is denied partial summary judgment regarding all but 24 of the 564 "non-ERISA" claims [claims relating to employee-sponsored health plans not governed by ERISA because they are church-related or governmental] because the Hospitals claim BlueCross/ BlueShield failed to comply with mandatory ERISA pre-litigation grievance processes that are required to be included in any health care plan. BlueCross/BlueShield's request for partial summary judgment necessitates resolution of material fact disputes and is denied.

(Bracketed text in original.) BCBST contends that this holding was in error and asserts on appeal that "HCA's legal contention that BCBST's administrative remedies for the 564 non-ERISA claims did not comply with ERISA is immaterial to claims governed by Tennessee law."

We first consider the effect of the court's reference to the "mandatory ERISA pre-litigation grievance processes" in the context of deciding whether exhaustion of remedies is required with respect to the 564 non-ERISA claims in this lawsuit.

HCA argues in its brief that other regulations, which "the parties and chancery Court often colloquially referred to as 'ERISA' regulations apply to non-ERISA plans as well ... because regulations applicable to non-ERISA group health plans (not just those governed by ERISA) also incorporate the requirements of the ERISA regulations (29 C.F.R.§ 2560.503–1) by reference." To support this position, HCA

Case 2:23-cv-02550-JTF-tmp   Document 1-2   Filed 08/31/23   Page 334 of 660   PageID 360

HCA Health Services of Tennessee, Inc. v. Bluecross..., Not Reported in S.W....

2016 WL 3357180

cites to 26 C.F.R. § 54.9815–2719T, which is contained in Title 26, "Internal Revenue Service," and 45 C.F.R. § 147.136, which is found in Title 45, "Public Welfare," of the Code of Federal Regulations. [17]

**\*13** We are not persuaded from our reading of the transcript of the hearing on the motions for summary judgment that the trial court's one-sentence verbal ruling on this matter, which contains a reference to unspecified ERISA regulations, was a "colloquial" reference to federal regulations that are applicable to the non-ERISA plans at issue in this lawsuit. We have reviewed the regulations which HCA cites and observe that both went into effect on September 21, 2010, more than three months after HCA filed the present suit. Both regulations contain the language that "the provisions of this section apply for plan years beginning on or after September 23, 2010." Exhibit 5–A to the second affidavit of Kelly Paulk, Director of Product Strategy for BCBST, shows that, with respect to the non-ERISA claims at issue, the latest date healthcare services were rendered was February 17, 2010; this fact is not disputed. Thus, the plan years for these non-ERISA claims would have begun prior to September 23, 2010, and the regulations do not apply to the non-ERISA plans. HCA has not cited, and our research has not revealed, a Tennessee statute or regulation similar to 29 C.F.R. § 2560.503–1(l) that would allow a court to determine that a participant can be deemed to have exhausted administrative remedies available under an insurance plan when that plan "fails to establish or reasonable claims procedures." 29 C.F.R. § 2560.503–1(l). For the plans governed by ERISA, § 2560.503–1(l) allows such a determination, but as to the non-ERISA plans, there is no comparable Tennessee statute or regulation. Consequently, the plan participant or HCA, as assignee, was required to exhaust the grievance procedure regarding these 564 claims before filing suit.

Of the 564 claims, BCBST contends that grievance procedures were initiated on only 24 and that the remaining 540 claims should be dismissed. [18] Of the 540 claims, it is not clear from the record whether the time period for filing grievance procedures had expired for six claims which were made arising from the State Plan or State Teachers Active plan because BCBST's list of non-ERISA claims, contained in Exhibit 5–A, does not contain the date of BCBST's adverse benefit determination. [19] Accordingly, we remand those six claims for a determination by the trial court whether the time period for initiating the grievance procedure has expired and for further proceedings as to those claims for which the time period has not expired.

Excluding the 24 claims on which administrative appeals were initiated and the 6 claims arising out of the State Plan or the State Teachers Active Plan, we hold that summary judgment should have been granted on the remaining 534 non-ERISA claims because neither the patient nor HCA, as assignee, initiated grievance procedures before suit was filed. We enter judgment for BCBST on those claims and remand this matter for further proceedings as to the remaining 24 claims (as listed in BCBST's Exhibit 6–B).

## ISSUE 6: WHETHER 902 OF HCA'S CLAIMS ARE TIME–BARRED UNDER TENN. CODE ANN. § 56–7–110(b)

**\*14** BCBST contends that the trial court erred in denying summary judgment to BCBST on its defense that Tenn.Code Ann.§ 56–7–110(b) is a statute of limitations that bars 902 claims for which HCA received some payment from BCBST on or before November 30, 2008. HCA argues that Tenn.Code Ann.§ 56–7–110(b) does not apply because it is not a statute of limitations. To resolve this issue, we look to the rules of statutory construction set forth in *McGee v. Best* :

The rule of statutory construction to which all others must yield is that the intention of the legislature must prevail. *Mangrum v. Owens,* 917 S.W.2d 244, 246 (Tenn.Ct.App.1995) (*citing Plough, Inc. v. Premier Pneumatics, Inc.,* 660 S.W.2d 495, 498 (Tenn.Ct.App.1983); *City of Humboldt v. Morris,* 579 S.W.2d 860, 863 (Tenn.Ct.App.1978)). "[L]egislative intent or purpose is to be ascertained primarily from the natural and ordinary meaning of the language used, when read in the context of the entire statute, without any forced or subtle construction to limit or extend the import of the language." *Mangrum v. Owens,* 917 S.W.2d at 246; (*quoting Worrall v. Kroger Co.,* 545 S.W.2d 736, 738 (Tenn.1977)). The Court has a duty to construe a statute so that no part will be inoperative, superfluous, void or insignificant. The Court must give effect to every word, phrase, clause, and sentence of the Act in order to achieve the Legislature's intent, and it must construe a statute so that no section will destroy another. *Id.* (*citing City of Caryville v. Campbell County,* 660 S.W.2d 510, 512 (Tenn.Ct.App.1983); *Tidwell v. Collins,* 522 S.W.2d 674, 676 (Tenn.1975)).

106 S.W.3d 48, 64 (Tenn.Ct.App.2002).

Tenn.Code Ann.§ 56–7–110 is part of the general provisions of Chapter 7 of Title 56, which governs insurance and is concerned with payment errors occurring between health care providers and health insurance entities[20]; subsection (b) reads as follows:

> A health insurance entity shall not be required to correct a payment error to a health care provider if the provider's request for a payment correction is filed more than eighteen (18) months after the date that the health care provider received payment for the claim from the health insurance entity.

As an initial matter, we resolve a dispute between the parties as to the meaning of the term "payment error" in the statute; though subsection (b) uses the term, subsection (a) does not define it. HCA argues that the term "error" as used in the statute arises from "a payment resulting from a mistake or oversight" and that a mistake has not occurred because BCBST's asserted underpayment was intentional. BCBST contends that the term "error" should be defined as "[a]n assertion or belief that does not conform to objective reality; a belief that what is false is true or that what is true is false." In the absence of a statutory definition, we must ascertain the natural and ordinary meaning of the word "error." To do that, we utilize the Webster's dictionary definition of "error" as "a mistake."[21] Given the purpose of the statute and the various provisions thereof as more fully discussed below, we construe the phrase "payment error" in subsection (b) to mean a "payment mistake" arising between a health care provider and a health insurance entity.

 **\*15** Subsection (a) contains definitions applicable to the part, including "recoupment," which occurs when a health insurance entity takes action "to recover amounts previously paid to a health care provider by withholding or setting off the amounts against current payments to the health care provider." Tenn.Code Ann.§ 56–7–110(a)(5). Subsections (c) through (g) address the time periods for correction of errors and notice requirements imposed on health insurance entities who seek to recoup overpayments; specifically, subsections (d), (e), and (g) impose notice requirements where a health insurance entity has determined to recoup payments previously made, and subsections (c) and (f) set

forth the time periods in which a health insurance entity may recoup payments. Reading the subsections together, subsection (b) relieves the insurance entity from having to correct a payment mistake if the provider has not requested the correction within 18 months after the provider received payment, while subsection (c) limits the insurance entity to an 18 month period from the date of payment within which to recoup a mistaken payment.

Subsection (b) is not located in Title 28, which sets forth the operation of statutes of limitations generally and establishes periods for specific causes of action. The statute is not phrased like other statutes of limitation, which typically contain language referencing a time period within which an action must be brought,[22] and does not use the term "cause of action" or "action" or specify the time period in which such an action must be brought. Tenn.Code Ann.§ 56–7–110 as a whole sets forth a procedure by which a health care provider and a health insurance entity are to resolve payments made by mistake; the statute imposes a duty on the insurance entity to correct mistakes in payment when a provider makes a timely request and allows the insurance entity to recoup amounts mistakenly paid to health care providers. Tenn.Code Ann.§ 56–7–110(b) is not a statute of limitations, and we affirm the denial of summary judgment to BCBST on this ground.[23]

### ISSUE 7: NETWORK P CLAIMS

BCBST seeks dismissal of 112 of the 4,713 claims at issue, arguing the claims are improperly included in this lawsuit because they arise out of Network P plans and thus do not relate to Network S, which is at issue in this case. The Chancery Court did not specifically address these 112 claims but generally denied BCBST's motion for summary judgment by holding that "[a]ll other matters raised by either party seeking partial summary judgment are respectfully denied."

We have reviewed BCBST's statement of undisputed facts, HCA's responses thereto, and the materials referenced in both; in these materials as well as its brief, HCA concedes that 47 claims should not be included in this case because 34 of the 112 claims involve Network P and an additional 13 are duplicative.[24] Accordingly, these 47 claims should be dismissed from this lawsuit.

 **\*16** HCA asserts that there are genuine issues of fact as to which network the remaining 65 claims belong. We

Case 2:23-cv-02550-JTF-tmp   Document 1-2   Filed 08/31/23   Page 336 of 660   PageID 362

HCA Health Services of Tennessee, Inc. v. Bluecross..., Not Reported in S.W....

2016 WL 3357180

have reviewed the proof cited by HCA and conclude that it establishes a genuine issue of material fact which precludes summary judgment on these 65 claims.[25]

In light of the parties' agreement that 47 claims were mistakenly included in the claims population, we grant summary judgment on these claims. With respect to the remaining 65 claims, the evidence presented establishes a genuine issue of fact as to whether these claims fall under Network S or Network P, and summary judgment was properly denied. We remand this matter for further proceedings in the trial court with respect to these 65 claims.

### IV. CONCLUSION

For the foregoing reasons, we:

(a) affirm the dismissal of HCA's state law cause of action for implied-in-law contract as to the ERISA-governed plans on the basis that ERISA preempts this cause of action and as to the non-ERISA claims on the ground that the duties imposed on HCA by EMTALA and BCBST by Tenn.Code Ann.§ 56–7–2355 do not create an implied-in-law contractual relationship;

(b) vacate for lack of subject matter jurisdiction those portions of the April 22, 2014 order in which the trial court considered whether the administrative appeals procedures related to the ERISA plans complied with applicable regulations;

(c) grant summary judgment to BCBST that 534 non-ERISA claims are barred for failure to exhaust administrative remedies, and remand for the trial court to determine whether the time for filing grievance procedures has expired for the six claims for coverage made under the State Plan and State Teachers Active Plan and for further proceedings on all claims for which grievance procedures were timely initiated;

(d) affirm the denial of summary judgment to BCBST on its asserted defense that 902 claims are barred by the application of Tenn.Code Ann.§ 56–7–110(b);

(e) affirm the denial of summary judgment on 65 of the 112 claims which are alleged to be Network P claims and grant summary judgment as to the remaining 47 claims, which are indisputably Network P claims.

**All Citations**

Not Reported in S.W. Rptr., 2016 WL 3357180

### Footnotes

1    ERISA is codified at 29 U.S.C. 1001 *et. seq.,* and regulates employee benefit plans by "requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C.§ 1001.

2    29 C.F.R.§ 2560.503–1(l) states:

   Failure to establish and follow reasonable claims procedures. In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of [ERISA, codified at 29 U.S.C.§ 1132(a) ] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

3    The trial court explained in a footnote that HCA's claims "are characterized as derivative claims because they are based upon the assignment of benefits executed by patients to the Hospitals." We adopt this characterization and will refer to HCA's breach of contract cause of action as the "derivative cause of action."

Case 2:23-cv-02550-JTF-tmp   Document 1-2   Filed 08/31/23   Page 337 of 660   PageID 363
HCA Health Services of Tennessee, Inc. v. Bluecross..., Not Reported in S.W....
2016 WL 3357180

HCA's *quantum meruit* /implied contract/unjust enrichment cause of action does not rely upon patients' assignments of benefits but rather on the benefit HCA alleges it as conferred on BCBST directly in the absence of a contract between the parties regarding network S patients; accordingly, we will refer the *quantum meruit* cause of action as the "direct cause of action."

4  Prior to October 26, 2015, courts which were considering motions for summary judgment were to apply the standard set forth in *Hannan v. Alltel Publishing Co.,* 270 S.W.3d 1 (Tenn.2008) for cases filed before July 1, 2011; for cases filed after July 1, 2011, courts are to apply Tenn.Code Ann.§ 20–16–101. On October 26, 2015, in *Rye v. Women's Care Ctr. of Memphis, MPLLC,* 477 S.W.3d 235, 273 (Tenn.2015), our Supreme Court overruled *Hannan* and adopted a standard for cases filed prior to July 1, 2011, that is consistent with the standard at applicable to Federal Rule 56. Inasmuch as this case was filed June 1, 2010, we apply the standard as directed by the *Rye* court.

5  ERISA's civil enforcement provision, found at section 502 of the Act and codified at 29 U.S.C.§ 1132(a)(1)(B), provides in relevant part:

(a) Persons empowered to bring a civil action

A civil action may be brought—

(1) by a participant or beneficiary—

...

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

The Supreme Court explained this provision in *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 52–53 (1987):

The civil enforcement scheme of§ 502(a) is one of the essential tools for accomplishing the stated purposes of ERISA. The civil enforcement scheme is sandwiched between two other ERISA provisions relevant to enforcement of ERISA and to the processing of a claim for benefits under an employee benefit plan. Section 501, 29 U.S.C.§ 1131, authorizes criminal penalties for violations of the reporting and disclosure provisions of ERISA. Section 503, 29 U.S.C.§ 1133, requires every employee benefit plan to comply with Department of Labor regulations on giving notice to any participant or beneficiary whose claim for benefits has been denied, and affording a reasonable opportunity for review of the decision denying the claim. Under the civil enforcement provisions of§ 502(a), a plan participant or beneficiary may sue to recover benefits due under the plan, to enforce the participant's rights under the plan, or to clarify rights to future benefits. Relief may take the form of accrued benefits due, a declaratory judgment on entitlement to benefits, or an injunction against a plan administrator's improper refusal to pay benefits. A participant or beneficiary may also bring a cause of action for breach of fiduciary duty, and under this cause of action may seek removal of the fiduciary. § § 502(a)(2), 409. In an action under these civil enforcement provisions, the court in its discretion may allow an award of attorney's fees to either party.§ 502(g).

6  In *Davila,* quoted *supra,* the Court considered the effect of ERISA on an alleged violation of a duty imposed by state law and held "if an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and where there is no other independent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B)." *Davila,* 542 U.S. at 210.

7  The assignments of benefits HCA received from plan participants gave HCA the standing and ability to bring actions for underpayment or denial of rights under 29 U.S.C.§ 1132(a)(1)(b). *Cromwell,* 944 F.2d at 1277 (holding that "a health care provider may assert an ERISA claim as a 'beneficiary' of an employee benefit

Case 2:23-cv-02550-JTF-tmp   Document 1-2   Filed 08/31/23   Page 338 of 660   PageID 364

HCA Health Services of Tennessee, Inc. v. Bluecross..., Not Reported in S.W....

2016 WL 3357180

plan if it has received a valid assignment of benefits."). For the ERISA-governed claims in the case at bar, HCA brought an action pursuant to 29 U.S.C.§ 1132(a)(1)(b), which is not at issue in this interlocutory appeal, as well as its direct cause of action for unjust enrichment.

8    BCBST's response to this allegation was "BCBST admits that members of Network S have insurance contracts or employer-sponsored health plans that provide certain coverage for health care."

9    Subsection (a)(7), not applicable here, permits a civil action to be brought "by a State to enforce compliance with a qualified medical child support order (as defined in section 1169(a)(2)(A) of this title)." Such actions may be heard by state or federal courts.

10   HCA addresses both issues together in one section of its brief and advanced its "deemed exhausted" argument before the trial court in response to BCBST's position that HCA's failure to exhaust administrative remedies should warrant dismissal.

11   The non-ERISA plans contain Emergency Care provisions, which set forth the coverage provided to Network S patients and limit the coverage in cases of non-emergencies, that are identical or similar to the following language from the Core–3PPO plans:

E. Hospital Emergency Care Services

Medically Necessary and Appropriate health care services and supplies furnished in a Hospital which are required to determine, evaluate and/or treat an Emergency until such condition is stabilized, as directed or ordered by the Practitioner or Hospital protocol.

1. Covered

a. Medically Necessary and Appropriate health care services, supplies and medications necessary for the diagnosis and stabilization of Your Emergency Condition.

b. Practitioner services.

2. Exclusions

a. Treatment of a chronic, non-Emergency condition, where the symptoms have existed over a period of time, and a prudent layperson who possesses an average knowledge of health and medicine would not believe it to be an Emergency.

b. Services received for inpatient care or transfer to another facility once your medical condition has stabilized, unless Prior Authorization is obtained from the Plan within 24 hours or next working day.

12   The relevant text of EMTALA provides:

If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

42 U.S.C.A.§ 1395dd(b)(1).

2016 WL 3357180

13    Tenn.Code Ann.§ 56–7–2355 provides in pertinent part:

(a) ... (1) "Emergency medical condition" means a medical condition that manifests itself by symptoms of sufficient severity, including severe pain, that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to potentially result in:

(A) Placing the person's health in serious jeopardy;

(B) Serious impairment to bodily functions; or

(C) Serious dysfunction of any bodily organ or part.

* * *

(3) "Health benefit plan" means any hospital or medical expense policy, health, hospital or medical service corporation contract, a policy or agreement entered into by a health insurer or a health maintenance organization contract offered by an employer, other plans administered by the state government, or any certificate issued under the policies, contracts or plans....

(b)(1) A health benefit plan shall not deny coverage for emergency services if the symptoms presented by an enrollee of a health benefit plan and recorded by the attending provider indicate that an emergency medical condition could exist, regardless of whether or not prior authorization was obtained to provide those services and regardless of whether or not the provider furnishing the services has a contractual agreement with the health benefit plan for the provision of the services to the enrollee.

* * *

(4) Coverage of emergency services shall be subject to applicable copayments, coinsurance and deductibles.

14    HCA has also asserted that 45 C.F.R.§ 147.138(b)(2)(ii) applies, arguing that it "bars an insurer from denying coverage for emergency medical services or discriminating based on the provider's network status." This federal regulation reads:

(b) Coverage of emergency services—

* * *

(2) General rules. A plan or issuer subject to the requirements of this paragraph (b) must provide coverage for emergency services in the following manner—

* * *

(ii) Without regard to whether the health care provider furnishing the emergency services is a participating network provider with respect to the services[.]

This regulation states its scope as follows:

If a group health plan, or a health insurance issuer offering group or individual health insurance coverage, provides any benefits with respect to services in an emergency department of a hospital, the plan or issuer must cover emergency services (as defined in paragraph (b)(4)(ii) of this section) consistent with the rules of this paragraph (b).

45 C.F.R.§ 147.138(b)(1). We find this regulation to be inapplicable to the facts of this case, as it did not take effect until August 10, 2010, after this lawsuit was filed, and clearly states that "the provisions of this section apply for plan years (in the individual market, policy years) beginning on or after September 23, 2010." 45 C.F.R.§ 147.138(c).

15   We are not persuaded by HCA's argument that "HCA benefitted BCBST by helping BCBST to fulfill its core obligation to 'improve and sustain the physical, financial and community health of Tennessee."

16   Tenn.Code Ann.§ 56–7–2355(b)(4) allows that "[c]overage of emergency services shall be subject to applicable copayments, coinsurance and deductibles"; thus, the statute contemplates that "coverage" does not necessarily equate to payment in full for emergency medical services rendered.

17   26 C.F.R.§ 54.9815–2719T, which went into effect on September 21, 2010, contained the following provision:

   (g) Applicability/effective date. The provisions of this section apply for plan years beginning on or after September 23, 2010. See§ 54.9815–1251T for determining the application of this section to grandfathered health plans (providing that these rules regarding internal claims and appeals and external review processes do not apply to grandfathered health plans).

   45 C.F.R.§ 147.136, which also went into effect on September 21, 2011, contains nearly identical language:

   (g) Applicability date. The provisions of this section apply for plan years (in the individual market, policy years) beginning on or after September 23, 2010. See§ 147.140 of this part for determining the application of this section to grandfathered health plans (providing that these rules regarding internal claims and appeals and external review processes do not apply to grandfathered health plans).

18   Our review of the 564 claims for coverage under the non-ERISA plans was aided by examining Exhibit 5– A to the Second Affidavit of Kelly Paulk and Exhibit 6–B to the Affidavit of Shelley Sullivan, both of which were filed under seal in support of BCBST's motion for summary judgment. Exhibit 5–A contains the entire population of claims arising under the non-ERISA plans, and Exhibit 6–B lists the non-ERISA claims for which grievance proceedings were initiated.

19   From Exhibits 5–A and 6–B, it appears that a few claims existed on which the time period for filing a grievance procedure had not yet expired at the time the lawsuit was filed. Specifically, 6 of the 564 claims involved members of the State Plan or State Teachers Active Plan, both of which permit a grievance proceeding to be initiated within two years of an adverse benefit determination. According to Exhibit 5–A, the latest date of the medical service for any claims made pursuant to either of those plans was December 18, 2009. Thus, at the time this lawsuit was filed approximately six months later, the two-year period had not yet expired. According to Exhibit 6–B, which lists the non-ERISA claims for which grievance proceedings were initiated, none of the six claims arising out of the State Plan or the State Teachers Active Plan were the subject of a grievance proceeding. This exhibit was attached to an affidavit signed on May 3, 2013 and filed with the court on May 15, 2013. Thus, by the time the Chancellor was considering the motion for summary judgment in 2013, it is likely that the two-year period had expired without the initiation of a grievance proceeding to appeal the adverse benefit determination. However, because BCBST's list of non-ERISA claims does not contain the date of BCBST's adverse benefit determination, a factual determination in this regard is needed.

20   Tenn.Code Ann.§ 56–7–110 was amended in 2009, and therefore different versions of the statute were in effect during the time period in which HCA asserts BCBST underpaid emergency room claims. Though the parties have not identified the version(s) of the statute applicable to each of the 902 claims, we apply the 2009 amendment and note that our analysis would be the same under the previous version of the statute.

HCA Health Services of Tennessee, Inc. v. Bluecross..., Not Reported in S.W....

2016 WL 3357180

21    *Webster's II New College Dictionary* (3d ed.2005).

22    *See,* e.g., Tenn.Code Ann. § § 28–3–104, –105; 29–28–103.

23    The parties have not distinguished whether these 902 claims arose from self-insured ERISA plans or non-ERISA plans. "Self-insured ERISA plans ... are generally sheltered from state insurance regulation." *UNUM Life Ins. Co. of Am. v. Ward,* 526 U.S. 358, 367 n.2 (1999) (citing *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 747 (1985)). Because we have held that statute does not operate as a statute of limitations, we make no determination of whether ERISA would have preempted the application of Tenn.Code Ann.§ 56–7–110(b), as applied to any self-funded ERISA plans present in the population of 902 claims.

24    In relevant part, HCA's responded to BCBSTs statements of undisputed material facts:

> 111. The Plaintiffs admit that they have mistakenly included claims relating to Network P in the claims population for this lawsuit, and representatives of the Plaintiffs admit that such claims are not properly part of this lawsuit. Ex. 4 to Amended Mot. For Partial Summary Judgment, Second Affidavit of Robert F. Parsley ("Second Parsley Aff."), PP2–3 & Exs. 4–A –4–B.

> Response: Disputed in part. The Hospitals admit that of the 112 claims that allegedly fall under Network P, 47 of these claims should be removed from the claims set. The Hospitals dispute that the remaining 65 claims are in fact under Network P. *See* Affidavit of Angelia Wright, filed herewith.

25    In this regard, HCA cited the statement in Ms. Wright's affidavit that "In a large number of these 65 claims, the patient showed an insurance card for Network S. In a few of these claims, a review of the BCBST website inconsistently showed Network P as the patient's network."

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 008E

Air Evac EMS Inc. v. USAble Mutual Insurance Co., Not Reported in Fed. Supp. (2018)

2018 Employee Benefits Cas. 188,805

2018 WL 2422314
United States District Court, E.D. Arkansas, Western
Division.

AIR EVAC EMS INC., Plaintiff
v.
USABLE MUTUAL INSURANCE CO.,
d/b/a Arkansas Blue Cross and Blue
Shield, Defendant

CASE NO. 4:16-CV-00266 BSM
|
Signed 05/29/2018

**Attorneys and Law Firms**

Alex T. Gray, George Nathan Steel, Jeremy Y.
Hutchinson, Steel, Wright, Gray & Hutchinson, PLLC,
Scott E. Poynter, Poynter Law Group, Little Rock, AR,
Henry C. Quillen, Whatley Kallas, LLP, Portsmouth, NH,
for Plaintiff.

Anthony F. Shelley, Miller & Chevalier Chartered,
Washington, DC, Chet A. Roberts, Arkansas Blue Cross
Blue Shield, Gordon S. Rather, Jr., Wright, Lindsey &
Jennings, Little Rock, AR, for Defendant.

**<u>ORDER</u>**

BRIAN S. MILLER, UNITED STATES DISTRICT
JUDGE

**\*1** Defendant USAble Mutual Insurance Company's
("Blue Cross") motion to dismiss the amended complaint
[Doc. No. 26] is granted, and the case is dismissed with
prejudice.

I. BACKGROUND

Plaintiff Air Evac EMS, Inc. ("Air Evac") alleges that
Blue Cross is violating federal and state law by limiting
the reimbursements it pays to Air Evac for the services
Air Evac provides to patients insured by Blue Cross. In
support of its position, Air Evac pleads as follows:

Air Evac provides emergency air ambulance services in
Arkansas. Am. Compl. ¶¶ 2, 8, 19, Doc. No. 18. These
services are very expensive due to the costs Air Evac
incurs in providing them. In addition to the millions of
dollars spent in purchasing each aircraft, Air Evac incurs
costs for aircraft maintenance, fuel, employees, regulatory
compliance, and medical supplies. *Id.* ¶¶ 12–16. In 2014,
it charged $19,250 for a single transport, exclusive of
mileage charges. *Id.* ¶ 17.

Consistent with federal law, Air Evac provides its
services without regard to the patient's ability to pay and
without consideration of the patient's choice of insurance
provider. *Id.* ¶ 19. Air Evac incurs debt when it transports
patients who cannot afford the service, such as uninsured
patients and Medicare and Medicaid patients, because
those programs do not reimburse the full cost of the
service. *Id.* Air Evac also incurs debt in cases such as this,
when it transports patients who have private insurance
that reimburse Air Evac for only a fraction of the cost of
the service.

Private insurance companies such as Blue Cross typically
provide different insurance benefits for "in-network" and
"out-of-network" care. By contracting with providers to
create an in-network system, Blue Cross negotiates costs
for services with the provider, whereby the provider
agrees to accept the negotiated cost. *Id.* ¶ 21. By
accepting this negotiated cost, the provider often agrees to
forgo billing the patient for the difference between the
provider's usual charge and the negotiated cost billed to
the insurer. This results in a lower bill for the insurance
company and for the patient, who incurs no additional
charge for the service.

An out-of-network provider has no pre-negotiated
arrangement with the insurance company, so a patient
using the provider could incur a much higher bill—the
provider's usual charge—for the services rendered.
Moreover, insurance companies typically reimburse
patients at a lower rate for use of out-of-network
providers. The result is a much larger bill passed on to
patients, which means that patients have a financial
incentive to choose in-network providers.

Although Blue Cross pays for air ambulance services, it
"does not offer participating contracts to ambulance
service providers." *Id.* ¶¶ 20, 22. Consequently, air
ambulance providers can only be out-of-network

2018 Employee Benefits Cas. 188,805

providers. Many of Blue Cross's policies have, at most, a maximum allowable reimbursement for air ambulance services of $5,000, leaving the patient to pay the remainder of the bill. *Id.* ¶ 24. Using the 2014 base rate, a reimbursement of $5,000 leaves the patient being billed approximately $14,250, which Air Evac often has little success in collecting. The limits on Blue Cross's reimbursement for ambulance services remained in place even as federal law banned annual limits for services and regulated minimum payment for emergency services. *Id.* ¶¶ 44–46.

**\*2** Air Evac obtains assignments from its patients for the right to appeal coverage decisions, collect compensation, and in some cases, enforce certain rights related to benefit claims or payments due. *See id.* ¶¶ 34–41. Air Evac asserts that Blue Cross's plans do not prohibit these assignments, and at most, merely "purport" to prohibit assignment of benefits. *Id.* ¶ 41. After Blue Cross reimbursed Air Evac pursuant to its subscribers' policy limits, Air Evac often appealed the reimbursement limits without success. Recently, Air Evac has refrained from appealing reimbursement decisions because Blue Cross began "clawing back" reimbursements as the review process unfolded. *Id.* ¶ 43.

Air Evac is challenging Blue Cross's reimbursement practices for services provided after 2010, following the enactment of the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010). The ACA prohibits annual limits on "essential health benefits," requires minimum payments for certain emergency services, and demands adequate participating-provider networks for plans offered through state and federal healthcare exchanges. *See* Am. Compl. ¶¶ 30–31, 47–52. Air Evac's amended complaint asserts that Blue Cross's insurance products violate these requirements. Air Evac also asserts that Blue Cross's conduct violates the Employee Income Retirement Security Act ("ERISA"), multiple federal and state insurance regulations, the Arkansas Deceptive Trade Practices Act ("ADTPA"), and Arkansas common law. Blue Cross moves to dismiss.

## II. LEGAL STANDARD

Rule 12(b)(6) permits dismissal when the plaintiff fails to state a claim upon which relief may be granted. To meet the 12(b)(6) standard, a complaint must allege sufficient facts to entitle the plaintiff to the relief sought. *See* Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009); *Bell Atl. Corp. v. Twombly*, 55 U.S. 544 (2007). Although detailed

factual allegations are not required, threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, are insufficient. Iqbal, 556 U.S. at 663. In ruling on a motion to dismiss, all well plead allegations in the complaint must be accepted as true and construed in the light most favorable to the plaintiff. *Id.*

## III. DISCUSSION

Blue Cross makes two broad categories of dismissal arguments. First, it argues that each of Air Evac's 11 counts fails to state a claim upon which relief can be granted and that Air Evac lacks standing to bring suit under Count V. Second, it argues that the "filed rate doctrine" independently requires dismissal of all of Air Evac's claims, insofar as they apply to services provided to subscribers in insured plans. The filed rate doctrine is considered only in its application to claims brought under the ADTPA.

Blue Cross's motion to dismiss is granted in its entirety. Counts I and II are considered as part of Count V based on the parties' arguments, and Count V is abandoned because Air Evac lacks standing to sue for equitable relief under ERISA. Similarly, Counts III and IV are considered as part of Counts VI and VII, and Counts VI and VII are dismissed because Blue Cross's conduct falls within the ADTPA's safe harbor provision. Counts VIII and IX are dismissed because Air Evac has not alleged the existence of an implied contract between the parties. Count X is dismissed because Blue Cross has not received anything of value from Air Evac and, therefore, was not unjustly enriched. Count X is dismissed because all of the foregoing counts have been dismissed.

### A. Counts I, II, and V

#### 1. Counts I and II

Based on the parties' arguments, Counts I and II are considered as part of Count V, and any attempt to enforce the ACA independently of ERISA has been abandoned. Morever, the motion to dismiss Count V is granted because Air Evac lacks standing to sue under ERISA.

**\*3** Counts I and II seek declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. section 2201. Specifically, Count I asserts that Blue Cross violated the

Air Evac EMS Inc. v. USAble Mutual Insurance Co., Not Reported in Fed. Supp. (2018)

2018 Employee Benefits Cas. 188,805

ACA by imposing an annual limit for "essential health benefits." Am. Compl. ¶¶ 58–60; 42 U.S.C. § 300gg–11(a)(1) ("A group health plan and a health insurance issuer offering group or individual health insurance coverage may not establish ... annual limits on the dollar value of benefits for any participant or beneficiary."); 45 C.F.R. § 147.126. Count II asserts that Blue Cross violated the ACA by imposing an annual benefit limit for emergency services. Am. Compl. ¶¶ 61–63; 45 C.F.R. § 147.138; 26 C.F.R. § 54.9815-2719A; 29 C.F.R. § 2590.715-2719A. The motion to dismiss Counts I and II is granted because the Declaratory Judgment Act does not create a private cause of action to enforce the applicable provisions of the ACA, and Air Evac has abandoned these claims by using ERISA to enforce these provisions.

The Declaratory Judgment Act provides no separate cause of action to enforce federal statutes. It provides for an alternative mode of relief when a particular law creates a cause of action. *See, e.g., Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950) (noting that the Declaratory Judgment Act is procedural in nature); *Mylan Pharm., Inc. v. Thompson*, 268 F.3d 1323, 1330–32 (Fed. Cir. 2001). "[T]he Declaratory Judgment Act does not authorize actions to decide whether federal statutes have been or will be violated when no private right of action to enforce the statutes has been created by Congress." *Jones v. Hobbs*, 745 F. Supp. 2d 886, 893 (E.D. Ark. 2010). Therefore, unless the ACA and its regulations create a private cause of action, declaratory relief is unavailable to Air Evac, and Counts I and II must be dismissed.

Neither the applicable ACA provisions nor its regulations create an explicit private cause of action. While Air Evac does not argue that the ACA or its regulations create an implied cause of action, it argues that sections 502(a)(3) and 715 of ERISA, which form the basis of Count V, contain an explicit cause of action to enforce the ACA through ERISA. 29 U.S.C. §§ 1132(a)(3), 1185d; Resp. Br. Opp. Mot. Dismiss at 4, Doc. No. 30.

Air Evac is correct that, under ERISA, participants, beneficiaries, and fiduciaries may sue to enjoin any action or practice that violates the statute or the terms of the plan. 29 U.S.C. § 1132(a)(3). Moreover, the relevant provisions of the ACA cited by Air Evac in Counts I and II have been incorporated into ERISA. 29 U.S.C. § 1185d(a)(1)("[T]he provisions of part A of title XXVII of the Public Health Service Act (as amended by the Patient Protection and Affordable Care Act) shall apply to group health plans, and health insurance issuers providing health insurance coverage in connection with group health plans, as if included in this subpart."); *see also King v. Blue*

*Cross and Blue Shield of Illinois*, 871 F.3d 730, 739 (9th Cir. 2017).

By making this argument, however, Air Evac abandons any attempt to enforce the ACA independently of ERISA. Counts I and II make no reference to ERISA, and both were brought in Air Evac's assignee capacity and "in its own right." Am. Compl. ¶¶ 59, 62. Now, Counts I and II are essentially recast under Count V, which is an independent claim for violations of the ACA brought through ERISA solely in Air Evac's assignee capacity. In other words, Air Evac has subordinated Counts I and II to Count V, rather than asserting two separate and distinct claims for violations of the ACA that are independent of Count V's ERISA claim. Therefore, Counts I and II are simply considered as part of Count V, and they are dismissed with Count V because Air Evac lacks standing to sue under ERISA for equitable relief.

*2. Count V*

Count V, which seeks equitable relief under ERISA, is dismissed because Air Evac lacks standing to sue. Specifically, Count V seeks an injunction enforcing the ACA's prohibitions on annual limits for essential health benefits and its regulations' minimum benefits for emergency services and for clarification and reformation of plan terms. The applicable ACA provisions and their accompanying regulations have been incorporated into ERISA. 29 U.S.C. § 1185d(a)(1); *King* 871 F.3d at 739.

**\*4** ERISA permits a private suit "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan." 29 U.S.C. § 1132(a)(3). Air Evac, however, is neither a "participant" nor a "beneficiary" of Blue Cross's ERISA plans. *See, e.g., id.* §§ 1002(7), (8); *Physicians Multispecialty Grp. v. Health Care Plan of Horton Homes, Inc.*, 371 F.3d 1291, 1294 (11th Cir. 2004) ("Healthcare providers ... are generally not 'participants' or 'beneficiaries' under ERISA and thus lack independent standing to sue under ERISA.") (citations omitted); *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040–41 (8th Cir. 2016) (rejecting providers' assertion that they were "beneficiaries" under ERISA). Instead, Air Evac asserts that it has standing to sue under section 502(a)(3) "as the assignee of participants and beneficiaries of plans governed by ERISA." Am. Compl. ¶¶ 34–41, 71.

2018 Employee Benefits Cas. 188,805

Blue Cross argues that Air Evac's assignments are not broad enough to confer a right to sue for equitable relief under ERISA. It asserts that Air Evac's patients have assigned to Air Evac the right to bring claims for benefits under section 502(a)(1)(B), but not the right to bring other claims, including those under section 502(a)(3) for equitable relief, such as curing violations of the statute or for reformation of plan terms. Accordingly, Blue Cross argues that Air Evac lacks standing to sue on behalf of its patients.

Beneficiaries of ERISA plans may assign their "benefits" and "causes of action arising after the denial of benefits." *Lutheran Med. Ctr. of Omaha, Neb. v. Contractors, Laborers, Teamsters & Engineers Health & Welfare Plan,* 25 F.3d 616, 619 (8th Cir. 1994); *Grasso Enterprises, LLC,* 809 F.3d at 1041. "Not all ERISA assignments convey the same rights." *Rojas v. CIGNA Health & Life Ins. Co.,* 793 F.3d 253, 258 (2d Cir. 2015). Assignment agreements are generally interpreted narrowly, and "the scope of an assignment cannot exceed the terms of the assignment agreement itself." *Sanctuary Surgical Ctr., Inc. v. Aetna Inc.,* 546 Fed.Appx. 846, 851–52 (11th Cir. 2013). For example, an assignment of the right to sue for benefits under section 502(a)(1)(B) is distinct from an assignment of the right to sue for a breach of fiduciary duties under 502(a)(3), and language conveying one does not necessarily encompass the other. *See, e.g., Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc.,* 770 F.3d 1282, 1292 (9th Cir. 2014). Moreover, an assignment of ERISA "benefits" does not necessarily convey a "cause[ ] of action arising after the denial of benefits." *Lutheran Med. Ctr.,* 25 F.3d at 616.

Air Evac presents six different versions of assignments it received from patients. *See* Am. Compl. ¶¶ 35–40. These assignments only convey "certain rights" to Air Evac. *Id.* ¶ 34. The first version conveys "all rights to ... payments" received from the insurer "for the services provided to" the patient. *Id.* ¶ 35. It also provides that Air Evac may "appeal payment denials or other adverse decisions ... without further authorization." *Id.* The second version conveys "all rights to (and related or associated with) ... payments" of "insurance benefits ... for any medical services provided to the patient by Supplier now or in the future." *Id.* ¶ 36. It designates Air Evac as the patient's " 'authorized representative' ... with respect to all aspects of patient's claim (Claim) for benefits." *Id.* The third version conveys "all rights to (and related or associated with) any benefit claims and/or payment due from any third-party payor as reimbursement or payment for the Services, including but not limited to the rights to pursue administrative claims, request documents, receive

payment and pursue litigation in order to obtain payment." *Id.* ¶ 37. The fourth and fifth versions are the same as the third version, except that the fourth version omits "request documents" while the fifth version adds back that phrase. *Id.* ¶¶ 38–39. The sixth version conveys "all rights to (and related or associated with)" payment "for any medical services provided to the patient by Supplier now or in the future," including "the right to file appeals, grievances, complaints, litigation, or arbitration relating to a claim for payment, as well as all rights to recover expenses or fees incurred for pursuing the claim and all rights, statutory or contractual, to any additional recovery such as treble damages, punitive damages, or penalties. *Id.* ¶ 40.

**\*5** Blue Cross is correct that none of these six versions convey a right to sue for injunctive or equitable relief under section 502(a)(3). The first two versions of Air Evac's assignments, which were in effect from 2009 through 2013, are not broad enough to encompass causes of actions arising out of section 502(a)(3). Under *Lutheran Medical Center,* these assignments may not even convey a right to sue under section 502(a)(1)(B), as they merely reference a right to payment and to pursue related administrative appeals if payment is denied. *See* 25 F.3d at 616 (drawing a distinction between an assignment of "benefits" and an assignment of "causes of actions" following a denial of benefits). Indeed, there is nothing that indicates the assignments convey the patients' rights to bring suit under section 502(a)(1)(B). *Id.* They certainly do not include the right to sue for the less benefits-oriented and more open-ended equitable relief under section 502(a)(3). *See Rojas,* 793 F.3d at 258 ("By expressly assigning only their right to payment, [plaintiff's] patients did not also assign any other claims they may have under ERISA."); *Sanctuary Surgical Ctr., Inc.,* 546 Fed.Appx. at 852.

Similarly, Air Evac's next four versions of assignments, which were in effect from 2013 through 2016, only assign causes of actions arising under section 502(a)(1)(B) and not those arising under section 502(a)(3). The language in these assignments only conveys patients' benefits and rights to bring related litigation in order to *obtain payment.* In *Spinedex,* the Ninth Circuit held that when the focus of an assignment concerned rights to payment for medical services, even a blanket assignment of all of the patient's "rights" did not include the patient's causes of action under section 502(a)(3) for breach of fiduciary duty. 770 F.3d at 1292. Because the assignments focused on litigation to obtain payment, there was simply no indication that by "executing the assignment, patients were assigning to Spinedex rights to bring claims for fiduciary duty." *Id.* Similarly, the assignments here center

Air Evac EMS Inc. v. USAble Mutual Insurance Co., Not Reported in Fed. Supp. (2018)

2018 Employee Benefits Cas. 188,805

on conveying benefit payments and pursuing litigation solely to obtain payment. Nothing in these assignments appears to convey the right to sue for clarification or reformation of plan terms, which are extraordinary equitable remedies that extend far beyond litigation for payment on claims. *See N. Cypress Med. Ctr. Operating Co. v. MedSolutions, Inc.,* No. H-10-2609, 2010 WL 4702298, at *1, 3 (S.D. Tex. Nov. 10, 2010); *Eden Surgical Ctr. v. B. Braun Med., Inc.,* 420 Fed.Appx. 696, 697 (9th Cir. 2011).

Because Air Evac's assignments do not convey the right to seek equitable remedies, Air Evac lacks standing to sue in an assignee capacity. Counts I, II, and V are dismissed.

### B. Counts III, IV, VI, and VII

*1. Counts III and IV*

Counts III and IV will be considered as part of Counts VI and VII. The motion to dismiss these claims is granted because Blue Cross's conduct falls within the ADTPA's safe harbor provision.

Counts III and IV seek declaratory relief finding that Blue Cross has violated ACA regulations and Arkansas regulations ensuring network adequacy for plans offered on state and federal exchanges and limiting patient responsibility for services from out-of-network providers. Am. Compl. ¶¶ 64–69; 45 C.F.R. § 156.230(a)(2); Ark. Admin. Code R. § 054.00.106-5(C). Like the statutory provisions and regulations at issue in Counts I and II, neither of the regulations cited in Counts III and IV create a private cause of action, and Air Evac cannot simply cite the Declaratory Judgment Act in an attempt to create one. *See* Br. Supp. Mot. Dismiss at 10–19. Air Evac does not seem to argue that the regulations themselves create an explicit or implicit cause of action. *See* Resp. Mot. Dismiss at 5–6, Doc. No. 27. Rather, it argues that it may enforce these regulations under the ADTPA through Counts VI and VII. *Id.* Similar to Counts I, II, and V, Counts III and IV are now subordinate to VI and VII, and any attempt by Air Evac to enforce the ACA or Arkansas Regulation 106 independent of the ADTPA is deemed abandoned.

*2. Counts VI and VII*

**\*6** Counts VI and VII, which assert that Blue Cross's business practices violate the ADTPA, are dismissed because Blue Cross's conduct falls within the statute's safe harbor provision. The ADTPA makes it unlawful to knowingly make "a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of goods or services." Ark. Code Ann. § 4-88-107(a)(1). The statute explicitly creates a private cause of action. *Id.* § 4-88-113(f).

First, in Count VI, Air Evac claims that Blue Cross is misleading its subscribers by informing them they could incur substantial out-of-pocket expenses by using out-of-network providers, except in circumstances involving "Emergency or Imperative Services" provided by out-of-network providers. Am. Compl. ¶ 79. In those cases, the out-of-network services would be subject to in-network benefits. *Id.* Air Evac claims that this creates the false impression that plan members would not suffer the significant expenses associated with out-of-network care in emergency situations because Blue Cross does not disclose that there is no in-network benefit for emergency ambulance service, and the extent of its advertised benefit for that service is possibly subject to an unlawfully low cap. Consequently, subscribers never realize the benefit of the emergency exception, and when they receive a bill for the out-of-network air transport service that potentially saved their lives, Blue Cross's contribution is an illegally capped reimbursement. *Id.* ¶¶ 79–83. Air Evac brings Count VI as the assignee of participants or beneficiaries of plans not governed by ERISA. *Id.* ¶ 76.

Second, in Count VII, Air Evac asserts that Blue Cross's refusal to contract with air ambulance providers violates federal and Arkansas insurance regulations governing network adequacy and costs. *Id.* ¶¶ 86–94; 45 C.F.R. § 156.230(a)(2); Ark. Code R. § 054.00.106-5(C). Air Evac argues that Blue Cross's failure to disclose to its subscribers that it does not contract with air ambulance providers is a deceptive trade practice. Am. Compl. ¶¶ 86–94. Air Evac brings Count VII on its own behalf. *Id.* ¶ 87.

Blue Cross moves to dismiss for two reasons. First, it argues that Count VI should be dismissed because Air Evac's patients, who have assigned their claims to Air Evac in non-ERISA plans, have not suffered "actual damage or injury." Br. Supp. Mot. Dismiss at 36–37 (citing *Wallis v. Ford Motor Co.,* 208 S.W.3d 153, 161–62 (Ark. 2005) ). This argument, however, is unpersuasive because Air Evac's patients "are now liable for large balance bills," and its "plan members have been damaged in an amount equal to the balance bills for which

2018 Employee Benefits Cas. 188,805

they are responsible to Air Evac." Am. Compl. ¶¶ 1, 85. This is sufficient to allege a concrete injury-in-fact.

Second, Blue Cross argues that its conduct is within the ADTPA's safe harbor provision. *See DePriest v. AstraZeneca Pharms., L.P.*, 351 S.W.3d 168, 174 (Ark. 2009) (referring to "the so-called 'safe harbor' provision of the ADTPA"). The safe harbor states, in part, that the ADTPA does not apply to "[a]ctions or transactions permitted under laws administered by the Insurance Commissioner[.]" *Ark. Code Ann. § 4-88-101(3)*. The parties dispute the meaning of actions "permitted under laws administered by the Insurance Commissioner."

Blue Cross argues that the ADTPA claim must be dismissed because insurance transactions are regulated activities, citing the "general activity" rule, which asks whether the entity itself is regulated or, alternatively, whether the conduct or transaction alleged in the complaint is regulated. *See* Doc. No. 39 at 7. Under the general activity rule, if the answer to either of these questions is yes, the conduct or transaction falls within the safe harbor. *Id.* Air Evac, on the other hand, argues for a "specific conduct" rule which exempts only conduct or transactions specifically authorized by law. *Id.* This issue was certified to the Supreme Court of Arkansas, Doc. No. 39, which reformulated the questions presented and held that "Arkansas follows the specific-conduct rule." *Air Evac EMS, Inc. v. USABle Mutual Insurance Company*, 533 S.W.3d 572, 573 (Ark. 2017).

**\*7** Blue Cross also argues that its conduct falls within the narrowest version of the specific conduct rule. Although it raised this argument in its brief to the Supreme Court, Joint Mot. Lift Stay Ex. A at 1–8, Doc. No. 44, the Court "decline[d] Blue Cross's invitation to hold that the certified questions need not be answered because its conduct satisfies even the narrowest reading of the safe-harbor provision." *533 S.W.3d at 573*. Blue Cross's conduct, however, does appear to fall within the specific conduct rule.

The insurance industry in Arkansas is highly regulated. *Ark. Code Ann. § 23-60-110*. The code regulates, among other things, insurance policies and terms, rates, reimbursement, licensing, and payment processes. *See, e.g.*, *id.* § 23-61-103(c)(5). The insurance commissioner is charged with enforcement of the code and has broad investigatory and regulatory powers. *Id.* § 23-61-103(d)(1), (f)(1)(A), (5)(B)(i)-(vi).

Importantly, the insurance code allows the commissioner to regulate rates and terms of coverage. The relevant statutory provision states that:

No basic insurance policy, or annuity contract form, or application form ... shall be issued, delivered, or used as to a subject of insurance resident, located, or to be performed in this state unless the form has been filed with and approved by the Insurance Commissioner and, in the case of individual accident and health contracts, the rates have been filed with and approved by the [C]ommissioner.

*Id.* § 23-79-109(a)(1)(A)(i). Blue Cross must file its policies and rates with the commissioner, and they must either be explicitly or implicitly approved. Air Evac has not alleged that Blue Cross failed to file the relevant policies and rates or that the commissioner did not or should not have approved them. It appears undisputed that Blue Cross's rates have been either explicitly or implicitly approved by the insurance commissioner. If Blue Cross subsequently deviated from its filed and approved rates, it would violate the insurance code.

For this reason, Blue Cross's conduct falls within the specific conduct rule, as the "actions or transactions at issue have been specifically permitted ... by a state ... regulatory body or officer." *Air Evac EMS, Inc.*, 533 S.W.3d at 576. Although the Supreme Court of Arkansas declined to address Blue Cross's argument that its conduct fell under the specific conduct rule, the commissioner "actively or formally allow[ed]" Blue Cross to sell insurance policies with the terms and rates at issue. *See id.* at 575. Therefore, it appears that the Court's interpretation of the terms "specifically permit" captures the insurance commissioner's ratification of Blue Cross's plans. Put differently, not only was Blue Cross's conduct generally regulated, but the conduct at issue was specifically authorized by the insurance commissioner. *See DePriest*, 351 S.W.3d at 176–77. This conclusion is supported by the fact that it would now be unlawful for Blue Cross to deviate from these pre-approved rates and terms.

Finally, Air Evac argues that the safe harbor does not apply because the crux of its ADTPA claims are not based on the language in Blue Cross's plans that have been approved by the insurance commissioner. *See* Reply Supp. Mot. Certify at 1–2, Doc. No. 37. Rather, Air Evac contends that Blue Cross's failure to disclose its unlawful refusal to contract with air ambulance providers is what constitutes a deceptive trade practice. This argument is unpersuasive because Air Evac is nonetheless challenging plans that have been filed and approved by the insurance commissioner.

2018 Employee Benefits Cas. 188,805

C. Counts VIII, IX, X, and XI

*1. Count VIII and IX*

**\*8** Counts VIII and IX, which allege a breach of implied contract and money due on an open account under Arkansas common law, are dismissed because Air Evac has not alleged the existence of an implied contract between the parties. Am. Compl. ¶¶ 95–112.

An open account is "an account based upon running or concurrent dealings between the parties, which has not been closed, settled, or stated, and in which the inclusion of further dealings between the parties is contemplated." *Northwest Arkansas Recovery Inc. v. Davis*, 200 S.W.3d 481, 486 (Ark. Ct. App. 2004)(citation omitted). An essential element of an open account claim is an enforceable contract. *See Stewart Elec. Co. of Sw. Ark., Inc. v. Meyer Sys. Corp.*, 632 S.W.2d 422, 423–24 (Ark. 1982).

Contracts, whether express or implied, share the same five elements: (a) competent parties; (b) subject matter; (c) legal consideration; (d) mutual agreement; (e) mutual obligations. *Berry v. Cherokee Vill. Sewer, Inc.*, 155 S.W.3d 35, 38 (Ark. Ct. App. 2004)(citations omitted). An implied contract is proven "by circumstances showing the parties intended to contract or by circumstances showing the general course of dealing between the parties." *Steed v. Busby*, 593 S.W.2d 34, 38 (Ark. 1980).

Three players are involved in all of these insurance transactions: Air Evac, Blue Cross, and Blue Cross subscribers who receive services from Air Evac. Simply because Blue Cross and Air Evac share the same patient-subscriber as a counter-party in their respective contracts does not necessarily mean that Blue Cross has an implied contract with Air Evac. The breach of implied contract and open account claims must be dismissed because Air Evac has failed to allege the existence of an implied contract.

In particular, Air Evac has not adequately pleaded the existence of mutual agreement between the parties. Accordingly, there is no implied contract. Although Air Evac argues that its prolonged course of dealing with Blue Cross shows an implied agreement between the parties that Blue Cross will pay Air Evac to supply emergency air ambulatory for Blue Cross subscribers, the complaint suggests precisely the opposite. Air Evac repeatedly alleges that Blue Cross "refuses to offer contracts to providers of emergency air ambulance transportation." Am. Compl. ¶ 48; *see also id.* ¶ 23 (Blue Cross "refuses to offer contracts to ... providers" of air

ambulance services); *id.* ¶ 65 (Blue Cross "believes that it does not need to offer contracts to providers of air ambulance services"). Further, the amended complaint says multiple times that Blue Cross was "aware of the rates charged by [Air Evac]," but nonetheless "refused to pay" them. *Id.* ¶¶ 24, 26. Indeed, Air Evac often abandons administrative appeals after Blue Cross denies payment because they "would be futile." *Id.* ¶¶ 32–33. Although Air Evac may wish to contract with Blue Cross, Blue Cross appears to have repeatedly rejected Air Evac's overtures.

Moreover, Blue Cross will not reimburse Air Evac for any more than what is allowed by the subscriber's plan, even when Air Evac has billed a much higher rate for its services. This belies Air Evac's assertion that an implied contract exists between the parties but is merely silent as to the price term. Finally, the weight of the authority cuts against finding implied contracts between insurers and healthcare providers, even if the parties had a prior course of dealing. *See, e.g., Peacock Med. Lab, LLC v. UnitedHealth Group Inc.*, No. 14-81271-CV, 2015 WL 2198470, at \*5 (S.D. Fla. May 11, 2015); *Broad St. Surgical Ctr., LLC v. UnitedHealth Group, Inc.*, No. CIV. 11-2775, 2012 WL 762498, at \*10 (D.N.J. Mar. 6, 2012); *Ctr. for Special Procedures v. Connecticut Gen. Life Ins. Co.*, No. CIV.A. 09-6566, 2010 WL 5068164, at \*6 (D.N.J. Dec. 6, 2010).

**\*9** Even supposing that the parties had a meeting of the minds satisfying the mutual agreement element, it could only be for the amount that the subscriber's plans offered in coverage. As discussed above, it is clear from Air Evac's allegations that Blue Cross refuses to pay more than the $5,000 limit. As alleged, these facts would not support a finding that the parties had an implied contract for the billed charges or anything in excess of the out-of-network rate. *See Cmty. Hosp. of Monterey Peninsula v. Aetna Life Ins. Co.*, 119 F. Supp. 3d 1042, 1049 (N.D. Cal. 2015) ("[I]t would have been unreasonable for [the provider] to expect that [the insurer's] authorization constituted a promise to pay 100 percent of billed charges. No reasonable jury could find otherwise.") (citations omitted).

For these reasons, the Counts VIII and IX are dismissed because Air Evac has failed to allege the existence of an implied contract.

*2. Count X*

Count X, which is a claim for unjust enrichment, is

2018 Employee Benefits Cas. 188,805

dismissed because Blue Cross has not received anything of value from Air Evac. Am. Compl. ¶¶ 113–120.

In support of this claim, Air Evac asserts that Blue Cross includes benefits for emergency air ambulance services in its plans, as required by federal law, and receives premiums from subscribers for these benefits. *Id.* ¶ 118. Blue Cross "has received a windfall" by retaining these premiums while insufficiently reimbursing Air Evac for services rendered to Blue Cross subscribers. *Id.*

"To find unjust enrichment, a party must have received something of value, to which he or she is not entitled and which he or she must restore." *El Paso Prod. Co. v. Blanchard*, 269 S.W.3d 362, 372 (Ark. 2007) (citation omitted). Put differently, "an action based on unjust enrichment is maintainable where a person has received money or its equivalent under such circumstances that, in equity and good conscience, he or she ought not to retain." *Campbell v. Asbury Auto. Inc.*, 381 S.W.3d 21, 36 (Ark. 2011). "[T]he focus of unjust enrichment is based on what the enriched person received rather than what the opposing party lost." *Butler & Cook, Inc. v. Centerpoint Energy Gas Transmission Co.*, No. 2:12-2107, 2012 WL 4195906, at *12–13 (W.D. Ark. Sept. 18, 2012) (citations omitted).

Blue Cross has not been unjustly enriched because it did not ask for nor receive Air Evac's services, and it paid benefits for which its subscribers bargained. Indeed, a number of courts have found that medical providers cannot bring unjust enrichment claims against insurers because patient-subscribers, and not insurers, are the ones receiving benefits from the provider's services. *See, e.g.*, *Hialeah Physicians Care, LLC v. Conn. Gen. Life Ins. Co.*, No. 13-21895-CIV, 2013 WL 3810617, at *4 (S.D. Fla. July 22, 2013) (finding that a provider "can hardly be said to have conferred any benefit, even an attenuated one, upon the Plan's insurer by providing Plan beneficiaries with health care services"); *Adventist Health Sys./Sunbelt Inc. v. Med. Sav. Ins. Co.*, No. 6:03-CV-1121, 2004 WL 6225293, at *6 (M.D. Fla. Mar. 8, 2004) (dismissing provider's unjust enrichment claim because "as matter of commonsense, the benefits of healthcare treatment flow to patients, not insurance companies"); *Travelers Indem. Co. of Conn. v. Losco Grp., Inc.*, 150 F. Supp. 2d 556, 563 (S.D.N.Y. 2001) ("It is counterintuitive to say that services provided to an insured are also provided to its insurer. The insurance company derives no benefit from those services; indeed, what the insurer gets is a ripened obligation to pay money to the insured—which hardly can be called a benefit."); *Encompass Office Sols., Inc. v. Ingenix, Inc.*, 775 F. Supp. 2d 938, 966 (E.D. Tex. 2011).

**\*10** Air Evac, however, points to other cases finding that providers may bring unjust enrichment claims against insurers. *See, e.g.*, *Appalachian Reg'l Healthcare v. Coventry Health & Life Ins. Co.*, No. 12-cv-114, 2013 WL 1314154, at *4 (E.D. Ky. Mar. 28, 2013). Almost all of these cases, however, are distinguishable based on the fact that they concern managed care organizations ("MCOs") under Medicaid as opposed to traditional indemnity insurers. Unlike indemnity insurers, MCOs do not cover the cost of healthcare services incurred by members. They are actually responsible for providing healthcare services to members, either directly or through a network of contracted providers. *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 786 (4th Cir. 1995). A provider may look only to an MCO for reimbursement for services rendered to that MCO's members. *See Appalachian Reg'l Healthcare*, 2013 WL 1314154, at *4; *El Paso Healthcare System, LTD v. Molina Healthcare of N.M., Inc.*, 683 F. Supp. 2d 454, 461–62 (W.D. Tex. 2010).

Air Evac's provision of services to Blue Cross subscribers, however, creates an obligation for Blue Cross, as it must pay benefits to the subscriber when she incurs healthcare expenses. This obligation is discharged when Blue Cross pays the amount set forth in the policy. Any remaining amount owed to Air Evac by the subscriber is presumably recoverable from that subscriber.

For these reasons, Air Evac's unjust enrichment claim is dismissed.

### 3. Count XI

In Count XI, Air Evac seeks declaratory relief pursuant to the Declaratory Judgment Act for all of the foregoing counts. Am. Compl. ¶¶ 121–130. Because Counts I–X have been dismissed, Count XI is also dismissed.

### IV. CONCLUSION

For these reasons, Blue Cross's motion to dismiss the amended complaint [Doc. No. 26] is granted, and the case is dismissed with prejudice.

IT IS SO ORDERED this 29th day of May 2018.

**Air Evac EMS Inc. v. USAble Mutual Insurance Co., Not Reported in Fed. Supp. (2018)**

2018 Employee Benefits Cas. 188,805

**All Citations**                                              Employee Benefits Cas. 188,805

Not Reported in Fed. Supp., 2018 WL 2422314, 2018

**End of Document**                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

931 F.3d 647
United States Court of Appeals, Eighth Circuit.

AIR EVAC EMS, INC., Plaintiff - Appellant
v.
USABLE MUTUAL INSURANCE COMPANY, doing business as Arkansas Blue Cross and Blue Shield, Defendant - Appellee

No. 18-2264
|
Submitted: January 16, 2019
|
Filed: July 23, 2019

**Synopsis**
**Background:** Air ambulance service provider brought action alleging that health insurer's limits on reimbursement for emergency air ambulance services violated Employee Retirement Income Security Act (ERISA), Arkansas Deceptive Trade Practices Act (ADTPA), and state contract law. The United States District Court for the Eastern District of Arkansas, Brian S. Miller, Chief Judge, 2018 WL 2422314, dismissed complaint, and provider appealed.

**Holdings:** The Court of Appeals, Melloy, Circuit Judge, held that:

insurance plan members did not convey right to sue plan for equitable relief under ERISA to provider;

provider's claims fell within scope of ADTPA's safe harbor;

insurer's alleged implied contract with provider was not for payment in full; and

insurer was not unjustly enriched as result of its refusal to pay full cost of air ambulance transportation.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss

for Failure to State a Claim.

**\*649** Appeal from United States District Court for the Eastern District of Arkansas - Little Rock

**Attorneys and Law Firms**

Counsel who presented argument on behalf of the appellant was Henry C. Quillen, of Portsmouth, NH. The following attorney(s) appeared on the appellant brief; Scott E. Poynter, of Little Rock, AR., Alex T Gray, of Little Rock, AR., Jeremy Y Hutchinson, of Little Rock, AR., George Nathan Steel, of Little Rock, AR.

Counsel who presented argument on behalf of the appellee was Anthony F. Shelley, of Washington, DC. The following attorney(s) appeared on the appellee brief; Chet A Roberts, of Little Rock, AR., Gordon S. Rather, Jr., of Little Rock, AR.

Before BENTON, MELLOY, and KELLY, Circuit Judges.

**Opinion**

MELLOY, Circuit Judge.

Air Evac EMS, Inc. ("Air Evac") asserts numerous claims against USAble Mutual Insurance Company, d/b/a Arkansas Blue Cross and Blue Shield ("Arkansas Blue"), regarding Arkansas Blue's allegedly inadequate reimbursement for air ambulance services that Air Evac provided to Arkansas Blue plan members. The district court[1] dismissed all of Air Evac's claims for failure to state a claim under Fed. R. Civ. P. 12(b)(6). We affirm.

I. Background

Emergency air transport is expensive. Air Evac's base rate for a single transport in 2014 was $19,250. With a per mile charge of between $115 and $205, Air Evac's average actual charge for air ambulance transportation in 2014 was over $30,000. Federal law requires Air Evac to provide its services without regard to a patient's ability to pay, which means Air Evac relies heavily on government and private insurers for reimbursement. But most government and private insurers provide only limited reimbursement for air ambulance services. For instance, Arkansas Blue, as a matter of policy, does not contract with air ambulance providers, and therefore has no

in-network providers of air ambulance services. Moreover, Arkansas Blue's insurance plans typically limit reimbursement for air ambulance services to $5,000 per trip, though in some cases reimbursement is limited to $1,000 or less. Thus, when Air Evac provides air ambulance services to Arkansas Blue plan members, it is regularly compensated less than it charges. According to the Amended Complaint, Air Evac has two options for making up such shortfalls: balance-bill the remaining cost to the plan member or appeal to Arkansas Blue. (To effectuate appeals, Air Evac obtains assignments from patients of their right to appeal coverage decisions.) Neither option has proved very successful.

Air Evac argues that Arkansas Blue's limited reimbursement for air ambulance services violates a number of federal and state laws, including laws that prohibit annual limits on "essential health benefits," **650 laws that mandate minimum payments for certain emergency services, and laws that require adequate provider networks. These laws do not provide a private cause of action, however, so Air Evac has chosen to seek relief under the Employee Retirement Income Security Act of 1974 ("ERISA"), the Arkansas Deceptive Trade Practices Act ("ADTPA"), and contract law. We address each set of claims in turn.

## II. Discussion

### A. Standard of Review

We review a district court's grant of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) de novo, "accept[ing] the well-pled allegations in the complaint as true and draw[ing] all reasonable inferences in the plaintiff's favor." Meiners v. Wells Fargo & Co., 898 F.3d 820, 821 (8th Cir. 2018). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Id. (citation omitted).

### B. ERISA

Under ERISA, Air Evac seeks equitable relief, namely an injunction and reformation of Arkansas Blue's insurance plan terms "so that they do not include limits on benefits for emergency air ambulance transportation." The district court concluded that Air Evac did not have the right to seek equitable relief under ERISA.

The primary remedy for challenging plan terms under ERISA is found in 29 U.S.C. § 1132(a)(1)(B). That section permits suit by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Id. § 1132(a)(1)(B). In addition to allowing suit for recovery of benefits, ERISA allows suit for breach of fiduciary duty under § 1132(a)(2) and equitable relief under § 1132(a)(3). Section 1132(a)(3) provides for suit "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

Thus, to have the right to seek equitable relief under ERISA, a party must either be a participant, beneficiary, or fiduciary, or the assignee of a participant, beneficiary, or fiduciary. Air Evac concedes that it is not a participant, beneficiary, or fiduciary. Air Evac argues, however, that it still has the right to sue Arkansas Blue for equitable relief under ERISA because Arkansas Blue plan members with ERISA-governed plans have assigned it that right. Accordingly, we must determine whether Air Evac's assignment actually conveys the right to sue for equitable relief.

The relevant language from the assignment[2] reads:

> [Patient] completely assigns to [Air Evac] all rights to (and related or associated with) any benefit claims and/or payments due from any third-party payor as reimbursement or payment for the Services, including but not limited to the rights to pursue administrative claims, request documents, receive payment and pursue litigation in order to obtain payment.

**651 The district court concluded that the assignment "only convey[ed] patients' benefits and rights to bring related litigation in order to obtain payment" and that "[n]othing ... appear[ed] to convey the right to sue for clarification or reformation of plan terms, which are extraordinary equitable remedies that extend far beyond litigation for payment on claims."

On appeal, Air Evac argues that ERISA assignments should be liberally construed and, accordingly, the language regarding rights "related or associated with ... benefit claims" should be interpreted to include the right to pursue equitable remedies. Arkansas Blue counters that ERISA assignments should be construed narrowly and, accordingly, the assignment should be interpreted to

convey only the right to sue for "payment of benefits." See Restatement (Second) of Contracts § 324 (Am. Law. Inst. 1981) ("It is essential to an assignment of a right that the obligee manifest an intention to transfer the right to another person without further action or manifestation of intention by the obligee."); see also Sanctuary Surgical Ctr., Inc. v. Aetna Inc., 546 F. App'x 846, 851 (11th Cir. 2013) (per curiam) ("Assignment agreements are generally interpreted narrowly. For that reason, the right to bring suit under 29 U.S.C. § 1132 cannot be assigned by 'implication or by operation of law.' " (citation omitted)).

More important than general statements as to liberal or narrow constructions, however, is the fact that our job is to interpret the express language of the assignment in the context in which it was made. When Arkansas Blue plan members assigned their rights to Air Evac, they did so in the context of facilitating payment for Air Evac's past provision of services. Thus, when Arkansas Blue plan members assigned "all rights to (and related or associated with) any benefit claims" to Air Evac, its seems clear, at a minimum, that they assigned Air Evac the right to recover benefits under § 1132(a)(1)(B). Given the context of the assignment, however, it does not automatically follow that such language also conveyed the right to sue for reformation of plan terms and other equitable relief under § 1132(a)(3). Indeed, the assignment does not specifically mention the right to sue for equitable relief; rather it limits the rights conveyed to those "related or associated with ... *benefit claims* and/or *payments* due from any third-party payor." (Emphasis added). Moreover, the rights that are specifically mentioned—"the rights to pursue *administrative claims*, request documents, *receive payment* and pursue litigation in order to *obtain payment*" (emphasis added)—all suggest that Air Evac sought assignment of ERISA rights related to obtaining payment, not equitable relief. Accordingly, we conclude that Air Evac's assignment does not convey the right to sue for equitable relief under § 1132(a)(3).

The limited case law supports our conclusion. For example, in Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc., the Ninth Circuit considered whether an assignment conveyed the right to sue for breach of fiduciary duty under § 1132(a)(2). 770 F.3d 1282, 1292 (9th Cir. 2014). According to the Ninth Circuit, the assignment "provided that the Plans would make payments directly to Spinedex for services rendered." Id. The assignment read that such payments would be considered

payment toward the total charges for the professional services rendered. THIS IS A DIRECT ASSIGNMENT OF MY RIGHTS AND BENEFITS UNDER THIS

POLICY. This payment, will not exceed my indebtedness to the above mentioned assignee, and I have agreed to pay, in a current manner, any **\*652** balance of said professional service charges over and above this insurance payment.

Id. The plaintiff argued that the word "benefits" referred to the right to payment and that the word "rights" referred to "rights to bring claims for breach of fiduciary duty." Id. The Ninth Circuit disagreed, holding that the plaintiff's argument was "divorced from context" and that "[t]he entire focus of the Assignment [was] payment for medical services." Id. The Ninth Circuit also noted that "[t]he Assignment nowhere indicate[d] that ... patients were assigning to [plaintiff] rights to bring claims for breach of fiduciary duty." Id. Similarly, in the present case, context suggests that the focus of the assignment is payment, and there is no indication that Arkansas Blue plan members were assigning their right to bring claims for equitable relief.

Air Evac points to several cases involving assignments that conveyed the right to sue for equitable relief under § 1132(a)(3). But in all of those cases, the breadth of the assignments was not at issue and the courts' analyses were largely conclusory. Moreover, the assignments in those cases appear to have been broader than the assignment in this case. See Grasso Entrs., LLC v. Express Scripts, Inc., 809 F.3d 1033, 1037, 1041 (8th Cir. 2016) (finding assignment "authorizing the pharmacy 'to pursue *any and all remedies* to which [the beneficiaries] may be entitled, including the use of legal action in any court' " conveyed the right to sue under § 1132(a)(3) (alteration in original) (emphasis added)); Podiatric OR of Midtown Manhattan, P.C. v. UnitedHealth Grp., Inc., No. 15-3234(DSD/HB), 2016 WL 126362, at \*1, \*3–4 (D. Minn. Jan. 11, 2016) (finding assignment of "*all of [beneficiary's] rights, claims, and other interests*—including the right to file an ERISA suit" conveyed the right to sue under § 1132(a)(3) (emphasis added)); Riverview Health Inst. v. UnitedHealth Grp. Inc., 153 F. Supp. 3d 1032, 1034, 1036 (D. Minn. 2015) (finding assignment of "*any causes of action* against the Health Insurer or Insurers arising from [the beneficiary's] contractual rights arising out of the procedure" conveyed the right to sue under § 1132(a)(3) (emphasis added)), aff'd on another ground, Peterson ex rel. E v. UnitedHealth Grp. Inc., 913 F.3d 769 (8th Cir. 2019), petition for cert. filed, (U.S. May, 30, 2019) (No. 18-1498). The assignment in this case is simply not as broad as the assignments in the cases cited by Air Evac.

C. Arkansas Deceptive Trade Practices Act

Air Evac EMS, Inc. v. USAble Mutual Insurance Company, 931 F.3d 647 (2019)

2019 Employee Benefits Cas. 270,861

The ADTPA makes it unlawful to, among other things, "[k]nowingly mak[e] a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of goods or services." Ark. Code Ann. § 4-88-107(a)(1). The ADTPA also makes it unlawful to "[e]ngag[e] in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade." Id. § 4-88-107(a)(10). Air Evac alleges that Arkansas Blue violated the ADTPA in two ways. First, as an assignee of Arkansas Blue plan members with plans not governed by ERISA, Air Evac alleges that Arkansas Blue misled those plan members. Specifically, Air Evac argues that while Arkansas Blue did not provide any in-network coverage of air ambulance services, its plans indicated "Emergency or Imperative Care Services" provided by an out-of-network provider would always be reimbursed as if they were provided by an in-network provider. According to Air Evac, Arkansas Blue's plans therefore led plan members to believe "they c[ould] avoid substantial out-of-pocket expense for emergency air ambulance transportation **\*653** when it [was], in fact, ... impossible for them to do so." Second, Air Evac alleges on its own behalf that Arkansas Blue engaged in the unconscionable practice of refusing to provide in-network coverage of air ambulance transportation. This practice, Air Evac argues, allowed Arkansas Blue to accept Air Evac's "valuable services," while paying only "a small fraction of the value of those services," thereby creating a windfall.

The district court concluded Arkansas Blue's conduct was not actionable because it fell within the ADTPA's safe harbor for "[a]ctions or transactions permitted under laws administered by the Insurance Commissioner." Ark. Code Ann. § 4-88-101(3) (2016) (amended 2017). In Arkansas, there are two approaches to applying statutory safe harbors: the specific-conduct rule and the general-activity rule. The specific-conduct rule "looks to whether state law permits or prohibits the conduct at issue," whereas the general-activity rule "looks to whether a state agency regulates the conduct." Air Evac EMS, Inc. v. USAble Mut. Ins. Co., 533 S.W.3d 572, 574 (Ark. 2017). Prior to determining that Arkansas Blue qualified for the ADTPA's safe harbor, the district court certified the following question to the Arkansas Supreme Court: "Should the ADTPA's safe-harbor provision be applied according to the specific-conduct rule or the general-activity rule?" Id. at 573 (citation omitted). The Arkansas Supreme Court adopted the specific-conduct rule, holding that the ADTPA's safe harbor protects only actions or transactions that "have been specifically permitted or authorized under laws administered by a state or federal regulatory body or officer." Id. at 575–76. In light of that ruling from the Arkansas Supreme Court,

the district court determined that Arkansas Blue qualified for the ADTPA safe harbor because Air Evac's claims were based on the terms and rates of Arkansas Blue's insurance plans, which pursuant to Arkansas law, are "filed with and approved by the Insurance Commissioner." Ark. Code Ann. § 23-79-109(a)(1)(A)(i).

On appeal, Air Evac does not suggest that the Insurance Commissioner failed to approve the terms and rates of Arkansas Blue's insurance plans. Rather, Air Evac argues that the safe harbor does not apply because its claims are based on Arkansas Blue's "unfair and unconscionable" actions, which "have never been approved by the Insurance Commissioner." We reject Air Evac's characterization of the basis for its ADTPA claims. The overall driving force behind Air Evac's claims is the allegation that Arkansas Blue inadequately reimbursed air ambulance services and misled its plan members about the nature of that reimbursement. But, the limits that Arkansas Blue imposes on reimbursement for air ambulance services are expressly stated in Arkansas Blue's insurance plans. Indeed, as Air Evac notes in its Amended Complaint, "[a] typical limit is $5,000, but some plans include limits of $1,000 or possibly less."[3] Consequently, Air Evac's ADTPA claims are, in fact, based on the terms and rates of Arkansas Blue's plans. Thus, for the reasons discussed by the district court, Air Evac's ADTPA claims are precluded by the ADTPA's safe harbor for "[a]ctions or transactions permitted under laws administered by the Insurance Commissioner."[4] **\*654** Ark. Code Ann. § 4-88-101(3) (2016) (amended 2017).

D. Contract Law

Air Evac seeks damages under contract law for breach of implied contract or, in the alternative, unjust enrichment. The district court concluded that Air Evac did not plausibly allege either the existence of an implied contract or unjust enrichment.

i. Implied Contract

Under Arkansas law, implied contracts are "inferred from the acts of the parties." Steed v. Busby, 268 Ark. 1, 593 S.W.2d 34, 38 (1980). Thus, they can be "proven by circumstances showing the parties intended to contract or by circumstances showing the general course of dealing between the parties." Id. The elements of an implied contract, however, are the same as an express contract.

Air Evac EMS, Inc. v. USAble Mutual Insurance Company, 931 F.3d 647 (2019)

2019 Employee Benefits Cas. 270,861

K.C. Props. of N.W. Ark., Inc. v. Lowell Inv. Partners, LLC, 373 Ark. 14, 280 S.W.3d 1, 13 (2008). "[T]here must be: (a) competent parties; (b) subject matter; (c) legal consideration; (d) mutual agreement; (e) mutual obligations." Berry v. Cherokee Village Sewer, Inc., 85 Ark. App. 357, 155 S.W.3d 35, 38 (Ark. Ct. App. 2004). The difference, therefore, between an express contract and an implied contract "is merely in the mode of manifesting assent and in the mode of proof." K.C. Props., 280 S.W.3d at 13 (citation omitted).

Air Evac alleges that its general course of dealing with Arkansas Blue established an implied contract. Specifically, Air Evac argues that: (1) it routinely provides air ambulance services to Arkansas Blue plan members; (2) Arkansas Blue "routinely receives and pays claims for [those services]"; and (3) "[a]t all relevant times, Arkansas Blue was fully aware of the rates charged by Air Evac." Air Evac further alleges that the implied contract is for "payment in full" because "Arkansas Blue was fully aware that Air Evac expected to be paid its set rates when patients covered by Arkansas Blue's plans required emergency air ambulance transport."

Even assuming that an implied contract existed, Air Evac alleges no facts to support its assertion that such a contract was for payment in full. As Air Evac notes in its Amended Complaint, Arkansas Blue has consistently refused to contract with providers of air ambulance services, meaning it does not provide the favorable reimbursement associated with in-network coverage. Instead, Arkansas Blue's insurance plans expressly limit reimbursement for air ambulance services, typically to $5,000 per trip, though in some cases to $1,000 or less. Thus, Air Evac knew that it was an out-of-network provider and that reimbursement for its services would be limited accordingly. See **655** Cmty. Hosp. of the Monterey Peninsula v. Aetna Life Ins. Co., 119 F. Supp. 3d 1042, 1049 (N.D. Cal. 2015) (finding "it would have been unreasonable for [a health care provider] to expect that [an insurer's] authorization constituted a promise to pay 100 percent of billed charges" in light of the "standard practice in the industry" and the fact that the provider knew it "would be paid at an out-of-network" level). Consequently, Air Evac's implied contract claim for payment in full is not plausible on its face because any implied contract between Air Evac and Arkansas Blue would only be for the amount paid in their course of dealings—the amount stated in Arkansas Blue's insurance plans.

ii. Unjust Enrichment

To find unjust enrichment, a party must have received something of value, to which he or she is not entitled and which he or she must restore. There must also be some operative act, intent, or situation to make the enrichment unjust and compensable. One who is free from fault cannot be held to be unjustly enriched merely because he or she has chosen to exercise a legal or contractual right. In short, an action based on unjust enrichment is maintainable where a person has received money or its equivalent under such circumstances that, in equity and good conscience, he or she ought not to retain.

Campbell v. Asbury Auto., Inc., 381 S.W.3d 21, 36 (Ark. 2011) (citations omitted).

Air Evac alleges that Arkansas Blue has been unjustly enriched because it has "willingly accepted Air Evac's valuable services," yet "has paid Air Evac a small fraction of the value of those services." The unjust enrichment, according to Air Evac, is the "windfall" that Arkansas Blue received "[b]y wrongfully withholding payments to Air Evac ... while at the same time retaining the amounts its members paid for air ambulance services (through premium payments)." Air Evac alleges unjust enrichment in the alternative to breach of implied contract because "[t]here can be no 'unjust enrichment' in contract cases." Campbell, 381 S.W.3d at 36 (citation omitted).

Arkansas Blue was not unjustly enriched because it was acting in accordance with its "contractual right[s]." Id. In return for their premium payments, Arkansas Blue provided its plan members with health insurance, including the expressly limited reimbursement for air ambulance services. Thus, as long as Arkansas Blue provided that limited reimbursement (and Air Evac does not allege otherwise), the premium payments Arkansas Blue received in exchange did not constitute money that it "ought not to retain." Id.; cf. 32nd Street Surgery Ctr., LLC v. Right Choice Managed Care, 820 F.3d 950, 957 (8th Cir. 2016) (rejecting a health care provider's claim of unjust enrichment against health insurance companies because the insurers' policies " 'clearly intend[ed] to govern' the amounts the insurers were obligated to pay on behalf of their insureds"). Consequently, Air Evac fails to state a claim of unjust enrichment.

III. Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

All Citations

**Air Evac EMS, Inc. v. USAble Mutual Insurance Company, 931 F.3d 647 (2019)**

2019 Employee Benefits Cas. 270,861

931 F.3d 647, 2019 Employee Benefits Cas. 270,861

Footnotes

1     The Honorable Brian S. Miller, Chief Judge, United States District Court for the Eastern District of Arkansas.

2     Air Evac's assignment language has changed over the years. Before the district court, Air Evac cited six versions of its assignment. On appeal, Air Evac only cites three versions, all of which are essentially identical.

3     For example, Arkansas Blue's "Gold Plan" specifically states under "Benefits and Specific Limitations In Your Plan," that reimbursement for air ambulance services "may not exceed $5,000 per trip."

4     Air Evac also argues that the Supreme Court's decision in Advocate Health Care Network v. Stapleton, ___ U.S. ___, 137 S. Ct. 1652, 198 L.Ed.2d 96 (2017) at least requires remand to determine whether its "ADPTA claims on behalf of church-affiliated hospital self-funded plans can proceed." According to Air Evac, such plans are now neither governed by ERISA, see Stapleton, 137 S. Ct. at 1656, nor subject to the Insurance Commissioner's approval, which means Air Evac's ADTPA claims on behalf of patients with such plans are not precluded by the ADTPA's safe harbor. We do not consider this argument, however, because Air Evac failed to alert the district court to the significance of Stapleton, which was decided well before the district court issued its decision in 2018, and additional factual development would be required. See United States v. Hirani, 824 F.3d 741, 751 (8th Cir. 2016) ("Ordinarily, we will not consider an argument raised for the first time on appeal. However, we may consider a newly raised argument 'if it is purely legal and requires no additional factual development, or if a manifest injustice would otherwise result.' " (citations omitted)).

**End of Document**       © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:23-cv-02550-JTF-tmp   Document 1-2   Filed 08/31/23   Page 358 of 660   PageID 384

Angelina Emergency Medicine Associates PA v. Health..., 506 F.Supp.3d 425...

506 F.Supp.3d 425
United States District Court, N.D. Texas, Dallas
Division.

ANGELINA EMERGENCY MEDICINE
ASSOCIATES PA, et al., Plaintiffs,
v.
HEALTH CARE SERVICE
CORPORATION, et al., Defendants.

Civil Action No. 3:18-CV-00425-X
|
Signed 12/10/2020

**Synopsis**
**Background:** Physicians associations brought multiple federal, state statutory, and state common law claims against insurance companies and medical organizations, alleging that the associations had been underpaid for emergency services provided to patients. The insurance companies and medical organizations moved to dismiss.

**Holdings:** The District Court, Brantley Starr, J., held that:

associations could not recover from insurers under quantum meruit;

associations failed to allege an independent injury;

associations' allegations did not support claim that insurers violated Texas exclusive provider statute;

Texas statute governing exclusive providers did not create a private right of action;

associations lacked standing to bring claims under Texas statute prohibiting insurers from failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim;

Texas Prompt Pay Act did not apply to physicians associations; and

personal jurisdiction over out-of-state insurance companies was proper in Texas with respect to ERISA claims.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

**Attorneys and Law Firms**

**\*428** Toby M. Galloway, Winstead PC, Fort Worth, TX, James Walton Boswell, Pro Hac Vice, Jennifer S. Lewin, Pro Hac Vice, King & Spalding LLP, Atlanta, GA, Leslie C. Murphy, Pro Hac Vice, King & Spalding LLP, Sacramento, CA, for Plaintiffs.

Brian P. Kavanaugh, Sidley Austin LLP, Cassandra Elaine Fenton, Stacey Pagonis, Pro Hac Vice, Kirkland & Ellis LLP, Chicago, IL, Joshua L. Hedrick, Hedrick Kring PLLC, Natali R. Wyson, Paige Holden Montgomery, Sidley Austin LLP, Dallas, TX, for Defendant Health Care Service Corporation.

Brian P. Kavanaugh, Sidley Austin LLP, Chicago, IL, Joshua L. Hedrick, Mark Alan Fritsche, Hedrick Kring PLLC, Dallas, TX, for Defendant Blue Cross Blue Shield of Texas.

Jonathan M. Herman, Charles Wilson Hill, Herman Law Firm, Dallas, TX, for Defendants Blue Cross and Blue Shield of Alabama, HealthNow New York Inc.

Covert J. Geary, Michael Christopher Drew, Tyler John Rench, Jones Walker LLP, New Orleans, LA, Amy Kathleen Anderson, Jones Walker LLP, Houston, TX, for Defendants USAble Mutual Insurance Company, Wellmark Inc., Blue Cross & Blue Shield of Mississippi, Excellus Health Plan Inc., Regence BlueCross BlueShield of Oregon, Independence Hospital Indemnity Plan Inc., Highmark Inc., Wellmark of South Dakota Inc., Regence BlueCross BlueShield of Utah, Regence BlueShield, Premera Blue Cross.

Maria Wyckoff Boyce, Russell A. Welch, Pro Hac Vice, Hogan Lovells US LLP, Houston, TX, Allen Paige Pegg, Pro Hac Vice, Craig A. Hoover, Pro Hac Vice, Peter R. Bisio, Pro Hac Vice, Hogan Lovells US LLP, Washington, DC, Mark J. Dyer, Martin Disiere Jefferson & Wisdom, Dallas, TX, for Defendants Anthem Blue Cross Life and Health Insurance, Rocky Mountain Hospital and Medical Services, Blue Cross and Blue Shield of Georgia Inc., Blue Cross Blue Shield Healthcare Plan of Georgia Inc., RightCHOICE Managed Care Inc., Healthy Alliance Life Insurance Company, HMO Missouri Inc., Empire HealthChoice Assurance Inc., Empire HealthChoice HMO Inc., Community Insurance Company, Blue Cross and Blue Shield of South Carolina,

Case 2:23-cv-02550-JTF-tmp   Document 1-2   Filed 08/31/23   Page 359 of 660   PageID 385

Angelina Emergency Medicine Associates PA v. Health..., 506 F.Supp.3d 425...

Anthem Health Plans of Virginia Inc., Blue Cross Blue Shield of Florida Inc.

Brian Keith Norman, LeDouglas G. Johnson, Shamoun & Norman LLP, Dallas, TX, Kenneth J. Lambert, Shamoun & Norman LLP, Farmers Branch, TX, for Defendants CareFirst Inc., Group Hospitalization and Medical Services Inc.

Michael Christopher Drew, Jones Walker LLP, New Orleans, LA, for Defendant Highmark BCBSD Inc.

Thomas C. Hardy, Abraham J. Souza, Daniel J. Hofmeister, Jr, Reed Smith LLP, Chicago, IL, Clark Anthony Donat, Sarah M. Cummings, Reed Smith LLP, Dallas, TX, for Defendants Blue Cross of Idaho Health Service Inc., Blue Cross and Blue Shield of Kansas City, Blue Cross and Blue Shield of Nebraska Inc., Blue Cross Blue Shield of North Dakota.

Jason Cross, Spencer Fane LLP, Dallas, TX, for Defendant Blue Cross and Blue Shield of Kansas Inc.

John R. Nelson, Dickinson Wright PLLC, Austin, TX, Maria L. Martinez, Pro Hac Vice, Blue Cross Blue Shield of Michigan, Detroit, MI, for Defendant Blue Cross Blue Shield of Michigan Mutual Insurance Company.

Joseph J. Mammone, Jr, Reed Smith LLP, John Clay Sullivan, Winstol D. Carter, Morgan, Lewis & Bockius LLP, Dallas, TX, for Defendant Capital Blue Cross.

Maria Wyckoff Boyce, Russell A. Welch, Pro Hac Vice, Hogan Lovells US LLP, Houston, TX, Craig A. Hoover, Pro Hac Vice, Peter R. Bisio, Pro Hac Vice, Hogan Lovells US LLP, Washington, DC, Mark J. Dyer, Martin Disiere Jefferson & Wisdom, Dallas, TX, for Defendant BlueCross BlueShield of Tennessee Inc.

## MEMORANDUM OPINION AND ORDER

BRANTLEY STARR, UNITED STATES DISTRICT JUDGE

**\*430** This case is in all ways an absolute unit[1]—in the serious nature of its subject matter, in the scope of claims brought, and in the amount of damages sought. The plaintiffs (over fifty physicians associations) brought multiple federal, state statutory, and state common law claims against some forty-odd defendants, a bunch of insurance companies and medical organizations, alleging they'd been underpaid for emergency services they provided to patients.

To facilitate a swifter, cleaner resolution of this mammoth matter, the Court split discovery in half, focusing on "identification and clarification of the [legal] claims" in Phase 1. In accordance with the Court's scheduling order, the defendants filed a joint omnibus motion to dismiss several of the plaintiffs' claims after Phase 1 had concluded, arguing that these claims could be cast aside solely on legal grounds. That motion to dismiss is now ripe.

Having considered these filings, the Court **GRANTS IN PART** and **DENIES IN PART** the defendants' omnibus motion to dismiss. The Court **DISMISSES WITH PREJUDICE:** (1) all claims based on quantum meruit (Count III); (2) all claims pursuant to Texas Insurance Code sections 541.060, 1271.155, and 1301.0053 (Count VI); and (3) all claims under the Texas Prompt Pay Act (Count VII). The Court also **DISMISSES WITHOUT PREJUDICE** all claims based on breach of the duty of good faith and fair dealing (Count IV). And finally, the Court **DISMISSES AS MOOT** any non-ERISA-based claims involving Capital BlueCross and Care First, Inc. ("CareFirst"). However, the Court **DENIES** the motion to dismiss with respect to: (1) defendants' anti-assignment provision defense; (2) jurisdiction over any remaining claims involving Blue Cross and Blue Shield of South Carolina ("South Carolina Blue") and Blue Cross and Blue Shield of Florida, Inc., d/b/a Florida Blue ("Florida Blue"); and (3) any remaining ERISA-based claims involving Capital BlueCross, and CareFirst.

* * *

When delivering its opinions, the Court customarily first recites the facts of the case, then the applicable law, and then its reasoning. Given the complexity of this case, the Court instead organizes this opinion and order by claim, according to the organization the parties followed in their respective motion and response.[2] When the Court reaches a particular claim, it will then recite the pertinent facts and law that relate specifically to it. The Court believes this method of organization will make its holdings easier to understand and apply. However, the Court must detail at the outset the overall legal standard it follows when confronting any motion to dismiss.

To survive a motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."[3] If the Court's analysis requires factual determinations, the Court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff.[4] Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if

Case 2:23-cv-02550-JTF-tmp   Document 1-2   Filed 08/31/23   Page 360 of 660   PageID 386

Angelina Emergency Medicine Associates PA v. Health..., 506 F.Supp.3d 425...

referred to in the complaint and otherwise central to its claims.[5]

**\*431** In this specific instance, though, the Court focuses its gaze primarily on the law, not the facts. And when doing so, the Court doesn't accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions."[6] The Court's plumb line, as usual, is plausibility, meaning "more than a sheer possibility that a defendant has acted unlawfully."[7] In that vein, the Court may dismiss claims for a variety of law-related reasons. For instance, dismissal of a claim is proper if it fails to plead all required elements necessary to obtain relief.[8] Put another way, the Court may find a claim that lacks a required element implausible because we cannot "draw the reasonable inference that the defendant is liable for the misconduct alleged."[9]

In summary, the primary purpose of this motion to dismiss is not to rule on factual matters that require further discovery, but to determine which legal claims—if any—can be dismissed as a matter of law. Accordingly, the Court now turns to the first dispute of law between the parties.

### I. Quantum Meruit (Count III)

In their response to the defendants' motion to dismiss, the plaintiffs helpfully categorized the health insurance claims at issue into four "buckets":

> • Insurance claims made in Texas by patients insured in Texas by Blue Cross Blue Shield of Texas ("Texas Blue"). The Court refers to this first bucket as Texas Blue Insured;
>
> • Insurance claims made in Texas by patients insured in Texas by self-funded ERISA-governed plans administered by Texas Blue. The Court refers to this second bucket as Texas Blue Self-Funded;
>
> • Insurance claims made in Texas by patients insured outside of Texas by other Blue Plan providers processed by Texas Blue. The Court refers to this third bucket as BlueCard Insured; and
> • Insurance claims made in Texas by patients insured outside of Texas by self-funded ERISA-governed administered by other Blue Plan providers. The Court refers to this fourth bucket as BlueCard Self-Funded.[10]

In their complaint, the plaintiffs argue they may recover in quantum meruit as to the Texas Blue Insured and BlueCard Insured insurance claims. Quantum meruit is a state-law equitable remedy founded in unjust enrichment.[11] To recover from the defendant, the plaintiff must show that (1) they rendered valuable services or materials (2) to the defendant (3) which the defendant accepted, used, and enjoyed, and (4) the circumstances placed the defendant on reasonable notice that the plaintiff expected compensation for the services or materials.[12] And it isn't enough **\*432** for a plaintiff to simply show that his actions benefitted the defendant. "[T]he plaintiff must show that his efforts were undertaken *for* the person sought to be charged"—*i.e.*, the defendant.[13]

The complaint states that by "providing medically necessary emergency services" to the defendants' insurance customers, the plaintiffs "conferred a benefit" on them by satisfying their "obligations to arrange and pay for healthcare services" for these members.[14] But saddling someone with a debt to repay hardly qualifies as a benefit. And the very phrasing of the plaintiffs' quantum meruit claim implies its failure. Serving a defendant's *customers* is hardly the same as serving the defendant *itself*.

On these points, the Court finds *Encompass Office Solutions, Inc. v. Ingenix, Inc.*[15] highly persuasive. In that case a provider of medical facilities and equipment (Encompass) sued an insurer (United) using the same line of logic: underpayment of insurance claims + provision of services to United members = recovery in quantum meruit.[16] The district court correctly reasoned that "[e]ven if United received some benefit as a result of Encompass providing medical services to its insureds, a proposition the court finds dubious, Encompass's services were rendered to and for its patients, not United."[17] Recovery in quantum meruit cannot be had from an insurer based on services rendered to an insured, because those services aren't directed to *or* for the benefit of the insurer.[18] As our sister district courts have repeatedly pointed out, "a ripened obligation to pay money to the insured ... hardly can be called a benefit."[19] The plaintiffs' claims for recovery under quantum meruit therefore fail on the law, and Count III is dismissed.[20]

**\*433 II. Breach of Duty of Good Faith and Fair Dealing (Count IV)**

Next, the Court addresses the defendants' alleged breach of duty of good faith and fair dealing. Texas courts have held that this implied covenant, rarely imposed in the

Case 2:23-cv-02550-JTF-tmp   Document 1-2   Filed 08/31/23   Page 361 of 660   PageID 387

Angelina Emergency Medicine Associates PA v. Health..., 506 F.Supp.3d 425...

state's common law, may arise in the insurance context based on "the parties' unequal bargaining power ...."[21] Plaintiffs may state a cause of action under this tort by alleging "that there is no reasonable basis for denial of a claim or delay in payment or a failure on the part of the insurer to determine whether there is any reasonable basis for the denial or delay."[22]

The plaintiffs argue that the defendants breached their duty of good faith and fair dealing under the Texas Blue Insured and BlueCard Insured policies. Their allegations sound familiar: because the plaintiffs provided medical services to patients carrying these policies, "who assigned their rights to benefits under the plans for services to" the plaintiffs, and the defendants "significantly underpaid" for those services and "failed to provide ... adequate written explanations" for this underpayment, the plaintiffs may recover.[23]

In their motion to dismiss, the defendants argue first that the plaintiffs haven't stated a claim for breach of this duty because an assignor can only assign ripened torts. To clarify, under Texas law, an assignment is simply a transfer of some right, interest, or property. It "operates by way of agreement or contract."[24] And it is a long-established principle of Texas common law that "contracts ... are not favored, and an instrument is not given effect as an assignment of an expectancy or future interest unless it clearly manifests the intention ... to sell, assign or convey [the] expectancy or future interest."[25] The Court notes that the plaintiffs have not pled that the patients who assigned them this as-yet-unripe tort expected it to ripen in the future.[26] So the Court is inclined to dismiss this claim, but without prejudice in order to allow repleading.

Moreover, the plaintiffs have failed to plead or argue an independent injury, as required by Texas law. In *USAA Texas Lloyds Co. v. Menchaca*,[27] the Texas Supreme Court held that:

> if an insurer's statutory violation causes an injury independent of the loss of policy benefits, the insured may recover damages for that injury even if the policy does not grant the insured a right to benefits.... [but] only if the damages are truly independent of the insured's right to receive policy benefits.[28]

Essentially, under Texas law, assuming for the sake of argument that assignment actually occurred, the plaintiffs must show (or at the very least allege with sufficient particularity) that they suffered some injury **\*434** independent of their right to repayment under the policy in order to recover for breach of the duty of good faith and fair dealing.[29]

The plaintiffs fail to allege an independent injury in their complaint.[30] They allege the defendants underpaid them when reimbursing the Texas Blue Insured and BlueCard Insured insurance claims (an alleged injury that is not "independent of the loss of policy benefits") and that defendants didn't timely provide them with policy documents, a delay which (even if there were an injury) still flows from the alleged denial of benefits to the plaintiffs.[31]

Because the plaintiffs didn't plead all the elements needed to ground a claim for breach of the duty of good faith and fair dealing, the Court dismisses without prejudice Count IV, the claim for breach of the duty of good faith and fair dealing.[32]

### III. State Law Claims (Counts V, VI, and VII)

That takes care of the two common-law claims at issue. But what about statutory claims? The plaintiffs make several such claims, as previously mentioned, and the Court will deal with them in the order presented in the defendants' omnibus motion to dismiss.

First off, the parties have mostly divergent ideas about how many of the allegedly underpaid claims are governed by state law—namely, several provisions of the Texas Insurance Code[33] and the Texas Prompt Pay Act. They at least agree that these Insurance Code and Prompt Pay Act provisions don't apply to Texas Blue Self-Funded or BlueCard Self-Funded insurance claims, because ERISA preempts them.[34] And indeed it does. ERISA supersedes "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan,"[35] unless they "regulate[ ] insurance ...."[36] So the statutes at **\*435** issue only apply, if they apply at all, to Texas Blue Insured and BlueCard Insured insurance claims.

The defendants argue that the state statutes only apply to claims under insurance policies sold in Texas—*i.e.*, the Texas Blue Insured claims, *not* the BlueCard Insured claims. The plaintiffs respond that the text of these state statutes isn't so limiting. To discern who's right, the Court must "begin by analyzing the statutory language, 'assum[ing] that the ordinary meaning of that language accurately expresses the legislative purpose.' "[37] By starting with the text, the Court will "find the best reading of the statute by interpreting the words of the statute, taking account of the context of the whole statute, and applying any appropriate semantic canons."[38] The Court will perform this analysis statute by statute, addressing other arguments brought forth by the parties as it does.

Case 2:23-cv-02550-JTF-tmp   Document 1-2   Filed 08/31/23   Page 362 of 660    PageID 388

Angelina Emergency Medicine Associates PA v. Health..., 506 F.Supp.3d 425...

## A. Emergency Care Statutes

The Court will begin by interpreting the Insurance Code's emergency care statutes. Here's the first, focused on exclusive providers:

> If an out-of-network provider provides emergency care as defined by Section 1301.155 to an enrollee in an exclusive provider benefit plan, the issuer of the plan shall reimburse the out-of-network provider at the usual and customary rate or at a rate agreed to by the issuer and the out-of-network provider for the provision of the services and any supply related to those services.[39]

And the second: "A health maintenance organization [("HMO")] shall pay for emergency care performed by non-network physicians or providers at the usual and customary rate or at an agreed rate."[40] Going forward, the Court will refer to the former law as the Exclusive Provider Statute and the latter as the HMO Statute.

The plaintiffs argue that the defendants violated both of these statutes by "significantly underpaying the [insurance] claims submitted ... for emergency services" and seek damages totaling at minimum the difference between the usual and customary rate for the services provided and the amount the defendants paid for these services.[41] The defendants retort in several ways, which the court will address in turn.

First, the defendants argue that the Exclusive Provider Statute only applies to "exclusive provider benefit plan[s]," and according to the definitions section of Insurance Code section 1301, these are exclusively plans "in which an insurer excludes" some or all benefits to an insured.[42] An "insurer" refers to a set of insurance companies "authorized to issue, deliver, or issue for delivery in this state health insurance policies."[43] Therefore, say the defendants, the Exclusive Provider Statute does not apply to the BlueCard Insured insurance claims.

**\*436** The Court agrees wholeheartedly. The text of the definitions section of section 1301 of the Insurance Code clearly cabins exclusive provider benefit plans to those issued or delivered within the state of Texas. Courts do and should look to definitions for interpretational guidance.[44] So the plaintiffs have failed to state a claim by not pleading that the providers connected to the BlueCard Insured insurance claims were authorized to issue or deliver insurance policies in Texas.

The plaintiffs also fail to allege the most basic element of a violation of the Exclusive Provider Statute: that the defendants' reimbursements were lower than the usual and customary rate. They merely gesture at "significant underpayment," but seem noncommittal as to what rate of payment would be adequate. This does not pass muster.[45] Still, if these were the only defects in the plaintiffs' Exclusive Provider and HMO Statute claims, the Court would allow repleading.

But unfortunately, the plaintiffs' entire claim under both the Exclusive Provider and HMO Statutes rests on the notion that a private right of action exists to enforce these laws. It does not. SCOTX has made it abundantly clear that Texas statutes create a private right of action "only when a legislative intent to do so appears in the statute as written."[46] The Court sees no indication of any intent to give out-of-network healthcare providers (or associations of them) a private right of action anywhere in the words of the Exclusive Provider or HMO Statutes. And the plaintiffs tellingly have not argued that such an intent is present. Their claims under the Exclusive Provider and HMO Statutes, also known as Count V, therefore fail as a matter of law because the Texas Legislature has not provided the plaintiffs with a right of action.

## B. Claim Settlement Statute

The plaintiffs next turn to Insurance Code section 541.060, a statute prohibiting insurers from "failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of ... a claim with respect to which the insurer's liability has become reasonably clear."[47] The plaintiffs first state that they have standing to bring suit on behalf of each patient due to assignment of benefits.[48] The defendants disagree, arguing that claims under Insurance Code section 541.060 may not be assigned. **\*437** The Court will address this threshold question before moving further.[49]

Though both parties marshal an impressive array of persuasive authority gleaned from federal district courts, the Court holds that interpretation of state law is generally best left to state courts.[50] And the Court is in luck, because the Texas Supreme Court has settled this question of law. When directly addressing a state appeals-court split over whether claims under the Deceptive Trade Practices Act—of which Insurance Code section 541 is a part—were assignable, Texas' highest civil court stated that allowing assignment "would defeat the primary purpose of the statute—to encourage individual consumers to bring such claims themselves."[51] The Texas

Supreme Court held, accordingly, that Deceptive Trade Practice "claims generally cannot be assigned by an aggrieved customer to someone else."[52] This Court, likewise, will not allow third-party standing by assignment to thwart the "clear intent of the Legislature."[53] The Court holds that claims brought under section 541 of the Insurance Code may not be assigned to third parties, and therefore that plaintiffs lack standing to sue.[54] The Court dismisses Count VI.

### C. Texas Prompt Pay Act

Finally, the plaintiffs press a claim under Insurance Code section 1301 *et seq.*, also known as the Texas Prompt Pay Act. They allege that, as to any insurance claims made after June 5, 2014, the defendants "improperly underpaid and untimely paid ... timely submitted clean [insurance] claims" for emergency care and did not determine these clean insurance claims "were payable at the rate of payment" the plaintiffs set forth.[55] To determine whether this is so, as before, the Court begins with the text of the statute.

The Prompt Pay Act defines a clean insurance claim (somewhat unhelpfully) as "a claim that complies with [Insurance Code] Section 1301.131."[56] That referenced section contains a litany of elements an insurance claim must satisfy to be considered "clean."[57] Section 1301.103 requires payment of clean claims (or notice of nonpayment) within either 30 or 45 days to the **\*438** "preferred provider" who submitted it, depending on how the claim was submitted.[58]

The Prompt Pay Act's clean-claim deadlines apply as well to insurance claims by out-of-network (or nonpreferred) providers who offer emergency care "as required by state or federal law[.]"[59] The plaintiffs claim that they are required to provide emergency care by law, and may therefore recover under the Prompt Pay Act.[60] The defendants make two counter-arguments in their motion to dismiss: that the plaintiffs lack standing because they are not required to provide emergency care, and that the plaintiffs cannot recover penalties because they are out-of-network providers. But the Court does not need to reach the latter argument, because the plaintiffs lack standing to sue under federal and state law.

The pertinent federal law, a subpart of the Emergency Medical Treatment and Labor Act ("Emergency Treatment Act"), reads in relevant part as follows:

If any individual (whether or not eligible for benefits

under this subchapter) comes to a *hospital* and the *hospital* determines that the individual has an emergency medical condition, the *hospital* must provide either ... within the staff and facilities available at the *hospital*, for such further medical examination and such treatment as may be required to stabilize the medical condition, or ... for transfer of the individual to another medical facility....[61]

Simply put, the plaintiffs are physicians' associations.[62] They are not a hospital.[63] The plain text of this federal statute does not require them to do anything. It places the entire onus to provide emergency medical treatment or transfer on hospitals. The Court can find no precedential or persuasive case requiring physicians' associations (or individual physicians, for that matter) to provide emergency treatment based on the Emergency Treatment Act.[64] Neither **\*439** do the plaintiffs provide one. The Emergency Treatment Act does not provide the plaintiffs with standing to sue under the Prompt Pay Act.

And neither does the plaintiffs' proffered state statute apply to them. Section 311.022 of Texas's Health & Safety Code prohibits "[a]n officer, employee, or medical staff member of a general hospital" from denying emergency services due to the patient's "[in]ability to pay[,] ... race, religion, or national ancestry."[65] First, again, the plaintiffs are not "[a]n officer, employee, or medical staff member" at a hospital. Some individual physician *members* of the plaintiff organizations may be covered. All of them may be. But the plaintiffs themselves are admittedly not. Second, based on the plain meaning of the text, this statute is not a blanket requirement to provide emergency services. It only prohibits the *denial* of such services based on unacceptable discrimination.

Because the plaintiffs have not established (and cannot establish) based on the pleadings that the Prompt Pay Act applies to them, the Court holds that they lack standing to sue under it. The Court dismisses Count VII with prejudice.[66]

### IV. Anti-Assignment Provisions

Not much more remains for the Court to address, besides a number of defenses marshaled in the omnibus motion to dismiss. Its discussion of these matters applies only to any remaining legal claims.

The defendants argue that many claims brought by the plaintiffs should be dismissed because the policies at issue contained anti-assignment provisions, so those

policyholders could not have assigned their right to repayment to the plaintiffs. The plaintiffs responded that, to the extent those plans contained anti-assignment provisions, they were waived, or the defendants were estopped from enforcing them due to the defendants' alleged past voluntary and intentional practice of paying the plaintiffs directly.

The Court does not have enough evidence to dismiss this claim because the claim hinges on several factual determinations that have not yet been made. For example, the defense of ERISA estoppel, which the plaintiffs assert, requires (1) material misrepresentation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances.[67] The Court has not yet determined whether any of these elements are satisfied, and further discovery is needed before it can. Furthermore, the Court has not yet held an evidentiary hearing on the previously filed declarations that the defendants offer to show that plaintiffs lack standing due to these anti-assignment provisions. We are not yet at the fact-weighing stage. So, the Court must decline to dismiss any claims based on the defendants' anti-assignment arguments as of yet.[68]

## V. Remaining Claims Against South Carolina Blue and Florida Blue

Now for several jurisdictional challenges regarding certain defendants. South Carolina *440 Blue and Florida Blue don't think they should be here at all. South Carolina Blue argues that all its insurance claims in this suit can only be brought before a South Carolina review board.[69] And South Carolina Blue further claims, along with Florida Blue, that all insurance claims at issue that involve them are self-insured (i.e., BlueCard Self-Funded) claims that they do not pay, only administer.[70]

Again, as before, the Court believes dismissal on these grounds is premature before discovery. These are disputed assertions of fact, not purely or primarily legal. And the Court has held no evidentiary hearing on the matter. The Court will therefore exercise its discretion to deny dismissal on this jurisdictional ground because the plaintiff "has [not] had a chance to discover the facts necessary to establish jurisdiction."[71]

## VI. Remaining Claims Against Capital BlueCross

Defendant Capital BlueCross adopts a different approach than South Carolina Blue and Florida Blue. It argues that this court has no *personal* jurisdiction over claims in which it's involved.

Personal jurisdiction is established when (1) the defendant has sufficient minimum contacts with the forum state, (2) the plaintiff's cause of action arises from those contacts, and (3) the exercise of personal jurisdiction is both fair and reasonable.[72] Capital BlueCross protests that it lacks sufficient minimum contacts with Texas (the forum state of this suit) because they have not engaged in actions that substantially connect them to Texas. It claims it has no physical presence in Texas and does not conduct business here, based on existing declarations attached to its motion to dismiss. Moreover, Capital BlueCross argues that because it never had a contract with any of the plaintiffs or engaged in conduct connected to Texas with respect to any of the insurance claims at issue, it cannot "reasonably anticipate being haled into court" in Texas.[73]

When considering whether to dismiss a complaint for lack of personal jurisdiction, the Court "may consider affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery."[74] And the Court should accept all "uncontroverted allegations, and resolve in [the plaintiffs'] favor all conflicts between the facts contained in the parties' affidavits and other documentation."[75]

The defendants rely on a declaration filed with their earlier motion to dismiss which states that Capital Blue Cross exclusively serves customers in "central Pennsylvania and the Lehigh Valley" and provides group insurance for businesses in the same general area.[76] Rather than disputing *441 any of these facts, the plaintiffs argue that "when a federal court is attempting to exercise personal jurisdiction over a defendant in a suit based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the United States," not any one state. Strange as it seems, the Fifth Circuit has confirmed this principle.[77] Because ERISA provides for nationwide service of process and Capital Blue Cross has minimum contacts with the United States, the Court has personal jurisdiction over Capital Blue Cross with respect to claims under it.[78]

The plaintiffs go further, though, arguing that pendent personal jurisdiction means the Court also has jurisdiction over their asserted state-law-based claims against Capital BlueCross. But because the Court has already dismissed all state-law claims for lack of standing above, Capital BlueCross's motion regarding these claims is moot.

## VII. Remaining Claims Against CareFirst

And finally, CareFirst argues that it is not a proper party to this suit because it "does not offer health insurance, administer insurance plans, or pay insurance claims."[79] The defendants offer this assertion as grounds for both 12(b)(2) and 12(b)(6) dismissal. But the declaration they reference most notably states that CareFirst has no significant contacts with the plaintiffs or the forum state, let alone a sufficient minimum number.[80] As with the Capital BlueCross claims, this makes no difference: CareFirst has sufficient minimum contacts with the United States, and the Court may therefore exercise jurisdiction over it with respect to claims under laws allowing nationwide service of process (like ERISA).[81]

With regard to whether CareFirst is an insurer (and whether it is possible to state a claim against it under ERISA or relevant state law at all), plaintiffs respond that determining CareFirst's business structure and practices is inappropriate at this point.[82] The Court agrees with the plaintiffs. CareFirst's arguments on this point go to whether it should be part of a lawsuit on this subject anywhere in the United States. As such, this is a merits-based argument under Rule 12(b)(6). But prior to

factual discovery, courts ought not dismiss claims that hinge on undeveloped facts.[83] Such a determination is more appropriate at the summary judgment stage.[84]

\* \* \*

**\*442** To sum up, the Court **GRANTS** the defendants' motion to dismiss with respect to Counts III, V, VI, and VII, which are hereby **DISMISSED WITH PREJUDICE**. And the Court **DISMISSES WITHOUT PREJUDICE** Count IV. The Court lastly **DISMISSES AS MOOT** all state-law-based claims against Capital BlueCross and CareFirst. But the Court **DENIES** the motion to dismiss with respect to the defendants' anti-assignment defense, subject-matter jurisdiction over South Carolina Blue and Florida Blue, and personal jurisdiction regarding any remaining ERISA claims over Capital BlueCross and CareFirst. The plaintiffs may refile their combined complaint with the only changes being reflective of these rulings within 28 days of this motion.

**IT IS SO ORDERED** this 10th day of December, 2020.

### All Citations

506 F.Supp.3d 425

### Footnotes

1   *See, e.g.*, *Absolute Unit*, Know Your Meme, https://knowyourmeme.com/memes/absolute-unit; *see also* Emilia Petrarca, *Why Is "Absolute Unit" a Menswear Meme?*, The Cut (Feb. 8, 2018), https://www.thecut.com/2018/02/absolute-unit-meme.html ("[A]n absolute unit is something or someone that is comically oversize.").

2   *See* Doc. 212 and Doc. 218.

3   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

4   *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007).

5   *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).

6   *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004).

7       *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

8       *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995).

9       *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). The Court may find claims implausible (and thus dismiss them) even without "judicially noticeable facts available to contradict them." *Denton v. Hernandez*, 504 U.S. 25, 33, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992); *see also Starrett v. U.S. Dep't of Def.*, 763 F. App'x 383, 384 (5th Cir. 2019).

10      Doc. 218 at 15.

11      *Bashara v. Baptist Mem'l Hosp. Sys.*, 685 S.W.2d 307, 310 (Tex. 1985).

12      *Id.*

13      *Truly v. Austin*, 744 S.W.2d 934, 937 (Tex. 1988) (emphasis in original).

14      Doc. 55 at 57.

15      775 F. Supp. 2d 938 (E.D. Tex. 2011).

16      *Id.* at 966; *see also Mid-Town Surgical Ctr., LLP v. Blue Cross Blue Shield of Tex.*, 2012 WL 1252512 at *3 (S.D. Tex. Apr. 11, 2012).

17      *Id.*

18      The plaintiffs argue that *Encompass* and similar cases can be distinguished because "the courts in those cases found that plaintiffs did not allege they provided services specifically to defendants." Maybe the plaintiffs were relying on a different case called *Encompass*. *See, e.g.*, *Encompass*, 775 F. Supp. 2d 966 ("Encompass counters that *it has provided valuable services to United* ...." (emphasis added)). And the Court is unpersuaded by the other district court cases the plaintiffs marshal in their favor. As a representative example, *DAC Surgical Partners*, 2011 WL 3841946 (S.D. Tex. Aug. 30, 2011), in which a Southern District of Texas court ruled that the plaintiffs stated their quantum meruit claim by merely alleging provision of a benefit, provides no indication of the facts that made this ruling plausible—which is the standard at the motion to dismiss stage. *Id.* at *6; *but see Denton*, 504 U.S. at 33, 112 S.Ct. 1728; *Southland*, 365 F.3d at 361 (noting that "conclusory allegations" cannot survive a motion to dismiss).

19      *Travelers Indem. Co. of Conn. v. Losco Grp., Inc.*, 150 F. Supp. 2d 556, 563 (S.D. NY 2001); *see also Encompass*, 775 F. Supp. 2d at 966 n.11 (quoting *Travelers*), *Tex. Spine & Joint Hosp., Ltd. v. Blue Cross & Blue Shield of Tex.*, 2015 WL 13649419 at *7 n.9 (E.D. Tex. May 28, 2015) (not reported) (also quoting *Travelers*).

Case 2:23-cv-02550-JTF-tmp   Document 1-2   Filed 08/31/23   Page 367 of 660   PageID 393

Angelina Emergency Medicine Associates PA v. Health..., 506 F.Supp.3d 425...

20    The defendants also argue that the plaintiffs' quantum meruit claims should be dismissed because such a claim is unavailable under Texas law where it duplicates a contract remedy. As the defendants' other argument on benefits is enough to dismiss the claim, the Court declines to address this line of reasoning.

21    *Arnold v. Nat'l Cty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987). This heavily implies, by the way, that this tort should primarily (perhaps only) be exercised in relation to this unbalanced bargaining relationship—*i.e.*, by an insured directly against an insurer, *not* by the insured's assignee.

22    *Id.*

23    Doc. 55 at 59.

24    *Univ. of Tex. Med. Branch at Galveston v. Allan*, 777 S.W.2d 450, 453 (Tex. App.—Houston [14th Dist.] 1989).

25    *McConnell v. Corgey*, 153 Tex. 49, 262 S.W.2d 944, 947 (1953).

26    *See Wolters Village Mgmt. Co. v. Merchs. and Planters Nat'l Bank of Sherman*, 223 F.2d 793, 798 (5th Cir. 1955) ("It is clear that in general a right expected to arise in the future may be the subject of assignment, if expected to arise under a contract in existence at the time of the assignment.").

27    545 S.W.3d 479 (Tex. 2018).

28    *Id.* at 499–500.

29    The plaintiffs argue that they may still recover under the "entitled-to-benefits" rule regardless of their success on the "independent-injury" rule. *See id.* at 495. The "entitled-to-benefits" rule allows recovery of benefits under an insurance policy by an insured as actual damages "if the insurer's statutory violation causes the loss of the benefits." *Id.* Existing Fifth Circuit caselaw does indeed construe these two rules as separate routes for recovery for violations of the duty of good faith and fair dealing. *See Lyda Swinerton Builders, Inc. v. Okla. Sur. Co.*, 903 F.3d 435, 452 (5th Cir. 2018). But because, as detailed below, the Court finds that the plaintiffs lack standing on every alleged state law claim, the plaintiffs may not recover under the "entitled-to-benefits" rule. *See id.* (holding that a statutory violation must cause the loss of policy benefits for recovery under the "entitled-to-benefits" rule to occur).

30    The Court would normally allow repleading to let the plaintiffs plead a specific independent injury. However, when given the opportunity to state what independent injury they had suffered in their response, they pointed only to the paragraph in their complaint that alleged they were entitled to damages. This is the definition of conclusory pleading. The Court sees no way that the plaintiffs could state a claim under the independent-injury rule.

Case 2:23-cv-02550-JTF-tmp   Document 1-2   Filed 08/31/23   Page 368 of 660   PageID 394

Angelina Emergency Medicine Associates PA v. Health..., 506 F.Supp.3d 425...

31      *See Provident Am. Ins. Co. v. Castaneda*, 988 S.W.2d 189, 199 (Tex. 1998) (holding that injuries that stem or flow from denial of benefits are not "independent").

32      The defendants also argue that plaintiffs haven't alleged sufficient facts to back up their claim of breach. This determination would require a factual analysis, and this claim is eminently resolvable on other grounds, so the Court declines to address this argument.

33      Specifically, sections 541.060, 1271.155, and 1301.0053.

34      Doc. 212 at 24; Doc. 218 at 32 n.11; *see also Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 274–75 (5th Cir. 2004).

35      29 U.S.C. § 1144(a).

36      § 1144(b)(2)(A).

37      *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010), *see also Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 445 (Tex. 2009) (Hecht, J. concurring) ("Ascertaining the meaning of a statutory text (or any text for that matter) begins with the language used, and if that language is plain enough, absent some obvious error or an absurd result, that is where the task ends.").

38      Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2163 (2016) (book review).

39      Tex. Ins. Code § 1301.0053(a).

40      *Id.* at § 1271.155(a).

41      Doc. 55 at 59–60.

42      Tex. Ins. Code § 1301.001(1).

43      *Id.* at § 1301.001(5).

44      *See, e.g. United States v. Fior D'Italia, Inc.*, 536 U.S. 238, 244, 122 S.Ct. 2117, 153 L.Ed.2d 280 (2002); *Conlon by Conlon v. Heckler*, 719 F.2d 788, 800 (5th Cir. 1983).

Case 2:23-cv-02550-JTF-tmp   Document 1-2   Filed 08/31/23   Page 369 of 660   PageID 395

Angelina Emergency Medicine Associates PA v. Health..., 506 F.Supp.3d 425...

45    *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 ("Factual allegations must be enough to raise a right to relief above the speculative level ....").

46    *Brown v. Arturo De La Cruz*, 156 S.W.3d 560, 567 (Tex. 2004). The Court is also persuaded by the reasoning in *Apollo MedFlight, LLC v. BlueCross BlueShield of Texas*, 2019 WL 4894263, at *3 (N.D. Tex. Oct. 4, 2019), which analyzes the statutes at issue here under the *Brown* standard and comes to the same conclusion the Court now reaches.

47    Tex. Ins. Code § 541.060(a)(2)(A).

48    Doc. 55 at 60–61. Insurance Code section 541.151(1) provides a private right of action for "[a] person ... against another person" whom they allege has acted in a manner defined as "an unfair method of competition or unfair or deceptive act or practice in the business of insurance." The plaintiffs must rely on assignment from their patients because the Texas Supreme Court has already ruled that third parties do not have standing to sue for unfair claim-settlement practices under Insurance Code section 541.060 and 541.151. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 384 (Tex. 2000); *Allstate Ins. Co. v. Watson*, 876 S.W.2d 145, 150 (Tex. 1994); *see also Companion Prop. and Cas. Ins. Co. v. Opheim*, 2014 WL 4209586, at *2 (N.D. Tex. Aug. 26, 2014) (Fish, J.) (unpublished).

49    *United States v. One 18th Century Colombian Monstrance*, 797 F.2d 1370, 1374 (5th Cir. 1986).

50    *See Hardy v. Univ. Interscholastic League*, 759 F.2d 1233, 1235 (5th Cir. 1985) (agreeing with other circuit precedent that "the validity of ... state-law claims ... [is] a matter of state law best determinable by the state courts").

51    *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 82 (Tex. 2004).

52    *Id.* at 92. The Texas Supreme Court noted a few exceptions, none of which are applicable here. And the very wording of the Texas Supreme Court's holding assumes that the third party in question has been assigned a ripe claim—*i.e.*, the customer (or patient, in this instance) was "aggrieved" before making the assignment. Because the specific grievance alleged here—underpayment of insurance claims to third-party healthcare providers—doesn't even involve the patient and occurred after patients assigned anything to the plaintiffs, the Court fails to see how the plaintiffs can reasonably claim they have standing to bring Count VI.

53    *Id.* at 85.

54    Because the Court holds that the plaintiffs lack standing, it declines to address their other arguments regarding Count VI.

55    Doc. 55 at 62.

56    Tex. Ins. Code § 1301.101.

Case 2:23-cv-02550-JTF-tmp   Document 1-2   Filed 08/31/23   Page 370 of 660   PageID 396

Angelina Emergency Medicine Associates PA v. Health..., 506 F.Supp.3d 425...

57    The Court will at this point refrain from determining whether any allegedly unpaid or underpaid insurance claim in this case is "clean," as that would mean delving into facts the Court doesn't yet have.

58    § 1301.103. *See also* § 843.338. The Court notes that the Fifth Circuit has ruled that section 1301.103 is preempted as to any insurance claims made under Federal Employee Health Benefits Act-governed plans. *See Health Care Serv. Corp. v. Methodist Hosps. of Dallas*, 814 F.3d 242, 253–55 (5th Cir. 2016) (recognizing preemption by 5 U.S.C. § 8902). The Court also notes that the relevant definition of "preferred provider" only includes physicians, health care providers, or organizations of physicians or health care providers that "contract[ ] with an insurer." Tex. Ins. Code § 1301.001(8). As the plaintiffs are admittedly out-of-network and thus not preferred, *see* Doc. 55 at 7, section 1301 only applies to them in limited fashion through section 1301.069.

59    *Id.* at § 1301.069(2)(A).

60    42 U.S.C. §§ 1395dd(b)(1); Tex. Health & Safety Code 311.022.

61    42 U.S.C. § 1395dd(b)(1)(A)–(B) (whole lotta emphases added).

62    *See* Doc. 218 at 39 ("Plaintiffs are groups of physicians ...").

63    Generally, hospitals tend not to employ physicians and instead have affiliations or admitting privileges with physicians. This practice often stems from state laws requiring individuals to be licensed to practice medicine and state judicial decisions interpreting those laws to prohibit hospitals from employing physicians. *See* Dep't of Health & Human Servs., Office of the Inspector Gen., State Prohibitions on Hospital Employment of Physicians (1991) (available at https://oig.hhs.gov/oei/reports/oei-01-91-00770.pdf).

64    The plaintiffs offhandedly gesture at 42 U.S.C. § 1395dd(d)(1)(B), which imposes penalties on "any physician who is responsible for the examination, treatment, or transfer of an individual in a participating hospital" who negligently violates Emergency Treatment Act requirements. But this statute doesn't require physicians to perform emergency medical care. It penalizes any physician whom a hospital requires to perform such care for doing so negligently. It has nothing to do with this suit.

65    Tex. Health & Safety Code § 311.022(a).

66    The Court will not further address the defendants' argument that plaintiffs have no right to penalties under the Prompt Pay Act as out-of-network providers because of its dispositive holding on standing.

67    *Mello v. Sara Lee Corp.*, 431 F.3d 440, 444–45 (5th Cir. 2005). Because the plaintiffs assert this specific variety of estoppel, the Court notes that their defense can only apply to ERISA-governed policies with anti-assignment clauses.

68    *See* *Lawal v. Lynch*, 156 F. Supp. 3d 846, 852 (S.D. Tex. 2016) (holding that district courts have "wide discretion" in resolving Rule 12(b)(1) subject-matter jurisdiction issues brought up in motions to dismiss).

69    Doc. 212 at 50.

70    *Id.* at 51.

71    *Williamson v. Tucker*, 645 F.2d 404, 414 (5th Cir. 1981).

72    *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006). ERISA allows for nationwide service of process, so rather than looking for sufficient minimum contacts with Texas, we look for sufficient contacts anywhere in the United States. *See* 29 U.S.C. § 1132(e)(2).

73    *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

74    *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002) (internal quotations and citations removed).

75    *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000).

76    *See* Doc. 122-1, at 2.

77    *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994). The Court fails to see the connection between service of process and personal jurisdiction, but the Court is nonetheless duty-bound to follow the Fifth Circuit's lead.

78    29 U.S.C. § 1132(e)(2).

79    Doc. 212 at 61–62.

80    *See* Doc. 128-1*, see also World-Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. 559.

81    And also, as above, CareFirst's arguments to dismiss the plaintiffs' state-law-based claims are moot.

82    Doc. 218 at 69–70.

83      The Court declines to consider the aforementioned declaration without an evidentiary hearing when making its 12(b)(6) determination because the declaration itself was not referred to in the plaintiffs' complaint. *See Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004) (holding that "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim").

84      *See* Fed. R. Civ. P. 12(b) ("[If] matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment.").

---

**End of Document**                                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2023 WL 160084
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

ATLANTIC NEUROSURGICAL
SPECIALISTS, P.A., Plaintiff,
v.
MULTIPLAN, INC., Connecticut General
Life Insurance Company, United
Healthcare Group Company, Defendants.

20 Civ. 10685 (LLS)
|
Signed January 11, 2023

**Attorneys and Law Firms**

Nicole Allocca, John William Leardi, Buttaci Leardi &
Werner LLC, Princeton, NJ, for Plaintiff.

Aimee Leigh Creed, D'arcambal Ousley & Cuyler Burk
LLP, New York, NY, Errol J. King, Katherine C.
Mannino, Phelps Dunbar LLP, Baton Rouge, LA, for
Defendant Multiplan, Inc.

OPINION & ORDER

LOUIS L. STANTON, United States District Judge

**\*1** Atlantic Neurosurgical Specialists, P.A. ("Atlantic
Neuro") alleges it was underpaid for medical services it
provided to three patients who were insured by either
Cigna Health and Life Insurance Company ("Cigna") or
UnitedHealthcare Insurance Company ("United").
Atlantic Neuro asserts various contractual and
quasi-contractual claims under New Jersey state law
against Cigna and United, and the administering preferred
provider organization ("PPO"), MultiPlan, Inc.
("MultiPlan") to recover the difference it is allegedly
owed.

Defendants separately move to dismiss the First Amended
Complaint for failure to state a claim. For the reasons set

forth herein, Cigna's and United's motion is granted and
MultiPlan's motion is granted as to Counts IV and VI but
denied as to Counts I and V.

**BACKGROUND**

The following facts are taken from the First Amended
Complaint and are presumed to be true for the purpose of
this ruling. The parties' familiarity with the action is
assumed and the Court will only recount what is
necessary for disposition.

Atlantic Neuro is a neurosurgical healthcare provider in
New Jersey. Dkt. No. 66 (First Amended Compl.
("FAC")) ¶ 2. Cigna and United administer employee
benefit health plans, Benefit Programs, and reimburse
"healthcare expenses incurred by program insureds for
services and/or products covered by the Benefit
Programs." Id. ¶¶ 10, 14.

MultiPlan administrators a Preferred Provider
Organization ("PPO") Network. MultiPlan offers a
Complementary Provider Network, which acts as a
secondary network to an insurance company's preferred
provider network. Id. ¶ 26. To create the Complementary
Provider Network, MultiPlan contracts with
out-of-network providers, on one hand, who agree to
receive a discounted rate (the Contract Rate) for services
provided to patients whose health benefit plans participate
in MultiPlan's Complementary Provider Network. Id. ¶
27.

On the other hand, MultiPlan contracts with health plan
administrators for the right to access the Network and
provide clients the ability to visit otherwise
out-of-network providers at a discounted cost. "Notably,
when a health plan administrator such as Cigna or United
contracts with MultiPlan to access its Complementary
Provider Network and the Contract Rate payable to
[out-of-network] providers thereunder, not every one of
the plans they administer are MultiPlan's Complementary
Provider Network, i.e., not every one of [the health plan
administrator's] plans participate in MultiPlan's
Complementary Provider Network." Id. ¶ 28. Health plan
administrators benefit from using the Complementary
Provider Network by either (1) paying the discounted
lower rate, as opposed to the standard out-of-network rate,
for claims they are responsible to pay directly or (2)
receiving from their self-insured clients a higher "Shared
Savings Fee," a percentage of the difference between the
provider's standard out-of-network charge and the amount

ultimately paid on the claim. Id. ¶¶ 31-32.

Cigna and United have contracted with MultiPlan to join the Complementary Provider Network. Id. ¶¶ 12, 16. Both health plan administrators advertise their association with MultiPlan on their respective websites. Cigna's "website states that 'if the MultiPlan Savings Program logo appears on your Cigna ID card, you may be eligible to receive discounts when using an ONET [out-of-network], non-participating health care professional or facility that participates in the Network Savings Program.' " Id. ¶ 66. Similarly, United's website states: "United may have the right to access contracts and discounts that certain third parties have with ONET providers. When this program applies, the ONET provider's billed charges will be discounted." Id. ¶ 68. Atlantic Neuro has not entered into an express contract with either Cigna or United.

**\*2** On November 1, 2011, Atlantic Neuro contracted with MultiPlan to be a participating provider. Id. ¶ 35. Atlantic Neuro alleges that under the contract, the MultiPlan Participating Professional Group Agreement ("Agreement"), MultiPlan represented that its clients, including Cigna and United, "would pay Contract Rates to Atlantic Neuro for surgical and other related medical services rendered to Atlantic Neuro's patients enrolled in Benefit Programs underwritten and/ or administered by Cigna or United when any such patient accesses MultiPlan's Complementary Provider Network." Id. ¶ 36.

Thus, Atlantic Neuro alleges that the Agreement entitles it to be paid at the Contract Rate, 70% of its billed charges, when it provides covered services to patients "presenting" a Cigna or United "insurance card containing the MultiPlan logo." Id. ¶¶ 29, 37, 39. In exchange, Atlantic Neuro alleges it is bound to provide services when presented with a patient participating in the MultiPlan Network and cannot balance bill the patient for the difference between the Contract Rates and its usual fees. Id. ¶¶ 38, 42.

Atlantic Neuro has provided services to patients presenting a Cigna or United insurance card that also bears the MultiPlan logo. When a plan member's card has a MultiPlan logo on it, Cigna has paid Atlantic Neuro the Contract Rate on many occasions, before, during, and after the claims arose in this case: July 29, 2016; February 14, 2017; April 18 and 28, 2017; May 15, 20, and 25, 2017; and July 1, 5, and 16, 2017; December 1, 2017; June 27, 2018; February 2019; March 5, 2019; April 15 and 24, 2019; May 7, 2019; June 10, 11, 12, 13, 14, and 16, 2019; July 15, 2019; and September 8, 2019. Id. ¶¶ 48-49; 51-52. On each occasion, Cigna provided a written Explanation of Benefits ("EOB") letter to Atlantic

Neuro stating "HEALTH CARE PROFESSIONAL: DO NOT BILL THE PATIENT FOR THE MULTIPLAN DISCOUNT THROUGH MULTIPLAN." Id. ¶¶ 50-52.

Likewise, when a plan member's card has a MultiPlan logo on it, United has paid Atlantic Neuro the Contract Rate on many occasions, before, during, and after the claims arose in this case: August 29, 2017; September 1 and 19, 2017; October 13, 16, 24, and 31, 2017; November 6, 9, 10, 11, 12, 13, and 29, 2017; December 4, 2017; January 2, 4, 7, and 18, 2019; March 7, 2019; April 6, 22, 26, and 19, 2019; and February 9, 2021. Id. ¶¶ 56, 58-59. On each occasion, United provided a written EOB letter to Atlantic Neuro stating "THIS PHYSICIAN OR HEALTHCARE PROVIDER IS OUT-OF-NETWORK, BASED ON AN AGREEMENT WITH MULTIPLAN, THE PROVIDER HAS ACCEPTED A DISCOUNT FOR THIS SERVICE. THE DISCOUNT SHOWN IS YOUR SAVINGS AND NOT INCLUDED IN THE AMOUNT YOU OWE." Id. ¶¶ 57-59.

This case arises from Atlantic Neuro's performance of medical services on three such Cigna or United patients for which Atlantic Neuro alleges it was not paid the required Contract Rate. Id. ¶¶ 75-76. Atlantic Neuro alleges that all of the patients' Cigna or United insurance cards included the MultiPlan Logo and that all the services rendered qualify as "covered services" under the Agreement. Id. ¶¶ 75-76; 83; 86; 89; 94; 99; 102; and 105.

First, Atlantic Neuro performed three surgical procedures on H.I., who was insured through a Benefit Program administered by Cigna on behalf of CBRE. Id. ¶ 79. For the procedure rendered on November 9, 2017, Atlantic Neuro alleges Cigna only paid it $1,493.32 even though it submitted charges to Cigna in the amount of $39,020.00. Id. ¶¶ 81; 83. Cigna's sole explanation for its level of payment was that it was subject to a "pricing review performed by an outside vendor." Id. ¶ 84. For services rendered on January 25, 2019, Atlantic Neuro alleges Cigna paid nothing towards submitted charges of $137,773.46. Id. ¶¶ 85-86. For services rendered on March 6, 2019, Atlantic Neuro alleges Cigna only paid $6,571.20 although Atlantic Neuro submitted charges in the amount of $181,470.68. Id. ¶ 88-89.

**\*3** Second, Atlantic Neuro rendered services to M.D., a patient insured by United on behalf of Control4. Id. ¶ 91. Atlantic Neuro submitted claims totaling $49,803.02 for the rendered services but United paid only $481.98. Id. ¶ 94.

Third, Atlantic Neuro thrice provided medical care to

C.F., who was insured by New York University's Benefit Program, under the administration of United. Id. ¶ 96. United underpaid on all of those claims, paying nothing towards December 17, 2018 services totaling $41,600, paying nothing towards December 21, 2018 services totaling $41,600, and paying $4,008.94 towards February 22, 2019 services totaling $42,681.60. Id. ¶¶ 99, 102, 105.

In total, Atlantic Neuro alleges that it was underpaid $431, 208.69. Id. ¶ 78. On December 18, 2020, Atlantic Neuro brought suit to recover the amount owed alleging: (1) Breach of Contract against MultiPlan; (2) Breach of Contract against Cigna; (3) Breach of Contract against United; (4) Breach of Implied Warranty of Good Faith and Fair Dealing against all Defendants; (5) Promissory Estoppel against all Defendants; and (6) Quantum Meruit against all Defendants. Dkt. No. 1.

On January 8, 2022, the Court held that ERISA preemption did not apply but nonetheless dismissed all claims against Cigna and United. Dkt. No. 63. Against MultiPlan, the Court dismissed the claims for Breach of the Implied Warranty and Quantum Meruit. Id. Leave to amend was granted for all counts. Id.

The First Amended Complaint was filed on March 4, 2022. It again alleged: (1) Breach of Contract against MultiPlan; (2) Breach of Implied Contract against Cigna; (3) Breach of Implied Contract against United; (4) Breach of Implied Warranty of Good Faith and Fair Dealing against all Defendants; (5) Promissory Estoppel against all Defendants; (6) Quantum Meruit against all Defendants. Dkt. No. 66. Defendants each moved to dismiss for failure to state a claim upon which relief can be granted and MultiPlan moved for reconsideration as to the Court's previous ruling upholding the Breach of Contract and Promissory Estoppel claims against it. Additionally, Cigna alleges that Atlantic Neuro's state law claims are preempted by ERISA.

As MultiPlan does not allege any "controlling decisions or data that the court overlooked," the Court declines to reexamine its initial rulings that Atlantic Neuro successfully pled breach of contract and promissory estoppel claims against MultiPlan and that Atlantic Neuro's claims are not preempted by ERISA. See McGraw-Hill Glob. Educ. Holdings. LLC v. Mathrani, 293 F. Supp. 3d 394, 397 (S.D.N.Y. 2018). Therefore, the Court will only address the motions to dismiss the claims for breach of implied contract and promissory estoppel against Cigna and United and for quantum meruit against all defendants.[1]

**DISCUSSION**

I. Legal Standards
The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The court reviews the complaint liberally, drawing all reasonable inferences in the plaintiff's favor and accepting as true all factual allegations, except for any legal conclusions couched as factual allegations. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Nicosia v. Amazon.com, Inc., 834 F.3d 220, 230 (2d Cir. 2016).

*4 "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' " Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). This requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 570 (citations omitted).

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court may consider documents that are attached to the complaint, incorporated by reference to the complaint, or relied upon heavily such that they become integral to the complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002); DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

II. Counts II and III-Breach of Implied Contract against Cigna and United
Atlantic Neuro argues that Cigna's and United's conduct and course of dealing, as well as their marketing communications revealed a promise to pay the Contract Rate to Atlantic Neuro for medical services provided to insureds whose plan was in MultiPlan's network. FAC ¶¶ 116-21; 125-30. That conduct, which Atlantic Neuro references, includes the placement of the MultiPlan logo on insurance cards issued by Cigna and United to H.I., M.D., and C.F., which Atlantic Neuro allegedly relied upon in determining whether to render medical services. FAC ¶¶ 118, 127. It also includes a history of Cigna and

United paying the Contract Rate for services provided to their other patients who had insurance cards with the MultiPlan logo. FAC ¶¶ 48-52; 53-59. And, in conjunction with paying the Contract Rate for the services provided to the aforementioned other patients, Cigna's and United's provision to Atlantic Neuro an Explanation of Benefits ("EOB"), which acknowledged that the amount being paid to Atlantic Neuro was calculated in reference to a contract a MultiPlan. FAC ¶¶ 50, 57, 59, 61.

To state a claim for breach of implied contract under New Jersey law,[2] a plaintiff must plead facts showing that: (1) "the parties entered into a contract with specific terms;" (2) "the moving party acted in accordance with the contract;" (3) "the non-moving party failed to act ('breached') accordingly;" and (4) "the breach resulted in damages to the moving party." See Structured Assets Tr. v. Long, No. A-0164-14Tl, 017 WL 1282742, at *2 (N.J. Super. Ct. App. Div. Apr. 6, 2017) (citing Barr v. Barr, 418 N.J. Super. 18, 31-32 (N.J. Super. Ct. App. Div. 2011)); St. Paul Fire & Marine Ins. Co. v. Indem. Ins. Co. of N. Am., 32 N.J. 17, 23, 158 A.2d 825, 828 (1960) ("An implied-in-fact contract is in legal effect an express contract.").

The critical issue here is whether the parties entered into an implied-in-fact contract. "The true implied contract consists of an obligation 'arising from mutual agreement and intent to promise but where the agreement and promise have not been expressed in words.' " Id. (citation omitted). Therefore, the relevant inquiry into whether an implied-in-fact contract exists is whether the conduct of the defendant, as viewed by a reasonable person in the relevant custom or trade, revealed a promise to pay. Plastic Surgery Ctr., P.A. v. Cigna Health & Life Ins. Co., No. CV 17-2055, 2019 WL 1916205, at *6 (D.N.J. Apr. 30, 2019); Duffy v. Charles Schwab & Co., Inc., 123 F. Supp. 2d 802, 804 (D.N.J. 2000).

*5 Here, there was no mutual agreement to pay Atlantic Neuro the Contract Rates for medical procedures performed on H.I., M.D., and C.F. The Court has already held that "the inclusion of the MultiPlan logo on Cigna's and United's insurance cards does not sufficiently demonstrate that Cigna and United offered to pay Atlantic Neuro" the contract amount. Op. at 20. As the Court explained, the inclusion of the MultiPlan logo on the Cigna and United cards advertises that the insurers are in the business of offering discounted rates for out of network providers, not that they will underwrite every procedure. Id.

Viewing the facts in the light most favorable to Atlantic

Neuro, the insurers' marketing materials and course of conduct also only shows that Cigna and United were in business with MultiPlan and not that they had agreed to pay the Contract Rates for the procedures needed by these three individuals. There is no dispute that Cigna and United have contracted with MultiPlan to have the right to access MultiPlan's network of medical providers. The question is instead whether Cigna and United had promised Atlantic Neuro that they would access the MultiPlan network and pay the contract rates for H.I.'s, M.D.'s, and C.F.'s procedures.

Cigna's and United's payment history on other claims does not provide any evidence of their intent to agree to pay the contract rates for the procedures under dispute here. Atlantic Neuro does not allege that Cigna and United always paid the Contract Rate. A history of paying the rate on some claims does not amount to giving binding assent to always pay the Contract rate.

Cigna's and United's marketing materials similarly evidence an association with MultiPlan, but do not commit the insurers' to paying the Contract Rate for the claims underlying this case. The First Amended Complaint alleges that Cigna's website states, " 'if the MultiPlan Savings Program logo appears on your Cigna ID card, you may be eligible to receive discounts when using an ONET, non-participating health care professional or facility that participates in the Network Savings Program.' " FAC ¶ 66. But the First Amended Complaint omits the remainder of the quote which states "Discounts are not guaranteed." FAC ¶ 66 ("Declaration of E. Evans Wohlforth, Jr."), Ex. A. It alleges that United's website says United clients "may have the right to access contracts and discounts that certain third parties have with ONET providers. When this program applies, the ONET provider's billed charges will be discounted." FAC ¶ 68. In the face of these provisos, no professional healthcare provider could plausibly believe the language on the websites is a binding promise to pay the Contract Rates. See Read v. Profeta, 397 F. Supp. 3d 597, 626 (D.N.J. 2019) ("An implied-in-fact contract is 'unenforceable for vagueness when its terms are too indefinite to allow a court to determine with reasonable certainty what each party has promised to do.' " (citation omitted)).

Finally, the fact that in the administration of other patient's insurance claims Cigna and United sent Atlantic Neuro EOB's that referenced the MultiPlan agreement has no bearing on this case. Atlantic Neuro did not receive any such EOB in connection with H.I., M.D., and C.F. Rather, "Cigna's sole explanation for its level of payment was that it was subject to a 'pricing review

performed by an outside vendor.' " FAC ¶ 84.

Because the First Amended Complaint fails to adequately show that Atlantic Neuro can prove there was a meeting of the minds between it and Cigna and United to pay the Contract Rates for H.I.'s, M.D.'s, and C.F.'s medical procedures, Counts Two and Three are dismissed.

III. Count V-Promissory Estoppel against Cigna and United

**\*6** To state a claim for promissory estoppel under New Jersey law, a plaintiff must allege: "1) a clear and definite promise, 2) made with the expectation that the promisee will rely upon it, 3) reasonable reliance upon the promise, 4) which results in definite and substantial detriment." Lobiondo v. O'Callaghan, 357 N.J. Super. 488, 499 (App. Div. 2003). Promissory estoppel is an alternative theory to breach of contract and a party may simultaneously plead each claim. See Goldfarb v. Solimine, 245 N.J. 326, 340-41 (2021) ("Suits to enforce contracts and suits predicated upon promissory estoppel are thus different in both their requisite elements and their goals.").

The First Amended Complaint alleges that Cigna's and United's "collective, consistent, and repeated representations" that they would pay the Contract Rate for the services rendered to H.I., M.D., and C.F. "represented a promise to pay Atlantic Neuro." FAC ¶ 141. The representations the First Amended Compliant relies on is not only the fact that the MultiPlan logo appeared on the Cigna and United insurance cards used by H.I., M.D., and C.F., but also the statements on the Cigna and United websites acknowledging their participation in the MultiPlan Network, FAC ¶¶ 65-68; 72, and the course of dealing between the parties-the 10 prior occasions for Cigna and 15 for United on which the insurers paid the Contract Rate for medical services provided to patients whose cards had the MultiPlan logo and issued EOBs that acknowledged that the reimbursement amount was based on participation in the MultiPlan Network, FAC ¶¶ 48-50; 55-57.

The First Amended Complaint does not adequately allege Cigna and United made a promise to pay. The general expectation of a benefit is insufficient to establish a claim for promissory estoppel. E. Orange Bd. Of Educ. v. N.J. Sch. Constr. Corp., 405 N.J. Super. 132, 147-48 (App. Div.), cert. denied, 199 N.J. 540 (2009) ("general expectation" of a benefit is insufficient to establish a claim for promissory estoppel). Thus, while the First Amended Complaint delivers far more detail illustrating

Cigna's and United's participation in the MultiPlan Network, it fails to state a claim for promissory estoppel because it does not provide any support for the claim that Cigna and United promised to pay the Contract Rates for the specific medical services received by H.I., M.D., and C.F.

The course of dealing between the parties cannot alone maintain a claim for promissory estoppel without an accompanying unambiguous promise. See North Jersey Brain & Spine Center v. Aetna Life Ins. Co., No. L-5817-18, 2019 WL 4889507, at \*16 (N.J.Super.L. Oct. 01, 2019) (maintaining a claim for promissory estoppel based on the parties course of dealing because the defendant gave a promise to pay for each service through either a prior authorization or an advisement that such authorization was unnecessary); Malaker Corp. S'holders Protective Comm. v. First Jersey Nat. Bank, 163 N.J. Super. 463, 480, 395 A.2d 222, 230 (App. Div. 1978) (finding that an "implied" promise of a loan of some indefinite amount was insufficient to support a promissory estoppel claim).

No unambiguous promise is shown to have ever been made between Cigna and United on one hand and Atlantic Neuro on the other. The placement of the MultiPlan logo on the Cigna and United insurance cards and the statements made on Cigna's and United's websites do not mean Cigna and United promised to pay the Contract Rates for H.I.'s, M.D.'s, and C.F.'s procedures. In fact, they provide notice that every claim might not be accepted.

**\*7** The Court has already held that the placement of the MultiPlan logo on Cigna's and United's insurance cards "alone does not sufficiently aver that Cigna and United promised to compensate Atlantic Neuro at the Contract Rates." Dkt. No. 63 at 25. This is especially true given that the United insurance card presented by M.D. and C.F. said "this card does not guarantee coverage," the exact opposite of an unambiguous promise to pay. See Dkt. No. 84 (Declaration of Matthew P. Mazzola), Exs. B & C.

The additional evidence of the statements on Cigna's and United's websites does nothing to change the statement of affiliation created by the placement of the MultiPlan logo into a promise to pay. As discussed above, the statements on the website made it clear that the MultiPlan rates would not apply to all scenarios.

Atlantic Neuro reliance on N. Jersey Brain & Spine Ctr. v. Aetna Life Ins. Co. to argue that a course of dealing is alone sufficient to plead promissory estoppel is misplaced. N. Jersey Brain & Spine Ctr. supports the

opposite conclusion, consistent with the Court's holding, that a course of dealing still needs an unambiguous promise to pay in order to sustain a claim for promissory estoppel. North Jersey Brain & Spine Center, 2019 WL 4889507, at *16. In N. Jersey Brain & Spine Ctr. there is unambiguous evidence of a promise to pay—the defendant there gave prior authorization or advised that such authorization was not required. Id. No such communications have been alleged here.

Because a "clear and definite promise" is the "sine qua non" of a promissory estoppel claim, Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bank, 163 N.J. Super. 463, 479 (App. Div. 1978) and none is alleged in the First Amended Complaint, Atlantic Neuro's promissory estoppel claim against Cigna and United is dismissed.

IV. Count VI-Quantum Meruit against all defendants
A claim of quantum meruit requires a showing that the defendant was unjustly enriched. See F. Bender, Inc. v. Jos. L. Muscarelle, Inc., 304 N.J. Super. 282, 285 (App. Div. 1997); Fuel Inc. v. BP Prod. N. Am., Inc., No. 08-CV-3947, 2009 WL 1873583, at *8 (D.N.J. June 29, 2009) ("Claims of quantum meruit 'rest[ ] on the equitable principle that a person shall not be allowed to enrich himself unjustly to the expense of another.' ") (citation omitted).

Atlantic Neuro alleges that "defendants received the benefit of Atlantic Neuro's participation in the MultiPlan's Complementary Provider Network and its treatment of the Cigna and United members in question, including but not limited to the collection and division of Shared Savings Fees by and among Cigna and United on the one hand, and MultiPlan on the other, without honoring Atlantic Neuro's Contract Rate." FAC ¶ 148.

However, Atlantic Neuro's allegation does not show that defendants received a benefit at Atlantic Neuro's expense. Its allegation of unjust enrichment is two-fold. The first is based on the premise that defendants collected and divided a "Shared Savings Fee"[5] at a higher rate than they would have if they had paid the Contract Rates. FAC ¶¶ 73, 148-49. But the Shared Savings Fee is paid by patients who have self-insured Cigna and United healthcare plans. United and Cigna then pay a portion of Fee to MultiPlan. Accordingly, the benefit of the Fee was paid at the patient's or insurer's expense. It was realized solely because of agreements between Cigna, United, MultiPlan, and its clients. Atlantic Neuro had no direct role in

producing for defendants the benefits of a higher Shared Savings Fee. What Atlantic Neuro provided was a benefit to the patients, as in the end defendants were still left with a ripened obligation to pay money. See Broad St. Surgical Ctr., LLC v. UnitedHealth Grp., Inc., No. CIV. 11-2775 JBS/JS, 2012 WL 762498, at *8 (D.N.J. Mar. 6, 2012) ("[T]he insurance company, 'derives no benefit from those services; indeed, what the insurer gets is a ripened obligation to pay money to the insured-which hardly can be called a benefit.' ") (quoting Travelers Indem. Co. of Conn. v. Losco Group, Inc., 150 F. Supp. 2d 556, 563 (S.D.N.Y. 2001)).

*8 The second basis on which Atlantic Neuro claims defendants were unjustly enriched is through defendants' leveraging of their participation in the Complementary Provider Network in their promotional materials in an effort to induce additional customers to participate in their networks. See FAC ¶¶ 70, 73. But again the party conferring the benefit is not Atlantic Neuro. In this scenario, MultiPlan is the entity conferring the benefit of association. That benefit would continue to exist whether or not Atlantic Neuro was a provider in the MultiPlan Network. The promotional materials Atlantic Neuro cites did not guarantee Cigna or United clients access to the MultiPlan Network. It only said that clients "may be eligible to receive discounts" or "may have the right to access contracts and discounts that certain third parties have." FAC ¶¶ 66, 68.

Atlantic Neuro's indirect conferral of benefits is too remote to sustain a claim for quantum meruit and it is accordingly dismissed against all defendants. See Plastic Surgery Ctr., P.A. v. Cigna Health & Life Ins. Co., No. CV 17-2055, 2019 WL 1916205, at *8 (D.N.J. Apr. 30, 2019) ("District courts have consistently dismissed unjust enrichment claims under substantially similar circumstances, reasoning that, if anything, the benefit is derived solely by the insured party.").

V. Leave to Amend
Atlantic Neuro is denied leave to amend. "Although leave to amend should be freely given 'when justice so requires,' it is 'within the sound discretion of the district court to grant or deny leave to amend.' " Lopez v. Stop & Shop Supermkt. Co. LLC, 2020 WL 4194897, at *2 (S.D.N.Y. July 21, 2020) (quoting Fed. R. Civ. P. 15(a)(2) and McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007)). Atlantic Neuro's Opposition brief does not suggest the withholding of any curative facts that would show a promise was made or a benefit was

conferred by the defendants. It "is well established that leave to amend a complaint need not be granted when amendment would be futile." Kirk v. Heppt, 423 F. Supp. 2d 147, 149 (S.D.N.Y. 2006) (quoting Ellis v. Chao, 336 F.3d 114, 126 (2d Cir. 2003))."

**CONCLUSION**

The claims against the parties who made no promise to Atlantic Neuro are dismissed. Cigna's and United's Motions to Dismiss all Counts against them are granted, with prejudice.

What remains of this case are the claims that reflect an actual commitment and that are properly brought against the party which pledged them, MultiPlan. MultiPlan's Motion to Dismiss is granted, with prejudice, as to Counts IV (Breach of Implied Warranty) and VI (Quantum Meruit) but is denied as to Counts I (Breach of Contract) and V (Promissory Estoppel).

So Ordered.

**All Citations**

Slip Copy, 2023 WL 160084

Footnotes

1   The First Amended Complaint also alleged a breach of the implied warranty of good faith and fair dealing against all defendants. But, because Atlantic Neuro does not oppose defendants' motions to dismiss that claim, the claim is dismissed. Dkt. No. 88 ("Plaintiff's Motion in Opposition") at 1.

2   The Agreement "shall be construed and governed in accordance with ... the laws of the state in which the health care services are rendered," here New Jersey. Dkt. 42, Exhibit A, § 9.3.

3   The Shared Savings Fee is paid by the patient to Cigna or United and is calculated by taking a percentage of the difference between the customary out of network rate for the medical service rendered and the amount Cigna or United ultimately paid to the provider on the claim. FAC ¶ 32. MultiPlan's compensation from Cigna or United is a portion of the Shared Savings Fee. Id. ¶ 34.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:23-cv-02550-JTF-tmp   Document 1-2   Filed 08/31/23   Page 380 of 660   PageID 406

Broad Street Surgical Center, LLC v. UnitedHealth Group, Inc., Not Reported in...

2012 WL 762498
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

BROAD STREET SURGICAL CENTER,
LLC, Plaintiff,

v.

UNITEDHEALTH GROUP, INC., et al.,
Defendants.

Civil No. 11–2775 (JBS/JS).
|
March 6, 2012.

**Attorneys and Law Firms**

Andrew Joseph Karcich, Esq., Joanne Eskin Sutkin, Esq.,
Lynch, Karcich & Yellin, Voorhees, NJ, for Plaintiff
Broad Street Surgical Center, LLC.

Scott A. Resnik, Esq., Katten, Muchin & Rosenman, LLP,
New York, NY, for Defendants UnitedHealth Group, Inc.
and United Healthcare Services, Inc.

*OPINION*

SIMANDLE, Chief Judge.

## I. INTRODUCTION

**\*1** This matter is before the Court on Defendants
UnitedHealth Group, Inc. and United Healthcare Services,
Inc.'s ("Defendants" or "United") motion to dismiss the
first amended complaint [Docket Item 4] and Plaintiff
Broad Street Surgical Center, LLC's ("Plaintiff") motion
for leave to file a second amended complaint [Docket
Item 18]. The Plaintiff is a non-participating provider of
medical services who provided services to patients who
were covered under various insurance policies or plans
administered by the Defendants. The instant action arises
out of United's denial to reimburse claims submitted by

the Plaintiff for services rendered to United's insureds.

For the reasons discussed herein, the Court will grant in
part and deny in part Plaintiff's motion to file a second
amended complaint. The Court will dismiss Defendant's
motion to dismiss as moot.

## II. BACKGROUND

Plaintiff is an ambulatory surgical facility that provides
services associated with outpatient surgery to patients,
including Patients 1–50, and is located in New Jersey.
(Pl.'s Ex. A to the Affidavit of JoAnne Eskin Sutkin in
support of motion for leave to amend complaint and file
opposition to motion to dismiss, hereinafter "Proposed
Second Amended Complaint") (Sec.Am.Comp.¶ 4).
United is an insurer providing insurance coverage to
insureds and beneficiaries within New Jersey, including
Patients 1–50. (Prop.Sec.Am.Comp.¶ 6.) The Plaintiff
was a non-participating provider of Services in that it did
not have a contract with Defendants to accept agreed rates
for the Services provided to the Patients with agreements
or who were otherwise beneficiaries, with the Defendants.
The Services provided to Patients 1–50 were out of
network services. (Prop.Sec.Am.Comp.¶ 14.)

Plaintiff provided surgical facility services associated
with outpatient surgery to Patients 1–50, who were at the
time of the services, insured by Defendants under various
United insurance agreements or agreements to which
United was or is the Third Party Administrator.
(Prop.Sec.Am.Comp.¶ 10.)

Prior to rendering services to Patients 1–50, Plaintiff's
representative telephoned the Defendants and spoke with
a Defendants' agent to confirm out of network coverage
for the requested services. During each telephone call, the
Plaintiff's representative stated where she was calling,
provided United with the tax i.d. number of the Plaintiff,
identified the patient by name, date of birth and policy
number, as well as the procedure being performed. In
each telephone call, Plaintiff's representative and
employee was informed by United that there was
coverage for Plaintiff's facility fees and for the
procedures involved. (Prop.Sec.Am.Comp.¶¶ 15–26.)

Plaintiff received assignments of benefits ("AOBs") from
Patients 1–50, each of which had out of network benefits
for ambulatory surgery under their respective insurance
agreements or plans with Defendants, some of which are
or may be ERISA plans. (Prop.Sec.Am.Comp.¶ 30.)

**\*2** From the Spring of 2009 to approximately September 2009, the Defendant paid claims submitted by the Plaintiff for services rendered to patients insured by United. (Prop.Sec.Am.Comp.¶ 33.)

On and after September 2009, Plaintiff made claims for payments for services provided by Plaintiff to Patients 1–50 as a service provider or alternately as an assignee of the patients. (Prop.Sec.Am.Comp.¶ 39.) As of September 2009 to the present, Defendants have denied insurance coverage and refuse to pay Plaintiff for services provided to Patients 1–50. (Prop.Sec.Am.Comp.¶ 40.) According to the explanation of benefits, the Defendants denied all of Plaintiff's claims on and after September 2009 for the following reason: "We cannot pay this claim because we are unable to verify state licensure of a facility or criteria to support the provider billing type. Proof of facility licensure or hospital affiliation is required." (Prop.Sec.Am.Comp.¶ 37.)

Pursuant to various letters, Defendants base their refusal to pay for the Services provided by Plaintiff to Patients 1–50 because the Plaintiff is not licensed with the New Jersey Department of Health as an ambulatory care facility and therefore no benefits are available for expenses incurred at the facility and that the wrong form was utilized for submission of the claims. (Prop.Sec.Am.Comp.¶ 41.)

From March 2009 until the present, the Plaintiff submitted to the Defendant 59 claims for payment relating to 15 patients. There are 14 employee benefit plans that govern the payment of Plaintiff's claims.[1] (Defs.' Ex. 2, Affidavit of Stacy A. Chalupsky "Chalupsky Aff." at ¶ 4.) Of these 14 plans, 13 are governed by the Employee Retirement Income Security Program, 29 U.S.C. §§ 1001, et seq. (hereinafter "ERISA.") The remaining plan is not an ERISA plan and governs 5 of Plaintiff's claims. (Chalupsky Aff. at ¶ 5.)

In addition, in or about September of 2009, Plaintiff entered into a contract with Beech Street, a VIANT Network ("Beech Street") as a health care provider with the Beech Street network. This contract had an effective date of September 3, 2009. The Beech Street contract included United as a payor within its network, subject to the terms of the contract, including the obligation to make payments to Plaintiff. (Prop.Sec.Am.Comp.¶ 74.) Under the Beech Street contract, Plaintiff is entitled to be paid for covered services at 80% of usual billed charges, less applicable co-payments, deductibles and coinsurance by payors, which identified payors specifically include United. (Prop.Sec.Am.Comp. ¶ 73.) United as a

participating payor with Beech Street, authorized Beech Street to enter into contracts on their behalf, including but not limited to, the contract with the Plaintiff. (Prop.Sec.Am.Comp.¶ 76.)

The Plaintiff filed the instant action in the Superior Court of New Jersey, Law Division, Camden County and subsequently filed a first amended complaint, seeking payment for the services rendered to Patients 1–50. [Docket Item 1.] The first amended complaint brought claims against the Defendants for: breach of contract, breach of the Beech Street contract, quantum meruit, third party beneficiary, contract by custom or dealing, reasonable reliance/arbitrary and disparate treatment, and tortious interference.

**\*3** The Defendants then removed the case to this Court. [Docket Item 2.] The Defendants then filed the instant motion to dismiss. [Docket Item 4.] The Plaintiff filed opposition to the dismissal motion [Docket Item 24] and filed a motion for leave to file a second amended complaint [Docket Item 18]. The proposed second amended complaint alleges the following causes of action against the Defendants: breach of contract, breach of the Beech Street contract, unjust enrichment and quantum meruit, third party beneficiary, implied contract/contract by custom or dealing/implied covenant of good faith and fair dealing, reasonable reliance/arbitrary and disparate treatment, and tortious interference, negligent misrepresentation, arbitrary and capricious, promissory estoppel, ERISA—payment of benefits due/violation of ERISA 502(a)(1).

## III. PLAINTIFF'S MOTION TO FILE A SECOND AMENDED COMPLAINT

### A. Standard of Review

Rule 15(a)(2) provides that leave to amend should be freely given when justice so requires. Fed.R.Civ.P. The decision to permit amendment is discretionary. *Toll Bros., Inc. v. Township of Readington,* 555 F.3d 131, 144 n. 10 (3d Cir.2009). Among the legitimate reasons to deny a motion is that the amendment would be futile. *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1414 (3d Cir.1993) (citation omitted). Futility is determined by the standard of legal sufficiency set forth in Rule 12(b)(6), Fed.R.Civ.P. In *re Burlington Coat Factory Litigation,* 114 F.3d 1410, 1434 (3d Cir.1997). Accordingly, an amendment is futile where the complaint, as amended, would fail to state a claim

Broad Street Surgical Center, LLC v. UnitedHealth Group, Inc., Not Reported in...

upon which relief could be granted. *Id.*

A complaint sufficiently states a claim when it alleges facts about the conduct of each defendant giving rise to liability. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). These factual allegations must present a plausible basis for relief (i.e. something more than the mere possibility of legal misconduct). *See Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1951, 173 L.Ed.2d 868 (2009). In assessing the complaint, the Court must "accept all factual allegations as true and construe the complaint in the light most favorable to the plaintiff." *Phillips v. County of Allegheny,* 515 F.3d 224, 231 (3d Cir.2008) (quoting *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 374 n. 7 (3d Cir.2002)).

The Plaintiff's Second Amended Complaint alleges ten counts. First, the Court will address the issue of ERISA preemption. Second, the Court will examine each of Plaintiff's alleged causes of action to determine if a plausible basis for relief is presented.

## A. ERISA PREEMPTION

The Defendants argue that Counts I through X of Plaintiff's proposed second amended complaint, to the extent these counts are seeking benefits under the ERISA plans, are completely preempted by ERISA's civil enforcement provision, § 502(a). The parties do not dispute that 13 of the 14 plans at issue are ERISA plans. The Defendants do not argue that ERISA preempts Counts I through X of Plaintiff's complaint as to the remaining non-ERISA plan.

**\*4** ERISA's civil enforcement provision provides that a civil action may be brought "by a participant or beneficiary" to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 29 U.S.C. 1132(a)(1)(B). ERISA's civil enforcement mechanism has "such extraordinary pre-emptive power" that all state law causes of action that are within its scope are completely preempted. *Pascack Valley Hosp. v. Local 464A UFCW Welfare,* 388 F.3d 393, 399–400 (3d Cir.2004) (quoting *Aetna Health Inc. v. Davila,* 542 U.S. 200, 209, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004)). In *Pascack* the Third Circuit outlined the test, provided by the Supreme Court in *Davila,* for determining whether a claim falls within the scope of § 502(a). A claim is completely preempted if (1) the plaintiff could have brought the action under § 502(a)

and (2) no other legal duty supports the plaintiff's claim. *Pascack,* 388 F.3d at 400.

In this case, the Plaintiff is suing in both its capacity as the assignee of the benefits of Patients 1–50 as well as its non-derivative capacity as a service provider. To the extent that Plaintiff is seeking to recover benefits due under the ERISA plans to Patients 1–50 as a beneficiary by virtue of the assignments of benefits, Counts I through X are completely preempted by ERISA's civil enforcement provision. The Plaintiff could have brought this action as a civil enforcement action under § 502(a) and no other legal duty supports the Plaintiff's claims.

To the extent that the Plaintiff is suing in its non-derivative capacity as a service provider in Counts I through X, these claims are not completely preempted through ERISA's civil enforcement provision because the Plaintiff is neither a "participant" nor a "beneficiary" since it is an out of network provider, and therefore could not bring suit pursuant to § 502(a).

However, ERISA contains, in addition to its complete preemption power under § 502(a), an express preemption provision. Section 514(a) provides, with some exceptions not relevant here, that "the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan ..." 29 U.S.C. § 1144(a). The Supreme Court has given broad meaning to "relate to," stating: "[T]he phrase 'relate to' [is] given its broad commonsense meaning, such that a state law 'relate[s] to' a benefit plan in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 47, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). The Third Circuit instructs that a state law claim relates to an employee benefit plan if "the existence of an ERISA plan [is] a critical factor in establishing liability" and "the trial court's inquiry would be directed to the plan." *1975 Salaried Ret. Plan for Eligible Employees of Crucible, Inc. v. Nobers,* 968 F.2d 401, 406 (3d Cir.1992) (citing *Ingersoll–Rand Corp. v. McClendon,* 498 U.S. 133, 139–40, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990)).

**\*5** Plaintiff's state law claims raised in Counts I through VII, IX and X,[2] which are asserted in Plaintiff's non-derivative capacity as a service provider, are expressly preempted by ERISA because they "relate to" an ERISA benefits plan. Each of Plaintiff's claims in Counts I[3] through VII, IX and X are all grounded in the premise that the Defendants were required to pay Plaintiff for services the Plaintiff provided to Patients 1–50 who were covered under ERISA benefit plans. It is clear that

"the existence of an ERISA plan [is] a critical factor in establishing liability" under Counts I through VII, IX and X, and therefore, these claims are expressly preempted.

Accordingly, Counts I through VII, IX and X of Plaintiff's complaint are preempted by ERISA and will be dismissed as to the ERISA plans.

However, Plaintiff's claim for negligent misrepresentation raised in Count VIII is a closer issue. The Plaintiff claims that in telephone conversations between Plaintiff's representatives and Defendants' representatives, the Defendants' representatives negligently misrepresented and informed Plaintiff's representatives that the facility fees and services provided to Patients 1–50 were covered services and would be reimbursed under the Plans. (Prop.Sec.Amend.Comp.¶ 174.) The Plaintiff argues this tort claim was committed by the Defendant and is independent of the plan. The Defendants maintain that this claim relates to the ERISA plan and should be preempted. In addition, the Defendants argue that this is not the type of case where a negligent misrepresentation claim is appropriate because Plaintiff's injury stems from the alleged breach of the contracts between Patients 1–50.

The court finds the reasoning articulated in *McCall v. Metropolitan Life Insurance Company,* 956 F.Supp. 1172 (D.N.J.1996) persuasive and therefore, Plaintiff's negligent misrepresentation claim raised in its non-derivative capacity in Count VIII is not preempted.

*McCall* held that a negligent misrepresentation claim was sufficiently independent of an ERISA plan and therefore was not preempted by ERISA. *Id.* at 1186. The district court reached this conclusion because it was "unable to discern from the statute the congressional intent to preclude a party," such as an out of network provider, from bringing a misrepresentation claim. *Id.* Importantly, the court noted that health care providers, such as Plaintiff in this case, who are neither beneficiaries nor participants under the ERISA statute are not able to bring suit in their own name under ERISA. Consequently, if ERISA's express preemption provision is interpreted so broadly as to preempt Plaintiff's negligent misrepresentation claim, then health care providers such as the Plaintiff, "would be stripped of the right to bring suit for tortious conduct such as that which allegedly occurred in this case, where negligent misrepresentations by private claims reviewers to health care providers induce the providers to render extended medical services and care." *Id.* at 1186.

**\*6** The court also cited pragmatic justifications for its holding, explaining:

In determining whether a patient is eligible for

coverage under a health care plan, health care providers customarily verify the patient's coverage with the insurer's agents. *See Memorial Hosp. Sys.,* 904 F.2d at 246. If coverage is confirmed, the patient is generally admitted "without further ado." *Id.* The result sought by Met Life and Healthmarc in this case would, by rendering both ERISA remedies and state-law remedies unavailable to health care providers, effectively immunize such health care managers and plan administrators from certain fraudulent and negligent misrepresentations made to health care providers. In turn, if ERISA were interpreted as precluding claims for negligent or fraudulent misrepresentations of health benefits administrators and managed care consultants to health care providers who rely upon promises of coverage, critical health care decisions would be delayed while the provider determined for itself whether its medical services would be covered under the specific terms of each prospective patient's plan. In the real world, providers place reliance upon the benefit plan interpretations of benefits administrators and managed care consultants functioning as intermediaries between the provider and the patient's benefit plan. Under the interpretation of 29 U.S.C. § 1144 espoused by Met Life and Healthmarc, such health care providers would be forced to demand payment up front or impose other costly inconveniences before admitting a patient for treatment. *See Memorial Hosp. Sys.,* 904 F.2d at 247. There is nothing in the language of ERISA or pertinent ERISA case law that compels such an inefficient result.

*Id.* at 1186–87.

The court finds this reasoning equally applicable in the instant action. Therefore, the Plaintiff's proposed negligent misrepresentation claim asserted in its own non-derivative capacity as an out of network service provider is not preempted by ERISA. Whether the Plaintiff's allegations state a sufficient claim upon which relief can be granted will be discussed below in subsection B(10).

**B. Sufficiency of Plaintiff's Claims**
The Plaintiff's proposed second amended complaint alleges ten state law claims as to the one non-ERISA plan. As to the 13 ERISA plans, the Plaintiff brings a claim pursuant to ERISA's enforcement provision, § 502(a), 29 U.S.C. § 1132(a)(1). Each claim will be address separately below.

Broad Street Surgical Center, LLC v. UnitedHealth Group, Inc., Not Reported in...

### 1. Breach of Contract

To state a claim for breach of contract, a plaintiff "must allege (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing there from; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot,* 507 F.3d 188, 203 (3d Cir.2007).

The Plaintiff's complaint alleges that "there is no written policy provision or plan document that prohibits payment of Services provided at 'unlicensed' ambulatory care facilities which are wholly physician owned with single operating rooms such as Plaintiff herein ." (Prop.Sec.Amend.Comp.¶ 91.) Therefore, the Defendants' refusal to pay Plaintiff for services rendered to Patients 1–50, which were otherwise covered, was a breach of the non-ERISA provider agreement.

**\*7** The Defendants argue that the Plaintiff has failed to sufficiently allege the second element of its breach of contract claim. Specifically, the Defendant argues that Plaintiff's allegation that the plan documents for Patients 1–50 did not prohibit payment of services at unlicensed ambulatory care facilities to be vague because the Plaintiff fails to state the express terms or provisions Defendants have actually breached. The Plaintiff argues, and alleges in its complaint, that the Defendants have failed to provide the Plaintiff with the specific plan document at issue despite the Plaintiff's multiple requests. Without the specific plan document, the Plaintiff argues it is unable to allege the violation of an express provision because it does not know the content of the express provisions.

The court finds the Plaintiff has stated a sufficient claim for breach of contract. It is clearly alleged that the reason the Defendants refused to pay the Plaintiff's for the services provided to Patients 1–50 was because the Plaintiff's facility was not licensed by the state of New Jersey. The Plaintiff alleges the absence of a provision which prohibits payments for services provided at 'unlicensed' ambulatory care facilities. Therefore, the Defendants' refusal to remit payment for the services rendered, if proved, would be a breach of the plan agreement as to the non-ERISA plan. Under the facts alleged, it is clear that Plaintiff's complaint states a cause of action for breach of contract.

Therefore, the Plaintiff will be permitted to amend its complaint alleging a claim for breach of contract as to the nonERISA plan only.

### 2. Breach of Contract—Beech Street

The complaint next alleges that the Defendants breached the Beech Street Contract by failing to pay the Plaintiff for services provided to Patient's 1–50. The Beech Street contract entitles the Plaintiff to be paid for covered services at 80% of usual billed charges less applicable co-payments, deductibles and co-insurance by payors. (Prop.Sec.Amend.Comp.¶ 103.) The Plaintiff then alleges that the Defendants authorized Beech Street to enter into contracts on their behalf, including the contract with the Plaintiff herein. (Prop.Sec.Amend.Comp.¶ 104.) The Plaintiff maintains that it has made demand for payment of its outstanding claims under the Beech Street contract, but the Defendants have failed to remit payments. (Prop.Sec.Amend.Comp.¶ 105.)

The Defendants argue that they cannot be sued for breach of a contract to which they are not a party. The Plaintiff maintains that it sufficiently alleged an agency relationship between Beech Street and the Defendants to establish a breach of contract claim.

It is well established that a principal is bound to contracts executed by an agent if it is within the agent's authority to contract on behalf of that principal. *Mesce v. Automobile Ass'n of New Jersey,* 8 N.J.Super. 130, 135, 73 A.2d 586 (App.Div.1950) ("It is, of course, the general rule that the principal is bound by the acts of the agent within the apparent authority which he knowingly permits the agent to assume or which he holds the agent out to the public as possessing.") *See Union Trust Co. v. Wekfern Food Corp ., No. 86–728, 1988 U.S. Dist. LEXIS 11858, \*12, 1988 WL 113354 (D.N.J. October 5, 1988)* and *Alicea v. New Brunswick Theological Seminary,* 244 N.J.Super. 119, 128, 581 A.2d 900 (App.Div.1990).

**\*8** The Plaintiff's complaint, as to the non-ERISA plan, sufficiently alleges that Beech Street entered into the contract as an agent for the United. Accordingly, if such agency is shown, United, as the principal, may be liable for breach of contract through the acts of its agent, Beech Street. Therefore, the Plaintiff will be permitted amend its complaint to include a breach of contract based upon the Beech Street contract with regard to the non-ERISA plan.

### 3. Unjust Enrichment and Quantum Meruit

Plaintiff's claims for unjust enrichment and quantum

meruit allege that the Plaintiff provided services to Patients 1–50 after receiving verbal confirmation from the Defendants that these services were covered under the insurance plans and the Defendants subsequently refused to remit payment for the services.

In order to state claim under the quasi-contractual theory of quantum meruit, a plaintiff must establish four elements: (1) the performance of services in good faith; (2) the acceptance of the services by the person to whom they are rendered; (3) an expectation of compensation therefore; and (4) the reasonable value of the services. *Sean Wood, L.L.C. v. Hegarty Group, Inc.,* 422 N.J.Super. 500, 513 (App.Div.2011). "Quasi-contractual recovery on the basis of quantum meruit rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Id.* at 512.

In order to establish a claim for unjust enrichment, "a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.,* 135 N.J. 539, 554, 641 A.2d 519 (1994).

It is well established that claims of quantum meruit and unjust enrichment do not exist where a valid express contract exists concerning the same subject matter. "Quasi-contract liability will not be imposed ... if an express contract exists concerning the identical subject matter." *Suburban Transfer Serv., Inc. v. Beech Holdings, Inc.,* 716 F.2d 220, 226–27 (3d Cir.1983).

In this case, the non-ERISA insurance plan of Patients 1–50, to which Plaintiff is the assignee of benefits, governs the instant dispute and takes precedence over any non-derivative claim Plaintiff has as service provider.

Further, to state a claim for quantum meruit and unjust enrichment, the benefit at issue must have been conferred on United, as the Defendants. *See Alpert, Golberg, Butler, Norton & Weiss, P .C. v. Quinn,* 410 N.J.Super. 510, 544 n. 6, 983 A.2d 604 (2009); 405 *Monroe Co. v. City of Asbury Park,* 40 N.J. 457, 464, 193 A.2d 115 (1963).

In this case, the Plaintiff provided services to Patients 1–50 and any benefit conferred was conferred on Patients 1–50, not United. United, as the insurance company, "derives no benefit from those services; indeed, what the insurer gets is a ripened obligation to pay money to the insured-which hardly can be called a benefit." *Travelers Indem. Co. of Conn. v. Losco Group, Inc.,* 150 F.Supp.2d 556, 563 (S.D.N.Y.2001).

**\*9** Therefore, Plaintiff will not be permitted to amend its complaint to include claims for unjust enrichment and quantum meruit as such claims would be futile.

### 4. Third Party Beneficiary
This claim is set forth by the Plaintiff as an alternative to its breach of contract claim in the event the Plaintiff is not entitled to recovery as a service provider or the Assignments of Benefits are not recognized. The Defendants argue that this claim is redundant to Plaintiff's breach of contract claim and should be dismissed.

Under the Federal Rules of Civil Procedure, a plaintiff may plead alternative claims for relief, regardless of consistency. *Fed.R.Civ.P.* 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency").

The Plaintiff alleges sufficient factual allegations to support its claim as a third party beneficiary. Therefore, as to the non-ERISA plan, the Plaintiff will be permitted to amend its complaint to include a claim as a third party beneficiary.

### 5. Promissory Estoppel
This claim for promissory estoppel is also asserted by the Plaintiff in the alternative to its breach of contract claim to the extent that the Plaintiff may not be recognized as the assignee and/or the contract claims are not cognizable. The Defendants argue that this claim should be dismissed because the representations made by Defendants' representatives to the Plaintiff did not constitute independent promises to pay separate and apart from the breach of contract claims. Rather, the Defendants' representatives made representations which only pertained to coverage under the insurance contracts.

In order to allege a claim for promissory estoppel, a plaintiff must show four elements: (1) a clear and definite promise; (2) made with the expectation that the promisee would rely upon it; (3) reasonable reliance; and (4) definite and substantial detriment. *Toll Bros., Inc. v. Board of Chosen Freeholders of County of Burlington,* 194 N.J. 223, 253, 944 A.2d 1 (2008).

In this case, the proposed second amended complaint sets forth in detail the alleged conversations between the Plaintiff's representatives and the Defendants'

Broad Street Surgical Center, LLC v. UnitedHealth Group, Inc., Not Reported in...

representatives regarding payment for services provided by the Plaintiff to Patients 1–50. During these conversations, the Plaintiff's representative provided the Defendants' representative with detailed information about the patient, the Plaintiff, and the services to be rendered, including: the tax i.d. number of the Plaintiff, identification of the patient by name, date of birth and policy number, as well as the specific procedure being performed. In each telephone call, Plaintiff's representative was informed by the Defendants' representative that there was coverage for Plaintiff's facility fees and for the procedures involved. (Prop.Sec.Am.Comp.¶¶ 15–26.)

These conversations alleged in the complaint constituted clear and definite promises upon which the Plaintiff relied in rendering services to Patients 1–50. The facts alleged here, that Defendants' representatives confirmed that Plaintiff would receive reimbursement for services provided to Patients 1–50, are separate from the Plaintiff's breach of contract claim which is premised on the improper denial of payment based on state licensure. While the Plaintiff has alleged a breach of contract claim, that should not foreclose the Plaintiff from alleging promissory estoppel in the alternative. As discussed above, a plaintiff may plead alternative claims for relief, regardless of consistency. Fed.R.Civ.P. 8(d) (3) ("A party may state as many separate claims or defenses as it has, regardless of consistency").

*10 Therefore, the Plaintiff will be permitted to amend its complaint to include a claim for promissory estoppel as to the non-ERISA plan.

### 6. Implied Contract/Contract by Custom or Dealing/Implied Covenant of Good Faith and Fair Dealing

The Plaintiff alleges that from Spring 2009 to September 2009, the Defendants paid Plaintiff for services provided to its patients who were Defendants' insureds and beneficiaries pursuant to the Assignments of Benefits ("AOBs") signed by the patients, or alternately by reason of an obligation to make payment to Plaintiff as a medical provider, or alternately pursuant to the applicable insurance agreements and/or the Beech Street agreement. (Prop.Sec.Am.Comp.¶ 136.) The Plaintiff alleges that this course of conduct constituted an implied promise to continue payment to Plaintiff for services provided to Defendants' insureds. (Prop.Sec.Am.Comp.¶ 137.)

The Defendants argue that Plaintiff's claim for "Implied

Contract/Contract by Custom or Dealing/Implied Covenant of Good Faith and Fair Dealing" should be dismissed because the Plaintiff does not set forth any facts that would allow the Court or the Defendants to discern the alleged terms of the Defendants' promise and/or contract to pay. The Defendants maintain that the complaint does not identify a specific oral representation which supports an implied contract.

The Plaintiff has not opposed the dismissal of this claim. The court agrees that the Plaintiff's allegations are insufficient to allow the court to discern the alleged terms of the Defendants' alleged implied contract. Therefore, the court will deny Plaintiff leave to amend its complaint to allege a count for "Implied Contract/Contract by Custom or Dealing/Implied Covenant of Good Faith and Fair Dealing."

### 7. Reasonable Reliance/Arbitrary and Disparate Treatment

The Defendants argue that "Reasonable Reliance/Arbitrary and Disparate Treatment" is not a recognized cause of a action under either state or federal law. The Plaintiff has not opposed Defendants' motion as to this claim.

As the Plaintiff has not put forth any legal basis for its "Reasonable Reliance/Arbitrary and Disparate Treatment" claim, the Plaintiff will not be permitted to file an amended complaint alleging this count as such claim would be futile.

### 8. Arbitrary and Capricious

Similarly, the Defendants argue that "Arbitrary and Capricious" is a standard of review, not an independent cause of action. The Plaintiff has not opposed Defendants' motion to dismiss this claim.

As the Plaintiff has not put forth any legal basis for its "Arbitrary and Capricious" claim, and as arbitrary and capricious is clearly a standard of review and not an independent cause of action, Plaintiff will not be permitted to file an amended complaint alleging this count as such claim would be futile.

### 9. Tortious Interference

The Plaintiff alleges in its proposed second amended complaint that the Defendants interfered with Plaintiff's contractual, business and patient relations by intentionally and maliciously refusing to pay for services rendered by the Plaintiff to Patients 1–50. (Prop.Sec.Am.Comp.¶¶ 165–171.)

**\*11** Under New Jersey law, a complaint based on tortious interference with prospective economic advantage must allege three elements: (1) a protectable right—a prospective economic or contractual relationship; (2) the interference was done intentionally and with malice; (3) the interference caused the loss of the prospective gain; and (4) the injury caused damage. *Printing Mart–Morristown v. Sharp Electronics Corp.,* 116 N.J. 739, 751, 563 A.2d 31 (1989).

Importantly, "it is fundamental to a cause of action for tortious interference with a prospective economic relationship that the claim be directed against defendants who are not parties to the relationship." *Id.* at 752, 563 A.2d 31. A cause of action for tortious interference "was not meant to upset the rules governing the contractual relationship itself." *Id.* at 753, 563 A.2d 31. "Where a person interferes with the performance of his or her own contract, the liability is governed by principles of contract law." *Id.*

The Defendants argue that they are a party to the insurance contracts at issue and therefore, a claim for tortious interference with prospective economic advantage is inappropriate and contract laws govern the instant dispute. The Plaintiff does not oppose the Defendants' motion to dismiss as to this claim.

The court finds the Defendants' argument persuasive. The Defendants are a party to the insurance contracts at issue in this case, and therefore, a claim for tortious interference is inappropriate. Therefore, the Plaintiff will not be permitted to amend its complaint to include a cause of action for tortious interference with prospective economic advantage.

### 10. Negligent Misrepresentation

As discussed above, the Plaintiff's proposed second amended complaint alleges a claim of negligent misrepresentation, which this court concluded *infra* was not preempted by ERISA. The Plaintiffs allege that in telephone conversations between Plaintiff's representatives and Defendants' representatives, the

Defendants' representatives negligently misrepresented and informed Plaintiff's representatives that the facility fees and services provided to Patients 1–50 were covered services and would be reimbursed under the Plans. (Prop.Sec.Amend.Comp.¶ 174.)

In order to state a claim for negligent misrepresentation, a plaintiff must allege "an incorrect statement, negligently made and justifiably relied on, which results in economic loss." *Konover Const. Corp. v. East Coast Const. Services Corp.,* 420 F.Supp.2d, 366, 370 (D.N.J.2006). While a fiduciary duty between the parties is not an element of a claim for negligent misrepresentation, courts have held that "a plaintiff seeking to recover for negligent misrepresentation must plead that the defendant owed it a duty of care." *Roll v. Singh,* No. 07–04136, 2008 W.L. 3413863, \*20 (D.N.J. June 26, 2008).

The Defendants argue that Plaintiff fails to state a claim because it did not allege the Defendants owed it a duty of care. However, the existence of a duty is a question of law to be decided by the court, not an issue of fact. *Endre v. Arnold,* 300 N.J.Super. 136, 142, 692 A.2d 97 (App.Div.1997) ("Whether a duty exists is solely a question of law to be decided by a court and not by submission to a jury.") Therefore, the Plaintiff need not expressly plead that the Defendants owed it a duty of care. Rather, in order to survive a motion to dismiss, the Plaintiff need only allege sufficient facts for a court to find a basis for the imposition of a duty between the parties.

**\*12** New Jersey law sets forth several factors for a court to consider in determining whether a duty exists.

> determination of the existence of a duty ultimately is a question fairness and policy. An important, although not dispositive consideration, is the foreseeability of injury to others from the defendant's conduct. Also important are the nature of the risk posed by the defendant's conduct, the relationship of the parties, and the impact on the public of the imposition of a duty of care.

*Snyder v. American Ass'n of Blood Banks,* 144 N.J. 269, 292, 676 A.2d 1036 (1996) (citations omitted).

In this case, the court finds that the Plaintiff has sufficiently alleged facts to support a finding that the Defendants owed the Plaintiff a duty of care. The Plaintiff has alleged that it is a provider of medical services and relied on representations of the Defendants, an insurer providing insurance coverage to insureds and beneficiaries within New Jersey, in ultimately providing medical services to Patients 1–50. The court finds the reasoning in *McCall,* 956 F.Supp. at 1187, persuasive and

Broad Street Surgical Center, LLC v. UnitedHealth Group, Inc., Not Reported in...

applicable to the instant action. Specifically:

> If health benefits administrators and managed care consultants fail to act reasonably in making representations concerning insurance coverage, financial harm will likely be inflicted on the medical companies that provide treatment in reliance upon promises of payment. This threatened harm, moreover, can easily be avoided if companies ... ensure the accuracy of their representations or refrain from making assurances of coverage in instances in which they do not have the authority to do so. As discussed previously, health care providers are often compelled by circumstances to rely on the representations made by benefits administrators and managed care consultants. Thus, the general public and companies involved in the delivery of medical care have a vital interest in ensuring that health plan administrators and medical consultants exercise due care in making such representations concerning insurance coverage. *See Snyder,* 144 N.J. at 292, 676 A.2d 1036 (imposing on blood "clearing house" duty to exercise due care, because of reliance of hospitals and patients on defendant for safety of nation's blood supply).

In this case, the United owed a duty to provide the Plaintiff with accurate information regarding reimbursement for medical services provided to United insureds. It was foreseeable that incorrect information would cause the Plaintiff and/or Patients 1–50 economic harm, as the cost of the medical services would not be covered by the insurance plan. Moreover, it is common for medical providers to verify coverage with a patient's insurance prior to administering any care in order to prevent the possibility of financial harm to the patient and the service provider. The general public has a significant interest in ensuring that representations made to medical service providers by insurance company representatives are accurate in order avoid incurring unnecessary expense and to provide efficient care. The Court does not have occasion to consider whether an insurance carrier may disclaim the healthcare provider's ability to rely upon such oral advice of coverage, since that circumstance is not presented in the pleadings under review.

**\*13** Therefore, the Plaintiff will be permitted to amend its complaint to include a claim for negligent misrepresentation as to the ERISA and non-ERISA plans.

**11. ERISA enforcement**
Finally, the Plaintiff alleges a claim pursuant to ERISA's

civil enforcement provision, § 502(a), 29 U.S.C. § 1132(a)(1)(B), as to the 13 ERISA plans. As discussed above, ERISA provides a private cause of action for a participant or beneficiary to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 29 U.S.C. § 1132(a).

The Defendant argues that the Plaintiff has failed to state a claim under ERISA because the Plaintiff has not identified any specific provision of the 13 ERISA plans that United has allegedly breached. The Plaintiff argues that it provided specific language from the Summary Plan Descriptions("SPDs") for 4 of the 13 ERISA plans at issue. As to the other plans, the Plaintiff argues, and alleges in its complaint, that the Defendants have failed to provide the plan documents to the Plaintiff despite numerous requests.

"A plaintiff seeking to recover under section 502(a)(1)(B) must demonstrate that the benefits are actually 'due'; that is, he or she must have a right to benefits that is legally enforceable against the plan" and that the plan administrator improperly denied him or her those benefits. *Hooven v. Exxon Mobil Corp.,* 465 F.3d 566, 574 (3d Cir.2006). "ERISA's framework ensures that employee benefit plans be governed by written documents and summary plan descriptions, which are the statutorily established means of informing participants and beneficiaries of the terms of their plan and its benefits." *In re Unisys Corp. Retiree Medical Ben. ERISA Litigation,* 58 F.3d 896, 902 (3d Cir.1995).

The Plaintiff alleges in its complaint that it provided pain management injections to nine patients. (Prop.Sec.Am.Comp.¶¶ 16–24.) Prior to providing these injections, the Plaintiff's representative confirmed coverage for the service and facility fees with Defendants' representatives. (Prop. Sec. Am. Comp. ¶¶ 16–24 .) The Plaintiff cites to four SPDs of the thirteen ERISA plans at issue to support its claim. (Prop.Sec.Am.Comp.¶¶ 51–63.) Specifically, the Plaintiff alleges:

> 52. For example, the Ernst & Young Flexible Benefits Program SPD provides that "once the deductible is satisfied, the plan pays a percentage (based on your benefit election) of eligible expenses ... You have the freedom to choose any physician or hospital." Under the Open Access Plan Summary, outpatient treatment is specifically covered and includes "outpatient hospital". Under the "$2,500.00 Deductible Plan Summary" outpatient treatment specifically includes both "outpatient surgery-hospital" and "outpatient surgery."

53. The SPD for Administaff of Texas, Inc. similarly provides for benefits for outpatient surgery both in and out of network. Eligible expenses specifically include non-network benefits. The SPD states "Pay for Covered Health Services Provided by Non–Network Providers: In accordance with any state prompt pay requirements, we will pay Benefits after we receive your request for payment that includes all required information ..."

**\*14** 54. The Administaff SPD specifically provides for coverage for surgery—outpatient which includes "surgery and related services received on an outpatient basis at a hospital or alternate facility or in a physician's office" providing benefits which include "the facility charge and the charge for supplies and equipment." Further, "alternate facility" is defined as "a health care facility that is not a hospital and that provides one or more of the following services on an out-patient basis, as permitted by law: surgical services ..."

55. Under the Interpublic Group of Companies, Inc. SPD, outpatient surgery is specifically covered when "received on an outpatient basis at a hospital or alternate facility."

56. Under the Bridgestone Americas Holding, Inc. SPD, in-network and out-of-network benefits are available for "surgical outpatient Hospital or Treatment Facility." In fact, covered expenses include "Outpatient Surgery," and the SPD states: "The Plan also requires that specific surgeries be performed on an outpatient basis in order for the Plan's normal benefits to apply."

57. The Bridgestone SPD also specifically provides that, "If there is any conflict between the brief description presented here and the official Plan document, the Plan document will govern."

58. None of the SPDs provided by United have language indicating that claims cannot or may not be paid because a facility does not have state licensure.

59. Defendants' insurance agreements and plans applicable to the claims they denied for payment to Plaintiff, do not in writing prohibit payment to otherwise lawfully authorized unlicensed ambulatory care facilities including Plaintiff's facility. It is believed that Defendants' denials are in violation of the terms of the insuring agreements at issue.

60. With the exception of the Administaff SPD, the SPDs do not define "alternate facility" and do not limit payment to outpatient surgical facilities that are licensed by the state. The Administaff SPD definition

specifically included a facility such as Plaintiff, which performs surgical services on an outpatient basis.

61. Plaintiff meets any reasonable interpretation of "alternate facility" under the SPDs, as it is an ambulatory surgical facility and pursuant to State of New Jersey, Department of Health Regulations, 8 N.J.A.C. 43A, is not required by the State of New Jersey to be "licensed."

(Prop.Sec.Am.Comp.¶¶ 52–61.)

However, these allegations do not establish, or even address, whether pain injections are a covered benefit under the plan or how pain injections relate to outpatient surgery. In addition, these allegations generally cite to the SPD and do not provide the court with enough factual information to determine whether the pain injections were indeed covered services under the plan. Further, while the Plaintiff alleges that none of the SPDs provided by Defendants have language indicating that claims cannot or may not be paid because a facility does not have state licensure, the Plaintiff has not attached these SPDs for the court's review.

**\*15** As to the remaining nine ERISA plans, the Plaintiff provides no support in its complaint for these claims because the Plaintiff does not provide any facts supporting its allegations that benefits are due and owing under the plans. Without information as to the terms and provisions of the plan documents, the complaint fails to state a claim upon which relief can be granted.

To the extent that the Defendants failed to provide the Plaintiff with the requested documents, ERISA provides that plan administrators shall "upon written request of any participant or beneficiary furnish a copy of the latest updated summary, plan description." 29 U.S.C. § 1024(b)(4). A beneficiary may enforce this obligation under ERISA's civil enforcement provision, 29 U.S.C. § 1132(c).

The Plaintiff has not followed the procedure prescribed by ERISA to obtain copies of the plan. It is the Plaintiff's burden of proof to have the plan documents and cite to specific plan provisions when filing a civil complaint to obtain ERISA benefits. As the Plaintiff has not cited to or attached the plan documents for the remaining nine ERISA plans, the Plaintiff has failed to state a claim under ERISA's civil enforcement provision.

Therefore, the Plaintiff will not be permitted to amend its complaint to bring a cause of action under ERISA's civil enforcement provision at this time, as such claim is incomplete as alleged. However, the court will grant the Plaintiff leave to file a motion to amend within sixty (60)

Broad Street Surgical Center, LLC v. UnitedHealth Group, Inc., Not Reported in...

days of the date of this order to correct the above deficiencies or in the alternative, to allege a claim enforcing United's obligation to provide the plan documents pursuant to 29 U.S.C. § 1024(b)(4).

#### C. Motion to Dismiss

As the court has granted in part and denied in part Plaintiff's motion to amend the complaint, the Defendants' motion to dismiss will be dismissed as moot.

## IV. CONCLUSION

For the reasons discussed above, the court will grant in part and deny in part Plaintiff's motion to file a second amended complaint. The Plaintiff will be granted leave file a second amended complaint alleging the following causes of action as to the non-ERISA plan: Breach of Contract; Breach of Contract–Beech Street; Third Party Beneficiary; and Promissory Estoppel. The Plaintiff will also be granted leave to amend the complaint to allege a negligent misrepresentation claim against both ERISA

and non-ERISA plans.

The court will deny Plaintiff leave to amend its complaint as to the Unjust Enrichment/Quantum Meruit claim, the Implied Contract/Contract by Custom or Dealing/Implied Covenant of Good Faith and Fair Dealing claim, the Reasonable Reliance claim, the Arbitrary and Capricious claim, and the Tortious Interference claim (as such claims are futile) and the ERISA enforcement claim (which is insufficiently pled at present). However, the Plaintiff will be granted leave to file a subsequent motion to amend to correct the deficiencies of the ERISA civil enforcement claim or to allege a claim enforcing United's obligation to provide the plan documents pursuant to 29 U.S.C. § 1024(b)(4) within sixty (60) days of the date of this order.

**\*16** Since the court has granted in part and denied in part Plaintiff's motion to file a second amended complaint, the court will dismiss Defendant's motion to dismiss as moot.

The accompanying Order will be entered.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 762498

Footnotes

1    In addition to the complaint, a court may consider material "integral to or explicitly relied upon in the complaint" without
     converting a motion to dismiss into one for summary judgment. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d
     Cir.1997). In this case, United has included the Affidavit of Stacy A. Chalupsky, an employee of United, in support of its motion to
     dismiss. Ms. Chalupsky's affidavit serves to identify which Plans are governed by ERISA and which are not. As this information is
     integral to the Plaintiff's complaint, the court may properly consider Ms. Chalupsky's affidavit without converting this motion to a
     summary judgment motion.

2    Counts I through VII, IX and X allege the following causes of action: Breach of Contract (Count I); Breach of Contract—Beech
     Street (Count II); Unjust Enrichment and Quantum Meruit (Count III); Third Party Beneficiary (Count IV); Implied
     Contract/Contract by Custom or Dealing/Implied Covenant of Good Faith and Fair Dealing (Count V); Reasonable
     Reliance/Arbitrary and Disparate Treatment (Count VI); Tortious Interference (Count VII); Arbitrary and Capricious (Count IX);
     and Promissory Estoppel (Count X).

3    To the extent the Plaintiff argued that its breach of contract claim in Count I was not preempted by ERISA in Plaintiff's capacity as
     a service provider because of an independent provider agreement, the court finds this argument unpersuasive. It is undisputed that
     the Plaintiff was an out of network provider and did not have a provider agreement with the Defendants. Therefore, the Plaintiff's
     reliance on *Blue Cross of California v. Anesthesia Care Associates Medical Group, Inc.*, 187 F.3d 1045 (9th Cir.1999), is without
     merit.

Broad Street Surgical Center, LLC v. UnitedHealth Group, Inc., Not Reported in...

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 6445593
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

COMPREHENSIVE SPINE CARE, P.A.,
Plaintiff,

v.

OXFORD HEALTH INSURANCE, INC.,
United Healthcare Services, Inc., John
Does 1-10, Jane Does 1-10, and ABC
Corporations 1-10, Defendants.

Civil Action No.: 18-10036 (JLL)
|
Signed 12/10/2018

**Attorneys and Law Firms**

Aaron Aubrey Mitchell, Cohen and Howard, LLP, Shrewsbury, NJ, for Plaintiff.

Michael H. Bernstein, Matthew P. Mazzola, Robinson & Cole, LLP, New York, NY, for Defendants.

**OPINION**

JOSE L. LINARES, Chief Judge

**\*1** This matter comes before the Court by way of a Motion to Dismiss the Amended Complaint filed by Defendants Oxford Health Insurance, Inc. and United Healthcare Services, Inc. pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (ECF No. 10). Plaintiff Comprehensive Spine Care, P.A. has submitted an Opposition to Defendants' Motion, (ECF No. 13), to which Defendants have replied, (ECF No. 22). The Court decides this matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court grants in part and denies in part Defendants' Motion to Dismiss.

**I. BACKGROUND**

This case arises from a dispute between a healthcare provider and an insurance company. Plaintiff Comprehensive Spine Care, P.A. is a healthcare provider located in Westwood, New Jersey. (Am. Compl. ¶ 1). On April 24, 2018, Plaintiff filed an action against Defendants Oxford Health Insurance, Inc. and United Healthcare Services, Inc. in the Superior Court of New Jersey, Bergen County, Law Division, alleging violations of New Jersey state law and seeking damages for Defendants' alleged failure to pay Plaintiff for its provision of medical services to an insured patient ("Patient"). (ECF No. 1-1). Defendants, health insurance companies with their principal places of business in Hartford, Connecticut, removed the action to this Court, invoking the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). (ECF No. 1). On July 23, 2018, Plaintiff filed its Amended Complaint. (ECF No. 6).

Plaintiff is a "non-participating or out-of-network provider" with respect to Defendants' insurance plans. (Am. Compl. ¶ 13). On some date prior to November 7, 2012, representatives from Plaintiff's office "contacted Defendants to request prior authorization" for the provision of medically necessary orthopedic surgery to Patient. (Am. Compl. ¶¶ 14–15). Plaintiff alleges that it "received authorization from Defendants approving the rendering of surgical services to the Patient under authorization number 97522373." (Am. Compl. ¶ 15). On November 7, 2012, a physician employed and/or contracted by Plaintiff performed the necessary surgical procedure on Patient. (Am. Compl. ¶¶ 16–17). Plaintiff then billed Defendants in the amount of $145,032.00 for the surgery, which Plaintiff alleges "represents normal and reasonable charges for the complex procedures performed by a Board-Certified Orthopedic Surgeon practicing in New Jersey." (Am. Compl. ¶ 19). Defendants ultimately paid Plaintiff a total of $1,474.37, leaving Plaintiff to cover the balance of $143,557.63. (Am. Compl. ¶ 20).

Plaintiff asserts claims for breach of contract, promissory estoppel, account stated, and quantum meruit, arguing that, "[b]y authorizing the surgery, Defendants agreed to pay the fair and reasonable rates for the medical services provided by Plaintiff." (Am. Compl. ¶ 24). Defendants now move to dismiss, arguing that all claims are preempted by the Employee Retirement Income Security Act, 29 U.S.C. § 1001, et seq. ("ERISA"), and, alternatively, that the Amended Complaint fails to state a claim upon which relief can be granted. (ECF No. 10-1

("Mov. Br.") ).

## II. LEGAL STANDARD

**\*2** To withstand a motion to dismiss for failure to state a claim, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

To determine the sufficiency of a complaint under *Twombly* and *Iqbal* in the Third Circuit, the Court must take three steps. "First, it must 'tak[e] note of the elements a plaintiff must plead to state a claim.' Second, it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Finally, '[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.' " *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679) (citations omitted).

## III. ANALYSIS

Defendants contend that Plaintiff submitted its bill for the relevant procedure to Oxford Health Insurance "for payment under the Marcus Brothers Textiles Inc. Freedom Direct Plan ('Plan'), which is an employee welfare benefit plan governed by [ERISA]." (Mov. Br. at 7). Defendants therefore argue that Plaintiff's state law claims are preempted by ERISA because the claims implicate Defendants' "administration of an ERISA governed employee welfare benefit plan." (Mov. Br. at 10). ERISA preempts state law in two "separate but related" ways—either completely or expressly. *Pryzbowski v. U.S. Healthcare, Inc.*, 245 F.3d 266, 270 (3d Cir. 2001) (citing 29 U.S.C. §§ 1132(a), 1144(a) ). Defendants argue that both of ERISA's preemption provisions bar Plaintiff's claims. (Mov. Br. at 21).

### A. Complete Preemption—ERISA § 502(a)

ERISA's civil enforcement mechanism, § 502(a), "allows a beneficiary or participant of an ERISA-regulated plan to bring a civil action 'to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.' " *Pryzbowski*, 245 F.3d at 271 72 (quoting 29 U.S.C. § 1132(a)(1)(B) ). A state law claim is completely preempted by § 502(a) "only if: (1) the plaintiff could have brought the claim under § 502(a); *and* (2) no other independent legal duty supports the plaintiff's claim." *N.J. Carpenters and the Trustees Thereof v. Tishman Constr. Corp. of N.J.*, 760 F.3d 297, 303 (3d Cir. 2014) (citing *Pascack Valley Hosp. Inc. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 400 (3d Cir. 2004) ). The first prong of this analysis, referred to as the *Pascack* test, requires courts to determine: "1(a) Whether the plaintiff is the type of party that can bring a claim pursuant to Section 502(a)(1)(B), and 1(b) whether the actual claim that the plaintiff asserts can be construed as a colorable claim for benefits pursuant to Section 502(a)(1)(B)"—in other words, whether the plaintiff would have standing to bring a claim under § 502(a). *E. Coast Advanced Plastic Surgery v. AmeriHealth*, No. 17-8409, 2018 WL 1226104, at *2 (D.N.J. Mar. 9, 2018) ("*AmeriHealth*") (quoting *Progressive Spine & Orthopaedics, LLC v. Anthem Blue Cross Blue Shield*, No. 17-536, 2017 WL 4011203, at *5 (D.N.J. Sept. 11, 2017) ).

**\*3** Plaintiff's claims in this case do not satisfy the first prong of the *Pascack* test and are therefore not completely preempted by § 502(a). First, Plaintiff is neither a "beneficiary" nor a "participant" of an ERISA-regulated plan—Plaintiff is a healthcare provider asserting claims on its own behalf, not on behalf of Patient. (Am. Compl. ¶ 9). Accordingly, Plaintiff is not "the type of party" that can bring a § 502(a) claim. *AmeriHealth*, 2018 WL 1226104, at *2, 3 ("Because Plaintiff is a third-party provider and does not attempt to assert the rights of [the patient], Plaintiff does not have standing to bring suit under § 502(a)."). Plaintiff also does not allege the existence of an assignment of Patient's rights under an ERISA plan to Plaintiff, which would allow Plaintiff to stand in Patient's shoes. *See CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 176 n.10 (3d Cir. 2014) ("[H]ealth care providers may obtain standing to sue [under ERISA § 502(a) ] by assignment from a plan participant."). In the absence of such an assignment, courts have held that healthcare providers lack standing to bring claims under § 502(a). *See, e.g., Pascack Valley*

*Hosp.*, 388 F.3d at 404 (concluding that hospital's claim was not preempted by § 502(a) because plan beneficiaries had not assigned their claims to the hospital, noting that "the absence of an assignment is dispositive of the complete pre-emption question"); *N. Jersey Spine Grp., LLC v. Blue Cross and Blue Shield of Mass., Inc.*, No. 17-13173, 2018 WL 2095174, at *2 (D.N.J. May 7, 2018) (holding state law claims not completely preempted by ERISA § 502(a) because there was no evidence that the patient "executed assignments of benefits in connection with his surgery such that ERISA would be applicable"); *Progressive Spine*, 2017 WL 4011203, at *6 (holding plaintiff healthcare provider lacked standing under the first prong of the *Pascack* test because of a lack of a valid assignment of patient's benefits).

Second, Plaintiff's claims cannot be construed as "colorable claim[s] for benefits" under § 502(a). *AmeriHealth*, 2018 WL 1226104, at *2. Plaintiff "does not challenge the type, scope or provision of benefits under" an ERISA-regulated plan, but rather "only asserts its right as a third-party provider to be reimbursed for pre-authorized medical services it rendered" to Patient. *Id.* at *3. While § 502(a) "preempts claims regarding coverage or denials of benefits" under a plan, it "does not ... preempt claims over the *amount* of coverage provided, which includes disputes over reimbursement." *Emergency Physicians of St. Clare's v. United Health Care*, No. 14-404, 2014 WL 7404563, at *5 (D.N.J. Dec. 29, 2014); *see also Pascack Valley Hosp.*, 388 F.3d at 403–04 (holding provider's claims not preempted where dispute concerned not "the *right* to payment ... but the *amount*, or level, of payment," which would be determined not by the ERISA plan but by an unrelated agreement between the parties) (quoting *Blue Cross of Cal. v. Anesthesia Care Assoc. Med. Grp., Inc.*, 187 F.3d 1045, 1051 (9th Cir. 1999) ).

Because Plaintiff's claims fail the first prong of the *Pascack* test, the Court concludes, without reaching the second prong, that Plaintiff's state law claims are not completely preempted by ERISA § 502(a). *See E. Coast Advanced Plastic Surgery v. Horizon Blue Cross Blue Shield of N.J.*, No. 18-7718, 2018 WL 6178869, at *6–7 (D.N.J. Nov. 26, 2018) (finding similar claims were not preempted by ERISA § 502(a) where the first prong of the *Pascack* test was not met); *Thomas R. Peterson MD PC v. Cigna Ins. Co.*, No. 14-3818, 2014 WL 4054120, at *3 (D.N.J. Aug. 15, 2014) (holding that claims were not preempted by ERISA § 502(a), because the case was "a breach of contract lawsuit for customary medical fees that touches on ERISA only insofar as pre-approval for the disputed procedure was granted by an entity that administers ERISA health plans").

## B. Express Preemption—ERISA § 514
Section 514(a) preempts "any and all State laws insofar as they may now or hereafter relate to any [ERISA] employee benefit plan." 29 U.S.C. § 1144(a). "[T]he phrase 'relate to' [is] given its broad commonsense meaning, such that a state law 'relate[s] to' a benefit plan 'in the normal sense of the phrase, if it has a connection with or reference to such a plan.' " *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47 (1987) (quoting *Metro. Life Ins. Co. v. Mass.*, 471 U.S. 724, 739 (1985) ). The Supreme Court has described two categories of express preemption under § 514: a state law cause of action is preempted (1) "if it has a 'reference to' ERISA plans" or (2) if it "has an impermissible 'connection with' ERISA plans." *Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 943 (2016) (citations omitted).

*4 Defendants argue that Plaintiff's claims "relate to" an ERISA-regulated benefit plan because "Patient, whose claims are at issue in this matter, was a member of an ERISA Plan," and because "the only reason [Plaintiff] contacted Defendant was to obtain authorization in compliance with Plan terms." (ECF No. 22 at 15). As a result, Defendants maintain that their "claim determination, related to what benefits are payable, is governed by the terms of the ERISA Plan." (ECF No. 22 at 15). Defendant further argues that Plaintiff's claims must be preempted by § 514 because the "Amended Complaint seeks as damages benefits the Defendant could only be obligated to pay under the terms of the Patient's employee benefit Plan." (Mov. Br. at 22). Plaintiff contends that its action is entirely unrelated to the terms of Patient's benefit plan, as Plaintiff is neither "a party to the Plan," nor was it "aware of any terms of the Plan" when the preauthorization communications giving rise to its claims occurred. (ECF No. 13 ("Opp. Br.") at 10). Plaintiff insists that it "is proceeding on its own state law claims premised on the independent duty to pay Plaintiff created by [Defendants'] preauthorization" of the surgery. (Opp. Br. at 7).

In a recent and nearly identical case out of this District, the Court denied an insurance company's motion to dismiss, concluding that a healthcare provider's state law claims, premised on the defendant's preauthorization of a medical procedure, were not preempted by ERISA § 514. *Glastein v. Aetna, Inc.*, No. 18-9262, 2018 WL 4562467 (D.N.J. Sept. 24, 2018). The Court found that the plaintiff's claims did not "refer to" an ERISA plan because "the Complaint does not claim that Plaintiff was

Comprehensive Spine Care, P.A. v. Oxford Health..., Not Reported in Fed....

2018 Employee Benefits Cas. 456,262

a contracting party to any ERISA plan" nor "allege that payment [was] due to [Plaintiff] according to the terms of an ERISA plan." *Id.* at *2. The healthcare provider's allegations of an implied contract "[did] nothing to suggest" that the plaintiff's claims would "require examination of an ERISA plan." *Id.* The Court also concluded that the state law claims did not have an "impermissible connection with" an ERISA plan, since the "central purpose of ERISA is to protect plan participants and beneficiaries," and "claims brought by a provider against an insurance company do not implicate" that goal. *Id.* at *3.

The Court reaches the same conclusion here. Contrary to Defendants' assertions, Plaintiff's claims do not "relate to" an ERISA-regulated plan because the Amended Complaint does not seek damages pursuant to the terms of Patient's benefit plan. Indeed, nothing in the Amended Complaint directs the Court to consider the terms of Patient's benefit plan in any way. Instead, the Amended Complaint seeks damages arising from an independent relationship between Plaintiff and Defendants. Defendants' arguments that the terms of Patient's plan govern or inform Plaintiff's reasonable expectations regarding Defendants' preauthorization do not alter the Court's analysis because, at this stage in the proceedings, the Court is concerned with the four corners of the Amended Complaint, which premises Defendants' liability solely on representations not facially related to Patient's plan. *See Glastein,* 2018 WL 4562467, at *4 (denying motion to dismiss claims as preempted by § 514, reasoning that "the Complaint provides no reason why the Court would need to reference an ERISA plan to adjudicate Plaintiff's claims").

Other courts in this District have found state law claims asserted by healthcare providers against insurance companies to be preempted by § 514, but those cases are factually distinguishable. For example, several of those cases consider claims arising from preauthorization letters that expressly stated that preauthorization was subject to the terms of an ERISA benefit plan, therefore requiring a court to interpret the plan in order to resolve the dispute. *See, e.g., Glastein v. Horizon Blue Cross Blue Shield of Am.,* No. 17-7983, 2018 WL 3849904, at *1 (D.N.J. Aug. 13, 2018); *Atl. Shore Surgical Assocs. v. Horizon Blue Cross Blue Shield of N.J.,* No. 17-7534, 2018 WL 2441770, at *1 (D.N.J. May 31, 2018). Courts have also found § 514 preemption where a healthcare provider sought to recover in contract against an ERISA-regulated plan itself, *see Our Lady of Lourdes Health Sys. v. MHI Hotels, Inc. Health and Welfare Fund,* No. 09-1875, 2009 WL 4510130, at *1 (D.N.J. Dec. 1, 2009), or where the complaint contained allegations acknowledging the

relevance of the terms of an ERISA plan, *see Broad St. Surgical Ctr., LLC v. UnitedHealth Grp., Inc.,* No. 11-2775, 2012 WL 762498, at *5 (D.N.J. Mar. 6, 2012).

**\*5** In the most analogous case finding § 514 preemption in this District, the Court reasoned that, "by disputing reimbursement for a medical procedure performed on a patient insured by an ERISA plan, Plaintiff asserts quintessential ERISA claims." *Adv. Orthopedics and Sports Med. Inst. v. Empire Blue Cross Blue Shield,* No. 17-8697, 2018 WL 2758221, at *5 (D.N.J. June 7, 2018). In that case, as here, the plaintiff argued that, "by pre-authorizing the surgery, Defendant was bound to reimburse Plaintiff at a 'usual, customary, and reasonable' rate," thereby giving rise to claims for breach of contract and promissory estoppel. *Id.* at *6. The Court rejected those arguments, concluding that "the reimbursement rate that [the defendant] must pay is not dictated by reasonability or fairness, but rather by [the plaintiff's] out-of-network reimbursement rate," requiring the Court to examine the terms of the patient's plan. *Id.* Nevertheless, at the motion-to-dismiss stage, the Court cannot find ERISA preemption where nothing in the Amended Complaint directs the Court to ERISA or an ERISA plan.

**C. Sufficiency of the Allegations**
Defendants further argue that, even if Plaintiff's claims are not preempted by ERISA, they should nevertheless be dismissed because the allegations in the Complaint fail to state a claim upon which relief can be granted. (Mov. Br. at 13–21).

**1. Implied Contract**
"An implied-in-fact contract ... is a true contract arising from mutual agreement and intent to promise, but in circumstances in which the agreement and promise have not been verbally expressed." *Baer v. Chase,* 392 F.3d 609, 616 (3d Cir. 2004) (quoting *In re Penn Cent. Transp. Co.,* 831 F.2d 1221, 1228 (3d Cir. 1987) ). Therefore, in order to survive a motion to dismiss, Plaintiff must plead the elements of a contract claim: "(1) the parties entered into a valid contract, (2) the defendant did not perform his or her obligations under the contract, and (3) the plaintiff suffered damages as a result." *Days Inn Worldwide, Inc. v. Shara & Sons, Inc.,* No. 13-1049, 2013 WL 5535959, at *3 (D.N.J. Oct. 7, 2013) (quoting *Murphy v. Implicito,*

392 N.J. Super. 245, 265 (App. Div. 2007) ).

In *E. Coast Advanced Plastic Surgery v. Aetna, Inc.*, No. 17-13676, 2018 WL 3062907, at *3 (D.N.J. June 21, 2018) ("*E. Coast*"), the Court considered an implied contract claim under facts very similar to the facts in the instant dispute. The Court determined that the plaintiff, a healthcare provider, sufficiently stated an implied-in-fact contract claim where the complaint alleged that the plaintiff rendered services in reliance on the defendant insurer's preauthorization of medical services. *E. Coast*, 2018 WL 3062907, at *3. The Court denied the defendant's motion to dismiss, reasoning that, through discovery, "the parties' conduct may show how it was understood that Plaintiff took [defendant's] pre-authorization letters as creating a promise to pay its usual and customary rates for medical services." *Id.*

The same analysis applies here. Plaintiff sufficiently alleges that the parties entered an implied-in-fact contract "through Defendants' course of conduct and interaction with Plaintiff," that Defendant failed to perform under the contract by failing to pay Plaintiff the correct amount for the services it rendered, and that Plaintiff suffered damages. (Am. Compl. ¶¶ 23–28). Defendants' argument that Plaintiff's contract claim fails because the Complaint does not allege the precise contours of the agreement is unpersuasive, as an implied contract may exist even where "the parties do not state their terms." *Baer*, 392 F.3d at 616. An agreement that lacks a definite price term may be enforceable so long as "the parties specify a practicable method by which they can determine the amount" owed. *Id.* at 619. The Amended Complaint alleges that the amount Plaintiff billed Defendants represented "normal and reasonable charges" for the provided services according to the customary practice in orthopedic surgery in New Jersey. (Am. Compl. ¶ 19). Plaintiff is entitled to discovery to demonstrate how the parties would have understood or measured the price term in their alleged agreement.

### 2. Promissory Estoppel

*6 A claim for promissory estoppel under New Jersey law requires a showing of the following elements: "(1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it[;] (3) reasonable reliance; and (4) definite and substantial detriment." *Cotter v. Newark Housing Auth.*, 422 F. App'x 95, 99 (3d Cir. 2011) (quoting *Toll Bros., Inc. v. Ed. of Chosen Freeholders of Cty. of Burlington*, 194 N.J. 223, 253 (2008) ). Plaintiff sufficiently alleges that Defendants' preauthorization of

Patient's surgery was a promise that "induced Plaintiff to provide the medical services," and that Plaintiffs reasonably "relied upon this promise to its detriment" in providing the services to Patient. (Am. Compl. ¶¶ 21, 30–33). The Court therefore finds that Plaintiff adequately states a claim for promissory estoppel. *See E. Coast*, 2018 WL 3062907, at *3 (holding plaintiff sufficiently alleged promissory estoppel claim "because upon pre-authorizing the procedures, [defendant] should have understood that it was reasonable for Plaintiff to rely on the representations ... which Plaintiff relied on to its detriment").

### 3. Account Stated

"A claim for account stated is similar to a claim for breach of contract, and requires a plaintiff to prove that there is an 'exact and definite balance' for goods delivered or services rendered that can be proven by a statement of account." *Progressive Freight, Inc. v. Framaur Ass., LLC*, No. 16-9366, 2017 WL 3872327, at *3 (D.N.J. Sept. 5, 2017) (quoting *Manley Toys, Ltd. v. Toys R Us, Inc.*, No. 12-3072, 2013 WL 244737, at *5 (D.N.J. Jan. 22, 2013) ). Plaintiff alleges that its bills and records state an amount of $145,032.00 which Defendants owe to Plaintiff based on their preauthorization of the provided surgery. (Compl. ¶¶ 35–38). Having concluded that Plaintiff sufficiently alleges breach of an implied contract, the Court likewise finds that Plaintiff's account stated claim survives Defendants' motion to dismiss. *See E. Coast*, 2018 WL 3062907, at *3 (holding plaintiff sufficiently alleged account stated claim, reasoning that, "in pleading adequately the breach of contract and promissory estoppel claims, it follows that the parties' conduct may show mutual agreement as to the exact and definite amount [defendant insurer] owes Plaintiff"); *Manley Toys*, 2013 WL 244737, at *5 (declining to dismiss account stated claim because it was "inseparable from [the plaintiff's] breach of contract claim").

### 4. *Quantum Meruit*

The doctrine of *quantum meruit* "is applied when, absent a manifest intention to be bound, 'one party has conferred a benefit on another and the circumstances are such that to deny recovery would be unjust.' " *China Falcon Flying Ltd. v. Dassault Falcon Jet Corp.*, 329 F. Supp. 3d 56, 76 (D.N.J. 2018) (quoting *Kas Oriental Rugs, Inc. v. Ellman*, 394 N.J. Super. 278, 286 (App. Div. 2007) ). "A plaintiff makes out a proper claim for *quantum meruit* when it

pleads that 'services were performed with an expectation that the beneficiary would pay for them, and under circumstances that should have put the beneficiary on notice that the plaintiff expected to be paid.' " *Manley Toys*, 2013 WL 244737, at *6 (quoting *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 438 (1992) ). Here, Defendants argue that Plaintiff cannot recover under a *quantum meruit* theory because any benefit conferred by Plaintiff's performance of the surgical procedure benefited Patient, not Defendants. (Mov. Br. at 19). The Court agrees. Plaintiff argues that "it conferred a benefit on Defendant by providing its insured with medical services." (ECF No. 13 at 21). However, courts have held that an insurance company "derives no benefit" from services provided to an insured for purposes of a *quantum meruit* claim. *Broad St. Surgical Ctr.*, 2012 WL 762498, at *8 (quoting *Travelers Indem. Co. of Conn. v. Losco Grp., Inc.*, 150 F. Supp. 2d 556, 563 (S.D.N.Y. 2001) ). As Plaintiff cites no authority to the contrary, the Court dismisses Plaintiff's *quantum meruit* claim with prejudice.

* * *

**\*7** As in *E. Coast*, Defendants here "attack[ ] the merits" of Plaintiff's contract and promissory estoppel claims at the motion-to-dismiss stage, when the Court's task is to ask "not whether a plaintiff will ultimately prevail[,] but whether the claimant is entitled to offer evidence to support the claim." 2018 WL 3062907, at *4 (quoting *Twombly*, 550 U.S. at 563 n.8). With the exception of the *quantum meruit* claim, the Court concludes that Plaintiff is entitled to do so here.

### IV. <u>CONCLUSION</u>

For these reasons, Defendants' Motion to Dismiss is granted in part and denied in part. An appropriate Order accompanies this Opinion.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 6445593, 2018 Employee Benefits Cas. 456,262

Footnotes

1   This background is derived from the Amended Complaint, (ECF No. 6 ("Am. Compl.") ), which the Court accepts as true at this stage of the proceedings. *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 758 (3d Cir. 2009).

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

775 F.Supp.2d 938
United States District Court, E.D. Texas, Sherman
Division.

ENCOMPASS OFFICE SOLUTIONS,
INC., Plaintiff,
v.
INGENIX, INC., Unitedhealth Group,
Inc., and United Healthcare Services,
Inc., Defendants.

Case No. 4:10–cv–00096
|
March 31, 2011.

**Synopsis**
**Background:** Provider of medical equipment and
services brought action against insurers, seeking
reimbursement for services provided in relation to
insureds' surgical procedures and alleging breach of
contract, negligent misrepresentation, defamation,
promissory estoppel, quantum meruit, and violations of
Texas Insurance Code, Texas Deceptive Trade Practices
Act (DTPA), and Employee Retirement Income Security
Act (ERISA). Insurers moved to dismiss.

**Holdings:** The District Court, Richard A. Schell, J., held
that:

provider had derivative standing to bring action;

provider stated Texas–law claims for breach of contract,
negligent misrepresentation, and defamation;

abatement was unwarranted under Texas Insurance Code
and DTPA, despite provider's failure to provide 60–day
pre–suit notice of action;

provider was not "consumer" under DTPA;

provider stated some claims under Texas Insurance Code;

provider stated Texas–law claims for promissory estoppel
and declaratory judgment; and

provider stated some claims under ERISA.

Motion granted in part and denied in part.

**Attorneys and Law Firms**

**\*945** Gregory William Curry, Adrienne Elizabeth
Dominguez, Jill Campbell Penn, William L. Banowsky,
Thompson & Knight, Dallas, TX, for Plaintiff.

**\*946** Kathy P. Josephson, Charles Chejfec, John W.
Reale, Kathy L. Kottos, Katten Muchin Rosenman LLP,
Chicago, IL, Christopher Shawn Cleveland, SNR Denton
U.S. LLP, Dallas, TX, Matthew D. Orwig, Sonnenschein
Nath & Rosenthal LLP, Dallas, TX, for Defendants.

*ORDER DENYING IN PART AND GRANTING IN
PART DEFENDANTS' MOTION TO DISMISS*

RICHARD A. SCHELL, District Judge.

Before the court is the "Defendants' Motion to Dismiss
Plaintiff's Second Amended Complaint Pursuant to
Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6)"
(Dkt. 41). For the following reasons, the Defendants'
motion is denied in part and granted in part.

**I. BACKGROUND**
This case arises out of a dispute between a medical
provider, Plaintiff Encompass Office Solutions, Inc.
(Encompass), and Defendants Ingenix, Inc. (Ingenix),
UnitedHealth Group, Inc., and United Healthcare
Services, Inc. (United) (collectively: Defendants) over
claims for reimbursement of services that Encompass has
provided to United's insureds.

Encompass provides equipment and nurses to assist
physicians in performing surgical procedures in the
physicians' own offices rather than in a traditional
hospital or ambulatory surgery center (ASC). The
physician and his or her patient make the choice of
whether to perform the procedure in the physician's office
and whether to use Encompass's services.

United provides health insurance policies to consumers and also administers health insurance plans offered by companies to their employees. Encompass's patients include those who have entered into contracts for health insurance coverage with United. Encompass receives an "Assignment of Benefits" from each of its patients and, pursuant to those assignments, Encompass has submitted hundreds of requests for reimbursement to United for services rendered to United's insureds.

United began reimbursing Encompass in 2007, but since June of 2009, United has stopped paying many of Encompass's claims. On July 27, 2009, Encompass received a letter from a representative of Ingenix, a wholly-owned subsidiary of United, demanding that Encompass return $2,051,896.22, which, according to Ingenix, was the amount United had paid Encompass for claims through June 1, 2009. Ingenix's stated reason for the refund request was that Encompass had misrepresented that it was an ASC on its reimbursement bills to United.

According to United, when a patient has a procedure performed at an ASC or hospital, or any facility other than the physician's office, United receives two bills, one from the physician for the professional component of the procedure, and the other from the facility for the technical component or facility fee. However, when a procedure is performed in the physician's own office, only the physician is eligible to bill United. This is because the physician's charges for in-office procedures are considered "global," which means they include both the professional and technical components. United argues that Encompass's claims constitute double billing of services because, in addition to reimbursing Encompass, United has already paid the physicians for the global procedure.

According to Encompass, it is not an ASC and has never represented itself as such. Rather, Encompass claims that in setting up an account with United, it emphasized that its services are provided in a physician's office. In particular, Encompass claims that in May of 2007, Encompass's billing company, Oklahoma Medical Billing, spoke with a United provider relations **947** representative over the phone and that in this call, the parties discussed that Encompass's services were performed in physicians' offices and that Encompass was not an ASC. Encompass further alleges that in this call, the United representative directed Encompass to bill United on a UB form with an SU modifier with the physician's name on the form to show the location of the service, which has been Encompass's practice ever since. This specific direction as to how Encompass was to bill United is significant because United claims that Encompass misrepresented itself as an ASC by the way it filled out reimbursement forms.

In August of 2009, Encompass responded to the July letter from Ingenix by sending a letter to Ingenix that described Encompass's efforts to properly bill for its services and stated that it had never represented itself as an ASC. In January of 2010, Ingenix again sent Encompass a letter claiming that it had misrepresented itself as an ASC and that United was entitled to reimbursement of all funds paid to Encompass based on the misrepresentation.

Apparently at an impasse, Encompass filed its initial complaint on March 5, 2010 (Dkt. 1). After filing an amended complaint on March 9, 2010 (Dkt. 3), Encompass filed its "Second Amended Complaint" (SAC) on July 1, 2010 (Dkt. 30). The SAC requests a declaratory judgment that Encompass is not required to reimburse United any amounts that it has paid Encompass, and that United is required to reimburse Encompass on its outstanding unpaid claims. The SAC also alleges numerous claims for relief under Texas common and statutory law and federal law. The claims are based generally on allegations that United led Encompass to believe that its services would be covered, that United has wrongfully denied coverage under the relevant benefit plans, and that the method Defendants used to calculate reimbursement rates has resulted in substantial underpayments. On August 24, 2010, the Defendants collectively filed the instant motion to dismiss Encompass's SAC (Dkt. 41).

## II. ANALYSIS

### A. Standing

The Defendants first argue that Encompass has not alleged enough facts to establish that it has standing to bring this suit. Specifically, the Defendants argue that the assignments Encompass received from its patients only give Encompass the right to receive payment for medical services but not the right to sue on behalf of the patients. The court notes at the outset that the Defendants' standing argument is necessarily limited to whether Encompass has standing to make claims on behalf of patients, which, according to Encompass, include claims alleging breach of contract, violations of the Texas Insurance Code and the Texas Deceptive Trade Practices Act (DTPA), and violations of ERISA. Encompass need not rely on the

assignments to establish standing for claims filed on its own behalf, claims alleging fraud or negligent misrepresentation, defamation and business disparagement, violations of the Texas Insurance Code and the DTPA, promissory estoppel, and quantum meruit.

The relevant language in the standard assignment of benefits form that Encompass obtained from its patients reads as follows:

> For the medical benefits allowable and otherwise payable to me under my current insurance policy as payment toward the total charges for the services rendered. This is a direct assignment of my rights and benefits under this policy.

Dkt. 30–1.

Below the paragraph that contains the above language, the assignment also states:

> **\*948** I authorize Encompass Office Solutions, Inc. to initiate a complaint to the insurance Commissioner for any reason on my behalf.

*Id.*

  It is well established in the Fifth Circuit that a healthcare provider may obtain derivative standing to enforce a beneficiary's claims by virtue of a valid assignment. *Harris Methodist Fort Worth v. Sales Support Servs. Inc. Emp. Health Care Plan,* 426 F.3d 330, 333–34 (5th Cir.2005).[1] The Defendants argue that Encompass's assignments do not confer derivative standing because they do not expressly give Encompass the right to bring a lawsuit. They also argue that because the assignments grant Encompass the right "to initiate a complaint to the insurance Commissioner," the principle of contract interpretation known as *expressio unius est exclusio alterius,* the expression of one thing is the exclusion of another, bars Encompass from filing lawsuits on behalf of its patients.

The Defendants cite three United States district court cases and one Florida state court in support of its argument that the assignment must "expressly transfer[ ] the specific right to bring the various causes of action alleged in the [complaint]:" *Barix Clinics of Ohio, Inc. v. Longaberger Family of Cos. Grp. Med. Plan,* 459 F.Supp.2d 617, 624 (S.D.Ohio 2005); *Cooper Hosp. Univ. Med. Ctr. v. Seafarers Health & Benefits Plan,* No. 05–5941, 2007 WL 2793372, at \*3 (D.N.J. Sept. 25, 2007); *Touro Infirmary v. Am. Maritime Officer,* No. 07–1441, 2007 WL 4181506, at \*5–6 (E.D.La. Nov. 21, 2007); and *Health Care Ctr. Tampa, Inc. v. Allstate Ins. Co.,* No. 03–5567, 2004 WL 1301917, at \*1 (Fla.Cir.Ct. Jan. 30, 2004). The court finds these cases unpersuasive

and respectfully declines to follow them.[2]

  Instead, the court chooses to follow a recent decision by the United States Court of Appeals for the Eleventh Circuit in which the court held that derivative standing does not require express authorization **\*949** to sue and that an "assignment of the right to payment is enough to create standing." *Conn. State Dental v. Anthem Health Plans,* 591 F.3d 1337, 1352 (11th Cir.2009). This is because " '[a]n assignment to receive payment of benefits necessarily incorporates the right to seek payment. [T]he right to receive benefits would be hollow without such enforcement capabilities.' " *Id.* at 1353 (quoting *I.V. Servs. of Am., Inc. v. Inn Dev. & Mgmt., Inc.,* 7 F.Supp.2d 79, 84 (D.Mass.1998)). *Conn. State Dental's* holding has been cited with approval by a district court within the Fifth Circuit. *See Spring E.R. LLC v. Aetna Life Insurance Co.,* No. H–09–2001, 2010 WL 598748, at \*2–4 (S.D.Tex. Feb. 17, 2010). Indeed, in *Spring E.R.,* the district court held that the healthcare provider had standing despite uncertainty about whether it had in fact received an assignment of benefits. *Id.* at \*4. The court reasoned that the mere possibility of the provider receiving direct payment of benefits was enough to establish standing. *Id. See also In re Managed Care Litigation,* No. 00–1334–MD, 2009 WL 742678, at \*5 (S.D.Fla. March 20, 2009) ("An assignment of benefits under a plan includes the assignment of the right to sue for such benefits, for without the latter, the former would be unenforceable.").

The court agrees with the Eleventh Circuit and finds that its reasoning is consistent with the Fifth Circuit's policy in favor of granting derivative standing. The court also finds that the Defendants' *expressio unius* argument does not overcome the compelling argument for holding that an assignment of policy benefits necessarily includes the right to seek payment of those benefits. Consequently, the court finds that by virtue of the assignments, Encompass has made a sufficient showing of standing to survive the Defendants' motion to dismiss. The Defendants' motion to dismiss on standing grounds is, therefore, **DENIED.**

**B. ERISA Preemption**
The Defendants argue that most of Encompass's state law claims are preempted by ERISA and, therefore, must be dismissed. Specifically, they argue that Encompass's state law claims that relate to insurance plans governed by ERISA are subject to complete preemption by the ERISA civil enforcement statute. The claims affected by this argument are Encompass's state law claims for breach of

Encompass Office Solutions, Inc. v. Ingenix, Inc., 775 F.Supp.2d 938 (2011)

contract, fraud or negligent misrepresentation, defamation, business disparagement, promissory estoppel, violations of the Texas Insurance Code and the DTPA, promissory estoppel, and quantum meruit.

The ERISA civil enforcement provision, § 502(a) of the statute, provides that a "civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan...." 29 U.S.C. § 1132(a)(1)(B). State law claims that duplicate or fall within the scope of the statutory remedy are completely preempted by ERISA. *Lone Star OB/GYN Associates v. Aetna Health Inc.,* 579 F.3d 525, 529 (5th Cir.2009). Complete preemption results in dismissal of the state-law claim, but courts typically allow plaintiffs to replead and assert the dismissed state law claims as federal claims under § 502(a). *See, e.g., Meyers v. Texas Health Resources,* No. 3:09–CV–1402–D, 2009 WL 3756323, at *8 (N.D.Tex. Nov. 09, 2009). This is because complete preemption is premised on the recognition "that Congress may so completely pre-empt a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Metro. Life Ins. Co. v. Taylor,* 481 U.S. 58, 63–64, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). *See also* **\*950** *Giles v. NYLCare Health Plans, Inc.,* 172 F.3d 332, 337 (5th Cir.1999) (complete preemption results in "transmogrifying a state cause of action into a federal one."). Given the ability of complete preemption to automatically transform state law claims into federal claims, the Supreme Court is "reluctant to find [this] extraordinary preemptive power." *Metro. Life,* 481 U.S. at 65, 107 S.Ct. 1542.[3]

Encompass responds to the Defendants' complete preemption argument by first arguing that its state law claims relating to plans not governed by ERISA cannot be preempted by ERISA. The Defendants do not dispute that these claims cannot be preempted by ERISA, and the court agrees that they cannot. Accordingly, as to any claim that relates to plans not governed by ERISA, the Defendants' motion to dismiss based on ERISA preemption is **DENIED.**

With regards to its state law claims that do relate to plans governed by ERISA, Encompass concedes that some of them are preempted by ERISA, namely, its request for declaratory judgment, claims for breach of contract, quantum meruit, violations of the DTPA, and violations of the Texas Insurance Code not based on negligent misrepresentation or fraud.[4] Accordingly, as to these claims, the Defendants' motion to dismiss is **GRANTED.** And, as previously discussed, because state law claims

that are completely preempted by § 502(a) are necessarily federal in character, Encompass is granted leave to amend its complaint to recast the preempted claims as federal claims under § 502(a).

As to its remaining state law claims for negligent misrepresentation under both the common law and the Texas Insurance Code, fraud, promissory estoppel, defamation and business disparagement, Encompass argues that they are not preempted because they are brought independently from the rights granted by ERISA to plan beneficiaries. In other words, Encompass argues that these claims are not preempted **\*951** because they are brought on its own behalf and not on behalf of plan beneficiaries.[5] The Defendants dispute this, arguing that because "the gravamen of Encompass's complaint is that United improperly failed to pay Encompass's claims that were submitted under ERISA plans," Encompass's claims are dependent on the rights of plan beneficiaries and therefore preempted.

In *Aetna Health Inc. v. Davila,* 542 U.S. 200, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004), the U.S. Supreme Court established a two-part test for determining when state law claims are completely preempted by § 502(a). Under *Davila,* state law claims are completely preempted when (1) an individual, at some point in time, could have brought the claim under § 502(a), and (2) there is no other legal duty independent of ERISA or the plan terms that are implicated by the defendant's actions. *Id.* at 210, 124 S.Ct. 2488. For the reasons set forth below, the court finds that Encompass's state law claims fail both prongs of *Davila* and are therefore not subject to complete preemption.

Under the first prong of the *Davila* test, Encompass could not have brought the state law claims under § 502(a) because they do not have standing to bring them under that section. The negligent misrepresentation, fraud and promissory estoppel claims relate to the alleged representation by United to Encompass that Encompass's services would be covered under United health plans. The defamation and business disparagement claims relate to alleged statements by United about Encompass to plan beneficiaries and an alleged statement by Ingenix about Encompass in a press release. Unlike Encompass's claims for breach of contract, violations of the Texas Insurance Code and the DPTA not based on negligent misrepresentation or fraud, and violations of ERISA, claims that Encompass brings on behalf of patients by virtue of the assignments, these other claims are brought independently of the assignments and on Encompass's own behalf. Therefore, because the only way in which Encompass could bring claims under § 502(a) is by virtue

of the assignments, and for these claims Encompass does not rely on the assignments, the court finds that the claims fail prong one of *Davila*. *See Marin General Hosp. v. Modesto & Empire Traction,* 581 F.3d 941, 947–49 (9th Cir.2009) (hospital's state law claims for negligent misrepresentation and estoppel failed prong one of *Davila* because basis for claims was telephone conversation with defendant plan administrator rather than assignments from patients); *Franciscan Skemp v. Central States Joint Bd.,* 538 F.3d 594, 597–98 (7th Cir.2008) (same).

Because complete preemption requires that both *Davila* prongs be met, and the court has found that prong one has not been met, the court is not obligated to analyze the claims under prong two. The court will nevertheless note that several other district courts have found that state law claims similar to Encompass's fail prong two of *Davila* because they were based on legal duties independent of those imposed by ERISA and the plan terms. *In Omega Hospital, LLC v. Aetna Life Ins. Co.,* No. 08–3717, 2008 WL 4724294 (E.D.La. Oct. 22, 2008), the hospital plaintiff alleged that before providing medical services, it verified with the patient's insurer **\*952** not only that the patient had health insurance but also that the specific care to be rendered would be covered. The insurer later refused to pay the claim and the hospital sued. The court held that the hospital's state law claims for detrimental reliance were not completely preempted by § 502(a) because "[r]egardless of whether the ERISA plan would have covered the procedures ... there is a state law question as to the insurer's negligent misrepresentation." *Id.* at \*6–7. Similarly, in *Texas Health Res. v. Grp. & Pension Adm'rs, Inc.,* No. 4:09–CV–547–A, 2009 WL 4667117 (N.D.Tex. Dec. 8, 2009), the plaintiff hospital brought a state law defamation claim against a plan administrator based on a letter the plan administrator sent to patients informing them that the hospital had overcharged them and that the plan would not cover overcharged amounts. The court held that the hospital's defamation claim was not completely preempted by ERISA because it arose from the letter sent by the plan administrator and not from the terms of the plan. *Id.* at \*3–4. *See also Ctr. for Restorative Breast Surgery, LLC v. Blue Cross Blue Shield of Louisiana,* No. 06–9985, 2007 WL 1428717 (E.D.La. May 10, 2007); *St. Luke's Episcopal Hosp. v. Acordia Nat'l,* No. H–05–1438, 2006 WL 3093132 (S.D.Tex. June 8, 2006).[6]

Therefore, because the court finds that Encompass's state law claims for negligent misrepresentation under both the common law and the Texas Insurance Code, fraud, promissory estoppel, defamation and business disparagement are not completely preempted by ERISA, the Defendants' motion to dismiss those claims on preemption grounds is **DENIED**.

**C. Motion to Dismiss under Rule 12(b)(6)**
The Defendants have moved to dismiss each of Encompass's claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Although the court has already held that many of the following claims are preempted by ERISA, the court must nevertheless analyze each of the SAC's claims under Rule 12(b)(6) because, as discussed above, the court's preemption holding does not apply to claims that relate to health plans not governed by ERISA. The court will begin its analysis by delineating the legal standard used to judge motions to dismiss under Rule 12(b)(6).

**1. Legal Standard**
In passing on a Rule 12(b)(6) motion, a court must accept all of the plaintiff's allegations **\*953** as true. *Ballard v. Wall,* 413 F.3d 510, 514 (5th Cir.2005). A claim will survive an attack under Rule 12(b)(6) if it "may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 562, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In other words, a claim may not be dismissed based solely on a court's supposition that the pleader is unlikely "to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Id.* at 563 n. 8, 127 S.Ct. 1955. Although detailed factual allegations are not required, a plaintiff must provide the grounds of its entitlement to relief beyond mere "labels and conclusions;" "a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555, 127 S.Ct. 1955. The complaint must be factually suggestive, so as to "raise a right to relief above the speculative level," *id.* at 555, 127 S.Ct. 1955, and into the "realm of plausible liability." *Id.* at 557 n. 5, 127 S.Ct. 1955. Facial plausibility is achieved "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Encompass Office Solutions, Inc. v. Ingenix, Inc., 775 F.Supp.2d 938 (2011)

**2. Breach of Contract**

The Defendants argue that Encompass has failed to state a claim for breach of contract. In order to prove its breach of contract claim, Encompass must plead facts showing: "(1) the existence of a valid contract; (2) performance or tender of performance; (3) breach by the defendant; and (4) damages resulting from the breach." *Oliphant Fin., LLC v. Patton,* No. 05–07–01731–CV, 2010 WL 936688, at *3 (Tex. App–Dallas Mar. 17, 2010, pet. filed). In particular, the Defendants argue that the breach of contract claim must be dismissed because Encompass has failed to identify specific contract provisions that United allegedly breached. The court disagrees and finds that Encompass has identified plan provisions in such a manner that is sufficient to survive the pleading stage. With regards to its breach of contract claim, Encompass has pled the following:

United's plans permit coverage for outpatient surgeries done in physicians' offices. The plans provide coverage for both in and out-of-network "[s]urgery and related services received on an outpatient basis at a Hospital or Alternate Facility or in a Physician's office.... Benefits under this section include: The facility charge and the charge for supplies and equipment. Physician services for anesthesiologists, pathologists and radiologists." (SAC ¶ 37);

Encompass patients have PPO or POS plans that allow them to seek medically necessary benefits, whether in-network or not. Encompass is an out-of-network provider for United, which assists in performing outpatient surgeries in physician's offices by providing supplies, equipment, and nurses—covered services. As such, United's insureds (Encompass's patients) are contractually entitled to reimbursement on their claims. [ ] For some time Defendants paid these claims. Then Defendants started denying many of Encompass's claims. The claims, however, should not have been denied as United's plans provide coverage for the very services Encompass performs. United breached its ERISA-governed plan language and non-ERISA contracts by failing to reimburse Encompass for covered procedures. (SAC ¶ 38);

Additionally, United contractually promises its patients that it will pay a percentage **\*954** of the reasonable and customary charge (also known as the "RAC" rate, or the usual, customary and reasonable rate ("UCR rate") after deductible for out-of-network outpatient surgery and anesthesia, for physician's office services, and for supplies and equipment used for office-based surgeries—the very supplies, equipment, and support

Encompass provides. [ ] But as set forth below, United's representations were untrue. United breached its ERISA-governed plan language and policies and non-ERISA contracts by using flawed or inadequate data to determine UCR amounts, which resulted in reimbursements well below actual UCR for such out-of-network medical services. (SAC ¶¶ 39–40).

The court finds that Encompass's allegations contain enough facts about plan provisions to make its breach of contract claim plausible and to put United on notice as to which provisions it allegedly breached. Accordingly, the Defendants' motion to dismiss Encompass's breach of contract claim for failure to state a claim is **DENIED.**[7]

**3. Fraud**

The Defendants argue that Encompass has failed to plead enough facts to state a claim for fraud. Encompass's fraud claim is based on allegations that United led Encompass to believe that its services would be covered. Under Texas law, a claimant alleging fraud must prove the following: (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *Aquaplex, Inc. v. Rancho La Valencia, Inc.,* 297 S.W.3d 768, 774 (Tex.2009) (per curiam).

Rule 9(b) of the Federal Rules of Civil Procedure imposes a heightened pleading standard for fraud claims and requires that a party "state with particularity the circumstances constituting fraud." The Fifth Circuit has interpreted Rule 9(b) to "require specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent." *Plotkin v. IP Axess Inc.,* 407 F.3d 690, 696 (5th Cir.2005). "Put simply, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out." *Shandong Yinguang Chem. Indus. Joint Stock Co., Ltd. v. Potter,* 607 F.3d 1029, 1032 (5th Cir.2010) (quoting *Benchmark Electronics, Inc. v. J.M. Huber Corp.,* 343 F.3d 719, 724 (5th Cir.2003)). But "[t]he particularity demanded by Rule 9(b) necessarily differs with the facts of each case." *Tuchman v. DSC Commc'ns Corp.,* 14 F.3d 1061, 1067–68 (5th Cir.1994).

**\*955** The court finds that Encompass has not adequately pled its cause of action for fraud. Specifically, the court

Encompass Office Solutions, Inc. v. Ingenix, Inc., 775 F.Supp.2d 938 (2011)

finds that Encompass's fraud claim is deficient in failing to adequately plead the knowledge element of fraud. While Rule 9(b) provides that intent and knowledge "may be alleged generally," this is not a license to base claims of fraud upon conclusory allegations. *City of Clinton, Ark. v. Pilgrim's Pride Corp.,* 632 F.3d 148, 154–55 (5th Cir.2010). Proving the knowledge element of fraud "requires more than a simple allegation that a defendant had fraudulent intent. To plead scienter adequately, a plaintiff must set forth specific facts that support an inference of fraud." *Tuchman,* 14 F.3d at 1068. The requirements for such specific facts can be satisfied by (1) alleging facts that show a defendant's motive to commit fraud, or (2) identifying circumstances that indicate conscious behavior on the part of the defendant, with the strength of such circumstantial allegations being correspondingly greater. *Id.* The only statement in the SAC alleging knowledge is that "Defendants either knew these representations were false or made the representations recklessly, as a positive assertion, without knowledge of their truth of falsity." ¶ 101. Not only is this insufficient under Rule 9(b), it also fails under the ordinary pleading standard provided by Rule 8(a). *See Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Accordingly, the Defendants' motion to dismiss Encompass's fraud claim is **GRANTED.** The claim is dismissed without prejudice, and Encompass is given leave to amend it to the extent necessary to remedy deficiencies identified herein.

**4. Negligent Misrepresentation**
  The Defendants argue that Encompass has failed to plead enough facts to state a claim for negligent misrepresentation. Like its fraud claim, Encompass's negligent misrepresentation claim is based on allegations that United led Encompass to believe that its services would be covered. Under Texas law, a claimant alleging negligent misrepresentation must prove the following: (1) the representation is made by a defendant in the course of his business, or in a transaction in which the defendant has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers a pecuniary loss by justifiably relying on the representation. *Biggers v. BAC Home Loans Servicing, LP,* 767 F.Supp.2d 725,

733–35, No. 3:10–CV–1182–D, 2011 WL 588059, at *7–8 (N.D.Tex. Feb. 10, 2011).

The SAC includes a subsection under the "Claims for Relief" section entitled "Fraud or Negligent Misrepresentation." *See* Dkt. 30, pg. 39. The list of allegations under that subsection appear to apply to both the fraud claim and the negligent misrepresentation claim. The Defendants argue that because Encompass's claims for fraud and negligent misrepresentation are intermingled, the heightened pleading requirements of Rule 9(b) should also apply to Encompass's negligent misrepresentation claim and that the claim is insufficient under that standard.

  It is true that while Rule 9(b) by its terms applies only to "averments of fraud or mistake," the Fifth Circuit has recognized that Rule 9(b) can apply to a claim for negligent misrepresentation when the fraud and negligent misrepresentation claims are sufficiently intertwined. **\*956** *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,* 594 F.3d 383, 387 n. 3 (5th Cir.2010). Thus, if the complaint bears no distinct focus on allegations of negligent misrepresentation separate from allegations of fraud then both claims are subject to the heightened pleading requirements of Rule 9(b). *Biliouris v. Sundance Res., Inc.,* 559 F.Supp.2d 733, 737 (N.D.Tex.2008); *Kitchell v. Aspen Exploration, Inc.,* 562 F.Supp.2d 843, 852–53 (E.D.Tex.2007); *In re Enron Corp. Securities, Derivative,* 540 F.Supp.2d 800, 807 & 827 (S.D.Tex.2007). In other words, Rule 9(b) governs both claims unless the court can devise a simple redaction that removes allegations of fraud from the complaint but leaves a valid and intelligible negligent misrepresentation claim intact. *Id.* (all three cases).

The court concludes that Rule 9(b) provides the appropriate pleading standard for Encompass's negligent misrepresentation claim. The SAC combines allegations of fraud and negligent misrepresentation without specifying which allegations are for the fraud claim and which are for the negligent misrepresentation claim. Therefore, it is not possible for the court to strip away from the complaint allegations of fraud without also stripping away allegations that may have been intended for the negligent misrepresentation claim. Accordingly, the court will judge the sufficiency of Encompass's negligent misrepresentation claim under the heightened pleading requirements of Rule 9(b).

The SAC alleges that United made negligent misrepresentations in four different ways. First, Encompass alleges that in May of 2007, Oklahoma Medical Billing (OMB), Encompass's billing company,

spoke over the phone to a United provider relations representative about Encompass establishing an out-of-network account with United. Encompass alleges that in this phone call OMB explained Encompass's services, and that the United provider relations representative gave OMB specific information about how Encompass should seek reimbursement from United. ¶¶ 72, 99. Second, Encompass alleges that United made several statements to it and to its patients representing that Encompass's services would be covered. ¶¶ 78, 100. Third, Encompass alleges that United represented to it and to its patients that United would "timely and properly reimburse for out-of-network outpatient surgical care performed in a physician's office." ¶ 102. And, finally, Encompass alleges that United falsely represented "in the course of Defendants' business ... the appropriate way for Encompass to bill, regarding coverage of the procedure, or regarding timely and proper reimbursement." ¶ 103.

The court finds that Encompass's first group of allegations, those relating to the May 2007 phone call, fails to meet the heightened pleading standard of Rule 9(b). While the claim does set forth the "who, what, when, and where" of the representations, as required under 9(b), it fails to allege how the statements constitute negligent misrepresentation, or, specifically, how the statements were false. The only language in the SAC suggesting that United's billing instructions were false is that "Defendants stopped abiding by their representation that they would reimburse Encompass as long as it billed on the UB form with the SU modifier," ¶ 99, and "Defendants promised to reimburse Encompass if it submitted requests for reimbursement on the UB form with the SU modifier," ¶ 134. Yet Encompass never provides the "who, what, when, and where" of these alleged representations, i.e. whether United made them in the May 2007 conversation or in some other conversation. Consequently, Encompass's negligent misrepresentation claim based on the **\*957** May 2007 phone call is insufficient under Rule 9(b).

The court also finds that Encompass's second group of allegations, those relating to United's assurance of coverage, fails to meet the heightened pleading standards of Rule 9(b). While the complaint does allege in several places that United represented to Encompass and its patients that Encompass's services would be covered by United policies, *see* ¶¶ 78, 100, 102, and 103, the complaint fails to allege when these representations were made, who made them, and to whom, specifically, they were made.[8] Therefore, Encompass's negligent misrepresentation claim based on these representations is insufficient under Rule 9(b).

Likewise, the court finds that the fourth group of allegations, those relating to United's representations in the course of business, is insufficient to state a claim for negligent misrepresentation because they too fail to identify when these representations were made, who made them, and to whom, specifically, they were made.

Alternatively, the court finds that the third group of allegations on which Encompass bases its negligent misrepresentation claim, those relating to United's promises to timely and properly reimburse patients, is sufficient to plead a claim for negligent misrepresentation under Rule 9(b). The SAC alleges that United's policies expressly provide coverage for the kind of services that Encompass provides. See ¶ 36–40. With these allegations, the "who, what, when, and how" is clear, and notice of the claim is sufficient to enable United in developing a response.

Accordingly, because the court finds that part of the allegations on which Encompass bases it claim for negligent misrepresentation does satisfy the heightened pleading requirements of Rule 9(b), the Defendants' motion to dismiss the claim is **DENIED.** Encompass is granted leave to amend its allegations in support of its negligent misrepresentation claim to the extent necessary to remedy the deficiencies identified herein.

**5. Defamation**

The Defendants argue that Encompass has failed to plead enough facts to state a claim for defamation. Encompass's defamation and business disparagement claims relate to the following statements allegedly made by the Defendants. First, "in correspondence from Defendants to Encompass's patients, Defendants often claimed that they could not pay the claim because they were 'unable to verify state licensure of a facility or criteria to support the provider billing type. Proof of facility licensure or hospital affiliation is required.' " ¶ 107. Encompass argues that this statement is defamatory because it implies that Encompass was required to be licensed and was not licensed, when in reality it is not required to be licensed. Second, "in a press release, a representative for Ingenix stated that 'Encompass submitted bills as an ambulatory surgery center [but] Encompass is not an ambulatory surgery center and does not perform medical procedures.' " ¶ 111. Encompass argues that this statement is false because it "does perform medical procedures, albeit under the supervision of physicians." Encompass **\*958** also argues that the Ingenix statement suggests that Encompass was falsely

seeking reimbursement as an ASC when in reality Encompass has never represented itself as such.

The elements of defamation under Texas law are that: (1) the defendant published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with malice, if the plaintiff was a public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement. *Udoewa v. Plus4 Credit Union,* 754 F.Supp.2d 850, 866–67 (S.D.Tex.2010) (citing *WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex.1998)). A defamatory statement is one in which the words tend to damage a person's reputation, exposing him or her to public hatred, contempt, ridicule, or financial injury. *Id.* While a claim for defamation is not subject to the heightened pleading requirements of Rule 9(b), the pleadings for a defamation claim must be sufficiently detailed to the extent necessary to enable the defendant to respond. *See Jackson v. Dallas Indep. Sch. Dist.,* No. CIV. A. 398–CV–1079, 1998 WL 386158, *5 (N.D.Tex.1998), *aff'd,* 232 F.3d 210 (5th Cir.2000); *Redden v. Smith & Nephew, Inc.,* No. 3:09–CV–1380–L, 2010 WL 2944598, at *5 (N.D.Tex. July 26, 2010).

The court finds that Encompass has pled its defamation claim with sufficient particularity. While the allegations relating to the defamation claim do not specify when these alleged statements were made or, with regards to the letters to patients, to whom they were specifically made, the court finds that they are nevertheless sufficient to put United on notice of the claim. The SAC quotes the statements that Encompass alleges are defamatory, and the statements are described in such a manner that will enable the Defendants to easily investigate the alleged statements through discovery. Additionally, that the Defendants have already mounted a defense to these statements being defamatory, a truth defense, further suggests that the SAC provides the Defendants with sufficient notice.

Regarding their truth defense, the Defendants argue that Encompass's defamation claim must fail because the content of the statements that Encompass alleges are defamatory is true. The Defendants argue that Encompass's own assertions in the SAC demonstrate the truthfulness of Defendants' statements: "in its SAC, Encompass admits that it: (1) 'is not an ASC' (SAC ¶ 13); (2) 'is not and has never been an ASC' (SAC ¶ 70); (3) 'is not a facility or and [sic] ASC' (SAC ¶ 70); (4) 'is not licensed as a facility' (SAC ¶ 107); and (5) 'provides a safe, surgical environment that allows *physicians* to perform surgical procedures in their own offices' (SAC ¶ 10 (emphasis added)). Thus, because the allegation [sic] conclusively establish that Encompass is *not* an ASC and

that *physicians* perform these procedures, Encompass's claims must be dismissed."

Encompass counters by arguing that its defamation claim rests not on the literal veracity of the Defendants' statements but on the false impressions that they convey, namely that Encompass should have been licensed as a facility when in reality it did not have to be, and that Encompass falsely submitted requests for reimbursement as an ASC when in reality it never represented itself as an ASC.[9] Moreover, Encompass argues that "whether the statements are true or false should be determined on a motion for summary judgement, not a motion to dismiss."

**\*959** Truth is an affirmative defense to a defamation claim when the plaintiff is a private person or entity. *See Hearst Corp. v. Skeen,* 159 S.W.3d 633, 637 n. 1 (Tex.2005). In order for dismissal to be appropriate on the basis of an affirmative defense, the defense must be established on the face of the complaint. *EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, N.A.,* 467 F.3d 466, 470 (5th Cir.2006). *See also Marquis v. OmniGuide, Inc.,* No. 3:09–CV–2092–D, 2011 WL 321112, at *4 (N.D.Tex. Jan. 28, 2011) ("Dismissal under Rule 12(b)(6) on the basis of an affirmative defense is appropriate only where the plaintiff pleads himself out of court by admitting all the ingredients of an impenetrable defense." (internal quotation and citation omitted)). The court agrees with Encompass that the Defendants' truth defense is not an appropriate basis for dismissal at this stage in the case. Encompass's defamation claim is based on the alleged false message conveyed by the statements, not on the literal truth of the Defendants' individual statements. Texas courts recognize this as a legitimate theory for a defamation cause of action. *See Turner v. KTRK Television,* 38 S.W.3d 103, 114 (Tex.2000) ("under Texas law a publication can convey a false and defamatory meaning by omitting or juxtaposing facts, even though all the story's individual statements considered in isolation were literally true or non-defamatory."). Thus, even if the court were to conclude on the basis of the SAC alone that the alleged defamatory statements are literally true, the court cannot conclude at this stage that Encompass has stated an implausible claim on which it cannot possibly recover. Accordingly, the Defendants' motion to dismiss Encompass's defamation claim is **DENIED.**

### 6. Business Disparagement

The Defendants argue that Encompass has failed to plead enough facts to state a claim for business

Encompass Office Solutions, Inc. v. Ingenix, Inc., 775 F.Supp.2d 938 (2011)

disparagement. Encompass's business disparagement claim relates to the same alleged statements that form the basis of its defamation claim. *See supra.* "To prevail on a business disparagement claim, the plaintiff must prove: (1) publication by the defendant of false and disparaging words about the plaintiff; (2) malice; (3) lack of privilege; and (4) special damages to the plaintiff." *Fluor Enters., Inc. v. Conex Int. Corp.,* 273 S.W.3d 426, 433 (Tex.App.-Beaumont 2008, pet. denied). The Defendants argue that Encompass has failed to plead special damages. To prove special damages, a plaintiff must provide evidence "that the disparaging communication played a substantial part in inducing third parties not to deal with the plaintiff, resulting in a direct pecuniary loss that has been realized or liquidated, such as specific lost sales, loss of trade, or loss of other dealings." *Astoria Indus. of Iowa, Inc. v. SNF, Inc.,* 223 S.W.3d 616, 628 (Tex.App.-Fort Worth 2007, pet. denied).

The only allegation in the SAC relating to special damages is that "[t]he publication of these statements has caused Encompass to suffer lost profits and lost goodwill/business reputation." The court finds that this conclusory statement, void of any supporting facts, is insufficient to support a claim for business disparagement. *See Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Consequently, the court **GRANTS** the Defendants' motion to dismiss Encompass's claim for business disparagement. The claim is dismissed without prejudice, and Encompass is given leave to amend it to the extent necessary to remedy deficiencies identified herein.

**\*960 7. DTPA and Texas Insurance Code**

**a. Pre–Suit Notice**

The Defendants argue that Encompass did not comply with the pre-suit notice requirements under the DTPA and the Texas Insurance Code. It is unclear whether, based on this argument, the Defendants seek dismissal of the claims brought under these statutes or abatement of the claims. However, because abatement, not dismissal, is the proper remedy for failure to satisfy the notice requirements, the court will treat the Defendants' request as one for abatement. *See Hines v. Hash,* 843 S.W.2d 464, 468–69 (Tex.1992).

Both the DTPA and the Texas Insurance Code require a plaintiff to give sixty days' notice to a defendant before filing suit. *See* Tex. Ins.Code § 541.154(a); Tex. Bus. & Com.Code § 17.505(a). If a person against whom an action under these statutes is brought does not receive the required pre-filing notice, he or she may file a plea in abatement no later than thirty days after the date he or she files an original answer in the court in which the action is pending. Tex. Ins.Code § 541.155(a); Tex. Bus. & Com.Code § 17.505(c). A court must abate the action if it finds that the claimant did not provide the required pre-filing notice. Tex. Ins.Code § 541.155(b); Tex. Bus. & Com.Code § 17.505(d). The abatement will run until the sixtieth day after the date the claimant properly provides the pre-filing notice. Tex. Ins.Code § 541.155(d); Tex. Bus. & Com.Code § 17.505(e).

Encompass concedes that it did not give pre-suit notice of the claims but asserts in its response to the Defendants' motion to dismiss (Dkt. 51), filed on October 18, 2010, that it has since provided the required pre-suit notice. And in its reply brief (Dkt. 55), the Defendants do not dispute that Encompass provided notice subsequent to filing suit.

The court finds that Encompass failed to provide pre-notice suit of its DTPA and Texas Insurance Code claims, as required by Texas law, and that the Defendants filed a plea in abatement within the required time frame. However, because the court finds that it has been over sixty days since Encompass represented to the court that it had filed its belated pre-filing notice, the court finds that there is no reason to formally abate this action for another sixty days. Accordingly, the Defendants' motion to dismiss/abate these claims for failure to provide pre-suit notice is **DENIED.**

**b. DTPA Standing**

The Defendants argue that Encompass's DTPA claim should be dismissed because Encompass lacks standing to bring such a claim. The DTPA prohibits entities engaged in commerce from engaging in "false, misleading, or deceptive acts or practices." Tex. Bus. & Com.Code § 17.46(a). To meet the DTPA's standing requirement, a complaining party must plead and prove that it is a "consumer." Tex. Bus. & Com.Code § 17.50(a). The Defendants argue that Encompass cannot bring a DTPA claim on its own behalf because it has not established that it is a "consumer" under the Act and that it cannot qualify as such. Further, they argue that Encompass can not bring a DTPA claim on behalf of its patients because DTPA claims cannot be assigned. Encompass counters by

emphasizing that it brings its DTPA claim on its own behalf and not on behalf of patients, and that it has sufficiently pled its "consumer" status. Encompass also argues that even if it is not a "consumer" under the Act, it can bring DTPA claims by virtue of the assignments.

The Defendants first argue that the SAC's lone allegation that "Encompass **\*961** is a consumer ... under the Texas Deceptive Trade Practices Act," ¶ 130, is insufficient to plead "consumer" status under the DTPA. However, "[t]he DTPA does not require a party to specifically refer to itself as a "consumer" when pleading its cause of action under the act. The complaining party need only allege facts showing that it fits within the act's definition of consumer." *Kuper v. Stewart Title Guar. Co.,* No. 01–00–00777–CV, 2002 WL 31429754, at \*4 (Tex.App.-Houston [1 Dist.] Oct. 31, 2002, no pet.) (internal citations omitted).[10]

To qualify as a consumer under the DTPA, (1) the person must have sought or acquired goods or services by purchase or lease, and (2) the goods or services purchased or leased must form the basis of the complaint. Tex. Bus. & Com.Code § 17.45(4); *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 539 (Tex.1981). In limited situations, Texas courts have recognized that a party who was not the direct purchaser of "goods or services" may qualify as a "consumer" under the Act. *See, e.g., Kennedy v. Sale,* 689 S.W.2d 890, 892 (Tex.1985) (holding that an employee who was covered under an employer provided insurance policy qualified as a "consumer" under the DTPA because employer had purchased policy for the employee's benefit); *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 539 (1981) (holding that purchasers of house who brought DTPA claim against seller's agent for misrepresenting the quantity of the house's square feet qualified as "consumer" under the Act even though purchasers did not actually seek or acquire goods or services directly from the agent). However, Texas courts have also held that "[a] party whose only relation to an insurance policy is to seek policy proceeds is not a 'consumer' " under the DTPA. *Transport Ins. Co. v. Faircloth,* 898 S.W.2d 269, 274 (Tex.1995). *See also Caplinger v. Allstate Ins. Co.,* 140 S.W.3d 927, 931 (Tex.App.-Dallas 2004, no pet.) ("Third-party claimants lack standing to assert direct claims against an insurance company for violations of ... the Texas Deceptive Trade Practices Act."); *Universal Sur. of Am. v. Cent. Elec. Enters. & Co.,* 956 S.W.2d 627, 629 (Tex.App.-San Antonio 1997, pet. denied) ("a third-party claimant seeking proceeds under an insurance policy is not a 'consumer' under the DTPA."). Accordingly, because Encompass's only relation to the United plans is to seek the proceeds of those plans, the court finds that

Encompass does not qualify as a "consumer" under the Act.

The court also finds unconvincing Encompass's argument that even if it were not a "consumer" under the DTPA, and could not bring the DTPA claim on its own behalf, it could still bring a DTPA claim as assignee of its patients' plans. As pointed out by the Defendants, the Texas Supreme Court has held that "DTPA claims generally cannot be assigned." *PPG Industries, Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 92 (Tex.2004). This is because "assigning DPTA claims would defeat the primary purpose of the statute—to encourage individual consumers to **\*962** bring such claims themselves." *Id.* at 82. While Encompass attempts to limit the holding of *PPG Industries* to its particular facts, the court disagrees and finds no compelling reason to do so. Out of the dozens of cases that have relied on *PPG Industries,* Encompass has not provided, and the court could not locate, a single decision dealing with the assignability of DTPA claims that limited *PPG Industries* in such a manner, and the court declines to do so here. Encompass also emphasizes that the holding in *PPG Industries* was that "DTPA claims *generally* cannot be assigned," *Id.* at 92 (emphasis added), and that this is, or should be, one of the times that an exception applies. However, a reading of the *PPG Industries* decision suggests that the court qualified its holding with the word "generally" only because elsewhere in the decision the court clarified that its holding did not reach whether "DTPA claims survive to a consumer's heirs" and whether "claims that were created within and could not be brought without the DTPA" could be assigned. *Id.* at 91–92. The court also noted that its holding did not prohibit "equitable assignments, such as a contingency-fee interest assigned to a consumer's attorney." *Id.* at 92. This court finds that none of those exceptions apply here, and that the *PPG Industries* decision precludes Encompass from bringing a DTPA claim in reliance on assignments from United's insureds.

Accordingly, because the court finds that Encompass lacks standing to bring a DTPA claim on its own behalf or on behalf of its patients, the court **GRANTS** the Defendants' motion to dismiss Encompass's DTPA claim. And because the court finds that Encompass could plead no facts that would enable it to overcome the authorities set forth above barring it from bringing DTPA claims, the court declines to grant Encompass leave to amend these claims.

In light of the court's dismissal of Encompass's DTPA claim for lack of standing, the court finds moot and will not address the Defendants' argument that because the

DTPA claim is predicated on the same misrepresentations and omissions as the fraud claim, it must satisfy, but fails to satisfy, the pleading requirements of Rule 9(b). Accordingly, that motion is **DENIED**.

**c. Texas Insurance Code**

**i. Claim under § 543.001**
The SAC alleges that United violated § 543.001 of the Texas Insurance Code, which prohibits health insurers from misrepresenting the terms of a policy or other benefits or advantages provided by the policy. The Defendants argue, and Encompass does not contest, that § 543.001 does not provide a private right of action for violations of that section. Encompass, however, argues that § 543.001 is actionable under § 541.061, which provides in relevant part that:

> It is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to misrepresent an insurance policy by:
>
> (1) making an untrue statement of material fact;
>
> (2) failing to state a material fact necessary to make other statements made not misleading, considering the circumstances under which the statements were made;
>
> (3) making a statement in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact;

Unlike § 543.001, § 541.061 is made actionable under § 541.151, which provides a private right of action for violations of certain provisions of the Act, including § 541.061 but not § 543.001.

**\*963**  In addition to the claim under § 543.001, the SAC alleges that United violated § 541.061, the provision set forth above. The court finds that the presence of the § 541.061 claim in the SAC precludes the § 543.001 claim. Even assuming that Encompass is correct that § 541.061 can be used to bring a claim under § 543.001, a proposition which Encompass advocates solely on the basis of a stretched reading of the statutes, the court finds that these claims are impermissibly duplicative. Sections 543.001 and 541.061 prohibit the same conduct, namely, prohibiting any entity engaged in the business of insurance from misrepresenting insurance policies. The SAC relies on the same set of allegations for both claims. Yet while one provision, § 541.061, provides a private

cause of action, the other, § 543.001, does not. For these reasons, the court finds that Encompass cannot rely on § 541.061 to bring a claim for an alleged violation of § 543.001 and also bring a § 541.061 claim on the same set of allegations. Consequently, the court **GRANTS** the Defendants' motion to dismiss Encompass's § 543.001 claim. And because the court finds that Encompass could plead no facts that would enable it to bring a § 543.001 claim alongside a § 541.061 claim, assuming the § 543.001 claim is even cognizable, the court declines to grant Encompass leave to amend this claim.

**ii. Claims under §§ 1301.051 and 1301.053**
The SAC alleges that the Defendants violated §§ 1301.051 and 1301.053 of the Texas Insurance Code. Section 1301.051 requires insurers to "afford a fair, reasonable, and equivalent opportunity to apply to be and to be designated as a preferred provider ...," and § 1301.053 provides that "[a]n insurer that does not designate a practitioner as a preferred provider shall provide a reasonable mechanism for reviewing that action." The Defendants argue that these claims must be dismissed because § 1301.051 also states that it only applies when the "preferred provider" applicant is "licensed to treat injuries or illnesses ...," and the SAC admits that Encompass is not licensed, *see* ¶¶ 13, 70, 76, and 107. Encompass's briefs in reply do not contest this argument and, therefore, the court finds that Encompass has conceded that it cannot bring claims under §§ 1301.051 and 1301.053. Accordingly, the court **GRANTS** the Defendants' motion to dismiss these claims. And because the court finds that Encompass could plead no facts that would enable it to bring these claims, the court declines to grant Encompass leave to amend this claim.

**iii. Claims under § 542.058 or Chapter 843**
The SAC alleges that United violated the Texas Prompt Payment Law as set out in § 542.058 "or" Chapter 843 of the Texas Insurance Code by "failing to promptly and properly reimburse Encompass." ¶ 126. The Defendants argue that Encompass's claim under Chapter 843 should be dismissed because Encompass failed to identify which provision of Chapter 843 was allegedly violated. Encompass appears to have conceded this argument because it did not respond to it in two subsequent briefs to the court. Therefore, the court finds that it is appropriate to **GRANT** the Defendants' motion to dismiss

Encompass's claim under Chapter 843 for failure to put Defendants on notice as to which provision of that Chapter United allegedly violated. The claim is dismissed without prejudice, and Encompass is given leave to amend it to the extent necessary to remedy deficiencies identified herein.

Section 542.058 provides that "if an insurer, after receiving all items, statements, and forms reasonably requested **\*964** and required ... delays payment of the claim for a period exceeding the period specified by other applicable statutes or, if other statutes do not specify a period, for more than 60 days, the insurer shall [be liable]." The Defendants argue that Encompass's claim under § 542.058 should be dismissed because that provision applies only when an insurer has delayed payment of a claim, but not when an insurer has denied payment. In other words, the Defendants appear to argue that, unlike what has occurred in this case, § 542.058 applies only when the insurer has not already refused to pay a claim. The court disagrees. "A wrongful rejection of a claim may be considered a delay in payment for purposes of [§ 542.058]." *Teate v. Mutual Life Ins. Co. of New York,* 965 F.Supp. 891, 893 (E.D.Tex.1997). *See also United Services Auto. Ass'n v. Croft,* 175 S.W.3d 457, 474 (Tex.App.-Dallas 2005, no pet.) (holding the same and stating that "[w]hen an insurance company denies a claim, it runs the risk that its decision may be wrong and subject it to liability [for failure to promptly pay].""). Encompass has sufficiently alleged that its claims were wrongfully rejected. The court, therefore, declines to grant the Defendants' motion to dismiss the § 542.058 claim for failure to allege a delay in payment.

Additionally, the Defendants argue that Encompass has not stated a claim under § 542.058 because it is not a proper claimant under the Act. Specifically, the Defendants cite § 542.051, which defines the term "claim" as "a first-party claim that is made by an insured or policyholder under an insurance policy or contract or by a beneficiary named in the policy or contract; and must be paid by the insurer directly to the insured or beneficiary." However, as pointed out by Encompass, the Defendants cite no authority to support their contention that the assignments Encompass received do not provide it with status to bring a claim under § 542.058. And given the Fifth Circuit's policy in favor of granting derivative standing to assignees of health plan benefits, the court will not refuse assignee standing at this stage of the case without authority holding otherwise. Accordingly, the Defendants' motion to dismiss Encompass's claim under § 542.058 of the Texas Insurance Code is **DENIED.**

#### iv. Claim under § 1301.068

The SAC alleges that the Defendants violated § 1301.068 of the Texas Insurance Code, which prohibits an insurer from using "any financial incentive or make payment to a physician or healthcare provider that acts directly or indirectly as an inducement to limit medically necessary services." In support of this claim, the SAC states that "United encourages medical providers to limit the use of Encompass or otherwise limit medically necessary services provided by Encompass." ¶ 122. The Defendants argue that the SAC fails to state a claim under § 1301.068 because it contains no allegations that United used financial incentives or payments as an inducement to limit medically necessary services. Instead, the SAC merely states that United "encourages" medical providers to limit services. The court agrees with the Defendants. The use of financial incentives or payments is a key element under the statute that must be pled with enough factual support to make the claim plausible. *See Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Accordingly, the court **GRANTS** the Defendants' motion to dismiss Encompass's claim under § 1301.068. The claim is dismissed without prejudice, and Encompass is given leave to amend it to the extent necessary to remedy deficiencies identified herein.

#### v. Claims under Chapter 541

Regarding Encompass's claims under Chapter 541 of the Texas Insurance **\*965** Code, more particularly claims under §§ 541.051, 541.060, and 541.061, which are provisions that in some fashion prohibit insurers from misrepresenting policy coverage, the Defendants argue that they must be dismissed because they fail to satisfy the heightened pleading requirements under Rule 9(b). In response, Encompass argues that Rule 9(b) does not apply to claims for violations of the Texas Insurance Code, but even if it does, Encompass's claims are sufficient.

The court has already applied Rule 9(b) to Encompass's common law negligent misrepresentation claim. *See supra.* Because Encompass's claims under §§ 541.051, 541.060, and 541.061 are based on the same set of allegations as Encompass's common law negligent misrepresentation claim, the court finds it appropriate to apply Rule 9(b) to the statutory claims as well as the common law claims. *See Berry v. Indianapolis Life Ins. Co.,* 608 F.Supp.2d 785, 800 (N.D.Tex.2009) (holding that Rule 9(b) applied to claims under Chapter 541 of the Texas Insurance Code that were based on the same set of

allegations as common law fraud and negligent misrepresentation claims.); *Reece v. Chubb Lloyds Ins. Co. of Texas,* No. H–11–507, 2011 WL 841430 (S.D.Tex. March 8, 2011) (applying Rule 9(b) to claims under the Texas Insurance Code for fraud and misrepresentation.). And because the statutory claims are based on the same set of allegations as the common law negligent misrepresentation claim, and because the court finds that Rule 9(b) provides the appropriate pleading standard for both claims, the court adopts for the statutory claims its analysis and findings for the negligent misrepresentation claim. *See supra.* Accordingly, the Defendants' motion to dismiss Encompass's claims under §§ 541.051, 541.060, and 541.061 for failure to state a claim is **DENIED.** Additionally, as the court did with the negligent misrepresentation claim, Encompass is granted leave to amend allegations in support of its claims under these provisions to the extent necessary to remedy the deficiencies identified herein.

### 8. Promissory Estoppel

  The Defendants argue that the SAC fails to state a claim for promissory estoppel. Encompass has brought the promissory estoppel claim as an "alternative cause of action." The elements of a promissory estoppel claim in Texas are (1) a promise, (2) the promisor foreseeing that the promisee will rely on the promise, and (3) detrimental reliance by the promisee. *Jones v. Landry's Seafood Inn & Oyster Bar–Galveston, Inc.,* 328 S.W.3d 909, 913 (Tex.App.-Houston [14 Dist.] 2010, no pet.). The Defendants argue that the SAC fails to sufficiently plead all three elements. Encompass counters by listing the following allegations in the SAC that it argues support its promissory estoppel claim:

  Defendants represented that procedures were covered under the policies (SAC ¶ 134);

  Defendants promised to reimburse Encompass if it submitted requests for reimbursement on the UB form with the SU modifier (*Id.*);

  Defendants made promises to timely and properly reimburse patients (and thereby Encompass through the Assignments of Benefits) for out-of-network outpatient surgical care performed in a physician's office (*Id.*);

  Yet, when the time came, Defendants denied reimbursement or reimbursed at the inappropriate UCR

rate (*Id.*);

Encompass justifiably relied on Defendants' promises to its detriment and Encompass's reliance was foreseeable considering Encompass had no ability to learn how Defendants wanted Encompass to bill or whether procedures were **\*966** covered by the plans separate and apart from Defendants' representations (SAC ¶¶ 101, 135); and

Defendants intended for Encompass to rely on its representations. And Encompass justifiably relied on Defendants' material representations to its detriment (SAC ¶ 101).

Dkt. 51, pg. 57.

The court agrees with Encompass and finds that it has sufficiently pled a claim for promissory estoppel. Accordingly, the Defendants' motion to dismiss the claim is **DENIED.**

### 9. Quantum Meruit

  The Defendants argue that the SAC fails to state a claim for quantum meruit. Like the promissory estoppel claim, Encompass has brought the quantum meruit claim as an "alternative cause of action." "To recover under quantum meruit a claimant must prove that: 1) valuable services were rendered or materials furnished; 2) for the person sought to be charged; 3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him; 4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged." *Vortt Exploration Co. v. Chevron U.S.A., Inc.,* 787 S.W.2d 942, 944 (Tex.1990). "In addition, the evidence must show that the efforts were undertaken for the person to be charged and not just that the efforts benefitted that person." *KUV Partners, LLC v. Fares,* No. 02–09–00246–CV, 2011 WL 944453, at \*16 (Tex.App.-Fort Worth March 17, 2011, no pet.) (citing *McFarland v. Sanders,* 932 S.W.2d 640, 643 (Tex.App.-Tyler 1996, no pet.)).

  The Defendants argue that the quantum meruit claim fails because Encompass has not alleged that any services were provided specifically for the Defendants. Encompass counters that it has provided valuable services to United by rendering medical services to individuals for whom United has a contractual obligation to pay health benefits. The court agrees with the Defendants. Even if United received some benefit as a result of Encompass providing medical services to its insureds, a proposition the court

Encompass Office Solutions, Inc. v. Ingenix, Inc., 775 F.Supp.2d 938 (2011)

finds dubious,[11] Encompass's services were rendered to and for its patients, not United. Because the court finds that Encompass has failed to plead a key element required under its quantum meruit theory of recovery, namely, that "services were rendered ... for the person sought to be charged," the court **GRANTS** the Defendants' motion to dismiss the quantum meruit claim. And because the court finds that Encompass could plead no facts that would enable it to bring a claim against United on the basis of quantum meruit, the court declines to grant Encompass leave to amend this claim.

**10. Request for Declaratory Judgment**

  Encompass seeks a declaratory judgment that it is "not required to reimburse United any amount that it has paid Encompass, and that United is required to reimburse Encompass on its outstanding unpaid claims." The Defendants argue that Encompass has failed to plead allegations **\*967** suggesting that it has a contractual duty to reimburse Encompass. Encompass counters by listing the following allegations in the SAC that it argues support its request for a declaratory judgment:

  [T]he plans and policies between United and its insureds under which United is contractually obligated to pay to [sic] a percentage of the charges for medical services after deductible for out-of-network outpatient surgery constitute valid contracts (SAC ¶¶ 1, 35–37, 39, 93);

  Encompass owns the contractual claims for reimbursement pursuant to Assignments of Benefits from its patients/United's insured's (SAC ¶ 1, 38, 93);

  Defendants have breached the contracts by denying most claims since June 2009 and demanding that Encompass reimburse Defendants for all payments made prior to June 1, 2009 (SAC ¶¶ 38, 64, 66, 93–94, Exhibit 4);

  the specific provisions breached by Defendants include those relating to coverage and payment for medical providers that are "out-of-network," including those for surgeries performed in a physician's office (SAC ¶¶ 31–40);

  Encompass tendered performance by providing its services to United's insureds (SAC ¶ 95); and

  Encompass was damaged as a result of the breach

(SAC ¶ 93–95).

  In addition, the spreadsheet attached as Exhibit 3 to the SAC contains specific information regarding the claims and health care plans and policies on which Encompass's causes of action are based.
Dkt. 51, pg. 61.
In their reply brief, the Defendants did not respond to Encompass's rebuttal; indeed, the Defendants' reply brief did not even address the request for a declaratory judgment. The court agrees with Encompass and finds that it has pled enough allegations to support its request for declaratory judgment. Accordingly, the Defendants' motion to dismiss the request is **DENIED.**

**11. ERISA Claims**
The Defendants argue on several grounds that Encompass's claims under the ERISA statute should be dismissed. The court will first address the Defendants' argument that they are not proper defendants to Encompass's ERISA claims.

**a. Proper Defendant**
  The Defendants argue that the only proper defendant in an action under 29 U.S.C. § 1132(a)(1)(B) is the benefit plan itself. They cite several decisions by district courts within the Fifth Circuit which have so held. E.g., *Sikes v. Life Ins. Co. of N. Am.,* No. 08–1969, 2009 WL 4351474, at *2 (W.D.La. Dec. 1, 2009); *Johnson v. Hartford Life & Accident Ins. Co.,* No. H09–56, 2009 WL 540959, at *3 (S.D.Tex. March 4, 2009). Encompass counters with citations to several other district court decisions within the Fifth Circuit that hold otherwise, namely, that any entity that makes benefit determinations or has control over plan administration qualifies as a proper defendant in a suit under § 1132(a)(1)(B). E.g., *Am. Surgical Assistants, Inc. v. Great W. Healthcare of Tex., Inc.,* No. H–09–0646, 2010 WL 565283, at *3 (S.D.Tex. Feb. 17, 2010) (Werlein, J.); *Bernstein v. Citigroup, Inc.,* No. 3:06–cv–209–M, 2006 WL 2329385, at *5–7 (N.D.Tex. July 5, 2006).

The decisions cited by Encompass, and other decisions within the circuit holding the same, generally rely on the Fifth Circuit's decision in *Musmeci v. Schwegmann Giant Super Markets, Inc.,* 332 F.3d 339, 349–50 (5th Cir.2003), in which the court held that an employer, who

Encompass Office Solutions, Inc. v. Ingenix, Inc., 775 F.Supp.2d 938 (2011)

was also the plan sponsor and administrator, was a proper defendant in an action under § 1 132(a)(1)(B). The employer had argued **\*968** that 29 U.S.C. § 1132(d)(2) limits the source of recovery under § 1132(a)(1)(B) to the amounts of the plans and therefore that the pension plan itself is the only proper defendant.[12] The court reasoned that "while the language [of § 1132(d)(2) ] suggests that the plan is the only proper party defendant ... [the plan] has no meaningful existence separate from [the employer]." *Id.* at 350. Moreover, the court reasoned, the employer is the proper defendant because it was the entity that made the final call on benefit determinations. *Id.* Thus, while the *Musmeci* decision dealt specifically with whether an employer can be a proper defendant under § 1132(a)(1)(B), district courts within this circuit have recognized its application to suits brought against insurers and plan administrators in addition to employers. *See, e.g., Kinnison v. Humana Health Plan of Texas, Inc.,* No. C–07–381, 2008 WL 2446054, at \*10–11 (S.D.Tex. June 17, 2008) (Jack, J.); *Sanborn–Alder v. CIGNA Grp. Ins.,* No. H–09–0806, 771 F.Supp.2d 713, 716–17, 719–24, 2011 WL 643216, at \*2, \*6–8 (S.D.Tex. Feb. 15, 2011) (Harmon, J.).

The court finds persuasive a recent decision by the Southern District of Texas. In *North Cypress Med. Ctr. Operating Co. v. CIGNA Healthcare,* No. 4:09–cv–2556, 782 F.Supp.2d 308, 2011 WL 819490 (S.D.Tex. March 2, 2011) (Ellison, J.), the plaintiff, a full service hospital, brought, among other claims, a claim under § 1132(a)(1)(B) against CIGNA, an insurer and plan administrator, alleging that CIGNA had underpaid the hospital for out-of-network and emergency services provided to CIGNA's insureds. In a motion to dismiss under Rule 12(b)(6), CIGNA argued that it was not a proper defendant because § 1132(a)(1)(B) claims may only be brought against a benefit plan and that it itself was not a benefit plan. Relying on *Musmeci* and decisions from the First, Third, Seventh, and Eleventh Circuit Courts of Appeals, the *North Cypress* court held that "apart from a benefit plan itself, persons or entities having responsibility for administering benefits are proper parties to a [§ 1132(a)(1)(B) ] suit." *Id.* at 320, at \*10. The court reasoned that any entity that "was responsible for making determinations to pay benefits ... and exerts control over plan administration in a manner that harms [the plaintiff]" qualified as a proper defendant under the statute. *Id.* Accordingly, the court held that the hospital had pled enough facts suggesting that CIGNA held sufficient control over plan administration to make it a proper defendant in a § 1132(a)(1)(B) suit. *Id.*

Because the court finds the *North Cypress* decision to be on all fours with the instant case and sound in reasoning,

the court likewise holds that Encompass has pled enough facts suggesting that United held sufficient control over plan administration to make it a proper defendant in a § 1132(a)(1)(B) suit. Therefore, the Defendants' motion to dismiss Encompass's ERISA claims on the basis of not being proper defendants is **DENIED.**

**b. Exhaustion of Remedies**

The Defendants argue that Encompass has not alleged exhaustion of administrative remedies, which it claims is a prerequisite to filing ERISA claims. Encompass counters that exhaustion of remedies is an affirmative defense and it does not have to be pled. The court agrees with Encompass. As pointed out by Encompass, **\*969** the Fifth Circuit has held that exhaustion of remedies is an affirmative defense and plaintiffs "need not 'specially plead or demonstrate exhaustion in their complaints' to avoid 12(b)(6) dismissal." *Wilson v. Kimberly–Clark Corp.,* 254 Fed.Appx. 280, 287 (5th Cir.2007) (reversing district court's dismissal of plaintiff's ERISA claims for failure to plead exhaustion of administrative remedies) (quoting *Jones v. Bock,* 549 U.S. 199, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007)).[13] Accordingly, because Encompass did not have to plead exhaustion of administrative remedies to survive the pleading stage, the Defendants' motion to dismiss Encompass's ERISA claims on that ground is **DENIED.**

**c. § 1132(a)(1)(B) and Specific Plan Provisions**

The Defendants argue that Encompass fails to state a claim under 29 U.S.C. § 1132(a)(1)(B), which provides a cause of action for a plan beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." The Defendants argue that Encompass's claim under this statute fails because the SAC does not specifically identify the provisions of the United plans that United allegedly breached. The Defendants asserted this same argument against Encompass's common law breach of contract claim. *See supra.* The court rejected that argument, and it does so again here. Encompass's allegations contain enough facts about contract provisions to make its § 1132(a)(1)(B) claim plausible and to give United notice as to which provisions it allegedly breached. Accordingly, the Defendants' motion to dismiss the claim on that ground is **DENIED.**

Encompass Office Solutions, Inc. v. Ingenix, Inc., 775 F.Supp.2d 938 (2011)

### d. § 1132(a)(1)(B) and Ingenix Reimbursement Methodology

The Defendants argue that Encompass's claims under 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(a)(3) relating to United's use of the Ingenix Databases for its reimbursement methodology fails to state a claim upon which relief can be granted. Section 1132(a)(1)(B) is quoted above. Section 1132(a)(3) provides a cause of action for plan beneficiaries "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or to obtain other appropriate equitable relief to redress such violations or to enforce any provisions of this subchapter or the terms of the plan." Encompass counters by listing the following allegations in the SAC that it argues support these claims:

Defendants are contractually obligated to pay a percentage of the reasonable and customary charge (also known as the "RAC" rate, or the usual, customary and reasonable rate ("UCR rate") after deductible for out-of-network outpatient surgery and anesthesia, for physician's office services, and for supplies and equipment used for office-based surgeries. SAC ¶ 39.

Defendants represent to members that the "reasonable and customary charge" refers to an amount set by the health plan by comparing the actual charge for the service or supply with the prevailing **970 charges and takes into account all pertinent factors, including: the complexity of the service; the range of services provided; and the prevailing charge level in the geographic area where the provider is located and other geographic areas having similar medical cost experiences. *Id.*

Defendants' representations were untrue, because Defendants used flawed or inadequate data to determine UCR amounts, which resulted in reimbursements well below actual UCR for such out-of-network medical services. SAC ¶ 40.

An investigation by the New York Attorney General concluded that the out-of-network system was broken, that United was misleading its patients in its policy language, and that United was hiding the inherent conflict of interest that existed when its wholly-owned subsidiary was preparing schedules that were supposed to reflect the market at large. SAC ¶ 48.

Dkt. 51, pg. 68.
These allegations, combined with an abundance of others in Paragraphs 39–63 of the SAC, succeed in making plausible Encompass's claims under § 1132(a)(1)(B) and § 1132(a)(3) relating to United's use of the Ingenix Databases for its reimbursement methodology. Accordingly, the Defendants' motion to dismiss the claim is **DENIED.**

### e. § 1132(a)(3) Claim Duplicative of § 1132(a)(1)(B) Claim

Again, with regard Encompass's claims under § 1132(a)(1)(B) and § 1132(a)(3), which relate to United's use of the Ingenix Databases for its reimbursement methodology, the Defendants argue that the § 1132(a)(3) claim should be dismissed because it is impermissibly duplicative of the § 1132(a)(1)(B) claim. It is well established in the Fifth Circuit that a potential beneficiary may not sue under § 1132(a)(3) while seeking the same relief under § 1132(a)(1)(B). *See Musmeci v. Schwegmann Giant Super Markets, Inc.,* 332 F.3d 339, 349 n. 5 (5th Cir.2003) (pointing out that because plaintiffs were found to have an adequate remedy at law under § 1132(a)(1)(B), they were foreclosed from equitable relief under (a)(3)). Additionally, Encompass has apparently conceded this argument by not responding to it in two subsequent briefs to the court. Accordingly, the court **GRANTS** the Defendants' motion to dismiss the § 1132(a)(3) claim. And because the court finds that Encompass could plead no additional facts that would enable it to bring a § 1132(a)(3) claim in addition to its § 1132(a)(1)(B) claim, the court declines to grant Encompass leave to amend the claim.

### f. Disclosure of Plan Documents

The Defendants argue that Encompass's claim regarding disclosure of plan documents fails to state a cognizable claim. The relevant allegation in the SAC states that "by applying a reduction in the UCR that was not authorized or disclosed to members/subscribers/policyholders in their plan documents, United failed to provide accurate plan documents." ¶ 146. Absent from the allegation is any legal basis for a claim. Consequently, the court agrees with the Defendants and their motion to dismiss the claim is **GRANTED.** The claim is dismissed without prejudice, and Encompass is given leave to amend it to the extent necessary to remedy deficiencies identified herein.

**g. Right of Action under § 1133(2)**

The Defendants argue that Encompass's claim under 29 U.S.C. § 1133(2) must be dismissed because that provision does not provide a private right of action. Section 1133(2) dictates that "every employee benefit **\*971** plan shall afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." Encompass alleges that "by failing to disclose the true 'specific reasons' for such denials and failing to disclose data and/or the methodology used to determine UCR," United has violated § 1133(2). In response, Encompass appears to concede that § 1133 does not provide an independent basis for a claim but argues that "[a]s stated in paragraph 147 of the SAC, Encompass seeks damages under § 1132(a)(1)(B) for damages resulting from Defendants' violation of § 1133." Dkt. 51, pg. 71. While it is true that courts have recognized claims under § 1132(a)(1)(B) for violations of § 1133, see *Leake v. Kroger Texas, L.P.*, No. 3:04–cv–2702–D, 2006 WL 2842024, at \*3 (N.D.Tex. Sept. 28, 2006), the court finds that, contrary to Encompass's assertion, § 1132(a)(1)(B) is nowhere mentioned in ¶ 147 of the SAC. Consequently, the court finds that the SAC does not state a claim on that basis. Encompass is granted leave to amend allegations in support of this claim to the extent necessary to remedy the deficiencies identified herein.

  However, the Fifth Circuit has recognized that violations of § 1133(2) can "give rise to a substantive damage remedy ... when the violations are continuous and amount to substantive harm." *Lafleur v. Louisiana Health Serv. & Indem. Co.*, 563 F.3d 148, 157 (5th Cir.2009). Whether Encompass can prove violations of § 1133(2) is a question more suited for the summary judgment stage. But for the pleading stage, the court finds Encompass has alleged enough facts to make a claim under § 1133(2) appear facially plausible. Accordingly, the Defendants' motion to dismiss Encompass's § 1133(2) claim is **DENIED.** *See Clontz v. Life Ins. Co. of N. Am.*, No. 3:08–cv–1947–B, 2009 WL 1491203, at \*2–4 (N.D.Tex. May 28, 2009)* (treating motion to dismiss claim under § 1133(2) in the same manner).

**III. CONCLUSION**

Regarding standing, the court **HOLDS** that Encompass

has standing to bring this civil action in reliance on the assignments of benefits that it received from United's insureds. Regarding ERISA preemption, the court **HOLDS** that the (1) state law claims relating to plans not governed by ERISA are not preempted by ERISA, (2) state law claims for breach of contract, quantum meruit, violations of the DTPA, and violations of the Texas Insurance Code not based on negligent misrepresentation or fraud are preempted by ERISA, with leave to amend granted to Encompass to refile these claims as claims under § 502(a), and (3) state law claims for negligent misrepresentation under both the common law and the Texas Insurance Code, fraud, promissory estoppel, defamation and business disparagement are not preempted by ERISA.

Regarding United's Rule 12(b)(6) motions, the court **DENIES** the following: (1) motion to dismiss for failure to state a breach of contract claim; (2) motion to dismiss for failure to state a negligent misrepresentation claim; (3) motion to dismiss for failure to state a defamation claim; (4) motion to dismiss DTPA and Texas Insurance Code claims for failure to provide pre-suit notice; (5) motion to dismiss for failure to state a DTPA claim (however, as noted below, the court has granted the motion to dismiss the DTPA claim for lack of standing); (6) motion to dismiss for failure to state a claim under § 542.058 of the Texas Insurance Code; (7) motion to dismiss for failure to state claims under §§ 541.051, 541.060, and 541.061 of the Texas Insurance Code; (8) motion to dismiss for failure to state a **\*972** promissory estoppel claim; (9) motion to dismiss request for declaratory judgment; (10) motion to dismiss ERISA claims for failure to name proper defendants; (11) motion to dismiss ERISA claims for failure to plead exhaustion of remedies; (12) motion to dismiss claim under 29 U.S.C. § 1132(a)(1)(B) for failure to plead specific plan provisions; (13) motion to dismiss for failure to state claims under 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(a)(3) relating to United's use of the Ingenix Databases; and (14) motion to dismiss for failure to state a claim under 29 U.S.C. § 1133(2).

Alternatively, the following 12(b)(6) motions are **GRANTED,** but with leave to amend **GRANTED** to Encompass: (1) motion to dismiss for failure to state a fraud claim; (2) motion to dismiss for failure to state a business disparagement claim; (3) motion to dismiss for failure to state a claim under Chapter 843 of the Texas Insurance Code; (4) motion to dismiss for failure to state a claim under § 1301.068 of the Texas Insurance Code; and (5) motion to dismiss for failure to state a claim regarding disclosure of plan documents. Should it choose to do so, Encompass is **GRANTED** twenty days from the date of this order to replead any claim or allegation found

Encompass Office Solutions, Inc. v. Ingenix, Inc., 775 F.Supp.2d 938 (2011)

deficient by this order.

Finally, the following 12(b)(6) motions are **GRANTED,** but with no leave to amend granted to Encompass: (1) motion to dismiss DTPA claim for lack of standing; (2) motion to dismiss for failure to state a claim under § 543.001 of the Texas Insurance Code; (3) motion to dismiss for failure to state claims under §§ 1301.051 and 1301.053 of the Texas Insurance Code; (4) motion to dismiss for failure to state a quantum meruit claim; and

(5) motion to dismiss claim under 29 U.S.C. § 1132(a)(3) for being duplicative of the § 1 132(a)(1)(B) claim.

**IT IS SO ORDERED.**

**All Citations**

775 F.Supp.2d 938

Footnotes

1    The Fifth Circuit has articulated policy reasons in favor of granting derivative standing to healthcare providers who have been assigned the right to receive benefits under patients' health plans. *See Tango Transport v. Healthcare Fin. Servs. LLC,* 322 F.3d 888, 894 (5th Cir.2003) ( "[D]enying derivative standing to health care providers would harm participants or beneficiaries because it would discourage providers from becoming assignees and possibly from helping beneficiaries who were unable to pay them 'up-front.' Likewise, granting derivative standing to the assignees of health care providers helps plan participants and beneficiaries by encouraging providers to accept participants who are unable to pay up front."). *See also Hermann Hosp. v. MEBA Med. & Benefits Plan,* 845 F.2d 1286, 1289 n. 12 (5th Cir.1988).

2    Contrary to the Defendants' assertion, the opinion in *Barix* did not suggest that derivative standing required anything more than a mere assignment of benefits. Rather, the court more narrowly held that while an assignee could sue to collect benefits, it could not sue for violating a federal statute requiring insurers to furnish plan documents upon request by a beneficiary. *Id.* at 623–24. And while the court in *Cooper Hosp.* did suggest that an assignee of health benefits needed express authorization to file suit, the court finds that decision unpersuasive because at the time it was decided, the Third Circuit, unlike the Fifth Circuit, had not definitely recognized the concept of derivative standing. *See North Jersey Ctr. for Surgery, P.A. v. Horizon Blue Cross Blue Shield of New Jersey, Inc.,* No. 07–4812(HAA), 2008 WL 4371754 (D.N.J. Sept. 18, 2008). The court's unwillingness to follow *Cooper Hosp.* also cautions it from *Touro Infirmary,* a case in which the court relied on *Cooper Hosp.* to hold that an assignee of health benefits needed express authorization to file suit. However, unlike the Third Circuit, derivative standing is firmly established in the Fifth Circuit and was so at the time *Touro* was decided. Finally, *Health Care Ctr. Tampa* is unpersuasive because the court did not take into account the concept of derivative standing, which, as mentioned before, is firmly established in the Fifth Circuit.

3    Complete preemption under § 502(a) is only one form of preemption under ERISA. The other form is conflict preemption under § 514. Section 514 provides that "the provisions of this subchapter ... shall supersede any and all State laws insofar as they may now or hereafter relate to any [ERISA] plan...." 29 U.S.C. § 1144(a). Conflict preemption under § 514 is an affirmative defense and therefore the Defendants would have the burden to plead and prove it. *Bank of Louisiana v. Aetna U.S. Healthcare Inc.,* 468 F.3d 237, 242 (5th Cir.2006). Conflict preemption is broader than complete preemption and as a result preempts more state law claims. *Conn. State Dental v. Anthem Health Plans,* 591 F.3d 1337, 1344 (11th Cir.2009). In their motion to dismiss, and in their reply to Encompass's response, the Defendants did not argue conflict preemption or even mention § 514. Rather, the Defendants repeatedly allege that Encompass's state law claims are "completely preempted" by ERISA, citing § 502. While several of the cases cited by both parties address conflict preemption, and both parties make arguments that relate to the conflict preemption framework, the court nevertheless concludes that the Defendants have not raised conflict preemption as an affirmative defense. To find otherwise would unfairly prejudice Encompass. And while courts can raise the question of subject matter jurisdiction *sua sponte,* conflict preemption is merely an affirmative defense and does not operate to confer subject matter jurisdiction. *Ellis v. Liberty Life Assurance Co. of Boston,* 394 F.3d 262, 275 n. 34 (5th Cir.2004). Consequently, the court addresses only whether Encompass's claims are subject to complete preemption under § 502(a).

4    The court's finding that Encompass conceded the preemption of these claims is based on the following: (1) in its response to the Defendants' motion dismiss (Dkt. 51), Encompass did not refute the Defendants' arguments that these claims were preempted; (2) in their reply to Encompass's response (Dkt. 55), the Defendants' asserted that Encompass had conceded that these claims were preempted, *see* pg. 27; and (3) in its sur-reply (Dkt. 58), Encompass did not refute the Defendants' assertion that it had conceded the preemption of these claims.

5   That Encompass has brought certain claims in reliance on assignments does not prevent it from bringing other claims that do not rely on assignments. "[A] provider that has received an assignment of benefits and has a state law claim independent of the claim arising under the assignment holds two separate claims. In such a case, the provider may assert a claim for benefits under ERISA, the state law claim, or both." *Conn. State Dental v. Anthem Health Plans,* 591 F.3d 1337, 1352 (11th Cir.2009).

6   The court's holding that these state law claims are not completely preempted also finds support from a pre-*Davila* Fifth Circuit decision that pertained to conflict preemption under § 514 rather than complete preemption under § 502(a). In *Transitional Hosps. Corp. v. Blue Cross,* 164 F.3d 952, 955 (5th Cir.1999), the hospital plaintiff alleged that before it treated the patient, the defendant insurer misrepresented that it would reimburse the hospital for 100% of the patient's hospital bills after the patient had exhausted his Medicare benefits. When the hospital sought full payment for the patient's bills after the Medicare benefits were exhausted, the insurer refused, claiming that the hospital was a nonparticipating hospital under patient's ERISA plan. The Fifth Circuit held that while the hospitals's breach of contract claim seeking payment of benefits under the terms of plan were preempted, the hospital's state law claims alleging common law misrepresentation and statutory misrepresentation were not preempted because the claims were "not dependent on or derived from the patient's right to recover benefits" under the ERISA plan. That the state law claims in *Transitional* survived conflict preemption under § 514, the form of ERISA preemption that is broader and takes in more claims than complete preemption, further suggests that the state claims in the instant case are not subject to complete preemption.

7   In support of its argument that Encompass's breach of contract claim fails to state a claim the Defendants rely heavily on *Midwest Special Surgery. P.C. v. Anthem Ins. Cos.,* No. 4:09CV646 TIA, 2010 WL 716105, at *2–3 (E.D.Mo. Feb. 24, 2010). In *Midwest Special,* the district court dismissed a healthcare provider's breach of an insurance contract claim for failure to identify the specific provisions in the plan that were allegedly breached. The court finds the *Midwest Special* decision inapposite to the instant case because in that case the plaintiffs merely alleged that "they seek recovery of sums due and owing 'as reimbursement for medical services provided to Defendants plan participants under numerous health plans which qualify as employee welfare benefit plans as defined by ERISA.' " *Id.* at *2. Needless to say, Encompass has alleged substantially more than the plaintiff in *Midwest Special.*

8   Encompass argues in its brief in response to the Defendants' motion to dismiss (Dkt. 51) that this information can be gathered from Exhibit 3 to the SAC, a spreadsheet containing data about claims made to United for services provided by Encompass. However, contrary to Encompass's assertion, Exhibit 3 does not reveal which of these claims relate to patients who were told by United that Encompass's services would be covered and when that representation occurred. Therefore, Exhibit 3 does not lift this set of allegations over the Rule 9(b) hurdle.

9   The SAC does contest, however, the literal veracity of the statement in the Ingenix press release that Encompass "does not perform medical procedures." *See* ¶¶ 111, 112. Thus, it cannot be said that the SAC admits the truth of this statement.

10   In support of its argument that Encompass must specifically plead consumer status under the DTPA, the Defendants cite *Burnette v. Wells Fargo Bank, N.A.,* No. 4:09–CV–370, 2010 WL 1026968, at *9 (E.D.Tex. Feb. 16, 2010) (Mazzant, J.). The Defendants' reliance on *Burnette* is misplaced. While the court did recognize that the plaintiff in that case "allege[d] that he is a 'consumer,' but he [did] not allege why," the court stated in the very next sentence that "[t]his is of no consequence" because the plaintiff's relationship with defendant precluded "consumer" status. *Id.* Thus, contrary to the Defendants' assertion, the court in *Burnette* made no finding as to the standard required to plead "consumer" status under the DTPA.

11   On this point the court is more inclined to agree with the Southern District of New York in *Travelers Indem. of Conn. v. Losco Group,* 150 F.Supp.2d 556, 563 (S.D.N.Y.2001) ("It is counterintuitive to say that services provided to an insured are also provided to its insurer. The insurance company derives no benefit from those services; indeed, what the insurer gets is a ripened obligation to pay money to the insured—which hardly can be called a benefit.").

Encompass Office Solutions, Inc. v. Ingenix, Inc., 775 F.Supp.2d 938 (2011)

12    Section 1132(d)(2) states that "[a]ny money judgment under this subchapter against an employee benefit plan shall be enforceable
      only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is
      established in his individual capacity under this subchapter."

13    Following the *Kimberly–Clark* decision, district courts in this circuit have likewise held that plaintiffs bringing ERISA claims need
      not plead exhaustion of administrative remedies to survive a motion to dismiss under either Rule 12(b)(1) or 12(b)(6). *See, e.g.,*
      *North Cypress Med. Ctr. Operating Co. v. CIGNA Healthcare,* No. 4:09–cv–2556, 782 F.Supp.2d 308, 317–18, 2011 WL 819490,
      at *7 (S.D.Tex. March 2, 2011); *Odom v. American Nonwovens Corp.,* No. 1:08–CV–299–SA–JAD, 2010 WL 3782426, at *2
      (N.D.Miss. Sept. 20, 2010);

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 12937486
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston
Division.

Abdel K. FUSTOK, M.D. et al., Plaintiffs,
v.
UNITEDHEALTH GROUP, INC. et al.,
Defendants.

CIVIL ACTION NO. 12-cv-787
|
Signed 09/06/2012

**Attorneys and Law Firms**

Muhammad S. Aziz, Abraham, Watkins, Nichols, Sorrels, Agosto & Friend, Houston, TX, for Plaintiffs.

Andrew G. Jubinsky, Timothy A. Daniels, Figari Davenport et al., Dallas, TX, Dimitri Portnoi, Matthew W. Close, O'Melveny & Myers LLP, Los Angeles, CA, Patricia Hair, Phelps Dunbar LLP, Houston, TX, Shannon M. Barrett, O'Melveny Myers LLP, Washington, DC, for Defendants.

**MEMORANDUM AND ORDER**

KEITH P. ELLISON, UNITED STATES DISTRICT JUDGE

**\*1** Pending before the Court is the Motion to Dismiss First Amended Class Action Complaint (Doc. No. 23) filed by Defendants UnitedHealth Group, Inc., Spectera, Inc., United HealthCare Services, Inc., and UnitedHealthcare Insurance Co. (collectively "United").

After considering the motion, all responses thereto, and the applicable law, the Court finds that United's Motion to Dismiss First Amended Class Action Complaint must be granted in part and denied in part.

**I. BACKGROUND**

This case is brought by Plaintiff Abdel K. Fustok, M.D. and Abdel K. Fustok, M.D., P.A. on behalf of themselves and all others similarly situated (collectively "Fustok") against United. United's motion, however, as well as this memorandum are limited to Fustok's claims without regard to the ostensible class.

On May 7, 2012, Fustok filed the First Amended Complaint (the "Complaint") (Doc. No. 20) alleging negligent misrepresentation, breach of implied-in-fact contract, liability in quantum meruit, promissory estoppel, and violations of the Texas Deceptive Trade Practices Act ("DTPA"). (Compl. ¶¶ 30-49.)

Fustok is licensed to practice medicine in Texas and regularly provided medical services to United's insured patients. Fustok served as an in-network health care provider for United before 2007. Beginning in 2007, Fustok switched to be an out-of-network health care provider for United. (Compl. ¶ 21.)

United has a certain set of procedures to reimburse out-of-network services. For some insurance plans, United requires that the insured patient or the out-of-network provider notify United prior to performing the medical services. Even if notification is not required, patients or providers may contact United to obtain information regarding potential coverage. Once United is contacted, it sends the insured patient and the out-of-network provider a letter confirming that notification has been given and that the procedure, based on limited information, is eligible to be covered. (Doc. No. 23 p. 5.) It was Fustok's practice to contact United for purposes of verifying and preauthorizing coverage before performing any medical services for United's insured patients. Fustok alleges that his office would call United as well as submit pre-authorization forms to United for review and approval. (Compl. ¶ 22.) Fustok claims that United expressly represented that Fustok would be compensated for his medical services. After receiving the pre-authorization, Fustok would then perform the medical services. (Compl. ¶ 22.) Fustok's practice of submitting services for pre-approval, performing the requested medical services once he received pre-approval, and then receiving reimbursement remained the same from 2007 until 2009. (Compl. ¶ 23.)

Beginning in October 2009, United denied a number of claims submitted by Fustok in which United had issued pre-authorization approval. (Compl. ¶ 22.) These claims were denied on the grounds that Fustok did not provide

certain documents. The allegedly omitted documents included previous medical records related to the procedure; preoperative history and physical; anesthesia record and pre-op anesthesia evaluation form; intraoperative/perioperative nursing record; recovery room record; pathology reports; admission and discharge nurses' notes; laboratory and X-ray reports; and itemized facility statement. Fustok claims he did not have access to these records. (Compl. ¶ 24.)

## II. LEGAL STANDARD

### A. Failure to State a Claim

**\*2** Federal Rule of Civil Procedure 8(a) requires that a plaintiff's pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). If a plaintiff fails to satisfy Rule 8(a), a defendant may file a motion to dismiss the plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *see also Bank of Abbeville & Trust Co. v. Commonwealth Land Title Ins. Co.,* 2006 WL 2870972, at \*2 (5th Cir. Oct. 9, 2006) (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1203 (3d ed. 2004)).

"To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.' " *Cuviller v. Taylor,* 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). That is, a complaint must contain sufficient factual matter that, if it were accepted as true, would "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). A claim need not give rise to "probability," but need only plead sufficient facts to allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). A pleading also need not contain detailed factual allegations, but it must go beyond mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (citation omitted).

While the court must accept well-pleaded facts as true, *Iqbal,* 556 U.S. at 678, it should neither "strain to find

inferences favorable to the plaintiffs" nor "accept 'conclusory allegations, unwarranted deductions, or legal conclusions.' " *R2 Investments LDC v. Phillips,* 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.,* 365 F.3d 353, 362 (5th Cir. 2004)). A court should not evaluate the merits of the allegations, but must satisfy itself only that plaintiff has adequately pled a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.,* 355 F.3d 370, 376 (5th Cir. 2004).

### B. Rule 9(b) Fraud

Fustok's DTPA and negligent misrepresentation claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). In *Flowserve Corp. v. Hallmark Pump Co.,* the court noted that claims alleging violation of the DTPA are subject to the requirements of Rule 9(b). No. 09-cv-0675, 2010 WL 2232285, at \*6 (S.D. Tex. Feb. 3, 2010) (citing *Krames v. Bohannon Holman, LLC,* 2009 WL 762205, at \*10 (N.D. Tex. March 24, 2009)). The Fifth Circuit has also stated that Rule 9(b) applies to negligent misrepresentation claims if that claim and a DTPA claim are based on the same set of alleged misconduct. *Benchmark Elecs., Inc. v. J.M. Huber Corp.,* 343 F.3d 719, 723 (5th Cir. 2003).

Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." In the Fifth Circuit, the Rule 9(b) standard requires "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation of why they were fraudulent." *Plotkin v. IP Axess, Inc.,* 407 F.3d 690, 696 (5th Cir. 2005); *see also Southland Sees. Corp. v. Inspire Ins. Solutions, Inc.,* 365 F.3d 353, 362 (5th Cir. 2004). Essentially, the standard requires the complaint to allege answers to "newspaper questions" ("who, what, when, where, and how") of the alleged fraud. *Melder v. Morris,* 27 F.3d 1097, 1100 n. 5 (5th Cir. 1994).

## III. ANALYSIS

**\*3** United argues that the Complaint fails to state a claim pursuant to Rule 12(b)(6) or Rule 9(b) under theories of negligent misrepresentation, breach of an implied-in-fact contract, quantum meruit, and promissory estoppel. Additionally, United argues that Fustok fails to state a claim under the DTPA. Even if Fustok succeeds in stating

a claim, United argues that all state law claims are preempted insofar as they seek insurance payments for patients who are covered by an employee benefit plan regulated by the Employee Retirement Income Security Act of 1974 ("ERISA"). Fustok contests all these arguments. They will be considered in turn.

### A. Preemption by ERISA

United argues that all of Fustok's claims relate to ERISA plans, and ERISA "preempts all state laws insofar as they 'relate to any employee benefit plan covered by the Act.' " *Transitional Hospitals Corp. v. Blue Cross & Blue Shield of Texas, Inc.,* 164 F.3d 952, 954 (5th Cir. 1999) (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96-97 (1983)).

ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." 29 U.S.C. § 1144(a). The Supreme Court has "observed repeatedly that this broadly worded provision is 'clearly expansive.' " *Egelhoff v. Egelhoff ex rel. Breiner,* 532 U.S. 141, 146 (2001) (quoting *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655 (1995)). However, the Supreme Court also recognized that the phrase "relate to" would encompass virtually all state law if given its broadest reading. *Egelhoff,* 532 U.S. at 146. The text of § 1144(a) is not helpful in restricting the provision. Therefore the Court must "look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Travelers,* 514 U.S. at 656.

In the Fifth Circuit, a defendant pleading preemption under 29 U.S.C. § 1144(a) must prove that: "the state law claims address an area of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan; and (2) the claims directly affect the relationships among traditional ERISA entities—the employer, the plan and its fiduciaries, and the participants and beneficiaries." *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.,* 904 F.2d 236, 245 (5th Cir. 1990). The Fifth Circuit further held that, even if the plans in issue are ERISA plans, "ERISA does not preempt state law when the state-law claim is brought by an independent, third-party health care provider (such as a hospital) against an insurer for its negligent misrepresentation regarding the existence of health care coverage." *Transitional,* 164 F.3d at 954.

The merits of Fustok's state law claims do not depend on

whether his services were or were not fully covered under the patients' plans, but rather on misrepresentation of reimbursement. Fustok alleges that United represented that Fustok would be compensated for his medical services. (Compl. ¶ 23.) If the plans did not cover the medical services, Fustok may go on to prove that he was reasonable to rely on United's statements regarding reimbursements. Even if the plans do cover the medical services, Fustok may have a misrepresentation claim to the effect that United omitted to inform Fustok that he would not be reimbursed. Fustok's alleged right to reimbursement does not depend on the terms of the ERISA plans, and therefore does not directly affect the relationships among traditional entities.

Not all third party providers escape preemption. The Fifth Circuit has stated that state law claims are preempted by ERISA when the third party "seeks to recover benefits owed under the plan to a plan participant who has assigned her right to benefits to the hospital." *Transitional,* 164 F.3d at 954. In this case, Fustok alleges that he is not acting as an assignee asserting patients' claim for ERISA benefits. (Doc. No. 24 ¶ 68.) Whether a medical provider is an assignee asserting a derivative claim for ERISA benefits is a "fact-sensitive inquiry" that need not be determined at this stage. *Cypress Fairbanks Med. Center, Inc. v. Pan-American Life Ins. Co.,* 110 F.3d 280 (5th Cir. 1997), *cert. denied,* 522 U.S. 862 (1997).

**\*4** Therefore United's motion to dismiss state law claims because of preemption by ERISA is denied.

### B. State Law Claims

### 1. Negligent misrepresentation

United moves to dismiss Fustok's negligent misrepresentation for failure to state a claim. However, the Court need not determine whether Fustok stated a claim because the claim would be barred by the statute of limitations.

In Texas, negligent misrepresentation claims have a two-year statute of limitations. *Newby v. Enron Corp.,* 542 F.3d 463, 468 (5th Cir. 2008); *Kansa Reinsurance Co. v. Cong. Mortg. Corp.,* 20 F.3d 1362, 1371-72 (5th Cir. 1994). The general rule in Texas is that a cause of action accrues and the statute of limitations begins to run when "a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if

all resulting damages have not yet occurred." *Murphy v. Campbell,* 964 S.W.2d 265, 270 (Tex. 1997) (quoting *S.V. v. R. V.,* 933 S.W.2d 1, 4 (Tex. 1996)); *Roberts v. Lain,* 32 S.W.3d 264, 269 (Tex.App.-San Antonio 2000, no pet). Fustok states that "false, material representations were made in pre-approval letters in the Fall of 2009." (Doc. No. 24 ¶ 24.) The two-year statute of limitations would have run in 2011. However, Fustok first pleaded a claim for negligent misrepresentation on May 7, 2012, months after the statute of limitations had run. (Compl. ¶ 30-33.)

Because the two-year statute of limitations has run, United's motion to dismiss this claim must be granted.

## 2. Implied-in-Fact Contract

United moves to dismiss Fustok's claim for breach of an implied-in-fact contract. The elements of a breach of contract claim are the same whether the alleged contract is express or implied. *See Plotkin v. Joekel,* 304 S.W.3d 455, 476 (Tex.App.-Houston [1st Dist.] 2009, review denied). In order to state a breach of contract claim based on an "implied-in-fact" contract, a plaintiff must allege the existence of a contract, the performance or tender of performance by the plaintiff, a breach by the defendant, and damages resulting from that breach. *Bridgmon v. Array Sys. Corp.,* 325 F.3d 572, 577 (5th Cir. 2003) (citing *Frost Nat'l Bank v. Burge,* 29 S.W.3d 580, 593 (Tex.App.Houston [14th Dist.] 2000, no pet.)).

Fustok alleges that United represented that it would compensate Fustok for providing medical services. (Compl. ¶ 22.) If these allegations are proven, it would establish the existence of a contract. Fustok also alleges that he performed his contractual obligations by rendering the medical services (Compl. ¶ 22), and that United breached its contractual obligation to pay for those services. (Compl. ¶ 24.) Fustok further alleges that he suffered damages as a result of United's breach. (Compl. ¶ 28.) These factual allegations satisfy the pleading requirements for a breach of contract claim based on an implied-in-fact contract.

The Court notes that United has not invoked the statute of frauds or any similar doctrine relating to parol evidence. Accordingly, and because Fustok has satisfied the pleading requirements, United's motion to dismiss this claim is denied.

## 3. Promissory Estoppel

**\*5** United argues that Fustok fails to state a claim for promissory estoppel. "The elements of promissory estoppel are: (1) a promise, (2) foreseeability of reliance by the promisor, (3) substantial and reasonable reliance by the promisee to its detriment, and (4) enforcing the promise is necessary to avoid injustice." *Collins v. Walker,* 341 S.W.3d 570, 573-74 (Tex.App.-Houston [14th Dist.] 2011, no pet.) *(citing English v. Fischer,* 660 S.W.2d at 524).

Fustok alleges that United promised to reimburse him for medical services performed (Compl. ¶ 43), and that reliance was foreseeable because United had issued pre-approvals and had reimbursed dozens of surgeries according to this procedure prior to October 2009. (Compl. ¶ 42.) However, it does not follow that previous reimbursements necessarily lead to foreseeability of reliance by the promisor. All medical services claims are submitted on a case-by-case basis and previous payment does not guarantee future payment. Fustok alleges that he received pre-approval for these medical services. This pre-approval did not waive United's right to evaluate the claim when it was submitted for reimbursement. *Provident Am. Ins. Co. v. Castaneda,* 988 S.W.2d 189 (Tex. 1998) (holding that pre-authorization letters do not waive right to evaluate and deny claims). Fustok continued to submit pre-authorization and reimbursement claims for medical services, indicating that reimbursement was granted on a case-by-case basis. Therefore it was not reasonable for Fustok to assume that payment was guaranteed.

Fustok has failed to plead the second and third elements of a promissory estoppel claim. Therefore United's motion to dismiss this claim is granted. Fustok may amend his claim.

## 4. Quantum Meruit

United argues that Fustok does not have a claim for quantum meruit because services were provided to insured patients and not for United. To recover under quantum meruit, a claimant must prove that: (1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him; (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be

charged. *Vortt Exploration Co., Inc. v. Chevron U.S.A., Inc.,* 787 S.W.2d 942, 944 (Tex. 1990) (quoting *City of Ingleside v. Stewart,* 554 S.W.2d 939, 943 (Tex. Civ. App. 1977)). Quantum meriut "is based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted." *Id.* Further, "[t]o recover in quantum meruit, the plaintiff must show that his efforts were undertaken for the person sought to be charged; it is not enough to merely show that his efforts benefitted the defendant." *Truly v. Austin,* 744 S.W.2d 934, 937 (Tex. 1988).

United argues that the medical services were not provided for United, but rather for the insured patients. In Fustok's complaint, he does acknowledge that the procedures were performed for United's insured patients. (Compl. ¶ 22.) However, Fustok claims that the procedures benefited United because it "discharged [United's] contractual obligation to facilitate health care for [United's] insured." (Compl. ¶ 40.) Whether United had a contractual obligation is a legal conclusion that Fustok has not supported with any factual allegations. Therefore United's motion to dismiss this claim is granted, but Fustok may amend his claim.

## 5. DTPA

**\*6** United moves to dismiss Fustok's DTPA claim for failure to state a claim. Under the DTPA, only a consumer may seek relief. A consumer is defined as one "who seeks or acquires by purchase or lease, any goods or services." Tex. Bus. & Com. Code §§ 17.45(4). *See also Sherman Simon Enterprises, Inc. v. Lorac Service Corp.,* 724 S.W.2d 13 (Tex. 1987) (recognizing the two requirements to qualify as a consumer under the DTPA as (1) seeking or acquiring by purchase or lease (2) any goods or services). Fustok fails to meet this definition of a consumer.

First, Fustok did not "purchase or lease." The Texas Supreme Court has stated that third parties negotiating a settlement with an insurer do not seek to purchase or lease any of the services of the insurer. They seek the proceeds of the policy. A party whose only relation to an insurance policy is to seek policy proceeds is not a "consumer." *Transp. Ins. Co. v. Fair cloth,* 898 S.W.2d 269, 274 (Tex. 1995) (citing *English v. Fischer,* 660 S.W.2d 521, 524 (Tex. 1983)). Fustok sought to be reimbursed pursuant to his patients' insurance policies for medical services he performed. Since this was Fustok's only interaction with United, he was only seeking the proceeds of the insurance policy and cannot be said to have purchased or leased.

Second, Fustok did not acquire goods or services, but only money. Under Texas law, "money is not a 'tangible chattel,' or 'goods' as defined by the DTPA." Tex. Bus. & Com. Code § 17.45(1); *Riverside Nat'l Bank v. Lewis,* 603 S.W.2d 169, 174 (Tex. 1980).

Because Fustok was not a consumer as defined by the DTP A, he cannot seek relief under this law. Therefore, United's motion to dismiss this claim must be granted, but Fustok may amend his claim.

## IV. CONCLUSION
For the reasons discussed above, United's Motion to Dismiss First Amended Class Action Complaint is granted in part and denied in part.

United's Motion to Dismiss Amended Class Action Complaint is **DENIED** as to the ERISA preemption argument, **GRANTED** as to negligent misrepresentation, promissory estoppel, quantum meruit, and DTPA, and **DENIED** as to implied-in-fact contract.

Fustok is granted leave to file a Second Amended Complaint, consistent with this Memorandum and Order, by September 14, 2012.

**IT IS SO ORDERED.**

## All Citations

Not Reported in Fed. Supp., 2012 WL 12937486

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

GVB MD v. Aetna Health Inc., Not Reported in Fed. Supp. (2019)

2019 WL 6130825
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida,
Miami Division.

GVB MD d/b/a Miami Back and Neck
Specialists, Plaintiff,
v.
AETNA HEALTH INC., Defendant.

Case Number: 19-22357-CIV-MORENO
|
Signed 11/19/2019

**Attorneys and Law Firms**

Lisandra Estevez, David Di Pietro, Associates, P.A.,
Nicole Marie Martell, David DiPietro, Di Pietro Partners,
LLP, Fort Lauderdale, FL, for Plaintiff.

Genevieve Lee Baisden, Richard Philip Hermann, II.,
David J. DePiano, Shapiro, Blasi, Wasserman &
Hermann, P.A., Boca Raton, FL, for Defendant.

**ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS**

FEDERICO A. MORENO, UNITED STATES
DISTRICT JUDGE

**\*1** In this insurance benefit dispute, Plaintiff GVB MD
*d/b/a* Miami Back and Neck Specialists asserts six claims
under Florida law for breach of contract, unjust
enrichment, *quantum meruit*, promissory estoppel, and
declaratory relief against Defendant Aetna Health Inc.
Specifically, Miami Back alleges it provided medically
necessary back procedures and treatments to patients
insured by Aetna, after Aetna verified the procedures and
treatments were covered by applicable health insurance
plans. Miami Back further claims that Aetna subsequently
failed to pay altogether, or in full, for the procedures and
treatments provided to Aetna's members.

Aetna filed a Motion to Dismiss **(D.E. 7)** asking the Court

to dismiss five counts of the Complaint on grounds that
Miami Back's claims are either preempted by the
Employee Retirement Insurance Security Act or the
allegations otherwise fail to state claims upon which relief
can be granted. Miami Back's Opposition insists that all
of its claims survive dismissal.

THE COURT has considered the Motion, the Opposition,
the Reply, the pertinent portions of the record, and being
otherwise fully advised in the premises, it is

**ADJUDGED** that the Motion to Dismiss is **GRANTED.**

**I. BACKGROUND**

Plaintiff Miami Back is an out-of-network medical
provider that specializes in minimally invasive orthopedic
spine surgery, and that treats patients with neck and back
pain, degenerative disc disease, nerve compression, spinal
cord compression, scoliosis, and spinal fractures.

In this case, Miami Back seeks reimbursement for
medical services provided to 10 of Defendant Aetna
Health Inc.'s insured members and health insurance plan
subscribers (the "Members"). The intake and admission
process at Miami Back requires that Members execute a
written assignment of benefits, which assigns to Miami
Back the Members' rights to receive benefits under
applicable health insurance plans. According to Miami
Back, spinal surgeries and other medical treatments were
performed for Aetna's Members only after Aetna
confirmed the procedures were covered by applicable
insurance plans.

After Aetna failed to reimburse Miami Back altogether, or
in full, for the treatments provided to the Members,
Miami Back filed a 6-count Complaint in the Eleventh
Judicial Circuit in and for Miami-Dade County. The
Complaint asserts claims for breach of contract, breach of
a third-party beneficiary contract, unjust enrichment,
*quantum meruit*, promissory estoppel, and declaratory
relief. Aetna removed the case to federal court and filed
the underlying Motion to Dismiss.

**II. LEGAL STANDARD**

"A pleading that states a claim for relief must contain ... a
short and plain statement of the claim showing that the

pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. Detailed factual allegations are not required, but a complaint must offer more than "labels and conclusions" or "a formulaic recitation of the elements of the cause of action." *Twombly*, 550 U.S. at 555 (citation omitted). The factual allegations must be enough to "raise a right to relief above the speculative level." *Id.* (citations omitted). Finally, at the motion to dismiss stage, the Court must view the allegations in the complaint in the light most favorable to the plaintiff and accept well-pleaded facts as true. *See St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*, 795 F.2d 948, 954 (11th Cir. 1986).

## III. DISCUSSION

**\*2** Aetna requests dismissal of Miami Back's claims for breach of contract (Count 1), unjust enrichment (Count 3), *quantum meruit* (Count 4), promissory estoppel (Count 5), and declaratory judgment (Count 6).[1] The Court addresses each count in turn.

### A. BREACH OF CONTRACT (COUNT 1)

In Count 1, Miami Back alleges breach of contract under Florida law. Aetna seeks dismissal of Count 1 on federal preemption grounds, to the extent this claim seeks payments for the value of services rendered by Miami Back to Aetna's Members under health insurance plans governed by the Employee Retirement Income Security Act ("ERISA").[2]

The Employee Retirement Income Security Act provides that it "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). Federal preemption under ERISA may take one of two forms: "defensive" preemption, or "complete" preemption. *Butero v. Royal Maccabees Life Ins. Co.*, 174 F.3d 1207, 1211–12 (11th Cir. 1999).[3] Here, Aetna contends Miami Back's claims should be dismissed as defensively preempted.

A state law claim is defensively preempted by ERISA if it "relates to" an ERISA plan. *Id.* at 1215 (citing 29 U.S.C. § 1144(a)). The Supreme Court has ruled that a state law "relates to" an employee benefit plan "in the normal sense of the phrase," that is, "if it has a connection with or reference to such a plan." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins.*, 514 U.S. 645, 656 (1995) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97 (1983)). This includes situations where the alleged conduct at issue is "intertwined with the refusal to pay benefits." *Garren v. John Hancock Mut. Life Ins. Co.*, 114 F.3d 186, 187 (11th Cir. 1997) (citations omitted). Ultimately, defensive preemption "require[s] dismissal of state-law claims." *Butero*, 174 F.3d at 1212.

Here, Miami Back alleges that Aetna provides a variety of health insurance plans to its Members, which includes among others, "employer-sponsored benefit plans." (D.E. 1-1 at 2–3, ¶ 3.) Miami Back further alleges, however, that it "does not have access to the terms of the Plans applicable to the claims at issue in this case, as Aetna is in sole possession of those Plans and has never supplied or offered to supply those plans to Miami Back." *Id.* at 6, ¶ 24. As a result, Miami Back concedes in its Opposition that it "is not confident one way or the other" whether some of its claims include patients with health insurance plans governed by ERISA. (*See* D.E. 10 at 4.) Miami Back goes on to argue that "[w]hile the statute may preempt any corresponding state law claims with respect to Members with ERISA plans, it cannot preempt non-ERISA claims as Defendant suggests." *Id.* at 4.

**\*3** The problem with Miami Back's position is this: it is the plaintiff who "bear[s] the exclusive burden of establishing the existence of any plan from which their non-ERISA claims arise"—"a burden that is inextricably intertwined with" a plaintiff's duty under Rule 8 to make a short and plain statement of the claim showing the pleader is entitled to relief. *Biohealth Med. Lab., Inc. v. Conn. Gen. Life Ins. Co.*, No. 1:15-CV-23075-KMM, 2016 WL 375012, at \*6 (S.D. Fla. Feb. 1, 2016), *aff'd in part, vacated in part*, *BioHealth Med. Lab., Inc. v. Cigna Health & Life Ins. Co.*, 706 F. App'x 521 (11th Cir. 2017) (citing Fed. R. Civ. P. 8(a)(2)).

Like this case, *Biohealth Med. Lab.* involved an insurance benefit dispute arising out of two insurance companies' refusal to pay claims for toxicology testing performed by the laboratories *after* the insurance companies verified the testing was covered by applicable health insurance plans.

2016 WL 375012, at *1. The laboratories filed a complaint that asserted a federal ERISA claim and claims under Florida law for breach of contract, breach of fiduciary duty, and promissory estoppel. *Id.* at *2. In addition to ruling that the laboratories had standing to assert breach of fiduciary duty claims, but did not have standing to assert claims under "self-funded" plans,[4] the district court dismissed state law claims "arising from ... non-ERISA plans" because the complaint did not "identify any [non-ERISA] plan(s)." *Id.* at *3–5. Notably, the district court concluded the laboratories failed to adequately allege state law claims even though they attached spreadsheets to their complaint that identified both the insurance claims that were improperly denied and the insurance companies' claim identification numbers. *Id.* at *5. The district court ruled that "merely claiming that some of the member claims arise under non-ERISA plans is insufficient to provide fair notice" to the defendants. *Id.*

Just like the laboratories in *Biohealth Med. Lab.*, Miami Back attaches to its Complaint a chart summarizing unpaid insurance claims. (*See* D.E. 1-1 at 17–18, Ex. A.) But neither the information in the chart, nor the allegations in the Complaint, identify or distinguish between any ERISA or non-ERISA insurance plans. To start, the chart only includes redacted patient names, patient account numbers, dates of service, CPT codes, billed amounts, and member IDs—but no distinction is made between ERISA and non-ERISA insurance claims. *See id.* Turning to the Complaint, Miami Back summarily alleges without more that "[t]he Plans covering the Members identified on Exhibit A are valid and enforceable insurance contracts." *Id.* at 9, ¶ 42. In addition, the Complaint includes only two allegations that reference employer-based health insurance plans. First, the general allegations assert that "Aetna provides health care insurance, administration, and/or benefits to insureds or plan participants pursuant to a variety of health care benefit plans and policies of insurance, including employer-sponsored benefit plans, government-sponsored benefit plans, and individual health benefit plans...." *Id.* at 2–3, ¶ 3. And second, in the allegations specific to Count 2, the Complaint asserts that "[t]o the extent the Plans are not issued pursuant to an employee benefit plan, Defendant's failure to pay for the medically necessary services provided by Plaintiffs to the Members constitutes a breach of contract under Florida law." *Id.* at 10, ¶ 48. Again, neither of these allegations identifies or distinguishes between any ERISA or non-ERISA insurance plans.

**\*4** As currently pleaded, it is possible that all of Miami Back's insurance claims "relate to" ERISA plans, thus

defensively preempting the breach of contract claim; but it is equally possible that all of Miami Back's insurance claims concern non-ERISA plans, paving the way for state law claims to proceed. At bottom, though, it is Miami Back's "exclusive burden" as the plaintiff to establish the existence of non-ERISA health insurance plans in order to state a claim for breach of contract. *See Biohealth Med. Lab., Inc.*, 2016 WL 375012, at *6.

Miami Back argues it is entitled "to plead its state law claims in the alternative, to provide Plaintiff with a remedy to the extent any of the plans fall outside the reach of ERISA." (D.E. 10 at 3.) Although the Federal Rules permit Miami Back to "set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones," Fed. R. Civ. P. 8(d)(2), that is not really what Miami Back pleads. Rather, that is what Miami Back argues it pleaded when faced with Aetna's preemption argument.

First off, the Complaint asserts only a breach of contract claim; it does not assert an ERISA claim. So it is unclear how Miami Back's breach of contract claim is pleaded in the alternative "to the extent any of the plans fall outside the reach of ERISA." (D.E. 10 at 3.) Indeed, the breach of contract claim is entirely about getting reimbursed for treatments covered by health insurance plans falling outside the reach of ERISA. And secondly, to the extent Miami Back meant to argue that it pleaded an ERISA claim in the alternative to its breach of contract claim, there are no allegations to support this reading of the Complaint. (*See generally* D.E. 1-1 at 2–15.)

In any event, unnecessary issues are created at the dismissal stage when a plaintiff attempting to plead causes of action in the alternative—where the viability of each claim depends on a dispositive distinction between ERISA and non-ERISA health insurance plans—fails to allege the facts necessary to establish the very distinction that its claims in the alternative require. A prime example is that Miami Back's breach of third-party beneficiary contract claim in Count 2 is limited to non-ERISA plans, and quite notably, this is the only claim Aetna did not move to dismiss. (*See* D.E. 1-1 at 10, ¶ 48 ("To the extent the Plans are not issued pursuant to an employee benefit plan, Defendant's failure to pay for the medically necessary services provided by Plaintiff to the Members constitutes a breach of contract under Florida law.").) On the other hand, the allegations in Count 1—which do not make this factual distinction—invited Aetna's preemption challenge, thereby creating an additional hurdle for Miami Back to state a cognizable breach of contract claim.

Additionally, although not raised by Aetna, this entire

GVB MD v. Aetna Health Inc., Not Reported in Fed. Supp. (2019)

discussion underscores that this kind of pleading runs the risk of "commit[ting] the sin of not separating into a different count each cause of action or claim for relief," and thereby failing to give Aetna "adequate notice of the claims against [it] and the grounds upon which each claim rests." *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1322–23 (11th Cir. 2015). And finally, as discussed above, the failure to distinguish between insurance claims arising under ERISA and non-ERISA health insurance plans has stopped Miami Back from satisfying its burden to establish the existence of applicable insurance plans. *See Biohealth Med. Lab., Inc.*, 2016 WL 375012, at \*5–6.

**\*5** Perhaps these pleading deficiencies stem from Aetna being "in sole possession of the applicable health insurance plans. (D.E. 1-1 at 6, ¶ 24.) So, between now and January 10, 2020—the deadline the Court is setting for Miami Back to amend the Complaint—the issue of whether the applicable insurance claims arise under ERISA or non-ERISA health insurance plans should become clear through initial discovery. If in fact the insurance claims submitted by Miami Back do not "relate to" ERISA, then the amended complaint should allege so (and there would be no reason to assert an ERISA claim in the alternative, separately or within the same count). But if Miami Back submitted insurance claims under ERISA and non-ERISA plans, Miami Back should strongly consider whether a federal ERISA claim should be pleaded in a separate count from the state law breach of contract claim. *See, e.g.*, Fed. R. Civ. P. 10(b) ("If doing so would *promote clarity*, each claim founded on a separate transaction or occurrence ... must be stated in a separate count or defense.") (emphasis added).

Looking forward, the Court notes that federal ERISA claims will not withstand dismissal if the complaint "simply states that all insurance plans subject to this litigation are 'group health insurance policies [that] constitute employee welfare plans as defined by The Employee Retirement Security Act' " because "[s]uch conclusive allegations are not sufficient to pass the pleading notice requirements under *Twombly*." *In re Managed Care Litig.*, Master File No. 00-1334-MD, Tag-Along Case No. 08–20005–CIV, 2009 WL 742678, at \*3 (S.D. Fla. Mar. 20, 2009) (citing *Twombly*, 550 U.S. at 555). As this Court previously explained, "[w]ithout describing an ERISA plan, Defendants cannot reasonably ascertain what the intended benefits were or who [were] the proper beneficiaries under a given plan. Although the allegations in the Complaint do not need to describe a given plan in detail, such as to identify each plan's policy number, the allegations must be sufficient to raise the existence of an ERISA plan above speculative level. As

such, failure to identify the controlling ERISA plans makes the Complaint unclear and ambiguous." *Id.*[5]

Turning back to the present allegations, the Court finds the Complaint does not identify any non-ERISA plans (or ERISA plans for that matter). Therefore, the Court cannot conclude that Miami Back has plausibly alleged breach of contract under Florida law. *See Biohealth Med. Lab., Inc.*, 2016 WL 375012, at \*6. For this reason, the Motion to Dismiss is **GRANTED** as to Count 1, which is accordingly **DISMISSED WITHOUT PREJUDICE.** Furthermore, Miami Back is granted leave to file an amended complaint to cure its pleading deficiencies.

### B. <u>UNJUST ENRICHMENT (COUNT 3)</u>

In Count 3, Miami Back asserts an unjust enrichment claim to get reimbursed for the value of unpaid medical treatments provided to Aetna's Members. Aetna argues this claim should be dismissed with prejudice because no direct benefits were conferred on Aetna, as required to state an unjust enrichment claim.

**\*6** To state a claim for unjust enrichment under Florida law, a complaint must allege: (1) the plaintiff conferred a benefit on the defendant, who has knowledge thereof; (2) the defendant voluntarily accepts and retains the conferred benefit; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff. *See Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC*, 650 F. Supp. 2d 1213, 1229 (S.D. Fla. 2009) (citations omitted). Importantly, the Florida Supreme Court has ruled the plaintiff "must directly confer the benefit to the defendant." *See Kopel v. Kopel*, 229 So. 3d 812, 818 (Fla. 2017) (citing *Peoples Nat'l Bank of Comm. v. First Union Nat'l Bank of Fla. N.A.*, 667 So. 2d 876, 879 (Fla. 3d DCA 1996)); *see also Harvey v. Fla. Health Scis. Ctr., Inc.*, 728 F. App'x 937, 946 (11th Cir. 2018) (noting same).

Here, the Court finds that Miami Back fails to state a claim for unjust enrichment because Miami Back "can hardly be said to have conferred any benefit, even an attenuated one, upon [Aetna] by providing [the Members] with health care services." *GVB MD, LLC v. United Healthcare Ins. Co.*, No. 19-20727-CIV, 2019 WL 3409183, at \*8 (S.D. Fla. May 9, 2019), *report and recommendation adopted*, 2019 WL 3408925 (S.D. Fla. May 28, 2019) (quoting *Hialeah Physicians Care, LLC v. Conn. Gen. Life Ins. Co.*, 2013 WL 3810617, at \*4 (S.D. Fla. July 22, 2013)). "[A]s a matter of commonsense, the

GVB MD v. Aetna Health Inc., Not Reported in Fed. Supp. (2019)

benefits of healthcare treatment flow to patients, not insurance companies," and as such, "a third-party providing services to an insured confers nothing on the insurer except, a ripe claim for reimbursement, which is hardly a benefit." *Adventist Health Sys./Sunbelt Inc. v. Med. Sav. Ins. Co.*, No. 6:03-cv-1121-Orl-19KRS, 2004 WL 6225293, at *6 (M.D. Fla. Mar. 8, 2004); *see also Peacock Med. Lab, LLC v. UnitedHealth Grp., Inc.*, No. 14-81271-CV, 2015 WL 2198470, at *5 (S.D. Fla. May 11, 2015) ("[A] healthcare provider who provides services to an insured does not benefit the insurer."); *cf. Hialeah Physicians Care, LLC*, 2013 WL 3810617, at *4 ("If [plaintiff] conferred no benefit upon the Plan's insurer by providing treatment to Plan beneficiaries, common sense dictates that [defendant], as the claims administrator, cannot be said to have received a benefit from the same conduct.").[6]

**\*7** Miami Back directs the Court to another ruling in this District, which found that a plaintiff adequately pleads an unjust enrichment claim by alleging it provided medical services to the defendant insurer's members. (*See* D.E. 10 at 8 (citing *Nordt v. Colina Ins. Ltd.*, No. 17-21226-CIV, 2017 WL 4225550, at *7 (S.D. Fla. Sept. 22, 2017).) Although *Nordt* initially allowed the unjust enrichment claim to proceed past the dismissal stage, a later decision in that case explained that the parties' "scant briefing ... did not even approach the question regarding whether *direct* conferral of a benefit from a plaintiff to a defendant [was] required to satisfy the first element of unjust enrichment under Florida law, nor did the [previous] Order touch on that." *John C. Nordt, III, M.D. & Assocs., P.A. v. Colina Ins. Ltd.*, No. 17-21226-CIV, 2018 WL 2688793, at *3 (S.D. Fla. Apr. 13, 2018) (emphasis added). After reviewing Florida Supreme Court and Eleventh Circuit case law, which confirmed that a *direct* benefit must be conferred on the defendant to state an unjust enrichment claim under Florida law, the district court ruled that the plaintiff "failed to show how providing medical services to [the defendant's] insureds conferred a direct benefit on [the defendant]." *See id.* at *4 ("Since any benefit [the plaintiff] may have conferred on [the defendant was] indirect at best, [the plaintiff] fail[ed] to establish an essential element of unjust enrichment, rendering all other facts immaterial.").

Taking the allegations in the Complaint as true and viewing them in the light most favorable to Miami Back, the Court finds that any benefit conferred on Aetna was indirect at best. Consequently, the Court finds Miami Back cannot state a claim for unjust enrichment under Florida law. Therefore, Aetna's Motion to Dismiss is **GRANTED** as to Count 3, which is accordingly **DISMISSED WITH PREJUDICE.** *See Hialeah*

*Physicians Care, LLC*, 2013 WL 3810617, at *4 (dismissing unjust enrichment claim with prejudice).[7]

### C. *QUANTUM MERUIT* (COUNT 4)

In Count 4, Miami Back asserts a *quantum meruit* claim also seeking reimbursement for the value of unpaid medical services provided to Aetna's Members. Aetna argues this claim should be dismissed with prejudice because Aetna did not express any discernible intentions to create a quasi-contractual situation.

To state a claim for *quantum meruit* under Florida law, a complaint must allege that the plaintiff provided, and the defendant assented to and received, a benefit in the form of goods or services under circumstances where, in the ordinary course of common events, a reasonable person receiving such a benefit normally would expect to pay for it. *White Holding Co., LLC v. Martin Marietta Materials, Inc.*, 423 F. App'x 943, 947 (11th Cir. 2011) (quoting *Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1194 (11th Cir. 2009)). *Quantum meruit* claims arise when parties "have expressed discernible intentions and created either incomplete contracts or something, very similar to a contract." *Adventist Health*, 2004 WL 6225293, at *4. In contrast to unjust enrichment claims, the threshold question in the *quantum meruit* context is whether there was a "meeting of the minds" between the parties, *id.*, which is shown by "a tacit promise, one that is inferred in whole or in part from the parties' *conduct*, not solely from their words," *Brush v. Miami Beach Healthcare Grp. Ltd.*, 238 F. Supp. 3d 1359, 1368–69 (S.D. Fla. 2017) (quoting *Comm. P'ship, 8098 Ltd. P'Ship v. Equity Contracting Co., Inc.*, 695 So. 2d 383, 386 (Fla. 4th DCA 1997)) (emphasis added).

**\*8** Here, Miami Back alleges that it performed medical treatments only after receiving confirmation from Aetna that the treatments were "covered and authorized," and after Miami Back received from Aetna "a reference number for future reference of the patients' insurance coverage details," which indicated "that Aetna would pay, at least in part, for the services rendered by Plaintiff." (D.E. 1-1 at 7, ¶¶ 30–31.) Miami Back further alleges that it submitted claim forms, in compliance with Aetna's "policies and procedures," that requested payment for procedures provided to Aetna's Members. *Id.* at – 32. Based on these allegations, Miami Back concludes in its Opposition that it provided the medically necessary treatments to Aetna's Members with Aetna's knowledge and approval, and under circumstances fairly raising the presumption that the parties understood and intended that

GVB MD v. Aetna Health Inc., Not Reported in Fed. Supp. (2019)

Aetna would pay the reasonable value of those services. (D.E. 10 at 10.)

Without more, Miami Back's verification of coverage allegations do not support a claim for *quantum meruit* because, as courts across the country agree, "an insurer's verification of coverage is not a promise to pay a certain amount." *RMP Enters., LLC*, 2018 WL 6110998, at *8 (collecting cases). Consistent with this widely-held conclusion, several courts in this District have dismissed *quantum meruit* claims on similar allegations because these allegations do not establish an insurer's *assent* to pay for medical services provided to its members. *See, e.g.,* *GVB MD, LLC*, No. 19-20727-CIV, 2019 WL 5260274, at *5–6 (S.D. Fla. Aug. 14, 2019), *report and recommendation adopted*, 2019 WL 5260178 (S.D. Fla. Sept. 5, 2019) (dismissing *quantum meruit* claim based on allegation the defendant "confirmed that its patients were covered under certain healthcare plans and that Defendant made sporadic payments for some of the services rendered"); *RMP Enters., LLC*, 2018 WL 6110998, at *8 (dismissing with prejudice *quantum meruit* claim based on "alleged oral verification of coverage" and noting "[c]ourts across the country agree that an insurer's verification of coverage is not a promise to pay a certain amount"); *Peacock*, 2015 WL 2198470, at *5 (dismissing *quantum meruit* claim based on allegation the defendants "made payments either inconsistently or not at all" and explaining "[t]his conduct shows that Defendants never assented to pay for the provided services. If anything, it shows they assented not to pay for them").

Miami Back invites the Court to deny the Motion to Dismiss based on *Watershed Treatment Programs, Inc. v. United Healthcare Ins. Co.*, No. 07-80091 CIV, 2007 WL 1099124 (S.D. Fla. Apr. 10, 2007). There, the district court declined to dismiss a *quantum meruit* claim "given the Parties' prior course of dealing, where, "over a period of years" the defendant "administered and paid [the plaintiff's] substance abuse and treatment claims in a consistent manner" and "routinely preauthorized and certified treatment at [the plaintiff's] facilities for all levels of care and treatment." *Id.* at *1, 3. In contrast, Miami Back simply alleges, without reference to any period of time, that "Aetna either refused to pay the claims altogether or grossly underpaid Miami Back for its services...." (*See* D.E. 1-1 at 8, ¶ 35.) These allegations are akin to the allegations rejected in *GVB MD, LLC*, 2019 WL 5260274, at *5–6, *RMP Enters., LLC*, 2018 WL 6110998, at *8, and *Peacock*, 2015 WL 2198470, at *5.

Accordingly, the Motion to Dismiss is **GRANTED** as to Count 4. The Court will, however, grant Miami Back leave to amend this claim to include factual allegations

showing Aetna's *assent* to pay for the services that Miami Back provided to the Members. As such, Count 4 is **DISMISSED WITHOUT PREJUDICE.**

## D. PROMISSORY ESTOPPEL (COUNT 5)

Next, in Count 5, Miami Back asserts a promissory estoppel claim seeking reimbursements for unpaid medical treatments provided to Aetna's members. Specifically, Miami Back alleges that it only provided medical treatment to Aetna's Members *because* Aetna verified coverage and expressly authorized treatment. Aetna argues Count 5 should be dismissed because the alleged promises are not sufficiently definite.

**\*9** To state a claim for promissory estoppel under Florida law, the complaint must allege facts that, if taken as true, would show: (1) the plaintiff detrimentally relied on a promise made by the defendant; (2) the defendant reasonably should have expected the promise to induce reliance in the form of action or forbearance on the part of the plaintiff or a third person; and (3) injustice can be avoided only through the enforcement of the promise against the defendant. *W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.*, 728 So. 2d 297, 302 (Fla. 1st DCA 1999) (citing *W.R. Grace & Co. v. Geodata Servs., Inc.*, 547 So. 2d 919, 920 (Fla. 1989)). Ultimately, the promise must be "definite" and of a "substantial nature," the evidence "clear and convincing," *W.R. Grace & Co.*, 547 So. 2d at 920, and the reliance "reasonable," *Romo v. Amedex Ins. Co.*, 930 So. 2d 643, 650 (Fla. 3rd DCA 2006). *See also Vencor Hosps. S., Inc. v. Blue Cross & Blue Shield of Rhode Island*, 86 F. Supp. 2d 1155, 1165 (S.D. Fla. 2000) ("[P]romissory estoppel does not apply if the terms of the promise are indefinite.") (citing *Maccaferri Gabions, Inc. v. Dynaterra, Inc.*, 91 F.3d 1431, 1443–44 (11th Cir. 1996)).

Here, the Court finds Miami Back's allegations are not sufficiently definite to state a claim for promissory estoppel. Miami Back alleges that "[p]rior to all non-emergent initial trial consultations with each new patient, [it] contacted [Aetna] to verify that each patient was covered by a health plan insured by and/or administered by [Aetna], and to obtain benefit information and pre-authorization." (D.E. 1-1 at 7, ¶ 29.) According to Miami Back, Aetna confirmed "the medical services were covered and authorized the same." *Id.* at ¶ 30. In so confirming, Miami Back alleges Aetna provided "a reference number for future reference of the patients' insurance coverage details, indicating that Aetna would pay, at least in part, for the services rendered by the

Plaintiff." *Id.* Finally, Miami Back alleges that "[b]ased upon the representations of Aetna during the benefit verifications communications," Miami Back performed medically necessary spine surgery and related medical treatments to Aetna's Members. *Id.* at ¶ 31.

Like *quantum meruit* claims, promissory estoppel claims also fail when they are premised only on an insurer's confirmation of coverage. For instance, in *Vencor Hosps. S., Inc. v. Blue Cross & Blue Shield of R.I*, the plaintiffs contacted the insurer "to verify coverage and amounts" and the insurer "acknowledged" the proposed treatment was covered under applicable insurance plans. 86 F. Supp. 2d at 1164. Noticeably absent were any allegations that the defendants made any acknowledgments "as to costs of a treatment." *Id.* Viewing the evidence in the light favorable to the plaintiffs, the district court found that the plaintiff could not reasonably rely on the confirmation of coverage to mean that the insurer would pay the full cost of such treatment. *Id.* at 1165, *aff'd sub nom.*, 284 F.3d 1174 (11th Cir. 2002); *see also Peacock*, 2015 WL 2198470, at *5 (citing *Vencor* and dismissing promissory estoppel claim premised on "indefinite confirmation of coverage"); *GVB MD, LLC*, 2019 WL 3409183, at *8, *report and recommendation adopted*, 2019 WL 3408925 (dismissing promissory estoppel claim where plaintiff alleged defendant authorized treatment but offered no "additional specifics" about the terms of the promise, such as the type of treatments the promise covered, the amount or extent of the reimbursements, or if the promise applied to some or all the Members).

Likewise here, Miami Back does not allege any specifics regarding what types of treatments, or to which Members, the alleged promises applied to. Furthermore, as to the amount or extent of reimbursements, while Miami Back alleges that providing a reference number for future inquiries regarding insurance coverage details "indicat[ed] that Aetna would pay, at least in part, for the services rendered" by Miami Back (D.E. 1-1 at 7, ¶ 30), this really only alleges that Miami Back interpreted the reference number as a promise to pay—but it does not allege that Aetna made an affirmative promise to pay any amount of any of the services rendered, *see Vencor*, 86 F. Supp. 2d at 1165 (dismissing promissory estoppel claim where plaintiff did not allege the defendant "made any acknowledgments as to costs of a treatment").

**\*10** In addition, to the extent Aetna made partial payments for certain treatments provided to some of its Members, even in conjunction with verifying coverage, such allegations taken as true still fail to demonstrate that Aetna made a sufficiently definite promise to pay. *See Sapphire Int'l Grp., Inc. v. Allianz Glob. Risks US Ins.*

*Co.*, No. 18-Civ-80101, 2018 WL 8344837, at *3 (S.D. Fla. June 29, 2018) (dismissing for lack of definitiveness a promissory estoppel claim even where the defendant "made a partial settlement payment" and the plaintiff "was made to believe that the claim would be covered by [the defendant], and that there was no doubt that the claim would be covered").

In short, Miami Back fails to allege that Aetna made a sufficiently definite promise to pay any amounts for any procedures regarding any patients. For these reasons, the Motion to Dismiss is GRANTED as to Count 5. As with the *quantum meruit* claim, Miami Back may amend the Complaint to include additional factual allegations supporting the definitiveness of Aetna's alleged promises.

### E. DECLARATORY RELIEF (COUNT 6)

In Count 6, Miami Back seeks declaratory relief. Aetna argues this claim should also be dismissed because the allegations are not sufficiently definite. Miami Back counters that its request for declaratory relief is separate from its other claims, and proper because there is an ongoing controversy where Aetna continues to preauthorize treatments, but then either refuses to pay or grossly underpays claims.

While Miami Back appears to assert a claim for declaratory relief under the Florida Declaratory Judgment Act, because this case was removed to federal court on diversity jurisdiction grounds, the Court applies the federal Declaratory Judgment Act, 28 U.S.C. Section 2201. *See Incredible Investments, LLC v. Fernandez-Rundle*, 984 F. Supp. 2d 1318, 1323–24 (S.D. Fla. 2013) (collecting cases). As a practical matter, however, the analysis under both acts is the same. *Id.* at 1324 at n.1.

The Declaratory Judgment Act provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). District courts have "an ample degree of discretion" in adjudicating declaratory relief claims. *Kerotest Mfg., Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183–84 (1952).

But a declaratory relief claim that seeks a general declaration of rights and obligations is not sufficient to survive a motion to dismiss. *See Bencomo Enters. v. United Specialty Ins. Co.*, 345 F. Supp. 3d 1401, 1406

(S.D. Fla. 2018) ("Plaintiff's request for general declaratory relief is insufficient at the motion-to-dismiss stage.") (citing *Great Am. Ins. Co. v. Pino Kaoba & Assocs., Inc.*, No. 08-20847-CIV, 2008 WL 11333253, at *2 (S.D. Fla. Dec. 8, 2008) (dismissing declaratory relief claim that was "unclear" and "overly general," and that did not "indicate precisely what rights it pertain[ed] to....")).

Here, the Court finds that Count 6 requests nothing more than a general declaration of rights. In the Complaint, Miami Back asserts "an actual, live controversy exists between Plaintiff and Defendant concerning the parties' rights and responsibilities in connection with insurance claims submitted by Plaintiff to Defendant, and such controversy will continue to exist unless declaratory relief is provided determining the parties' respective rights and obligations." (D.E. 1-1 at 14, ¶ 78.) Miami Back then generally requests—because it "is in doubt of its rights to receive benefits for such services as a result of Defendant's actions," *id.* at 15, ¶ 81—that the Court "issue a declaratory judgment clarifying the parties' rights and obligations under Defendant's Plans, and grant such other relief as the Court deems proper" *id.* at 15.

**\*11** As pleaded, this claim does not request any specific declarations as to any specific rights or obligations implicated by the "actual, live controversy." Thus, the Complaint simply leaves the Court left to infer what declarations are sought by Miami Back. The Court is not, however, required to make such inferences. *See Bencomo Enters.*, 345 F. Supp. 3d at 1406 ("While the Court could infer Plaintiff wants the Court to determine the outstanding coverage and causation issues between the parties through its claim for declaratory relief, such is not the claim that appears and the Court will not do Plaintiff's job for it.") (citing *Helman v. Udren Law Offices, P.C.*, No. 0:14-CV-60808, 2015 WL 1565335, at *5 (S.D. Fla. Apr. 8, 2015)).

The indefiniteness of Miami Back's request for a declaration of rights is underscored by Aetna's second and third arguments for dismissing this claim: that the Court cannot issue a general, sweeping declaration as to the medical necessity and reasonable pricing of both past and future services provided by Miami Back. For instance, as pleaded now, Miami Back asks the Court for a general declaration to resolve Miami Back's doubt as to its rights to receive benefits under numerous insurance plans, each of which likely has different terms and conditions of coverage, concerning services provided to different patients with different diagnoses. To account for these variations, a declaration of rights would require a case-by-case assessment.[8]

As currently pleaded, the Complaint fails to provide the Court with any guideposts for declaring the parties' rights.[9] To survive dismissal, the Complaint must at minimum seek declarations with some level of specificity. For these reasons, the Motion to Dismiss is **GRANTED** as to Count 6 as well. Once more, Miami Back may amend its declaratory relief allegations.

## IV. <u>CONCLUSION</u>

For these reasons, it is

**ADJUDGED** that the Motion to Dismiss is **GRANTED** as follows: Count 3 is **DISMISSED WITH PREJUDICE,** and Counts 1, 4, 5, and 6 are **DISMISSED WITHOUT PREJUDICE** and with leave to amend. It is further

**ADJUDGED** that Miami Back may file an Amended Complaint no later than **<u>Friday, January 10, 2020</u>**. Should Miami Back fail to timely file an Amended Complaint, Aetna will be required to answer Count 2 no later than **<u>Friday, January 24, 2020</u>**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this <u>19th</u> of November 2019.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 6130825

Footnotes

1   Aetna does not ask the Court to dismiss Count 2.

2   Aetna extends this argument to Counts 3 through 6, to the extent those claims also seek payments related to health insurance plans governed by ERISA.

GVB MD v. Aetna Health Inc., Not Reported in Fed. Supp. (2019)

---

3      In contrast to defensive preemption, which acts a substantive defense, complete preemption is jurisdictional in nature. *See Jones v. LMR Int'l, Inc.*, 457 F.3d 1174, 1179 (11th Cir. 2006) (citing *Ervast v. Flexible Prods. Co.*, 346 F.3d 1007, 1014 (11th Cir. 2003)).

4      The plaintiffs "appeal[ed] only the district court's ruling that they lack[ed] standing to raise claims arising from self-funded plans." *See BioHealth Med. Lab., Inc.*, 706 F. App'x at 522, 525. Thus, the Eleventh Circuit's order vacating the ruling on standing has no bearing on Miami Back's burden to establish the existence of applicable insurance plans.

5      Other courts in this District have recognized the same. *See, e.g., RMP Enters., LLC v. Conn. Gen. Life Ins. Co.*, No. 9:18-CV-80171, 2018 WL 6110998, at *5 (S.D. Fla. Nov. 21, 2018) (dismissing with prejudice ERISA claim lacking "basic and necessary facts" due to the plaintiffs "continued failure to identify the particular patients, claims, services, or dates of service at issue, notwithstanding the benefit of the Court's instruction on this point") (collecting cases); *Gould v. Univ. of Miami*, No. 16-25233-CIV, 2017 WL 4155479, at *10 (S.D. Fla. Sept. 19, 2017) (ordering *sua sponte* that the plaintiff file an amended complaint identifying applicable ERISA and other benefit plans and providing "enough information to allow the Defendant and the Court to know the basis of the Plaintiff's ERISA claims, sufficient for the Defendant to file an appropriate responsive pleading, and for the Court to assess the viability of those claims").

6      Miami Back attempts to distinguish *Hialeah* and *Peacock* on grounds they "erroneously rely only on *Adventist*," which in turn "relied on South Carolina and New York substantive law." (D.E. 10 at 9.) The Court disagrees with this characterization of *Adventist*. While the *Adventist* court cited decisions from the South Carolina Supreme Court and the Southern District of New York, it ultimately ruled the plaintiff failed to state an unjust enrichment claim because "as a matter of *commonsense*, the benefits of healthcare treatment flow to patients, not insurance companies," and, because "cases interpreting *Florida* law require the 'benefit' in an unjust enrichment claim to be direct, not indirect or attenuated, as would be any putative 'benefit' conferred on an insurer by treating its insureds." *See Adventist Health*, 2004 WL 6225293, at *5–6 (citing *Nova Info. Sys. v. Greenwich Ins. Co.*, No. 6:00CV1703ORL31 KRS, 2002 WL 32075792 (M.D. Fla. Dec. 13, 2002); *Se. Fla. Laborers Dist. Health & Welfare Tr. Fund v. Philip Morris*, No. 97–8715–CIV–RYSKAMP, 1998 WL 186878, at *4 (S.D. Fla. Apr. 13, 1998)) (emphases added). The Court agrees with the well-reasoned analysis in *Adventist*, which was subsequently followed in this District in *Hialeah* and *Peacock*.

7      The Court notes that Miami Back recently advanced a similar, if not identical claim, for unjust enrichment against another health insurance company. In that case, the district court dismissed the claim without prejudice and granted Miami Back leave to amend. But even after Miami Back amended its complaint, the Magistrate Judge issued another Report and Recommendation recommending that the district court dismiss the claim because "even if the Court was to accept all of Plaintiff's factual allegations as true, those facts would still fail to demonstrate that [the Plaintiff] conferred a *direct* benefit on [the Defendant]." *See GVB MD, LLC*, 2019 WL 5260274, at *4 (emphasis in original). After "independently review[ing] the Report, the objections, the record, and applicable case law," the district court affirmed and adopted the Report and Recommendation, dismissed the unjust enrichment claim, and ordered the defendant to answer the remaining claims. *See GVB MD, LLC*, 2019 WL 5260178.

8      *Cf. Shenandoah Chiropractic, P.A. v. Nat'l Specialty Ins. Co.*, 526 F. Supp. 2d 1283, 1285—86 (S.D. Fla. 2007) (dismissing declaratory relief claim requesting "across-the-board" relief because "the fact finder must, on a case by case basis, construe the term 'reasonable' and determine whether or not the insurer's evaluation of the bills submitted fits the definition") (citing *State Farm Mut. Auto. Ins. Co. v. Sestile*, 821 So. 2d 1244, 1245–16 (Fla. 2d DCA 2002) ("The fact-finder must construe the word 'reasonable' and determine whether the insurance company's evaluation of medical bills fits the definition on a case-by-case basis.")).

9      At the very least, Miami Back's Opposition fails to counter in any meaningful way Aetna's arguments for dismissal.

---

End of Document                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:23-cv-02550-JTF-tmp   Document 1-2   Filed 08/31/23   Page 434 of 660   PageID 460

Hialeah Physicians Care, LLC v. Connecticut General Life..., Not Reported in...

2013 WL 3810617
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida,
Miami Division.

HIALEAH PHYSICIANS CARE, LLC, a
Florida corporation, Plaintiff,
v.
CONNECTICUT GENRAL LIFE
INSURANCE COMPANY, a foreign
Corporation, Defendant.

No. 13–21895–CIV.
|
July 22, 2013.

**Attorneys and Law Firms**

Bradley Seldin, The Seldin Law Firm, Miami Beach, FL;
Karen B. Schapira, Florida Health Law Center, Davie,
FL, for Plaintiff.

Robert T. Kofman, Susan Jeanne Toepfer, Stearns
Weaver Miller Weissler Alhadeff & Sitterson, Miami, FL,
for Defendant.

*ORDER GMNTING MOTION TO DISMISS*

JAMES LAWRENCE KING, District Judge.

**\*1 THIS MATTER** comes before the Court upon
Defendants' Motion to Dismiss (DE # 3), filed June 5,
2013. Defendants argue that the Complaint (Compl., DE #
1, Exhibit E) should be dismissed pursuant to Rule 12 of
the Federal Rules of Civil Procedure. The Court, being
briefed on the matter,[1] finds that the Motion should be
granted and Plaintiff's Complaint dismissed with
prejudice.

# I. BACKGROUND

On April 18, 2013, Plaintiff Hialeah Physicians Care
("HPC") filed a four-count Complaint against Defendant
Connecticut General Life Insurance Company
("CGLIC"), alleging claims related to CGLIC's refusal to
reimburse HPC for costs of health care rendered by HPC
to employees of Miami–Dade County Public Schools
("MDCPS") pursuant to a group health plan established
by the School Board of Miami–Dade County (the "Plan").
(Compl. at ¶ 3–11). HPC is a Florida corporation and a
licensed health care provider; CGLIC is a foreign
insurance company,[2] authorized to conduct business in the
state of Florida.

HPC is a non-contracted provider of health care, and was
apparently neither in possession of a copy of the Plan nor
had knowledge of the terms of said Plan at the time it
brought this action.[3] On the basis of federal diversity
jurisdiction, CGLIC timely removed HPC's Complaint to
this Court on May 29, 2013.[4] (DE # 1). CGLIC
subsequently filed its Motion to Dismiss, to which it
attached a copy of the Plan.[5] The Plan is self-insured by
the School Board of Miami–Dade County.[6] Indeed, the
terms of the Plan clearly state that CGLIC serves as the
claims administrator for the Plan and the School Board of
Miami–Dade County is solely responsible for payment of
the benefits covered by the Plan.[7]

# II. LEGAL STANDARD

Defendant's Motion to Dismiss alleges that the Complaint
fails federal pleading standards and should be dismissed,
under Rule 12, for failure to state a claim upon which
relief can be granted. Fed.R.Civ.P. 12. Rule 8 requires
that a complaint include a "short and plain statement"
demonstrating that the claimant is entitled to relief. Fed R.
Civ. P. 8. To survive a Rule 12(b)(6) motion, a complaint
must include "enough facts to state a claim to relief that is
plausible on its face," *Bell Atl. Corp. v. Twombly,* 550
U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).
"A claim has facial plausibility when the plaintiff pleads
factual content that allows the court to draw the
reasonable inference that the defendant is liable for the
misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662,
663, 129 S.Ct. 1937, 173 L.Ed.2d 868, (2009). As a

corollary, allegations absent supporting facts are not entitled to this presumption of veracity. *Id.* at 681.

When evaluating a motion to dismiss, the Court must take all of the well-pled factual allegations as true. *Iqbal,* 556 U.S. at 664. However, the Court's duty to accept the factual allegations in the complaint as true does not require it to ignore specific factual details "in favor of general or conclusory allegations." *Griffin Indus., Inc. v. Irvin,* 496 F.3d 1189, 1205–06 (11th Cir.2007). And, where documents considered part of a pleading "contradict the general and conclusory allegations" of the pleading, the document governs.[8] *Id.* If the Court identifies such conclusory allegations, it must then consider whether the remaining allegations "plausibly suggest an entitlement to relief." *See Iqbal,* 556 U.S. at 681. The Court must dismiss a complaint that does not present a plausible claim entitled to relief.

## III. DISCUSSION

**\*2** HPC's Complaint alleges claims for breach of contract (Count I), violation of § 627.6131(4)(b), Fla. Stat. (2012) (Count II), quantum meruit (Count III), and unjust enrichment (Count IV). CGLIC has moved for the dismissal of HPC's Complaint pursuant to Rule 12 of the Federal Rules of Civil Procedure.

### A. The Counts

#### i. Breach of Contract (Count I)
To establish an action for breach of a third party beneficiary contract, HPC must properly allege the following four elements: "(1) existence of a contract; (2) the clear or manifest intent of the contracting parties that the contract primarily and directly benefit the third party; (3) breach of the contract by a contracting party; and (4) damages to the third party resulting from the breach." *Found. Health v. Westside EKG Assocs.,* 944 So.2d 188, 194–95 (Fla.2006); *Networkip, LLC v. Spread Enter., Inc.,* 922 So.2d 355, 358 (Fla. 3d DCA 2006).

The Plan itself, which was incorporated into the Complaint by HPC and attached to CGLIC's Motion to Dismiss,[9] belies certain conclusory allegations contained in Count I. Owing to the clear terms of the Plan, HPC has failed to properly allege three necessary elements, namely: (2) the clear or manifest intent of MDCPS and CGLIC that the contract between them should primarily and directly benefit HPC, (3) breach of the contract by CGLIC, and (4) damages to HPC resulting from CGLIC's breach.

The Complaint alleges that HPC is a third party beneficiary of the Plan. (Compl. at ¶ 12). However, HPC's conclusory allegation that it is a third party beneficiary of the Plan is directly contradicted by the express language of the policy, and must therefore be rejected. There is nothing in the Plan itself that demonstrates any clear or manifest intent that the contract between MDCPS and CGLIC would primarily and directly benefit HPC, as required under the law. Indeed, the Plan clearly states that CGLIC is merely the claims administrator for the policy, and "Connecticut General does not insure the benefits described." *See* n. 6 *supra.*

The Plan also undermines HPC's claim that CGLIC breached the contract. By the terms of the Plan, CGLIC is not the insurer and CGLIC never contracted with the beneficiaries to provide the Plan's benefits. Indeed, under the clear terms of the plan, CGLIC is not a party obligated to pay claims thereunder. Accordingly, CGLIC cannot be said to be in breach for refusing to reimburse a health care provider, such as HPC, for costs associated with treatment rendered to Plan beneficiaries.

Finally, as there has been no breach by CGLIC, HPC's conclusory allegation that it has been damaged by CGLIC's refusal to reimburse HPC for costs of treatment rendered under the Plan is unfounded. Accordingly, Count I is dismissed with prejudice because, as a matter of law, HPC is unable to adequately plead entitlement to the relief requested.

#### ii. Violation of § 627.6131(4)(b), Fla. Stat. (2012) (Count II)
**\*3** HPC's Complaint alleges that the Plan is governed by § 627.613 l(4)(b), Fla. Stat. (2012). (Compl. at ¶ 25). The Complaint further alleges that CGLIC is in violation of the statute for failing to timely approve, deny, or contest the claims submitted by HPC to CGLIC. (Compl. at ¶ 26). For the reasons cited herein, the Court finds that HPC's allegations pertaining to § 627.6131(4)(b) do not state a cognizable claim against CGLIC.

As a preliminary matter, § 627.6131(4)(b) is contained

Case 2:23-cv-02550-JTF-tmp   Document 1-2   Filed 08/31/23   Page 436 of 660   PageID 462

Hialeah Physicians Care, LLC v. Connecticut General Life..., Not Reported in...

within Part VI of Chapter 627, Florida Statutes. Chapter 627 concerns "Insurance rates and Contracts," and Part VI pertains to "Health Insurance Policies."[10] The scope of Part VI is limited by § 627.601, Fla. Stat., titled "Scope of this part," which provides that "[n]othing in this part applies to or affects ... (2)[a]ny group or blanket policy...."[11] By its plain language, § 627.6131(4)(b) sets forth certain actions that a "health insurer" must take after receiving a claim. Notwithstanding HPC's allegations to the contrary, the Plan clearly states that CGLIC is merely the claims administrator for the policy, and "[CGLIC] does not insure the benefits described." *See* n. 6 *supra*.

Thus, § 627.6131(4)(b) is inapplicable. The Plan is a group health plan and CGLIC is not an insurer of the Plan, accordingly, there is no set of facts under which this Court can find CGLIC to be in violation of § 627.6131(4)(b) for failing to timely approve, deny, or contest claims submitted by HPC. As a result, Count II is dismissed with prejudice, because, as a matter of law, the Court is unable to draw any reasonable inference that CGLIC is liable for the alleged misconduct or that HPC is entitled to the relief requested.

### iii. Quantum Meruit and Unjust Enrichment (Counts III and IV)

The Complaint purports to state causes of action for quantum meruit and unjust enrichment based upon allegations that CGLIC requested, acquiesced to, and benefitted from HPC's provision of health care to beneficiaries of the Plan. (Compl. at ¶¶ 29, 34). Having considered the allegations of the Complaint, the Court finds that HPC is unable to properly state causes of action for unjust enrichment or quantum meruit because i) no benefit was conferred upon CGLIC by HPC's provision of treatment to Plan beneficiaries and ii) CGLIC made no promises, implicit or otherwise, to reimburse health care providers for treatment provided to Plan beneficiaries.

Under Florida law, claims for quantum meruit and unjust enrichment provide relief based upon the theory that the party seeking relief conferred a benefit on the defendant, and conferring such a benefit is an element of both causes of action. *See Sierra Equity Group, Inc. v. White Oak Equity Partners, LLC,* 650 F.Supp.2d 1213, 1229 (S.D.Fla.2009) ("The elements of a cause of action for unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the conferred benefit; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit

without paying the value thereof to the plaintiff."); *see also W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.,* 728 So.2d 297, 305 (Fla. 1st DCA 1999) ("To satisfy the elements of quantum meruit, a plaintiff must allege facts that, taken as true, show the plaintiff provided, and the defendant assented to and received, a benefit in the form of goods or services under circumstances where, in the ordinary course of common events, a reasonable person receiving such a benefit normally would expect to pay for it."); *see also Adventist Health Sys./ Sunbelt, Inc. v. Med. Sav. Ins. Co.,* 2004 WL 6225293, Case No. 6:03–CV–1121–ORL–19KRS, at *4 (M.D.Fla.2004) ("*Quantum meruit* claims arise out of circumstances in which parties have expressed discernible intentions and created either incomplete contracts or something, very similar to a contract.").

**\*4** HPC can hardly be said to have conferred any benefit, even an attenuated one, upon the Plan's insurer by providing Plan beneficiaries with health care services. *See Adventist Health,* 2004 WL 6225293, at *6 ("[A] third party providing services to an insured confers nothing on the insurer except, a ripe claim for reimbursement, which is hardly a benefit."). If HPC conferred no benefit upon the Plan's insurer by providing treatment to Plan beneficiaries, common sense dictates that CGLIC, as the claims administrator, cannot be said to have received a benefit from the same conduct. Additionally, the Complaint contains no allegations of any agreement between CGLIC and HPC that would even make a quantum meruit claim plausible. Accordingly, Counts III and IV are dismissed with prejudice because, as a matter of law, HPC is unable to adequately plead entitlement to the relief requested.

### IV. CONCLUSION

Accordingly, after careful consideration and the Court being otherwise fully advised, it is **ORDERED, ADJUDGED,** and **DECREED** that Defendants' Motion to Dismiss (**DE # 3**) be, and is hereby, **GRANTED.** All claims are **DISMISSED with prejudice** as to Defendant Connecticut General Life Insurance Company.

**DONE AND ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 3810617

Footnotes

1    Plaintiff filed a Memorandum in Opposition to Defendant's Motion to Dismiss (DE # 7) on June 24, 2013, and Defendants filed
     their Reply (DE # 9) on July 8, 2013.

2    CGLIC is incorporated under the laws of Connecticut and maintains its principal place of business in Bloomfield, CT.

3    Compl. at ¶¶ 4, 6.

4    CGLIC was served on May 1, 2013, and filed its Notice of Removal (DE # 1) on May 29, 2013.

5    DE # 3, Exhibit A.

6    The policy states: "IMPORTANT INFORMATION: THIS IS NOT AN INSURED BENEFIT PLAN. THE BENEFITS
     DESCRIBED IN THIS BOOKLET ... ARE SELF–INSURED BY THE SCHOOL BOARD OF M IAM I–DADE COUNTY,
     FLORIDA WHICH IS RESPONSIBLE FOR THEIR PAYM ENT, CONNECTICUT GENERAL PROVIDES CLAIM ADM
     INISTRATION SERVICES TO THE PLAN, BUT CONN ECTICUT GENERAL DOES NOT INSURE THE BENEFITS
     DESCRIBED." (DE # 3, Exhibit A at 5).

7    *Id.*

8    Furthermore, "where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's
     claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the
     defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for
     summary judgment." *Brooks v. Blue Cross and Blue Shield of FL, Inc.,* 116 F.3d 1364, 1369 (11th Cir.1997).

9    As the contract between MDCPS and CGLIC is central to HPC's Complaint, the Court may properly consider it in evaluating
     HPC's claim. *See* n. 7 *supra.*

10   Part VI of Chapter 627 includes §§ 627.601–627.64995, Fla. Stat.

11   It is well-settled that Part VI's "Scope of this part" provision limits the application of that Part. *See Essex Ins. Co. v. Zota,* 985
     So.2d 1036, 1043–44 (Fla.2008) *accord All Children's Hosp., Inc. v. Med. Sav. Ins. Co.,* 2005 WL 1863409, Case No.
     8:04–CV–186T26EAJ, at *10 (M.D.Fla.2005) (holding that, based on § 627.601, § 627.639 does not apply to group health plans).

Hialeah Physicians Care, LLC v. Connecticut General Life..., Not Reported in...

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 55471
Only the Westlaw citation is currently available.
United States District Court,
S.D. Georgia,
Augusta Division.

JOSEPH M. STILL BURN CENTERS,
INC., f/k/a Physicians' Multispecialty
Group, P.C., Plaintiff,
v.
LIBERTY MUTUAL INSURANCE
COMPANY, Defendant.

No. CV 108–090.
|
Jan. 6, 2010.

**Attorneys and Law Firms**

John J. Czura, John J. Czura, PC, Augusta, William P. Walker, Jr., Walker & Morgan, LLC, Lexington, SC, for Plaintiff.

Neal W. Dickert, Hull Barrett, PC, Augusta, Pope D. Johnson, III, Johnson & Barnette, LLP, Columbia, SC, for Defendant.

**ORDER**

J. RANDAL HALL, District Judge.

**\*1** Before the Court is Plaintiff's Motion for Leave to File Amendments to Complaint and Defendant's Motion for Summary Judgment. (Doc. nos. 41 & 24.) Upon consideration of the record evidence, the briefs submitted by counsel, and the relevant law, Plaintiff's Motion for Leave to File Amendments to Complaint is **DENIED and Defendant's Motion for Summary Judgment is GRANTED.**

*I. Background*

**A. Outstanding Payments for Medical Services**
Plaintiff Joseph M. Still Burn Centers, Inc. ("J.M.Still") is an independently operated arm of Doctors Hospital of Augusta, which exclusively provides specialized burn care in Augusta, Georgia. (Bennett Aff. ¶ 12.) Prior to the filing of the instant lawsuit, forty-seven (47) individuals employed by employers insured with workers compensation insurance policies issued by Defendant, Liberty Mutual Insurance Company ("Liberty Mutual"), were injured in separate incidents outside the state of Georgia and transferred to J .M. Still's burn facility in Augusta, Georgia.[1] (*Id.* ¶¶ 4, 5; Doc. no. 31, Ex. 1.)

It is Plaintiff's standard operating procedure, in regard to obtaining admission information on workers' compensation claimants, to call the injured employee's insured employer. If Plaintiff is unable to reach the employer, Plaintiff often calls the insurer directly to verify the patient's workers' compensation claim status. (Hicks Aff. ¶ 7.) Here, Plaintiff obtained mailing addresses, claim numbers, the insurance adjusters' names, and telephone numbers from the burn victims' employers or Defendant Liberty Mutual for each individual claim, demonstrated by the fact that all such information was entered into Plaintiff's computer system. (*Id.*)

Plaintiff treated all forty-seven burn victims and submitted appropriate medical records and bills to Defendant. (Bennett Aff. ¶ 6.) At all times, Plaintiff expected complete payment for its services. (*Id.* ¶ 14.) Throughout treatment—and after treatment—Plaintiff and Defendant occasionally communicated with each other regarding the workers' compensation claimants. (*Id.* ¶¶ 10–11; Hicks Aff. ¶¶ 6–10.) Ultimately, Defendant paid Plaintiff in accordance with the Georgia Workers' Compensation Medical Fee Schedule. (Insco Aff. ¶ 3.) These payments were less than what Plaintiff had demanded in its bills to Defendant. (Bennett Aff. ¶ 7.)

**B. Procedural History**
Plaintiff filed the instant action against Defendant Liberty Mutual to collect upon payments for individual bills for services rendered to workers' compensation claimants

employed by employers insured with workers' compensation insurance policies issued by Defendant. (Doc. no. 31, at 4–5; Compl. ¶¶ 25, 30.) Plaintiff originally filed the captioned case in the Superior Court of Richmond County on June 5, 2008. (Doc. no. 1.) On July 7, 2008, Defendant filed a Notice of Removal with this Court pursuant to 28 U .S.C. § 1446(b) based upon the complete diversity of citizenship between the parties and an amount in controversy that exceeded seventy-five thousand dollars ($75,000). (*Id.*)

**\*2** In its original Complaint, Plaintiff asserts the following causes of action: breach of contract and promissory estoppel. (Compl.¶¶ 23–30.) Under "Count One," Plaintiff's "Breach of Contract" claim, Plaintiff alleges that "Liberty Mutual has wrongfully refused to make payment for the medical services provided" and has, therefore, breached "its agreement to pay for medical services of its insureds to the Plaintiff." (Compl.¶¶ 24, 25.) Regarding Plaintiff's promissory estoppel claim under "Count Two," Plaintiff alleges Defendant violated O.C.G.A. § 13–3–44(a) by making "representations and promises to the Plaintiff during the admission of its insureds for medical care and treatment that it would pay for their services," which Plaintiff relied on to its detriment. (Compl.¶¶ 27–29.)

On August 1, 2008, the Honorable W. Leon Barfield, United States Magistrate Judge, issued a scheduling order pursuant to Federal Rule of Civil Procedure 16(b) and the Local Rules of the Court. (Doc. no. 7.) The order set forth the scheduling deadlines for this case, including a deadline for the filing of all motions to amend or add parties. (*Id.*) The scheduling order has since been amended, but the deadline for filing motions to amend the pleadings, September 5, 2008, has remained in full force and effect. (Doc. no. 18.) On December 1, 2008, this Court granted the parties' most recent motion to amend the scheduling order and set forth the final pre-trial deadlines: discovery was ordered to end on April 1, 2009, and all civil motions, excluding motions in limine, were ordered to be filed by April 22, 2009. (*Id.*)

On March 6, 2009, Defendant Liberty Mutual filed a motion for summary judgment that is, in large part, the subject of this Order. (Doc. no. 24.) On March 31, 2009, Plaintiff filed its response to Defendant's motion,² and approximately three weeks later, on April 22, 2009, Plaintiff filed a Motion for Leave to File Amendments to Complaint. (Doc. nos.31, 41.) In its motion, Plaintiff requests the Court's permission to supplement its Complaint with claims for *quantum meruit,* pursuant to O.C.G.A. § 9–2–7, and breach of contract as to a third party beneficiary, pursuant to O.C.G.A. § 9–2–20. (Doc.

no. 41, Ex. 2.)

## *II. SUMMARY JUDGMENT STANDARD*

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).* The Court must view the facts in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986),* and must draw "all justifiable inferences in [its] favor," *United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir.1991)* (en banc) (internal punctuation and citations omitted).

**\*3** The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).* How to carry this burden depends on who bears the burden of proof at trial. *Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir.1993).* When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606–08 (11th Cir.1991)* (explaining *Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)* and *Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)*). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir.1997)* (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. *Clark, 929 F.2d at 608.*

If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." *Id.* When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by

which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." *Fitzpatrick,* 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116–17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. *See Morris v. Ross,* 663 F.2d 1032, 1033–34 (11th Cir.1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

The Clerk has given the non-moving party notice of the summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. (Doc. no. 27.) Therefore, the notice requirements of *Griffith v. Wainwright,* 772 F.2d 822, 825 (11th Cir.1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motion is ripe for consideration.

## III. DISCUSSION

### A. Plaintiff's Motion for Leave to File Amendments to Complaint

**\*4** "[W]hen a motion to amend is filed after a scheduling order deadline, [Federal Rule of Civil Procedure] 16 is the proper guide for determining whether a party's delay may be excused." *Sosa v. Airprint Sys., Inc.,* 133 F.3d 1417, 1418 n. 2 (11th Cir.1998). Rule 16(b)(4) states, "A schedule may be modified *only for good cause* and with the judge's consent." Fed.R.Civ.P. 16(b)(4) (emphasis added). "The good cause standard precludes modification unless the schedule cannot 'be met despite the diligence of the party seeking the extension.' " *Sosa,* 133 F.3d at 1418 (quoting Fed.R.Civ.P. 16 Advisory Committee's Note).

The lack of diligence that precludes a finding of good

cause is not limited to a plaintiff who has full knowledge of the information with which it seeks to amend its complaint before the deadline passes. That lack of diligence can include a plaintiff's failure to seek the information it needs to determine whether an amendment is in order. *Southern Grouts & Mortars, Inc. v. 3M Co.,* 575 F.3d 1235, 1241 n. 3 (11th Cir.2009).

The United States Court of Appeals for the Eleventh Circuit has further stated:

> It is not an abuse of discretion for a district court to deny a motion for leave to amend a complaint when such motion is designed to avoid an impending adverse summary judgment. Furthermore, it is not an abuse of discretion for a district court to deny a motion for leave to amend following the close of discovery, past the deadline for amendments and past the deadline for filing dispositive motions.... [I]n order to ensure the orderly administration of justice, [the court] has the authority and the responsibility to set and enforce reasonable deadlines.

*Lowe's Home Ctrs., Inc. v. Olin Corp.,* 313 F.3d 1307, 1315 (11th Cir.2002) (citations omitted).

In the instant case, Plaintiff filed its motion to amend more than seven months after the applicable deadline set forth in the scheduling order and nearly a month after the end of discovery. At the time of filing, nearly two months had passed since Defendant filed its Motion for Summary Judgment and nearly a month had passed since Plaintiff filed its response, which specifically referenced the particular claims Plaintiff now wishes to include in its Complaint.

Given the timing of this Motion, Federal Rule of Civil Procedure 16 is the "proper guide for determining whether [Plaintiff's] delay may be excused," *Sosa,* 133 F.3d at 1418, and, therefore, the appropriate inquiry is whether Plaintiff has shown good cause for the delay in filing its motion. Fed.R.Civ.P. 16(b)(4).

Plaintiff's sole articulated excuse for its delayed filing is that Liberty Mutual's workers' compensation insurance policies were not produced until March 26, 2009, "just in time to respond to Defendant's Motion for Summary Judgment." (Doc. no. 41, at 3.) According to Plaintiff, Defendant's delay was in contravention of Federal Rule of Civil Procedure 26(a)(1)(A)(iv).

**\*5** Plaintiff misconstrues the plain text of Rule 26(a)(1)(A)(iv). Rule 26(a)(1) addresses the initial disclosures required at the outset of a lawsuit; specifically, Rule 26(a)(1)(A)(iv) states that a party is

required to submit "any insurance agreements under which an *insurance business* may be liable to *satisfy all or part of a judgment in the action* or to indemnify or reimburse for payments made to *satisfy the judgment."* Fed.R.Civ.P. 26(a) (1)(A)(iv) (emphasis added). Defendant Liberty Mutual asserts that it is "self-insured" (doc. no. 44, at 3) and no evidence has been provided to the Court to show that any "insurance business" other than Liberty Mutual would be obligated to satisfy any part of a judgment against it.

Because Liberty Mutual was not required to submit its actual workers' compensation insurance policies pursuant to Rule 26(a)(1) (A)(iv), the proper procedure for obtaining these policies was to make a discovery request. Defendant points out—and Plaintiff does not dispute—that such a request was not made until February 26, 2009, nearly five and a half months after the deadline for the filing of all motions to amend. (*Id.*) Plaintiff received the requested insurance policies within one month of its request (doc. no. 45, at 5), and yet still did not file a motion to amend for nearly a month. (Doc. no. 41.) Beyond citing Rule 26(a)(1)(A) (iv), Plaintiff provides no explanation for its substantial delay.

Plaintiff states in its Complaint, "From January 1, 2002, to the present, Liberty Mutual issued various workers' compensation policies to Employers outside the State of Georgia, covering their employees for medical benefits in the event they are injured on the job and require care and treatment from a medical provider." (Compl.¶ 9.) Based on this allegation, Plaintiff was clearly aware of the potential existence of these workers' compensation policies. Nevertheless, Plaintiff waited for months to request their production. By the time Plaintiff filed its request for production of the workers' compensation policies, five months had passed since the deadline for filing motions to amend. Furthermore, the "essential information" pulled from these policies, allegedly spurring the filing of Plaintiff's motion to amend, is nothing more than boilerplate workers' compensation policy language stating that Liberty Mutual is "liable to any person entitled to benefits" and "those persons may enforce [Liberty Mutual's] duties." (Doc. no. 45, at 5.)

"[I]n order to ensure the orderly administration of justice, [this Court] has the authority and the responsibility to set and enforce reasonable deadlines." Lowe's Home Ctrs., 313 F.3d at 1315. Not only does this Court suspect that Plaintiff had "full knowledge of the information with which it seeks to amend its complaint before the deadline passe[d]," but also finds that, at the very least, "[P]laintiff's failure to seek the information it need[ed] to determine whether an amendment [was] in order"

demonstrates a lack of diligence sufficient to support the denial of Plaintiff's motion. *See Southern Grouts,* 575 F.3d at 1241. Therefore, the Court DENIES Plaintiff's Motion for Leave to File Amendments to Complaint, having found that Plaintiff has failed to show good cause as to why the deadline for filing motions to amend could not be met in this instance.

**B. Defendant's Motion for Summary Judgment**

*i. Breach of Express Contract*

**\*6** Count One of Plaintiff's Complaint alleges "Breach of Contract," due to Defendant's "breach of its agreement to pay for medical services of its insureds" through its wrongful refusal "to make payment for the medical services provided to its various insureds as demanded." (Compl.¶¶ 23–25.) Defendant, citing O.C.G.A. § 13–1–1, argues in its brief in support of its Motion for Summary Judgment that any alleged contract "fails for lack of specificity or lack of the essential terms necessary to make such a contract enforceable." (Doc. no. 24, at 7.) Specifically, Defendant directs the Court's attention to the fact that there is nothing in the record establishing "what the contract was, how the doctors were to be paid, [and] what mechanism or schedule was to be utilized." (*Id.*)

Plaintiff responds by arguing that "Defendant's use of O.C.G.A. § 13–3–1, *et seq.,* and the case law interpreting it is misplaced ." (Doc. no. 31, at 4.) Plaintiff contends that Defendant has erred by focusing on O.C.G.A. § 13–3–1 instead of "the controlling provisions of Georgia Law, O.C.G.A. § 9–2–7 (Implied Contracts) and § 9–2–20(a) (Third Party Beneficiary of a written contract)." (*Id.*) By all appearances, including Plaintiff's own statements, Plaintiff never intended to assert a claim for breach of express contract in the first place. Nevertheless, even though Plaintiff has implicitly denied that it is asserting a claim pursuant to O.C.G.A. § 13–3–1, to the extent Plaintiff is asserting such a claim, Defendant's Motion for Summary Judgment on such a claim should be granted.

"To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." O.C.G.A. § 13–3–1. Furthermore, under Georgia law, price is an essential element of a contract and "an alleged contract on which there is no firm agreement as to the

Joseph M. Still Burn Centers, Inc. v. Liberty Mut. Ins. Co., Not Reported in F.Supp.2d...

price is unenforceable." *BellSouth Adver. & Publ'g Corp. v. McCollum,* 209 Ga.App. 441, 444, 433 S.E.2d 437 (1993); *see also Green v. Johnson Realty, Inc.,* 212 Ga.App. 656, 659, 442 S.E.2d 843 (1994) (upholding trial court's grant of summary judgment in favor of defendant on plaintiff's breach of contract claim where evidence showed "there was never an agreement as to how much defendant would be paid" for providing service); *King v. State Farm Mut. Auto. Ins. Co.,* 117 Ga.App. 192, 194, 160 S.E.2d 230 (1968) (finding that when insurer allegedly told insured that "at the appropriate time plaintiff would be compensated in full for his personal injuries" resulting from car accident, no contract was formed due to lack of essential elements necessary for contract). Finally, "A contract cannot be enforced if its terms are incomplete, vague, indefinite or uncertain. In addition, the party asserting the existence of a contract has the burden of proving its existence and its terms." *Home Depot U.S.A ., Inc. v. Miller,* 268 Ga.App. 742, 744, 603 S.E.2d 80 (2004) (quoting *Mooney v. Mooney,* 245 Ga.App. 780, 782, 538 S.E.2d 864 (2000)).

**\*7** Nowhere in Plaintiff's pleadings or in its responses to Defendant's Motion for Summary Judgment, does Plaintiff allege or provide facts to support the notion that a price or payment terms were ever agreed upon by both parties. Susan J. Bennett, the Manager of J.M. Still, states that Plaintiff "treated every Liberty Mutual claimant ... and submitted appropriate medical records and bills for complete payment to Liberty Mutual. After submission of these records to Liberty Mutual, [Plaintiff] received incomplete payment on those accounts...." (Bennett Aff. ¶ 6.) Bennett continues, "Liberty Mutual stated they paid according to the Georgia Fee Schedule." (*Id.* ¶ 8, 538 S.E.2d 864.) While recounting the treatment and billing procedures, however, Ms. Bennett does not state that Plaintiff and Defendant agreed to a price for the medical services provided to the burn victims nor does she state that Defendant agreed to pay anything at all. Rather, Plaintiff simply billed Defendant one price and Defendant paid Plaintiff another.

The evidence of record establishes little more than that, at some point, Liberty Mutual *may* have, in *some* cases, verified that the claimants were insured by Liberty Mutual and *may* have, in special cases, pre-certified an individual procedure. (Hicks Aff. ¶¶ 7, 9.) There is no evidence, however, showing that a price for any medical procedure or treatment was agreed upon before or after the burn victims were treated nor has any evidence been produced demonstrating that there was any agreement regarding when or how Plaintiff was to be paid. *See King,* 117 Ga.App. at 194, 160 S.E.2d 230 ("[T]here was no allegation as to when would be the proper and appropriate

time [for payment] nor as to what sum would constitute full compensation for the injuries. Therefore, lacking these essential elements the alleged contract was too indefinite to be enforceable."). There is also no evidence in the record setting forth any specific terms of an agreement. Plaintiff fails to point to any specific instance, in the forty-seven different burn cases, in which Defendant requested or approved a particular procedure or treatment or agreed to pay a particular price.

Having found that Plaintiff has failed to demonstrate the presence of certain essential elements required to create an express contract, to the extent Plaintiff is attempting to assert a claim for breach of express contract pursuant to O.C.G.A. § 13–3–1, the Court **GRANTS** Defendant's Motion for Summary Judgment on this claim.

*ii. Promissory Estoppel*

In Count Two of the Complaint, Plaintiff asserts a claim of promissory estoppel. According to Plaintiff, "Liberty Mutual made representations or promises to the Plaintiff during the admission of its insureds for medical care and treatment that it would pay for their services." (Compl.¶ 28.) Plaintiff then allegedly relied on these promises to its detriment. (Compl.¶¶ 29–30.) Defendant, however, asserts that Plaintiff has failed to present or point to any evidence in the record supporting the contention that a promise or representation was made regarding payment for medical services. (Doc. no. 24, at 8–10.) Specifically, Defendant contends that there is "no evidence that Liberty Mutual manifested an intention to pay the full amount of the Plaintiff's charges." (*Id.* at 10, 160 S.E.2d 230.)

**\*8** "To prevail on a promissory estoppel claim, a plaintiff must demonstrate that (1) the defendant made certain promises, (2) the defendant should have expected that the plaintiff would rely on such promises, and (3) the plaintiff did in fact rely on such promises to his detriment." *Doll v. Grand Union Co.,* 925 F.2d 1363, 1371 (11th Cir.1991) (applying Georgia law); *see also* O.C.G.A. § 13–3–44(a) ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."). "An essential element of a claim of promissory estoppel is that the defendant made certain promises to the plaintiff. And, while the promise need not meet the formal requirements of a contract, it must, nonetheless, have been communicated with sufficient particularity to enforce the commitment ." *Mooney,* 245 Ga.App. at 783, 538 S.E.2d

864.

While Plaintiff may assert in its Complaint that Defendant "made representations or promises to the Plaintiff during the admission of its insureds for medical care and treatment that it would pay for these services," Plaintiff has failed to point to or provide evidence in the record showing any such promise or representation. (Compl.¶ 28.) In response to Defendant's Motion for Summary Judgment, Plaintiff has provided the Court with several affidavits—none of which identify a single promise or representation made by Defendant regarding a single one of the forty-seven cases upon which this action has been brought. For example, J.M. Still's Admission Director states in her affidavit, "It is my standard procedure for obtaining admission information on Liberty Mutual claimants, to call the insured employer. If I am unable to reach the employer, I will call Liberty Mutual to verify the workers' compensation claim status." She goes on to say, "In the event a Liberty Mutual's claimant had to return to the Joseph M. Still Burn Centers, Inc., for additional surgical procedures, following discharge, our Pre–Certification Department would call to get authorization for that procedure." These facts simply fail to show any promise—"an essential element of a claim for promissory estoppel"—was made in the specific cases sued upon. *Mooney,* 245 Ga.App. at 783, 538 S.E.2d 864. At the very most, the evidence demonstrates that, in some of the cases, there were unspecific communications between Plaintiff and Defendant regarding insurance claims. (Doc. no. 31, Ex. 3.)

Assuming, *arguendo,* that Defendant made a promise or promises, there is no evidence setting forth the substance of the promise or promises with any degree of particularity. As stated above, for purposes of promissory estoppel, "while the promise need not meet the formal requirements of a contract, it must, nonetheless, have been communicated with sufficient particularity to enforce the commitment." *Mooney,* 245 Ga.App. at 783, 538 S.E.2d 864. The evidence fails to show what services Defendant promised to pay for or how much Defendant promised to pay; to the extent any promise could be inferred, it would lack "sufficient particularity to enforce [a] commitment." *Id.*

**\*9** For the foregoing reasons, Defendant's Motion for Summary Judgment on Plaintiff's promissory estoppel claim is **GRANTED.**

*iii. Applicability of Gilmour to Plaintiff's Remaining*

*Claims—Quantum Meruit and Third Party Beneficiary*
Plaintiff asserts in its Brief Opposing Defendant's Motion for Summary Judgment that its cause of action for breach of contract "is grounded in three well established features of Georgia law": implied contracts under O.C.G.A. § 9–2–7, a third party beneficiary claim under O.C.G.A. § 9–2–20, and promissory estoppel under O.C.G.A. § 13–3–44(a). (Doc. no. 31, at 9.) Defendant responds, in its Reply Brief, "[T]he Plaintiff has asserted two brand new theories of recovery, neither of which are raised in the complaint. The Plaintiff now contends it has an 'implied contract' with Liberty Mutual under O.C.G.A. § 9–2–7, and that the Plaintiff is a third party beneficiary of the Defendant's workers' compensation policies." (Doc. no. 35, at 2.) For these reasons, Defendant urges this Court not to consider Plaintiff's "new claims." (*Id.* at 4, 538 S.E.2d 864.)

In *Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312 (11th Cir.2004), the Eleventh Circuit states the following:

In *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), the Supreme Court has mandated a liberal pleading standard for civil complaints under Federal Rule of Civil Procedure 8(a). This standard however does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage. Indeed, the "simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of umeritorious claims." *Id.* Efficiency and judicial economy require that the liberal pleading standards under Swierkiewicz and Rule 8(a) are inapplicable after discovery has commenced. At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed.R.Civ.P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment. *Id.* at 1314–15.

In *Gilmour,* the plaintiff brought suit based upon the following causes of action: negligent misrepresentation, promissory estoppel, bad faith, negligence *per se,* infliction of emotional distress, and tortious interference with contract. *Id.* at 1314. In response to the defendant's motion for summary judgment, the plaintiff withdrew every claim except for the bad faith and negligence *per se* claims, the tortious interference with contract claim, and the claim for attorney's fees. *Id.* The defendant also asserted a new claim based on a "breach of duty" under contract law arising from a contract that was not the subject of any other claim. *Id.* The court held that the "[defendant] had no notice of a contract claim based on the tort claims set forth in the complaint.... The proper

procedure for [Plaintiff] to assert a new contract claim [would have been] to seek to amend her complaint." *Id.* at 1315.

**\*10** The threshold issue here is whether Plaintiff has raised new legal claims for the first time in response to the summary judgment motion. The Court concludes that Plaintiff has not raised a new claim by seeking *quantum meruit* pursuant to an implied contract theory; however, Plaintiff has raised a new claim by asserting, for the first time on summary judgment, a third party beneficiary claim. The *Gilmour* case is, therefore, only applicable to the third party beneficiary claim, and no amendment is necessary in order for this Court to address Plaintiff's claim for *quantum meruit.*

(a) *Quantum Meruit*

The Court recognizes that Plaintiff's Complaint is somewhat ambiguous and does not go so far as to specify the statutes under which it has brought this suit; nevertheless, this does not mean that Plaintiff has failed to assert a claim for *quantum meruit.* Regarding Plaintiff's claim for *quantum meruit,* this is not a case like *Gilmour* in which the plaintiff had no notice of an entirely new claim raised in response to summary judgment. *See id.* at 1315 ("[D] efendant had no notice of a contract claim based on the tort claims set forth in the complaint."); *see also Snelling v. Stark Props., Inc.,* No. 5:05–cv–46, 2006 WL 2078562, \*13 (M.D.Ga. July 24, 2006) (distinguishing *Gilmour* and finding "that the Court cannot say as a matter of law" that the plaintiff was not entitled to offer proof on her claim). Here, not only can the Complaint be read to be asserting a claim for *quantum meruit* based upon the allegation that Defendant breached an implied contract with Defendant, but any alleged ambiguity in the Complaint was clarified over the course of discovery.

Defendant characterizes Plaintiff's Complaint as asserting a claim for breach of an express contract between Plaintiff and Defendant, but the Complaint does not explicitly allege that there was a written or oral contract between the two parties in this case. Furthermore, on at least one occasion, when Defendant attempted to make Plaintiff identify the "express agreement" allegedly set forth in the Complaint, Plaintiff made clear it was asserting a claim for *quantum meruit.* When Defendant asked Plaintiff in an interrogatory to describe exactly what contracts it had with Liberty Mutual, Plaintiff responded, "The agreement for payment of medical services by Liberty Mutual arises in the regular and usual course of business with the

Plaintiff." (Doc. no. 25, Ex. 1 at 4–6.) Plaintiff then set forth the general process by which Liberty Mutual insureds are admitted to J.M. Still and how Plaintiff goes about obtaining payment for services provided to those insureds. (*Id.*) Even assuming that Plaintiff's Complaint does not make its claim for *quantum meruit* completely clear, its answer to this interrogatory demonstrates that Plaintiff's breach of contract claim does not involve an express contract, but rather is a claim for *quantum meruit* based upon a theory that Defendant breached an implied contract.

**\*11** Moreover, this Court also cannot overlook the fact that Defendant originally addressed Plaintiff's claim for breach of implied contract in its Motion for Summary Judgment. (Doc. no. 24, at 7–8.) The fact that Defendant felt compelled to address Plaintiff's claim for breach of implied contract is strong evidence that Defendant was put on sufficient notice of Plaintiff's claim such that its claim for *quantum meruit* should not be considered a "new claim." Thus, the Court will now address the merits of this claim.

Plaintiff seeks *quantum meruit* for breach of an implied contract pursuant to O.C.G.A. § 9–2–7, which states in part: "Ordinarily, when one renders service or transfers property which is valuable to another, which the latter accepts, a promise is implied to pay the reasonable value thereof." Based on this statute, the Supreme Court of Georgia has established the following essential elements regarding a claim for *quantum meruit:* "(1) the performance of valuable services; (2) accepted by the recipient or at his request; (3) the failure to compensate the provider would be unjust; and (4) the provider expected compensation at the time services were rendered." *Amend v. 485 Props.,* 280 Ga. 327, 329, 627 S.E.2d 565 (2006).

Defendant contends that "no implied contract is applicable where the acceptance of the work performed appears to be for the benefit of another." (Doc. no. 24, at 8.) Implicit in this argument is the contention that Defendant Liberty Mutual did not receive any benefit as a result of Plaintiff's performance of medical treatment on the employees of Defendant's insureds; or, in other words, the medical services performed by Plaintiff had no value to Defendant. This argument is made explicit in Defendant's Reply Brief: "Liberty Mutual has received no benefit, and consequently, this Statute [O.C.G.A. § 9–2–7] on implied contract has no application to Liberty Mutual." (Doc. no. 35, at 4.)

Plaintiff counters by arguing that "[t]he medical services benefitted ... Liberty Mutual who had both a State Law

obligation to pay medical benefits as well as a contractual one to its insured." (Doc. no. 40, at 7.) Plaintiff goes on to state:

> Liberty Mutual actually was the recipient of the medical benefits from the Plaintiff to treat its insureds' employees. Of course it did not receive medical treatment. Liberty Mutual's conduct of partial payment to the Joseph M. Still Burn Centers, Inc., was done to satisfy both State Law as well as its contract obligations under its regulated workers' compensation insurance contract. This benefit was acknowledged by Liberty Mutual when it accepted the bills and paid the Joseph M. Still Burn Centers, Inc., under a Georgia Fee Schedule.

(*Id.* at 8, 627 S.E.2d 565.)

"Quantum meruit is not available when there is an express contract; however, if the contract is void, is repudiated, or can only be implied, then quantum meruit will allow a recovery if the work or service was accepted and *if it had value to the recipient.*" *Watson v. Sierra Contracting Corp.,* 226 Ga.App. 21, 28, 485 S.E.2d 563 (1997) (emphasis added.) Under Georgia law, for any claim based on *quantum meruit,* a plaintiff must show that it performed "services valuable to the defendant and that the defendant accepted those services." *Langford v. Robinson,* 272 Ga.App. 376, 379, 612 S.E.2d 552 (2005). While normally issues of benefit and value of services are reserved for jury determination, where the "facts conclusively show by plain, palpable and undisputed evidence" the benefit or lack of benefit, or value or lack of value, conferred upon an alleged recipient of services, the case can be properly resolved on summary judgment. *Sosebee v. McCrimmon,* 228 Ga.App. 705, 708–09, 492 S.E.2d 584 (1997).

**\*12** To date, Plaintiff has identified no evidence upon which a reasonable juror could conclude that it conferred valuable services upon Defendant. This Court simply cannot accept Plaintiff's conclusory assertion that "Liberty Mutual actually was the recipient of the medical benefits from the Plaintiff to treat its insureds' employees." Clearly, Plaintiff's services were valuable to the individual burn victims treated, but those individuals are not parties to this suit. The only defendant in this suit is Liberty Mutual, and the only evidence this Court has before it regarding the existence of any benefit or value conferred upon Liberty Mutual is evidence that Liberty Mutual was billed for services and subsequently made payments to Plaintiff. (Bennett Aff. ¶ 7.)

The fact that Liberty Mutual made payments for medical services performed on an employee of its insured—by itself—does not establish Plaintiff performed services

valuable to *Defendant.* Moreover, in this particular case, all evidence and Plaintiff's own arguments on this point (doc. no. 40 at 8) tend to show that payments were made, not because Defendant valued the services or received a benefit from the medical services provided, but because Defendant believed it had a statutory and/or contractual obligation to pay. (Insco Aff. ¶ 3.)

Plaintiff uses Defendant's alleged statutory and/or contractual obligation to pay Plaintiff to show the conferred medical services were somehow beneficial to Defendant. Assuming, *arguendo,* Defendant had such an obligation to pay Plaintiff for the medical services provided to the employees of its insureds, the Court fails to see how this has any bearing on whether or not those services were valuable to Defendant. If Plaintiff's performance of medical services provided anything to Defendant, it was "a ripened obligation to pay its insured—which could hardly be called a benefit." *Travelers Indem. Co. of Conn. v. Losco Group, Inc.,* 150 F.Supp.2d 556, 563 (S.D.N.Y.2001).

Moreover, Plaintiff has failed to provide this Court with sufficient evidence, such that a reasonable juror could conclude, that any such statutory obligation to pay exists.[3] All that can be found in the record is evidence that the injuries occurred outside the State of Georgia. (Bennett Aff. ¶ 4.) Plaintiff has failed, for example, to provide or point to any evidence showing where the individual injuries occurred, where the contracts of employment were made, where the insured employers were located, and whether or not the contracts for employment were expressly for service outside of the state.[4] *See* O.C.G.A. § 34–9–242 ("In the event an accident occurs while the employee is employed elsewhere in this state ... the employee or his dependents shall be entitled to compensation if the contract of employment was made in this state and if the employer's place of business or the residence of the employee is in this state unless the contract of employment was expressly for service exclusively outside of the state.")

**\*13** And to the extent that Plaintiff asserts that Defendant had a contractual obligation to pay, there is no evidence in the record to establish that fact. The only evidence presented to the Court on this issue are three pages of what appears to be a Liberty Mutual insurance policy. There is no evidence establishing that this policy is representative of all the policies at issue in this lawsuit.

Based upon the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED** in regard to Plaintiff's claim for *quantum meruit.*

Joseph M. Still Burn Centers, Inc. v. Liberty Mut. Ins. Co., Not Reported in F.Supp.2d...

(b) *Third Party Beneficiary Claim*
Unlike Plaintiff's claim for *quantum meruit,* Plaintiff's third party beneficiary claim is a "new claim" within the meaning of *Gilmour,* such that an amendment is required in order for the claim to be addressed on summary judgment. Nowhere in the Complaint does Plaintiff state the words "third party" or "third party beneficiary," or in any way indicate that it is suing upon the workers' compensation policies issued by Defendant Liberty Mutual to its insureds. The complete lack of notice of a third party beneficiary claim is further evidenced by the fact that Defendant did not address such a claim in its initial motion for summary judgment. While the Complaint refers once to the workers' compensation policies, no claim could reasonably be drawn from this single statement of fact and, further, "[l]iberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of facts set forth in the complaint." *Gilmour,* 382 F.3d at 1315.

Not only does the Complaint provide no real notice of a third party beneficiary claim, but there is also no conceivable way to read Plaintiff's "breach of contract" claim as simultaneously asserting both a claim for breach of implied contract and a third party beneficiary claim. The two claims refer to entirely different "agreements," one of which is express and one of which is implied. Moreover, a plaintiff cannot assert a claim for "breach of contract," and then wait until summary judgment to inform the defendant as to whether it is asserting a claim for breach of implied contract, a third party beneficiary claim, or promissory estoppel, without ever having amended its complaint; to permit this method of asserting claims, would be to ignore the spirit and clear language of *Gilmour:* "Efficiency and judicial economy require that the liberal pleading standards ... are inapplicable after discovery has commenced. At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint ...." *Id.* at 1315.

Based on the foregoing reasons, the Court concludes that Plaintiff has improperly asserted a new third party beneficiary claim in its Response to Defendant's Motion for Summary Judgment. The proper procedure for Plaintiff to assert a new claim is to timely seek to amend the complaint. In light of Plaintiff's failure to do so, Plaintiff's third party beneficiary claim cannot be considered on summary judgment.

**\*14** Even if this Court were to consider a third party

beneficiary claim, Plaintiff's claim would fail as a matter of law. Plaintiff asserts that under O.C.G.A. § 9–2–20(b), it is a third party beneficiary of Liberty Mutual's workers' compensation policies. (Doc. no. 31, at 15.) Georgia Code § 9–2–20(b) states the following: "The beneficiary of a contract between other parties for his benefit may maintain an action against the promisor on the contract." In order to maintain a contract action as a third party beneficiary, the third party must "show from the face of the contract that it was intended to benefit [the plaintiff]." *Gilmour,* 382 F.3d at 1315; *see also, Kaiser Aluminum & Chem. Corp. v. Ingersoll–Rand Co.,* 519 F.Supp. 60, 72 (S.D.Ga.1981) ("The law of Georgia has not been anxious to find that parties not in privity can sue under the aegis of the third party beneficiary doctrine. Under Georgia law, a plaintiff must be an intended rather an incidental beneficiary and it must clearly appear from the contract itself that both contracting parties intended to benefit the third party.").

Defendant, in its Reply Brief, asserts that Plaintiff has failed to identify any evidence to support the contention that it was an intended third party beneficiary of Defendant's workers' compensation policies (doc. no. 35, at 5), and the Court agrees. Plaintiff has simply failed to supply or point to any evidence showing that, on the face of the workers' compensation policies, it was an *intended* beneficiary. In support of its third party beneficiary claim, Plaintiff contends that Defendant's workers' compensation policies "all contain compliance language similar to that of the law of Georgia." (Doc. no. 31, at 16.) Plaintiff cites the following language from a Liberty Mutual workers' compensation policy: "We are directly and primarily liable to any person entitled to benefits payable by this insurance. Those persons may enforce our duties." (*Id.*)

Putting aside the fact that the policy provided to the Court is unverified and there is no evidence in the record establishing that this policy is an exact copy of the policies issued in each of the individual cases sued upon, this language fails to provide any evidence that, on the face of the contract, Plaintiff J.M. Still, or any hospital for that matter, is an intended beneficiary of Liberty Mutual's workers' compensation policies. This is not a case like *Vencor Hosps. v. Blue Cross Blue Shield of R.I.,* 169 F.3d 677 (11th Cir.1999). In *Vencor,* a case which arose under Florida law, a hospital brought a breach of contract suit against a health insurer due to the insurer's failure to fully pay for services allegedly covered by its policy. *Id.* at 679–80. The insurer argued that the hospital could not bring the suit because the policies at issue were between the insurer and the patients, not between the insurer and the hospital. *Id.* at 680. The hospital responded by arguing

that it was a third party beneficiary of the insurance contracts and the Eleventh Circuit agreed. *Id.* The Eleventh Circuit's opinion focused specifically on the language set forth in the insurance contract, which stated: "Benefit payments may be paid to the doctor, *hospital* or to you directly at our discretion." *Id.* (emphasis added). Based upon this language, the court of appeals found, "By providing for payment directly to the hospital, the contracting parties showed a clear intent to provide a direct benefit to Vencor (or any other service-providing hospital), and thus Vencor has standing to bring this suit." *Id.*

**\*15** Unlike in *Vencor,* where the word "hospital" appeared directly in the policy, Plaintiff has not identified any language in the contract at issue here indicating a "clear intent to provide a direct benefit" to J.M. Still or any other service-providing hospital. Nowhere does Liberty Mutual state that it will pay hospitals or doctors directly for their services. Furthermore, the contracts at issue here are not like the ones in *Vencor,* which were between an individual and an insurer of medical services; the contracts at issue here cover workers' compensation benefits owed by employers to employees; medical providers are, therefore, more distant beneficiaries in this context.

Plaintiff appears to argue that certain Georgia workers' compensation statutes and rules, when incorporated into the contracts, provide the necessary language to support Plaintiff's claim that it is a third party beneficiary under Defendant's insurance contracts. (Doc. no. 31, at 18.) However, any attempt by Plaintiff to invoke these statutes and rules removes the entire basis for their claim. Plaintiff asserts in its Response to Defendant's Motion for Summary Judgment: "Nor is [J.M. Still] subject to the Georgia Fee Schedule because these claims are not under

the jurisdiction of [workers' compensation law in] Georgia." (*Id.* at 3.) Based upon this theory, Plaintiff argues that the payments made by Liberty Mutual pursuant to the Georgia Workers' Compensation Medical Fee Schedule were in error. (*Id.* at 2.) Plaintiff cannot argue both that Georgia workers' compensation rules do not apply to the claims at issue in this case and then invoke those same rules to support a claim as a third party beneficiary. To the extent Georgia workers' compensation rules apply, Plaintiff appears not to dispute that Defendant paid in full. Furthermore, as discussed above, Plaintiff has not provided sufficient evidence establishing that Georgia workers' compensation rules and laws apply to the individual burn cases in the first place.

### IV. CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Leave to File Amended Complaint is **DENIED** and Defendant's Motion for Summary Judgment is **GRANTED.** The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in favor of Defendant. The Clerk shall terminate all deadlines and motions, and **CLOSE** the case.

**ORDER ENTERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 55471

Footnotes

1    The actual number of individual claims appears to be in dispute. Plaintiff has provided an affidavit stating, "The Joseph M. Still Burn Centers, Inc., treated every Liberty Mutual claimant listed on Exhibit '1' ...." (Bennett Aff. ¶ 6.) There are forty-seven (47) individuals listed in Exhibit 1. (Doc. no. 31, Ex. 1) In Defendant's Brief in Support of Defendant's Motion for Summary Judgment, Defendant states thirty-nine individual claimants are involved in this case. (Doc. no. 24, at 1.) On this motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party, and therefore finds that there are forty-seven (47) claims in dispute.

2    Plaintiff attempted to file its Response to Defendant's Motion for Summary Judgment on March 30, 2009, but all pages in the electronic pleadings transmission were blank. The response was properly filed the following morning, on March 31, 2009.

3    Of note, Plaintiff's argument that there existed a statutory obligation to pay for the services contradicts a fundamental premise of its claim, that "[t]he claims presented ... [are] not subject to the regulations of the various State Industrial Commissions" and are

not "under the jurisdiction of Georgia." (Doc. no. 31, at 3–4.) To the extent that the Georgia rules and laws governing workers' compensation apply to these claims. Defendant argues it paid in full, and Plaintiff does not appear to dispute this. (Doc. no. 35, at 6; Insco Aff. ¶ 3.)

4      Plaintiff also largely fails to provide or point to any evidence showing where the burn victims resided at the time of the injuries. Plaintiff provided the Court with "Patient Face Sheets" for seven (7) of the forty-seven (47) patients which are the subject of this lawsuit. These sheets include an address under each patient's name, which the Court can only assume identifies their residences.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 2015949
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

MC1 HEALTHCARE, INC., d/b/a
Mountainside Treatment Center, Plaintiff
v.
UNITED HEALTH GROUP, INC., et al.,
Defendants

CIVIL NO. 3:17-CV-01909 (KAD)
|
Signed 05/07/2019

**Attorneys and Law Firms**

Anthony Charles Famiglietti, Connecticut Office of the Attorney General, Hartford, CT, Emily McDonough Souza, Murtha Cullina LLP, Kevin M. Godbout, Danielle Irene Duplessis, Gregory J. Pepe, Neubert, Pepe & Monteith, P.C., New Haven, CT, for Plaintiff.

Gregory Jacob, O'Melveny & Myers, LLP, Washington, DC, Kelly Frye Barnett, Theodore J. Tucci, Robinson & Cole, LLP, Hartford, CT, Kevin Feder, O'Melveny & Myers LLP, Washington DC, DC, for Defendants United Health Group, Inc, United Healthcare, Inc., Optum, Inc., Optumhealth, Inc.

Kelly Frye Barnett, Theodore J. Tucci, Robinson & Cole, LLP, Hartford, CT, for Defendants UnitedHealthCare Services, Inc., United Behavioral Health, Inc., OptumInsight, Inc.

**MEMORANDUM OF DECISION RE: MOTION TO DISMISS AND MOTION TO STRIKE THE AMENDED COMPLAINT [ECF NO. 55]**

KARI A. DOOLEY, UNITED STATES DISTRICT JUDGE

**\*1** The Plaintiff, MC1 Healthcare Inc., d/b/a Mountainside Treatment Center ("Mountainside"), is a

healthcare services provider that has treated individuals who are beneficiaries under benefit plans covered and/or administered by the seven Defendants[1] (collectively, "United"). In the Amended Complaint, Mountainside asserts five causes action, each challenging United's efforts to recoup purported overpayments it made to Mountainside. United has moved to dismiss this action pursuant Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. United has also moved pursuant to Rule 12(f) to strike Paragraphs 16 through 18 of the Amended Complaint. For the reasons set forth below, the Motion to Dismiss is GRANTED in part and DENIED in part and the Motion to Strike is GRANTED in part and DENIED in part.

**Factual Allegations**

For purposes of this motion, the Court accepts the allegations in the Amended Complaint as true and they are set forth as follows. Mountainside is a healthcare services provider that provides treatment for, among other things, substance abuse. (Amended Compl. at ¶¶ 2–3.) Prior to providing such services, Mountainside requires its prospective patients to sign a contract that contains the following "Assignment of Benefits" provision:

**Assignment of Benefits**

\* \* \*

**Permission to Bill**

I, [patient's name], permit Mountainside Treatment Center, to bill my insurance company for any facility and professional charges rendered during my treatment stay.

**Assignment of Benefits**

I, [patient's name], am requesting that my Insurance company submit any payment related to my care at this rendering facility to the Mountainside Treatment Center at PO Box 717, Canaan, CT 06018.

**Authorization to Appeal**

I, [patient's name], authorize Mountainside Treatment Center to appeal any adverse decisions provided by my insurance company on my behalf.

(*Id.* at ¶ 23.)

If the prospective patient has insurance, Mountainside

calls the insurance company to confirm that the proposed treatment is covered under the terms of the relevant policy or benefit plan. (*Id.* at ¶ 24.) Mountainside also intermittently contacts the insurance company for additional approvals as the patient's treatment regimen progresses towards discharge. (*Id.*) Mountainside relies on the insurance company's approvals in determining the percentage or amount of the services costs that need to be billed directly to the patient. (*Id.*)

During the relevant time period, Mountainside provided services to beneficiaries of benefit plans covered and/or administered by United. (*Id.* at ¶¶ 18–21.) Mountainside does not have a contract with United and is an out-of-network provider under the plans. (*Id.* at ¶ 22.) When billing United, Mountainside used a "UB04" form, which indicates that payment is requested pursuant to an assignment. (*Id.* at ¶ 28.) Initially, United tendered payment to Mountainside for covered services. (*Id.*) On or about May 5, 2017, however, United sent a letter to Mountainside accusing it of improperly billing services on an "unbundled" basis rather than a "bundled" basis. (*Id.* at ¶ 29.) On May 25, 2017, Mountainside responded that, as an out-of-network provider, it was not required to bundle or unbundle any of its services. (*Id.* at ¶ 31.) Thereafter, United began recouping its purported overpayments by not paying for services for other insureds ("offsetting"), including services provided to insureds who are not members of the same plans under which the alleged overpayments were made ("cross-plan offsetting"). (*Id.* at ¶ 32.)

**Procedural History**

**\*2** On November 14, 2017, Mountainside initiated this action. On March 26, 2018, United filed its first motion to dismiss for largely the same reasons asserted in the instant motion to dismiss. On April 13, 2018, the parties reached a stipulation whereby Mountainside would file an amended complaint, which it did on April 30, 2018.

The Amended Complaint is the operative complaint. Like the original complaint, it seeks declaratory, monetary, and injunctive relief pursuant to § 502(a) of the Employee Retirement Income Security Act ("ERISA"), codified at 29 U.S.C. § 1132 (Count One). (Amended Compl. at ¶¶ 38–44.) It also contains four state law claims for violation of the Connecticut Unfair Trade Practices Act ("CUTPA") and Connecticut Unfair Insurance Practices Act ("CUIPA") (Count Two), negligent misrepresentation (Count Three), promissory estoppel (Count Four), and unjust enrichment (Count Five). (*Id.* at ¶¶ 45–62). Each

count of the Amended Complaint seeks payment for services rendered and in doing so challenges United's right to recoup the disputed fees. Count One and Count Two further challenge United's use of cross-plan offsetting for its recoupments.

United moves to dismiss this action in its entirety on several grounds. With respect to the ERISA claim, United principally argues that Mountainside, as a provider, cannot assert a claim under ERISA. With respect to the state law claims, United argues that Mountainside has failed to plead these claims adequately. Alternatively, United argues that ERISA preempts each of these claims. The Court will address each of United's arguments as necessary.

**United's Motion to Dismiss**

**Standard of Review**

As an initial matter, United originally moved to dismiss Count One of the Amended Complaint for lack of standing pursuant to Rule 12(b)(1). United's challenge, however, is to Mountainside's "statutory standing" — *i.e.*, its ability to assert a claim under ERISA — not its constitutional standing under Article III of the United States Constitution. "The Supreme Court has recently clarified ... that what has been called 'statutory standing' in fact is not a standing issue, but simply a question of whether the particular plaintiff has a cause of action under the statute. This inquiry does not belong to the family of standing inquiries because the absence of a valid cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional *power* to adjudicate the case." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (citations omitted; ellipses omitted; internal quotation marks omitted). Accordingly, United's motion to dismiss Count One for lack of "statutory standing"² is properly analyzed under Rule 12(b)(6), not Rule 12(b)(1).

To survive a motion to dismiss filed pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly,* 550 U.S. at 557). Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Iqbal,* 556 U.S. at 678. Nevertheless, when reviewing a motion to dismiss, the court must accept well-pleaded factual allegations as true and draw "all reasonable inferences in the non-movant's favor." *Interworks Sys. Inc. v. Merch. Fin. Corp.,* 604 F.3d 692, 699 (2d Cir. 2010).

**\*3 Count One: ERISA**

United first challenges Mountainside's ability to assert claims based on its patients' rights under their benefit plans and ERISA, arguing that the "Assignment of Benefits" form does not transfer any of the patients' rights to Mountainside. Mountainside counters that this form constitutes a legal assignment of its patients' rights under their plans and, therefore, confers derivative standing to sue under ERISA. For purposes of the motion to dismiss, it is deemed true that all of Mountainside's patients executed the Assignment of Benefits form detailed above. Therefore, if United is correct that the Assignment of Benefits form does not convey any rights under ERISA, whatever claims Mountainside purports to bring under ERISA must be dismissed with prejudice. If the Court does not agree with United's argument, however, then the Court must determine whether Count One is adequately pleaded.

**The Assignment of Benefits Form**

Pursuant to Section 502 of ERISA, a plan participant or beneficiary may bring a civil enforcement action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B); *see also Simon v. Gen. Elec. Co.,* 263 F.3d 176, 177 (2d Cir. 2001) (per curiam). A "beneficiary" is "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder."[3] 29 U.S.C. § 1002(2)(B)(8). "A beneficiary is best understood as an individual who enjoys rights equal to the participants to receive coverage from the healthcare plan. A participant's spouse or child is the most likely candidate for this term."

*Rojas v. Cigna Health & Life Ins. Co.,* 793 F.3d 253, 257 (2d Cir. 2015). The "right to payment" for covered services, however, "does not a beneficiary make." *Id.* at 258 (holding that healthcare providers are not beneficiaries under ERISA).

Generally, only the parties enumerated in Section 502 may sue for relief under ERISA. *Franchise Tax Bd. v. Constr. Laborers Vacation Trust for S. Cal.,* 463 U.S. 1, 27 (1983); *Simon,* 263 F.3d at 177. A "narrow exception" to this rule exists for "healthcare providers to whom a [participant or] beneficiary has assigned his claim in exchange for health care." *Montefiore Med. Ctr. v. Teamsters Local 272,* 642 F.3d 321, 329 (2d Cir. 2011); *see also Simon,* 263 F.3d at 178; *I.V. Serv. of Am. Inc. v. Trustees of the Am. Consulting Eng'r Council,* 136 F.3d 114, 117 n.2 (2d Cir. 1998). To assert an ERISA claim, therefore, a provider must establish that it has a valid assignment of the rights asserted in the complaint that comports with the terms of the benefit plan(s) at issue. *See, e.g., McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc.,* 857 F.3d 141, 147 (2d Cir. 2017) (holding that assignment to out-of-network provider was "a legal nullity" in light of anti-assignment provision in plan); *see also Kennedy v. Conn. Gen. Life Ins. Co.,* 924 F.2d. 698, 700 (7th Cir. 1991) ("Because ERISA instructs courts to enforce strictly the terms of plans, an assignee cannot *collect* unless he establishes that the assignment comports with the plan." [citation omitted]); *Physicians Multispecialty Grp. v. Health Care Plan of Horton Homes, Inc.,* 371 F.3d 1291, 1295 (11th Cir. 2004) ("we are persuaded by the reasoning of the majority of federal courts that have concluded that an assignment is ineffectual if the plan contains an unambiguous anti-assignment provision"); *City of Hope Nat. Med. Ctr. v. HealthPlus, Inc.,* 156 F.3d 223, 229 (1st Cir. 1998) ("Consistent with the other circuits which have addressed this issue, we hold that ERISA leaves the assignability or non-assignability of health care benefits under ERISA-regulated welfare plans to the negotiations of the contracting parties.").

**\*4** "Assuming a plan does not dictate the form of a valid assignment or bar assignment altogether, a court may draw upon federal common law in assessing whether any purported assignment was effective." *Neuroaxis Neurosurgical Assocs., PC v. Costco Wholesale Co.,* 919 F. Supp. 2d 345, 351 (S.D.N.Y. 2013) (citing *I.V. Servs. Of Am. Inc.,* 136 F.3d at 117 n.2). Here, as discussed *infra,* the Court has no way of knowing the extent to which the multitude of plans implicated in Count One dictate the form of assignments or bar assignments altogether.[4] The Court leaves aside this issue for purposes of assessing whether the Assignment of Benefits form is

an assignment because if, as posited by United, the Assignment of Benefits form does not assign any rights under ERISA, the extent to which the plans allow or disallow assignments is irrelevant.

"An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance." Restatement (Second) Contracts § 317 (1981). "No words of art are required to constitute an assignment; any words that fairly indicate an intention to make the assignee owner of a claim are sufficient...." 29 S. Williston, Contracts § 74:3 (4th Ed.); *accord Sunset Gold Realty, LLC v. Premier Bldg. & Dev., Inc.*, 133 Conn. App. 445, 452–53 (2012); *see also DB Healthcare, LLC v. Blue Cross Blue Shield of Ariz., Inc.*, 852 F.3d 868, 876 (9th Cir. 2017) ("These forms do not use the terms 'assign' or 'assignment,' but no such specific language is necessary to effectuate an assignment of rights."). Valid assignments may take a variety of forms; Restatement (Second) of Contracts § 324; *see Montefiore Med. Ctr.*, 642 F.3d at 329 n.8; unless a statute or contract provides otherwise; Restatement (Second) of Contracts § 324; *see McCulloch Orthopaedic Surgical Servs., PLLC*, 857 F.3d at 147 (looking to terms of benefit plan to determine whether assignment was valid).

Some courts have held that assignments of rights under ERISA must be express and, therefore, concluded that forms authorizing or directing an insurance company to pay benefits directly to a provider do not constitute valid assignments under ERISA. *E.g., AvuTox, LLC v. Cigna Health & Life Ins. Co.*, No. 5:17-cv-00250 (BO), 2017 WL 6062257, at *3 (E.D.N.C. Dec. 7, 2017) ("In order for an assignment under ERISA to be valid, it must be express."); *see Peterson v. UnitedHealth Grp.*, No. 14-cv-02101 (PJS) (BRT), ECF No. 60 at 37–39 (D. Minn. Jan. 23, 2015) (oral ruling rejecting plaintiff's that argument direction of payment form constituted assignment of benefits). On the other hand, numerous other courts have concluded that language authorizing an insurance company to pay a provider directly constitutes an assignment of the right to payment and the corollary right to sue under ERISA for nonpayment. *E.g., Brown v. BlueCross BlueShield of Tenn., Inc.*, 827 F.3d 543, 547 (6th Cir. 2016); *Am. Chiropractic Ass'n v. Am. Specialty Health Inc.*, 625 Fed. Appx. 169, 174–75 (3d Cir. 2015); *Dialysis Newco Inc. v. Cmty. Health Sys. Tr. Health Plan*, No. 5:15-cv-00272, 2017 WL 2591806, at *4 (S.D. Tex. June 14, 2017); *Dallas Cty. Hosp. Dist. v. Blue Cross Blue Shield of Tex.*, No. 3:05-cv-0582-BF(M), 2006 WL 680473, at *4 (N.D. Tex. Mar. 14, 2006).[5]

**\*5** Here, United contends that the Assignment of Benefits form, despite being titled an "assignment," does not meet the requirements for a legal assignment because it merely requests that the insurance company submit payments directly to Mountainside. As a result, United argues that no reasonable patient would have understood himself to be irrevocably transferring his legal rights under ERISA or his plan to Mountainside by signing this form. Mountainside relies upon the cases cited above that have found to the contrary. It further posits that the Second Circuit when confronted with the issue will agree, as the Second Circuit recently suggested in *dicta* that a form authorizing an insurance company to pay medical benefits directly to a provider "normally would constitute an assignment to the provider of the patient's right to payment." *McCulloch Orthopaedic Surgical Servs., PLLC*, 857 F.3d at 147.

Having considered the foregoing, the Court agrees with Mountainside that the Assignment of Benefits form constitutes a legal assignment of both the right to receive payment and the commensurate right to sue under ERISA for nonpayment. The Assignment of Benefits form notes in two locations that it is an "Assignment of Benefits," and it makes clear that the patient is authorizing its insurance company to receive bills from and submit payments directly to Mountainside. The patient further authorizes Mountainside to appeal any adverse decisions made by the insurance company concerning coverage. Though not a model of clarity, based on the foregoing terms and provisions, the Court is persuaded that the average patient would have understood that by signing this form he was transferring to Mountainside the right to seek and collect any benefits due under the patient's plan for the services about to be performed by Mountainside. The Court is similarly persuaded that, in doing so, this same patient would have understood himself to be forfeiting the right to seek and collect those same benefits.

United next contends that even if the Assignment of Benefits form is a legal assignment of the right to payment and the right to sue under ERISA for non-payment, it does not encompass the right to pursue injunctive relief.[6] Specifically, United asserts that nothing in the language of the Assignment of Benefits form suggests that the patient is assigning the right to seek prospective, injunctive relief. Mountainside responds that ERISA expressly authorizes equitable relief and, therefore, it can seek an injunction as an assignee of an ERISA benefit. The Court agrees with United.

"Not all ERISA assignments convey the same rights." *Rojas*, 793 F.3d at 258. The Assignment of Benefits form

conveys the narrow right to payment for the services about to be rendered by Mountainside. Nothing in the Assignment of Benefits form suggests that the patient is assigning (and thereby forfeiting) his right to seek prospective, injunctive relief concerning United's recoupment practices. Because the scope of Mountainside's derivative standing is necessarily determined by the scope of its assignment, Mountainside does not have derivative standing to seek injunctive relief. *DB Healthcare, LLC*, 852 F.3d at 877 (holding assignment of right to insurance benefits did not confer right to seek injunction prohibiting insurance company from recouping alleged overpayments through offsetting); *see Rojas*, 793 F.3d at 258 (holding that assignment of patients' right to payment conferred "*only* the right to pursue the participants' claims for payment, not other categories of ERISA claims"); *Premier Health Ctr., P.C. v. UnitedHealth Grp.*, 292 F.R.D. 204, 218–19 (D.N.J. 2013) (holding assignment of benefits from a patient for services rendered by provider "cannot logically imply the right to assert ERISA claims for injunctive relief" regarding insurance company's utilization review process). Thus, that portion of the Amended Complaint and Prayer for Relief which seeks injunctive relief is dismissed with prejudice.


**\*6  *The Deficiencies in Mountainside's Pleading in Count One***

Having determined that the Assignment of Benefits form, on its face, assigns the patients' right to payment, the Court must next address certain critical deficiencies in Mountainside's pleading of Count One.

As previously discussed, an ERISA claim lies where (1) a participant or beneficiary (2) to a plan covered by ERISA (3) seeks to recover benefits due to him or her under the terms of the plan. 29 U.S.C. § 1132(a). Providers do not ordinarily have authority to bring a civil action under ERISA. Instead, to sue under ERISA, Mountainside must establish that it has a valid assignment from a plan participant or beneficiary that comports with the terms of the relevant plan. *See Simon*, 263 F.3d at 177–78; *see also, supra, pp.* 6 – 11.

Here, Mountainside seeks to bring, by way of a single count, dozens of individual ERISA claims on behalf of numerous beneficiaries pursuant to numerous different benefit plans. Although the Amended Complaint seeks to challenge and enjoin United's recoupment practices, at its core, Mountainside seeks to collect what it claims to be owed under the relevant benefit plans for services

provided to each individual patient. Yet, Mountainside fails to identify with sufficient particularity the assignor-beneficiaries whose claims it is asserting, the participants through whom the beneficiaries have benefits, or the identity of the plans under which such benefits are allegedly conferred. The mere fact that Mountainside is an assignee of numerous claims under benefit plans covered by ERISA does not give Mountainside the unfettered ability to challenge United's benefits payments or billing practices, wholly untethered from the patients in whose shoes Mountainside purports to stand and the plans which convey the rights Mountainside seeks to enforce.

The Amended Complaint does include two spreadsheets, which list, in redacted form, information about the patients who were the subjects of the alleged overpayments and recoupments.[7] It is not clear, however, whether Mountainside is asserting claims of patients whose treatment allegedly resulted in overpayments, the patients whose payments are being offset, or both. Mountainside also seems to aver that there might be additional, unknown patients whose rights it might also seek to enforce in this action. Permitting the complaint to proceed as drafted — without any specificity or clarity as to the beneficiaries, claims, or plans at issue — would, in the Court's view, be unfair.

**\*7**  The "principal function" of the pleading requirements embodied in Rule 8 of the Federal Rules of Civil Procedure "is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). When a complaint does not comply with Rule 8's requirements, "the court has the power, on its own initiative ... to dismiss the complaint." *Id.* "The key to Rule 8(a)'s requirements is whether adequate notice is given." *Wynder v. McMahon*, 360 F.3d 73, 79 (2d Cir. 2004). "[F]air notice [is] that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so that it may be assigned the proper form of trial." *Id.* (internal quotation marks omitted). Rule 8 requires a plaintiff to "disclose sufficient information to permit the defendant 'to have a fair understanding of what the plaintiff is complaining about and to *know whether there is a legal basis for recovery*.'" *Kittay v. Kornstein*, 230 F. 3d 531, 541 (2d Cir. 2000) (emphasis added) (quoting *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)). For these reasons, dismissal can be appropriate when a complaint is so "confusing as to 'overwhelm the defendants' ability to understand or to mount a defense.'" *Warner Bros. Entm't Inc. v. Ideal World Direct*, 516 F. Supp. 2d 261, 269 (S.D.N.Y. 2007)

(quoting *Wynder*, 360 F.3d at 80).

With these standards in mind, the Court concludes that Count One does not meet the pleading requirements of Rule 8.[8] Without knowing whose rights Mountainside purports to assert, or the plans under which those rights allegedly derive, United does not have fair notice as to the claims asserted and cannot defend the claims in a meaningful or orderly manner. By way of example, the terms of the individual plans might identify available defenses, such as the existence of anti-assignment provisions which might defeat Mountainside's ability to bring ERISA claims in the first instance.[9] *See, e.g., McCulloch Orthopaedic Surgical Servs., PCCL*, 857 F.3d at 147 (determining whether assignments were effective based on the terms of the plans); *Merrick v. UnitedHealth Grp. Inc.*, 175 F. Supp. 3d 110, 121–123 (S.D.N.Y. 2016) (looking to plan terms to determine whether anti-assignment provisions invalidated provider's assignments and whether provider had viable equitable defenses to anti-assignment provisions). The plan provisions will also shed light on whether United's recoupments are improper. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) ("the validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue"); *Karl v. Asarco, Inc. &/or its Pension Bd.*, No. 93-cv-03819 (KTD), 1998 WL 107113, at *6 (S.D.N.Y. Mar. 11, 1998) ("Under ERISA, every employee benefit plan must be contained in a written instrument which governs the obligations and entitlements under that plan."), *aff'd sub nom. Karl v. Asarco Inc.*, 166 F.3d 1200 (2d Cir. 1998).

**\*8** Accordingly, Count One is dismissed.[10] The dismissal is without prejudice to allow Mountainside to file a second amended complaint that includes sufficient information to put United on fair notice of the patients whose rights are being asserted and the plans at issue in Count One. To accomplish this purpose, the second amended complaint could, for example, identify the assignor-patients whose rights are asserted in this action, although the names may be redacted so long as an unredacted version is provided to United. There may be other identifiers which would accomplish the same result, and the Court does not direct the precise manner by which the ERISA claims should be re-pled. Nor does the Court require any particular format for presenting the individual ERISA claims. The claims can be grouped by plan, or Mountainside could amend its claim to allege a separate count for each patient whose rights are asserted. In whatever manner Mountainside chooses to replead, the notice concerns at the core of Rule 8 must be adequately addressed.

**Count Two: CUTPA/CUIPA**

The Court next addresses United's argument that Count Two of the Amended Complaint fails to state a claim under CUTPA/CUIPA. The thrust of United's argument is that Count Two simply reiterates the allegations against United and, in a purely conclusory fashion, labels this conduct illegal without any explanation as to how it violates CUIPA. United also argues that ERISA preempts this claim. Mountainside avers that it has pleaded a plausible CUTPA violation and that Count Two is not preempted because it is based on United's representations and assurances during the course of their business relationship.

In Connecticut, the interplay between the CUTPA and CUIPA statutes is now well-settled. CUTPA prohibits the use of "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). It further provides for a private right of action. Conn. Gen. Stat. § 42-110g(a). CUIPA, in turn, "prohibits unfair business practices in the insurance industry and defines what constitutes such practices in that industry," but it "does not authorize a private right of action." *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, 317 Conn. 602, 623 (2015). The Connecticut Supreme Court has determined, however, "that individuals may bring an action under CUTPA for violations of CUIPA." *Id.* "Because CUIPA provides the exclusive and comprehensive source of public policy with respect to general insurance practices, ... unless an insurance related practice violates CUIPA or, arguably, some other statute regulating a specific type of insurance related conduct, it cannot be found to violate any public policy and, therefore, it cannot be found to violate CUTPA." *State v. Acordia, Inc.*, 310 Conn. 1, 37 (2013); *accord Artie's Auto Body, Inc.*, 317 Conn. at 624 ("as a general rule, a plaintiff cannot bring a CUTPA claim alleging an unfair insurance practice unless the practice violates CUIPA"). As a result, "the failure of the CUIPA claim is fatal to the CUTPA claim." *Artie's Auto Body, Inc.*, 317 Conn. at 624.

**\*9** In light of the foregoing, the Court begins its analysis by determining whether Count Two plausibly alleges a CUIPA violation. Mountainside alleges that United violated CUIPA through a variety of recoupment-related conduct, by forcing it to commence this lawsuit, and by "[i]nserting and/or relying upon anti-assignment provisions in the United Plans as a means of attempting to defeat out-of-network claims against United of the type asserted by Mountainside." (Amended Compl. at ¶ 48.)

MC1 Healthcare, Inc. v. United Health Group, Inc., Not Reported in Fed. Supp. (2019)

Although Mountainside asserts that this conduct violates CUIPA, this conclusory allegation is not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Mountainside has not identified, and the Court has not located, any provision of CUIPA that prohibits the conduct alleged in Count Two. CUIPA does prohibit certain conduct with respect to claim settlement; Conn. Gen. Stat. § 38a-816(6); but it does not contain any prohibitions with respect to an insurance company's use of offsetting to recoup overpayments to providers. CUIPA also prohibits insurance companies from "compelling insureds to institute litigation to recover amounts due under an insurance policy"; Conn. Gen. Stat. § 38a-816(6)(G); but even if United's conduct falls within the scope of this provision, which it likely does not, Mountainside has not alleged that United engaged in this conduct "with such frequency as to indicate a general business practice"; *id.* § 38a-816(6). Finally, CUIPA does not prohibit the use of or reliance on anti-assignment provisions in insurance policies or benefit plans.

Because Mountainside has failed to allege a plausible CUIPA violation, its CUTPA claim necessarily fails. The deficiencies identified herein are not of the type that can be cured through amendment, nor does Mountainside seek the opportunity to amend. Count Two is dismissed with prejudice.

**Count Three: Negligent Misrepresentation and Count Four: Promissory Estoppel**

United seeks dismissal of Count Three and Count Four because they are vague and fail to identify any false representations or promises made by United. Alternatively, United argues that ERISA preempts these claims. Mountainside responds that it has adequately pleaded these claims because it alleged that United promised to pay it a specific amount for its services. Because that representation or promise creates an independent legal duty, Mountainside asserts that these claims are not preempted by ERISA.

"To establish liability for negligent misrepresentation, a plaintiff must be able to demonstrate by a preponderance of the evidence: (1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." *Stuart v. Freiberg*, 316 Conn. 809, 821–22 (2015) (internal quotation marks omitted). To prevail on a claim for promissory estoppel in the ERISA context, a plaintiff must establish (1) "a

promise," (2) "reliance on the promise," (3) "injury caused by the reliance," (4) "an injustice if the promise is not enforced," and (5) that "extraordinary circumstances" exist. *Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 79 (2d Cir. 1996). "The promise must be sufficiently clear and definite such that the promisor could reasonably expect to induce reliance." *Seitz v. J. C. Penney Prop., Inc.*, No. 3:15-cv-01131 (VAB), 2017 WL 4316874, at *6 (D. Conn. Sept. 28, 2017) (citing *D'Ulisse–Cupo v. Bd. of Dir. of Notre Dame High Sch.*, 202 Conn. 206, 213 (Conn. 1987)); *accord Schonholz*, 87 F.3d at 79.

Mountainside essentially relies upon the same representation or promise from United for both claims — namely, a representation or promise to pay Mountainside a specific amount for approved services. Mountainside has alleged that United promised to pay for the services at issue and that it "relies upon United's approvals in determining the percentage or amount of the services provided to the patient/United Plan beneficiary, to directly bill to the client." The Court infers from these allegations that United communicates with Mountainside concerning the amount it will pay for the proposed services. That representation or promise to pay is sufficient to state a plausible claim for negligent misrepresentation and promissory estoppel.

The Court must next decide whether ERISA completely preempts these causes of action as a matter of law. In *Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004), the Supreme Court established a two-part test to determine whether a claim falls "within the scope" of § 502(a)(1)(B) and, therefore, is completely preempted. *Id.* at 210; *Montefiore Med. Ctr.*, 642 F.3d at 328. "Specifically, claims are completely preempted by ERISA if they are brought (i) by 'an individual [who] at some point in time, could have brought his claim under ERISA § 502(a)(1)(B),' and (ii) under circumstances in which 'there is no other independent legal duty that is implicated by a defendant's actions.' The test is conjunctive; a state-law cause of action is preempted only if both prongs of the test are satisfied." *Montefiore Med. Ctr.*, 642 F.3d at 328 (quoting *Davila*, 542 U.S. at 210) (citation omitted; footnote omitted).

**\*10** Under the *Davila* analysis, the Second Circuit has not adopted a *per se* rule regarding whether and when ERISA preempts claims for negligent misrepresentation and promissory estoppel. *Compare Montefiore Med. Ctr.*, 642 F.3d at 332 (holding representations made by insurance company during pre-approval process did not create a sufficiently independent legal duty under *Davila* where the plan expressly required pre-approval process) *with McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna*

*Inc.*, 857 F.3d 141, 150–51 (2d Cir. 2017) (noting that *Montefiore* did not adopt a *per se* preemption rule concerning statements made during pre-approval process and holding that provider's promissory estoppel claim was not preempted by ERISA); *see also id.* at 149–50 (collecting cases holding that promissory estoppel claim was not preempted by ERISA). The circumstances here are strikingly similar to those presented in *McCulloch.*

If, as United asserts, Mountainside has no standing due to anti-assignment provisions in some of the plans at issue, then clearly the first prong is not met with respect to those claims. *See id.* at 146 ("McCulloch – an 'out-of-network' healthcare provider who plainly did not have a valid assignment for payment – is not the type of party who can bring a claim pursuant to § 502(a)(1)(b)). Moreover, Mountainside has adequately pled "an independent legal duty" arising out of the alleged promise to pay for services. *See id.* at 150–51 (holding promissory estoppel claim was not preempted where it was based on insurer's promise to reimburse at a specific rate, not the specific terms of the plan). Whether that alleged duty is inextricably intertwined in the benefit plans at issue, as was the case in *Montefiore*, must await further discovery and examination of the plans at issue. United can renew its preemption claim by way of summary judgment.

**Count Five: Unjust Enrichment**

Finally, United seeks dismissal of Count Five because Mountainside is not alleged to have conferred any benefit upon United, as is necessary to state a claim for unjust enrichment. Mountainside responds that United was benefited by the services it rendered to United's plan beneficiaries and that such a benefit is sufficient to give rise to a claim for unjust enrichment. The Court disagrees.

To prevail on a claim of unjust enrichment, the plaintiff "must prove (1) that the defendant was benefited, (2) that the defendant unjustly did not pay the plaintiff for the benefits, and (3) that the failure of payment was to the plaintiff's detriment." *Hall v. Bergman*, 296 Conn. 169, 182 n.7 (2010) (alterations omitted; internal quotation marks omitted) (quoting *Vertex, Inc. v. Waterbury*, 278 Conn. 557, 573 (2006)). A right of recovery under the doctrine of unjust enrichment is essentially based on principles of equity and restitution — "its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another." *Trenwick Am. Reinsurance Corp. v. W.R. Berkley Corp.*, 138 Conn. App. 741, 753 (2012).

In the Amended Complaint, Mountainside characterizes the "benefit" to United as the recoupments or offsets made by United. Yet, in opposing the motion to dismiss, Mountainside asserts that the benefit to United is Mountainside's treatment of United's plan beneficiaries. Neither of these purported benefits is sufficient to state a plausible claim for unjust enrichment. First, it is readily apparent that Mountainside confers no benefit upon United when United uses self-help to recoup alleged overpayments. Such a claim defies logic.

Second, courts have repeatedly held that providers cannot bring unjust enrichment claims against insurance companies based on the services rendered to insureds. *E.g., Air Evac EMS Inc. v. USAble Mut. Ins. Co.*, No. 4:16-cv-00266 (BSM), 2018 WL 2422314, at *9 (E.D. Ark. May 29, 2018); *Hialeah Physicians Care, LLC v. Conn. Gen. Life Ins. Co.*, No. 13-cv-21895 (JLK), 2013 WL 3810617, at *4 (S.D. Fla. July 22, 2013); *Broad St. Surgical Ctr., LLC v. UnitedHealth Grp., Inc.*, No. 11-cv-02775 (JBS) (JS), 2012 WL 762498, at *8–*9 (D.N.J. Mar. 6, 2012); *Adventist Health Sys./Sunbelt Inc. v. Med. Sav. Ins. Co.*, No. 6:03-cv-01121 (PCF), 2004 WL 6225293, at *6 (M.D. Fla. Mar. 8, 2004); *see Encompass Office Sols., Inc. v. Ingenix, Inc.*, 775 F. Supp. 2d 938, 966 (E.D. Tex. 2011) (rejecting argument that *quantum meruit* claim could be sustained because plaintiff "provided valuable services to United by rendering medical services to individuals for whom United has a contractual obligation to pay health benefits"); *Travelers Indem. Co. of Connecticut v. Losco Grp., Inc.*, 150 F. Supp. 2d 556, 563 (S.D.N.Y. 2001) (dismissing *quantum meruit* claim based on insurance company's failure to pay full amount demanded by contractor for services performed for insured). As one court aptly explained:

> **\*11** It is counterintuitive to say that services provided to an insured are also provided to its insurer. The insurance company derives no benefit from those services; indeed, what the insurance company gets is a ripened obligation to pay money to the insured — which hardly can be called a benefit.

*Travelers Indem. Co. of Conn.*, 150 F. Supp. 2d at 563. Although not binding, these decisions are persuasive.

Accordingly, Count Five is dismissed with prejudice.

**United's Motion to Strike**

United also moves to strike Paragraphs 16 through 18 of the Amended Complaint because the allegations

contained therein are irrelevant and are intended only to disparage United. Mountainside responds that these allegations are relevant to its claims, including its CUTPA claim, and will not prejudice United.

Under Rule 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "[T]he party moving to strike 'bears a heavy burden' and must show that '(1) no evidence in support of the allegations would be admissible; (2) the allegations have no bearing on the issues in the case; and (3) permitting allegations to stand would result in prejudice to the movant.' " *Walczak v. Pratt & Whitney*, No. 3:18-cv-00563 (VAB), 2019 WL 145526, at *2 (D. Conn. Jan. 9, 2019) (quoting *Tucker v. Am. Int'l Grp.*, 936 F. Supp. 2d 1, 16 (D. Conn. 2013)). "Motions to strike under Rule 12(f) are generally disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute. Furthermore, [t]o the extent that Defendants' aim is to avoid unduly inflaming and prejudicing the jury, the court may take into account that the Complaint will not be submitted to the jury." *Walczak*, 2019 WL 145526, at *2 (citations omitted; internal quotation marks omitted); *see also Gierlinger v. Town of Brant*, No. 13-cv-00370 (AM), 2015 WL 3441125, at *1 (W.D.N.Y. May 28, 2015) ("[B]ecause striking a [part] of a pleading is a drastic remedy ... motions under Rule 12(f) are viewed with disfavor by the federal courts and are infrequently granted.").

In Paragraph 16, Mountainside alleges that "United has a history of violating applicable law to the detriment of patients and providers, particularly out-of-network healthcare providers like Mountainside." It then discusses how several state attorney generals and insurance commissioners have investigated and taken issue with United's Ingenix database, which it used to set reimbursement rates for medical providers. The Court agrees with United that the Ingenix litigation is irrelevant to this proceeding. As such, its only intended effect can be to prejudice United and therefore it is stricken. *Kent v. AVCO Corp.*, 815 F. Supp. 67, 71 (D. Conn. 1992) (" 'References to other litigation and the context in which they are made, are improper and irrelevant' when they are asserted in an unrelated complaint before the court." [quoting *Reiter's Beer Distributors, Inc. v. Christian Schmidt Brewing Co.*, 657 F. Supp. 136, 145 (E.D.N.Y. 1987)]); *see also Lynch v. Southampton Animal Shelter Found. Inc.*, 278 F.R.D. 55, 68 (E.D.N.Y. 2011) ("references to a preliminary investigation that is unrelated to the allegations in the complaint and that did not result in 'an adjudication on the merits or legal or permissible findings of fact' is immaterial as a matter of

law and serves no purpose other than to inflame the reader"); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 79 (S.D.N.Y. 2003) ("Similarly, references to an Attorney General's conclusory report following a preliminary investigation in a case that never was presented for nor reached an adjudication upon the merits, are also immaterial under Rule 12(f).").

**\*12** The Motion to Strike Paragraphs 17 presents a closer issue. The first half of Paragraph 17 focuses on the anti-assignment provisions in United's plans and United's (and other insurance company's) motivations in adding them to their benefit plans. Although this allegation might be relevant to Mountainside's claim that United's use of anti-assignment provisions violates CUIPA, the Court has already concluded that this conduct does not violate CUIPA and, therefore, this allegation is also irrelevant. Accordingly, the Motion to Strike the first two sentences of Paragraph 17 is granted. The Motion to Strike is denied, however, as to the remainder of Paragraph 17, which focus on United's use of cross-plan offsetting to recoup losses. Those allegations are germane to whether, as alleged, payments are owed for services rendered and go to the heart of Mountainside's request for declaratory relief in Count One and is not irrelevant as a result.

Finally, United moves to strike Paragraph 18, which essentially describes the conduct at issue in this case — *i.e.*, United's cross-plan offsetting to recoup purported overpayments made to Mountainside. Because that allegation is clearly relevant to the claims and issues presented in the Amended Complaint, the Motion to Strike is denied as to Paragraph 18.

**Conclusion**
For the foregoing reasons, the Motion to Dismiss is GRANTED as to Counts Two and Five with prejudice and GRANTED as to Count One without prejudice. The Motion to Dismiss as to Counts Three and Four is DENIED. Mountainside may file an amended complaint consistent with this decision on or before June 21, 2019.

For the foregoing reasons, the Motion to Strike Paragraph 16 is GRANTED. The Motion to Strike the first two sentences of Paragraph 17 is GRANTED. The Motion to Strike the remaining allegations in Paragraph 17 and Paragraph 18 is DENIED.

**SO ORDERED** at Bridgeport, Connecticut, this 7th day of May 2019.

Not Reported in Fed. Supp., 2019 WL 2015949

**All Citations**

Footnotes

1 United Health Group, Inc., United Healthcare, Inc., Optum, Inc., Optumhealth, Inc., UnitedHealthCare Services, Inc., United Behavioral Health, Inc., and OptumInsight, Inc.

2 “Because the Supreme Court made clear in *Lexmark [Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)] that the ‘statutory standing’ appellation is ‘misleading’ and ‘a misnomer,’ ” the Second Circuit has instructed courts to avoid this appellation. *Am. Psychiatric Ass'n*, 821 F.3d at 359.

3 A “participant” is “any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.” 29 U.S.C. § 1002(2)(B)(7). In Count One, Mountainside purports to bring claims on behalf of only “beneficiaries.”

4 United has represented that eighteen of the twenty one plans it has identified contain anti-assignment provisions. Although Mountainside contests the accuracy of that plan identification, it does not dispute that at least some of the plans implicated by the complaint contain provisions restricting or barring assignments. Instead, Mountainside argues in its complaint and opposition to the motion to dismiss that these provisions are unenforceable.

5 United contends that *Brown* and *Dialysis Newco* are unpersuasive because the insurance company in each of those cases conceded that there was a valid assignment. United is mistaken. In both cases, the insurance company made the same argument as United makes in this case — *i.e.*, that a form authorizing direct payment of benefits to a provider does not constitute an assignment of rights for the purposes of derivative standing to sue under ERISA. *Brown*, 827 F.3d at 546 (“Blue Cross argues that Harrogate's ‘Assignment of Benefits Forms’ provide only for direct payment and are therefore insufficient to grant an assignment of rights for purposes of derivative standing.”); *Dialysis New Co. Inc.*, 2017 WL 2591806, at *4 (“DSI believes that it has this derivative standing because H.S. executed an ‘Assignment of Benefits’ form on his first day of treatment. Defendants disagree. They note that this assignment only authorized direct payment to DSI — it says nothing about the right to sue.” [citation omitted]). In both cases, the court rejected this argument. *Brown*, 827 F.3d at 547 (“We therefore reverse the district court's holding that Harrogate's ‘Assignment of Benefits Forms’ were not valid assignments of benefits for the purpose of conferring derivative standing.”); *Dialysis New Co. Inc.*, 2017 WL 2591806, at *4 (“In this circuit, the right to receive direct payment necessarily includes the right to sue for non-payment.”).

6 United does not challenge whether the Assignment of Benefits form, if it is a valid assignment, conveys the right to seek the declaratory relief sought in the Amended Complaint.

7 United has not filed an unredacted copy of its spreadsheets, under seal or otherwise. Because one of the spreadsheets contains a list of the overpayments as identified by United in its May 5, 2017, United has been able to identify the patients in that spreadsheet. With respect to the other spreadsheet, however, United stated at oral argument that it has been unable to determine who these patients are, and United's counsel represented that Mountainside's counsel has refused to provide the spreadsheet in unredacted form. The spreadsheets do not list any information about the plans themselves.

MC1 Healthcare, Inc. v. United Health Group, Inc., Not Reported in Fed. Supp. (2019)

8    Although United did not move to dismiss this action under Rule 8, it repeatedly raised concerns regarding Mountainside's failure to identify the patients and plans at issue in its supporting memoranda. United further requested that this action be dismissed because of the lack of "the information necessary to identify all of the patients and plans at issue."

The Court also raised its concerns regarding the structure and content of Count One at the hearing on the motion to dismiss and provided counsel with an opportunity to address those concerns. To the extent that Mountainside believes it has not had an adequate opportunity to address the Court's Rule 8 concerns, it may address this issue through a motion for reconsideration.

9    Indeed, United argued in its motion to dismiss that the Assignment of Benefits form, if it is a legal assignment, will likely be void in many instances because of the anti-assignment provisions in many of United's plans. Because of the uncertainty concerning the patients and plans at issue in this litigation, the Court cannot take up this argument at this time.

10    The Court is aware of cases where many patients' claims were combined into a single ERISA count. *E.g.*, *Texas Gen. Hosp., LP v. United Healthcare Servs., Inc.*, No. 3:15-cv-02096-M (BMGL), ECF No. 38 (N.D. Tex. Oct. 23, 2015); *Exact Sci. Corp., v. Blue Cross & Blue Shield of N.C.*, No. 1:16-cv-00125 (NCT)(LPA), ECF No. 16 (M.D.N.C. June 10, 2016). The problem presented by the Amended Complaint is principally one of substance, not form. In some of these other cases, the complaints contained much greater specificity concerning the subject matter of the singular ERISA count and, therefore, did not raise Rule 8 concerns. *E.g., Texas Gen. Hosp., LP*, No. 3:15-cv-02096-M (BMGL), ECF No. 38 at ¶¶ 41–43 & Exhibit A (appending and incorporating by reference a comprehensive spreadsheet detailing the specific non-payments and underpayments at issue in the litigation, including the policy and group numbers associated with each benefit claim at issue); *Exact Sci. Corp.*, No. 1:16-cv-00125 (NCT)(LPA), ECF No. 16 at ¶ 55 (appending and incorporating by reference a comprehensive spreadsheet detailing the specific underpaid claims at issue in the litigation, including the subscriber identification number associated with each benefit claim at issue). In other cases, the claim was pursued as a putative class action and, therefore, the lack of specificity in terms of the precise claims at issue was more tolerable. *E.g., High Street Rehabilitation, LLC v. Am. Specialty Health Inc.*, No. 2:12-cv-07243 (NIQA), ECF No. 91 (E.D. Pa. Dec. 23, 2015). Nevertheless, in light of the possible defenses already identified by United, the Court has significant concerns about the feasibility of adjudicating all of Mountainside's ERISA claims in a single count.

End of Document    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

620 S.W.3d 458
Court of Appeals of Texas, Dallas.

**TEXAS MEDICINE RESOURCES, LLP**;
Texas Physician Resources, LLP; and
Pediatric Emergency Medicine Group,
LLP, Appellants
v.
**MOLINA HEALTHCARE OF TEXAS,
INC.**, Appellee

No. 05-19-01447-CV
|
Opinion Filed February 23, 2021

**Synopsis**
**Background:** Physicians brought action against health maintenance organization (HMO) claiming HMO's reimbursements for care of covered patients were inadequate and failed to satisfy HMO's obligation to pay "usual and customary" rate for services, seeking to recover under Texas Insurance Code and equitable theory of quantum meruit, and seeking declaration that the jury's finding on the usual and customary rate would be the rate HMO was to pay physicians in future. The 160th District Court, Dallas County, No. DC-18-14467, granted HMO's plea to the jurisdiction. Physicians appealed.

**Holdings:** The Court of Appeals, Schenck, J., held that:

version of emergency care statute in effect when physicians sought payments from HMO did not create a private right of action in favor of physicians;

physicians lacked standing independently, or as assignees of enrollees of HMO, to bring claim against HMO under unfair settlement practices statute;

physicians did not have a right to claim penalties against HMO under the prompt payment statute;

physicians failed to state claim of quantum meruit with respect to HMO's alleged underpayment; and

Physicians failed to state claim under Declaratory Judgments Act with respect to usual and customary rate HMO was to pay for physicians' services in future.

Affirmed.

**Procedural Posture(s):** On Appeal; Plea to the Jurisdiction; Motion for Declaratory Judgment.

**\*461 On Appeal from the 160th Judicial District Court, Dallas County, Texas, Trial Court Cause No. DC-18-14467, Honorable** Aiesha Redmond, **J.**

**Attorneys and Law Firms**

Robert M. Roach Jr., Daniel William Davis, Roach Newton L.L.P., Houston, for Appellants.

Jonathan M. Herman, The Herman Law Firm, Dallas, for Appellee.

Before Justices Schenck, Osborne, and Partida-Kipness

**OPINION**

Opinion by Justice Schenck

Texas Medicine Resources, LLP, Texas Physician Resources, LLP, and Pediatric Emergency Medicine Group, LLC (collectively, "Physicians") appeal the trial court's order granting Molina Healthcare of Texas, Inc.'s ("Molina") plea to the jurisdiction. Physicians assert the trial court erred in dismissing their claims because they have standing to assert same and their complaints present a justiciable controversy. We affirm the trial court's order.

**Background**

Physicians are medical provider groups composed of doctors who staff emergency departments at hospitals and freestanding **\*462** emergency medical care centers. Physicians assert they provide emergency care without regard to patients' financial standing, whether the patients have healthcare coverage or—where the patient has coverage—whether the Physicians have contractual relationships with the patient's insurance carriers.

Molina is a Health Maintenance Organization ("HMO") that issues Health Insurance Exchange ("HIX") plans.[1] Physicians are "non-network physicians" relative to Molina, meaning there is no written contract establishing the rates which Molina will pay for emergency medical care Physicians provide to Molina's enrollees. Thus, pursuant to the emergency care statute applicable to HMOs, Molina is to "pay for emergency care performed by [Physicians] at the usual and customary rate."[2] Tex. Ins. Code § 1271.155(a).

Physicians claim to have provided emergency medical care to more than 3,800 patients enrolled in Molina's HIX plans between January 2017 and September 2018. They billed Molina for the services. Dissatisfied with the payments they received, Physicians sued Molina seeking judicial resolution of their claim that Molina's reimbursement regime under Medicare–Medicaid programs, as implemented through the federal Affordable Care Act and corresponding federal and state regulations, is inadequate. Specifically, Physicians urge that the rates fail to satisfy the obligation to pay the "usual and customary" rate for services under an administrative regulation that has been codified as section 1271.155 of the Texas Insurance Code. They go on to argue that section 1271.155 implies a private cause of action and, thus, a justiciable claim to be presented to lay jurors. This theory has not met success with other courts. Molina urges that the regulation and resulting legislation are part of a broader comprehensive regulatory regime that courts have uniformly held affords no private right of action and presents no justiciable issue, or both. In addition, Physicians claim they are entitled to recover the value of the services provided to Molina's HIX plan enrollees under the equitable theory of quantum meruit and seek a declaration that the jury's finding on the usual and customary rate will be the rate Molina pays Physicians in the future. Molina urges that these claims are all anchored in the same regulatory regime and, accordingly, present a nonjusticiable controversy.

Molina filed a plea to the jurisdiction asserting Physicians lack standing to assert claims under the emergency care statute, the unfair settlement practices statute and the prompt payment statute; that no direct relationship exists between Physicians and Molina to support a quantum meruit claim; and no justiciable controversy exists to support Physicians' claim for declaratory relief regarding future claims. **463 The trial court granted Molina's plea and dismissed Physicians' claims in their entirety. This appeal followed. For reasons that follow, we join our colleagues in federal courts in finding these claims to be nonjusticiable at this time. See Angelina Emergency Med.

Assocs. PA v. Health Care Serv. Corp., No. 3:18-CV-00425-X, 2020 WL 7259222, at *1–2, 6–8 (N.D. Tex. Dec. 10, 2020); Apollo MedFlight, LLC v. Bluecross Blueshield of Tex., No. 2:18-CV-166-Z-BR, 2019 WL 4894263, at *2–3 (N.D. Tex. Oct. 4, 2019).

**Discussion**

**I. Standard of Review**

A plea to the jurisdiction challenges a court's subject-matter jurisdiction to hear a case. Bland Indep. Sch. Dist. v. Blue, 34 S.W.3d 547, 554 (Tex. 2000). When, as in this case, the plea challenges the claimant's pleadings, we determine whether the claimant has pleaded facts that affirmatively demonstrate the trial court's jurisdiction, construing the pleadings liberally and in favor of the claimant. Tex. Ass'n of Bus. v. Tex. Air Control Bd., 852 S.W.2d 440, 446 (Tex. 1993).

"Standing is a prerequisite to subject-matter jurisdiction, and subject-matter jurisdiction is essential to a court's power to decide a case." M.D. Anderson Cancer Ctr. v. Novak, 52 S.W.3d 704, 708 (Tex. 2001). Thus, a plea to the jurisdiction is a proper vehicle to challenge a plaintiff's standing to maintain suit. Vernco Constr., Inc. v. Nelson, 460 S.W.3d 145, 149 (Tex. 2015). Ripeness is also a component of subject-matter jurisdiction. Robinson v. Parker, 353 S.W.3d 753, 755 (Tex. 2011). In order for a claim to be ripe, there must be "a real and substantial controversy involving genuine conflict of tangible interests and not merely a theoretical dispute." Bonham State Bank v. Beadle, 907 S.W.2d 465, 467 (Tex. 1995). The plaintiff bears the burden to plead and establish facts affirmatively showing the court has subject-matter jurisdiction. Tex. Dep't of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 225–26 (Tex. 2004); see also Bland, 34 S.W.3d at 554.

We review a trial court's ruling on a plea to the jurisdiction de novo. Miranda, 133 S.W.3d at 226. In our review, we construe the pleadings liberally in favor of the pleader and look to the pleader's intent to determine whether the facts alleged affirmatively demonstrate the trial court's jurisdiction to hear the cause. See id. If the pleadings affirmatively negate the existence of jurisdiction, then the trial court may grant the plea to the jurisdiction without allowing the plaintiffs an opportunity to amend. Id. at 227.

## II. Physicians' Claim Molina Violated the Emergency Care Statute

In their first issue, Physicians urge the trial court erred in dismissing their claim seeking to enforce the payment obligation set forth in the emergency care statute, specifically section 1271.155 of the Texas Insurance Code. Section 1271.155 requires HMOs to "pay for emergency care performed by non-network physicians or providers at the usual and customary rate or at an agreed rate." Ins. Code § 1271.155(a).

When a private cause of action is alleged to derive from a statutory provision, as it is in this case, our duty is to ascertain the drafters' intent. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 77 S.W.3d 253, 260 (Tex. 2002). The legislature can indicate its intent to create a private right of action either by including an express provision in the statutory text or through implication. *Brown v. De La Cruz*, 156 S.W.3d 560, 563 (Tex. 2004). Physicians concede that section 1271.155 does not expressly confer a private **\*464** right of action but contend that it does so by implication because the requirement that HMO make the payment *directly* to the physician or provider establishes the statute was enacted to benefit healthcare providers; and thus, claim Physicians, they are entitled to enforce the payment obligation. *See* Ins. Code § 1271.155(f). The statute, as it existed at the time Physicians provided medical services to Molina enrollees, did not contain a provision that HMOs pay the physician or provider *directly*. That provision, subsection (f) to section 1271.155, was enacted in 2019, after Physicians provided the services at issue in this case, and it applies to health care or medical services provided on and after January 1, 2020. Consequently, Physicians' reliance on direct payment language subsequently added to the statute is misguided.[3]

How Texas addresses issues concerning the availability of and payment for emergency medical services involves important policy considerations that are primarily for the legislature, not the courts. The unique bifurcated structure of the Texas court system calls for particular deference to legislative choices regarding the method of enforcement of Texas statutes. *Brown*, 156 S.W.3d at 566. The legislature may delegate enforcement to executive departments, administrative agencies, regulatory commissions, local governments and districts, as well as to the criminal or civil courts. *Id.* at 566–67. We are obligated by separation of powers principles to exercise restraint, strictly construe statutory enforcement schemes, and imply a private cause of action to enforce a statute

only when the legislature's intent is clearly expressed from the language as written.[4] *Witkowski v. Brian, Fooshee & Yonge Props.*, 181 S.W.3d 824, 831 (Tex. App.—Austin 2005, no pet.) (citing *Brown*, 156 S.W.3d at 567). Although in some cases it may be desirable to imply a private right of action to provide remedies thought to effectuate the purpose of the statute, ultimately we must determine whether the drafters intended to create such a private remedy. *See Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 15–16, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *see also Brown*, 156 S.W.3d at 567 (rejecting rule of "necessary implication" that provides when a legislative enforcement scheme fails to adequately protect intended beneficiaries, the courts must imply a cause of action to effectuate the statutory purposes); *Linick v. Emp'rs Mut. Cas. Co.*, 822 S.W.2d 297, 300 (Tex. App.—San Antonio 1991, no writ) (where intent of legislature is clear, it will be given effect even if result appears harsh or ill-advised). Moreover, in cases such as this, where the relevant statutes are silent on a private right of action but provide detailed administrative enforcement mechanisms, we may presume that the legislature intended that a separate private right of action not be included. *Witkowski*, 181 S.W.3d at 831; *see also Middlesex Cty. Sewerage Auth. v. Nat'l Clammers Ass'n*, 453 U.S. 1, 14, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) (when a statute includes elaborate enforcement provisions, it cannot be assumed that Congress authorized by implication additional judicial remedies for private citizens).

**\*465** The insurance industry is heavily and comprehensively regulated by both federal and state law. Most sections of the Texas Insurance Code are expressly enforced by the Texas Attorney General or the Texas Department of Insurance. Moreover, where the legislature has intended to provide a private right of action under the insurance code, it has made a clear expression of that intent. *See, e.g.*, Ins. Code § 541.151.[5] By law, federal and state regulators must certify Molina's HIX plans before they can be offered to consumers. 45 C.F.R. § 155.1000; Ins. Code § 843.071. Federal regulators have the authority to remove Molina's HIX plans from the healthcare exchanges for non-compliance with federal law. 45 C.F.R. § 155.1010(a)(2). At the state level, the legislature has delegated enforcement powers over HMOs to the Texas Department of Insurance. *See* Ins. Code § 843.461.

The Texas Department of Insurance, in turn, requires HMOs, such as Molina, to maintain dispute resolution processes and expressly permits dissatisfied persons to make complaints directly to the department, including for violations of section 1271.155. *Id.* §§ 843.251–.261, 843.282. In fact, the commissioner of insurance may

suspend or revoke a certificate of authority issued to an HMO, impose sanctions, issue a cease and desist order, or impose administrative penalties. *Id.* §§ 82.051, 843.082, 843.461(a). In addition, the legislature has empowered the commissioner to direct the holder of a permit, license, certificate of authority, certificate of registration, or other authorization issued or existing under the commissioner's authority or the insurance code to make complete restitution to each Texas resident, each Texas insured, and each entity operating in this state that is harmed by a violation of, or failure to comply with, the Texas Insurance Code or a rule of the commissioner. *Id.* §§ 82.052, 82.053(a). The commissioner is empowered to adopt rules necessary to implement the provisions governing HMOs and to meet the minimum requirements of federal law, including regulations. *Id.* § 1271.004(d). Accordingly, the Texas Insurance Code provides a distinct and comprehensive enforcement mechanism, but it is not directed to the courts. Accordingly, we presume the legislature did not intend for a private right of action to be included.

Moreover, Physicians' claim that section 1271.155 impliedly authorizes a private cause of action because it mandates payment to an identifiable group and attempt to analogize the emergency care statutes to the Texas Constitution's prohibition on takings without just compensation are unavailing. The Texas Supreme Court has noted the Texas Constitution provides a party whose property has been taken by the government with "a textual entitlement to compensation." *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 149 (Tex. 1995). As the *Bouillion* opinion makes clear, however, the Takings Clause creates a limited right to relief because it requires the State to pay just compensation—but the court explicitly cautioned the "limited context" of the Takings Clause and stated that its holding "cannot be interpreted beyond its context." *Id.* Accordingly, Physicians' reliance on the existence of a right of action under the constitution's takings clause for **466** the proposition that a private right of action can be implied where a statute is enacted to benefit a particular group of persons is misplaced. *Coll v. Abaco Operating LLC*, No. 2:08-CV-345-TJW, 2011 WL 1831748, at *4 (E.D. Tex. May 12, 2011).

Physicians' reliance on *Merkle v. Health Options, Inc.*, 940 So. 2d 1190 (Fla. Dist. Ct. App. 2006), an intermediate appellate opinion interpreting Florida's emergency care statute, is unpersuasive. In reaching the conclusion that an implied private right of action existed under the Florida statute, the *Merkle* court cited the rule articulated by the Florida Supreme Court "that 'because the legislature enacted a statute that clearly imposes a

duty and because the intent of the section is to preclude retaliatory discharge, the statute confers by implication every particular power necessary to insure the performance of that duty.' " *Id.* at 1196 (quoting *Smith v. Piezo Tech. & Prof'l Adm'rs*, 427 So. 2d 182, 184 (Fla. 1983)). Thus, *Merkle* adheres to the "necessary implication test," which the Texas Supreme Court explicitly rejected in *Brown*. *Brown*, 156 S.W.3d at 567. Texas now applies a far stricter rule of construction in determining whether a private right of action exists: "[A] right of enforcement should not be implied simply because the statute 'fails to adequately protect intended beneficiaries.' " *Witkowski*, 181 S.W.3d at 831 (quoting *Brown*, 156 S.W.3d at 567). The fact that a person claims to have suffered harm from the violation of a statute does not automatically give rise to a private cause of action. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 688, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

In addition, Physicians' reliance on *Brown v. De La Cruz* and *Davis v. Hendrick Autoguard, Inc.* to support their implied enforcement right argument is unfounded because in each of those cases the statutory provision Physicians rely upon stated the seller or provider is *liable* to the purchaser or contracting party. *Brown*, 156 S.W.3d at 561 (property code provision which directs that "a seller is 'liable to the purchaser for ... liquidated damages' ... clearly provides a private cause of action for purchasers"); *Davis v. Hendrick Autoguard, Inc.*, 294 S.W.3d 835, 837–39 (Tex. App.—Dallas 2009, no pet.) (statutory provision which dictated that if a "provider does not pay the refund or credit the service contract holder's account ..., the provider is liable to the service contract holder" reflected legislative intent to imply a private right of action).

Moreover, the cases squarely addressing the issue, while not binding on this Court, applied *Brown* and properly analyzed the Texas authorities in concluding that there is no private right of action under the Texas emergency care statutes[6] because those provisions "do not clearly express a legislative intent to create such a right." *Angelina*, 2020 WL 7259222, at *6; *Apollo MedFlight*, 2019 WL 4894263, at *2–3.

In addition, section 1271.155's legislative history confirms the statute was intended to function as part of a broader regulatory scheme and, as it existed through 2019, was not intended to create a private cause of action. *See Brown*, 156 S.W.3d at 568 ("legislative history may sometimes provide insight as to legislative intent"). What is now section 1271.155(a) first appeared as an amendment to the Texas Administrative Code on November 24, 1995. 28 Tex. Admin. Code § 11.204. That

regulation governed the certificate of authority to operate as an HMO and listed the items an **\*467** HMO must include in an application for a certificate, and subsection (20) included the same "usual and customary rate" language at issue here. *Id.*[7] In 1997, the legislature passed Senate Bill 385 and codified this rule as section 20A.04 of the Texas Insurance Code. *See* 75th Leg., R.S., ch. 1026 (S.B. 385). In 2001, the Texas House of Representatives passed House Bill 2811, which codified the Texas Insurance Code and moved the relevant language from section 20A.04 to section 20A.9Y. *See* 77th Leg., R.S., ch. 1419 (H.B. 2811). House Bill 2811 retained the payment language but moved the certificate of authority reference to another section of the code. That move was intended to be "nonsubstantive." *See id.* In 2003, the Texas House of Representatives passed House Bill 2922, which recodified the Texas Insurance Code and moved section 20A.9Y to section 1271.155(a). *See* 78th Leg., R.S., ch. 1274 (H.B. 2922). This amendment was also "nonsubstantive." *See id.*

In 2019, the legislature adopted amendments to the Texas Insurance Code, to be effective prospectively. *See* Acts 2019, 86th Leg., ch. 1342 (S.B. 1264). Among other things, Senate Bill 1264 amended section 1271.155 to add subsection (f), which for the first time required HMOs to pay non-network providers "directly," and subsection (g), which substantially limits the right of non-network providers to bill patients for the difference between the billed amount and the paid amount. The bill also included a detailed dispute resolution process in chapter 1467 of the insurance code.

As we read Physicians' brief, they appear to present a claim arising only in connection with payments sought prior to the effective date of the 2019 amendments. Nevertheless, the amendments appear to offer little support to the contention that the legislature intended to create a general private cause of action. On the contrary, the legislature directed the parties away from the court to an administrative arbitrator who would appear to function in lieu of the Texas Department of Insurance itself. Ins. Code § 1467.083. Unlike traditional arbitration in lieu of plenary judicial proceedings, the parties to this administrative proceeding are not directed to participate by their own consent, a feature indispensable to arbitration under either the Texas or federal arbitration acts,[8] but by legislative decree with the arbitrator empowered to act in the place of the Texas Department of Insurance and pursuant to the mandatory administrative process we have outlined above. More notably, when the arbitration is concluded, the parties may come to court, not for confirmation or vacatur pursuant to the general arbitration acts, but for the familiar "substantial evidence"

review that would follow from an administrative appeal from the decision of an administrative agency under the Administrative Procedure and Texas Register Act—or, in this case, the Texas Department of Insurance. *See* Tex. Gov't Code § 2001.175.

As Senate Bill 1264 does not apply retroactively to any claim preceding its enactment and does not clearly create the plenary judicial proceeding Physicians urge, it is much like the amendment to the property code in *Brown*, which the Texas Supreme Court determined did not clarify **\*468** the legislature's prior intent; rather, it simply reaffirmed that the statute had not allowed for a private right of action. *See Brown,* 156 S.W.3d at 565.

Considering the text of section 1271.155, the legal standard applicable to legislative intent to create private rights of action, and the legislative history of section 1271.155, we conclude the version of section 1271.155 applicable to this case does not create a private right of action in favor of non-network physicians or providers. Accordingly, the trial court did not err in dismissing Physicians' section 1271.155 claim. We overrule Physicians' first issue.

## III. Violations of the Unfair Settlement Practices and Prompt Payment Statutes

In their second issue, Physicians contend the trial court erred in dismissing their claims under the unfair settlement practices statute (specifically, sections 541.060 and 541.151 of the Texas Insurance Code) and the prompt payment statute (chapter 843 of the Texas Insurance Code) because they are within the class of persons expressly authorized to bring claims under the statutes.

### A. Unfair Settlement Practices

Physicians assert they have standing to bring an unfair settlement practices claim both independently and as assignees of the Molina enrollees' benefits. Molina counters that Physicians do not have standing to bring the claim because they lack any direct basis for their own standing and any claim the Molina enrollees may have under chapter 541 is unassignable under Texas law. We agree with Molina.

In bringing their unfair settlement practices claim, Physicians rely on the express provision for a private

cause of action under section 541.151 and claim Molina's violation of section 1271.155 constitutes a violation of section 541.060 (a)(2), allowing for redress under section 541.151. Section 541.151 provides:

a person who sustains damages may bring an action against another person for those damages caused by the other person engaging in an act or practice (1) defined by Subchapter B to be an unfair method of competition or an unfair or deceptive act or practice in the business of insurance; or (2) specifically enumerated in Section 17.46(b), Business & Commerce Code, as an unlawful deceptive trade practice if the person bringing the action shows that the person relied on the act or practice to the person's detriment.

Ins. Code § 541.151. Subchapter B provides, in part:

it is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to engage in the following unfair settlement practices with respect to *a claim by an insured or beneficiary ...* failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of: (A) a claim with respect to which the insurer's liability has become reasonably clear.

*Id.* § 541.060(a)(2)(A) (emphasis added).

As an initial matter, Physicians are not insureds or beneficiaries to which the unfair settlement practices statute applies. *See id.* § 541.151. In addition, Physicians' asserted independent unfair settlement practices claim is premised on a violation of section 1271.155, which we have already concluded to be jurisdictionally unsupported.

As to Physicians' assertion they are entitled to maintain an unfair settlement practices claim as assignees of Molina enrollees' benefits, that assertion fails because the overwhelming weight of persuasive authority **\*469** holds that claims under chapter 541 of the Texas Insurance Code may not be assigned. *Angelina*, 2020 WL 7259222, at \*7; *Gilmour v. Blue Cross and Blue Shield of Ala.*, No. 4:19-CV-160, 2020 WL 2813197, at \*8 (E.D. Tex. May 29, 2020). Although the Texas Supreme Court has not directly addressed the issue, it has held that Texas Deceptive Trade Practices Act claims are unassignable because such claims are fundamentally personal and punitive. *PPG Indus., Inc. v. JMB/Houst. Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 87 (Tex. 2004). Drawing on *PPG Industries*, several federal courts have held that claims under chapter 541 of the Texas Insurance Code are also personal and punitive and likewise are unassignable. *See, e.g., Berkley Reg'l Ins. Co. v. Phila. Indem. Ins. Co.*, No. A-10-CA-362, 2011 WL 9879170, at \*8–9 (W.D. Tex. Apr. 27, 2011) (collecting cases), *rev'd on other*

*grounds*, 690 F.3d 342 (5th Cir. 2012); *see also Montoya v. State Farm Mut. Auto. Ins. Co.*, No. 16-00005(RCL), 2016 WL 5942327, at \*6 (W.D. Tex. Oct. 12, 2016). Several Texas intermediate courts of appeals, including this Court, have concluded Chapter 541 provides remedies that are personal and punitive in nature. *See Goin v. Crump*, No. 05-18-00307-CV, 2020 WL 90919, at \*15 (Tex. App.—Dallas Jan. 8, 2020, no pet.) (mem. op.) (concluding trial court erred in ordering the turnover of Chapter 541 claims to receiver); *Lee v. Rogers Agency*, 517 S.W.3d 137, 146 n.3 (Tex. App.—Texarkana 2016, pet. denied) (noting insurance code claims are not assignable for the reasons discussed in *PPG*). Therefore, Physicians lack standing as assignees to bring a claim against Molina for unfair settlement practices.

**B. Prompt Payment**

Physicians' assertion the trial court erred in dismissing their prompt payment statute claim is likewise unavailing. While section 843.351 of the Texas Insurance Code requires prompt payment of claims when a non-network provider renders medical care related to an emergency or its attendant episode of care as required by state or federal law, the penalties under the prompt payment statute are not available to out-of-network physicians. Ins. Code §§ 843.342; 843.351, 1301.069. Section 843.342 provides for penalties based on the billed charges, as submitted on the claim, and the contracted rate. *Id.* § 843.342. The penalty structure depends, for its calculation, on the contracted right of reimbursement to the provider. The legislature could have specified the manner for calculating a penalty for non-network providers who do not have a contracted rate but it failed to do so. Because out-of-network physicians and providers do not have contracted rates, there is no basis for the statutory penalties. *See Emerus Hosp. v. Health Care Serv. Corp.*, No. 1:13-cv-8906, 2020 WL 1675665, at \*3 (N.D. Ill. Apr. 6, 2020); *see also* Tex. Att'y Gen. Op. No. KP-0250, at 6 (2019) (concluding out-of-network physicians do not have a right to penalties under the prompt payment statute).[9]

Physicians' claim under the prompt payment statute is also predicated on the viability of their claim under section 1271.155, which, as noted above, fails. Accordingly, we conclude Physicians cannot seek penalties **\*470** under the prompt payment statute and thus the trial court did not err in dismissing Physicians' claim against Molina for violation of the prompt payment statute.

We overrule Physicians' second issue.

## IV. Quantum Meruit and Declaratory Judgment

In their third issue, Physicians claim principles of quantum meruit and declaratory judgment afford them alternative means to redress Molina's alleged underpayment for services.

### A. Quantum Meruit[10]

Physicians' equitable claim of quantum meruit seeks to enforce the same payment obligations they cannot enforce under the emergency care statute. Accordingly, the claim fails because the judiciary is precluded from creating a claim in equity that merely repackages a statutory claim the legislature declined to create. *See Davis*, 294 S.W.3d at 840 ("[P]laintiff attempts to achieve indirectly what he cannot do directly under the statute."). In addition, a comprehensive regulatory scheme has been enacted to regulate plans created under the Affordable Care Act, signaling a pre-emption of state law claims. *See, e.g., English v. GE Co.*, 496 U.S. 72, 78, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990) (in absence of explicit statutory language, state law is pre-empted where it regulated conduct in a field that Congress intended the Federal Government to occupy exclusively).

Moreover, the trial court properly dismissed Physicians' quantum meruit claim because, contrary to Physicians' assertion, the facts alleged in Physicians' petition do not establish they rendered valuable services to Molina. Merely stating the services Physicians provided were for Molina's benefit would be insufficient to state a quantum meruit claim. *See Wooley v. Schaffer*, 447 S.W.3d 71, 76 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (it is not enough that plaintiff recite certain talismanic words in their pleading because allegations that are mere conclusions are entitled to no deference). The non-conclusory facts alleged—those entitled to deference—reflect that the benefits at issue are healthcare services provided to the insured patients, not Molina. Where, as here, a plaintiff renders services to an insured, courts applying Texas law have held the plaintiff does not have a quantum meruit claim against the insurer because any services rendered only indirectly benefit the insurer, if they benefit the insurer at all. *See Angelina*, 2020 WL 7259222, at *3 (services rendered to an insured are not directed to or for the benefit of the insurer); *Fisher v. Blue Cross & Blue Shield of Tex., Inc.*, No. 3:10-CV-2652-L,

2015 WL 5603711, at *13 (N.D. Tex. Sept. 23, 2015) (holding doctors who rendered medical services to insured patients had no quantum meruit claim against patients' insurer because "any possible benefit conferred on [insurer] was too attenuated and indirect"); *Tex. Spine & Joint Hosp., Ltd. v. Blue Cross & Blue Shield of Tex.*, No. 6:14-cv-952-JDL, 2015 WL 13649419, at *7 (E.D. Tex. May 28, 2015) (dismissing quantum meruit claim against insurer for medical services rendered to insureds); **\*471** *Encompass Office Sols., Inc. v. Ingenix, Inc.*, 775 F. Supp. 2d 938, 966 n.11 (E.D. Tex. 2011) ("It is counterintuitive to say that services provided to an insured are also provided to its insurer. The insurance company derives no benefit from those services; indeed, what the insurer gets is a ripened obligation to pay money to the insured—which hardly can be called a benefit." (quoting *Travelers Indem. of Conn. v. Losco Grp.*, 150 F. Supp. 2d 556, 563 (S.D.N.Y. 2001)).

In this case, the services for which Physicians seek additional compensation were provided for the benefit of and accepted by Molina's insureds, not Molina. If Molina received any benefit, it was too indirect and attenuated to support a quantum meruit claim operating in parallel to but outside of the legislature's regulatory scheme. *See Encompass Office Sols.*, 775 F. Supp. 2d at 966 & n.11. Because Physicians cannot rebrand their defunct section 1271.155 claim as a quantum meruit claim and cannot aver that valuable services were rendered to and accepted by Molina, the trial court did not err in dismissing Physicians' quantum meruit claim.

### B. Declaratory Judgment

Under the Texas Uniform Declaratory Judgments Act ("the Act"), a person whose rights, status, or other legal relations are affected by a statute may have determined any question of construction or validity arising under the statute and obtain a declaration of rights, status or other legal relations thereunder. Tex. Civ. Prac. & Rem. Code § 37.004(a). The Act is not a grant of jurisdiction, but merely a procedural device for deciding cases already within a court's jurisdiction. *Chenault v. Phillips*, 914 S.W.2d 140, 141 (Tex. 1996) (quoting *State v. Morales*, 869 S.W.2d 941, 947 (Tex. 1994)).

"A declaratory judgment is appropriate only if a justiciable controversy exists as to the rights and status of the parties and the controversy will be resolved by the declaration sought." *Bonham State Bank*, 907 S.W.2d at 467 (citing *Tex. Ass'n of Bus.*, 852 S.W.2d at 446). The Act gives the court no power to pass upon hypothetical or

contingent situations, or determine questions not then essential to the decision of an actual controversy. *Firemen's Ins. Co. of Newark, N.J. v. Burch*, 442 S.W.2d 331, 333 (Tex. 1968), *superseded by constitutional amendment on other grounds as stated in Farmers Tex. Cty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81 (Tex. 1997). Thus, a declaratory judgment action cannot resolve issues not yet mature and subject to change. *See Lane v. Baxter Healthcare Corp.*, 905 S.W.2d 39, 41–42 (Tex. App.—Houston [1st Dist.] 1995, no writ).

Here, Physicians seek a declaratory judgment as to the rate Molina should pay under section 1271.155(a) for services provided to Molina's insureds in the future. Because Physicians lack standing to enforce section 1271.155(a) directly, they likewise lack standing to assert that claim indirectly under the Declaratory Judgments Act. *See Reid v. Aransas Cty.*, 805 F. Supp. 2d 322, 339 (S.D. Tex. 2011) ("[A] plaintiff cannot use the Declaratory Judgments Act to create a private right of action where none exists.").

In addition, Physicians seek a declaration concerning claims for payment for medical services that have not yet been performed. The adjudication of hypothetical future claims, with unknown patients and unknown medical procedures, does not present a real controversy. The controversy is not ripe for consideration. *Burch*, 442 S.W.2d at 333.

Moreover, future disputes concerning the "usual and customary rates" will be subject to the dispute resolution process **\*472** set forth in chapter 1467 of the insurance code, and a judicial declaration concerning same in advance of a party's employment of that process would contravene the legislative mandate that a court's review of an arbitrator's decision is to determine whether it is supported by substantial evidence.

Because the Declaratory Judgments Act neither creates jurisdiction nor permits the rendition of advisory opinions, the trial court properly dismissed Physicians' claim for declaratory relief.

We overrule Physicians' third issue.

**Conclusion**

We affirm the trial court's order granting Molina's Plea to the Jurisdiction.

**All Citations**

620 S.W.3d 458

Footnotes

1    HIX plans are created under the federal Affordable Care Act ("ACA"), are offered primarily for low income individuals, and are sold through the federal government's exchange. Molina's HIX plans must be approved as HMOs by the Texas Department of Insurance and separately approved as Qualified Health Plans by the Centers for Medicare and Medicaid Services. *See* Tex. Ins. Code § 843.071; 45 C.F.R. § 155.1010. The ACA strives to provide affordable insurance for underserved citizens.

2    If a non-network physician or provider is to be compensated based on usual and customary charges, then the methodology must be based on generally accepted industry standards and practices for determining the customary billed charge for a service, and fairly and accurately reflect market rates, including geographic differences in costs. 28 Tex. Admin. Code § 11.1161(f)(1).

3    As noted below, the legislature also included a comprehensive regulatory compliance regime by which claims, direct and otherwise, might be resolved.

4    Physicians' references to principles of statutory construction ignore the relevant legal standard applicable to inquiries into private rights of action. Because grants of private rights of action implicate the separation of powers, the rules are applied strictly in that context.

5    Section 541.151 provides "a person who sustains damages may bring an action against another person for those damages caused by

**Texas Medicine Resources, LLP v. Molina Healthcare of..., 620 S.W.3d 458 (2021)**

the other person engaging in an act or practice (1) defined by Subchapter B to be an unfair method of competition or an unfair or deceptive act or practice in the business of insurance; or (2) specifically enumerated in Section 17.46(b), Business & Commerce Code, as an unlawful deceptive trade practice if the person bringing the action shows that the person relied on the act or practice to the person's detriment." Ins. Code § 541.151.

6    Texas Insurance Code sections 1271.155 (HMO plans), 1301.0053 (EPO plans), and 1301.155 (PPO plans) are collectively referred to as the emergency care statutes. *Apollo MedFlight*, 2019 WL 4894263, at *1. Only section 1271.155 is implicated here.

7    More particularly, subsection 20 provided, in part, for "documentation demonstrating that the HMO will pay for emergency care services performed by non-network physicians or providers at the negotiated or usual and customary rate...."

8    *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) ("arbitration is 'a matter of consent, not coercion' "); *In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185, 192 (Tex. 2007) (orig. Proceeding) (same).

9    The legislature explicitly requested an attorney general opinion on the issue of penalties under the prompt payment statute. Thus, the "usual deference paid to formal opinions of state attorney generals is accentuated," *Kneeland v. Nat'l Collegiate Athletic Ass'n*, 850 F.2d 224, 228 (5th Cir. 1988), and Texas courts generally accord great weight to such opinions. *See Plainview Indep. Sch. Dist. v. Edmonson Wheat Growers, Inc.*, 681 S.W.2d 299, 302 (Tex. App.—Amarillo 1984, writ ref'd n.r.e.).

10   Quantum meruit is an equitable remedy based on an implied promise to pay for benefits received. *See Vortt Expl. Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990). To recover on a claim of quantum meruit a plaintiff must show (1) he rendered valuable services, (2) for the defendant, (3) the defendant accepted his services, and (4) he rendered the services under circumstances that would reasonably notify the defendant he expected to be paid. *Smith v. Deneve*, 285 S.W.3d 904, 915 (Tex. App.—Dallas 2009, no pet.).

---

**End of Document**                                            © 2023 Thomson Reuters. No claim to original U.S. Government Works.

659 S.W.3d 424
Supreme Court of Texas.

TEXAS MEDICINE RESOURCES, LLP;
Texas Physician Resources, LLP; and
Pediatric Emergency Medicine Group,
LLP, Petitioners,
v.
MOLINA HEALTHCARE OF TEXAS,
INC., Respondent
UnitedHealthcare Insurance Company;
UnitedHealthcare of Texas, Inc.,
Appellants,
v.
ACS Primary Care Physicians Southwest,
P.A.; Hill County Emergency Medical
Associates, P.A.; Longhorn Emergency
Medical Associates, P.A.; Central Texas
Emergency Associates, P.A.; Emergency
Associates of Central Texas, P.A.;
Emergency Services of Texas, P.A.,
Appellees

No. 21-0291, No. 22-0138
|
Argued September 20, 2022
|
OPINION DELIVERED: January 13, 2023

**Synopsis**
**Background:** Out-of-network physicians and practice groups brought actions against health insurers to recover for failure to reimburse for emergency care at "usual and customary" rate and sought recovery under equitable theory of quantum meruit. In one case physicians and groups also alleged unfair settlement practices and sought declaration that the jury's finding on the usual and customary rate would be the rate insurer was to pay physicians in future. Insurers removed cases. The United States District Court for the Northern District of Texas, Sam R. Cummings, Senior District Judge, 356 F.Supp.3d 612, remanded to state court. The 160th District Court, Dallas County, granted insurer's plea to the jurisdiction. Physicians appealed. The Dallas Court of Appeals, Schenck, J., 620 S.W.3d 458, affirmed. Physicians' petition for review was granted. In other case, the United States District Court for the Southern District of Texas,

Andrew S. Hanen, J., 514 F.Supp.3d 927, dismissed action. Practice groups appealed. The Court of Appeals, King, Circuit Judge, 26 F.4th 716, certified question.

**Holdings:** The Supreme Court, Hecht, C.J., held that:

Emergency Care Statutes did not authorize private action;

physicians could not satisfy element of quantum meruit claim requiring benefit to insurers;

physicians had no claim against insurers for unfair settlement practices;

unfair settlement practices claims were not assignable; and

plea to jurisdiction was improper.

Affirmed, and question answered.

**Procedural Posture(s):** Certified Question; Petition for Discretionary Review; On Appeal; Interlocutory Appeal; Plea to the Jurisdiction; Motion for Declaratory Judgment; Motion to Dismiss for Failure to State a Claim.

**\*426** On Petition for Review from the Court of Appeals for the Fifth District of Texas

On Certified Question from the United States Court of Appeals for the Fifth Circuit

**Attorneys and Law Firms**

Nolan C. Knight, Jennifer Ecklund, Dallas, Mark R. Trachtenberg, Houston, Alicia Pitts, Christopher Knight, Nina Cortell, Andrew Christian Cookingham, Dallas, for Petitioners.

Jonathan Herman, Razvan Ungureanu, Joshua S. Smith, David M. Gunn, Houston, Michelle Stratton, for Respondent.

**Opinion**

Chief Justice Hecht delivered the opinion of the Court.

**\*427** Three sections of the Texas Insurance Code we refer to as the Emergency Care Statutes require a health-insurance company to pay a non-network physician

for emergency care rendered to the company's insureds "at the usual and customary rate".[1] Recent amendments to Chapter 1467 of the Code provide a mandatory arbitration process for resolving payment disputes accruing on or after January 1, 2020.[2] Two cases before us present the question whether the Code authorizes a private cause of action by a physician against an insurer for payment of claims that accrued prior to 2020. The answer is no. We also hold that the physician–plaintiffs' claims for recovery in quantum meruit and for unfair settlement practices[3] fail as a matter of law.

In No. 21-0291, *Texas Medicine Resources, LLP v. Molina Healthcare of Texas, Inc.*, we affirm the judgment of the court of appeals. In No. 22-0138, *UnitedHealthcare Insurance Co. v. ACS Primary Care Physicians Southwest, P.A.*, we answer the certified question no.

# I

Unlike other medical specialists, emergency-medicine doctors are required by law and ethics to provide emergency care to any patient regardless of the patient's insurance status or ability to pay. In each of the cases before us, groups of emergency-medicine doctors outside an insurer's provider network sued the insurer, alleging that it did not pay them at the usual and customary rates for treating its insureds.[4]

## A

Section 1271.155(a) of the Insurance Code states that "[a] health maintenance organization shall pay for emergency care performed by non-network physicians or providers at the usual and customary rate or at an agreed rate."[5] Subsection (e) provides that an HMO "shall comply" with (a) "regardless of whether the physician or provider furnishing the emergency care has a contractual or other arrangement" with the insurer.[6] Other sections of the Code address the same directive to insurers that offer exclusive provider benefit plans, or EPOs,[7] and to those that offer preferred provider benefit plans, or PPOs.[8] **\*428** In the underlying lawsuits, the Doctors allege that the defendants underpaid them for emergency care provided to thousands of the defendants' insureds and assert claims for damages under the Emergency Care Statutes. All claims asserted by the Doctors are for care provided before January 1, 2020.

## B

Enacted in 2009, Chapter 1467 of the Insurance Code is titled Out-of-Network Claim Dispute Resolution.[9] But for the first ten years of its existence, the chapter's scope was quite limited. The only dispute-resolution process set forth in it was a mediation for balance-billing disputes between an individual enrolled in one of a few enumerated types of plans and the out-of-network provider that billed the individual.[10] The original version of Chapter 1467 did not address disputes between providers and insurers at all.

Yet from the beginning, Chapter 1467 has included a standard remedies-not-exclusive provision in Section 1467.004. The original language is still in effect:

> ### § 1467.004. Remedies Not Exclusive
> The remedies provided by this chapter are in addition to any other defense, remedy, or procedure provided by law, including the common law.[11]

In 2019, the Legislature added Subchapter B-1, which includes a mandatory binding arbitration process for disputes between an insurer and an out-of-network emergency-care physician over the amount the insurer must pay the physician for care rendered to an individual enrolled in the insurer's plan.[12] These new provisions:
> • explain how the provider or insurance company requests arbitration[13] and how the arbitrator will be selected;[14]
> • limit the scope of arbitration to "the reasonable amount" owed the provider for the services rendered;[15]
> • list ten categories of technical information that the arbitrator must consider in calculating the reasonable payment amount;[16]
>
> • provide for procedures;[17] and
> • authorize a suit for judicial review in which the arbitrator's decision is reviewed by the court without a jury under the substantial evidence standard.[18]

New Section 1467.085(a) reinforces the mandatory nature of the arbitration process by clarifying that notwithstanding the remedies-not-exclusive provision in Section 1467.004, an out-of-network provider cannot file suit until the arbitration is completed:

> ### § 1467.085 Effect of Arbitration and Applicability of Other Law
> (a)   Notwithstanding Section 1467.004, an out-of-network provider or **\*429** health benefit plan

issuer or administrator may not file suit for an out-of-network claim subject to this chapter until the conclusion of the arbitration on the issue of the amount to be paid in the out-of-network claim dispute.[19]

The arbitration process applies only to healthcare services rendered on or after January 1, 2020.[20] All parties agree that it does not apply to the Doctors' claims here because the claims are for services rendered before January 1, 2020. They also agree that the new arbitration process would apply to the Doctors' claims if they were for services rendered on or after that date.

## C

The two cases before us arrived by different paths.

### 1

In *Molina*, the Doctors[21] sued Molina Healthcare of Texas, Inc., an HMO, in state district court. The Doctors allege that they provided emergency care to more than 3,800 of Molina's insureds between January 1, 2017, and the end of 2019 and that "on average, Molina has reimbursed less than 15% of [the Doctors'] usual and customary charges." The Doctors allege two sets of claims under the Insurance Code: (1) claims under Sections 1271.155 and 1301.0053, for failing to pay the Doctors' usual and customary rates; and (2) claims under Section 541.060, for engaging in unfair settlement practices.[22] They also allege a common law claim for quantum meruit. They seek damages, including statutory penalties, and "a declaration that the rate that the jury determines to be the usual and customary rate for the past healthcare claims asserted ... [will be] the usual and customary rate that Molina [will be] required to pay" to the Doctors for emergency care rendered in the future.

Molina removed the case to federal court, but it was remanded. Molina then filed a plea to the jurisdiction. Though Molina phrased its arguments in terms of standing and justiciability, the thrust of its plea was that the Emergency Care Statutes do not create a private right of action and that the Doctors' other claims also fail as a matter of law. After a hearing, the trial court granted the plea and dismissed all the Doctors' claims. The court of appeals affirmed.[23]

### 2

In *UnitedHealthcare*, the Doctors[24] sued UnitedHealthcare Insurance Company, which provides PPOs and other plans, and UnitedHealthcare of Texas, Inc., an HMO, in state district court initially. They **\*430** assert a claim for thousands of violations of the Emergency Care Statutes arising out of care rendered from January 2016 through the end of 2019. The Doctors in this case also assert a quantum meruit claim and a claim for breach of an implied contract.

UnitedHealthcare removed the case to federal court and then moved for dismissal under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted".[25] The district court granted the motion with respect to the Doctors' implied-contract and quantum meruit claims.[26] With respect to the claims under the Emergency Care Statutes, the court also dismissed the claims under the PPO statute, Section 1301.155(b), because it had determined in earlier proceedings on the Doctors' motion to remand that the PPO claims were completely preempted by ERISA.[27] The court denied the motion with respect to the other Emergency Care Statute claims.[28] The district court then granted UnitedHealthcare's motion for a permissive interlocutory appeal under 28 U.S.C. § 1292(b) of the issues arising under the Emergency Care Statutes.[29]

On the Doctors' motion, the U.S. Court of Appeals for the Fifth Circuit certified the following question to this Court:

> Do §§ 1271.155(a), 1301.0053(a), and 1301.155(b) of the Texas Insurance Code authorize Plaintiff Doctors to bring a private cause of action against UHC for UHC's failure to reimburse Plaintiff Doctors for out-of-network emergency care at a "usual and customary" rate?[30]

No other issue raised in this case is before us.

### 3

We granted Molina's petition for review and accepted the certified question. Because each case presents the same question under the Emergency Care Statutes, and the Doctors are represented by the same counsel in each case, we consolidated the cases for oral argument.

## II

The first and main issue—raised in both cases—is whether the Insurance Code authorizes a private action by an emergency-medicine physician against an insurer for payment of the usual and customary rate for services rendered before 2020 to the insurer's enrollees. Because the Emergency Care Statutes are worded similarly, and no party argues that our answer might be different for one provision than another, our analysis will focus on Section 1271.155. As we have noted, it states that an HMO "shall pay for emergency care performed by non-network physicians or providers at the usual and customary rate." [31] The Doctors argue that when this language is viewed in the context **431** of our caselaw and the 2019 amendments to Chapter 1467, the Code can be fairly read to authorize their claims. We disagree.

### A

Our starting point is *Brown v. De La Cruz*, which provides the controlling legal standard: the existence of a private cause of action must be clearly implied in the statutory text. [32]

### 1

Like this case, *Brown* involved a statute that was amended after the plaintiff's claim accrued. What was then Section 5.102 of the Property Code (now Section 5.079) requires certain sellers of residential real estate to transfer a deed to the buyer within 30 days of purchase. From 1995 to 2000, subsection (b) provided that the seller's failure to comply was "subject to a penalty" of up to $500 a day, but the statute was silent on who was entitled to collect the penalty. [33] In 2001, (b) was amended to provide that a seller who violates (a) "is liable to the purchaser for ... liquidated damages" of $250 a day up to the 90th day and $500 a day after that, plus "reasonable attorney's fees." [34] The Court acknowledged that "[t]he 2001 amendment clearly provide[d] a private cause of action for purchasers." [35] But only the pre-2001 statute was at issue in the case, and the Court concluded that it did *not* authorize a private cause of action. [36]

"When a private cause of action is alleged to derive from a constitutional or statutory provision, our duty is to ascertain the drafters' intent." [37] To do that, we look to "the language of the specific provisions involved" and

determine whether they "clearly impl[y]" a private cause of action. [38] In *Brown*, we said "the answer ... must be found in the language of section 5.102." [39] Further, "[w]ithout some indication in [that section] that [the] penalty belongs to [the buyer]", we did "not believe [that] he ha[d] brought himself *so clearly within the statute's terms* as to justify implying a private cause of action." [40]

Other passages in *Brown* make clear that the bar for implying a private cause of action is high. We noted there that the court of appeals had "felt compelled to imply a private cause of action" because it could not find authority for the Attorney General to enforce Section 5.102, and the court "fear[ed] that otherwise the provision would go unenforced." [41] Indeed, the Office of the Attorney General filed an amicus brief in this Court acknowledging that it had never filed an action for penalties under Section 5.102(b). [42] Nonetheless, we said that "even if future events [were to] prove that section 5.102 is unenforceable by any public official, attorney, or **432** agency, we [did] not believe that alone would justify an implied private cause of action". [43] That is because legislative silence cannot override a lack of clear authorization in the text. "[L]egislative silence ... [can] reflect many things, including ... lack of consensus, oversight, or mistake" and "does not give us the power" to legislate from the bench. [44]

Furthermore, we outright rejected a "rule of necessary implication" that had been adopted by some courts of appeals. [45] Under that rule, "when a legislative enforcement scheme fails to adequately protect intended beneficiaries, the courts must imply a private cause of action to effectuate the statutory purposes." [46] Instead, we expressly approved "a contradictory rule", in which "causes of action may be implied only when a legislative intent to do so appears in the statute as written." [47] That rule, we observed, is consistent with modern federal law. [48] We proclaimed that "[t]o the extent there has been confusion about the Texas rule, we too disapprove of the former [rule of necessary implication] in favor of the latter [textual-mandate rule]." [49]

We closed the opinion by recalling that "[t]he very balance of state governmental power imposed by the framers of the Texas Constitution depends on each branch, and particularly the judiciary, operating within its jurisdictional bounds." [50] "By implying a private cause of action in a statute that did not provide for one," we wrote, "the court of appeals [had] exceeded those bounds." [51]

**2**

Our analysis in *Brown* cited to *City of Beaumont v. Bouillion*.[52] The plaintiffs in *Bouillion* were former police officers who alleged that they were constructively discharged after publicly challenging the qualifications of the new police chief. One issue before us was whether we should recognize an implied cause of action for damages for the violation of the free speech[53] and assembly[54] clauses of the Texas Constitution. We failed to find "any textual basis" for a damages action,[55] especially since the Bill of Rights expressly provides for an equitable action to declare a law void.[56] We also failed to find any **\*433** "historical basis to create the remedy sought" because there was "no authority" indicating "that at the time the Constitution was written, it was intended to provide an implied private right of action for damages for the violation of constitutional rights."[57]

The officers pointed to the takings clause "as evidence that [we had] approved actions for damages arising under the Constitution before."[58] We explained that "[t]heir reliance on that section [was] misplaced" because:

> Section 17 provides that no person's property shall be taken, damaged or destroyed or applied to public use without adequate compensation. The converse of the provision is that if property is taken, the owner is entitled to adequate payment. Section 17 provides a textual entitlement to compensation *in its limited context*.[59]

Later, in *Brown*, we cited *Bouillion* to exemplify our fidelity, when construing statutory or constitutional text, to "ascertain[ing] the drafters' intent" and also for the rule that the Texas Constitution or a statute will be construed to "create[ ] a private action for damages only if the language of the specific provisions involved clearly impl[y] one."[60] To illustrate that rule, we contrasted the language of the takings clause prohibiting takings "without adequate compensation" with the language in Article I, Section 29 declaring that any law in violation of the free speech or assembly clauses "shall be void."[61]

**3**

The Doctors cast aside most of *Brown* by characterizing Section 5.102's "penal nature" as "key to [our] analysis". They urge us to hold that under *Bouillion*, Section 1271.155(a) implies a damages claim because it creates a textual entitlement to compensation. Specifically, the Doctors point out that Section 1271.155(a) "creates a compensation requirement ('shall pay'), identifies who is entitled to compensation ('non-network physicians or providers'), and identifies the measure of compensation

('usual and customary rate')." The rule they propose is that if a statute or constitutional provision does not impose a penalty, then a textual entitlement to compensation is sufficient to create a private damages action. But the analytical framework the Doctors put forward is based on a cherry-picking of language from *Bouillion*. It also ignores our clear statements in *Brown*.

To start, we cautioned in *Bouillion* that the takings clause has limited relevance to the question whether another text implies a private cause of action for damages.[62] In a previous case, we had traced the origin of a government's obligation to compensate its citizens for the taking of property back to "before Magna Carta."[63] In contrast to the rich history of takings jurisprudence, "we [found] no historical basis" for a damages **\*434** action alleging a violation of the free speech and assembly clauses because there was no authority that either clause was interpreted to provide one "at the time the Constitution was written".[64] The takeaway from *Bouillion* should not be our acknowledgment that the takings clause of the Texas Constitution authorizes a damages action. It should be our analytical focus on the drafters' intent.[65] That is precisely why we cited to *Bouillion* in *Brown*.[66]

We never limited our statutory analysis in *Brown* to the context of a penal statute, and we fail to see why such a limitation would make sense. The separation-of-powers concerns we pointed out in *Brown* are just as present here. In *Brown*, we noted the possibility that, but a lack of clarity whether, the Attorney General could file suit under the Deceptive Trade Practices–Consumer Protection Act to collect the penalties provided for in Section 5.102.[67] We also observed that in the context of a statute imposing penalties—which could be civil in nature or criminal in nature or both—"too permissive an implication of [a] private civil action[ ]" could run the risk of our appropriating for the civil courts "jurisdiction the Legislature never intended."[68]

The separation of powers will be implicated any time we are asked to decide whether the Legislature has delegated to the courts the authority to enforce a statutory obligation through a damages action. But this case presents additional reasons we must be careful to stay in our lane.

One is that the Legislature has given the Department of Insurance broad authority to "regulate the business of insurance in this state" and "ensure that [the] code and other laws regarding insurance and insurance companies are executed".[69] In its oral argument exhibits, Molina has pointed to approximately thirty provisions of the Insurance Code that address the Department's powers of regulation and enforcement. Section 843.461(a)

empowers the Department to take enforcement actions against an HMO that include "impos[ing] sanctions" or "administrative penalties" or "suspend[ing] or revok[ing] [its] certificate of authority".[70] Section 843.463 authorizes the Department to initiate "an action in a Travis County district court" to enjoin specific Code violations.[71] The Doctors say that Chapter 843 "omits the HMO emergency-care statute from its specific provision detailing [the Department's] dominion", but that characterization is incompatible with the text. Section 843.461(b) **435 lists Code violations that may prompt an enforcement action under (a); one is an HMO's failure to "compl[y] substantially with ... Chapter 1271".[72] Section 843.463 expressly lists Chapter 1271 among the Code chapters whose violation could result in the Department's filing a civil action.[73]

Our warning in *Brown* about the need for caution when the criminal law could be impacted applies here too.[74] Section 843.464, titled "Criminal Penalty", provides that "[a] person, including an agent or officer of [an HMO], commits an offense if the person ... willfully violates ... Chapter 1271".[75] "An offense under [Section 843.464] is a Class B misdemeanor."[76]

**4**

In sum, *Brown* governs this case. The test it applies is whether the statutory text "clearly implie[s]" a private damages action.[77] Section 1271.155 does not.

**B**

That is not the end of the story, the Doctors say. They argue that language in new Section 1467.085, added to the Code in the 2019 amendments, signals the Legislature's understanding that a private cause of action already existed in the Code for claims under the Emergency Care Statutes arising under the old law. Section 1467.085 states that "[n]*otwithstanding Section 1467.004*, an out-of-network provider or health benefit plan issuer or administrator *may not file suit* for an out-of-network claim subject to this chapter *until the conclusion of the arbitration*".[78] There are two parts to the Doctors' argument: (1) by stating that a provider or insurer "may not file suit ... until the conclusion of the arbitration", Section 1467.085 presupposes that a right to file suit existed before the amendments; and (2) the reference to Section 1467.004 also points to a pre-existing

right to sue.[79] Neither is persuasive.

Before the 2019 amendments, Chapter 1467 did not apply to claims under the Emergency Care Statutes.[80] Section 1467.004 therefore could not have authorized a private cause of action before the amendments took effect. What the Doctors really must demonstrate is that the 86th Legislature retroactively created a private cause of action for claims arising under the old, pre-arbitration law. They cannot do so because we "may not judicially amend a statute [to] add words" that are not there.[81]

The interpretation of Section 1467.085 that the Doctors advance is a stretch at best. They say that the "may not file suit ... until" language reflects a pre-existing right to file a private cause of action, but this argument ignores what kind of suit can be filed under the new law. There will be no damages action tried to a jury. The arbitrator's decision "is binding."[82] A party **436 dissatisfied with the decision has 45 days to file a suit for judicial review, in which "the court [will] determine whether the arbitrator's decision is proper based on a substantial evidence standard of review."[83] Indeed, if Chapter 1467 tells us anything about the 86th Legislature's intent, it is that determining the amount that an out-of-network provider should be paid by an insurer is a technical exercise to be performed by a subject-matter expert—not an issue to be decided by a jury of laymen.[84]

* * * * *

We hold that the Insurance Code does not create a private cause of action for claims under the Emergency Care Statutes.

**III**

In *Molina*, the Doctors challenge the lower courts' dismissal of two additional claims. We affirm on each.

**A**

The first claim is for recovery in quantum meruit. Quantum meruit is an equitable theory[85] "founded in the principle of unjust enrichment."[86] There are four elements:

1. valuable services were rendered or materials furnished;

2. for the defendant;

66 Tex. Sup. Ct. J. 231

3. the services or materials were accepted by the defendant; and
4. the defendant was reasonably notified that the plaintiff performing the services or providing the materials was expecting to be paid.[87]

Regarding the second element, we have emphasized that "[i]t is not enough to show that [the plaintiff's] efforts benefited [the defendant]".[88] Rather, the plaintiff's "efforts must have been undertaken '*for* the person sought to be charged.' "[89]

We agree with the court of appeals that the Doctors cannot satisfy this test.[90] The Doctors claim that by treating Molina's insureds, they directly benefited Molina itself. The argument goes like this: Chapter 843 requires an HMO to "provid[e] or arrang[e] for health care services on a prepaid basis through insurance or otherwise" rather than "indemnify[ ] [its enrollees] for the cost of health care services."[91] Because an HMO is statutorily **\*437** obligated to "provid[e] or arrang[e]" for care, the Doctors fulfilled Molina's core statutory duty by providing emergency medical care to Molina's enrollees. The Doctors cite one federal district court decision that has accepted this reasoning,[92] but we are unpersuaded.

An emergency-room physician does not undertake to provide life-saving treatment *for* an HMO or any other kind of insurance company.[93] As the Doctors emphasize in their briefing on the Emergency Care Statute claims, it is an emergency physician's ethical duty to provide care to a patient regardless of whether the patient is insured at all. At the time the services are rendered, the physicians themselves may not know anything about the patient's insurance status. We thus agree with the reasoning of another federal district court, which recently dismissed an identical claim against a group of insurers:

> Serving a defendant's *customers* is hardly the same as serving the defendant *itself*.... Recovery in quantum meruit cannot be had from an insurer based on services rendered to an insured, because those services aren't directed to *or* for the benefit of the insurer. As our sister district courts have repeatedly pointed out, "a ripened obligation to pay money to the insured ... hardly can be called a benefit."[94]

We hold that the Doctors cannot satisfy the second element of a quantum meruit claim as a matter of law.[95]

**B**

The remaining claim is for unfair settlement practices under Chapter 541 of the Insurance Code. Subchapter B of Chapter 541 contains several provisions that define "unfair methods of competition and unfair or deceptive acts or practices". Among them is Section 541.060(a), which prohibits the practices subsequently listed "*with respect to a claim by an insured or beneficiary*".[96] One listed practice is "failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of ... a claim with respect to which the insurer's liability has become reasonably clear".[97] The Doctors allege that Molina violated Section 541.060(a) by "failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement" of the Doctors' claims under the Emergency Care Statutes. They further allege that Molina did this "knowingly" and is therefore liable for treble damages under Section 541.152(b).[98]

**\*438** As an initial matter, failing to attempt a good-faith settlement is only unfair "with respect to a claim by an insured or beneficiary".[99] And as the court of appeals correctly observed, the Doctors are neither insureds nor beneficiaries.[100] Furthermore, in light of our holding that the Doctors cannot recover the difference between the payment they received and the amount they claim is the usual-and-customary rate by suing under the Emergency Care Statutes directly, it would be odd indeed if they could potentially recover three times that amount by pleading the same claim under Chapter 541.

The Doctors raise two theories to try and salvage this claim, but neither does. First, they point to the language of Section 541.151, which authorizes a "person" to sue for damages caused by an act or practice that is "defined by Subchapter B to be ... unfair".[101] The broad statutory definition of "person" includes "an individual, corporation, association, [or] partnership" and is not limited to an insured or beneficiary.[102] Thus, the Doctors argue, they have "standing" under Section 541.151 to sue for a violation of Section 541.060(a).

In Part IV, we address why the issues raised in this case are not issues of standing, but of merits. That aside, we agree with the Doctors that they are persons within the meaning of Section 541.151, but it does not matter. They still can never prevail on the specific Subchapter B claim they have pleaded because it requires "a claim by an insured or beneficiary".[103]

The Doctors' second theory is that they can maintain a Section 541.060(a) claim as assignees of Molina's insureds because, as part of the patient-intake process, they obtained an assignment of the insured's benefits and claims for benefits against Molina.[104] We start with the observation **\*439** that this theory does not make sense. "[A]n assignee under Texas common law stands in the

shoes of his assignor."[105] The Doctors are not asserting a claim that the insureds could have brought. They are not suing Molina for engaging in unfair settlement practices with respect to claims by Molina's insureds. The Doctors allege that Molina engaged in unfair practices with respect to claims asserted *by them*, and those claims are not actionable under Section 541.060(a).

In any event, we also agree with the court of appeals below and with the other courts that have concluded that "claims under chapter 541 ... may not be assigned."[106] In *PPG Industries, Inc. v. JMB/Houston Centers Partners, Ltd.*, we held that "DTPA claims ... cannot be assigned by an aggrieved consumer to someone else."[107] One reason we gave is that DTPA claims and damages are personal and punitive rather than property-based and remedial.[108] We contrasted a DTPA claim, which entails "a 'personal' aspect in being 'duped' that does not pass to subsequent buyers", with a warranty claim, which is purely property based and can be passed.[109] We also pointed out that "DTPA claims generally are ... punitive" in that they "overlap[ ] [with] many common-law causes of action" but offer more favorable remedies, including treble damages.[110]

The same reasoning applies to the claim for unfair settlement practices under Section 541.060(a). In many cases, the same set of facts could support a breach of contract claim. But this claim is personal to the insured because it is for harm caused by the insurer's behavior and attitude towards the insured: for the insurer's "fail[ure] to attempt in good faith" to settle a claim with respect to which its "liability has become reasonably clear".[111] And it is punitive because if the insured proves that the insurer engaged in that behavior knowingly, then treble damages are authorized.[112] Thus, if the Doctors are somehow asserting a claim that Molina's insureds could have brought themselves, that claim is not assignable under *PPG Industries.*

**IV**

Throughout this litigation, the parties and the lower courts have characterized Molina's challenges to the Doctors' claims as challenges to the Doctors' *standing.*[113] Some of our older opinions use standing as a short-hand reference for a plaintiff's ability to fulfill some statutory prerequisite to bringing suit or recovering on a claim.[114] The phrasing is regrettable and has tangled the line demarcating issues *440 that truly implicate a trial court's subject-matter jurisdiction from those pertaining to the merits.[115] The integrity of that line is fundamental to the

working of the civil justice system because a court without subject-matter jurisdiction cannot decide the case at all.[116]

"A challenge to a party's standing is an attack on the party's ability under the United States and Texas Constitutions to assert a claim."[117] The constitutional requirements of standing are (1) a concrete, particularized, actual or imminent injury; (2) that is traceable to the defendant's conduct; and (3) that would be redressed by a favorable decision.[118] A plea to the jurisdiction is one appropriate vehicle for challenging a plaintiff's ability to meet these constitutional requirements in state court.

But "[a]s we have repeatedly recognized, a plaintiff does not lack standing simply because some other legal principle may prevent it from prevailing on the merits".[119] That is because the "question whether a plaintiff has established his right to go forward with his suit or satisfied the requisites of a particular statute pertains in reality to the right of the plaintiff to relief rather than to the subject-matter jurisdiction of the court to afford it."[120] As the U.S. Supreme Court has put it, "the failure of a cause of action does not automatically produce a failure of jurisdiction,"[121] which is why a party loses *on the merits* when an arguable cause of action ultimately turns out not to exist.

More than two decades ago, we held in *Dubai Petroleum Co. v. Kazi* that whether the plaintiff satisfied statutory prerequisites to maintaining a wrongful-death action arising from conduct that occurred in a foreign territory was an issue of merits, not subject-matter jurisdiction.[122] More recently, in *Pike v. Texas EMC Management, LLC*, "we discouraged the use of the term *standing* to describe extra-constitutional restrictions on the right of a particular plaintiff to bring a particular lawsuit."[123] There, a defendant challenged a damages award against him by arguing that the limited-partnership plaintiff "lack[ed] 'standing' as a limited partner to recover damages individually for an injury *441 suffered by the Partnership."[124] Recalling *Dubai*, we explained that "a plaintiff does not lack standing in its proper, jurisdictional sense 'simply because he cannot prevail on the merits of his claim' ".[125] We then "conclude[d] ... that the authority of a partner to recover for an alleged injury to the value of its interest in the partnership is not a matter of constitutional standing that implicates subject-matter jurisdiction."[126] Since *Pike*, we have also corrected arguments characterizing Sections 2001.038(a) and 2001.174(2) of the Administrative Procedure Act as "statutory standing" provisions.[127]

The issues before this Court are (1) whether the Insurance Code creates a private damages action for claims under the Emergency Care Statutes; (2) whether the Doctors can satisfy the elements of a common-law quantum meruit claim; and (3) whether the Doctors can state a claim for unfair settlement practices under Chapter 541 of the Code. None of these issues implicates constitutional standing. Each is a pure issue of law pertaining to the merits that should have been raised in the trial court by traditional motion for summary judgment[128] or under Rule 91a[129]—not in a plea to the jurisdiction.

Nonetheless, both parties agree that we can render a decision on the merits, which we have done. The title of a pleading or motion does not affect a court's subject-matter jurisdiction to decide the issues raised in it.[130] "We look to the substance of a plea for relief to determine the nature of the pleading, not merely at the form of the title given to it."[131] We have included this discussion to clarify again for the judiciary and the bar that the satisfaction of a statutory or common-law prerequisite to a plaintiff's filing suit or recovering on a claim is not an issue of standing but of merits.

* * * * *

We affirm the court of appeals' judgment in *Molina.* We answer the certified question no in *UnitedHealthcare.*

### All Citations

659 S.W.3d 424, 66 Tex. Sup. Ct. J. 231

### Footnotes

1   Tex. Ins. Code §§ 1271.155(a), 1301.0053(a), 1301.155(b).

2   Act of May 24, 2019, 86th Leg., R.S., ch. 1342, § 2.15, 2019 Tex. Gen. Laws 3940, 3958-3960 (SB 1264) (codified at Tex. Ins. Code §§ 1467.081-1467.089).

3   *See* Tex. Ins. Code § 541.060(a)(2)(A).

4   We refer to the plaintiffs as the Doctors.

5   Tex. Ins. Code § 1271.155(a).

6   *Id.* § 1271.155(e).

7   *See id.* § 1301.0053(a) ("If an out-of-network provider provides emergency care ... to an enrollee in an exclusive provider benefit plan, the issuer of the plan shall reimburse the out-of-network provider at the usual and customary rate or at a rate agreed to by the issuer and the out-of-network provider for the provision of the services and any supply related to those services."); *see also id.* § 1301.001(1) (defining "[e]xclusive provider benefit plan").

8   *See id.* § 1301.155(b) ("If an insured cannot reasonably reach a preferred provider, an insurer shall provide reimbursement for ... emergency care services at the usual and customary rate or at an agreed rate and at the preferred level of benefits ...."); *see also id.* § 1301.001(9) (defining "[p]referred provider benefit plan").

9   Act of May 27, 2009, 81st Leg., R.S., ch. 1290, § 1, 2009 Tex. Gen. Laws 4072, 4072-4078 (HB 2256) (enacting Tex. Ins. Code

ch. 1467).

10      *Compare id.* § 1, 2009 Tex. Gen. Laws at 4072-4073, *with* Act of May 24, 2019, *supra* note 2.

11      *Compare* Act of May 27, 2009, *supra* note 9, 2009 Tex. Gen. Laws at 4073, *with* Tex. Ins. Code § 1467.004 (current version).

12      Act of May 24, 2019, *supra* note 2.

13      Tex. Ins. Code § 1467.084.

14      *Id.* § 1467.086.

15      *Id.* § 1467.083(a).

16      *Id.* § 1467.083(b).

17      *Id.* §§ 1467.087-1467.088.

18      *Id.* § 1467.089(b)-(c).

19      *Id.* § 1467.085(a).

20      Act of May 24, 2019, *supra* note 2, § 5.01, 2019 Tex. Gen. Laws at 3963.

21      The Doctors in *Molina* are Texas Medicine Resources, LLP; Texas Physician Resources, LLP; and Pediatric Emergency Medicine Group, LLP.

22      In *Molina*, the Doctors also brought claims for recovery of "prompt pay" penalties. *See* Tex. Ins. Code § 843.342 (imposing penalties for an HMO's failure to pay a "clean claim" within prescribed periods of time); *see also id.* § 843.336 (defining clean claim). Molina has not appealed the dismissal of those claims to this Court.

23      620 S.W.3d 458 (Tex. App.—Dallas 2021).

24      The Doctors in *UnitedHealthcare* are ACS Primary Care Physicians Southwest, P.A.; Hill County Emergency Medical Associates, P.A.; Longhorn Emergency Medical Associates, P.A.; Central Texas Emergency Associates, P.A.; Emergency Associates of Central Texas, P.A.; and Emergency Services of Texas, P.A.

25      Fed. R. Civ. P. 12(b)(6).

26      *ACS Primary Care Physicians Sw., P.A. v. UnitedHealthcare Ins. Co.*, 514 F. Supp. 3d 927, 934-935, 942 (S.D. Tex. 2021).

27      *Id.* at 931, 942.

28      *Id.* at 939, 942.

29      Under that section, "[w]hen a district judge ... [is] of the opinion that [an] order [not otherwise appealable] involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation," the judge may authorize a permissive interlocutory appeal of the question. 28 U.S.C. § 1292(b). The court of appeals may then, "in its discretion," permit the appeal. *Id.*

30      *ACS Primary Care Physicians Sw., P.A. v. UnitedHealthcare Ins. Co.*, 26 F.4th 716, 720 (5th Cir. 2022).

31      Tex. Ins. Code § 1271.155(a).

32      156 S.W.3d 560, 563 (Tex. 2004).

33      *Id.*

34      *Id.* at 564-565 (quoting Tex. Prop. Code § 5.079(b)).

35      *Id.* at 562.

36      *Id.*

37      *Id.* at 563 (citing *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 77 S.W.3d 253, 260 (Tex. 2002)).

Texas Medicine Resources, LLP v. Molina Healthcare of..., 659 S.W.3d 424 (2023)

66 Tex. Sup. Ct. J. 231

38      *Id.* (citing *City of Beaumont v. Bouillion*, 896 S.W.2d 143, 148-149 (Tex. 1995)).

39      *Id.*

40      *Id.* at 564 (emphasis added).

41      *Id.* at 565-566.

42      *Id.* at 566.

43      *Id.*

44      *Id.*

45      *Id.* at 567 (internal quotation marks omitted).

46      *Id.* & n.40 (collecting cases).

47      *Id.*

48      *See id.* & n.42 (collecting cases).

49      *Id.*; *see also id.* at 566 (cautioning against a statutory approach centered on the statute's underlying purpose, which "will usually be less helpful when the issue is not whether a wrong should be addressed but whether private parties are entitled to do so").

50      *Id.* at 569 (quoting *State v. Morales*, 869 S.W.2d 941, 949 (Tex. 1994)).

51      *Id.*

52      896 S.W.2d 143 (Tex. 1995).

53      "Every person shall be at liberty to speak, write or publish his opinions on any subject ...." Tex. Const. art. I, § 8.

54      "The citizens shall have the right, in a peaceable manner, to assemble together for their common good; and apply to those invested with the powers of government for redress of grievances or other purposes, by petition, address or remonstrance." *Id.* art. I, § 27.

55    *Bouillion*, 896 S.W.2d at 149.

56    See *id.* at 148-149 (discussing Tex. Const. art. I, § 29 ("[W]e declare that every thing in this 'Bill of Rights' is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void.")).

57    *Id.* at 148.

58    *Id.* at 149.

59    *Id.* (emphasis added) (citation omitted).

60    *Brown*, 156 S.W.3d at 563 (citing *Bouillion*, 896 S.W.2d at 148-149).

61    *Id.*

62    See *Bouillion*, 896 S.W.2d at 149 ("The text of section 17 waives immunity only when one seeks adequate compensation for property lost to the State. We are not persuaded that a right to damages for injuries to constitutional interests can be implied solely from a limited explicit entitlement for compensation for the loss of property.").

63    *Steele v. City of Houston*, 603 S.W.2d 786, 789 (Tex. 1980), *discussed in Bouillion*, 896 S.W.2d at 149.

64    *Bouillion*, 896 S.W.2d at 148.

65    See *id.* ("To interpret our Constitution, we give effect to its plain language. We presume the language of the Constitution was carefully selected, and we interpret words as they are generally understood." (citation omitted)); *id.* ("[W]e note that we have been presented no authority, and our research has revealed no authority, that would indicate that at the time the Constitution was written, it was intended to provide an implied private right of action for damages for the violation of constitutional rights."); *id.* ("[T]he text of the Texas Bill of Rights cuts against an implied private right of action for the damages sought because it explicitly announces the consequences of unconstitutional laws.").

66    See *Brown*, 156 S.W.3d at 563 ("When a private cause of action is alleged to derive from a constitutional or statutory provision, our duty is to ascertain the drafters' intent. For example, in *City of Beaumont v. Bouillion* ...." (footnote omitted)).

67    *Id.* at 566.

68    *Id.* at 567.

69    Tex. Ins. Code § 31.002(1), (3).

70    *Id.* § 843.461(a).

71    *Id.* § 843.463.

72    *Id.* § 843.461(b)(10)(B).

73    *Id.* § 843.463.

74    *See Brown,* 156 S.W.3d at 567.

75    Tex. Ins. Code § 843.464(a)(1).

76    *Id.* § 843.464(b).

77    *Brown,* 156 S.W.3d at 563.

78    Tex. Ins. Code § 1467.085(a) (emphases added).

79    In *UnitedHealthcare,* the federal district court agreed with this analysis. *See* 514 F. Supp. 3d at 936-939.

80    *See supra* Part I.B.

81    *Jones v. Liberty Mut. Ins. Co.,* 745 S.W.2d 901, 902 (Tex. 1988).

82    Tex. Ins. Code § 1467.089(a).

83    *Id.* § 1467.089(b)-(c).

84    *See id.* § 1467.086(b) ("[T]he commissioner shall give preference to an arbitrator who is knowledgeable and experienced in applicable principles of contract and insurance law and the health care industry generally."); *id.* § 1467.083(b) (detailing ten categories of information that the arbitrator must take into account before rendering a decision, including "the 80th percentile of all billed charges for the service ... performed by a health care provider in the same or similar specialty" in the same geographical area).

85    *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 732 (Tex. 2018); *Truly v. Austin*, 744 S.W.2d 934, 938 (Tex. 1988).

86    *Bashara v. Baptist Mem'l Hosp. Sys.*, 685 S.W.2d 307, 310 (Tex. 1985).

87    *Hill*, 544 S.W.3d at 732-733.

88    *Bashara*, 685 S.W.2d at 310.

89    *Id.* (quoting *City of Ingleside v. Stewart*, 554 S.W.2d 939, 943 (Tex. Civ. App.—Corpus Christi 1977, writ ref'd n.r.e.)); *see also Truly*, 744 S.W.2d at 937 ("To recover in quantum meruit, the plaintiff must show that his efforts were undertaken *for* the person sought to be charged; it is not enough to merely show that his efforts benefitted the defendant." (citing *Bashara*, 685 S.W.2d at 310)).

90    620 S.W.3d at 470.

91    Tex. Ins. Code § 843.002(12)(B); *see also id.* § 843.002(14).

92    *See El Paso Healthcare Sys., Ltd. v. Molina Healthcare of N.M., Inc.*, 683 F. Supp. 2d 454, 461-462 (W.D. Tex. 2010).

93    *See Bashara*, 685 S.W.2d at 310.

94    *Angelina Emergency Med. Assocs. P.A. v. Health Care Serv. Corp.*, 506 F. Supp. 3d 425, 432 (N.D. Tex. 2020) (footnote omitted) (quoting *Travelers Indem. Co. of Conn. v. Losco Grp., Inc.*, 150 F. Supp. 2d 556, 563 (S.D.N.Y. 2001), and collecting cases).

95    The Doctors point us to the *Restatement (Third) of Restitution and Unjust Enrichment* § 20 cmt. a (2011), which seems to support a claim for restitution under the facts presented here. In this case, we decline to jettison the longstanding requirement of Texas law that the plaintiff's efforts must have been undertaken for the defendant directly. *See Bashara*, 685 S.W.2d at 310 ("It is well settled that '[n]o one can legally claim compensation for ... incidental benefits and advantages to one, flowing to him on account of services rendered to another ....' " (first and second alterations in original) (quoting *Landman v. State*, 97 S.W.2d 264, 265 (Tex.

Civ. App.—El Paso 1936, writ ref'd))).

96    Tex. Ins. Code § 541.060(a) (emphasis added).

97    *Id.* § 541.060(a)(2)(A).

98    *See id.* § 541.152(b) ("Except as provided by Subsection (c), on a finding by the trier of fact that the defendant knowingly committed the act complained of, the trier of fact may award an amount not to exceed three times the amount of actual damages.").

99    *Id.* § 541.060(a).

100    620 S.W.3d at 468.

101    Tex. Ins. Code § 541.151(1). Section 541.151 also authorizes a suit for damages caused by a person's engaging in an act or practice that is an unlawful deceptive trade practice under Section 17.46(b) of the Business and Commerce Code. *Id.* § 541.151(2).

102    " 'Person' means an individual, corporation, association, partnership, reciprocal or interinsurance exchange, Lloyd's plan, fraternal benefit society, or other legal entity engaged in the business of insurance, including an agent, broker, or adjuster." *Id.* § 541.002(2).

103    The Doctors rely on *Crown Life Insurance Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000), but *Casteel* is consistent with our analysis today. We held that Casteel, an insurance agent, was a person under Section 16(a) of Article 21.21—the statutory predecessor to Section 541.151—and that he could maintain a claim under Article 21.21 if he could "meet[ ] the other required elements for a cause of action" in Section 16(a). *Id.* at 385. But we went on to hold that Casteel could not state a cause of action under Article 21.21 for some of the claims because, "by their terms," they "require[d] consumer status." *Id.* at 387.

104    This is common practice. In fact, the Legislature has prohibited insurers from issuing policies that "restrict[ ] a covered person from making a written assignment of benefits to a physician or other health care provider who provides health care services to the person." Tex. Ins. Code § 1204.053(a). Section 1204.053(a) thus protects the ability of a provider who has obtained an assignment of benefits from the patient to bring a breach-of-contract claim against the insurer that the insured could have brought. In an amicus brief to this Court, the Texas Association of Health Plans argues that the existence of Section 1204.053(a) is further proof that, prior to the addition of the arbitration process in the 2019 amendments, the Code did not authorize a damages claim under the Emergency Care Statutes directly or by any other theory. We agree.

105    *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 920 (Tex. 2010) (citing *Jackson v. Thweatt*, 883 S.W.2d 171, 174 (Tex. 1994)).

106    620 S.W.3d at 469 (collecting cases).

Texas Medicine Resources, LLP v. Molina Healthcare of..., 659 S.W.3d 424 (2023)

66 Tex. Sup. Ct. J. 231

107    146 S.W.3d 79, 92 (Tex. 2004).

108    *Id.* at 89; *see also id.* at 92.

109    *Id.* at 89.

110    *Id.*

111    Tex. Ins. Code § 541.060(a)(2)(A).

112    *Id.* § 541.152(b).

113    *See* 620 S.W.3d at 461 ("Physicians assert the trial court erred in dismissing their claims because they have standing to assert same and their complaints present a justiciable controversy.").

114    *See, e.g., Casteel,* 22 S.W.3d 378 (throughout the opinion, incorrectly characterizing as an issue of standing the defendant's argument that Casteel could not bring a claim under the predecessor to Chapter 541 of the Insurance Code because he did not meet the statutory definition of person).

115    *See Pike v. Tex. EMC Mgmt., LLC,* 610 S.W.3d 763, 773 (Tex. 2020) ("[S]tanding 'is a word of many, too many, meanings.' " (quoting *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 90, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998))).

116    *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 443 (Tex. 1993) ("Subject matter jurisdiction is essential to the authority of a court to decide a case."); *see also Dubai Petroleum Co. v. Kazi,* 12 S.W.3d 71, 76 (Tex. 2000) ("[A] judgment will never be considered final if the court lacked subject-matter jurisdiction. 'The classification of a matter as one of subject-matter jurisdiction opens the way to making judgments vulnerable to delayed attack for a variety of irregularities that perhaps better ought to be sealed in a judgment.' " (cleaned up) (quoting Restatement (Second) of Judgments § 12 cmt. b, at 118 (1982))).

117    *Data Foundry, Inc. v. City of Austin,* 620 S.W.3d 692, 700 (Tex. 2021).

118    *Id.* at 696 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

119    *Id.*

120    *Pike,* 610 S.W.3d at 774 (cleaned up) (quoting *Dubai,* 12 S.W.3d at 76-77).

121   *Steel Co.*, 523 U.S. at 91, 118 S.Ct. 1003.

122   12 S.W.3d at 77 ("[S]ection 71.031 [of the Civil Practice and Remedies Code] is not jurisdictional ....").

123   *Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*, 616 S.W.3d 558, 567 (Tex. 2021) (discussing *Pike*, 610 S.W.3d at 774).

124   *Pike*, 610 S.W.3d at 773.

125   *Id.* at 774 (quoting *Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 484-485 (Tex. 2018)).

126   *Id.* at 775; *see also Cooke v. Karlseng*, 615 S.W.3d 911 (Tex. 2021) (reversing the court of appeals' judgment and remanding for the court of appeals to reconsider its holding that the trial court lacked jurisdiction over claims of a limited partner for harm done to the partnership in light of our decision in *Pike*).

127   *See Dyer v. Tex. Comm'n on Env't Quality*, 646 S.W.3d 498, 506 n.36 (Tex. 2022); *Tex. Bd. of Chiropractic Exam'rs*, 616 S.W.3d at 566-567.

128   Tex. R. Civ. P. 166a(b).

129   *See id.* R. 91a (dismissal of baseless causes of action).

130   *See id.* R. 71 ("When a party has mistakenly designated any plea or pleading, the court, if justice so requires, shall treat the plea or pleading as if it had been properly designated.").

131   *State Bar of Tex. v. Heard*, 603 S.W.2d 829, 833 (Tex. 1980); *see also In re J.Z.P.*, 484 S.W.3d 924, 925 (Tex. 2016) ("We have stressed that 'courts should acknowledge the substance of the relief sought despite the formal styling of the pleading.' " (quoting *Ryland Enter., Inc. v. Weatherspoon*, 355 S.W.3d 664, 666 (Tex. 2011))).

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

66 Tex. Sup. Ct. J. 231

150 F.Supp.2d 556
United States District Court,
S.D. New York.

TRAVELERS INDEMNITY COMPANY
OF CONNECTICUT a/s/o The German
School of New York, Plaintiff,
v.
THE LOSCO GROUP, INC., Pacific Iron
Works, Inc., Fairway Testing Co., Inc.,
and Peter Englert & Associates, Inc.,
Defendants.

No. 99 CV 11422(CM)(GAY).
|
June 29, 2001.

**Synopsis**
School's insurer brought subrogation action against
contractor for gross negligence and breach of contract,
arising out of collapse of school gymnasium's roof.
Contractor filed counterclaim against insurer, alleging
inter alia, breach of contract and intentional misconduct
with respect to the redesigned roof trusses. On
contractor's motions to amend counterclaim and add
third-party complaint against school, the District Court,
McMahon, J., held that: (1) contractor was not third-party
beneficiary of builder's risk insurance policy between
insurer and school; (2) contractor could not bring claim
for quantum meruit against insurer; (3) contractor could
amend counterclaim to include promissory estoppel
claim; (4) school was not necessary party to federal
action; and (5) contractor could not permissibly join
school in federal action.

Motions granted in part, and denied in part.

**\*558** MEMORANDUM DECISION AND ORDER
GRANTING IN PART DEFENDANT'S MOTION FOR
LEAVE TO AMEND THE COUNTERCLAIM AND
DENYING DEFENDANT'S MOTION FOR LEAVE TO

FILE A THIRD PARTY COMPLAINT

McMAHON, District Judge.

In an action to recover damages for the collapse of a
school gymnasium at the German School in White Plains,
New York, defendant The Losco Group, Inc. ("Losco")
moves for leave to amend its counterclaim against
Travelers Indemnity Company of Connecticut
("Travelers") to allege that Losco was an intended Third
Party Beneficiary under a Travelers insurance policy
taken out by The German School of New York ("the
German School"), and to include claims of promissory
estoppel and unjust enrichment against Travelers. Losco
also moves for leave to file a third party complaint against
the German School for breach of contract, breach of
fiduciary duty, and unjust enrichment. Finally, Losco
seeks to discontinue Count Two of its original
counterclaim, which alleged intentional misconduct by
Travelers.

FACTUAL BACKGROUND

On or about July 23, 1997, Losco entered into a written
agreement with the German School to perform general
construction work necessary for the building of a
gymnasium on the premises of the school.[1] (the "First
Agreement") Pursuant to the terms and conditions of the
First Agreement, the German School was required, *inter
alia,* to purchase and maintain a comprehensive builder's
risk insurance policy. The builder's risk policy insured
against physical loss and damage to the property at the
School during the construction of the gymnasium. On or
about January 20, 1998, Travelers issued a builder's risk
insurance policy to the German School that covered such
risks. Losco was not a party to the Builder's Risk Policy,
nor was it named as an additional insured on said policy.

On June 30, 1998, during Losco's construction of the
gymnasium's roof structure, the roof of the gymnasium
collapsed as a result of faulty welding on steel trusses that
were designed to support the roof. After the collapse, The
German School **\*559** hired Losco to replace the damaged
building construction at the German School site.[3]
According to Losco, Michael Losco had a conversation
with Jim Hanrahan of Travelers in which Losco agreed to
replace all damaged building construction. (Losco Dep. at
40.) (the "Second Agreement"). Losco allegedly agreed

orally with the German School and Travelers that Losco was to be paid only for the post-collapse repairs and construction that was of "like and kind" to the construction damaged during the collapse. Losco also alleges that the German School authorized Losco to perform additional extra work, and promised (again, orally) to pass through to Losco the monies received from Travelers for the post-collapse repairs. (Losco Dep. at 23.)

Ultimately, a dispute arose among Losco, the German School and Travelers regarding the amount that Losco was owed for its post-collapse construction and repair work. Losco claimed that it incurred costs of approximately $997,784 for the like-kind repairs at the German School. However, Travelers paid the German School, and The German School in turn paid Losco, only $759,230 for the repairs. Losco claims that it is owed at least $238,554 under the German School Construction Contract (the First Agreement), the Travelers Policy, and/or Losco's oral agreement with Travelers. (Losco Mem. in Support of Motion to Amend at 3.) Travelers contends that Losco has to look to the German School for payment, because the German School was the only insured on the Builder's Risk Policy.

PROCEDURAL BACKGROUND

On November 12, 1999, Travelers, as subrogee, filed a complaint against defendants Losco, Pacific Iron Works, Inc., and Fairway Testing Co., Inc. to recover the amount paid to the German School for the damage resulting from the collapse of the gym roof. With permission of the Court, on October 16, 2000, Travelers amended its complaint to name Peter Englert & Associates, Inc. as defendant in the action. In its amended complaint, Travelers alleged two counts against Losco: gross negligence and negligence.

On or about November 20, 2000, Losco filed and served its counterclaim against Travelers. It alleged, *inter alia,* breach of contract (Count One) and intentional misconduct with respect to the redesigned roof trusses (Count Two). Travelers timely answered Losco's counterclaim on December 13, 2000.

On or about May 1, 2000—but five months before Losco asserted counterclaims here—Losco filed a Verified Complaint against The German School in New York Supreme Court, County of Westchester. Losco

subsequently filed an Amended Verified Complaint, dated June 16, 2000. Losco's state action seeks damages for breach of both the first and second agreement for construction and repairs done before and after the collapse of The German School's roof. The First Agreement was terminated by the German School on April 12, 2000 as a result of alleged failures by Losco to correct "various defaults" under the contract. In Losco's Amended Verified Complaint against the German School, dated June 16, 2000, Losco seeks $3,214,255 for damages resulting from, *inter alia,* The German School's failure "to recognize and promptly pay for the extra and additional work it directed [Losco] to perform and to compensate Losco for the **560** additional home office and field expenses Losco incurred in performing the contract work and extra work."

Since the inception of Losco's counterclaim, Travelers and Losco have engaged in document exchange and inspection. On December 12, 2000, this Court extended discovery on the counterclaim until March 31, 2001, noting that: "There will be no more extensions. Discovery is limited to the new counterclaim."

On March 21, 2001, ten days before the discovery deadline on the counterclaim, Losco moved to amend its counterclaim against Travelers and to add a third party complaint against The German School. Losco's proposed amended counterclaim would add the following counts against Travelers: (1) breach of contract based on a theory of intended third party beneficiary; (2) promissory estoppel; and (3) unjust enrichment/quantum meruit. Losco also seeks to delete Count Two of its original counterclaim, relating to the redesign of the roof trusses. Losco's proposed third-party complaint against The German School asserts three claims: (1) breach of contract (the First Agreement); (2) breach of fiduciary duty; and (3) unjust enrichment/quantum meruit.

DISCUSSION

A motion to amend is governed by Rule 15(a) of the Federal Rules of Civil Procedure, which states that leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a); *Ronzani v. Sanofi S.A.,* 899 F.2d 195, 198 (2d Cir.1990). Notwithstanding the liberality of the general rule, "[w]hether to allow amendment is a decision that rests in the discretion of the district court," *H.L. Hayden Co. v. Siemens Medical Sys., Inc.,* 112 F.R.D. 417, 419 (S.D.N.Y.1986) (citations omitted), and for a

proper reason, a court may deny permission to amend, in whole or in part. In discussing the use of this discretion, the Supreme Court has stated that in the absence undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment, the leave sought should be "freely given." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). "Mere delay ... absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *State Teachers Retirement Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir.1981) (citations omitted).

The federal courts consistently grant motions to amend where it appears that new facts and allegations were developed during discovery, are closely related to the original claim, and are foreshadowed in earlier pleadings. *See id.* (granting plaintiff's amendment despite delay of three years on grounds that there was no undue prejudice); *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc.,* 734 F.Supp. 1071, 1078 (S.D.N.Y.1990) (allowing amended claim for punitive damages after three years where discovery was still open, little additional discovery was required, and no undue delay would result). Furthermore, amendment is favored where it would allow the merits of a claim to be fully adjudicated. *S.S. Silberblatt, Inc. v. East Harlem Pilot Block–Building Housing Development Co.,* 608 F.2d 28, 43 (2d Cir.1979).

Of course, the liberal policy with regard to granting leave to amend must be reconciled with Rule 16 of the Federal Rules of Civil Procedure, which governs pretrial scheduling orders. "A schedule shall not be modified except upon a showing of good cause and leave of the [Court]." Fed.R.Civ.P. 16(b). A court **\*561** may grant permission to amend the pretrial order when "the interests of justice make such a course desirable." *Ismail v. Cohen,* 706 F.Supp. 243, 255 (S.D.N.Y.1989) (quoting *Madison Consultants v. Federal Deposit Insurance Corp.,* 710 F.2d 57, 62 n. 3 (2d Cir.1983)). In making this determination, the Court must consider any prejudice to the non-movant and "balance 'the need for doing justice on the merits between the parties (in spite of the errors and oversights of their attorneys) against the need for maintaining orderly and efficient procedural arrangements.' " *Id.* (citation omitted).

Losco's request comes very late. The initial action was filed on November 12, 1999, and Losco's counterclaim was filed one year later—on November 20, 2000. This case is now over a year and a half old. I set a discovery deadline on Losco's counterclaim at March 31, 2001, a date that has long passed. I was also quite explicit that there would be no extension of that discovery schedule. Accordingly, I will not entertain any amendment to the counterclaim that could require any additional discovery to be taken. Discovery on the counterclaims is no longer "in its infancy" as Losco claims—nor should it have been on March 21, 2001 (ten days before the scheduled close of discovery) when Losco moved to amend its counterclaim.

For the reasons stated below, Losco's motion to add a counterclaim for promissory estoppel is granted, but its motion to add counterclaims in quantum meruit and as a third party beneficiary of the Travelers Building Risk Policy is denied as futile. Losco's motion to add file a Third Party Complaint against the German School is also denied.

1. *Losco's Counterclaims*

Travelers argues that granting Losco's motion amend the counterclaims would be futile, and that it would result in undue prejudice to them.

Losco's original counterclaim alleged breach of contract against Travelers. The Amended Counterclaim adds counts for (1) breach of contract under a theory that Losco was an intended third-party beneficiary under the Travelers Policy; (2) promissory estoppel; and (3) unjust enrichment/quantum meruit.[3]

A. *Third–Party Beneficiary*

In order for a third party to enforce a policy of insurance, it must be demonstrated that the parties intended to insure the interest of the person seeking to recover on the policy. *See Stainless, Inc. v. Employers Fire Ins. Co.,* 69 A.D.2d 27, 33, 418 N.Y.S.2d 76, 80 (1st Dep't 1979), *aff'd,* 49 N.Y.2d 924, 428 N.Y.S.2d 675, 406 N.E.2d 490 (1980). In *Stainless,* 69 A.D.2d at 33, 418 N.Y.S.2d 76, the court wrote:

> As with other contracts, unless it is established that there is an intention to benefit the third party, the third party will be held to be a mere incidental beneficiary, with no enforceable rights under the contract.... *The intention to benefit the third party must appear from the four corners of the instrument.* The terms contained in the contract must clearly evince an intention to

benefit the third person who seeks the protection of the contractual provisions.

*Id.* (emphasis added) Where the insurance contract does not name, describe, or otherwise refer to the entity or individual seeking the benefit as an insured, there is no obligation to defend or indemnify. *State v.* **\*562** *American Mfrs. Mut. Ins. Co.,* 188 A.D.2d 152, 155, 593 N.Y.S.2d 885, 887 (3d Dep't 1993).

Losco does not allege that it was named in the insurance policy, and nothing in the Builder's Risk Policy expresses an intent to benefit Losco as a third party. To the contrary, the "German School of New York" is the only named insured, and the policy makes no reference to Losco in any manner—either as an additional insured or as a third party. Because there is no allegation that the four corners of the policy show an intention to benefit Losco, this theory of recovery would fail as a matter of law. Therefore any amendment to the counterclaim would be futile.

To the extent that Losco maintains that its status as a third-party beneficiary is evidenced by General Condition 11.3 of the First Agreement between The German School and Losco (requiring the German School to purchase an all-risk policy), this argument is unavailing. Even though the contract between these parties required that the German School purchase a builder's risk policy, the policy itself makes no mention of Losco.

Losco's motion to amend the counterclaim to include this theory of recovery is denied.

### B. *Quantum Meruit*

To state a claim for quantum meruit, a plaintiff must allege that: (1) the plaintiff rendered services to the defendant; (2) that the defendant accepted those services; (3) that the plaintiff expected reasonable compensation for those services; and (4) the reasonable value of the services rendered. *Huntington Dental & Medical Co. v. Minnesota Mining & Manuf. Co.,* No. Civ. 95–10959, 1998 WL 60604, *7 (S.D.N.Y.1998).

If a plaintiff fails to prove a valid contract, the court may nonetheless allow recovery in quantum meruit to assure a just and equitable result where the defendant "received a benefit from the plaintiff's services under circumstances which, in justice, preclude him from denying an obligation to pay for them." *Rule v. Brine,* 85 F.3d 1002 (2d Cir.1996) (quoting *Bradkin v. Leverton,* 26 N.Y.2d 192, 196, 309 N.Y.S.2d 192, 257 N.E.2d 643 (1970)).

Such a recovery for unjust enrichment is permissible "when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it, and which *ex aequo et bono* belongs to another." *Id.* (quoting *Miller v. Schloss,* 218 N.Y. 400, 407, 113 N.E. 337, 339 (1916)).

The amended counterclaim alleges that Losco rendered construction services to Travelers' insured, the German School, which in turn accepted the services. However, plaintiff also contends that Travelers asked it to provide the services, and agreed that it would cause the German School to compensate Losco out of the proceeds paid by Travelers to the German School. Thus, it is Losco's position that it provided services to Travelers. Losco contends that it expected the reasonable compensation for those services, in an amount of at least $997,784, and was only paid $759,320.

Travelers responds that the quantum meruit theory is unavailable because Losco failed to demonstrate that its services were performed for Travelers, rather than the German School. Travelers further argues that Losco and Travelers are not in privity, and that it "is not enough that the defendant received a benefit from the activities of the plaintiff; if services were performed at the behest of someone other **\*563** than the defendant, the plaintiff must look to that person for recovery." *Heller v. Kurz,* 228 A.D.2d 263, 264, 643 N.Y.S.2d 580, 581–82 (1st Dep't 1996).

Travelers is correct that the services were provided by Losco to the German School. Losco is a builder. It built and then repaired a school. Travelers may have been involved in the discussions that led to Losco's providing those services (see below), but that does not mean that the services were provided *to* Travelers. It is counterintuitive to say that services provided to an insured are also provided to its insurer. The insurance company derives no benefit from those services; indeed, what the insurer gets is a ripened obligation to pay money to the insured—which hardly can be called a benefit. In the absence of any authority espousing this theory—and Losco has provided none—I conclude that it would be futile for Losco to assert a claim against Travelers in quantum meruit.

### C. *Promissory Estoppel*

In order to state a claim of promissory estoppel under New York law, plaintiff must allege that there was (1) a

clear and unambiguous promise; (2) a reasonable and foreseeable reliance by the party to whom the promise is made; and (3) an injury sustained by the party asserting the estoppel by reason of his reliance. *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 74 (2d Cir.1989). Losco's proposed amended counterclaim alleges that Travelers promised to compensate Losco for repairing, replacing and constructing the roof after the collapse.[4]

The motion to amend the counterclaim to add a promissory estoppel claim is granted. Promissory estoppel is an alternative theory to breach of contract. The factual issues raised by this new theory (e.g. whether Losco acted in reliance on those promises) would not require any additional discovery, since Losco already has developed testimony about what promises were or were not made by Travelers, and what work was accomplished in reliance on the promises. Because the facts underlying the claims are the same, the addition of a promissory estoppel claim will not prejudice Travelers.

2. *Losco May Not File a Third Party Complaint*

On June 16, 2000, Losco filed an Amended Verified Complaint against the German School in the Supreme Court of the State **\*564** of New York, County of Westchester. In that Complaint, Losco alleged breach of its July 23, 1997 contract with the German School for failing to pay for work done on the gymnasium. Plaintiff alleged $3,214,255 in damages, and for enforcement of a mechanics lien on the premises in the amount of $2,785,670. Losco now seeks to add the German School as a third party defendant in this action, and to assert breach of contract, breach of fiduciary duty, and unjust enrichment against the German School.

Plaintiff alleges that the German School should be joined as a necessary party under Federal Rule of Civil Procedure 19(a), or in the alternative, under the permissive joinder rules of Rule 13 or 20.

(a) The German School is Not a Necessary Party

The German School will not be joined pursuant to Rule 19(a). Fed.R.Civ.P. 19(a) states that a "necessary party" shall be added if:

(1) in the person's absence, complete relief cannot be

accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any risk of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.P. 19(a).

Losco argues that the German School is a necessary party because it was a party to the First Agreement, signed in July 1997, and because it is the subrogor in Travelers' main action. (Def. Mem. In Supp. of Motion to Amend Counterclaim at 7.) It also contends that it would be prejudiced if required to maintain a separate state court cause of action against the German School. Losco cites, as an example, the possibility that a trier-of-fact could find against Losco in its counterclaim against Travelers in this case, believing that the German School was the party truly liable. At the same time, a trier-of-fact in state court could find against Losco on its claim against the German School for the same monies, finding that Travelers is the true party liable.

However, the German School is *not* a necessary party within the meaning of the rule because complete relief can be accorded here as between Losco and Travelers, and the German School has no interest in these proceedings. There is also no risk that either Travelers or Losco would be subject to double, multiple or inconsistent *obligations* (as opposed to results) if the federal and state actions both proceed. *Delgado v. Plaza Las Americas, Inc.,* 139 F.3d 1 (1st Cir.1998). In *Delgado,* defendants faced a federal action and a state action arising from the same incident. The First Circuit, reversing the district court's dismissal of the complaint, stated that "the mere possibility of inconsistent results in separate actions does not make the plaintiff in each action a necessary party to the other." *Id.* It continued:

Inconsistent obligations occur when a party is unable to comply with one court's order without breaking another court's order concerning the same incident. Inconsistent adjudications or results, by contrast, occur when a defendant successfully defends a claim in one forum, yet loses on another claim arising from the same incident in another forum. *Unlike a risk of inconsistent obligations, a risk that a defendant who has successfully defended against a party may be found liable to another party in a subsequent action arising from the* **\*565** *same incident—i.e., a risk of inconsistent adjudications or results—does not necessitate joinder of all of the parties into one action pursuant to*

Travelers Indem. Co. of Connecticut v. Losco Group, Inc., 150 F.Supp.2d 556 (2001)

*Fed.R.Civ.P. 19(a)*.

*Delgado,* 139 F.3d at 3 (emphasis added). *See also Southern Co. Energy Marketing LP v. Virginia Elec. and Power Co.,* 190 F.R.D. 182 (E.D.Va.1999) (same); *No. Am. Specialty Ins. Co. v. Chichester School Dist.,* No. CIV–A 99–2394, 2000 WL 1052055, \*25 (E.D.Pa. July 20, 2000) (same).

Losco's fear is that each jury will conclude that the other party is liable to it. But as was true in *Delgado,* the mere possibility of inconsistent verdicts does not make the German School a necessary party under Rule 19(a). It is possible that Losco could win both cases, or lose both cases, or win one and lose one (one way or the other); but none of these results would result in Losco's incurring inconsistent obligations.

(b) Permissive Joinder Not Warranted

Plaintiff asks this Court, in the alternative, to join The German School under the permissive joinder rules of Fed.R.Civ.P. 13 and 20. Rule 13 provides that "persons other than those made parties to the original action may be made parties to a counterclaim or cross-claim in accordance with the provisions of rules 19 and 20." Rule 20 states that persons may be joined in one action "if there is asserted against them jointly, severally, or in the alternative, any right to relieve in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action."

Fulfillment of the specific requirements of Rule 20, however, is not enough to warrant granting the plaintiff's motion. *Shaw v. Munford,* 526 F.Supp. 1209, 1213 (S.D.N.Y.1981). Permissive joinder rests with the "sound discretion of the Court, which must determine if joinder 'will comport with the principles of fundamental fairness.' " *Shaw v. Munford,* 526 F.Supp. 1209, 1213 (S.D.N.Y.1981) (quoting *Desert Empire Bank v. Ins. Co. of N. Am.,* 623 F.2d 1371, 1375 (9th Cir.1980)). A district court may deny a motion for joinder where the addition of the defendants would cause prejudice, expense, and delay by opening up a "Pandora's box" of discovery. *Barr Rubber Products Co. v. Sun Rubber Co.,* 425 F.2d 1114,

1127 (2d Cir.), *cert. denied,* 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115 (1970); *Krumme v. WestPoint Stevens, Inc.,* 143 F.3d 71, 88 (2d Cir.1998) ("One of the most important considerations in determining whether amendment would be prejudicial is the degree to which it would delay the final disposition of the action"); *Republic Nat'l Bank v. Hales,* 75 F.Supp.2d 300, 308 (S.D.N.Y.1999) (noting that a court must consider whether joinder would require the opponent to expend significant additional resources to conduct discovery and to prepare for trial, or significantly delay the resolution of the dispute).

Losco's motion to file a Third Party Complaint against the German School is denied. Losco (albeit with its former counsel) chose the state court as its forum, and now must live with that decision. Joining the German School at this late stage would delay the proceedings, prejudice Travelers, and significantly delay resolution of this dispute. The German School would have the right to retake all depositions, and discovery—which has been completed for months—would need to be re-opened. Losco's claims are already being litigated in the state court action that Losco commenced six months after the present action was initiated. If **\*566** Losco has new claims against the German School, it can amend its pleading in state court.

CONCLUSION

Losco's motion to amend the counterclaim is granted in part, allowing only the promissory estoppel claim to be included, and allowing Losco to omit Count Two of the original counterclaim. Losco's motion to file a Third Party Complaint against the German School is denied.

This constitutes the decision and order of this Court.

**All Citations**

150 F.Supp.2d 556

Footnotes

1   Other related facts of this case are set forth in my opinion of March 23, 2001, granting in part and denying in part defendant Peter Englert & Associates' motion to dismiss. *See Travelers Indemnity Co. v. The Losco Group, Inc.,* 136 F.Supp.2d 253 (S.D.N.Y.2001).

2    The German School had no contractual obligation to hire Losco as its post-collapse general contractor.

3    I have no problem if Losco wishes to drop its counterclaim alleging intentional misconduct with respect to the redesigned roof trusses. It is, accordingly, dismissed.

4    The proposed Amended Counterclaim states:

> Travelers agreed to fully protect and reimburse Losco for all costs incurred by Losco in repairing, replacing and constructing the like-kind roof. Travelers also agreed to compensate Losco for other portions of work Losco performed under the German School Construction Contract that had to be repaired or replaced as a result of the collapse. Travelers further agreed to pay Losco a rate of ten percent on Losco's subcontractor costs incurred in performing the relevant roof construction work. Under its contract with Losco, Travelers also agreed to pay Losco a combined overhead and profit rate of twenty-one percent on all other costs incurred by Losco in providing labor, material, services, and equipment in repairing, replacing, and constructing the like-kind roof.

(Amended Counterclaim ¶ 11.)

It also alleges that:

> Travelers promised to fully compensate Losco for all labor, materials, services, and equipment, with agreed upon mark-ups for profit and overhead, incurred by Losco in repairing, replacing, and constructing a like-kind roof at the Project after the collapse. Travelers also promised to compensate Losco for other portions of work Losco performed under the German School Construction Contract that had to be repaired or replaced as a result of the collapse.

(Id.¶ 33.)

**End of Document**                         © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 3536519
Only the Westlaw citation is currently available.
United States District Court, D. Nevada.

VALLEY HEALTH SYSTEM LLC, et al.,
Plaintiff(s),
v.
AETNA HEALTH, INC., et al.,
Defendant(s).

Case No. 2:15-CV-1457 JCM (NJK)
|
Signed 06/28/2016

**Attorneys and Law Firms**

Glenn E. Solomon, Hooper, Lundy & Bookman, P.C., Los Angeles, CA, Jennifer A Hansen, Hooper, Lundy & Bookman, P.C., San Diego, CA, John H. Cotton, Melanie Bernstein Chapman, John H. Cotton & Associates, Ltd., Las Vegas, NV, for Plaintiffs.

Mark J. Connot, Fox Rothschild, LLP, Las Vegas, NV, Jon T. Neumann, Steptoe & Johnson LLP, Phoenix, AZ, for Defendants.

ORDER

James C. Mahan UNITED STATES DISTRICT JUDGE

**\*1** Presently before the court is defendants Aetna Health Management, LLC and Aetna Health, Inc.'s (together "Aetna") motion to dismiss. (ECF No. 26). Plaintiffs Valley Health System LLC, et al. (collectively "Valley Health") filed a response (ECF No. 28), and Aetna subsequently replied. (ECF No. 31).

**I. Background**
Valley Health is comprised of various health care facilities operating in Nevada. (ECF No. 28 at 3). Aetna

provides health insurance to its members and processes insurance claims for other payors. (*Id.*). Valley Health has provided medical services to patients who were either insured by Aetna or for whom Aetna processed claims on behalf of other payors.

From April 15, 2013, until April 14, 2014, Valley Health agreed to be one of Aetna's in-network providers pursuant to a written provider agreement ("the Aetna contract"). Valley Health agreed to accept reimbursement for services provided to Aetna members at a discounted rate from their total billed charges. (*Id.* at 3).

Upon termination of the contract in April of 2014, Aetna was permitted to use the discounted contract rates for no more than 60-days after the effective termination date—June 13, 2014. (*Id.* at 3–4). Since terminating the Aetna contract, the only other written agreements to which Aetna and Valley Health are both parties are "wrap network" agreements between Valley Health and a company called Beech Street. (*Id.* at 4). These agreements were effective at all times from June 13, 2014, to on or about February 1, 2015. (*Id.*).

Subsequent to termination of the Aetna contract, Valley Health has continued to provide medical services to patients with Aetna insurance coverage. Upon request by Valley Health, Aetna has authorized, either explicitly or implicitly, the treatment or continued treatment of its members. (*Id.* at 12). However, Aetna has not paid its members' full-billed charges resulting from the services rendered, which Valley Health argues Aetna is obligated to pay as an out-of-network insurance provider. (ECF No. 14 at 9).

Valley Health brought forth twelve causes of action for breach of contract, breach of implied-in-law contract, breach of implied-in-fact contract, estoppel, recovery of services rendered, intentional interference with prospective economic advantage, negligent interference with prospective economic advantage, and violations of ERISA under 29 U.S.C. §§ 1132(a)(1)(B), (a)(3). (ECF No. 28 at 1–2).

**II. Legal Standard**
A court may dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A properly pled complaint must provide "[a] short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2);

Valley Health System LLC v. Aetna Health, Inc.,, Not Reported in Fed. Supp. (2016)

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While Rule 8 does not require detailed factual allegations, it demands "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citation omitted). "Factual allegations must be enough to rise above the speculative level." *Twombly*, 550 U.S. at 555. Thus, to survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Iqbal*, 129 S.Ct. At 1949 (citation omitted).

**\*2** In *Iqbal*, the Supreme Court clarified the two-step approach district courts are to apply when considering motions to dismiss. First, the court must accept as true all well-pled factual allegations in the complaint; however, legal conclusions are not entitled to the assumption of truth. *Id.* at 1950. Mere recitations of the elements of a cause of action, supported only by conclusory statements, do not suffice. *Id.* at 1949. Second, the court must consider whether the factual allegations in the complaint allege a plausible claim for relief. *Id.* at 1950. A claim is facially plausible when the plaintiff's complaint alleges facts that allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* at 1949.

Where the complaint does not "permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not shown, that the pleader is entitled to relief." *Id.* (internal quotations and alterations omitted). When the allegations in a complaint have not crossed the line from conceivable to plausible, plaintiff's claim must be dismissed. *Twombly*, 550 U.S. at 570.

The Ninth Circuit addressed post-*Iqbal* pleading standards in *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The *Starr* court stated,

First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

*Id.*

### III. Discussion

Aetna moves to dismiss counts three, four, seven, eight, and nine of Valley Health's first amended complaint. (ECF No. 26). Counts three and four are for breach of implied-in-law contract for emergency and post-stabilization medical services. (ECF No. 14 at 17–19). Counts seven and eight of Valley Health's complaint are for recovery of services rendered and intentional interference with prospective economic advantage. (*Id.* at 26–28). Count nine is for negligent interference with prospective economic advantage. (*Id.* at 28–30).

#### A) Count nine: negligent interference with prospective economic advantage claim

The parties agree that this claim should be dismissed because it is not a recognized cause of action under Nevada law. Therefore, count nine is dismissed.

#### B) Counts three, four, seven, and eight: ERISA conflict preemption

In its motion to dismiss, Aetna argues that ERISA preempts Valley Health's claims because they "relate to" employee benefit plans covered by ERISA. *See* 29 U.S.C. § 1144(a); *Ingersoll-Rand Co. v. McCleandon*, 498 U.S. 133, 138 (1990); *Aloha Airlines, Inc. v. Ahue*, 12 F.3d 1498, 1504 (9th Cir. 1993).

In the response (ECF No. 28), Valley Health argues that Congress did not intend to supplant state law, and that the "relate to" prong of ERISA conflict preemption does not apply to every state law claim that might have some impact on an ERISA plan. *See New York State Conference of Blue Cross & Blue Shield Plan v. Travelers Ins. Co.*, 514 U.S. 645 (1995).

"... ERISA [Section 514(a) ] preempts state law 'insofar as they may now or hereafter relate to any employee benefit plan.' " *Arizona State Carpenters Pension Trust Fund v. Citibank*, 125 F.3d 715, 722 (9th Cir. 1995). "To determine whether a state law has a connection with an ERISA plan [for purposes of conflict preemption under Section 514(a) ], courts should consider the objectives of ERISA and the effect of the state law on ERISA plans." *Borton v. New United Motor Mfg.*, 2010 U.S. Dist. LEXIS 85119, at \*11–12, 2010 WL 3259907 (D. Nev. August 16, 2010) (quoting *Cal. Div. of Labor Standards Enforcement*

*v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 324 (1997)).

**\*3** The Nevada District Court addressed ERISA preemption in *Borton*, holding: Congress intended ERISA to preempt state law in three areas: (1) laws that mandate employee benefit structures or their administration; (2) laws that bind employers or administrators to choices or that preclude uniform practice so that they regulate an ERISA plan; and (3) laws that provide an alternate enforcement mechanism for obtaining ERISA plan benefits.
*Id.* (quoting *Ariz. State Carpenters Pension Trust Fund*, 125 F.3d at 723).

"Courts should assume that Congress did not intend to bar state action in areas traditionally regulated by states unless that purpose is clear." *Id.* at 12. Furthermore, state law claims brought by providers, independent from any assignment of rights belonging to ERISA plan beneficiaries, are not preempted by Section 514(a). *The Meadows v. Employers Health Ins.*, 47 F.3d 1006, 1008–09 (9th Cir. 1995).

Valley Health's claims against Aetna arise under Nevada contract and tort law. Valley Health alleges Aetna is obligated to pay its members' full-billed charges for emergency and post-stabilization medical services, which amount to sums above and beyond their ERISA coverage. These contract and tort claims are not the types of claims which might alter the structure or administration of beneficiaries' ERISA plan coverage. *See Borton*, 2010 U.S. Dist. LEXIS 85119, at \*11–12, 2010 WL 3259907. Furthermore, the claims do not have any bearing on the uniform practice and administration of ERISA plans generally, nor do they have any impact on patients' abilities to obtain ERISA plan benefits. *See Id.*

Insofar as Valley Health is acting as Aetna members' assignees, ERISA conflict preemption is still inapposite because the reimbursements sought by Valley Health are for values that exceed the individual members' insurance coverage. In other words, Valley Health seeks to recover for services rendered based on Aetna's alleged authorization of the services, not based on the members' insurance coverage. Therefore, Valley Health's claims do not "relate to" any ERISA plan such that they would be preempted by ERISA Section 514(a).

*C) Counts three and four: implied-in-law contract*
Valley Health argues that Aetna either explicitly or implicitly authorized its members' medical services upon request by the Valley Health hospitals. (ECF No. 14 at 14–15). Valley Health asserts that Aetna implicitly authorized the services rendered in some circumstances by failing to arrange for transfer of the patients to another hospital. (*Id.* at 19). Valley Health further argues that arranging for transfer is the customary practice in the health care industry, and that doing so creates an implied-in-law contract for fair market value of the services rendered to Aetna's members. (*Id.* at 14–15, 19). Valley Health also asserts a theory of unjust enrichment as a basis for these claims, alleging that Aetna has received the benefit of having had medical services provided to its members without paying for the reasonable value of such services. (*Id.* at 17–18).

Aetna argues that Valley Health has not conferred any benefit directly upon Aetna, but instead, has conferred a benefit on the individual patients. (ECF No. 31). Aetna further alleges that Valley Health's unjust enrichment claims arise in the out-of-network context and do not allege any express or implied-in-fact provider agreements that establish a requisite level of reimbursement. (ECF No. 31 at 7). Aetna asserts that Valley Health's unjust enrichment claims fail because when Valley Health's charges exceed the members' coverage for out-of-network services, providing those services does not confer a benefit to Aetna; it confers a benefit to the patient. (*Id.* at 8).

**\*4** In Nevada, the elements of an unjust enrichment claim or "quasi contract" are: "(1) a benefit conferred on the defendant by the plaintiff; (2) appreciation of the benefit by the defendant; and (3) acceptance and retention of the benefit by the defendant (4) in circumstances where it would be inequitable to retain the benefit without payment." *Kennedy v. Carriage Cemetery Servs.*, 727 F. Supp. 2d 925, 932 (Nev. 2010).

Valley Health has failed to identify any way in which Aetna has been enriched independently of the benefit its members received as a result of being provided with emergency medical services. While Valley Health argues that Aetna acknowledged a duty to pay for "most if not all of the services" rendered, Valley Health has not alleged that Aetna failed to reimburse Valley Health at levels commensurate with its individual members' coverage. (ECF No. 14 at 15).

Valley Health has failed to identify a situation where Aetna failed to meet its obligation to pay for medical services commensurate with its members' insurance coverage. Therefore, with respect to counts three and four, breach of implied-in-law contract for emergency

services and post-stabilization services, the facts alleged do not support the necessary elements for a claim of breach of implied-in-law contract against Aetna. Accordingly, counts three and four are dismissed.

#### D) Count seven: recovery of services rendered

Valley Health alleges that Aetna requested the Valley Health hospitals perform the billed medical services on behalf of its members, and therefore became indebted to Valley Health for services rendered. (ECF No. 14 at 26). Valley Health further argues that Aetna unilaterally decided to reimburse Valley Health at rates it deemed appropriate, amounting to far less than the total billed charges. (*Id.*). Aetna argues that any billed charges for services that surpass the amount of coverage held by its members have enriched the patients, not Aetna, because Aetna is only legally obligated to pay for services commensurate with its members' coverage. (ECF No. 26 at 5).

"In order to support a right for recovery for services rendered upon a quantum meruit ... there must be evidence tending to prove that the services were rendered under some understanding or expectation of both parties that compensation therefore was to be made." *In re Estate of Mumford*, 173 Cal. 511, 160 P. 667, 672 (Cal. 1916).

Valley Health has failed to allege the rates Aetna "deemed appropriate" are of less value than the rates it is obligated to pay under its members' individual coverage plans. Even if Valley Health is entitled to receive payment for the reasonable value of the services rendered, Valley Health has not alleged that Aetna contemplated that it would pay for its members' medical services above and beyond amounts it would typically pay to out-of-network hospitals.

With respect to count seven, the facts alleged do not support the necessary elements for a claim of quantum meruit recovery for services rendered against Aetna. Therefore, count seven is dismissed.

#### E) Count eight: intentional interference with prospective economic advantage claim

Valley Health argues that Aetna purposefully interfered with its eventual reimbursement by other payors for whom Aetna administered claims. (ECF No. 14 at 28).

Valley Health provides various scenarios under which Aetna allegedly committed intentional interference, including a contract directly between Valley Health and the other payors, and a "non-contractual prospective economic relationship between Valley Health and the other payors." (ECF No. 14 at 26). Valley Health argues that Aetna purposely misrepresented to the other payors the reasonable and customary rates for the services rendered, which caused the other payors to pay Valley Health less than they otherwise would have. (*Id.* at 27).

**\*5** Aetna argues that Valley Health's prospective implied-in-fact contract claim is an unprecedented expansion of Nevada law. (ECF No. 31 at 9). Aetna further argues that Valley Health has not suffered any actual harm, because Valley Health has allegedly acknowledged, yet failed to pursue, other avenues of payment. (*Id.* at 10).

In Nevada, the tort of interference with a prospective economic advantage has five elements: (1) a prospective contractual relationship between plaintiff and a third party; (2) defendant must have knowledge of this prospective relationship; (3) defendant must intend to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by defendant; and, (5) actual harm to the plaintiff resulting from defendant's conduct. *Kennedy v. Carriage Cemetery Servs.*, 727 F. Supp. 2d 925, 932 (Nev. 2010). For the purpose of this type of claim, a current relationship cannot be considered a "prospective" one. *Id.*

As Aetna correctly points out, count eight of Valley Health's complaint depends on the assertion that Aetna is not the other payor's agent because the other payors cannot interfere with their own contractual relationships. *See Klein v. Freedom Strategic Partners, LLC*, 595 F. Supp. 2d 1152, 1163 (D. Nev. 2009). However, by Valley Health's own admission, Aetna is responsible for all of Valley Health's requests for reimbursement because Aetna either processed or priced all of them, regardless of whether Aetna was the insurer or administrator. (ECF No. 28 at 5).

Valley Health cannot establish a direct contractual relationship, written or implied, with the other payors. Aetna either acted as the other payors' agent by performing the pricing and processing of the claims, or the other payors could not have assented by words or conduct to specific reimbursement terms and conditions by virtue of assigning those duties to Aetna. If Aetna acted as the other payors' agent, then Aetna could not have interfered with its own contractual relationship. On the other hand, if Aetna did not act as the other payors'

agent, unilaterally determining the reimbursement rates, then the other payors could not have assented to specific reimbursement rates and there is no implied-in-law contract with which Aetna could have interfered. Furthermore, these alleged contractual relationships between Valley Health and the other payors already exist, and thus they are not prospective.

Because Valley Health has not properly alleged a prospective contractual relationship between Valley Health and a third party with which Aetna could have interfered, count eight is dismissed.

**IV. Conclusion**
Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Aetna's motion to dismiss counts three, four, seven, eight, and nine (ECF No. 26), be, and the same hereby is, GRANTED, without prejudice.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3536519

---

                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

# TAB 009A

ELECTRONICALLY FILED
2023 Aug 14 3:56 PM
CLERK OF COURT - CHANCERY

# IN THE CHANCERY COURT FOR SHELBY COUNTY, TENNESSEE
## FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

| | | |
|---|---|---|
| **CIGNA HEALTHCARE OF TENNESSEE, INC.** | ) | |
| | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **Case No. Case No. CH-22-1654** |
| **v.** | ) | |
| | ) | |
| **BAPTIST MEMORIAL HEALTHCARE CORPORATION** | ) | |
| | ) | |
| **Respondent.** | | |

## PETITIONER'S AMENDED MOTION TO STAY

Petitioner Cigna Healthcare of Tennessee, Inc. ("Cigna") by and through its undersigned counsel, hereby files its Amended Motion to Stay these proceedings. As shown in the memorandum submitted in support of this motion, good cause exists for staying these proceedings pending resolution of the federal action and arbitration. For the reasons set forth herein and in the memorandum supporting this motion, Cigna respectfully requests this Court to grant its motion.

Respectfully submitted,

WYATT, TARRANT & COMBS, LLP

Odell Horton, Jr. (Tenn. Bar No. 12426)
Andrew J. Pulliam (Tenn. Bar No. 16863)
6070 Poplar Avenue
Suite 300
Memphis, TN 38119
ohorton@wyattfirm.com
apulliam@wyattfirm.com
901.537.1000


DLA PIPER LLP (US)


/s/ John J. Hamill
John J. Hamill (*pro hac vice*)
Pamela Begaj Loutos (*pro hac vice*)
DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606
john.hamill@us.dlapiper.com
pamela.loutos@us.dlapiper.com
312-368-7036

2

## <u>CERTIFICATE OF CONSULTATION</u>

This is to certify that Pamela Begaj Loutos as counsel for Cigna as Petitioner communicated with counsel for Respondent, David King, on August 14, 2023 via phone with respect to the relief sought in the present Motion for Stay. Counsel for Respondent communicated that Respondent opposes the motion.

Odell Horton, Jr.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served on the 14th day of August 2023 to counsel for Respondents via e-mail and the Court's docketing system:

> David King
> Polsinelli
> 401 Commerce Street, Suite 900
> Nashville, TN 37219
> dking@polsinelli.com

> Christopher S. Campbell (BPR 019061)
> Harris | Shelton
> 6060 Primacy Parkway
> Suite 100
> Memphis, TN 37118
> 901.525.1455
> ccampbell@harrisshelton.com

Odell Horton, Jr.

3

# TAB 009B

ELECTRONICALLY FILED
2023 Aug 14 3:56 PM
CLERK OF COURT - CHANCERY

## IN THE CHANCERY COURT FOR SHELBY COUNTY, TENNESSEE
## FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

| | | |
|---|---|---|
| **CIGNA HEALTHCARE OF TENNESSEE, INC.** | ) | |
| | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **Case No. Case No. CH-22-1654** |
| **v.** | ) | |
| | ) | |
| **BAPTIST MEMORIAL HEALTHCARE** | ) | |
| **CORPORATION** | ) | |
| | ) | |
| **Respondent.** | | |

### PETITIONER'S MEMORANDUM IN SUPPORT OF AMENDED MOTION TO STAY

Petitioner Cigna Healthcare of Tennessee, Inc. ("Cigna") by and through its undersigned counsel, hereby files its Memorandum of Law in Support of its Amended Motion to Stay this proceeding.[1]

### Overview

Cigna moves this Court to stay this matter, in which Cigna had filed a Confidential Petition to Modify or Vacate, in Part, "Partial Final Award" in Arbitration (the "Petition"). Cigna's Petition was in connection with a still ongoing private and confidential arbitration between the parties that is not yet fully resolved (the "Ongoing Arbitration"). Cigna petitioned this Court to vacate one aspect of a decision that the three-member arbitration panel (the "Panel") issued on September 7, 2022 (the "First Partial Final Award"). The Panel styled its decision as a "Partial Final Award" even though the specific question presented to the Panel for arbitration had not yet been answered.

As Cigna stated in its Petition, Cigna did not wish to challenge the Panel's rulings in

---

[1] This Memorandum in Support of Cigna's Amended Motion to Stay supersedes Cigna's June 13, 2023 Memorandum in Support of Motion to Stay.

piecemeal fashion when no remedy had been awarded and multiple phases remained in the Ongoing Arbitration (after which challenges might also be levied by either party depending on the ultimate rulings). There was a genuine question whether Cigna had standing to pursue the Petition at that time before this Court because the Panel had not issued any decision on whether any actual relief (e.g., money damages) was owed to Baptist Memorial Healthcare Corporation ("Baptist"). Cigna thus did not have federal Article III standing and so could not file in federal court. Cigna was nevertheless faced with a (potential) clock that continued to tick under the Federal Arbitration Act ("FAA"). Cigna thus protectively challenged the Panel's First Partial Final Award in this Court out of an abundance of caution to ensure its rights were not waived. Cigna also filed a motion to stay with its Petition.

After Cigna filed its Petition along with its Motion to Stay in this Court, the Panel issued another award on July 17, 2023 (the "Second Partial Final Award," together the "Awards") that now establishes federal Article III standing (i.e., there is no longer a question whether the Panel would issue a remedy to Baptist). On August 14, 2023, Cigna thus filed an application in the Western District of Tennessee federal court to vacate (in part) the First Partial Final Award and to vacate the Second Partial Final Award.[2]

Despite that Cigna believes there is Article III standing in federal court, it is conceivable that there could be a disagreement on that topic and the federal court's jurisdiction because there are still ongoing arbitration proceedings in this matter. Cigna therefore believes as a protective matter that it needs to maintain a viable petition on file with this Court. On the assumption that the federal court will proceed with the matter and resolve the merits, the full scope of Cigna's challenge through the Awards could and would be resolved in federal court. Upon such a

---

[2] The Petition before this Court only addresses the First Partial Final Award.

2

determination by the federal court, Cigna would then dismiss this state court proceeding.

It is within this Court's discretion and authority to stay the state court proceedings pending a merits resolution of the federal proceeding. The federal proceeding not only encompasses every question at issue here but is broader in its current stature as it involves a challenge to both Awards. All controversies between the parties could be resolved by the final outcome, thus eliminating additional burden and expense on the parties as well as waste of judicial resources. Cigna further moves the Court only to stay, rather than dismiss, this proceeding pending resolution of the federal proceeding. Should the federal proceeding ultimately not resolve all controversies between the parties, the stay could be lifted and this matter would proceed without delay.

It is conceivable that even the federal court will decide the matter is not yet ripe for review. While Cigna believes that the federal matter is ripe, the Second Partial Final Award only addresses a portion of what the Panel determined to be Baptist's remedy. Another hearing is taking place in December 2023 and a final decision on the extent of the full award that the Panel may grant to Baptist thus is not expected until a future point in 2024. Challenges before this Court would continue in piecemeal fashion. All of that supplies an additional protective and precautionary basis to hold this matter pending before this Court.

### **Factual Summary**

The parties are engaged in a confidential Ongoing Arbitration. Baptist is the complaining party in the Ongoing Arbitration and Cigna is the defending party. Baptist asserts that it is owed money as additional reimbursement on certain instances between 2013-19 where Baptist provided emergency or other medical services to patients whose health benefit plans were administered by Cigna. The Ongoing Arbitration is being administered over the course of several "phases." Two phases occurred in 2021 and 2022, another phase has proceeded in 2023, while an additional phase

is scheduled later in 2023 and more may come in 2024.

The Ongoing Arbitration is governed by a written agreement between the parties to arbitrate the dispute that had arisen between them (the "Arbitration Agreement"), attached as **Exhibit 1**.   Paragraph 5 of the Arbitration Agreement specifies the ultimate question to be addressed in the Ongoing Arbitration:  "[t]he question to be decided in this arbitration is *whether Baptist was properly reimbursed for the Arbitration Claims, and if not, what is the amount Cigna owes*." (Ex. 1 ¶ 5.)[3]  That is the "Arbitration Question."

On September 7, 2022, the Panel issued the First Partial Final Award.  In that decision, the Panel permitted Baptist's *quantum meruit* cause of action to go forward for a portion of the claims.  Notwithstanding the incomplete status of the Ongoing Arbitration, the Panel designated its ruling a "Partial Final Award."  Cigna filed its Petition with this Court on December 6, 2022 to ensure its rights under the FAA.

Since the filing of the Petition (and Cigna's motion to stay), another phase completed. The Panel decided that Baptist has a remedy under Tennessee law and granted Baptist relief on a portion of the claims at issue.  A hearing is taking place on the remaining claims in December 2023.  A decision on whether the Panel would grant Baptist relief on those claims would not be issued until 2024.  There also may be some additional remaining issues on which the Panel has not yet determined liability which may occur in 2024 (or later).

## Legal Issues Presented in the Petition

As detailed in the Petition, Cigna submits that the Panel exceeded its authority and acted in manifest disregard of the law by (i) permitting Baptist to proceed on a *quantum meruit* state law cause of action that is expressly not recognized by Tennessee law under clear precedent; and (ii)

---

[3] All emphasis in quotes and citations is added unless noted.

4

determining that a Supreme Court decision issued during the Arbitration demolished bedrock preemption law under the Employment Retirement Income Security Act ("ERISA").   The application that Cigna filed in the federal court sets out the additional and independent flaws in the Second Partial Final Award.  If the federal court decides it lacks jurisdiction, Cigna would present those points to this Court.

<div align="center"><b><u>Argument</u></b></div>

**I.      This Court Has the Discretion and Authority to Stay this Proceeding.**

Tennessee trial courts have broad authority to manage their dockets and proceedings. *Hodges v. Attorney General*, 43 S.W.3d 918, 921 (Tenn. Ct. App. 2000).   That includes the authority to stay proceedings. *Bell v. Todd*, 206 S.W.3d 86, 93 (Tenn. Ct. App. 2005); *Federated Rural Elec. Ins. Exch. v. Hill*, 2007 WL 907717, at *14 (Tenn. Ct. App. Mar. 26, 2007).  Tennessee courts regularly grant stays pending final orders in related proceedings or during arbitration proceedings. *See, e.g., Mello v. Lamar Advertising Co., Inc.*, 2005 WL 5433563 (Tenn. Cir. Ct. Jan. 26, 2005); *Hunter v. HTI Memorial Hospital Co.*, 2005 WL 5432183 (Tenn. Cir. Ct. Apr. 27, 2005); *Credit General Ins. Co. v. Insurance Services Group, Inc.*, 2006 WL 6372552 (Tenn. Ch. Oct. 31, 2006); *Mello v. Lamar Advertising Co.*, 2005 WL 5433563 (Tenn. Cir. Ct. Jan. 26, 2005); *Stillings v. HCA Health Services of Tennessee, Inc.*, 2001 WL 35978158 (Tenn. Cir. Ct. Apr. 17, 2001); *Brown v. Tennessee Title Loans, Inc.*, 2006 WL 7346884 (Tenn. Cir. Ct. Feb. 08, 2006).[4]

The Court's analysis in examining the propriety of a stay should be tailored to the particular facts before it, and no specific set of factors is necessarily determinative.  The trial court should balance a party's desire for an expeditious proceeding and the potential prejudice that may result

---

[4] Tennessee law in other contexts supports this motion to stay.  In the context of appeals, Tennessee law looks to whether a stay "will prevent needless, expensive and protracted litigation, and will result in a net reduction in the duration and expense of this litigation[.]"  *Credit General Ins. Co. v. Insurance Services Group, Inc.*, 2006 WL 6372553 (Tenn.Ch. Dec. 15, 2006).  That is certainly the case here.

<div align="center">5</div>

from a delay against the potential burdens of allowing an action to proceed. *Federated Rural Elec. Ins. Exch.*, 2007 WL 907717, at *14 (potential for undue expense and wasted time were appropriate reasons to stay further litigation pending outcome of appeal). A decision to stay proceedings will not be disturbed on appeal absent a showing that the trial court abused its discretion. *Id.* Trial courts likewise have broad discretion under the Tennessee Rules of Civil Procedure to manage pre-trial proceedings and discovery. *Benton v. Snyder*, 825 S.W.2d 409, 416 (Tenn. 1992); *Federated Rural Elec. Ins. Exch.*, 2007 WL 907717, at *6-7. Trial courts thus are explicitly granted discretion to enter scheduling orders governing how matters are to proceed. *See* Tenn. R. Civ. P. 16.

## II.     The Court Should Stay this Proceeding.

This is a textbook example of why the Court's case management powers exist. There is no added urgency in this case. The broader federal court action has been filed and Cigna intends to pursue its challenge of the Awards in that action. On top of that, the Panel designated its ruling as a Partial Final Award. The Panel has awarded only partial relief to Baptist—the extent of the total actual relief that may be granted to Baptist remains unknown. The Panel therefore has not ultimately determined "*whether Baptist was properly reimbursed for the Arbitration Claims and if not, what is the amount Cigna owes,*" which again is the question presented by the parties to the Panel for Arbitration. Multiple other phases remain outstanding. Proceeding in piecemeal fashion would be highly inefficient for the parties and the Court. A petitioner would be hard pressed to find a sensible basis to invoke this Court's jurisdiction and resources in resolving a dispute where a federal proceeding that would resolve the merits is pending and the relief is still being litigated in the Ongoing Arbitration.

## Conclusion

Based on the foregoing, Cigna respectfully requests this Court to grant its Motion to Stay this proceeding.

Respectfully submitted,

WYATT, TARRANT & COMBS, LLP

Odell Horton, Jr. (Tenn. Bar No. 12426)
Andrew J. Pulliam (Tenn. Bar No. 16863)
6070 Poplar Avenue
Suite 300
Memphis, TN 38119
ohorton@wyattfirm.com
apulliam@wyattfirm.com
901.537.1000


DLA PIPER LLP (US)


/s/ John J. Hamill
John J. Hamill (*pro hac vice*)
Pamela Begaj Loutos (*pro hac vice*)
DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606
john.hamill@us.dlapiper.com
pamela.loutos@us.dlapiper.com
312-368-7036

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on the 14th day of August 2023 to counsel for Respondents via e-mail and the Court's docketing system:

David King
Polsinelli
401 Commerce Street, Suite 900
Nashville, TN 37219
dking@polsinelli.com

Christopher S. Campbell (BPR 019061)
Harris | Shelton
6060 Primacy Parkway
Suite 100
Memphis, TN 37118
901.525.1455
ccampbell@harrisshelton.com

_____
Odell Horton, Jr.

8

101231666.1

# TAB 009C

ELECTRONICALLY FILED
2023 Aug 14 3:56 PM
CLERK OF COURT - CHANCERY

# EXHIBIT 1

## FIRST AMENDED ARBITRATION AGREEMENT

**THIS AGREEMENT** ("Agreement") is made as of the 24th day of February, 2020, by and between Baptist Memorial Health Care Corporation, individually and on behalf of its affiliated companies (collectively, "Baptist"), and Cigna HealthCare of Tennessee, Inc., individually and on behalf of its affiliated companies (collectively, "Cigna"). Baptist and Cigna are referred to in this Agreement in the singular as a "Party" and collectively as the "Parties."

**WHEREAS**, Baptist claims that the Parties have a dispute about the appropriate reimbursement for a specific set of certain out-of-network healthcare services provided by Baptist facilities to Cigna members (the "Dispute");

**WHEREAS**, the Parties have agreed to submit the Dispute to binding arbitration pursuant to the terms set forth below;

**WHEREAS**, the specific out-of-network reimbursement claims subject to the Dispute will not include any claims other than those set forth on the document identified on March 25, 2019, as Exhibit A to the Tolling Agreement executed on March 18, 2019, and will not include any in-network facility claims even if any in-network facility claim was identified on Exhibit A ("Arbitration Claims"); and

**WHEREAS**, Baptist has not specified the full legal or factual basis for its claims, other than Baptist asserts it has not received the full amount of reimbursement it says it is owed for out-of-network healthcare services, and Cigna therefore reserves all rights, defenses, and counterclaims related to the classification and appropriate rate of payment for the Arbitration Claims and will assert any such defenses and counterclaims pursuant to a schedule established in the arbitration.

**WHEREAS**, the Parties desire to promptly and efficiently resolve this Dispute through an arbitration process as set forth herein.

**NOW THEREFORE**, in consideration of the Parties' mutual desire to resolve this Dispute, the Parties agree as follows:

1.   <u>Agreement to Arbitrate</u>. The Parties agree to arbitrate the Arbitration Claims as provided for in this Agreement.

2.   <u>Scope of Arbitration Claims</u>.

   a.   The Arbitration shall be limited to the Arbitration Claims.  Both Parties agree that in no event do they intend the Arbitration Claims to include in-network facility claims; any inclusion of in-network facility claims on any list of disputed claims provided by Baptist is inadvertent, and any in-network facility claims are expressly excluded from this Agreement.  Both Parties agree that any applicable statutes or periods of limitation or repose and other legal or equitable defenses related to the passage of time for asserting a claim against a Party, including but not limited to laches or the loss of a claim via waiver or estoppel, as well as any evidentiary or procedural rule or presumption based on

passage of time to bring a claim against a Party (all such defenses collectively referred to as "Time-Related Defenses") for Baptist's out-of-network claims that allegedly accrue after January 1, 2019 and before January 1, 2020 and are not on Exhibit A, but that Baptist asserts in good faith that arise out of the same legal theories and subject to the same causes of action that it raises in the statement of claim to be filed in this action, shall be tolled until the later of either 60 days after the final arbitration award is received or December 31, 2020. Nothing in this agreement shall toll any procedural or exhaustion requirements. Similarly, the Parties agree that any Time-Related Defenses related to Cigna's counterclaims relating to Baptist's out-of-network claims that allegedly accrue after January 1, 2019 and before January 1, 2020 shall likewise be tolled until after the completion of the Arbitration. Nothing in this Agreement shall affect any defense available to any Party as of the Effective Date of this Agreement. This Agreement shall not be deemed to revive any claim that is or was already barred on the Effective Date of this Agreement. This Agreement shall not revive or toll any in-network claim. This Agreement shall not operate as an admission or acknowledgement by any Party that any applicable statute of limitations or other Time-Related Defense has expired or arisen as of the Effective Date of this Agreement. On or around March 18, 2019, the Parties executed a Tolling Agreement extending the time within which to file causes of action related to the Arbitration Claims on Exhibit A. Nothing in this Agreement shall supersede, rescind, or otherwise affect the provisions of the Tolling Agreement and any amendments thereto, and the terms of the Tolling Agreement and any amendments thereto are incorporated herein by reference.

b. Within 7 days of the execution of this Agreement, Baptist shall provide a detailed statement of claim providing the factual and legal basis for its claimed right to relief on each of the reimbursement claims that are part of the Arbitration Claims. For efficiency, Baptist may group the reimbursement claims into categories of reimbursement claims that involve the same factual basis or legal theory. Baptist will have the right to amend its detailed statement of claim, including but not limited to amending its causes of action (and Cigna its corresponding counterclaims and defenses); provided that no amendment to the Arbitration Claims will be permitted that increases the number of Arbitration Claims.

c. Within 60 days after receipt of the detailed statement of claim provided in subparagraph b above from Baptist, Cigna will identify any reimbursement claims it contends should not be included in the Arbitration Claims (for example, because they are not out-of-network claims, or were paid, or such other similar reason), except that time may be extended for reasonable cause; provided, however, that this showing shall be only to secure a list of reimbursement claims actually to be disputed in the Arbitration and shall not constitute Cigna's defense to reimbursement claims that are in dispute.

d. Thereafter, if any dispute remains as to what reimbursement claims are a part of this Arbitration, the Parties will make good faith efforts to resolve this dispute within 60 days. Any such dispute remaining after 60 days will be submitted to the arbitration panel for resolution.

e. Nothing in this Agreement nor any position taken during this Arbitration by either Party will be construed to waive any claim or defense unrelated to this Dispute, and nothing in this Agreement impacts the rights of either Party aside from this Agreement and the issues involved in this dispute.

3. Appointment of Arbitrators.

a. A panel of three arbitrators will decide the Dispute.

b. The arbitrators will each be a former judge or a well-respected dispute resolution attorney who has sophisticated commercial litigation experience and a minimum of 20 years' experience in the practice of law, and who shall not have regularly represented parties in the lines of business of Baptist or Cigna.

c. The Parties will select the arbitrators by agreement. Baptist will provide a list of potential arbitrators to Cigna, and Cigna will endeavor in good faith to agree to one of the arbitrators on that list. Likewise, Cigna will provide a list of potential arbitrators to Baptist, and Baptist will endeavor in good faith to agree to one of the arbitrators on that list. The Parties will select the third arbitrator by agreement. If the Parties cannot reach agreement on the third arbitrator, then the Parties agree to engage the American Arbitration Association to identify a list of seven potential arbitrators that meet the criteria set out in (3)(b) above. The Parties will then strike and rank the potential arbitrator, but each Party may only strike a maximum of three of the seven potential arbitrators.

d. Any contact with a prospective arbitrator will be made jointly and not on a unilateral basis. As part of the selection process, the prospective arbitrator(s) will disclose to both Parties any representation, fact, or relationship that might constitute a conflict of interest in serving as a neutral in this matter. Conflict of interest issues will be governed by the Commercial Arbitration Rules of the American Arbitration Association, amended and effective October 1, 2013, regular track, including the Procedures for Large, Complex Commercial Disputes ("AAA Commercial Rules"). If the Parties are unable to select the arbitration panel by agreement, the Parties agree to negotiate an alternative mechanism for selection of the arbitration panel.

e. The arbitration panel will administer the proceeding directly without the employment of the American Arbitration Association or any other dispute resolution body, unless agreed otherwise.

4. Fees and Costs for Arbitration. The Parties each agree to pay their own legal fees and expenses in connection with the arbitration and, in addition, to pay one-half the cost of the arbitration, including fees charged by the arbitrators. Notwithstanding any contrary provision of

the AAA Commercial Rules, the arbitration panel will not have the power to reallocate fees or costs of the proceeding as part of its award.

5.    <u>Issues for Arbitration</u>. The question to be decided in this arbitration is whether Baptist was properly reimbursed for the Arbitration Claims, and if not, what is the amount Cigna owes. Baptist generally contends that it provided medically necessary out-of-network healthcare services to Cigna members that were not properly paid.  Cigna disputes Baptist's contentions, including whether they are factually or legally correct or state actionable claims or are subject to Cigna's counterclaims or other defenses.

6.    <u>Conduct of the Arbitration</u>.  The arbitration panel will apply the AAA Commercial Rules for procedural and process issues, and applicable federal and state law for substantive legal issues, except that processes and procedures regarding disclosure, use, and communications with experts will follow federal law.

7.    <u>Initial Pleadings</u>.

    a.    Baptist will be deemed the claimant for purposes of the arbitration, and Cigna will be deemed the respondent.

    b.    Within 7 days after execution of this Agreement, Baptist will submit to the arbitration panel and send to Cigna's counsel a detailed statement of claim specifying its causes of action and factual basis for the same, as provided in paragraph 2.b above.

    c.    Within 30 days thereafter, Cigna will file an answering statement stating with specificity all affirmative defenses and counterclaims, and the grounds thereof.

    d.    If either Party becomes aware during discovery of additional legal theories, causes of actions, defenses, or counterclaims relating to the appropriate reimbursement of the Arbitration Claims, it may seek leave to add them to the arbitration, which may be permitted upon a showing of good cause.

    e.    The Parties agree that any applicable statutes or periods of limitation or repose and other legal or equitable defenses related to the passage of time for asserting a claim against a Party, including but not limited to laches or the loss of a claim via waiver or estoppel, as well as any evidentiary or procedural rule or presumption based on passage of time to bring a claim against a Party (all such defenses collectively referred to as "Time-Related Defenses") for Baptist's claims will continue to be tolled from the Effective Date of December 5, 2018, of the Tolling Agreement executed by the Parties on March 18, 2019, until the filing of the detailed statement in paragraph 2.b above; provided, however, that claims accruing after January 1, 2019 and before January 1, 2020 shall be tolled as provided in paragraph 2.a above.  Furthermore, the terms of the Tolling Agreement and any amendments thereto are incorporated herein by reference.

    f.    Similarly, the Parties agree that any Time-Related Defenses related to Cigna's counterclaims will likewise be tolled until the filing of Cigna's answering

statement; provided again, however, that any Time-Related Defenses related to Cigna's counterclaims regarding any of Baptist's claims accruing after January 1, 2019 and before January 1, 2020 shall also be tolled as provided in paragraph 2.a above.

g.    Nothing in this Agreement will affect any defense available to any Party as of the Effective Date of the Tolling Agreement. This Agreement will not be deemed to revive any claim that is or was already barred on the Effective Date of the Tolling Agreement. This Agreement will not operate as an admission or acknowledgement by any Party that any applicable statute of limitations or other Time-Related Defense has expired or arisen as of the Effective Date of the Tolling Agreement.

8.    <u>Scope of Discovery</u>.

a.    The scope of discovery will be consistent with the AAA Commercial Rules, except as described herein.

b.    Each Party will be entitled to serve upon the other Party a total of 30 Interrogatories, including subparts, and a total of 30 Requests for Production of Documents and Tangible Things, including subparts. The Parties shall negotiate the scope of discovery in good faith and under the guidance of the arbitration panel once Baptist has supplied its detailed statement of claim as provided in paragraph 2.b above.  It is anticipated that depositions may be necessary, including corporate representatives and expert witnesses.

c.    Discovery depositions of any witness will be limited to 7 hours of questioning per deposition by the noticing Party, and up to 1 hour of follow-up by the defending Party, subject to extensions by agreement or by order of the arbitration panel for good cause shown.

d.    The Parties will select by agreement one arbitrator from the arbitration panel to resolve discovery disputes. If the Parties are unable to agree after reasonable efforts, the arbitration panel will select one arbitrator to resolve discovery disputes, according to a process determined by the arbitration panel. Discovery disputes may be taken up at any time after the Parties have made reasonable efforts to meet and confer over the dispute.

e.    Except as provided in this Agreement, discovery tools will be utilized in a manner generally consistent with the commensurate Federal Rules of Civil Procedure; provided, however, that it is anticipated and expected that the scope of document discovery (especially for electronically stored information ("ESI")) will be as narrow as reasonably feasible to the needs of this specific Dispute, as is consistent with the Parties' desire to arbitrate this Dispute and resolve it in a cost-effective and streamlined fashion.

f.    The Parties are obligated to work in good faith to ensure that discovery is streamlined and narrowly tailored to the purposes of this case. Any decisions

by the arbitrator to resolve discovery disputes regarding the scope of discovery, ESI, or any other information will take into account the Parties' desire to have a cost-effective proceeding and will not be controlled or otherwise determined by the scope of discovery provided in the Federal Rules of Civil Procedure.

9.      Pre-hearing Schedule. The Parties agree to negotiate a schedule with the goal of completing the Arbitration by the end of the summer 2020, with specific dates to be agreed to by the Parties and the arbitration panel.  This schedule may be modified by agreement or upon the motion of either Party for good cause shown, including with regard to trial schedules of counsel or the Parties that may be set by courts or arbitration panels in the interim, provided that counsel and the Parties have made best efforts to maintain this agreed-upon schedule.   Good cause includes, but is not limited to, the failure of a Party to timely produce discovery to the Party requesting modification/extension.  A material and key consideration to the Parties' agreement to the pre-hearing schedule and hearing date is their respective agreement to cooperate and timely and fully produce the documents and other information set forth herein.  Also material and key to the Parties' agreement is that, because this is a voluntary arbitration, the discovery process is streamlined, sensible, and managed to the needs of the case as provided for in paragraph 8 above.

10.      Periodic Status Conferences. The Parties and the arbitration panel will have monthly status conferences regarding the progress of discovery and the arbitration, unless otherwise agreed by the Parties.

11.      Mandatory Mediation.  No later than 90 days before the scheduled start of the final hearing, the Parties will conduct a non-binding mediation at a location to be determined by agreement of the Parties before a neutral other than the arbitration panel.  The Parties will attempt in good faith to select a mediator.  If after reasonable efforts the Parties are unable to select a mediator, the arbitration panel will appoint a mediator according to a process determined by the arbitration panel.

12.      Bifurcation.  By agreement of the Parties or by order of the arbitration panel upon motion for good cause shown, issues to be decided at the final hearing may be bifurcated in order to promote efficiencies and resolution of the Dispute.

13.      Final Hearing.  The final arbitration hearing will commence on a date to be agreed to by the Parties and the arbitration panel, with the goal of setting the hearing for summer 2020. Proof will be closed at the conclusion of the final hearing and will not be re-opened unless extraordinary grounds are shown to the arbitration panel.

14.      Hearing Site.  The final hearing will be held at a neutral, mutually agreeable location.

15.      Decision.  The final award will be rendered by a majority of the arbitration panel. The arbitration panel will have the authority to decide all claims and defenses asserted in the arbitration, as required by law and equity.  The arbitration panel will prepare a reasoned award in writing consistent with the AAA Commercial Rules, which will specify any damages payable to any Party.

16.    <u>Binding Nature of Arbitration</u>.  The award to be made by the arbitration panel will be valid and binding upon, and will be performed by, each of the Parties and their respective parents, subsidiaries, affiliates, owners, shareholders, officers, directors, employees, representatives, successors, transferees, and assigns.  The Parties further agree that in the event either Party refuses to implement or honor the final award of the arbitration panel, then, and only then, within 90 days following such refusal to implement or honor the final award, either Party may commence a summary action in any federal court of competent jurisdiction for the confirmation of the award subject to the Federal Arbitration Act and the Federal Rules of Civil Procedure, but will abide by the confidentiality provisions of this Agreement consistent with applicable court rules.

17.    <u>Confidentiality Regarding this Agreement</u>.  No Party will disclose to third parties the terms and provisions of this Agreement without the prior written consent of the other Party except as required by law, or to enforce this Agreement, or as may be required for purposes of communicating with the Parties' auditors, regulators, attorneys, and insurers.  The Parties agree that this Agreement will be admissible in the arbitration contemplated by this Agreement but will not be admissible in any other pending or subsequent litigation or arbitration between the Parties related to any subject, except to enforce the Agreement.  The Parties agree that the breach or prospective breach of this provision will cause irreparable harm for which monetary damages may not be adequate.  The Parties therefore agree that in addition to any other remedies, the non-breaching Party will be entitled to injunctive or other equitable relief to restrain the breach hereof. Should either Party receive a subpoena or other process requesting information pertaining to this Agreement, the subpoenaed Party shall in good faith make best efforts to provide notice of such subpoena via overnight delivery and email to counsel for the Parties, and a reasonable opportunity to oppose or quash such subpoena will be afforded to the Party seeking to oppose or quash such subpoena or process; however, this notice requirement does not apply to governmental investigations and governmental audits, for which no such notice is required of either Party.

18.    <u>Confidentiality Regarding Arbitration Proceedings and Documents Exchanged in this Arbitration</u>.  The Parties agree that the arbitration communications, filings, proceedings, and the arbitration award are and will be kept confidential and that the documents exchanged between the Parties and/or the arbitrators in relation to the arbitration may not be disclosed to any persons other than current and former employees of the Parties acting as witnesses in the arbitration, the Parties' expert witnesses and their personnel, the arbitrators and their personnel, counsel for the Parties and their personnel, or as necessary in the ordinary course of the Parties' business, absent the consent of all Parties or proper legal process.  The Parties will execute a mutually agreeable Confidentiality Agreement that will govern the documents exchanged in the arbitration.  The results and decisions of the arbitration panel will also be confidential, and will not be revealed to anyone or disclosed by the Parties for any reason other than to enforce the award, or as may be required by law, or for purposes of communicating with the Parties' auditors, regulators, attorneys, and insurers. In the event that a Party files an action to enforce the award, all Parties will use their best efforts to ensure that the award is filed under seal and remains permanently under seal.  Should either Party receive a subpoena or other process requesting information pertaining to this Agreement, the subpoenaed Party shall in good faith make best efforts to provide notice of such subpoena via overnight delivery and email to counsel for the Parties, and a reasonable opportunity to oppose or quash such subpoena will be afforded to the Party seeking to oppose or quash such

subpoena or process; however, this notice requirement does not apply to governmental investigations and governmental audits, for which no such notice is required of either Party.

19.    <u>Binding Agreement</u>.  This Agreement will be binding upon, inure to the benefit of, and be enforceable by and against each Party hereto and their respective successors and permitted assigns.

20.    <u>Entire Agreement</u>.  The Parties represent and warrant that this document constitutes the entire agreement between the Parties hereto with respect to the subject matter hereof, and all prior negotiations, correspondence, agreements, and discussions with respect thereto, are hereby merged into this Agreement.  There exists between the Parties no oral agreement, understanding, statement, promise, representation, warranty, or inducement other than as may be contained in this Agreement.  The Parties are not relying upon any promise, representation, warranty, or consideration not expressly set forth herein.

21.    <u>Assignment</u>.  No Party may assign this Agreement or its rights or obligations hereunder without the prior written consent of the other Party.

22.    <u>Amendment</u>.  This Agreement may be amended at any time by mutual agreement of the Parties, but any such amendment must be in writing, dated, and signed by the Parties.

23.    <u>Counterparts</u>.  This Agreement may be executed in multiple originals, each of which will be binding upon the Party whose signature it contains, and the combined total of which will constitute the entire document.  A facsimile or electronically scanned copy of the entire Agreement that contains the signature of an authorized representative of one or more of the Parties will be accepted as an original document for all purposes.

24.    <u>Authority</u>.  Each individual signing below on behalf of Baptist and Cigna has full and complete authorization and power to execute this Agreement.  This Agreement is a valid, binding, and enforceable obligation of each Party, and does not violate any law, rule, regulation, or contract binding upon either Party.  Cigna represents and warrants that it has full authority to execute this Agreement and to bind itself to the covenants stated herein. Baptist represents and warrants that it has full authority to execute this Agreement and to bind itself to the covenants stated herein.

25.    <u>Governing Law</u>.  It is agreed that applicable federal and state substantive law will be applied by the arbitration panel in the arbitration, except as provided under Section 6 of the Agreement with regard to the use and declaration of experts.  It is further agreed that these proceedings are governed by, construed, and enforced in accordance with the Federal Arbitration Act and the Federal Rules of Civil Procedure, except that Arkansas' Revised Uniform Arbitration Act, Ark. Code Ann. § 16-108-217(e), will be applied by the arbitration panel only for the issuance of protective orders.  The arbitration necessarily involves the production of documents containing confidential information, and protected health information and individually identifiable health information that may be protected from unauthorized disclosure by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the privacy regulations promulgated thereunder (45 C.F.R. Parts 160 and 164).  The Parties agree that the arbitration panel has the

power to issue and enforce a HIPAA qualified protective order in the arbitration under Ark. Code Ann. § 16-108-217(e).

26.     <u>Arbitrability</u>.  The arbitration panel will have the power to decide all issues of arbitrability, including whether any Arbitration Claim, cause of action, defense, or counterclaim is subject to this Agreement or may be resolved in the arbitration.

27.     <u>Construction</u>.  In the event of any question or dispute under this Agreement, Baptist and Cigna agree that the terms of this Agreement will not be construed against the drafter, but will be construed as though all Parties were the drafter.

28.     <u>Additional Documents</u>.  The Parties agree to cooperate fully and to execute any and all supplementary documents, and to take all additional actions that may be necessary or appropriate to give full force and effect to the terms and intent of this Agreement.

29.     <u>Effective Date</u>.  This Agreement will become effective on the date of the last signature below.

30.     <u>Invalid Provisions</u>.  If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, or unenforceable, the remainder of the provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated; provided, however, in lieu of such illegal, invalid, or unenforceable provision, the Parties hereto agree to add as a part hereof a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable that preserves the same benefits to the Parties.

IN WITNESS WHEREOF the Parties to this Agreement have caused it to be executed by themselves or their duly authorized representative.

Baptist Memorial Health Care Corporation *by counsel*

Signed: _____

Printed Name: DAVID A. KING

Title: Polsinelli Shareholder

Date: 2/24/20


Cigna

Signed: _____

Printed Name: John Hamill

Title: Partner, Counsel for Cigna

Date: 2/24/20

10

# TAB 010A

ELECTRONICALLY FILED
2023 Aug 18 1:25 PM
CLERK OF COURT - CHANCERY

**IN THE CHANCERY COURT FOR SHELBY COUNTY, TENNESSEE**
**FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS**

| | | |
|---|---|---|
| **CIGNA HEALTHCARE OF TENNESSEE INC.,** | ) | |
| | ) | |
| **Petitioner / Counter-Respondent,** | ) | |
| | ) | **Case No. CH-22-1654** |
| **v.** | ) | **Hon. Melanie Taylor Jefferson** |
| | ) | |
| **BAPTIST MEMORIAL HEALTH CARE CORPORATION,** | ) | |
| | ) | |
| **Respondent / Counter-Petitioner.** | ) | |

**BAPTIST MEMORIAL HEALTH CARE CORPORATION'S**
**COUNTER-PETITION TO CONFIRM ARBITRATION**
**AWARDS AND ENTER JUDGMENT**

Respondent / Counter-Petitioner, Baptist Memorial Health Care Corporation ("Baptist"),

respectfully moves the Court for an order confirming: (1) the Phase 2 Partial Final Award entered

by the three-member arbitration panel ("Panel") on September 7, 2022; and (2) the Phase 3(a)

Partial Final Award entered by the Panel on July 11, 2023.  In support, Baptist states as follows:

**FACTS AND PROCEDURAL HISTORY**

1.      In November 2019, Baptist and Petitioner / Counter-Respondent, Cigna Healthcare

of Tennessee, Inc. ("Cigna") (collectively, the "Parties"), agreed to arbitrate a dispute before the

Panel involving Cigna's wrongful denial and underpayment of certain claims for out-of-network

emergency services provided by Baptist to Cigna members (the "Arbitration").  The controlling

arbitration agreement is the First Amended Arbitration Agreement dated February 24, 2020

("Arbitration Agreement").  A true and accurate copy of the Arbitration Agreement is attached as

**Exhibit A**.

2.      The Parties agreed that the Arbitration would be conducted pursuant to the

American Arbitration Association's Procedures for Large, Complex Commercial Disputes (*i.e.,*

AAA's Commercial Rules).  Arbitration Agreement at ¶ 6.  They also agreed that applicable federal and state law would apply for substantive legal issues.  *Id.*

3.     The Parties agreed that there would be no express right to appeal and that any challenge would be governed by the Federal Arbitration Act ("FAA").

4.     Paragraph 12 of the Arbitration Agreement permits the bifurcation of issues in the Arbitration to promote efficiencies and resolution of the dispute.  *Id.* at ¶ 12.  Pursuant to that authority, the Parties agreed (and the Panel ordered) that the Arbitration would be split into multiple phases, with separate hearings for liability and damages. Order No. 13 – Case Management Order for Phase 2 Hearing (the "Phase 2 CMO").  A true and accurate copy of the Phase 2 CMO has been redacted by agreement of the Parties and is attached as **Exhibit B**.

5.     Phase 1 concluded with a five-day evidentiary hearing held in late February, early March 2021.

6.     Following the Phase 1 hearing, on June 30, 2021, the Panel issued its "Phase 1 ***Tentative*** Ruling," expressly noting its ruling was "subject to reconsideration after the conclusion of Phase 2."

7.     The Parties then proceeded to conduct discovery and have a Phase 2 hearing.  Per the Phase 2 CMO, the Parties agreed that the Phase 2 hearing would result in final liability rulings on all claims and defenses but that the issue of damages would be addressed at a subsequent hearing.  Phase 2 CMO at ¶¶ 9–10.

8.     Phase 2 culminated in a nine-day evidentiary hearing in November and December 2021.

9.     Following the Phase 2 hearing, the Panel issued its first "Partial Final Award," dated September 7, 2022 ("Phase 2 Final Award").  A true and accurate copy of the Phase 2 Final

Award has been redacted by agreement of the Parties pursuant to the Court's order and is attached as **Exhibit C**.

10.     The Phase 2 Final Award resolved all issues between the Parties related to liability for the claims at issue in Phases 1 and 2.  Importantly, the Panel found that, under Tennessee law, *quantum meruit* applies to the out-of-network emergency services at issue.  Even though damages were to be determined at a later date, the Phase 2 Final Award was a "final award" under the FAA because the Parties agreed to bifurcate liability and damages into separate proceedings.  Phase 2 CMO at ¶¶ 9–10.  *See Trade & Transp., Inc. v. Nat. Petroleum Charterers Inc.*, 931 F.2d 191, 195 (2d Cir. 1991) (holding that a partial final award determining liability is final and subject to judicial review when the parties formally agreed to bifurcate liability and damages); *see also Hart Surgical, Inc. v. Ultracision, Inc.*, 244 F.3d 231, 234–35 (1st Cir. 2001) (same).

11.     Following issuance of the Phase 2 Final Award, the Panel and the Parties agreed to set a Phase 3(a) hearing to determine the appropriate rate of payment Cigna owes Baptist under its *quantum meruit* cause of action.  This hearing was held in January 2023.

12.     On July 11, 2023, the Panel issued its second "Partial Final Award" ("Phase 3(a) Final Award"), determining the applicable rate of payment for Baptist's *quantum meruit* cause of action.  Pursuant to the Court's Protective Order entered on June 06, 2023, Baptist is hereby filing the Panel's Phase 3(a) Final Award under seal as **Exhibit D**.

## LAW AND SHORT-FORM ARGUMENT

13.     The FAA states "any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court ***must*** grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title."  9 U.S.C. § 9 (emphasis added).

14.     On December 6, 2022, Cigna filed with this Court a petition to modify or vacate the Panel's Phase 2 Final Award.  On June 13, 2023, Cigna filed with this Court an amended petition to modify or vacate the Panel's Phase 2 Final Award.

15.     Although Cigna has not filed a petition to modify or vacate the Panel's Phase 3(a) Final Award with this Court, it has filed a petition to vacate the Panel's Phase 3(a) Final Award in federal court, with its previous challenge to the Phase 2 Final Award still pending in this Court. Baptist now brings this summary counter-petition to confirm both the Phase 2 Partial Final Award and the Phase 3(a) Partial Final Award.

16.     Cigna makes two arguments in support of modification or vacatur of the Phase 2 Final Award: (i) the Panel acted beyond its authority granted by the Arbitration Agreement; and (ii) the Panel acted in manifest disregard of the law.  *See* Cigna Amended Petition at ¶¶ 7, 50.  Both arguments fail as a matter of law.

17.     Cigna's first argument fails because, pursuant to the Arbitration Agreement, the Panel had the authority to "decide all claims and defenses asserted in the arbitration, as required by law and equity."  Arbitration Agreement at ¶ 15.  As such, the Panel was clearly authorized to issue its Phase 2 Final Award, which represents its final ruling on liability resolving all claims and defenses addressed during Phases 1 and 2.

18.     Cigna's second argument fails because the Supreme Court held in *Hall Street Associates, L.L.C. v. Mattel* that the FAA's statutory grounds for vacatur are the exclusive grounds for vacating an arbitration award under the FAA.  552 U.S. 576, 581 (2008).  These statutory grounds do not include the so-called "manifest disregard of the law" ground for vacatur relied upon by Cigna.  *Id.* at 584–85.  Even if "manifest disregard of the law" was a viable ground for vacatur, Cigna cannot meet the high burden of proof required to meet that standard.  *See Merrill Lynch,*

*Pierce, Fenner & Smith, Inc. v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995).  Baptist will submit a response in opposition to Cigna's petition to modify or vacate the Panel's Phase 2 Final Award that sets forth the grounds for confirmation of the awards in more detail.

19.    Because Cigna's arguments fail as a matter of law, there are no grounds for vacating, modifying, or correcting the Phase 2 Final Award or the Phase 3(a) Final Award. Consequently, the Court has an obligation to confirm these awards into judgment. *See* 9 U.S.C. § 9.

WHEREFORE, Respondent / Counter-Petitioner, Baptist Memorial Health Care Corporation, respectfully requests that the Court grant its counter-petition to confirm both the Phase 2 Partial Final Award and the Phase 3(a) Partial Final Award and enter judgment thereon.

Respectfully submitted,


**POLSINELLI PC**

*/s/ David A. King*
David A. King (BPR 011559)
N. Adam Dietrich II (BPR 031093)
Samantha Flener (BPR 038282)
401 Commerce Street, Suite 900
Nashville, Tennessee 37219
dking@polsinelli.com
adietrich@polsinelli.com
sflener@polsinelli.com
615-259-1510


**HARRIS | SHELTON**


*/s/ Christopher S. Campbell (w/p by DAK)*
Christopher S. Campbell (BPR 019061)
6060 Primacy Parkway, Suite 100
Memphis, Tennessee 37118
ccampbell@harrisshelton.com
901-525-1455

*Attorneys for Counter-Petitioner*

6

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that a true and correct copy of the foregoing was served on this 18th day of August, 2023, to the following via email and the Court's docketing system:

Odell Horton, Jr.                  John J. Hamill
Andrew J. Pulliam             Pamela Begaj Loutos
WYATT, TARRANT & COMBS, LLP    DLA PIPER LLP (US)
6070 Poplar Avenue, Suite 300     444 West Lake Street, Suite 900
Memphis, TN 38119             Chicago, IL 60606
ohorton@wyattfirm.com         john.hamill@dlapiper.com
apulliam@wyattfirm.com        pamela.loutos@dlapiper.com

*Counsel for Counter-Respondent*

                              */s/ David A. King*

# TAB 010B

ELECTRONICALLY FILED
2023 Aug 18 1:25 PM
CLERK OF COURT - CHANCERY

# **<u>EXHIBIT A</u>**

# FIRST AMENDED ARBITRATION AGREEMENT

**THIS AGREEMENT** ("Agreement") is made as of the 24th day of February, 2020, by and between Baptist Memorial Health Care Corporation, individually and on behalf of its affiliated companies (collectively, "Baptist"), and Cigna HealthCare of Tennessee, Inc., individually and on behalf of its affiliated companies (collectively, "Cigna"). Baptist and Cigna are referred to in this Agreement in the singular as a "Party" and collectively as the "Parties."

**WHEREAS**, Baptist claims that the Parties have a dispute about the appropriate reimbursement for a specific set of certain out-of-network healthcare services provided by Baptist facilities to Cigna members (the "Dispute");

**WHEREAS**, the Parties have agreed to submit the Dispute to binding arbitration pursuant to the terms set forth below;

**WHEREAS**, the specific out-of-network reimbursement claims subject to the Dispute will not include any claims other than those set forth on the document identified on March 25, 2019, as Exhibit A to the Tolling Agreement executed on March 18, 2019, and will not include any in-network facility claims even if any in-network facility claim was identified on Exhibit A ("Arbitration Claims"); and

**WHEREAS**, Baptist has not specified the full legal or factual basis for its claims, other than Baptist asserts it has not received the full amount of reimbursement it says it is owed for out-of-network healthcare services, and Cigna therefore reserves all rights, defenses, and counterclaims related to the classification and appropriate rate of payment for the Arbitration Claims and will assert any such defenses and counterclaims pursuant to a schedule established in the arbitration.

**WHEREAS**, the Parties desire to promptly and efficiently resolve this Dispute through an arbitration process as set forth herein.

**NOW THEREFORE**, in consideration of the Parties' mutual desire to resolve this Dispute, the Parties agree as follows:

1. <u>Agreement to Arbitrate</u>. The Parties agree to arbitrate the Arbitration Claims as provided for in this Agreement.

2. <u>Scope of Arbitration Claims</u>.

   a. The Arbitration shall be limited to the Arbitration Claims. Both Parties agree that in no event do they intend the Arbitration Claims to include in-network facility claims; any inclusion of in-network facility claims on any list of disputed claims provided by Baptist is inadvertent, and any in-network facility claims are expressly excluded from this Agreement. Both Parties agree that any applicable statutes or periods of limitation or repose and other legal or equitable defenses related to the passage of time for asserting a claim against a Party, including but not limited to laches or the loss of a claim via waiver or estoppel, as well as any evidentiary or procedural rule or presumption based on

passage of time to bring a claim against a Party (all such defenses collectively referred to as "Time-Related Defenses") for Baptist's out-of-network claims that allegedly accrue after January 1, 2019 and before January 1, 2020 and are not on Exhibit A, but that Baptist asserts in good faith that arise out of the same legal theories and subject to the same causes of action that it raises in the statement of claim to be filed in this action, shall be tolled until the later of either 60 days after the final arbitration award is received or December 31, 2020. Nothing in this agreement shall toll any procedural or exhaustion requirements. Similarly, the Parties agree that any Time-Related Defenses related to Cigna's counterclaims relating to Baptist's out-of-network claims that allegedly accrue after January 1, 2019 and before January 1, 2020 shall likewise be tolled until after the completion of the Arbitration. Nothing in this Agreement shall affect any defense available to any Party as of the Effective Date of this Agreement. This Agreement shall not be deemed to revive any claim that is or was already barred on the Effective Date of this Agreement. This Agreement shall not revive or toll any in-network claim. This Agreement shall not operate as an admission or acknowledgement by any Party that any applicable statute of limitations or other Time-Related Defense has expired or arisen as of the Effective Date of this Agreement. On or around March 18, 2019, the Parties executed a Tolling Agreement extending the time within which to file causes of action related to the Arbitration Claims on Exhibit A. Nothing in this Agreement shall supersede, rescind, or otherwise affect the provisions of the Tolling Agreement and any amendments thereto, and the terms of the Tolling Agreement and any amendments thereto are incorporated herein by reference.

b.   Within 7 days of the execution of this Agreement, Baptist shall provide a detailed statement of claim providing the factual and legal basis for its claimed right to relief on each of the reimbursement claims that are part of the Arbitration Claims. For efficiency, Baptist may group the reimbursement claims into categories of reimbursement claims that involve the same factual basis or legal theory. Baptist will have the right to amend its detailed statement of claim, including but not limited to amending its causes of action (and Cigna its corresponding counterclaims and defenses); provided that no amendment to the Arbitration Claims will be permitted that increases the number of Arbitration Claims.

c.   Within 60 days after receipt of the detailed statement of claim provided in subparagraph b above from Baptist, Cigna will identify any reimbursement claims it contends should not be included in the Arbitration Claims (for example, because they are not out-of-network claims, or were paid, or such other similar reason), except that time may be extended for reasonable cause; provided, however, that this showing shall be only to secure a list of reimbursement claims actually to be disputed in the Arbitration and shall not constitute Cigna's defense to reimbursement claims that are in dispute.

      d.      Thereafter, if any dispute remains as to what reimbursement claims are a part of this Arbitration, the Parties will make good faith efforts to resolve this dispute within 60 days.  Any such dispute remaining after 60 days will be submitted to the arbitration panel for resolution.

      e.      Nothing in this Agreement nor any position taken during this Arbitration by either Party will be construed to waive any claim or defense unrelated to this Dispute, and nothing in this Agreement impacts the rights of either Party aside from this Agreement and the issues involved in this dispute.

3.      <u>Appointment of Arbitrators</u>.

      a.      A panel of three arbitrators will decide the Dispute.

      b.      The arbitrators will each be a former judge or a well-respected dispute resolution attorney who has sophisticated commercial litigation experience and a minimum of 20 years' experience in the practice of law, and who shall not have regularly represented parties in the lines of business of Baptist or Cigna.

      c.      The Parties will select the arbitrators by agreement.  Baptist will provide a list of potential arbitrators to Cigna, and Cigna will endeavor in good faith to agree to one of the arbitrators on that list.  Likewise, Cigna will provide a list of potential arbitrators to Baptist, and Baptist will endeavor in good faith to agree to one of the arbitrators on that list.  The Parties will select the third arbitrator by agreement. If the Parties cannot reach agreement on the third arbitrator, then the Parties agree to engage the American Arbitration Association to identify a list of seven potential arbitrators that meet the criteria set out in (3)(b) above. The Parties will then strike and rank the potential arbitrator, but each Party may only strike a maximum of three of the seven potential arbitrators.

      d.      Any contact with a prospective arbitrator will be made jointly and not on a unilateral basis. As part of the selection process, the prospective arbitrator(s) will disclose to both Parties any representation, fact, or relationship that might constitute a conflict of interest in serving as a neutral in this matter.  Conflict of interest issues will be governed by the Commercial Arbitration Rules of the American Arbitration Association, amended and effective October 1, 2013, regular track, including the Procedures for Large, Complex Commercial Disputes ("AAA Commercial Rules"). If the Parties are unable to select the arbitration panel by agreement, the Parties agree to negotiate an alternative mechanism for selection of the arbitration panel.

      e.      The arbitration panel will administer the proceeding directly without the employment of the American Arbitration Association or any other dispute resolution body, unless agreed otherwise.

4.      <u>Fees and Costs for Arbitration</u>.  The Parties each agree to pay their own legal fees and expenses in connection with the arbitration and, in addition, to pay one-half the cost of the arbitration, including fees charged by the arbitrators.  Notwithstanding any contrary provision of

the AAA Commercial Rules, the arbitration panel will not have the power to reallocate fees or costs of the proceeding as part of its award.

5.   <u>Issues for Arbitration</u>. The question to be decided in this arbitration is whether Baptist was properly reimbursed for the Arbitration Claims, and if not, what is the amount Cigna owes. Baptist generally contends that it provided medically necessary out-of-network healthcare services to Cigna members that were not properly paid.  Cigna disputes Baptist's contentions, including whether they are factually or legally correct or state actionable claims or are subject to Cigna's counterclaims or other defenses.

6.   <u>Conduct of the Arbitration</u>.  The arbitration panel will apply the AAA Commercial Rules for procedural and process issues, and applicable federal and state law for substantive legal issues, except that processes and procedures regarding disclosure, use, and communications with experts will follow federal law.

7.   <u>Initial Pleadings</u>.

    a.    Baptist will be deemed the claimant for purposes of the arbitration, and Cigna will be deemed the respondent.

    b.    Within 7 days after execution of this Agreement, Baptist will submit to the arbitration panel and send to Cigna's counsel a detailed statement of claim specifying its causes of action and factual basis for the same, as provided in paragraph 2.b above.

    c.    Within 30 days thereafter, Cigna will file an answering statement stating with specificity all affirmative defenses and counterclaims, and the grounds thereof.

    d.    If either Party becomes aware during discovery of additional legal theories, causes of actions, defenses, or counterclaims relating to the appropriate reimbursement of the Arbitration Claims, it may seek leave to add them to the arbitration, which may be permitted upon a showing of good cause.

    e.    The Parties agree that any applicable statutes or periods of limitation or repose and other legal or equitable defenses related to the passage of time for asserting a claim against a Party, including but not limited to laches or the loss of a claim via waiver or estoppel, as well as any evidentiary or procedural rule or presumption based on passage of time to bring a claim against a Party (all such defenses collectively referred to as "Time-Related Defenses") for Baptist's claims will continue to be tolled from the Effective Date of December 5, 2018, of the Tolling Agreement executed by the Parties on March 18, 2019, until the filing of the detailed statement in paragraph 2.b above; provided, however, that claims accruing after January 1, 2019 and before January 1, 2020 shall be tolled as provided in paragraph 2.a above.  Furthermore, the terms of the Tolling Agreement and any amendments thereto are incorporated herein by reference.

    f.    Similarly, the Parties agree that any Time-Related Defenses related to Cigna's counterclaims will likewise be tolled until the filing of Cigna's answering

statement; provided again, however, that any Time-Related Defenses related to Cigna's counterclaims regarding any of Baptist's claims accruing after January 1, 2019 and before January 1, 2020 shall also be tolled as provided in paragraph 2.a above.

g.      Nothing in this Agreement will affect any defense available to any Party as of the Effective Date of the Tolling Agreement. This Agreement will not be deemed to revive any claim that is or was already barred on the Effective Date of the Tolling Agreement. This Agreement will not operate as an admission or acknowledgement by any Party that any applicable statute of limitations or other Time-Related Defense has expired or arisen as of the Effective Date of the Tolling Agreement.

8.      <u>Scope of Discovery</u>.

a.      The scope of discovery will be consistent with the AAA Commercial Rules, except as described herein.

b.      Each Party will be entitled to serve upon the other Party a total of 30 Interrogatories, including subparts, and a total of 30 Requests for Production of Documents and Tangible Things, including subparts. The Parties shall negotiate the scope of discovery in good faith and under the guidance of the arbitration panel once Baptist has supplied its detailed statement of claim as provided in paragraph 2.b above.  It is anticipated that depositions may be necessary, including corporate representatives and expert witnesses.

c.      Discovery depositions of any witness will be limited to 7 hours of questioning per deposition by the noticing Party, and up to 1 hour of follow-up by the defending Party, subject to extensions by agreement or by order of the arbitration panel for good cause shown.

d.      The Parties will select by agreement one arbitrator from the arbitration panel to resolve discovery disputes. If the Parties are unable to agree after reasonable efforts, the arbitration panel will select one arbitrator to resolve discovery disputes, according to a process determined by the arbitration panel. Discovery disputes may be taken up at any time after the Parties have made reasonable efforts to meet and confer over the dispute.

e.      Except as provided in this Agreement, discovery tools will be utilized in a manner generally consistent with the commensurate Federal Rules of Civil Procedure; provided, however, that it is anticipated and expected that the scope of document discovery (especially for electronically stored information ("ESI")) will be as narrow as reasonably feasible to the needs of this specific Dispute, as is consistent with the Parties' desire to arbitrate this Dispute and resolve it in a cost-effective and streamlined fashion.

f.      The Parties are obligated to work in good faith to ensure that discovery is streamlined and narrowly tailored to the purposes of this case. Any decisions

by the arbitrator to resolve discovery disputes regarding the scope of discovery, ESI, or any other information will take into account the Parties' desire to have a cost-effective proceeding and will not be controlled or otherwise determined by the scope of discovery provided in the Federal Rules of Civil Procedure.

9.      Pre-hearing Schedule. The Parties agree to negotiate a schedule with the goal of completing the Arbitration by the end of the summer 2020, with specific dates to be agreed to by the Parties and the arbitration panel.  This schedule may be modified by agreement or upon the motion of either Party for good cause shown, including with regard to trial schedules of counsel or the Parties that may be set by courts or arbitration panels in the interim, provided that counsel and the Parties have made best efforts to maintain this agreed-upon schedule.   Good cause includes, but is not limited to, the failure of a Party to timely produce discovery to the Party requesting modification/extension.  A material and key consideration to the Parties' agreement to the pre-hearing schedule and hearing date is their respective agreement to cooperate and timely and fully produce the documents and other information set forth herein.  Also material and key to the Parties' agreement is that, because this is a voluntary arbitration, the discovery process is streamlined, sensible, and managed to the needs of the case as provided for in paragraph 8 above.

10.      Periodic Status Conferences. The Parties and the arbitration panel will have monthly status conferences regarding the progress of discovery and the arbitration, unless otherwise agreed by the Parties.

11.      Mandatory Mediation.  No later than 90 days before the scheduled start of the final hearing, the Parties will conduct a non-binding mediation at a location to be determined by agreement of the Parties before a neutral other than the arbitration panel.  The Parties will attempt in good faith to select a mediator.  If after reasonable efforts the Parties are unable to select a mediator, the arbitration panel will appoint a mediator according to a process determined by the arbitration panel.

12.      Bifurcation.  By agreement of the Parties or by order of the arbitration panel upon motion for good cause shown, issues to be decided at the final hearing may be bifurcated in order to promote efficiencies and resolution of the Dispute.

13.      Final Hearing.  The final arbitration hearing will commence on a date to be agreed to by the Parties and the arbitration panel, with the goal of setting the hearing for summer 2020. Proof will be closed at the conclusion of the final hearing and will not be re-opened unless extraordinary grounds are shown to the arbitration panel.

14.      Hearing Site.  The final hearing will be held at a neutral, mutually agreeable location.

15.      Decision.  The final award will be rendered by a majority of the arbitration panel. The arbitration panel will have the authority to decide all claims and defenses asserted in the arbitration, as required by law and equity.  The arbitration panel will prepare a reasoned award in writing consistent with the AAA Commercial Rules, which will specify any damages payable to any Party.

16.  <u>Binding Nature of Arbitration</u>.  The award to be made by the arbitration panel will be valid and binding upon, and will be performed by, each of the Parties and their respective parents, subsidiaries, affiliates, owners, shareholders, officers, directors, employees, representatives, successors, transferees, and assigns.  The Parties further agree that in the event either Party refuses to implement or honor the final award of the arbitration panel, then, and only then, within 90 days following such refusal to implement or honor the final award, either Party may commence a summary action in any federal court of competent jurisdiction for the confirmation of the award subject to the Federal Arbitration Act and the Federal Rules of Civil Procedure, but will abide by the confidentiality provisions of this Agreement consistent with applicable court rules.

17.  <u>Confidentiality Regarding this Agreement</u>.  No Party will disclose to third parties the terms and provisions of this Agreement without the prior written consent of the other Party except as required by law, or to enforce this Agreement, or as may be required for purposes of communicating with the Parties' auditors, regulators, attorneys, and insurers.  The Parties agree that this Agreement will be admissible in the arbitration contemplated by this Agreement but will not be admissible in any other pending or subsequent litigation or arbitration between the Parties related to any subject, except to enforce the Agreement.  The Parties agree that the breach or prospective breach of this provision will cause irreparable harm for which monetary damages may not be adequate.  The Parties therefore agree that in addition to any other remedies, the non-breaching Party will be entitled to injunctive or other equitable relief to restrain the breach hereof.  Should either Party receive a subpoena or other process requesting information pertaining to this Agreement, the subpoenaed Party shall in good faith make best efforts to provide notice of such subpoena via overnight delivery and email to counsel for the Parties, and a reasonable opportunity to oppose or quash such subpoena will be afforded to the Party seeking to oppose or quash such subpoena or process; however, this notice requirement does not apply to governmental investigations and governmental audits, for which no such notice is required of either Party.

18.  <u>Confidentiality Regarding Arbitration Proceedings and Documents Exchanged in this Arbitration</u>.  The Parties agree that the arbitration communications, filings, proceedings, and the arbitration award are and will be kept confidential and that the documents exchanged between the Parties and/or the arbitrators in relation to the arbitration may not be disclosed to any persons other than current and former employees of the Parties acting as witnesses in the arbitration, the Parties' expert witnesses and their personnel, the arbitrators and their personnel, counsel for the Parties and their personnel, or as necessary in the ordinary course of the Parties' business, absent the consent of all Parties or proper legal process.  The Parties will execute a mutually agreeable Confidentiality Agreement that will govern the documents exchanged in the arbitration.  The results and decisions of the arbitration panel will also be confidential, and will not be revealed to anyone or disclosed by the Parties for any reason other than to enforce the award, or as may be required by law, or for purposes of communicating with the Parties' auditors, regulators, attorneys, and insurers. In the event that a Party files an action to enforce the award, all Parties will use their best efforts to ensure that the award is filed under seal and remains permanently under seal.  Should either Party receive a subpoena or other process requesting information pertaining to this Agreement, the subpoenaed Party shall in good faith make best efforts to provide notice of such subpoena via overnight delivery and email to counsel for the Parties, and a reasonable opportunity to oppose or quash such subpoena will be afforded to the Party seeking to oppose or quash such

subpoena or process; however, this notice requirement does not apply to governmental investigations and governmental audits, for which no such notice is required of either Party.

19.   <u>Binding Agreement</u>.  This Agreement will be binding upon, inure to the benefit of, and be enforceable by and against each Party hereto and their respective successors and permitted assigns.

20.   <u>Entire Agreement</u>.  The Parties represent and warrant that this document constitutes the entire agreement between the Parties hereto with respect to the subject matter hereof, and all prior negotiations, correspondence, agreements, and discussions with respect thereto, are hereby merged into this Agreement.  There exists between the Parties no oral agreement, understanding, statement, promise, representation, warranty, or inducement other than as may be contained in this Agreement.   The Parties are not relying upon any promise, representation, warranty, or consideration not expressly set forth herein.

21.   <u>Assignment</u>.  No Party may assign this Agreement or its rights or obligations hereunder without the prior written consent of the other Party.

22.   <u>Amendment</u>.  This Agreement may be amended at any time by mutual agreement of the Parties, but any such amendment must be in writing, dated, and signed by the Parties.

23.   <u>Counterparts</u>.  This Agreement may be executed in multiple originals, each of which will be binding upon the Party whose signature it contains, and the combined total of which will constitute the entire document.  A facsimile or electronically scanned copy of the entire Agreement that contains the signature of an authorized representative of one or more of the Parties will be accepted as an original document for all purposes.

24.   <u>Authority</u>.  Each individual signing below on behalf of Baptist and Cigna has full and complete authorization and power to execute this Agreement.  This Agreement is a valid, binding, and enforceable obligation of each Party, and does not violate any law, rule, regulation, or contract binding upon either Party.  Cigna represents and warrants that it has full authority to execute this Agreement and to bind itself to the covenants stated herein.  Baptist represents and warrants that it has full authority to execute this Agreement and to bind itself to the covenants stated herein.

25.   <u>Governing Law</u>.  It is agreed that applicable federal and state substantive law will be applied by the arbitration panel in the arbitration, except as provided under Section 6 of the Agreement with regard to the use and declaration of experts.  It is further agreed that these proceedings are governed by, construed, and enforced in accordance with the Federal Arbitration Act and the Federal Rules of Civil Procedure, except that Arkansas' Revised Uniform Arbitration Act, Ark. Code Ann. § 16-108-217(e), will be applied by the arbitration panel only for the issuance of protective orders.  The arbitration necessarily involves the production of documents containing confidential information, and protected health information and individually identifiable health information that may be protected from unauthorized disclosure by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the privacy regulations promulgated thereunder (45 C.F.R. Parts 160 and 164).  The Parties agree that the arbitration panel has the

power to issue and enforce a HIPAA qualified protective order in the arbitration under Ark. Code Ann. § 16-108-217(e).

26.    <u>Arbitrability</u>.  The arbitration panel will have the power to decide all issues of arbitrability, including whether any Arbitration Claim, cause of action, defense, or counterclaim is subject to this Agreement or may be resolved in the arbitration.

27.    <u>Construction</u>.  In the event of any question or dispute under this Agreement, Baptist and Cigna agree that the terms of this Agreement will not be construed against the drafter, but will be construed as though all Parties were the drafter.

28.    <u>Additional Documents</u>.  The Parties agree to cooperate fully and to execute any and all supplementary documents, and to take all additional actions that may be necessary or appropriate to give full force and effect to the terms and intent of this Agreement.

29.    <u>Effective Date</u>.  This Agreement will become effective on the date of the last signature below.

30.    <u>Invalid Provisions</u>.  If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, or unenforceable, the remainder of the provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated; provided, however, in lieu of such illegal, invalid, or unenforceable provision, the Parties hereto agree to add as a part hereof a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable that preserves the same benefits to the Parties.

IN WITNESS WHEREOF the Parties to this Agreement have caused it to be executed by themselves or their duly authorized representative.

Baptist Memorial Health Care Corporation *; by counsel*

Signed: _____

Printed Name: __DAVID A. KING__

Title: __Polsinelli Shareholder__

Date: __2/24/20__

Cigna

Signed: _____

Printed Name: __John Hamill__

Title: __Partner, Counsel for Cigna__

Date: __2/24/20__

10

# TAB 010C

ELECTRONICALLY FILED
2023 Aug 18 1:25 PM
CLERK OF COURT - CHANCERY

# **<u>EXHIBIT B</u>**

**PRIVATE AND CONFIDENTIAL ARBITRATION**

| | | |
|---|---|---|
| **BAPTIST MEMORIAL HEALTH** | ) | |
| **CARE CORPORATION,** | ) | |
| | ) | |
| **Claimant,** | ) | **Arbitrators** |
| | ) | **Chair:  Conna A. Weiner, Esq.** |
| **v.** | ) | **Hon. Joseph J. Farnan, Jr.** |
| | ) | **Hon. Michael J. Schless.** |
| **CIGNA HEALTHCARE OF** | ) | |
| **TENNESSEE, INC.,** | ) | |
| | ) | |
| **Respondent.** | ) | |

<u>**ORDER NO. 13 – CASE MANAGEMENT ORDER FOR PHASE 2 HEARING**</u>

The Panel enters this Procedural Order No. 13 to establish a case management plan for a Phase 2 Hearing in this Arbitration, in which the Parties are litigating approximately 21,000 individual claims for healthcare services that Baptist alleges were underpaid or denied by Cigna and where Cigna has alleged certain affirmative defenses.

1.    **Panel Authority.**  This Order is entered pursuant to Section 12 of the Parties' First Amended Arbitration Agreement, which grants authority to divide the Arbitration into phases.  The Panel finds that phasing along these lines, and featuring hearings on sample claims selected from agreed "buckets" (categories), is appropriate and may advance the efficient resolution of this dispute.

2.    **Virtual Phase 2 Hearing Commencing in November 2021.**  The Parties and the Panel have agreed to reserve the following days for the Phase 2 virtual hearing on the Zoom platform: November 10, 11, 12, 17, 18[1], 19, and December 1[2], 2, and 3, 2021.  There will be a prehearing conference on November 4, 2021 at 4 pm CT to discuss the logistics of the Phase 2

---

[1] Arbitrator Weiner has a commitment at the lunch break on November 18 which will require her to step away from 11:40 AM-1:15 PM Eastern time.
[2] Arbitrator Weiner has a commitment in the morning on December 1 that will require that we start the session later this day, at approximately 11 AM Eastern.

1

hearing, including the handling of exhibits, as well as the form and content of pre-hearing briefs. Additional pre-hearing conference(s) may be required by the Panel.  Procedural Order No. 9, the Virtual Hearing Protocol Order, will govern relevant logistical aspects of each part of the hearing.

   **3.**      **Phase 2 "Bucketing".**   The Phase 2 Hearing will involve the presentation of evidence through attorney presentations (*e.g.*, "Clopenings"), document submissions, and witness testimony, on the subjects and "buckets" of claims identified below, including defenses.[3]

   a. 

   b.      *Quantum Meruit (Count II)*:  On claims not governed by ERISA, whether Baptist is entitled to recovery on Count II, including whether Baptist conferred a legally cognizable benefit on Cigna.  If the Panel determines that Baptist did not confer such a benefit on Cigna, then the *quantum meruit*

---

[3]  The Panel finds "Clopenings" very helpful but wants more of a direct relationship between the attorney presentations and evidence presented via documents or witnesses than in Phase 1.  That said, the Panel recognizes that certain foundational evidence, like with sample claims, might be best suited for attorney presentations and is, therefore, inclined to keep things flexible.  The parties are cautioned that there should be a significant overlap between issues discussed in any "Clopenings" and evidence presented via documents or witnesses.  Attorney statements without evidence are not going to be convincing to the Panel and adequate opportunity for cross examination must be provided.  Specific evidence about specific claims and the amount of time it would take to have a witness testify about a particular sample claim may be an exception so long as a party presents adequate documentary evidence.

cause of action shall be dismissed.  If the Panel determines that such a benefit was conferred on Cigna, then the Panel will determine the proper remedy.  The Parties shall brief the disputed issue of the proper remedy for *quantum meruit* claims in their pre-hearing briefs for Phase 2.  The Phase 2 hearing shall include all liability related expert opinions on "reasonable value."  Issues related to damages (if any) regarding the proper remedy shall be reserved for the second part of Phase 2.

1)  If Baptist prevails on its *quantum meruit* cause of action for non-ERISA claims, the Panel will set a deadline after the Phase 2 hearing for Baptist to file a motion on whether Baptist can  amend its Statement of Claim to include ERISA claims in light of the Supreme Court's recent decision in *Rutledge v. Pharmaceutical Care Management Association*, 141 S.Ct. 474, 480 (2020).  Cigna reserves the right to oppose such a motion.

c.  ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████

d.   █████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

██████

e.   *Compliance with the Greatest-of-Three Regulation.*  (i) Whether one or more of Cigna's reimbursement methodologies violated the Greatest-of-Three regulation; and (ii) whether, in reviewing sample claims (as identified in Section 4 below), Cigna's allowed amounts are consistent with the Greatest-of-Three regulation.

f.   █████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████

g.   █████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

h.   ██████████████████████





5.      **Phase 2 Discovery**.

    a.      *Document Fact Discovery*.  The Parties have separately presented requests and argument to the Panel on fact discovery.  The Panel has issued separate discovery rulings not reflected in this order.

    b.      *Party Depositions*.  Each Party shall be entitled to serve one corporate representative deposition notice akin to the provisions in FED. R. CIV. P. 30(b)(6) limited to all topics set forth in this Order related to Phase 2.  The Parties shall complete the corporate representative deposition(s) by October 29, 2021.  The Parties shall work in good faith to keep depositions as focused and efficient as possible.

    c.      



    d.    *Experts.*  Expert disclosures shall be consistent with the Arbitration Agreement and the Federal Rules of Civil Procedure.  The Parties shall disclose expert witnesses and produce expert reports by October 11, 2021.  Rebuttal reports shall be served by October 25, 2021.  Expert depositions shall be completed by November 3, 2021.  The Parties may object as appropriate to the scope of expert testimony.

    e.    *Discovery Disputes.*  The Parties shall make a good faith attempt to resolve any discovery disputes.  If the Parties are unable to resolve the dispute, either party may submit the dispute to the Discovery Dispute Arbitrator for determination; alternatively, either Party may submit discovery disputes for determination by the full Panel should that Party feel the dispute will materially affect the outcome of the Arbitration.

**6.**    **Phase 2 Hearing Deadlines.**

    a.    Pre-Hearing Briefs due by November 3, 2021 at 4 pm CT.

    b.    Exchange witness and exhibit lists, including electronic copies of the exhibits, by November 5, 2021;

    c.    Deposition designations due by November 8, 2021, and objections and counter-designations due by November 10, 2021;

    d.    Any pre-hearing conference(s) with the Panel in addition to the November 4, 2021 conference set forth above will be scheduled as necessary; and

    e.    Additional pre-hearing issues, including the establishment of the order of witnesses and expectations regarding the application of evidentiary

standards, may be decided by the Panel as necessary to achieve an efficient hearing process, clarify the issues and avoid surprise.

7.     **Phase 2 Hearing Exhibits.**  The Parties agree that all documents, spreadsheets, or other electronic files that have been produced in this Action by the Parties or their respective counsel which are offered as hearing exhibits by the opposing party are authentic and satisfy the requirements of Fed. R. Evid. 901 without witness testimony authenticating the document.  The Parties expressly reserve the right to object to the admissibility of any or all such documents on any grounds as permitted under the Federal Rules of Evidence, other than challenging their authenticity.

8.     **Incorporation of Phase 1 Evidence.**  Evidence presented at the Phase 1 hearing that relates to Phase 2 issues shall be incorporated into the record for the Phase 2 hearing and need not be repeated.

9.     **Phase 2 Liability Rulings.**  Except as specifically reserved for later phases herein or as otherwise agreed to by the Parties, the Phase 2 Hearing shall result in final rulings on all claims and defenses that have been addressed to date.

10.     **Damages**.  The issue of Baptist's damages, if any, will be addressed separately from the liability rulings in Phase 2.  A damages proceeding as a second part of Phase 2 will be scheduled for a later date.

11.     **Mediation**.  The Parties shall complete a Mediation as contemplated in Section 11 of the Arbitration Agreement as agreed to by the Parties.

12.     **Phase 3.**  All issues concerning Baptist's "denied" claims, line-item denials, any other issues not specified here, including the disputed category of non-emergency claims[6], and any

---

[6]  The Parties will address their respective positions on the scope of the Phase 3 claims at the appropriate time.

remaining claims or defenses (in whole or part) not previously addressed,  as well as damages on any claims (if any) for which a determination of liability is or will be deferred to a later phase.  To the extent any defenses already adjudicated by the Panel apply equally to these claims (*e.g.*, exhaustion of remedies), Cigna may file a motion to demonstrate why those defenses apply to this stage.

     **13.**     **Modification of Case Management Order**.  This Case Management Order shall continue in effect unless amended by subsequent order of the Panel.  This Case Management Order may be modified by order of the Panel based upon stipulation of the parties or upon motion of a party for good cause shown.

**SO ORDERED THIS 2nd day of November, 2021**

_[signature]_

**Conna A. Weiner, Esq., on behalf of the Full Panel**

**Conna A. Weiner, Chair**
**Hon. Joseph J. Farnan, Jr.**
**Hon. Michael J. Schless**

# TAB 010D

ELECTRONICALLY FILED
2023 Aug 18 1:25 PM
CLERK OF COURT - CHANCERY

# EXHIBIT C

**PRIVATE AND CONFIDENTIAL ARBITRATION**

| | | |
|---|---|---|
| **BAPTIST MEMORIAL HEALTH** | ) | |
| **CARE CORPORATION,** | ) | |
| | ) | |
| **Claimant,** | ) | **Arbitrators** |
| | ) | **Conna A. Weiner, Esq., Panel** |
| **v.** | ) | **Chair** |
| | ) | **Hon. Joseph J. Farnan, Jr.** |
| **CIGNA HEALTHCARE OF** | ) | **Hon. Michael J. Schless.** |
| **TENNESSEE, INC.,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**HIGHLY CONFIDENTIAL**

**PARTIAL FINAL AWARD**

**I. INTRODUCTION**

In this Arbitration, Baptist is claiming, on behalf of a number of its Memphis, Tennessee metro area hospitals, that Cigna has wrongfully underpaid or denied altogether certain claims for out-of-network emergency services these hospitals provided to Cigna members between 2013 and 2019 (the "Dispute Period"). This Partial Final Award sets forth the Panel's reasoning and rulings in connection with the issues addressed in Phases 1 and 2.

**II. PROCEDURAL HISTORY**

**II. A.  PHASE 1**

The Phase 1 Hearing was conducted virtually in February and March, 2021, pursuant to the Panel's Procedural Order No. 6 of September 8, 2020, Procedural Order No. 7  and other rulings. Phase 1 focused on underpaid claims from the "Top 16" Accounts and Counts I (breach of contract for non-ERISA plans) and IV (wrongful denial of benefits under ERISA). Baptist proceeds by assignment of claims by plan members in connection with these Counts (see Procedural Order No. 10).

Day 1 of the Phase I Hearing consisted of counsel tutorials pursuant to which counsel educated the Panel about the general context of this matter. On Days 2 and 3, Baptist presented its case-in-chief.  On Days 4 and 5, Cigna presented its case-in-chief. Designated pre-hearing deposition testimony was included as well, all of which the Panel reviewed in writing and some of which was presented to the Panel by video, and  viewed by each Arbitrator separately outside of the actual hearing session time. The parties submitted extensive post-hearing briefing through April. The parties presented Phase 1 closing arguments on May 14, 2021.

1

Thereafter the Panel and counsel discussed a structure for Phase 2 and its associated discovery. The Panel issued informal email orders on May 19, 2021, and May 26, 2021, outlining the agreed processes. During the summer of 2021, the parties engaged in discovery with the assistance of the Panel.

The Panel issued Procedural Order No. 12 dated June 30, 2021, making various tentative rulings which were expressly subject to re-consideration. In this Partial Final Award, we finalize and/or modify those tentative rulings as appropriate given our findings.

## II. B. PHASE 2

The foregoing discussions and discovery resulted in the Panel's Procedural Order No. 14 of November 2, 2021, which is the case management order for Phase 2. Like Procedural Order No. 6 governing the Phase 1 Hearing, Procedural Order No. 14 cited the Panel's authority pursuant to the parties' February 24, 2020 First Amended Arbitration Agreement, which grants the Panel authority to divide the Arbitration into phases. The universe of claims considered in Phase 2 was the same as the claims considered in Phase 1, namely allegedly underpaid out-of-network emergency claims focusing on the Top 16 accounts. The number of issues, however, was expanded beyond the liability issues under Counts I and IV to include additional "buckets," namely:

(2) Baptist's Count II, direct (non-derivative) state law claim under a quantum meruit/unjust enrichment theory;
(3) compliance with the greatest of three regulation;

Procedural Order No. 14 ¶ 9 required that the Panel issue final rulings on all claims and defenses that have been addressed to date except as specifically reserved for later phases in the order or as otherwise agreed by the Parties.  Procedural Order No. 14 ¶10 provides that "the issue of Baptist's damages, if any, will be addressed separately from the liability rulings in Phase 2. A damages proceeding as a second part of Phase 2 will be scheduled at a later date."

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

The Phase 2 hearing proceeded for 9 days during November and December, 2021. Pre-and Post-Hearing Briefs were filed and the Panel heard oral argument on April 22, 2022.

At the Panel's request, the parties also briefed and argued the issue of whether or not Baptist's quantum meruit claim is pre-empted by ERISA in light of recent Supreme Court jurisprudence. The Panel heard oral argument on these subjects on June 23, 2022, and received post-argument supplementary briefing. We rule on these issues in this Partial Final Award.

Finally, the Panel conducted a question and answer session with counsel on July 26, 2022 and received follow up submissions relating to topics addressed during that session.

Pursuant to ¶15 of the parties' First Amended Arbitration Agreement, final awards in this matter are to be "reasoned" consistent with the Commercial Arbitration Rules of the American Arbitration Association.  In connection with its post-hearing submissions, although Cigna filed an extensive Summary of Evidence and Statement of Facts to Support its requested reasoned award, it expressly acknowledged that formal findings of fact are unnecessary in this arbitration and have not been requested. Baptist filed detailed responses to Cigna's summary. (We will refer to this document, namely the version with Baptist's responses, as "SOF" in this award.)

### III.  ARBITRATION HEARINGS - EVIDENCE

### III. A. Background

Cigna offers health coverage products to some of its employer-clients which entitle enrolled members (the employees of its clients) a level of reimbursement for out-of-network provider services, including but not limited to coverage for out-of-network emergency hospital facility services. This order concerns out-of-network emergency services only, non-emergency services to be set for later assessment. Both "emergency outpatient" and "emergency inpatient," or "emergency admit" claims are at issue. ███████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

In connection with virtually all of the claims at issue in the Top 16 accounts, Cigna is not the actual insurer. Rather, it provides administrative services only for self-insured employer plans pursuant to an Administrative Services Agreement, or ASO. ███████████████████████ ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████

The evidence demonstrated that the programs and services provided, developed, and managed by Cigna and its vendors -- for whom Cigna was responsible -- were in fact substantial, extraordinarily sophisticated, and complex; and ultimately directly affected *how much* Baptist was paid for its out-of-network emergency services. These were services Baptist was to a significant extent required by law to provide, regardless of its contractual relationship with Cigna.



**III. B. In-Network vs. Out-of-Network; the "Managed Care Bargain"**

When a hospital provider is "in-network," it has a contract with an insurer or claims administrator such as Cigna to provide their facility services at a specified reimbursement rate that is a discount from their "full billed charges." The contracted in-network provider is generally prohibited from balance billing a customer for amounts above and beyond the agreed, discounted, contractual reimbursement rate ████████████████████. As was discussed in testimony and by the experts, the provider has an incentive to do this from a business perspective because they believe they will receive a greater volume of patients and the improved predictability of pricing and administrative simplicity with which in-network claims are handled. It is reasonable to infer that the converse holds true with respect to out-of-network claims, namely the provider would not expect predictability of pricing or administrative simplicity.

Cigna evaluates the adequacy of its networks to meet the needs of patients, and presented testimony that its networks consistently have met the access standards of a third party private regulator, the National Committee on Quality Assurance (NCQA), and that employer accounts had not complained about the lack of access to emergency room services ███████ ████████████████ However, ████████████████████████████████ ███████████ responsible for the provider network in the relevant area, had not looked at the

4

number of out-of-network emergency patients that had gone to Baptist during the Dispute Period, and did not believe that the NCQA standards took into account how many out-of-network emergency claims were involved in the relevant geographical area over a certain period of time ████████████████████████ Although he further stated that Cigna did not depend on Baptist for out-of-network emergency services because it was a "*very, very small…percentage of overall services in the area*," he agreed with Baptist counsel that emergency services were important; stated that Cigna wanted their members to receive care when they needed it; and also agreed with Baptist counsel that the number of disputed claims in this arbitration was "*not insignificant*" ████████████████████████. He further indicated he had heard anecdotally that Baptist has taken patients out-of-network from a Cigna in-network hospital that had gone on "*diversion*" ████████████████████

The parties and their experts have referred to the "managed care bargain" and "volume steerage" to identify the specifics of these incentives for entering into a discounted in-network arrangement. There is no credible evidence to the contrary in this arbitration. ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████████████████



In general, when entities such as Cigna, on behalf of its employer-clients, structure coverage for out-of-network benefits, a natural dilemma arises precisely because there is no contract. How much should a provider be paid for these services? The issue is particularly stark in the case of the emergency services at issue here, since various federal and state laws require that a hospital accept a patient into their emergency room and provide certain services, without questioning their insurance coverage.[5] In other words, and critically for our decision, the payor and provider are forced to deal with each other, at least to this extent. ██████████████████

---

[4] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████

[5] The Emergency Medical Treatment and Labor Act (EMTALA) requires most hospitals to provide an examination and needed stabilizing treatment, without consideration of insurance coverage or ability to pay, when a patient presents to an emergency room for attention to an emergency medical condition.



### III. C. The "Greatest of Three" Rule

The reimbursement dilemma for providers who do not have a contract for out-of-network emergency services has now twice been addressed by Congress through provisions of The Patient Protection and Affordable Care Act (Pub. L. 111-148) ("PPACA') which amended other laws, such as the Public Health Service Act, or PHS Act, and more recently the No Surprise Billing Act.[6]

The provisions of PPACA and the associated regulations which led to the creation of the "greatest of three rule," a federal rule providing a minimum payment for out-of-network emergency services ("GOT Rule"), deserve our attention.

Background on the intent and goals behind the GOT Rule is available in the Department of Health and Human Services "Clarification of Final Rules for Grandfathered Plans, Preexisting Condition Exclusions, Lifetime Annual Limits, Rescissions, Dependent Coverage, Appeals and Patient Protections Under the Affordable Care Act, " 83 Fed. Reg. 19431 (May 3, 2018), cited by both parties at various points ("Clarification Regulation"). The HHS "clarification" was necessary because of litigation filed by the American College of Emergency Physicians, which resulted in a federal district court judge remanding the case to the relevant agencies (referred to as "the Departments" in the regulation) in order to more fully respond to public comments on the interim rule generating the greatest of three calculation.  Id. at 19432.

As described in the Clarification Regulation, the section of PPACA entitled "Patient Protections" provides requirements relating to coverage of emergency services, including the parties here. The statue requires coverage of emergency services even if the provider is not a participating provider, or "in-network," and requires plans to apply the same cost-sharing requirements to members as they would have to pay if they went to an in-network facility (expressed as copayments and coinsurance). The statute did not address, however, how much the out-of-network provider of emergency services must be paid for performing such services. Id. The statute  also did not prohibit an out-of-network facility like Baptist from billing a patient for an amount it felt it was owed beyond what a plan or issuer paid, or in other words, "in

---

[6] As the No Surprise Billing Act was not in effect during the Dispute Period, it is only briefly addressed in this order to the extent the Panel found it helpful for context. The Act sets up a dispute resolution process between payors and out-of-network providers of emergency services, culminating in baseball arbitration. Unlike PPACA and the GOT Rule, it prohibits balance billing by the provider.

circumstances in which a provider's charge exceeds the allowed amount," or maximum amount on which payment is based for covered services. Id. The Clarification Regulation cites to a CMS Uniform Glossary of Health Coverage and Medical Terms for the definition of the term of art "allowed amount," an important concept in this arbitration.

The Clarification Regulation went on to discuss the 2010 interim final rule ("IFR") that initially proposed the greatest of three rule:

> The June 2010 IFR preamble...stated, in part, that, because the statute does not require plans or issuers to cover balance billing amounts, and does not prohibit balance billing, even where the protections of the statue apply, patients may be subject to balance billing. It would defeat the purpose of the protections in the statute if a plan or issuer paid an unreasonably low amount to a provider, even while limiting the coinsurance or copayment associated with that amount to the in-network amounts. To avoid the circumvention of the protections of section 2719A of the PHS Act, it is necessary that a reasonable amount be paid before a patient becomes responsible for a balance billing amount. Thus, these interim final regulations require that a reasonable amount be paid for services by some objective standard. In establishing the reasonable amount that must be paid, the Departments had to account for wide variation in how plans and issues determine both in-network and out-of-network rates.
>
> Accordingly, these interim final regulations considered three amounts: the in-network rate, the out-of-network rate, and the Medicare rate. Specifically, a plan or issuer satisfies the copayment and coinsurance limitations in the statute if it provides benefits for out-of-network emergency services in an amount equal to the greatest of three possible amounts: (1) The amount negotiated with in-network providers for the emergency service furnished; (2) The amount for the emergency service calculated using the same method the plan generally uses to determine payments for out-of-network services (such as usual, customary and reasonable charges), but substituting the in-network cost-sharing provisions; or (3) The amount that would be paid under Medicare for the emergency service.
>
> This is referred to as the "Greatest of Three" or "GOT" rule because it sets a floor on the amount plans are required to pay for out-of-network emergency services under these provisions at the greatest of the three listed amounts.

The Clarification Regulation went on to recount some of the concerns cited by commentators regarding the IFR and particularly the alleged lack of transparency and potential for manipulation of the second prong of the GOT Rule, namely the "amounts a plan generally uses to determine payments for out-of-network emergency services." These commentators urged, among other things, the use of a transparent database for determining the reimbursement rate. For example, the ACEP's 2010 comment letter supported the development of an objective standard to establish "fair payment," asserting that since insurers *"know that emergency physicians will see everyone that comes to the [emergency department] due to EMTALA responsibilities...many leverage that fact to impose extremely low reimbursement rates...the plan has arbitrarily offered an in-network payment rate that fails to cover the costs of providing the service. This forces the physicians to balance bill the patients, which often results in*

*an unsatisfactory experience for everyone.*" Id. at 19433. The interim rule acknowledged that the term "'*reasonable' was in the eye of the beholder,*" and that while for many years, usual and customary rates referred to charges or a proportion of a hospital's charges, this had changed in recent years as providers had issues with the "*black box*" approach that commercial insurers have used to determine the usual and customary rates for out-of-network providers.

In response to these concerns, the Departments clarified that plans were required to disclose how they calculated the amounts under the GOT regulation, including the UCR amount. More specifically, for plans governed by ERISA, documentation and data used to calculate each of the amounts under the GOT regulations for out-of-network emergency services, including the UCR amounts, would be subject to disclosure provisions under Section 104(b) of ERISA, as well as Department of Labor claims procedure regulations.

On reconsideration of the comments and concerns as required by the federal district court, the Departments were not, however, convinced that the GOT standards are "*insufficiently transparent or otherwise unreasonable, and we conclude that the methodology for determining payment amounts under all three prongs of the GOT regulation is sufficiently transparent and reasonable.*":

> *Under the GOT regulation, the three prongs work together to establish a floor on the payment amount for out-of-network emergency services, and each state generally retains authority to set higher amounts for health insurance issued within the state. The GOT regulation requires that a…plan…must pay the highest amount determined under the three prongs, which reflect amounts that the federal government itself, or group health plans and health insurance issuers, have established as reasonable.* Id., at 19435.

The Clarification Regulation also noted the importance of the fact that a "claimant (or a claimant's authorized representative) upon appeal of an adverse benefit determination must be provided reasonable access to, and copies of, all documents, records and other information relevant to the claim for benefits, including information about the plan's determination of the UCR amount. A failure to provide or make a payment of a claim in whole or in part is considered an adverse benefit determination…patients who are to be protected by the statute have a right to transparent access to the calculations used to arrive at the allowed amount for out-of-network emergency services, and a provider can obtain this information as a patient's authorized representative. To the extent that a provider is not able to obtain these calculations, the Departments believe that the patients' ability to obtain and to potentially challenge the information through litigation or the appeals process creates adequate safeguards with respect to" concerns about…manipulation of UCR amounts. This provides sufficient protections, especially in light of the focus of section 2719A of the PHGS Act on the protection of patients, rather than physicians." Id.[7]

---

[7] The Departments also explained that creation of a database to establish payments would be problematic to monitor and that there was no indication that such a database would be a "better barometer of UCR amounts than the

### III. D.  Plan Terms; Maximum Allowable Cost

The parties agree that the amount of reimbursement received by an out-of-network provider of emergency services depends upon the terms of the plan, the GOT rule which provides a "floor" or minimum payment for such services, and various state laws.



---

current methodology used by …plan…It is the Department's' view that it is appropriate to continue to reserve the determination of the relative merits of each database to the discretion of the states, insurers, and health plans."



**III. E. Baptist's Contentions**

It is useful to highlight Baptist's fundamental points, as these have developed during the course of the arbitration and were set forth in Baptist's Phase 2 post hearing briefs and during closing argument.







Quantum Meruit, on the other hand, does not depend on such findings as it is a direct claim made by Baptist without reliance on the plan terms or contract between the employer and the member.



13

























































































57









**IV. PARTIAL FINAL AWARD RULINGS**

**IV. A. Summary of Rulings**





**5. Quantum Meruit**

**a.** We find that Baptist has shown by a preponderance of the evidence that, under Tennessee law, quantum meruit is applicable to these out-of-network – in other words, out-of-contract – claims, but only to the extent that Baptist was required by law to provide the services under consideration.  (We will use the October hearing dates to address the extent to which Cigna will be so liable).

**b.** We find that the Cigna defenses applicable to a quantum meruit claim are accord and satisfaction, waiver and estoppel, laches.

**c.** We further find that Cigna has not sustained its burden of proof as to any of these defenses in this quantum meruit context.

**d.** We find that quantum meruit claims are not pre-empted by ERISA and  thus that this relief is available for all of the claims in issue.

**e.** Finally, we find that the measure of damages for quantum meruit is the reasonable value of the services. The reasonable value of the services will be further assessed during the damages phase hearings  to be held  in October 2022.

**IV. B. Statement And Discussion Of Rulings**

Except as required by law, employers have many options when determining the extent to which they will provide coverage, if at all, for the health care expenses of their employees. [34]

Pursuant to quantum meruit principles, however, a provider of out-of-network services is entitled to recover the "reasonable value" of those services. There is no contract limiting what they can recover. Similarly, the ERISA superstructure and the discretion otherwise afforded plan administrators, as well as a plan's procedural requirements of the plans, are inapplicable.

We address Count IV before Count I because our disposition of the issues on Count IV largely addresses the issues in Count I. We then turn to quantum meruit.

**IV. B. 1. Count IV Wrongful Denial of Benefits Under ERISA 502(a)(1)(B)**















69













**IV. B. 2. Count I Breach of Contract**



**IV. B. 3. GOT Rule Compliance**



      We have also considered that a finding in this regard would  require us to find, in effect, that the plan choice of ███████████ was illegal **from an ERISA perspective**, something we do not believe is appropriate in light of the emphasis in ERISA on process and conduct rather than the substantive regulation and content of benefits. ██████████████████████████████ ██████████████████████████████ ██████████████████████████████ ██

76

### IV. B. 4. Count II Quantum Meruit

A health care provider of emergency services with an assignment of benefits from the patient has two basic causes of action available to it to pursue a denied or underpaid claim. ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ we find Baptist has proven by a preponderance of the evidence that, to the extent it was required by law to provide emergency services, it has a valid claim for relief under quantum meruit/quasi contract theories. Even Cigna agrees – as it must -- that, given the requirements of EMTALA, where there is "no choice other than the service, there has to be a remedy" and that there is a "gap" in the law that needed to be filled. Cigna  argues that the federal government stepped in to fill it with the GOT Rule. ████████████████████████████████████████. We find that, properly construed against the backdrop of an understanding of how the health care system works, an implied-in-law contract was created under Tennessee law for which Baptist must be compensated at a "reasonable" rate for its services rendered under that quasi-contract.  We also find that, with the further clarification of the recent Supreme Court jurisprudence on pre-emption, that quantum meruit is available for all the plans in this case and is not pre-empted by ERISA.

Since this is a state law claim, we are bound by Tennessee law pursuant to the Parties' arbitration agreement.  Although at present, there is no Tennessee Supreme Court case directly on point, we have the discretion to make reasoned findings, based on the evidence of record in this case, that we believe are consistent with general Tennessee law principles.  In this regard, we note that other lower courts in Tennessee have reached different conclusions on this issue, but we also note we have the discretion to disagree. ██████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████ We are looking at the facts through a very different lens and, in this universe, there is no contract between Baptist and Cigna and no requirements other than the elements of the cause of action.

#### (a)  Quantum Meruit is Applicable Here

The Tennessee Supreme Court has noted that the actions brought under theories of unjust enrichment, quasi contract, contracts implied in law, and quantum meruit are essentially the same. "Courts frequently employ the various terminology interchangeably to describe that class of implied obligations where, on the basis of justice and equity, the law will impose a contractual relationship between the parties, regardless of their assent thereto." *Paschall's, Inc.* v. *Dozier*, 407 S.W. 2d 150 (Tenn. 1996). We note various tests propounded by the Tennessee Supreme Court and Tennessee intermediate courts to assess Baptist's claims made under these theories.

We agree with Baptist that, at least in Tennessee, the existence of member plans do not bar a cause of action on the non-ERISA claims and we do not think it bars this cause of action under a pre-emption theory either, as we discuss below. (███████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████)

Cigna cites *Doe* v. *HCA Health Services of Tennessee*, 46 S.W. 3d 191 (Tenn. 2001), a case in which the plaintiff hospital expressly relied upon a quantum meruit theory in seeking the reasonable value of its out-of-network services from a patient, for the following test:

1. There is not an existing, enforceable contract between the parties covering the same subject matter;
2. The party seeking recovery proves that it provided valuable goods or services;
3. The party to be charged receives the goods or services;
4. The circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services;
5. The circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment.

Id. At 198. The Court went on to discuss how the lower court on remand should assess the "reasonable value" of the hospital's services and what elements it might want to consider.

Baptist takes issue with Cigna's reliance on *Doe* because it predates *Freeman Indus., LLC* v. *Eastman Chem. Co.*, 172 S. W. 3d 512 (Tenn. 2005) and does not involve an "indirect" benefit as it believes is at issue here. In *Freeman*, the Tennessee Supreme Court assessed whether or not an indirect purchaser from producers guilty of fixing the price of food products could bring a claim for "unjust enrichment" against those producers and found that they could. The *Freeman* court noted that the Tennessee Supreme Court had recognized two types of implied contracts, those implied in fact and those in law, that contracts implied in law are "created by law without the parties' assent and are based on reason and justice," and that courts may impose a contract implied in law where no contract exists under various quasi contractual theories, including unjust enrichment. In Freeman, the Court recited the elements of an unjust enrichment as follows:

1. A benefit has been conferred upon the defendant by the plaintiff
2. Appreciation by the defendant of such benefit
3. Acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof.

Id. at 524-525.

The court noted that the most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust. The *Freeman* court did not clearly address the appropriate remedy for an unjust enrichment claim or implied-in-law contract claim, and we have

not seen persuasive authority that it should not be the reasonable value of the services, as opposed to the value of the specific benefit received by Cigna.

In *River Park Hospital, Inc.* v. *BlueCross BlueShield of Tennessee, Inc.*, 173 S.W. 3d 43 (Ct. of Appeals, Tenn. 2003), a case we find helpful, a Tennessee appellate court relied on the "implied-in-law" concept  and the idea that "theories of unjust enrichment, quasi-contract, contracts implied in law and quantum meruit are essentially the same" in assessing a claim for unjust enrichment in a health care context. There, a hospital sought its full standard rates for out-of-network emergency services it provided to Tennessee Medicaid recipients through TennCare, the state's Medicaid managed care program, managed by BlueCare, the managed care entity administering the program. The court upheld the trial court's finding that, under EMTALA and Tennessee law, River Park was required to provide services, and thus:

> …while neither of these parties may have wanted to deal with each other, both were left with no choice. Under these circumstances, we must find a contract implied in law, without the assent of either party, on the basis that it is "dictated by reason and justice."  (citation omitted)….
>
> Under these circumstances, the trial court must determine a reasonable rate of reimbursement for all of the emergency admissions at issue. River Park argues that it is entitled to its full standard rate because it repeatedly insisted on this rate with BlueCare; while River Park's standard rate for its services is pertinent to the determination of a reasonable rate, it is hardly conclusive. Likewise, BlueCare maintains that its reimbursement rate for in-network providers is clearly a reasonable rate, and relies heavily on its BlueCare provider services manual was [sic] well as on industry custom among MCOs of paying all providers, both in-network and out-of-network, the same rate. Again, evidence of BlueCare's in-network rates, as well as evidence of industry custom, is pertinent but certainly not determinative. In assessing a reasonable reimbursement rate, the trial court may take into account all of these factors, as well as others that may be pertinent, such as whether the rate for in-network providers is appropriate for out-of-network providers, given the difference in volume of BlueCare enrollees treated. Moreover, the trial court may consider factors that may increase the providers costs, such as BlueCare's repeated automatic disallowance of claims previously authorized, apparently onerous and costly appeal and approval procedures, and delays in payment.

Id. at 59-60.

Thirteen years later, this same court later distinguished *River Park* in the context of a commercial plan and found that an implied-in-law contract did not exist for out-of-network

emergency services entitling a hospital to compensation.[38]  *HCA Health Services of Tennessee, Inc. v. BlueCross BlueShield of Tennessee, Inc.,* 2016 WL 3357180 (Court of Appeals Tenn. 2016). The *HCA* Court cited the language in *Paschall's* indicating that the various theories of implied obligations were the same and cited the test relied upon in *Freeman*, above. With respect to the *River Park* decision, the HCA Court said:

> We disagree with HCA's contention that the holding in *River Park* is "squarely on point."   Unlike River Park, where BlueCare had received payment for each TennCare enrollee and was under an obligation to pay for emergency services rendered to the enrollee, the patients in this case are participants in commercial health benefit plans which include coverage provide by BCBST for emergency medical services, at a level which depends upon the specific plan and the facts and circumstances of each claim. In River Park, HCA could only seek payment from BlueCare; significantly and as distinguished from River Park, in this case HCA can seek payment directly from the patients it has treated, with the amount it may have received from BCBST operating to reduce the amount for which the patient is responsible.

Id. at 10.

Having distinguished *River Park* on this basis, the HCA court then went on to assess whether HCA had a direct cause of action against Blue Cross for unjust enrichment, focusing on the provisions of EMTALA and the equivalent Tennessee Code Section 56-7-2355. Applying the unjust enrichment elements, the Court found that:

> Applying these elements to the facts of this case, the duty imposed on HCA by EMTALA and the prohibition imposed by BCBST by Tenn.Cod Ann. Section 56-72355 do not create an implied-in-law contractual relationship upon which to sustain HCA's cause of action. HCA has not conferred a benefit on BCBST; the services were rendered to the patients, none of whom are a party to this suit, and they are the ones who received the benefits of medical care provided in HCA's emergency rooms and are obligated to pay for the services. BCBST has not denied coverage for the services covered by the plan to which the participant agreed and for which the participant paid. Without a benefit conferred on BCCST by HCA, a cause of action for implied-in-law contract cannot be sustained.

Id. at 12.

---

[38] HCA was not included in what we might refer to as a "narrow network". Blue Cross paid the full amount for what it considered a "true" medical emergency, but paid less in cases where it did not think that a true emergency existed. HCA alleged that Blue Cross only paid a small percentage of its usual and customary charges in this instance and demanded at least 80% of its full-billed charges and the removal of any "Maximum Allowable Charges."

In a footnote in the above citation (n. 15), the Court noted that "[w]e are not persuaded by HCA's argument that HCA benefitted BCBST by helping BCBST to fulfill its core obligation to "improve and sustain the physical, financial and community health of Tennessee."

We acknowledge that a number of courts have agreed that it is the patient, not the provider, that is getting a legally cognizable "benefit," not the insurer paying for or administering the services. Some of these cases rely on a non-health care case, *Travelers Indemnity of Conn*. v. *Losco Grp., Inc.*, 150 F. Supp 2d 556 (S.D.N.Y 2001) for its seductive assertion that:

> [i]t is counterintuitive to say that services provided to an insured are also provided to its insurer. The insurance company derives no benefit from those services; indeed, what the insurer gets is a ripened obligation to pay money to the insured – which hardly can be called a benefit.

Id. at 563.

As Baptist compellingly notes, however, the same Southern District of New York distinguished *Travelers* in connection with an unjust enrichment claim brought by out-of-network emergency room physicians, noting that *Travelers* did not involve healthcare services and did not involve an allegation that the plaintiff was required by law to provide the services. *Emergency Physicians of New York* v. *UnitedHealthcare Group, Inc.,* 2021 WL 4437166 (SDNY 2021). As the court further noted:

> New York courts have found, consistent with the courts of several other states, that, "where, as here, a hospital is required by law to treat patients in an emergency room, an insurance company is unjustly enriched if it fails to pay the hospital in full for the costs incurred in rendering the necessary treatment to the insurer's enrollees (N.Y.C. Health & Hosps. Corp v. Wellcare of N.Y., Inc, 937 N.Y.S2d 540, 544 (S. Ct. 2011); River Park Hosp., Inc. V. BlueCross BlueShield of Tenn., Inc., 173 S.W.3d 43, 59. As the Third Circuit recently explained, the insurer's benefit is not the provision of the healthcare services per se, but rather the discharge of the obligation the insurer owes to the insured." Plastic Surgery Ctr. P.A. v. Aetna Life Ins. Co., 967 F3d 218, 240-41 (3d Cir. 2020) (citations omitted). Other federal courts have reached the same conclusion for similar reasons. E.g., El Paso Healthcare Sys., LTD v. Molina Healthcare of N.M., Inc, 683 F. Supp. 2d 454, 461 (W.D. Tex. 2010) (While it is true that the immediate beneficiaries of the medical services were patients, and not Molina, that company did receive the benefit of having its obligations to its plan members, and to the state in the interests of its plan members, discharged (additional citations omitted).

Id. at 12.

In assessing the issues relating to an implied-in-law contract, whether a benefit was conferred and the general equities involved, we are also influenced by the Supreme Court of Tennessee's discussion of the current state of the health care system in a non-quantum meruit

case -- finding that the collateral source rule prohibited evidence of discounted rates accepted by medical providers from an insurer to rebut proof that the full, undiscounted charges of the hospital were reasonable medical expenses -- in *Dedmon* v. *Steelman*, 535 S.W. 3d 431 (Ten. 2017), which we quote here without citations, although we note that the Court cited River Park several times in the course of its description:

> During this same period since the adoption of the rule, the pricing, payment and reimbursement system for health care providers has become exponentially more complex. The rise of managed care organizations has distorted pricing for health care services, as deep discounts demanded by the MCO's require providers to offset those discounts by charging higher prices to other patients…Hospitals are often legally required to provide treatment for patients who either are insured by companies with whom the hospital has no contractual relationship or who have no insurances at all…In all, providers are faced with competing objectives of balancing budgets, remaining competitive, complying with health care and regulatory standards, and continuing to offer needed services to the community…In this complicated environment, charges by hospitals have come to be set within the context of hospitals' broader communities, including their competitors, payors, regulators and customers. Funding the required treatment of patients without the means to fully pay for care depends on the ability of providers to disproportionately charge various patient categories…Of significance in this appeal, one result of the increasing complexity of health care has been a widening of the gap between a medical provider's standard rate charged to uninsured patients and the amounts accepted from insurance or social legislation benefits…all of these developments have caused the issue of what constitutes a reasonable medical charge or expense to become the subject of increase litigation due to the increased involvement of government payors, the complexity of health care reimbursement provisions, financial pressures on hospitals and the significance of medial expense recovery in personal injury litigation.

Id. at 452.

Considering all that we have learned in this arbitration, our collective experience, the evidence and the law, we find that Baptist has established by a preponderance of the evidence that a cognizable benefit has been conferred on Cigna – an extension, to some extent, of the "discharge of the obligations to the insured" line of reasoning adopted by a number of courts -- and that the equities require, as was the case in *River Park*, that we find a contract implied-in-law for Cigna to pay the reasonable value of the applicable out-of-network emergency services to the extent Baptist was required by law to provide them. The HCA Court did not have the advantage of this education and evidence and that opinion was, we believe, wrongly decided.

We have reviewed the expert testimony and associated witness evidence. We do not fully agree with either ████████████████. Suffice it to say that the most significant – but not the only – benefit for Cigna is created by the very "managed care bargain" with which we began this

82

opinion. Cigna is able to get lower rates from in-network providers by excluding Baptist. It has every right to do that, but it must bear the consequences under state law in terms of how much it pays those out-of-network providers for services they are required to provide. ███████████ ██████████████████████████████████████████████████████████████ A Cigna witness  also admitted, as he had to, that this network relationship puts Cigna in the best possible position to get business with various self-funded employers. ██████████████████████

While Cigna pressed upon the Panel its compliance with NCQA standards as proof that its network was adequate, implying that it did not need Baptist and therefore did not get a true benefit from Baptist's existence, the fact is that there are 19,000 claims in this arbitration, and Baptist evidence that over three thousand Cigna members went to Baptist hospitals on an out-of-network basis each year in the Dispute Period (Baptist Post-Hearing Brief Response at 47-48). Cigna was obviously relying on Baptist in connection with its Open Access Plus and Local Plus options.

Given this – the discounts, associated competitive advantage, capacity and marketing benefits Cigna received and relied upon -- although Tennessee law only requires an indirect benefit, and that certainly has been shown here, we believe that these facts are sufficient to establish a direct benefit to Cigna, and that it received services under *Doe*.

███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████

The other elements required to be shown to prove an implied in law contract have not been as controversial and in any event have been established by a preponderance of the evidence. For example, Cigna clearly "appreciated" or accepted the services and realized that Baptist expected to get paid – it marketed out-of-network, or non-contracted, coverage to its employer-clients and their employees, ███████████████████████████████████ ██████████████████████. Marketing the out-of-network coverage was of course another benefit, a subset of the competitive advantage that ████████████ identified.

As quantum meruit is an equitable remedy, additional focus on the equities is warranted. Of course, the fact that Baptist is obligated to perform the services is enough under *River Park* to create an implied in law contract and it is enough here. ████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████



Cigna argued that Baptist should not get a "side payment" because they exist ███████
██████ – but, in a way, they should, although we would recharacterize the "side payment" as compensation for the reasonable value of their services when they are forced by law to provide such services.[39]

### (b) Cigna's Applicable Defenses

We now address those of Cigna's defenses that may be relevant to a quantum meruit claim. Cigna bears the burden of proof on these issues. ██████████████████████
████████████████████



---

[39] We also note that the distinction made in the *HCA* case between government plans forbidding balance billing and commercial plans that permit it -- the idea being that Baptist can look to patients to collect the remainder of the reasonable value of the services if Cigna's payment falls short -- would incentivize inequitable results that are inconsistent with quantum meruit by encouraging payors to pay very little to Baptist when they were required by law to see Cigna members. If Cigna and its employer clients are going to provide out-of-network services in these (notably circumscribed) situations we think that quantum meruit principles require them to pay the reasonable value of the services in the first place.



### (c)  Implied-in-Law, Quantum Meruit Claims Are Not Pre-empted

In addition to finding that quantum meruit is applicable, we also find that it is not pre-empted by ERISA.

### (c)(i) Effect of Rutledge

In *Rutledge* v. *Pharm. Care Mgmt. Ass'n*, 592 U.S. ___, 141 S. Ct. 474 (2020), the Supreme Court found that  ERISA did not pre-empt an Arkansas statute, Act 900, that required pharmacy benefit management companies to reimburse Arkansas pharmacies at a price equal to or higher than the pharmacy's wholesale cost. The statute required that PBMs timely update their maximum allowable cost ("MAC") lists, the amount at which the PBM's reimbursed pharmacies, when drug wholesale costs – the amounts paid by pharmacies to acquire drugs – increased and set forth an administrative procedure by which pharmacies could challenge MAC rates. It also permits pharmacies to refuse to sell a drug if the reimbursement rate from a PBM is lower than its acquisition costs.

This holding, relating as it does to a clear, healthcare-related exercise of a state's legislative authority, can be distinguished in general from a general state common law cause of action such as quantum meruit, and, as the Panel pointed out during oral argument on these issues, many (although not all) of the cases upon which the Supreme Court relied dealt with state legislation. An exception was *Mackey* v. *Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 831-832 (1988), where the Court held that "state-law mechanisms of executing judgements against ERISA welfare benefit plans, even when those mechanisms prevent plan participants from receiving their benefit" was not pre-empted by ERISA (Id. at 831-832.)

Nevertheless, we are convinced by Baptist's arguments that the logic of the Court's thinking is applicable here, and several lower courts since *Rutledge* have agreed that quantum meruit claims are not pre-empted by ERISA in part in reliance on *Rutledge*, e.g., *Emergency Services of Oklahoma, P.C.* v. *Aetna Health*, Inc. 556 F. Supp. 3d 1259, 1263-64 (ERISA does not pre-empt Oklahoma state law unjust enrichment claim by out-of-network emergency services medical providers alleging that health insurer paid claims at impermissibly low rates where they

should have been paid the reasonable value of their services). While we largely agree with Baptist's thorough and tightly reasoned submissions on the relevant issues and in particular found the charts in their May 27, 2022 response submission of great assistance, we discuss some of the key issues below.

ERISA pre-empts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C. Section 1144(a). A state law relates to an ERISA plan if it has a connection with or reference to such a plan. *Rutledge,* citing *Egelhoff v. Egelhoff*, 532 U.S. 141, 147 (2001). Elaborating upon the relevant questions, the *Rutledge* court addressed the issues required of us here: In assessing whether or not ERISA pre-empts a state law quantum meruit cause of action, we must ask the following questions:

> *Does quantum meruit have an impermissible connection to an ERISA plan, in that it "governs a central matter of plan administration or interferes with a nationally uniform plan administration"? *Rutledge* at 4-6, citing *Gobeille* v. *Liberty Mut. Ins. Co.* 577 U.S. 312, 320.
> *Does it "refer to" ERISA in that it acts immediately and exclusively upon ERISA plans and the existence of ERISA plans  is essential to the law's operation"? *Rutledge*, citing *Gobeille*, 577 U.S. at 319-320.

The *Rutledge* Court was able quickly to dispense with the issue of whether or not Act 900 "referred to" ERISA because it applied to PBM's whether or not they managed an ERISA plan and did not directly regulate health benefit plans at all and ERISA plans were not essential to Act 900's operation. *Rutledge* at 6-7. We think that quantum meruit can be similarly assessed as not "referring to" an ERISA plan. For example, we agree with Baptist that a quantum meruit claim does not impermissibly refer to an ERISA plan. Among other things, "[t]he 'mere fact that a claim arises against the factual backdrop of an ERISA plan does not mean it makes reference to that plan'" *Sarasota Cty. Pub. Hosp. Bd*, 511 F. Supp. 3d 1240, 1249 (quoting *Plastic Surgery Ctr. P.A.* v. *Aetna Life Ins. Co.*, 967 F. 3d 218 (Third Cir. 2020).

To address the more difficult, "impermissible connection" question,  the *Rutledge* court first analyzed the objectives of ERISA, noting that ERISA is:

> primarily concerned with pre-empting state laws that require providers to structure benefit plans in particular ways, such as by requiring payment of specific benefits…or by binding plan administrators to specific rules for determining beneficiary status…A state law may also be subject to pre-emption if "acute, albeit indirect, economic effects of the state law force an ERISA plan to adopt a certain scheme, of substantive coverage…"

> In short, ERISA does not pre-empt state rate regulations that merely increase costs or alter incentives for ERISA plans without forcing plans to adopt any particular scheme of substantive coverage.

Id at 5 (citations omitted).

86

In finding that Act 900 did not have an impermissible connection to an ERISA plan, the *Rutledge* Court relied heavily on its decision in *New York State Conference of Blue Cross & Blue Shield Plan* v. *Travelers Ins. Co*., 514 U.S. 645 (1995), which found that a New York state statute that imposed surcharges of up to 13% on hospital billing rates for patients covered by insurers other than Blue Cross/Blue Shield was not pre-empted by ERISA:

> The logic of *Travelers* decides this case. Like the New York surcharge law in Travelers, Act 900 is merely a form of cost regulation. It requires PBM's to reimburse pharmacies for prescription drugs at a rate equal to or higher than the pharmacy's acquisition costs. PBM's may well pass those increased costs on to plans, meaning that ERISA plans may pay more for prescription drug benefits in Arkansas than in, say, Arizona, But "cost uniformity was almost certainly not an object of pre-emption....nor is the net effect of Act 900 so acute that it will effectively dictate plan choices....as a result, Act 900 does not have an impermissible connection with an ERISA plan. (citations omitted)

Of particular relevance here, the *Rutledge* Court specifically addressed the PBM's concern that Act 900 affected ERISA plan design by mandating a particular pricing methodology for the pharmacy benefits at issue by forcing PBMs to reimburse pharmacies using a MAC list constructed with an eye toward containing costs and ensuring predictability, something the plan using the PBM might prefer, and instead requiring reimbursement at acquisition cost. This was, the court said:

> ...just a long way of saying that [the statute] regulates reimbursement rates. Requiring PBMs to reimburse pharmacies at or above their acquisition costs does not require plans to provide any particular benefit to any particular beneficiary in any particular way. It simply establishes a floor for the cost of the benefits that plans choose to provide. The plans in Travelers might likewise have preferred that their insurers reimburse hospital services without paying an additional surcharge, but that did not transform New York's cost regulation into central plan administration.

The Court also warned that PCMA's pre-emption argument could improperly pre-empt any state law that could affect the price or provision of plan benefits. It also noted that the "responsibility for offering the pharmacy a below-acquisition cost reimbursement lies first with the PBM" in dismissing arguments that lower rate interfered with central matters of plan administration.

We agree with Baptist that, for purposes of pre-emption, quantum meruit is nothing more than a cost regulation – representing a cost of providing an out-of-network benefit -- which does not "relate to" or create an impermissible connection with ERISA plans:

> In this case, Cigna remains free to maintain its broad and narrow networks for both ERISA and non-ERISA plans. These networks can include or exclude Baptist.

> The only difference is that the out-of-network services associated with Cigna's narrow networks will be subject to payment of such claims at "reasonable" rates under quantum meruit / unjust enrichment principles. This common law protection addresses the "unappealing outcome" that could result from Cigna's position that Baptist has no recourse if Cigna refuses to reasonably compensate it, "which could conceivably incentivize insurers…to pay as little as possible while Baptist remains obligated to treat Cigna's insureds." See Emergency Physician Services of N.Y., 2021 WL 4447166.

Baptist Opening Quantum Meruit Submission, at 18.

We also think it is important not to lose sight of the over-arching principle that, as Baptist points out, quantum meruit is Baptist's "independent, non-derivative cause of action independent directly against Cigna that does not implicate traditional ERISA relationships." (May 27 Response at 2). As the Third Circuit has noted:

> ERISA governs relationships among "the employer, the plan and its fiduciaries, and the participants and beneficiaries."…As our sister circuits have recognized, ERISA struck a "bargain" between the interests of participants and beneficiaries on the one hand and insurers on the other: Section 502() created federal causes of action that allow plan participants and beneficiaries to enforce ERISA's mandates, and section 514(a) limits potential sources of plan liability, providing employers and plan administrators with some measure of security…Critically, however, out-of-network healthcare providers "were not…party to this bargain"…. Health care providers…orbit the periphery of this bargain, but their rights and remedies are not delineated in ERISA's substantive or remedial provisions.

*Plastic Surgery Center, P.S.,* v. *Aetna Life Insurance Company*, 967 Fed. 3d 218 (Third Cir. 2020). (citations omitted).[40] We appreciate Cigna's attention to the various relationships involved here, but from the perspective of ERISA and quantum meruit, Baptist is not part of the club.

### (c)(ii) GOT Rule

We also agree with Baptist about the implications of the GOT Rule. Cigna argues that the federal government has spoken on the "gap" in the law occasioned by the legal requirements of EMTALA and analogous state laws. As Baptist notes, however, the express terms of the ACA, from which the GOT Rule derives, state that it should not be construed to affect the ERISA preemption

---

[40] In this pre-*Rutledge* case, the Third Circuit found that state law contract and promissory estoppel claims were not pre-empted by ERISA, but that unjust enrichment claims were because the "benefit conferred," which it defined to be the discharge of the obligation by the insurer, arose from the existence of the plan. Id. at 240-41, We think that this holding is not consistent with *Rutledge*, but in any event disagree with this logic. See *Saratoga Cty Publ. Hosp. Bd,* supra 511 F. Supp 3d at 1249 (fact that a claim arises against the factual backdrop of an ERISA plan or that ERISA plan is an initial step in the causation chain, without more, is too remote of a relationship with the covered plan to support a finding of preemption.)

analysis in any way. See 42 U.S.C. Sections 300gg-123 & 10841(d). This law was addressed by the Supreme Court in *Gobeille,* which confirmed that "[t]he ACA…specifies that it shall not 'be construed to preempt any State law that does not prevent the application of the provisions of the ACA." 577 U.S. 312, 326 (2016). A quantum meruit cause of action does not prevent the application of the provisions of the ACA.  If the Panel were to find that the reasonable value of the services provided by Baptist should be higher than what it received, quantum meruit would work in tandem with the GOT Rule and simply adjust upwards the floor rate set by its three part test, which, in turn, has the effect of lowering the members' balance billing liability – the express goal of PPACA, all as we outlined earlier in this opinion in discussing in detail the Clarification Regulation.

We also emphasize that the Clarification Regulation is quite explicit that the GOT Rule is a minimum amount, like the PBM regulation analyzed by the Supreme Court in *Rutledge* – the Departments used the word "floor" and "minimum" payment to describe it. It is, as Baptist notes, a "reasonable floor rate" and does not preclude finding that other amounts are reasonable. Cigna itself in effect acknowledges the function of the GOT Rule through its conduct. It sets the GOT Rule as the absolute minimum that must be paid as a matter of law, and adjusts this rate upward in some cases ███████████████████████████████████████████████████████████████ We also agree with Baptist that to the extent the Clarification Regulation addressed only the ability of states to increase amounts in connection with plans regulated by state insurance, the *Rutledge* decision supersedes this limitation.

**[spaces intentionally included]**

89

## V. Conclusion

For the reasons stated above, the Panel makes this Partial Final Award as follows:

1. Baptist's request ▮ for relief based upon Count ▮▮▮▮▮▮▮▮ IV (denial of benefits under ERISA, including but not limited to any requests for relief based upon Cigna's calculations pursuant to the GOT Rule) are DENIED;
2. Baptist's request for a finding that Cigna is liable to it based upon Count II (quantum meruit) is GRANTED as limited by this Partial Final Award; and
3. The Panel will conduct further proceedings consistent with this Partial Final Award, including (a) determination of the reasonable value of the services provided pursuant to the Panel's ruling in (2) above; and (b) considering and deciding any additional issues the Panel determines are appropriate after consultation with the parties.

SO ORDERED this 7th day of September, 2022

Joseph J. Farnan, Jr.

Michael J. Schless

Conna A. Weiner, Panel Chair

90

# TAB 010E

ELECTRONICALLY FILED
2023 Aug 18 1:25 PM
CLERK OF COURT - CHANCERY

# **<u>EXHIBIT D</u>**

\*\* Pursuant to the Court's Protective Order Entered on June 06, 2023, Baptist Memorial Health Care Corporation Filed **Exhibit D** Under Seal and Submitted a Hard Copy of Exhibit D to the Court \*\*

# TAB 010F

ELECTRONICALLY FILED
2023 Aug 18 1:29 PM
CLERK OF COURT - CHANCERY

**IN THE CHANCERY COURT FOR SHELBY COUNTY, TENNESSEE FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS**

| | | |
|---|---|---|
| **CIGNA HEALTHCARE OF TENNESSEE INC.,** | ) | |
| | ) | |
| **Petitioner / Counter-Respondent,** | ) | |
| | ) | **Case No. CH-22-1654** |
| **v.** | ) | **Hon. Melanie Taylor Jefferson** |
| | ) | |
| **BAPTIST MEMORIAL HEALTH CARE CORPORATION,** | ) | |
| | ) | |
| **Respondent / Counter-Petitioner.** | ) | |

<u>**NOTICE OF FILING EXHIBIT UNDER SEAL**</u>

Respondent / Counter-Petitioner, Baptist Memorial Health Care Corporation ("Baptist"), hereby notifies the Court that, pursuant to the Court's Protective Order entered on June 06, 2023, it is filing under seal the Arbitration Panel's Phase 3(a) Partial Final Award as **Exhibit D** to Baptist's Counter-Petition to Confirm Arbitration Awards and Enter Judgment ("Motion to Confirm"), filed contemporaneously herewith. Due to the highly confidential nature of the award, a hard copy of Exhibit D is being delivered to Part I by courier as opposed to being filed electronically.

Respectfully submitted,

**POLSINELLI PC**

*/s/ David A. King*

David A. King (BPR 011559)
N. Adam Dietrich II (BPR 031093)
Samantha Flener (BPR 038282)
401 Commerce Street, Suite 900
Nashville, Tennessee 37219
dking@polsinelli.com
adietrich@polsinelli.com
sflener@polsinelli.com
615-259-1510

**HARRIS | SHELTON**

*/s/ Christopher S. Campbell (w/p by DAK)*

Christopher S. Campbell (BPR 019061)
6060 Primacy Parkway, Suite 100
Memphis, Tennessee 37118
ccampbell@harrisshelton.com
901-525-1455

*Attorneys for Counter-Petitioner*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served on this 18th day of August, 2023, to the following via email and the Court's docketing system:

Odell Horton, Jr.
Andrew J. Pulliam
WYATT, TARRANT & COMBS, LLP
6070 Poplar Avenue, Suite 300
Memphis, TN 38119
ohorton@wyattfirm.com
apulliam@wyattfirm.com

John J. Hamill
Pamela Begaj Loutos
DLA PIPER LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606
john.hamill@dlapiper.com
pamela.loutos@dlapiper.com

*Counsel for Counter-Respondent*

*/s/ David A. King*

# TAB 011

## IN THE CHANCERY COURT FOR SHELBY COUNTY, TENNESSEE FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

| | | |
|---|---|---|
| **CIGNA HEALTHCARE OF TENNESSEE INC.,** | ) | |
| | ) | |
| **Petitioner / Counter-Respondent,** | ) | |
| | ) | **Case No. <u>CH-22-1654</u>** |
| **v.** | ) | |
| | ) | |
| **BAPTIST MEMORIAL HEALTHCARE CORPORATION,** | ) | |
| | ) | |
| **Respondent / Counter-Petitioner.** | ) | |

### <u>BAPTIST'S MOTION TO SET DISPOSITIVE HEARING</u>

Respondent / Counter-Petitioner, Baptist Memorial Healthcare Corporation ("Baptist"), pursuant to the Federal Arbitration Act ("FAA") and the Local Rules of this Court, moves to set for dispositive hearing Baptist's Motion to Confirm Arbitration Award ("Motion to Confirm") and Cigna's Amended Petition to Modify or Vacate, in Part, "Partial Final Award" in Arbitration ("Motion to Vacate").  In support of this motion, Baptist shows the Court as follows:

(1)     The parties are involved in a confidential arbitration involving phased proceedings, which have yielded two partial final awards to date. The first Partial Final Award for Phases I and II was delivered on September 7, 2022 ("Award I") and the second Partial Final Award for Phase 3(a) was delivered on July 11, 2023 ("Award II"). These awards have been filed with this Court.

(2)     On December 6, 2022, Cigna filed a petition in this Court to modify or vacate Award I. On June 13, 2023, Cigna filed its Amended Petition to Modify or Vacate Award I.

(3)     On August 18,2023, Baptist filed its Motion to Confirm both Award I and Award II.

(4)     Pursuant to the parties' arbitration agreement, court actions relating to the Panel's awards are governed by the FAA. The FAA provides that petitions to confirm, vacate, or modify awards "shall be made and heard in the manner provided by law for the making and hearing of motions." 9 U.S.C. § 6.  Under the FAA, applications filed in court are expected to get "'streamlined treatment' – a kind of 'expedited review.'" *Badgerow v. Walters*, 142 S.Ct. 1310, 1320 (2022).

(5)     These motions are now ripe for final briefing and oral argument.

(6)     The undersigned counsel certify that they have conferred with opposing counsel about Baptist's plan to ask the court to set this matter for dispositive hearing.

THEREFORE, Baptist moves the Court to set a briefing schedule and dispositive hearing date as soon as possible.  Baptist suggests the following briefing schedule:

    a.     **Twenty-one days before the hearing:**

        i.     Baptist shall file a combined response to Cigna's Motion to Vacate and a Memorandum in Support of its Motion to Confirm.

    b.     **Fourteen days before the hearing:**

        i.     Cigna shall file a response to Baptist's Memorandum in Support of its Motion to Confirm and may file a reply to Baptist's response to Cigna's Motion to Vacate.

    c.     **Seven days before the hearing**:

        i.     Baptist may file a reply to Cigna's response to Baptist's Memorandum in Support of its Motion to Confirm.

## <u>NOTICE OF HEARING</u>

This motion is expected to be heard on the Court's regular motion docket on Friday, September 8, 2023, at 9:00 a.m.

Respectfully submitted,

**HARRIS | SHELTON**

*/s/ Christopher S. Campbell*
Christopher S. Campbell (BPR 019061) 6060
Primacy Parkway, Suite 100
Memphis, Tennessee 37118
ccampbell@harrisshelton.com
901-525-1455

**POLSINELLI PC**

*/s/ David A. King*
David A. King (BPR 011559)
N. Adam Dietrich II (BPR 031093)
Samantha Flener (BPR 038282)
401 Commerce Street, Suite 900
Nashville, Tennessee 37219
dking@polsinelli.com
adietrich@polsinelli.com
sflener@polsinelli.com
615-259-1510

*Attorneys for Respondent/ Counter-Petitioner*

3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served on this August 30, 2023, to the following via email and the Court's docketing system:

Odell Horton, Jr.
Andrew J. Pulliam
WYATT, TARRANT & COMBS, LLP
6070 Poplar Avenue, Suite 300
Memphis, TN 38119
ohorton@wyattfirm.com apulliam@wyattfirm.com

John J. Hamill
Pamela Begaj Loutos
DLA PIPER LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606
john.hamill@dlapiper.com
pamela.loutos@dlapiper.com

*Counsel for Petitioner/ Counter-Respondent*

91060841.1